No. 26-1699

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

*v.*

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Acting Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Acting Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts (Sorokin, J.) in No. 1:25-cv-13829-LTS

## PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

*(Counsel listed on inside cover)*

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
GERARD J. CEDRONE
  *Deputy State Solicitor*
MICHELLE R. PASCUCCI
NITA K. KLUNDER
  *State Trial Counsels*
JULIA S. CANNEY
  *Assistant Attorney General*
COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

June 25, 2026

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*
JULIE VEROFF
  *Deputy Solicitor General*
MARISSA MALOUFF
JAMES E. STANLEY
  *Supervising Deputy Attorneys General*
DENISE LEVEY
LORRAINE LOPEZ
JEANELLY OROZCO ALCALÁ
JAMES E. RICHARDSON
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov

*Attorneys for the State of California*

*(Additional counsel listed in signature block)*

**TABLE OF CONTENTS**

**Page**

Introduction ................................................................................... 1

Statement of the case .................................................................... 3

Argument ....................................................................................... 5

    I.      Defendants are unlikely to succeed on the merits .................... 5

          A.    Defendants unlawfully imposed a tax without congressional approval ...................................................... 5

          B.    The $100,000 tax is judicially reviewable on ultra vires grounds and under the APA ................................. 13

    II.     The equities disfavor a stay ..................................................... 20

Conclusion .................................................................................... 23

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Agatha v. Trump*
151 F.4th 9 (1st Cir. 2025)................................................................18

*Biden v. Texas*
597 U.S. 785 (2022)...........................................................................17

*Chamber of Commerce v. DHS*
815 F. Supp. 3d 73 (D.D.C. 2025).....................................................6

*Chi. & N.W. Transp. Co. v. Webster Cnty. Bd. of Sup'rs*
71 F.3d 265 (8th Cir. 1995) ..............................................................11

*Common Cause R.I. v. Gorbea*
970 F.3d 11 (1st Cir. 2020)...............................................................20

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
603 U.S. 799 (2024)...........................................................................19

*Dalton v. Specter*
511 U.S. 462 (1994)................................................................14, 15, 16

*DHS v. Regents of Univ. of Cal.*
591 U.S. 1 (2020)................................................................................18

*Edye v. Robertson*
112 U.S. 580 (1884)..................................................................2, 10, 11

*Enwonwu v. Gonzales*
438 F.3d 22 (1st Cir. 2006)................................................................12

*FCC v. Consumers' Rsch.*
606 U.S. 656 (2025)...........................................................................10

*Federal Energy Administration v. Algonquin SNG*
426 U.S. 548 (1976).............................................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
561 U.S. 477 (2010)..................................................................14

*Galvan v. Press*
347 U.S. 522 (1954)..................................................................12

*Garland v. Cargill*
602 U.S. 406 (2024)..................................................................18

*Global Health Council v. Trump*
153 F.4th 1 (D.C. Cir. 2025)......................................................16

*Illinois v. Trump*
155 F.4th 929 (7th Cir. 2025) ....................................................15

*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016).......................................................22

*Learning Res., Inc. v. Trump*
607 U.S. 229 (2026)....................................1, 2, 5, 6, 7, 8, 9, 10, 13, 15, 22

*Merrion v. Jicarilla Apache Tribe*
455 U.S. 130 (1982)..................................................................12

*Murphy Co. v. Biden*
65 F.4th 1122 (9th Cir. 2023) ....................................................16

*New York v. Kennedy*
789 F. Supp. 3d 174 (D.R.I. 2025) ........................................8, 20

*New York v. Trump*
133 F.4th 51 (1st Cir. 2025)......................................................17

*NFIB v. Sibelius*
567 U.S. 519 (2012)...........................................................2, 11, 12

*Nken v. Holder*
556 U.S. 418 (2009)...............................................................2, 5

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Nuclear Regul. Comm'n v. Texas*
605 U.S. 665 (2025)................................................................17

*Pacito v. Trump*
169 F.4th 895 (9th Cir. 2026) .................................................12

*RoDa Drilling Co. v. Siegal*
552 F.3d 1203 (10th Cir. 2009) ..............................................22

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) ................................................20

*Russo v. United States*
464 U.S. 16 (1983)....................................................................9

*San Juan Cellular Tel. Co. v. Pub. Serv. Com'n of P.R.*
967 F.2d 683 (1st Cir. 1992)...................................................11

*Skinner v. Mid-Am. Pipeline Co.*
490 U.S. 212 (1989)................................1, 2, 5, 9, 10, 11, 13

*State v. Su*
121 F.4th 1 (9th Cir. 2024) ...............................................17, 18

*Sustainability Institute v. Trump*
165 F.4th 817 (4th Cir. 2026) .................................................16

*Transamerica Mortg. Advisors, Inc. v. Lewis*
444 U.S. 11 (1979)....................................................................6

*Trump v. Hawaii*
585 U.S. 667 (2018)..................................................................8

*Trump v. Illinois*
146 S. Ct. 432 (2025)..............................................................15

*Trump v. Orr*
146 S. Ct. 44 (2025)................................................................18

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
  578 U.S. 590 (2016)......................................................17

*United States ex rel. Knauff v. Shaughnessy*
  338 U.S. 537 (1950)..................................................12, 13

*United States v. Kahriger*
  345 U.S. 22 (1953)......................................................12

*Washington v. Trump*
  814 F. Supp. 3d 1173 (W.D. Wash. 2026) ...................................17

*Wickard v. Filburn*
  317 U.S. 111 (1942)......................................................13

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952)..............................................14, 15, 16, 22

