No. 26-1699

IN THE

# United States Court of Appeals for the First Circuit

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

*v.*

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Acting Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Acting Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants-Appellants*,

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-13829-LTS, Hon. Leo T. Sorokin

**BRIEF OF PROFESSOR MICHAEL CLEMENS AS
AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES**

Nicole Ries Fox
Geoffrey C. Shaw
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA  90071

Anisha S. Dasgupta
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

*Additional Counsel Listed on Inside Cover*

Kamilyn Y. Choi
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave NW
Washington, DC  20037

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ii

STATEMENT OF INTEREST ............................................................. 1

INTRODUCTION ................................................................................. 2

ARGUMENT ........................................................................................ 4

    I.    Defendants' Claims Of Economic Harm Find No Support In The Economic Evidence The Proclamation Cites. .......................................................................... 4

        A.    The Proclamation misstates or misuses each source it invokes. ......................................... 5

        B.    The broader economic literature contradicts Defendants' emergency theory. .................................. 16

    II.    The Proclamation Imposes A Tax. ....................................... 18

CONCLUSION .................................................................................. 22

APPENDIX A

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Edye v. Robertson*,
    112 U.S. 580 (1884) ............................................................. 19

**Rules and Regulations**

Proclamation No. 10973, Restriction on Entry of Certain
    Nonimmigrant Workers, 90 Fed. Reg. 46,027 (Sept. 24,
    2025) ................................................................. 2, 5, 7, 9, 10, 12, 13

**Other Authorities**

Jaison R. Abel & Richard Deitz, *The Labor Market for Recent
    College Graduates: Outcomes by Major*, Federal Reserve
    Bank of New York, https://perma.cc/UQZ4-U8ZL
    (accessed June 25, 2026) ..................................................... 10

Jaison R. Abel et al., *Are Businesses Scaling Back Hiring
    Due to AI?*, Liberty Street Economics, Federal Reserve
    Bank of New York (Sept. 4, 2025), https://perma.cc/PY28-
    FWBT ........................................................................ 12

American Immigration Council, *Foreign-born STEM Workers
    in the United States: Fact Sheet* (June 13, 2022),
    https://perma.cc/2YND-BSSS ......................................... 9, 10

Rebecca Bellan et al., *The running list: major tech layoffs in
    2026 where employers cited AI*, TechCrunch (June 22,
    2026), https://perma.cc/Y5PT-WKGW .............................. 13

Nicholas Bloom, John Van Reenen & Heidi Williams, *A
    Toolkit of Policies to Promote Innovation*, 33 J. Econ.
    Perspectives 163 (2019), https://perma.cc/X8RA-SHK3 ..................... 17

George J. Borjas, *The H-1B Wage Gap, Visa Fees, and Employer Demand* (Nat'l Bureau of Econ. Rsch., Working Paper No. 34793, Feb. 4, 2026), https://perma.cc/K48A-EWAW ........................................................................................ 21

John Bound, Guarava Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the US* (Nat'l Bureau of Econ. Rsch., Working Paper No. 23153, 2017), https://perma.cc/UCC4-BEYK ................................. 6

John Bound, Gaurav Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the United States*, *in* HIGH-SKILLED MIGRATION TO THE UNITED STATES AND ITS ECONOMIC CONSEQUENCES 109 (Gordon H. Hanson et al. eds. 2018), https://perma.cc/MGK7-L29E ................................................. 6

Kyra Buckley & Holly Bartholomew, *Mass Layoffs at Intel Will Mean Less Revenue for Oregon, even as the Semiconductor Industry Remains a Major Economic Driver*, Oregon Public Broadcasting (July 18, 2025), https://perma.cc/AHN6-HTZ7 ........................................... 13

Congressional Budget Office, *The Growth of Federal User Charges: A CBO Study* (Aug. 1993), https://tinyurl.com/mr4cm8d9 .................................................. 18

Daniel Costa & Ron Hira, *H-1B Visas and Prevailing Wage Levels*, Econ. Pol'y Inst. (May 4, 2020), https://tinyurl.com/y42tf39p ...................................................... 8

Natalia Emanuel, Emma Harrington & Amanda Pallais, *The Power of Proximity to Coworkers* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31880, 2023), https://perma.cc/EFP4-9Y86 ................................................... 11