CONSTITUTIONAL PROVISIONS

United States Constitution
  Art. I, § 8, cl. 1 .......................................................15
  Art. I, § 8, cl. 15 ......................................................15

STATUTES AND REGULATIONS

Code of Federal Regulations, Title 8
  § 106.4...................................................................4

Immigration Act of 1882, ch. 376, 22 Stat. 214 (1882)......................3

Immigration Act of 1903, ch. 1012, 162 Stat. 1213 (1903)...................3

Immigration Act of 1907, ch. 1134, 34 Stat. 898 (1907)....................3

Immigration and Nationality Act, ch. 477, 66 Stat. 163 (1952) .............4

v

# TABLE OF AUTHORITIES
## (continued)

Page

Pub. L. No. 114-113, § 402(g), 129 Stat. 2242 (2016)......................................4

United States Code, Title 5
§ 704........................................................................................................17
§ 706(2)(A) .......................................................................................17, 19

United States Code, Title 8
§ 1101(a)(15)(H)(i)(b) ..............................................................................4
§ 1182........................................................................................................21
§ 1182(f)........................................................................1, 2, 6, 8, 9, 16, 18
§ 1184(c)(9)(A)-(C) ...................................................................................4
§ 1184(c)(12)(A)-(C) .................................................................................4
§ 1185(a) .......................................................................1, 2, 6, 8, 9, 16, 18
§ 1351.........................................................................................................4
§ 1356(m).....................................................................................................4
§ 1356(u)(3) ................................................................................................4

United States Code, Title 12
§ 1828a.........................................................................................................7

United States Code, Title 21
§ 387f(d)(1) .................................................................................................7

United States Code, Title 44
§ 2108(a) .....................................................................................................7

**OTHER AUTHORITIES**

41 Cong. Rec. 2802 (1907)..........................................................................11

90 Fed. Reg. 46027 (Sep. 24, 2025) .........................................................4, 19

Gibson et al., Cong. Rsch. Serv. LSB10458, *Presidential
Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)*
(Feb. 21, 2024), https://www.congress.gov/crs-
product/LSB10458.......................................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

H.R. Rep. No. 59-5072 (1907)...........................................................................11

*Restriction*, Black's Law Dictionary (12th ed. 2024)..........................................6

## INTRODUCTION

The H-1B visa program has long allowed American employers to hire nonimmigrant workers for specialty occupations. The twenty plaintiff States have relied on that program to address worker shortages and fill critical roles in schools, hospitals, and research institutions that provide essential public services. In September 2025, the President upended plaintiffs' reliance on the H-1B program by imposing a tax of $100,000 on new petitions for H-1B visas.

Under our Constitution, however, "Congress alone" has "access to the pockets of the people." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 241 (2026) (internal quotation marks omitted). To protect that congressional prerogative—"the most important of the authorities . . . conferred upon the Union," *id.* at 240 (quoting The Federalist No. 33 (A. Hamilton))—courts do not lightly infer that Congress has "delegate[d] to the Executive" the power to levy taxes, *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). Instead, "Congress must indicate clearly its intention" to do so. *Id.* Applying that longstanding principle, the district court correctly held that defendants' H-1B tax is unlawful and must be vacated.

The statutory provisions defendants invoke—Sections 212(f) and 215(a) of the Immigration and Nationality Act—authorize "restrictions" on the "entry of aliens," as well as related "rules, regulations, and orders." But nowhere do they refer to taxes, fees, or other types of monetary exactions. Elsewhere, Congress

1

carefully prescribed the fees that the Executive may lawfully impose in connection with H-1B visas. And at no point in history has the President invoked Sections 212(f) or 215(a) to impose a tax or fee. "[T]he fact that no President has ever found such power . . . is strong evidence that it does not exist." *Learning Res.*, 607 U.S. at 250.

In seeking a stay, defendants make little effort to show that Sections 212(f) and 215(a) "clearly" empower the Executive to levy taxes. *Skinner*, 490 U.S. at 224. Instead, they primarily argue that the $100,000 payment is not a "tax." They also assert that plaintiffs lack a cause of action to redress the substantial harms of the President's unprecedented new exaction, which include teacher shortages, Dkt. 88-3, inadequate "medical care to vulnerable populations," Dkt. 88-33 ¶ 20, and cuts to "specialized instruction and research," Dkt. 88-7 ¶ 21.

Defendants' arguments lack merit, and certainly do not make out the "strong showing" necessary to justify a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009). The required $100,000 payment is a tax. It "raise[s] revenue," "the defining feature of a tax." *Learning Res.*, 607 U.S. at 241 (internal quotation marks omitted). And unlike fees and other charges that the Supreme Court has sometimes declined to treat as taxes, the $100,000 payment here does not merely "'defray the expenses of regulat[ion],'" *Edye v. Robertson*, 112 U.S. 580, 590 (1884), or impose "punishment for an unlawful act," *NFIB v. Sibelius*, 567 U.S.

2

519, 567 (2012). The tax challenged here is also no different from other taxes—and many other executive actions—reviewed by courts through ultra vires actions or under the Administrative Procedure Act. Where executive officials take action unauthorized by statute, and without inherent constitutional authority, the judiciary may hold those officials accountable.

Defendants' contrary arguments would make it all too easy for the Executive to usurp powers entrusted to Congress and insulate those actions from judicial review. Indeed, defendants' arguments would give the President virtually unchecked authority to extract fees of any amount, whenever he wishes, from whomever he wishes, to spend however he wishes, so long as he asserted some nominal connection to the entry of foreign nationals. To preserve our Constitution's separation of powers and prevent irreparable harm to state research institutions, hospitals, and schools, as well as patients, doctors, nurses, teachers, and students—to say nothing of the broader business community—the Court should deny the requested stay.