Jennifer Hunt & Marjolaine Gauthier-Loiselle, *How Much Does Immigration Boost Innovation?*, 2 Am. Econ. J.: Macroeconomics 31 (2010), https://perma.cc/Q2HN-BJQ6 ................ 16

David N. Hyman, *Public Finance* (Cengage 10th ed. 2010) ................... 17

IRS, Revenue Ruling 77-29 (1977),
https://tinyurl.com/2ew83tjy ...................................................... 19

IRS, *Understanding Taxes: Glossary*, https://perma.cc/CYG4-
BX8L (accessed June 25, 2026) ........................................... 18

Kit Johnson, *Beauty and the Beast: Disney's Use of the Q and
H-1B Visas*, 12 N.Y.U. J. L. & Liberty 124 (2018),
https://perma.cc/5N5D-M7BQ .......................................... 15

Lauren Kaori Gurley, *The Cuban-born Harvard Economist
Behind Trump's Immigration Crackdown*, Wash. Post
(Jan. 7, 2026), https://perma.cc/Y9UC-WC4P ................................. 20

William R. Kerr & William F. Lincoln, *The Supply Side of
Innovation: H-1B Visa Reforms and US Ethnic Invention*,
28 J. Lab. Econ. 473 (2010), https://perma.cc/K9TF-H57G .............. 16

Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers,
H-1B Visas, and Productivity in US Cities*, 33 J. Lab.
Econ. S225 (2015) https://perma.cc/F8EE-MVA2 ........................... 16

Marta Prato, *The Global Race for Talent: Brain drain,
knowledge transfer, and growth*, 140 Q. J. Econ. 165
(2025), https://perma.cc/U3ZT-728R ............................................. 16

Julia Preston, *Lawsuits Claim Disney Colluded to Replace
U.S. Workers With Immigrants*, N.Y. Times (Jan. 25,
2016), https://tinyurl.com/2aweme5v ............................................. 14

Julia Preston, *Pink Slips at Disney. But First, Training
Foreign Replacements*, N.Y. Times (June 3, 2015),
https://tinyurl.com/m4w7h58w .......................................... 14

Julia Preston, *Toys 'R' Us Brings Temporary Foreign
Workers to U.S. to Move Jobs Overseas*, N.Y. Times (Sept.
29, 2015), https://tinyurl.com/bdcn475e ........................................ 14

RePEc (Research Papers in Economics) database, *Top Economists (Last 10 Years of Publications), as of May 2026 (with details)*, https://perma.cc/8VZV-TK29 (accessed June 22, 2026) ........................................................................... 1

*Tech layoffs hit two-year high; how AI is driving biggest workforce reset*, MSN (June 16, 2026), https://perma.cc/A8UB-HB9X ........................................................ 13

USCIS, *H-1B Employer Data Hub*, https://perma.cc/FMF9-YESP (accessed May 10, 2026) ...................................................... 15

Roger Wood, *Microsoft's 2025 Layoffs and Its All-In Bet on an AI-Powered Future*, TimeTrex Workforce Management (July 3, 2025), https://tinyurl.com/2f2ruwj4 ..................................... 12

Kelsey Ziser et al., *Tech company layoffs: The post-pandemic correction meets AI realignment*, Information Week (Dec. 22, 2025), https://tinyurl.com/56fd2efa ............................................. 13

# STATEMENT OF INTEREST[1]

Amicus curiae Professor Michael Clemens is an economist of global standing who studies the field of immigration, its impact on the American economy, and the history of immigration policy. He is a tenured Professor at the School of Government & Policy at Johns Hopkins University and ranks among the top one percent of most-cited economists for work published in the last ten years.[2] Federal courts and policymakers in the White House, National Security Council, the Department of Homeland Security, and foreign governments have relied on his work. Professor Clemens submits this brief on his own behalf, as an individual and expert in his academic field, in the interest of ensuring that immigration regulation in the United States proceeds from the best available empirical understanding of its impacts and how policy shapes those impacts.

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any person other than amicus or its counsel contributed money intended to fund preparing or submitting this brief. University affiliation is provided for identification purposes only. All parties have consented to the filing of this brief.

[2] RePEc (Research Papers in Economics) database, *Top Economists (Last 10 Years of Publications), as of May 2026 (with details)*, https://perma.cc/8VZV-TK29 (accessed June 22, 2026).