## STATEMENT OF THE CASE

For well over a century, Congress has carefully calibrated immigration-related taxes and fees. Prior to the INA, for example, Congress set "head taxes" on entry of noncitizens. *E.g.*, 22 Stat. 214 (1882) ("fifty cents"); 162 Stat. 1213 (1903) ("two dollars"); 34 Stat. 898 (1907) ("four dollars"). Congress later created

3

a detailed "schedule of fees" related to entry and visas.  66 Stat. 163, 230-231, 279 (1952).  Among the fees that Congress has prescribed are those related to the H-1B program, which allows an employer to petition to hire a nonimmigrant worker in a "specialty occupation."  8 U.S.C. § 1101(a)(15)(H)(i)(b).  Such fees include a $500 fraud-prevention fee, *id.* § 1184(c)(12)(A)-(C); a $1,500 filing fee, *id.* § 1184(c)(9)(A)-(C); a $4,000 fee on employers if more than 50% of their employees have H-1B visas, 129 Stat. 2242, 3006 (2016); and a $2,965 "premium" processing fee for expedited services, 8 U.S.C. § 1356(u)(3); 8 C.F.R. § 106.4. The INA also delegates to the Department of Homeland Security authority to set fees to "ensure recovery of the full costs of providing" visa-related services. 8 U.S.C. § 1356(m); *see id.* § 1351 (similar for Secretary of State).

On September 19, 2025, President Trump issued a proclamation directing executive officials to impose a $100,000 exaction on H-1B visa petitions.  90 Fed. Reg. 46027 (Sep. 24, 2025).  The Department of State and DHS, including U.S. Citizenship and Immigration Services, then published memoranda and guidance to establish how the proclamation would be applied.  Dkt. 106 at 6-7 (Order).  For example, USCIS clarified that the fee applies to "new H-1B petitions filed . . . on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa."  Dkt. 84-3 at 7.  USCIS also explained that it would grant

4

"[e]xceptions" to the $100,000 exaction only in "extraordinarily rare circumstances." *Id.* at 8.

Twenty States sued, alleging that defendants' implementing actions are ultra vires and unlawful under the APA. Dkt. 1 at 59-67. Granting summary judgment to plaintiffs, the district court declared the challenged actions unlawful and vacated them under the APA. Order 42. In light of that ruling, the court concluded that a permanent injunction was "not necessary." *Id.* at 41. The court also denied defendants' motion for a stay but granted an administrative stay pending resolution of the instant motion. Dkt. 113.

## ARGUMENT

To obtain a stay, defendants must make "a strong showing" that they are "likely to succeed" and that the equities favor a stay. *Nken*, 556 U.S. at 426. Defendants have not made either showing.

## I. DEFENDANTS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A. Defendants Unlawfully Imposed a Tax Without Congressional Approval

"Congress alone" has the "unique[ly] importan[t]" authority to impose taxes. *Learning Res.*, 607 U.S. at 241, 248 (internal quotation marks omitted). Accordingly, Congress must "indicate clearly" that it intends to delegate that power. *Skinner*, 490 U.S. at 224; *see Learning Res.*, 607 U.S. at 243 (plurality) (delegation of "core congressional power of the purse" must be "'clear[]'").

5

Neither of the INA provisions invoked by defendants provides such "clear congressional authorization." *Id.* at 255 (plurality).

1.  The first provision on which defendants rely, Section 212(f), authorizes the President to "suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate."  The second provision, Section 215(a), grants the President power to impose "reasonable rules, regulations, and orders," and "limitations and exceptions," on the entry of noncitizens.  Nowhere do those provisions authorize imposition of taxes.  Order 21 (citing *Restriction*, Black's Law Dictionary (12th ed. 2024)).  When Congress "wished to" authorize monetary exactions under the INA, "it knew how to do so and did so expressly." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 21 (1979) (internal quotation marks omitted).  Indeed, Congress has a long history of carefully calibrating fees under the INA, including for H-1B visas. *Supra* pp. 3-4.  And even though Presidents have invoked Section 212(f) approximately 100 times since 1981, they have not once used that authority to impose a monetary requirement. *See Chamber of Commerce v. DHS*, 815 F. Supp. 3d 73, 98 (D.D.C. 2025) ("defendants' counsel confirmed[] § 1182(f) has not been previously

6

invoked to restrict entry into the United States using monetary mechanisms"), *appeal filed*, No. 25-5473 (D.C. Cir. argued Mar. 9, 2026).[1]

In *Learning Resources*, the Supreme Court struck down certain taxes as ultra vires in similar circumstances. There, as here, Congress used language that did not clearly authorize taxation. 607 U.S. at 249. There, as here, Congress demonstrated that it knew how to delegate authority to impose a monetary exaction "in explicit terms" when it wished to do so. *Id.* at 243 (plurality); *see id.* at 248-249 (majority). There, as here, "no President [had] ever found . . . power" to impose taxes under the relevant statutory provision, providing "strong evidence that [such power] does not exist." *Id.* at 250. And there, as here, "the Government [failed to] identify any [other] statute" that authorizes "the power to tax" using the language invoked by the President—there, "regulate," here, "restrict"—even though many statutes use similar terms when delegating authority. *Id.* at 249; *see, e.g.*, 12 U.S.C. § 1828a; 21 U.S.C. § 387f(d)(1); 44 U.S.C. § 2108(a).