# INTRODUCTION

Defendants seek emergency relief to reinstate a vacated presidential Proclamation requiring a $100,000 payment for each person entering the United States on an H-1B visa. *See* Proclamation No. 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46,027 (Sept. 24, 2025) (the "Proclamation"). This emergency request is based on assertions in the Proclamation that the H-1B program causes urgent harms to American workers and the national economy, and that the $100,000 exaction is an "immigration regulation" and not a tax. From an empirical economic perspective, both premises are incorrect.

Amicus has comprehensively analyzed the economic evidence referenced in the Proclamation and has found that the Proclamation misrepresents or incorrectly characterizes each of those sources. What is more, the Proclamation references only one genuine economic study of the nationwide impacts associated with the H-1B program, and that study demonstrates that the H-1B program provides a multibillion-dollar annual *benefit* to 99% of American workers and massive stimulus

to the national economy. Defendants simply have no factual basis for their claim that emergency relief is necessary to avoid imminent harms.

The government's contention that the $100,000 payment reflects a regulatory fee and not a tax fails as well. Plaintiffs' Opposition explains that the payment is not a "fee" from a legal perspective. *See* Pl. States' Opp. to Defs.' Emergency Mot. for Stay Pending Appeal at 10-12 (filed June 25, 2026) ("Opp."). The payment is not a "fee" from an economic perspective either. Under standard fiscal and regulatory economic definitions, a tax payment funds general public purposes, while a fee is earmarked to offset the cost of a specific service to the payor. The Proclamation's $100,000 exaction goes to general revenue; Defendants do not identify any specific cost it supposedly offsets. Defendants' effort to portray this payment as a regulatory fee thus defies basic economic understanding and usage.

In sum, Defendants' emergency request is based on faulty economic premises and should be denied.

**ARGUMENT**

**I. Defendants' Claims Of Economic Harm Find No Support In The Economic Evidence The Proclamation Cites.**

To support their claim of emergency economic harms, Defendants' motion relies entirely on the Proclamation itself, along with statements made by the President in introducing it. *See* Emergency Motion for Stay Pending Appeal at 2 (filed June 18, 2026) ("Mot."). Specifically, they contend that they "will suffer irreparable harm" without a stay because additional H-1B visa holders may "enter the country despite the President's determination that [such] entry would be detrimental." Mot. 2. They assert that those workers will "take vital jobs from Americans," depress wages, cause "substantial harm to American workers," and "undermin[e] the American economy." Mot. 1, 20.

Amicus has conducted a comprehensive review of the factual assertions in the Proclamation. The review shows that far from supporting Defendants' claims of harm, the same economic evidence

4

cited by the Proclamation contradicts Defendants' claims at almost every turn.[3]

**A.  The Proclamation misstates or misuses each source it invokes.**

Amicus has conducted a close review of the purported bases for the Proclamation's assertions of economic harms. The sources do not support the assertions. Instead, the Proclamation misconstrues and grossly overstates the underlying source material. In some instances, the sources flat out contradict the Proclamation's assertions of harm.

*The "2017 study" on "wages for American computer scientists."*

The Proclamation cites a "2017 study" that showed a decline in "wages for American computer scientists" supposedly caused by "the importation of foreign workers into the computer science field." 90 Fed. Reg. at 46,028. That is the only study about the economic effects of H-1B workers that the Proclamation specifically references. That study was conducted by John Bound, Gaurav Khanna, and Nicolas Morales in

---

[3] Because the Proclamation cites no sources for its factual assertions, amicus forensically identified the apparent source for each specific economic claim. A table comparing the text of the Proclamation against the sources (Appendix A) is included as an appendix to this brief.

2017.[4] Even the most cursory review of this study shows that it does not support the Proclamation's claim of economic harm. The study's central finding is that H-1B immigration from 1994 to 2001 produced *multibillion-dollar annual benefits* for approximately 99% of U.S. workers, including workers both with and without college degrees, as well as gains to businesses, productivity, and national growth.[5]

---

[4] *Understanding the Economic Impact of the H-1B Program on the US* (Nat'l Bureau of Econ. Rsch., Working Paper No. 23153, 2017), https://perma.cc/UCC4-BEYK ("Bound 2017"); Final version published as John Bound, Gaurav Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the United States*, *in* HIGH-SKILLED MIGRATION TO THE UNITED STATES AND ITS ECONOMIC CONSEQUENCES 109 (Gordon H. Hanson et al. eds. 2018), https://perma.cc/MGK7-L29E ("Bound 2018").