Much like in *Learning Resources*, moreover, defendants here assert a "broad, expansive power" that "Congress would not have delegated" without speaking clearly. 607 U.S. at 242-243 (plurality). Under defendants' view, for example, the President could impose a $1 million tax on American entities for each H-1B visa

---

[1] *See also* Gibson et al., Cong. Rsch. Serv. LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (Feb. 21, 2024), https://www.congress.gov/crs-product/LSB10458.

they seek or demand a business forfeit ten percent of its equity in exchange for an H-1B visa. Order 25 n.9. Or a President could selectively impose H-1B taxes to promote his domestic political agenda—*e.g.*, by imposing taxes only on renewable-energy companies or only on fossil-fuel companies. The President could also impose taxes on other types of visas, or on all noncitizens seeking entry. That would give the President remarkable coercive authority: as the Framers well understood, the power to tax is the "'power to destroy.'" *Learning Res.*, 607 U.S. at 638. Coupled with defendants' view of the appropriations power—which would give the President authority to spend from public coffers in any way he pleases without judicial review, *cf. New York v. Kennedy*, 789 F. Supp. 3d 174, 209 (D.R.I. 2025)—defendants' arguments here would provide a roadmap for the President to raise and spend money on anything he desires.

2. Defendants make only a limited attempt to argue that Sections 212(f) and 215(a) "clearly" authorize taxation. Mot. 13-14. They invoke *Trump v. Hawaii*, 585 U.S. 667 (2018), for the principle that the President has "sweeping" authority under those provisions. *See, e.g.*, Mot. 7-8. But the President's authority is only "sweeping" within a certain "sphere": "decid[ing] whether to suspend entry, whose entry to suspend, and for how long." *Hawaii*, 585 U.S. at 686, 693. For the reasons discussed above, there is no persuasive basis for concluding that the relevant "sphere" under Sections 212(f) and 215(a) includes taxes.

8

Defendants also invoke *Federal Energy Administration v. Algonquin SNG*, 426 U.S. 548 (1976). Mot. 12. But the Supreme Court recently "decline[d] to extend *Algonquin*'s expressly 'limited' holding any further." *Learning Res.*, 607 U.S. at 254. In *Algonquin*, it was "natural" to construe the relevant text— "adjust[ing] . . . imports"—to include duties because a subsection of the same statutory provision made "explicit reference to duties." *Learning Res.*, 607 U.S. at 254. The legislative history in *Algonquin* was also replete with references to duties. *See, e.g.*, 426 U.S. at 564, 567. Sections 212 and 215, by contrast, make no reference to taxes. Nor have defendants pointed to any legislative history suggesting Congress contemplated that Section 212(f) or 215(a) would be used to raise revenue. And contrary to defendants' assertion, Mot. 12-13, the express references to fees in *other* INA provisions, *see, e.g.*, *supra* pp. 3-4, strongly suggest that Congress did *not* intend for Sections 212(f) and 215(a) to serve that purpose. "[W]here Congress includes particular language in one section of a statute but omits it another," "it is generally presumed that Congress acts intentionally[.]" *Russo v. United States*, 464 U.S. 16, 23 (1983).

3. Defendants focus on arguments that the longstanding rule recognized in *Skinner*, 490 U.S. at 224—requiring a "clear" delegation of taxing power—is inapplicable. That matters, of course, only if "ordinary tools of statutory interpretation" do not resolve this case. *Learning Res.*, 607 U.S. at 304 (Kagan, J.,

9

concurring in part and concurring in the judgment).  For all the reasons discussed above, defendants are unlikely to succeed on "straight-up statutory construction" grounds, *id.* at 310, even setting aside *Skinner*'s clear-statement rule.

In any case, defendants' efforts to cast aside *Skinner* are flawed.  Defendants point, for example, to the Supreme Court's rejection of a "'special nondelegation rule for revenue-raising legislation.'"  Mot. 13 (quoting *FCC v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025)).  But the question here is not whether Congress delegated its taxing authority in a constitutionally permissible way.  606 U.S. at 674.  The question is whether Congress intended to delegate taxing power *in the first place*.  That question is subject to *Skinner*'s requirement that Congress act "clearly."

Defendants also contend that *Skinner* is inapplicable because the $100,000 exaction is not a "tax" pursuant to delegated taxing power.  Mot. 8.  But defendants ignore the reasoning of their principal authority:  the 1884 ruling in *Edye*, 112 U.S. at 596, which treated a statutory fee of fifty cents imposed on each arriving foreign passenger as an exercise of Congress's Commerce Clause authority, and not its taxing power.  The Court reasoned that the fee was merely "a charge for services rendered" and the proceeds were earmarked for specific governmental costs—"temporary care of the [arriving] passengers"—rather than "general support of the

10

government." *Id.* at 596.[2] *Edye* thus "stand[s] for the proposition that a government levy is a tax if it raises revenue to spend for the general public welfare." *Chi. & N.W. Transp. Co. v. Webster Cnty. Bd. of Sup'rs*, 71 F.3d 265, 267 (8th Cir. 1995); *see San Juan Cellular Tel. Co. v. Pub. Serv. Com'n of P.R.*, 967 F.2d 683, 685-686 (1st Cir. 1992) (similar).  That is exactly what the $100,000 exaction does here:  defendants have conceded that the payments are placed into "the General Fund of the U.S. Treasury," Dkt. 93-12 ¶ 7, and do not "cover costs," Dkt. 93 at 22.  In any event, *Skinner*'s "clear[ ]" delegation requirement does not turn on whether the exaction is best "characterized as [a] 'fee[ ]' or 'tax[ ].'"  490 U.S. at 224.  The only exception under *Skinner* is for costs "inuring directly to the benefit of [the] regulated part[y]," *id.*—which is plainly not the case here.