[5] Specifically, the study shows that H-1B immigration from 1994 to 2001 raised the welfare of all U.S.-born workers by about 0.20–0.27%, worth $8.2–10.9 billion per year (Bound 2018, *supra*, at Table 4.6); it raised non-computer-science college workers' welfare by 0.04–0.28%, worth $0.6–4.3 billion (*Id.* at Table 4.6); it raised non-college workers' welfare by 0.43–0.52%, worth $10.2–13.0 billion (*Id.* at Table 4.6); and it raised IT-sector profits (capital income for largely U.S. investors) by 0.61–0.70%, worth $0.78–0.89 billion (*Id.* at 159, Table 4.7). The study estimates (*Id.* at Table 4.3) that during the period the authors analyze, 1994 to 2001, between 98.8 and 99.0% of U.S. workers were either college-educated non-computer-science workers, or non-college-educated workers—the groups for which they find large economic benefits caused by the H-1B program.

Neither the Proclamation nor Defendants' briefing mentions this headline finding. Instead, the Proclamation cherry-picks one subsidiary finding in the study—that from 1994 to 2001, directly competing U.S. computer-science workers experienced a small decline in wages. 90 Fed. Reg. at 46,028 (citing "[a] 2017 study"). That one quoted data point is in fact an *exception* to the overall findings in the study, for one small sub-group of the population studied. Furthermore, Defendants do not explain how evidence from between 25 and 32 years ago (1994 to 2001) about one small group of U.S. workers could be even hypothetically suggestive of a state of economic "emergency" in the summer of 2026. And more importantly, the overall findings of this study conclusively reject Defendants' claims that H-1B workers "caus[e] substantial harm to American workers" or are "undermining the American economy." Mot. 1; *see also* 90 Fed. Reg. at 46,027.

*The "study of tech workers" on IT outsourcing.*

The Proclamation cites a "study of tech workers" that purportedly "showed a 36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers," and attributes that discount to "H-1B-reliant IT outsourcing." 90 Fed. Reg. at 46,027. This

most likely refers to an Economic Policy Institute article by Daniel Costa and Ron Hira, titled *H-1B Visas and Prevailing Wage Levels*.[6] The study compares entry-level H-1B software-developer wages in the Washington, D.C. metropolitan area with the average wage of workers in the same occupation across all experience and seniority levels. It finds that in 2019, in the Washington, D.C. metropolitan area *only*, the average *entry-level* wage for H-1B software developers was 36% below the average U.S. wage for *all* workers *at all levels* in the same occupational category.[7]

This comparison does not demonstrate or even suggest that H-1B workers are paid less than U.S. workers performing the same work. Entry-level workers earn much less than workers of average experience and seniority in essentially all professional occupations. The study does not reach any finding about the effects of H-1B workers on U.S. workers' wages or the economy more generally. Nonetheless, the Proclamation misleadingly suggests that the study concerns H-1B

---

[6] Daniel Costa & Ron Hira, *H-1B Visas and Prevailing Wage Levels*, Econ. Pol'y Inst. (May 4, 2020), https://tinyurl.com/y42tf39p.

[7] *Id*. at 8.

wages in general, rather than H-1B wages in a single category of worker seniority, in a single year, in a single metropolitan area.

*Influx of STEM labor is caused by the "abuse of the H-1B visa."*

The Proclamation cites an increase in the "number of foreign STEM workers in the United States" between 2000 and 2019 and claims that "the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa." 90 Fed. Reg. at 46,027. Amicus found only one source that provides the "44.5 percent" increase that the Proclamation references. That is an American Immigration Council internet "Fact Sheet" that reports "[b]etween 2000 and 2019, the overall number of STEM workers in the United States increased by 44.5 percent, from 7.5 million to more than 10.8 million."[8]

The source contains no evidence that this increase was caused by "abuse of the H-1B visa"; it simply reports the rise. And in fact, the report actually advocates for an *increase* in the availability of H-1B visas, reporting that "[r]esearch has shown that areas which attract more high-skilled foreign-born workers see faster rates of growth in

---

[8] American Immigration Council, *Foreign-born STEM Workers in the United States: Fact Sheet* (June 13, 2022), https://perma.cc/2YND-BSSS.

labor productivity."[9] The Proclamation's claims about "abuse of the H-1B visa" have no support in any economic evidence Amicus is aware of, and in fact are undermined by the very sources the Proclamation references.