Defendants' stay motion appears to abandon any argument that the $100,000 exaction is a "penalty."  *Compare* Mot. 10-11, *with* Dkt. 93 at 23, *and* Dkt. 112 at 9-10.  That is for good reason:  "'if the concept of penalty means anything, it means punishment for an unlawful act or omission.'"  *NFIB*, 567 U.S. at 567.  Petitioning for an H-1B visa is not "unlawful."  And although the $100,000 exaction's purported purpose is to discourage employers from hiring foreign

---

[2] When Congress later raised the fee to $4 and projected that it would generate surplus revenue for the general treasury, *see* 41 Cong. Rec. 2802, 2810 (1907) (Sen. Dillingham), Congress understood that it would constitute a "tax," *see* H.R. Rep. No. 59-5072, at 16-17 (1907) (Conf. Rep.).

11

workers, *see* Mot. 11, "taxes that seek to influence conduct"—such as tariffs and cigarette taxes—"are nothing new." *NFIB*, 567 U.S. at 567; *see, e.g.*, *United States v. Kahriger*, 345 U.S. 22, 28 (1953). Nor would the analysis change if the $100,000 exaction has produced just $8.5 million to date. Dkt. 93-11 ¶¶ 3-6. A tax need only "produce[] at least *some* revenue for the Government." *NFIB*, 567 U.S. at 564 (emphasis added).

Defendants also invoke what they call the President's "inherent executive power to exclude aliens." Mot. 9. But "the formulation" of "[p]olicies pertaining to the entry of aliens . . . is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954). The two cases cited by defendants do not establish otherwise—let alone that the Executive could impose a tax without congressional authorization. In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), the Court addressed an Indian tribe's inherent powers, not the separation-of-powers question here. And in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950), the Court recognized Congress's authority to "place[] . . . the decision to admit or exclude" a noncitizen "with the President."[3] Although *Knauff* also briefly observed that Congress and the Executive share certain powers over admission and exclusion, *see id.* at 542-543, any such powers are immaterial here.

---

[3] *See also, e.g.*, *Enwonwu v. Gonzales*, 438 F.3d 22, 30 (1st Cir. 2006); *Pacito v. Trump*, 169 F.4th 895, 909 (9th Cir. 2026).

Just as the power to prohibit or compel imports does not encompass power to levy tariffs, *see Learning Res.*, 607 U.S. at 251 (rejecting "greater-includes-the-lesser argument"), any authority to suspend or restrict entry would not include the power to levy taxes on entry. The power to tax is "different in kind, not degree." *Id.* at 252.

Finally, defendants suggest (Mot. 10) that *Skinner*'s requirement of a "clear[]" delegation is inapplicable to the extent a tax is supported by multiple sources of constitutional authority. But the Supreme Court rejected a similar argument in *Learning Resources*. 607 U.S. at 251. If accepted, that argument would effectively render *Skinner* a dead letter. Given the broad scope of Congress' power under the Commerce Clause, *see, e.g.*, *Wickard v. Filburn*, 317 U.S. 111 (1942), a tax could almost always be at least partially justified under the commerce power. Defendants' proposal would thus provide a roadmap for this President and future administrations to discover new sources of taxing authority in ambiguous delegations, thereby allowing the President to siphon revenue from the People in ways that Congress never intended.

### B.   The $100,000 Tax Is Judicially Reviewable on Ultra Vires Grounds and Under the APA

Defendants do not contest plaintiffs' standing to challenge the $100,000 tax. But they nonetheless argue that review is precluded because plaintiffs lack a cause

13

of action.  Mot. 14-16.  That is incorrect.  Plaintiffs can proceed on either ultra vires grounds or under the APA.  Either is sufficient to provide a cause of action.

1.  As the Supreme Court has repeatedly recognized, there is no need for an express cause of action to seek equitable relief challenging unconstitutional actions by executive officials.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).  *Youngstown* is illustrative:  owners of steel mills argued that President Truman's seizure of steel mills was ultra vires on separation-of-powers grounds because it was "not authorized by an act of Congress or by any constitutional provisions."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583 (1952).  Here, plaintiffs similarly argue that defendants have no inherent constitutional authority to impose taxes and that Congress has not empowered the Executive to adopt the new $100,000 tax.  *Supra* pp. 3-13.

To be sure, not "every action by . . . [an] executive official, in excess of . . . statutory authority is *ipso facto* in violation of the Constitution."  *Dalton v. Specter*, 511 U.S. 462, 472 (1994).  But where the Executive lacks inherent constitutional authority, executive officials may validly act *only* if authorized by statute.  In those circumstances, the absence of statutory authority renders executive action contrary to our system of separation of powers—and thus judicially reviewable on constitutional grounds.

14

Two recent decisions support this understanding.  In *Learning Resources*, 607 U.S. at 635, the Supreme Court reviewed the legality of tariffs adopted by the President under a statute (IEEPA), and in *Trump v. Illinois*, 146 S. Ct. 432 (2025), the Court addressed the President's statutory authority to federalize the National Guard.  In neither case did the Court identify a statute expressly conferring a cause of action to challenge those presidential decisions.[4]  And in both, the validity of the President's actions turned on whether a statute had conferred power upon the Executive because Congress alone possessed the relevant constitutional authority: in *Learning Resources*, the power to tax, and in *Illinois*, the power to federalize a state militia.  *See* U.S. Const., art. I, § 8, cl. 1, 15.