*Federal Reserve Bank study about unemployment rates.*

The Proclamation claims that "the abuse of the H-1B visa program has made it even more challenging for college graduates trying to find IT jobs, allowing employers to hire foreign workers at a significant discount to American workers." 90 Fed. Reg. at 46,027. It cites to "a study from the Federal Reserve Bank of New York" showing that "among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively—more than double the unemployment rates of recent biology and art history graduates." *Id.*

---

[9] *Id.*

These numbers come from a data dashboard published by the Federal Reserve Bank of New York (FRBNY).[10] The Proclamation's use of those numbers is misleading at best. The existence of any given unemployment rate in any occupation and in any year does not reveal the reason for the rate. Nor does the source purport to explain the unemployment numbers it reports. The source is simply a standalone table of numbers on the website of the FRBNY, not a "study" of any kind, much less a study of immigration.

Defendants' statements in the Proclamation also grossly misrepresent the research of FRBNY economists more broadly. FRBNY economists have directly investigated the causes of high unemployment for recent computer science graduates and traced it to factors other than immigration. For example, Natalia Emanuel of the FRBNY and her co-authors found in one study that the rise of remote work after the COVID-19 pandemic harmed training and mentorship opportunities for recent computer science graduates, causing 64% of the rise in their

---

[10] Jaison R. Abel & Richard Deitz, *The Labor Market for Recent College Graduates: Outcomes by Major*, Federal Reserve Bank of New York, https://perma.cc/UQZ4-U8ZL (accessed June 25, 2026). 2025 edition archived at: https://tinyurl.com/md8m29jd.

unemployment rates.[11] Other genuine studies written by the economists who created the data dashboard cited by the Proclamation focus on the role of technological change and the rise of artificial intelligence, and do not mention immigration.[12]

*Tech company layoffs of "highly skilled American workers."*

The Proclamation cites "[r]eports" that "indicate that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." *See* 90 Fed. Reg. at 46,027-28. The Proclamation's claim of a causal connection between those layoffs and the hiring of H-1B visa holders has no evidentiary or statistical support.

For one, the fact that H-1B hiring and layoffs can occur in the same firm at the same time does not demonstrate or suggest that H-1B workers *caused* layoffs. Layoffs at tech firms can arise from eliminating managerial layers, reallocating resources toward AI data centers,

---

[11] Natalia Emanuel, Emma Harrington & Amanda Pallais, *The Power of Proximity to Coworkers* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31880, 2023), https://perma.cc/EFP4-9Y86.

[12] *See, e.g.*, Jaison R. Abel et al., *Are Businesses Scaling Back Hiring Due to AI?*, Liberty Street Economics, Federal Reserve Bank of New York (Sept. 4, 2025), https://perma.cc/PY28-FWBT.

rebalancing skills toward new technical needs, canceling projects or entire divisions, shifting from product development to cybersecurity, or a wide range of other forces.

Indeed, the Proclamation ignores widely available evidence that undercuts the unsupported conjecture it makes. For instance, analyses of recent layoffs by various tech companies have found that those layoffs arose primarily from technological shocks and restructuring in response to competitive pressure.[13] This undermines the Proclamation's suggestion that the H-1B program played any causal role in the layoffs.

*Claims of "indignity" to American IT workers.*

The Proclamation reports that "American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance." 90 Fed. Reg. at 46,028. According to the Proclamation, "[t]his suggests H-1B visas are not being

_____

[13] Kelsey Ziser et al., *Tech company layoffs: The post-pandemic correction meets AI realignment*, Information Week (Dec. 22, 2025), https://tinyurl.com/56fd2efa; Rebecca Bellan et al., *The running list: major tech layoffs in 2026 where employers cited AI*, TechCrunch (June 22, 2026), https://perma.cc/Y5PT-WKGW; *Tech layoffs hit two-year high; how AI is driving biggest workforce reset*, MSN (June 16, 2026), https://perma.cc/A8UB-HB9X.

used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States." *Id.*

This claim does not state what specific facts it refers to, when this occurred, or how often it has occurred. For that reason alone, vague claims of "indignities" experienced an unspecified number of times, an unspecified number of years ago, do not demonstrate or suggest an ongoing economic emergency.