Invoking language in *Dalton*, defendants distinguish between cases involving "the conceded absence of any statutory authority," such as *Youngstown*, and those where the President acted "in excess of such authority."  511 U.S. at 473 (emphases omitted).  Defendants argue that only the former can be challenged as unconstitutional on separation-of-powers grounds.  Mot. 14-15.  That view, however, is difficult to square with *Learning Resources* and *Illinois*, which reviewed claims that the President acted in excess of statutory authority.  Although

---

[4] *See V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-66, Dkt. 2 at 16-18 (C.I.T. Apr. 14, 2025) (pleading excess of statutory authority without pointing to any express cause of action); *Illinois v. Trump*, 155 F.4th 929, 937 (7th Cir. 2025) (distinguishing *Dalton* and treating challenge to President's exercise of statutory authority as judicially reviewable).

15

*Dalton* described *Youngstown* as a case "involv[ing] the conceded *absence* of *any* statutory authority*," 511 U.S. at 473, it did not hold that ultra vires actions are available *only* in those circumstances.  Construing *Dalton* in that way would make it trivially easy for the Executive to evade judicial review of separation-of-powers challenges.  In *Youngstown*, for example, all the President would have needed to do to insulate his steel seizure from judicial review would have been to present an argument—however flawed—that a statute authorized the seizure.  *Cf. Youngstown*, 343 U.S. at 702-703 (Vinson, C.J., dissenting).  The availability of judicial review should not turn on such a minor technicality.  *See Global Health Council v. Trump*, 153 F.4th 1, 40-44 (D.C. Cir. 2025) (Pan, J., dissenting).[5]

But even if plaintiffs' challenge here were based on statutory grounds alone, ultra vires review would still be available.  Claims that executive officials have acted "beyond delegated statutory authority" "are reviewable," *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023), so long as review is not precluded by

---

[5] The out-of-circuit decisions in *Global Health* and *Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026), do not foreclose review of claims like those at issue here.  *Contra* Mot. 14-15.  *Global Health* acknowledged that separation-of-powers claims are reviewable where—as here, *supra* pp. 3-13—"the presidential action at issue was not 'even contemplated by Congress.'"  153 F.4th at 15.  And the claims in both *Global Health* and *Sustainability Institute* necessarily turned on statutory questions.  *See, e.g.*, 165 F.4th at 832.  Here, by contrast, plaintiffs' constitutional challenge would be the same even if defendants had never invoked Sections 212(f) and 215(a):  plaintiffs would still be arguing that the President cannot impose a tax without congressional authorization.

statute.  For example, in *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025), the Supreme Court held that the Hobbs Act expressly precluded review of an ultra vires action.  *See, e.g.*, Order 15, 17 & nn. 4, 6; *Washington v. Trump*, 814 F. Supp. 3d 1173, 1211 & n.49 (W.D. Wash. 2026).  Defendants identify no comparable bar to review here.

2.  Plaintiffs also have a cause of action under the APA.  Defendants' steps to implement the President's proclamation constitute "final agency action," 5 U.S.C. § 704, "not in accordance with law," *id.* § 706(2)(A).  Nothing about those actions is "merely tentative or interlocutory."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  Additionally, "legal consequences . . . flow" from those actions, *id.*, because they clarify who must pay the tax, how it is paid, and what is necessary for an exception.  *See, e.g.*, *infra* p. 19 n.6.  Defendants' memoranda and guidance materials also "'bound [agency] staff,'" "obligat[ing]" them to implement the $100,000 tax in a prescribed manner.  *Biden v. Texas*, 597 U.S. 785, 808 & n.7 (2022).

Defendants assert their actions are immune from APA review because they "simply implement[]" a presidential directive.  Mot. 16.  But the "plain language of the APA" covers all final agency actions, including those that implement presidential directives.  *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025).  Courts thus commonly invoke the

17

APA to review agency actions that implement signature presidential policies.  *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406 (2024); *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020).  On defendants' view, the President could "insulate any desired rulemaking from judicial review with the single stroke of an executive pen."  *Su,* 121 F.4th at 15.  Nothing in the APA supports that "shocking[]" result, which defies "fundamental principles of administrative law."  *Id.*

Defendants also emphasize that Sections 212(f) and 215(a) delegate authority "to the President directly."  Mot. 16.  Nothing in the APA's text, however, provides an exception for agency actions that carry out delegations to the President.  Indeed, this Court has already recognized that defendants' theory is not supported by "any decision from the U.S. Supreme Court or any federal court of appeals."  *Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025), *granting stay on other grounds*, *Trump v. Orr*, 146 S. Ct. 44 (2025).  Defendants also provide no sensible reason to think Congress intended to insulate agency implementation of presidential directives from APA review merely because it used the words "the President" in Sections 212(f) and 215(a).  Nor do defendants show that the challenged agency actions merely carried out the President's instructions in

18

"ministerial" fashion. Mot. 2. Defendants clarified and filled out the details of the presidential proclamation in multiple material ways. *Supra* pp. 4-5.[6]

Those efforts to flesh out the proclamation not only undermine defendants' assertion that "Plaintiffs' claims are an impermissible challenge to the Proclamation itself," Mot. 17; they also undercut defendants' claim that the APA's arbitrary-and-capricious and notice-and-comment requirements would be "meaningless," *id.* at 2. As the district court recognized, *see* Order 30-36, and as plaintiffs have explained in detail, *see* Dkt. 87 at 18-22, those APA requirements serve the important purpose of ensuring that defendants exercised their discretion to implement the proclamation in an informed, reasonable manner. For that reason, and because defendants' actions were not "in accordance with law," 5 U.S.C. § 706(2)(A); *supra* pp. 3-13, the district court properly vacated them. Order 37 (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring)).