But press reports do contain anecdotes of events, 11 years ago, that fit this vague description. An influential investigation by the *New York Times* documented that at least about 200 and at most about 500 U.S. workers had been laid off from five firms and apparently replaced with H-1B workers that they were obliged to train.[14] A substantial but unclear portion of the workers laid off were not replaced by anyone.

---

[14] Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, N.Y. Times (June 3, 2015), https://tinyurl.com/m4w7h58w; Julia Preston, *Toys 'R' Us Brings Temporary Foreign Workers to U.S. to Move Jobs Overseas*, N.Y. Times (Sept. 29, 2015), https://tinyurl.com/bdcn475e; Julia Preston, *Lawsuits Claim Disney Colluded to Replace U.S. Workers With Immigrants*, N.Y. Times (Jan. 25, 2016), https://tinyurl.com/2aweme5v. The range of 200 to 500 workers does not include layoffs reported in the sources who were not replaced, or who were quickly re-hired.

These events, if indeed they are the referent of the Defendants' evidence in the Proclamation, do not demonstrate or suggest an ongoing economic emergency. First, they occurred 11 years ago. They garnered national attention and were addressed with a series of class-action lawsuits.[15] That negative press and legal jeopardy have strongly discouraged employers from replicating the practice since. No credible study has documented substantial prevalence of such practices in recent years. If such a study exists, it is difficult to explain why neither Defendants nor the Proclamation would mention it.

Second, the events described above concern an extremely small number of H-1B workers—at most between roughly 200 and 500 total H-1B workers in the past 11.5 years. Even 500 workers would be just 0.04% of the 1,327,689 H-1B workers hired into the United States during the 11.5-year period from 2015 through April 2026.[16]

---

[15] Kit Johnson, *Beauty and the Beast: Disney's Use of the Q and H-1B Visas*, 12 N.Y.U. J. L. & Liberty 124 (2018), https://perma.cc/5N5D-M7BQ.

[16] USCIS, *H-1B Employer Data Hub*, https://perma.cc/FMF9-YESP (accessed May 10, 2026).

**B.    The broader economic literature contradicts Defendants' emergency theory.**

Defendants' emergency motion relies almost entirely on the "facts" asserted in the Proclamation, ignoring the voluminous peer-reviewed academic research literature on the economic effects of H-1B workers, which directly rejects the conjectures in the Proclamation and the motion's claim of emergency harm.

Leading economists have found that H-1B workers were the cause of more than a third of all economic-productivity growth in the United States, benefiting native workers at all skill levels,[17] including by sparking more inventions.[18] One major study finds that doubling the size of the H-1B program would raise long-run productivity growth in the United States by 4%, with a gain to the U.S. economy of about $190

---

[17] Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S225 (2015) https://perma.cc/F8EE-MVA2.

[18] William R. Kerr & William F. Lincoln, *The Supply Side of Innovation: H-1B Visa Reforms and US Ethnic Invention*, 28 J. Lab. Econ. 473 (2010), https://perma.cc/K9TF-H57G; Jennifer Hunt & Marjolaine Gauthier-Loiselle, *How Much Does Immigration Boost Innovation?*, 2 Am. Econ. J.: Macroeconomics 31 (2010), https://perma.cc/Q2HN-BJQ6.

billion per year after 10 years.[19] Indeed, some of the world's top experts on productivity identify high-skill immigration visas (H-1B chief among those) as the single most effective policy lever to raise U.S. productivity.[20]

These are just a few highlights from decades of research. The literature as a whole overwhelmingly rejects Defendants' claims that the H-1B program "'discourage[s] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields,' instead replacing them with aliens with foreign loyalties." Mot. 20. To the contrary, the research literature demonstrates that H-1B workers are a central reason for American leadership in the science and technology fields. Defendants ignore it entirely.