---

[6] For example, defendants' implementing actions clarified the specific categories of H-1B workers covered by the proclamation. Dkt. 84-3 at 3-5. Separately, the proclamation gave DHS authority to waive the $100,00 payment, including on a categorical basis for "all [noncitizens] working in an industry." 90 Fed. Reg. 46027. Yet defendants subsequently explained that "exceptions" would be granted only on an individualized basis in "extraordinarily rare circumstances." Dkt. 84-3 at 7.

## II.    THE EQUITIES DISFAVOR A STAY

On the equities, defendants' principal contention is that "[t]he Government suffers irreparable harm when it is 'enjoined by a court from effectuating statutes.'"  Mot. 19.  But defendants "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see New York*, 133 F.4th at 71.  And in the H-1B program's nearly four-decade history, the federal government has never attempted to extract a $100,000 levy or anything remotely similar.  It has not demonstrated an urgent need for implementation of this unprecedented tax while the appeal proceeds.

Defendants' suggestion that a stay is warranted to avoid "'[t]he large-scale replacement of American workers'" and "'suppress[ed] wages'" lacks merit.  Mot. 19-20.  Defendants point to no record support for their assertions; they merely speculate that "some employers may rush to file" petitions unless a stay is granted.  Dkt. 112-2 ¶¶ 5-7 (cited at Mot. 20).  But assertions of irreparable harm must be substantiated as "a matter of fact and reality," not conjecture.  *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020).  The record evidence that *does* exist contradicts defendants' assertions.  It shows that H-1B visas mitigate shortages of qualified domestic applicants in critical fields.  *E.g.*, Dkt. 88-3 ¶¶ 6-8; Dkt. 88-8 ¶ 10; Dkt. 88-10 ¶¶ 16-17.  And Congress has already addressed many of defendants' concerns by imposing minimum wage requirements for H-1B workers,

20

limiting such visas to a six-year period, and otherwise restricting the entry of inadmissible non-immigrants. *See* Order 2-3; 8 U.S.C. § 1182.

By contrast, a stay would irreparably harm plaintiffs and the public. As detailed in plaintiffs' numerous declarations, institutes of higher learning, K-12 schools, and public health systems—particularly in rural areas—will suffer substantial harms arising from their inability to fill crucial positions. Dkt. 87 at 8-10; *see, e.g.*, Dkt. 88-3 ¶¶ 7-10 (Arizona school in "small rural district" "unable to sponsor any petition," "likely result[ing] in vacancies for middle school, elementary, and specialist positions"); Dkt. 88-7 ¶ 21 (California educational institution "forced to halt the hiring" of faculty and researchers and "curtail specialized instruction and research"); Dkt. 88-33 ¶ 20(New York municipal health system "unable" to cover the fee without jeopardizing "its ability to provide medical care to vulnerable populations"); Dkt. 88-35 ¶¶ 15-17 (North Carolina school district "faces a significant teacher shortage due to its location in a very rural district" and "will not be able to pay").[7] These harms are not just "economic." *Contra* Mot. 21. Cutting a check at the end of this litigation would

---

[7] Other parties challenging the tax, including the Chamber of Commerce, have detailed harms to a broad array of commercial and business interests. Opening Br. 54-57, *Chamber of Commerce v. DHS*, No. 25-5473 (D.C. Cir. Jan. 6, 2026); Mot. for Prelim. Inj. 38-43, *Global Nurse Force v. Trump*, No. 25-8454 (N.D. Cal. Dec. 18, 2025), Dkt. 75.

21

not redress interim harms to students who do not learn or patients who do not receive healthcare—or to society more broadly from cuts to important research.[8]

There is also "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Indeed, our Nation has "discovered no technique for long preserving free government except that the Executive be under the law." *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). Consistent with that settled understanding, the Supreme Court recently rejected the President's assertion of "extraordinary power . . . to unilaterally impose" taxes "of unlimited amount, duration, and scope." *Learning Res.*, 607 U.S. at 255 (plurality). Defendants' assertion of that same "sweeping authority" (Mot. 1) here should be met with the same result.

---

[8] Defendants assert that "[t]he States' long delay" in bringing suit suggests they would not suffer harm from a stay. Mot. 21. But plaintiffs sued within two months of defendants' actions and promptly sought final judgment. Dkt. 1 ¶ 110. *Cf. RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) ("three-month delay in filing did not defeat a claim of irreparable injury").

## CONCLUSION

The motion for a stay pending appeal should be denied.

June 25, 2026                                    Respectfully Submitted,

**ANDREA JOY CAMPBELL**                          **ROB BONTA**
*Attorney General*                               *Attorney General*
Commonwealth of Massachusetts                    State of California

*/s/ Gerard J. Cedrone*                          By: */s/ Julie Veroff*
GERARD J. CEDRONE                                SAMUEL T. HARBOURT
*Deputy State Solicitor*                         *Solicitor General*
MICHELLE R. PASCUCCI                             HELEN H. HONG
NITA K. KLUNDER                                  *Principal Deputy Solicitor General*
*State Trial Counsels*                           MICHAEL L. NEWMAN
JULIA S. CANNEY                                  *Senior Assistant Attorney General*
*Assistant Attorney General*                     JULIE VEROFF
One Ashburton Place                              *Deputy Solicitor General*
Boston, MA 02108                                 MARISSA MALOUFF
(617) 963-2282                                   JAMES E. STANLEY
Gerard.Cedrone@mass.gov                          *Supervising Deputy Attorneys General*
                                                 DENISE LEVEY
*Attorneys for Plaintiff*                        LORRAINE LOPEZ
*Commonwealth of Massachusetts*                  JEANELLY OROZCO ALCALÁ
                                                 JAMES E. RICHARDSON
                                                 *Deputy Attorneys General*
                                                 455 Golden Gate Avenue, Suite 11000
                                                 San Francisco, CA  94102-7004
                                                 (415) 510-3776
                                                 Julie.Veroff@doj.ca.gov