---

[19] Marta Prato, *The Global Race for Talent: Brain drain, knowledge transfer, and growth*, 140 Q. J. Econ. 165 (2025), https://perma.cc/U3ZT-728R. Prato finds that doubling the size of the H-1B program would raise annual *growth* of overall productivity by 4%, or roughly 0.06 percentage points. In a $31.8 trillion economy, approximately today's value, the implied additional GDP would cumulate over 10 years to $((1.0006^{10} \times 31.8) - 31.8) \times 10^{12}$ dollars, or $191 billion added per year.

[20] Nicholas Bloom, John Van Reenen & Heidi Williams, *A Toolkit of Policies to Promote Innovation*, 33 J. Econ. Perspectives 163 (2019), https://perma.cc/X8RA-SHK3.

## II.    The Proclamation Imposes A Tax.

Defendants argue that the $100,000 payment they demand from H-1B entrants is "not a tax, but instead a standard form of immigration regulation." Mot. 8. That is wrong not only from a legal perspective, Opp. 10-11, but also from an economic perspective.

Economics distinguishes taxes from regulation based on where the revenue goes. The literature on fiscal economics and fiscal regulation is clear: "Taxes, the principal means of financing government expenditures, are compulsory payments that *do not necessarily bear any direct relationship to the benefits from government goods and services received*." David N. Hyman, *Public Finance* 21 (Cengage 10th ed. 2010) (emphasis added).

The federal government's own definition of a tax confirms that consensus view. As the Congressional Budget Office explains, "fees and taxes" are distinguishable "based on whether charges are levied for purely private benefits" (as in the case of a fee) "or whether they confer public benefits that are independent of, rather than incidental to,

18

private benefits" (as in the case of a tax).[21] The Internal Revenue Service likewise defines "taxes" as "[r]equired payments of money to governments that are used to provide public goods and services for the benefit of the *community as a whole*."[22]

"Regulatory payments," in contrast, represent a charge for services. When payments are imposed as a "regulatory measure," the revenue is "earmarked for a specific purpose," to offset the cost of services rendered.[23] Defendants assert that the $100,000 H-1B payment provided *general revenue* "designed to mitigate the externalities of bringing such aliens into the country," Mot. 9, not to compensate the government for the cost of providing any particular service. That is not the kind of specific earmarking characteristic of a regulatory payment.

This economic usage tracks the long-established legal distinction between taxes and regulatory payments. *See* Opp. 10-12. Defendants' principal authority only confirms this. In *Edye v. Robertson*, 112 U.S.

---

[21] Congressional Budget Office, *The Growth of Federal User Charges: A CBO Study* 15 (Aug. 1993), https://tinyurl.com/mr4cm8d9.

[22] IRS, *Understanding Taxes: Glossary*, https://perma.cc/CYG4-BX8L (accessed June 25, 2026) (emphasis added).

[23] IRS, Revenue Ruling 77-29 (1977), https://tinyurl.com/2ew83tjy.

580 (1884), the Supreme Court concluded that a fifty-cent charge on every immigrant arriving by vessel in the late 1800s was a fee, not a tax. That was so because the money was "appropriated in advance to the uses of the statute, and [did] not go to the general support of the government"; instead, it went into a dedicated fund for offsetting expenses with private benefit, such as for the care of arriving immigrants. *See id.* at 596.

Here, the obligatory $100,000 payment imposed by the Proclamation goes into the general treasury fund and Defendants nowhere claim that the payment is for $100,000 of services to the firms that paid. *See* Dist. Ct. Dkt. 93-12 ¶ 7; Dist. Ct. Dkt. 93 at 22. Defendants instead contend that "the purpose" and the "effect of the Proclamation" is not "to raise revenue" but "to incentivize the hiring of American workers." Mot. 11. Strikingly, however, only one economist at the White House Council of Economic Advisers directly evaluated that contention—and that economist rejected it, a fact which Defendants ignore.