                                                 *Attorneys for Plaintiff*
                                                 *State of California*

23

**KRISTIN K. MAYES**
*Attorney General of Arizona*

 /s/ *Jaylia Yan*
JOSHUA G. NOMKIN
JAYLIA YAN
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
jaylia.yan@azag.gov

*Attorneys for Plaintiff*
*State of Arizona*


**PHILIP J. WEISER**
*Attorney General of Colorado*

 /s/ *David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
NORA PASSAMANECK
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for Plaintiff*
*State of Colorado*


**WILLIAM TONG**
*Attorney General of Connecticut*

 /s/ *Michael K. Skold*
MICHAEL K. SKOLD
*Solicitor General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Attorneys for Plaintiff*
*State of Connecticut*


**KATHLEEN JENNINGS**
*Attorney General of Delaware*

 /s/ *Vanessa L. Kassab*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for Plaintiff*
*State of Delaware*

24

**ANNE E. LOPEZ**
*Attorney General of Hawaiʻi*

/s/ *Kalikoʻonālani D. Fernandes*
KALIKOʻONĀLANI D. FERNANDES
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for Plaintiff*
*State of Hawaiʻi*


**ANTHONY G. BROWN**
*Attorney General of Maryland*

/s/ *Virginia A. Williamson*
VIRGINIA A. WILLIAMSON
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Attorneys for Plaintiff*
*State of Maryland*


**KWAME RAOUL**
*Attorney General of Illinois*

/s/ *Sarah A. Hunger*
SARAH A. HUNGER
*Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5202
sarah.hunger@ilag.gov

*Attorneys for Plaintiff*
*State of Illinois*


**DANA NESSEL**
*Attorney General of Michigan*

/s/ *Neil Giovanatti*
NEIL GIOVANATTI
*Assistant Attorney General*
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Attorneys for Plaintiff*
*State of Michigan*

25

**KEITH ELLISON**
*Attorney General of Minnesota*

/s/ *Joseph R. Richie*
JOSEPH R. RICHIE
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorneys for Plaintiff*
*State of Minnesota*


**JENNIFER DAVENPORT**
*Attorney General of New Jersey*

/s/ *Melina Meneguin Layerenza*
MELINA MENEGUIN LAYERENZA
*Assistant Attorney General*
MAX G. LESSER
*Deputy Attorney General*
25 Market Street
Trenton, NJ 08625
(609) 696-5366
max.lesser@law.njoag.gov

*Attorneys for Plaintiff*
*State of New Jersey*

**AARON D. FORD**
*Attorney General of Nevada*

/s/ *K. Brunetti Ireland*
K. BRUNETTI IRELAND
*Chief of Special Litigation*
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*


**LETITIA JAMES**
*Attorney General of New York*

/s/ *Judith N. Vale*
JUDITH N. VALE
*Deputy Solicitor General*
BARBARA D. UNDERWOOD
*Solicitor General*
ZOE LEVINE
*Special Counsel for Immigrant Justice*
VICTORIA OCHOA
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(212) 416-8329
zoe.levine@ag.ny.gov

*Attorneys for Plaintiff*
*State of New York*

**JEFF JACKSON**
*Attorney General of North Carolina*

/s/ *Daniel P. Mosteller*
DANIEL P. MOSTELLER
*Associate Deputy Attorney General*
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Attorneys for Plaintiff*
*State of North Carolina*


**PETER F. NERONHA**
*Attorney General of Rhode Island*

/s/ *Kyla Duffy*
KYLA DUFFY*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov

*Attorneys for Plaintiff*
*State of Rhode Island*


**DAN RAYFIELD**
*Attorney General of Oregon*

/s/ *Robert A. Koch*
ROBERT A. KOCH
*Senior Assistant Attorney General*
100 S.W. Market Street
Portland, OR 97201
(971) 673-1880
robert.a.koch@doj.oregon.gov

*Attorneys for Plaintiff*
*State of Oregon*


**CHARITY R. CLARK**
*Attorney General of Vermont*

/s/ *Jonathan T. Rose*
JONATHAN T. ROSE
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for Plaintiff*
*State of Vermont*

27

**NICHOLAS W. BROWN**
*Attorney General of Washington*

 /s/ *Sara L. Wilmot*
SARA L. WILMOT*
*Assistant Attorney General*
KATE S. WORTHINGTON
*Assistant Attorney General*
7141 Cleanwater Drive S.W.
P.O. Box 40111
Olympia, WA 98504
(360) 709-6470
sara.wilmot@atg.wa.gov

*Attorneys for Plaintiff*
*State of Washington*

**JOSHUA L. KAUL**
*Attorney General of Wisconsin*

 /s/ *Faye B. Hipsman*
FAYE B. HIPSMAN
*Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707
(608) 264-9487
faye.hipsman@wisdoj.gov

*Attorneys for Plaintiff*
*State of Wisconsin*

\* Application for admission pending

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1.      This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 5,185 words and thus does not exceed the 5,200-word limit.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in proportionally spaced typeface using Microsoft Word word-processing system in Times New Roman that is at least 14 points.

Dated: June 25, 2026

*/s/ Julie Veroff*
Julie Veroff
Deputy Solicitor General

**CERTIFICATE OF SERVICE**

I hereby certify that on this June 25, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: June 25, 2026

/s/ *Julie Veroff*
Julie Veroff
Deputy Solicitor General