Earlier this year, George Borjas[24] released a paper analyzing the economic effects of a $100,000 H-1B visa tax, an analysis he conducted while he was at the White House and directly involved with the Administration's H-1B visa policy at the highest level. His analysis found that a $100,000 tax would cause no change in the number of H-1B visas issued to U.S. firms, because the visa cap is so oversubscribed that even with a substantial decrease in demand for H-1B visas, firms' demand for the visas would surpass the cap.[25] In other words, Borjas's economic analysis found that the tax will have zero effect on the "hiring of American workers" by U.S. firms. Instead, Borjas's analysis affirmed that the amount of the tax was set to "maximize government revenue,"

---

[24] George Borjas was the senior-most economist at the Council of Economic Advisers working directly on H-1B visa policy, doing "extensive behind-the-scenes work on Trump's overhaul of the H-1B visa system for highly skilled workers that added a $100,000 fee." Lauren Kaori Gurley, *The Cuban-born Harvard Economist Behind Trump's Immigration Crackdown*, Wash. Post (Jan. 7, 2026), https://perma.cc/Y9UC-WC4P.

[25] George J. Borjas, *The H-1B Wage Gap, Visa Fees, and Employer Demand* (Nat'l Bureau of Econ. Rsch., Working Paper No. 34793, Feb. 4, 2026), https://perma.cc/K48A-EWAW.

adding tens of billions of dollars per year to the treasury fund without affecting firms' use of the visa.[26]

The Borjas study thus debunks Defendants' claim that a stay will imminently "threaten American workers' wages and jobs, undermining the American economy," Mot. 1, as well as their claim that the Proclamation is an instrument of immigration regulation with no "effect" on general government revenue, Mot. 11. Defendants do not mention the study's findings, which is quite extraordinary given no other known study conducted by a government economist has investigated the issue.

## CONCLUSION

For the foregoing reasons, this Court should deny the Emergency Motion for Stay Pending Appeal.

---

[26] Borjas, *supra*, at 5.

June 26, 2026

Nicole Ries Fox
Geoffrey C. Shaw
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA  90071

Respectfully submitted,

/s/ Anisha S. Dasgupta

Anisha S. Dasgupta
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

Kamilyn Y. Choi
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave NW
Washington, DC  20037

*Counsel for Amicus Curiae*

# APPENDIX A

Below is a comprehensive list of economic evidence referenced by the Proclamation and its sources:

| # | *Proclamation text* | *Source* |
|---|---|---|
| **A** | "A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field." | "In the absence of immigration [of H-1B workers, 1994 to 2001], wages for US computer scientists would have been 2.6% to 5.1% higher and employment in computer science for US workers would have been 6.1% to 10.8% higher in 2001" (Bound et al. 2017, a draft version of Bound, Khanna, and Morales 2018). |
| **B** | "Using these H-1B-reliant IT outsourcing companies provides significant savings for employers: one study of tech workers showed a 36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers." | "H-1B prevailing wage levels for 'Software Developers, Applications,' in the Washington, D.C., region": At "Wage level 1" (entry level), the "Discount from median (%)" is "36%" (Costa and Hira 2020, Table 2, row 1). |

A-1

| C | "Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019. And the key facilitator for this influx of foreign STEM labor has been the abuse of the H–1B visa." | "The largest increase was seen among computer and math occupations, where the immigrant share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019" (American Immigration Council 2022). |
|---|---|---|
| D | "According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively— more than double the unemployment rates of recent biology and art history graduates." | Data dashboard by Abel and Deitz (2025), which shows a 2023 unemployment rate of 6.1 percent for recent college graduates in computer science, and 7.5 percent for computer engineering. The 2023 figures were the most recent available on the dashboard in September 2025. |
| E | "Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025." | Özkan and Sullivan (2025) write that "workers in computer occupations, who historically enjoyed very low unemployment, have seen unemployment rates jump from an average of 1.98% in 2019 to 3.02% in 2025". |

| F | "American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance." | A few hundred workers at five firms in 2015 were widely reported to have been both laid off and obliged to train H-1B replacements: Toys 'R' Us (8 H-1B workers) Fossil (25 H-1B workers), Northeast Utilities/Eversource (an unknown portion of 350 layoffs), Disney (150 layoffs, after 100 were re-hired), and Southern California Edison (less than 162 workers, given that 70 percent of 540 layoffs were not replaced) (Preston 2015a, 2015b, 2016; Li and Morrison 2015). |
|---|---|---|

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. 29(a)(5), because this brief contains 4,085 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Anisha S. Dasgupta*
Anisha S. Dasgupta
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on June 26, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

/s/ Anisha S. Dasgupta
Anisha S. Dasgupta
*Counsel for Amicus Curiae*