**No. 26-1699**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

State of California, *et al.*,

*Plaintiffs-Appellees*,

v.

Markwayne Mullin, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts No. 1:25-cv-13829-LTS

**OPENING BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

JEFFREY A. ALDERETTE
*Trial Attorney*

DAVID J. BYERLEY
*Senior Litigation Counsel*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)-860-8970

*Counsel for Defendants*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ... iii

REASONS WHY ORAL ARGUMENT IS REQUESTED ... ix

INTRODUCTION ... 1

STATEMENT OF JURISDICTION ... 3

STATEMENT OF THE ISSUES ... 3

STATEMENT OF THE CASE ... 4

I. Statutory Background ... 4

A. The Executive's Broad Authority ... 4

B. H-1B Nonimmigrant Classification ... 5

II. Factual Background ... 7

A. Presidential Proclamation 10973 ... 7

B. Agency Guidance and Memoranda ... 10

III. Prior Proceedings ... 11

SUMMARY OF ARGUMENT ... 12

STANDARD OF REVIEW ... 15

ARGUMENT ... 15

I. The Proclamation Is Authorized By 8 U.S.C. §§1182(f) and 1185(a) ... 15

A. The Proclamation is an Exercise of Delegated Immigration or Foreign Commerce Power and Inherent Authority. ... 17

B. The Proclamation is Not an Unconstitutional Tax. ..................22

C. Plaintiffs' Alternative Arguments Fail. ...................................32

II. Appellees' Challenges are Nonjusticiable. ........................................36

III. Appellees Lack an Ultra Vires Cause of Action. ...............................40

IV. The Proclamation and its Implementation are not Reviewable under the APA. ....................................................................................42

A. There is No Reviewable Final Agency Action. ........................42

B. The Proclamation and its Implementation are Committed to Discretion. ....................................................................46

V. The Proclamation and its Implementation are not Procedurally Infirm. ..........................................................................................47

A. Notice and Comment Rulemaking is Inapplicable. ..................48

B. The Proclamations' Implementation is Not Subject to Arbitrary and Capricious Review. ..........................................51

VI. The District Court Erred in Granting Universal Vacatur. ...................54

CONCLUSION ............................................................................................... 56

## TABLE OF AUTHORITIES

### Cases


*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) .................................................................. 37

*Agatha v. Trump*,
151 F.4th 9 (1st Cir. 2025) ......................................................................... 45

*Allen v. Milas*,
896 F.3d 1094 (9th Cir. 2018) ............................................................. 38, 46

*Am. Foreign Serv. Ass'n v. Trump*,
2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam) ............................. 40

*Amanullah v. Nelson*,
811 F.2d 1 (1st Cir. 1987)(A) ........................................................ 37-38, 39, 54

*Ancient Coin Collectors Guild v. CBP*,
801 F. Supp. 2d 383 (D. Md. 2011) ............................................................ 43

*Baaghil v. Miller*,
1 F.4th 427 (6th Cir. 2021) ......................................................................... 38

*Bennett v. Spear*,
520 U.S. 154–78 (1997) .............................................................................. 44

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................................... 34

*Bradford v. DOL*,
101 F.4th 707 (10th Cir. 2024) ............................................................ 51, 52, 53

*Brock v. Washington Metro. Area Transit Auth.*,
796 F.2d 481 (D.C. Cir. 1986) .................................................................... 25

*California v. Mullin*,
183 F.4th 42 (1st Cir. 2026) ......................................................... 12, 22, 26, 27

*Cboe Futures Exch., LLC v. SEC*,
77 F.4th 971 (D.C. Cir. 2023) ..................................................................... 55

*Cent. Maine Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001) ......................................................................... 55

*Chamber of Com. of United States v. U.S. Dep't of Homeland Sec.*,
815 F. Supp. 3d 73 (D.D.C. 2025) ....... 31, 32, 33, 34, 35, 42, 49, 50, 51, 52, 53

*Colony Place S., Inc. v. Volvo Car USA, LLC*,
121 F.4th 973–78 (1st Cir. 2024) ........................................................ 15

*Confiscation Cases*,
87 U.S. (20 Wall.) 92 (1873) ................................................................ 46

*Conservation L. Found. v. Evans*,
360 F.3d 21 (1st Cir. 2004) ..................................................... 50-51, 53

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ............................................................. 51

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................ 14, 40, 42, 46, 47

*Democratic Executive Comm. of Fla. v. NRSC*,
950 F.3d 790 (11th Cir. 2020) ............................................................. 16

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) ............................................................ 14, 36, 37, 38, 39

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ........................................... 45, 47, 48, 53

*Doe #1 v. Trump*,
984 F.3d 848 (9th Cir. 2020) ............................................................... 35

*Edye v. Robertson*,
112 U.S. 580 (1884) ................................ 1-2, 12, 13, 18, 20, 23, 24, 25, 28, 32

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) ............................................................................. 26

*FEA v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) ................................................................. 13, 29, 30

*Ford v. Mabus*,
629 F.3d 198 (D.C. Cir. 2010) ............................................................. 28

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ......................................................................... 14, 42

*Gill v. Whitford*,
585 U.S. 48 (2018) ........................................................................................ 55

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .................................................................... 40, 41

*Haitian Refugee Ctr. v. Gracey*,
809 F.2d 794 (D.C. Cir. 1987) ...................................................................... 21

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ...................................................................................... 21

*Henderson v. Mayor of N.Y.*,
92 U.S. 259 (1875) ........................................................................................ 17

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .................................................................................... 49-50

*Hung Chi Doan v. INS*,
160 F.3d 508 (8th Cir. 1998) ......................................................................... 38

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ........................................................................ 55

*Kerry v. Din*,
576 U.S. 86 (2015) ......................................................................................... 38

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ........................................................ 13, 24, 27, 28, 29, 30

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ........................................................................................... 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ...................................................................................... 20

*Make The Rd. New York v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ...................................................... 45, 48, 51, 53

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) ...................................................................................... 22

*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026) ................................................................................... 22

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ........................................................ 42

*N.H. Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018) ........................................................ 49

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ........................................................ 13, 23, 24

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................................ 46, 47

*NRC v. Texas*,
605 U.S. 665 (2025) ........................................................ 14, 41

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) ........................................................ 30, 33

*Pak v. Biden*,
91 F.4th 896 (7th Cir. 2024) ........................................................ 39

*Patel v. Garland*,
596 U.S. 328 (2022) ........................................................ 20

*Penate v. Sullivan*,
73 F.4th 10 (1st Cir. 2023) ........................................................ 15

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)(A) ........................................................ 49

*Pietersen v. U.S. Dep't of State*,
138 F.4th 552 (D.C. Cir. 2025) ........................................................ 38

*Runkle v. United States*,
122 U.S. 543 (1887) ........................................................ 44

*Saavedra Bruno v. Albright*,
197 F.3d 1153 (D.C. Cir. 1999) ........................................................ 46

*Sale v. Haitian Ctrs. Council*,
509 U.S. 155 (1993) ........................................................ 30-31, 44, 54

*Sherley v. Sebelius*,
689 F.3d 776–85 (D.C. Cir. 2012) ........................................................ 45, 48, 53

*Shiba v. Mullin*,
173 F.4th 895 (7th Cir. 2026) .......................................................... 39

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ........................................................................ 51

*Skinner v. Mid-American Pipeline Co.*,
490 U.S. 212 (1989) ........................................................................ 26, 29

*Smith v. Turner*,
48 U.S. 283 (1849) .......................................................................... 17

*State of S.C. ex rel. Tindal v. Block*,
717 F.2d 874 (4th Cir. 1983) .......................................................... 24, 25

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) .......................................................... 41

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021) ................................................ 43, 44

*Tulare County v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) ............................................... 42-43, 43

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................................ 55

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) .................................................................... 45

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................ 55

*Trump v. Cook*,
146 S. Ct. 2234 (2026) .................................................................... 28

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................................ *passim*

*Trump v. Orr*,
146 S. Ct. 44 (2025) ........................................................... 45, 48, 52, 53

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) ........................................................... 21, 22, 36, 49

*United States v. Rahimi*,
602 U.S. 680 (2024) .................................................................................... 31

*United States v. Texas*,
599 U.S. 670 (2023) .................................................................................... 54

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .................................................................................... 22

**Statutes**

5 U.S.C. §553 .................................................................................................. 49
5 U.S.C. §701 ........................................................................................... 46, 47
5 U.S.C. §702 .................................................................................................. 46
5 U.S.C. §706 ........................................................................................... 53, 54
8 U.S.C. §1101 ......................................................................................... 4, 5, 7
8 U.S.C. §1182 ....................................................................................... *passim*
8 U.S.C. §1184 ...................................................................................... 5, 6, 34
8 U.S.C. §1185 ....................................................................................... *passim*
8 U.S.C. §1356 ......................................................................................... 33, 34
19 U.S.C. §1862 .............................................................................................. 29
28 U.S.C. §1291 ................................................................................................ 3
28 U.S.C. §1294 ................................................................................................ 3

**Other**

8 C.F.R. §214.2 ............................................................................................ 6, 7
85 Fed. Reg. 34,353 (June 4, 2020) ............................................ 31-32, 33, 36
86 Fed. Reg. 59,603 (Oct. 25, 2021) ................................................................ 31
90 Fed. Reg. 46,027 (Sep. 24, 2025) ........................... 1, 7, 8, 9, 10, 11, 17, 20, 35
Black's Law Dictionary (4th ed. 1951) ............................................................ 19
Webster's New Int'l Dictionary Of the English Language (2d ed. 1936) ............. 19
Cambridge Advanced Learner's Dictionary & Thesaurus (4th ed. 2013)........ 19-20
98 Cong. Rec. 4490-91 (Apr. 25, 1952) ............................................................35

## REASONS WHY ORAL ARGUMENT IS REQUESTED

Appellants request oral argument because this case involves complex questions of statutory and constitutional interpretation. The Court would benefit from oral argument to clarify the specific points of disagreement between the parties, relates cases in the D.C. Circuit and Northern District of California, and to address the Supreme Court's recent opinion in *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). This case is also of national importance for the Executive Branch. For the foregoing reasons, Appellants respectfully request that the Court schedule oral argument on the Appellants' brief.

## INTRODUCTION

Though the H-1B nonimmigrant worker visa program was originally created by Congress to fill gaps in the labor market with qualified foreign workers, it has been exploited by corporations and aliens to import lower-paid, lower-skilled workers—thereby artificially depressing wages and employment opportunities for Americans. Responding to this pervasive abuse of the H-1B system, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation") to temporarily restrict the entry of new H-1B workers "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." The Proclamation readily falls within both Congress's "sweeping" delegation to impose "any restrictions he may deem to be appropriate" or any "reasonable rules, regulations, and orders" under 8 U.S.C. §§1182(f), 1185(a) and the President's inherent authority. *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

Plaintiff-Appellee States (Plaintiffs), the district court, and motions panel disagreed, arguing that the payment imposed a tax that was not clearly delegated. As a result, the district court vacated the implementation of the Proclamation and opened the floodgates to aliens entering the country to take vital American jobs. That was wrong several times over. First, the Proclamation was an exercise of the immigration or foreign commerce powers, not a tax. *See Edye v. Robertson*, 112 U.S.

580, 594-95 (1884). It is thus well within Congress's comprehensive delegations and the President's inherent authority. While the payment is not a tax, even if it was those separate authorities support the Proclamation. Second, even if it was a tax there is no special clear statement rule and even then, the broad delegation of "any restrictions" can plainly encompass a limited tax. None of Plaintiffs' alternative arguments hold water either. That alone requires reversal.

There are also threshold reasons that this Court should reverse. To start, consular non-reviewability bars judicial second guessing of alien entry decisions. Furthermore, Plaintiffs lack a cause of action, as their *ultra vires* claim is a statutory argument masquerading as a constitutional one, and the statutes vest the President with unreviewable discretion. Likewise, neither the President's authority can be challenged under the Administrative Procedure Act (APA), nor can agencies' ministerial implementation of the President's authority be challenged. Regardless, the district court's procedural APA rulings were premised on its taxation conclusions and thus likewise fail. Even so, notice-and-comment rulemaking and arbitrary and capricious review cannot apply to the simple implementation of an exercise of Presidential power, and any error in foregoing notice-and-comment was harmless. Finally, the district court's nationwide vacatur was improper.

This Court should reject the district court's attempt to gut the President's broad authority over the entry of aliens, especially where the harms caused by the flood of H-1B workers to American workers is stark. This Court should reverse.

## STATEMENT OF JURISDICTION

On June 8, 2026, the district court entered final judgment against Defendants. On June 11, 2026, Appellants timely appealed. This Court has jurisdiction over that final order under 28 U.S.C. §§1291, 1294(1).

## STATEMENT OF THE ISSUES

1. Whether a Presidential Proclamation restricting alien admission by imposing a $100,000 entry payment falls within the President's sweeping delegated authority to impose "any restrictions he may deem to be appropriate" under 8 U.S.C. §§1182(f) and 1185(a)(1) and his inherent authority.
2. Whether the Proclamation overrides the H-1B program by adding additional restrictions to entry.
3. Whether review is precluded under consular non-reviewability.
4. Whether *ultra vires* review is unavailable to challenge executive action committed by statute to the President.
5. Whether ministerial, non-discretionary agency guidance effectuating a Presidential Proclamation is reviewable under the APA.

6. Whether the ministerial implementation of the Proclamation required notice and comment and is subject to arbitrary and capricious review.

7. Whether the district court erred in vacating the implementation of the Proclamation universally.

## STATEMENT OF THE CASE

### I. Statutory Background

#### A. The Executive's Broad Authority

Under the Immigration & Nationality Act (INA), ch. 477, 66 Stat. 163 (8 U.S.C. §1101, *et seq*.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203. Even with a visa, the alien must be found admissible upon inspection at a port of entry. *Id.* §§1201(h), 1185(d), 1225(a), §1101(a)(4). The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, *id.* §§1182(a), 1201(g). Congress has also accorded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. §1182(f). "By its terms, §1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed that

§1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." *Id.* §1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times since its passage.

### B. H-1B Nonimmigrant Classification

The INA provides for the classification of qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." *Id.* §§1101(a)(15)(H)(i)(b); 1184(c)(1) (the "H-1B program"). A specialty occupation is defined as an occupation that requires (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum qualification for entry into the occupation in the United States." *Id.* §1184(i)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b.

By statute, H-1B petitions fall into two broad categories: cap-subject petitions and cap-exempt petitions. Cap-subject petitions are counted against the strict annual numerical limitations created by Congress, which is 65,000 ("Regular Cap"), with an additional 20,000 for individuals who have earned a master's or higher degree from a United States institution of higher education ("Master's Cap"). 8 U.S.C. §1184(g)(1)(A) (Regular Cap); §1184(g)(5)(C) (Master's Cap). Certain H-1B petitions are cap-exempt based on the nature of the petitioning employer or work location. *Id.* §1184(g)(5)(A)-(B). The demand for initial H-1B status invariably exceeds the congressionally-imposed numerical limitations, and as such, DHS regulations provide rules for the administration of an H-1B cap selection process, commonly referred to as a "lottery." 8 C.F.R. §214.2(h)(8)(iii).

Before a petitioning employer is eligible to submit a Form I-129, Petition for a Nonimmigrant Worker, requesting H-1B classification on behalf of a beneficiary who is subject to the H-1B cap ("an H-1B cap-subject petition"), the petitioner must register for the H-1B cap lottery through the USCIS website. *Id.* §214.2(h)(8)(iii)(A)(1) (discussing the registration requirement). Once the registration period closes, USCIS then determines whether it has received registrations for a sufficient number of unique beneficiaries projected as needed to meet the caps. *Id.* §214.2(h)(8)(iii)(A)(5)-(6). If a beneficiary is selected, USCIS sends a notification to the online account of each prospective petitioner who

submitted a registration for the selected beneficiary along with petition filing instructions. *Id.* §214.2(h)(8)(iii)(C)-(D). The employer must then file a Form I-129 to request the classification of the alien as an H-1B nonimmigrant worker (known as an "H-1B petition") and obtain authorization to employ the beneficiary. *Id.* §214.2(h)(4)(iii)(B)(1); 8 U.S.C. §1101(a)(15)(H)(i)(b). Under the applicable regulations, USCIS shall notify the petitioner of the approval, denial, intent to revoke, and revocation of any H-1B petitions. 8 C.F.R. §214.2(h)(9)(i), (h)(10)(ii), (h)(11).

## II. Factual Background

### A. Presidential Proclamation 10973

President Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." 90 Fed. Reg. at 46,027. It found that H-1B workers account for an outsized share of the labor market in Science, Technology, Engineering, and Mathematics (STEM) fields, and that the information technology (IT) sector, and particularly outsourcing firms, have abused the H-1B system, providing H-1B workers for entry-level positions at a 36% discount compared to American workers. *Id.*

As the number of H-1B workers in STEM fields has increased, the unemployment rate for recent college graduates in those fields has also increased, and companies have at times laid off thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

As the Proclamation explains, not only are H-1B program abuses detrimental to American workers, but such abuses also are a national security threat because they reduce American wages and "discourage Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response" and that "unrestricted entry into the United States of certain foreign workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." *Id.* The President accordingly determined that it was "therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the

abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed a paywall entry restriction on H-1B workers pursuant to the President's authority contained in §§1182(f) and 1185(a) for a one-year period. In particular, it restricted entry to only petitions accompanied by or supplemented by a payment of $100,000 after the effective date. *Id.* It permitted the Secretary of Homeland Security to grant exceptions in his discretion if entry of an alien is "in the national interest and do not pose a threat to the security or welfare of the United States." 90 Fed. Reg. at 46,029.

The Proclamation instructed the Secretary of Homeland Security to restrict decisions on H-1B petitions not accompanied by the $100,000 payment, and it instructed the Secretary of State to confirm payment of the $100,000 before addressing any H-1B visa application. *Id.* at 46,028-29. It also instructed the Department of State and the Department of Homeland Security to take all necessary steps to implement the Proclamation and deny entry to the United States of any H-1B nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also instructed the Department of Labor and the Department of Homeland Security to engage in rulemaking on issues relating to the prevailing wage levels and the H-1B lottery. *Id.* The restrictions are set to expire after 12 months from September 21, 2025, absent an extension. *Id.* at 46,028.

### B. Agency Guidance and Memoranda

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining the contours of the Proclamation. JA129. USCIS explained that the Proclamation applied prospectively and did not impact the ability of any current H-1B visa holder to travel to or from the United States. *Id.* On its website, USCIS explained that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa." JA133. It explained that the $100,000 payment can be submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS", that "petitioners must submit proof that the payment has been scheduled" or evidence that they received an exception, and that "[p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." *Id.* It further provided information on where to submit a request for an exception. *Id.*

U.S. Customs and Border Protection (CBP) also issued brief guidance on September 20, 2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens who are the beneficiaries of approved petitions or who hold valid H-1B visas. JA113. It explained that "[t]he Proclamation does not impact the ability of any current visa holder to travel to or from the United States"

and that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." *Id.*

The State Department issued guidance on its website explaining that the Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000." JA462. The State Department unequivocally stated, "No visas have been revoked pursuant to the Proclamation." *Id.* The State Department "posted guidance to all consular offices, consistent with the guidance from [USCIS and CBP]." JA130.

## III. Prior Proceedings

Nearly three months after the Proclamation issued, Plaintiffs filed this action challenging the entry restriction. JA28. Counts I-III allege that the agency guidance and memoranda are arbitrary and capricious, *ultra vires*, and procedurally improper, in violation of the APA. JA86-91. Count IV alleges a claim in equity that the Proclamation (and thus the agency implementation) are *ultra vires* and violate separation of powers. JA91-94. The Plaintiffs seek to enjoin implementation and enforcement of the agency guidance and memoranda and the Proclamation. JA94-95.

On June 8, 2026, the district court issued an opinion (Addendum 01(Ad.) (Op.)) and order (Ad.43) granting summary judgment for Plaintiffs and vacating the implementation of the Proclamation's restriction on entry (the $100,000 payment requirement). Defendants timely appealed and sought a stay pending appeal. JA26. The district court denied a stay pending appeal but granted an administrative stay until this Court ruled on a stay pending appeal. *See California v. Mullin*, 183 F.4th 42, 48 (1st Cir. 2026). On June 18, 2026, Appellants filed an Emergency Motion for Stay Pending Appeal in the United States Court of Appeals for the First Circuit. *See id*. On July 24, 2026, the First Circuit Court of Appeals denied Appellants' Motion for Stay Pending Appeal. *See generally id*.

## SUMMARY OF ARGUMENT

The district court fundamentally erred by overriding the President's core constitutional and statutory powers over immigration and foreign affairs and ignoring bars on reviewability and causes of action to issue a universal vacatur of a vital Presidential policy. This Court should reverse.

**I.** The Proclamation was a lawful exercise of the President's delegated and inherent authority to restrict the entry of aliens. **A.** History makes clear that imposing a paywall on aliens is an exercise of the immigration or foreign commerce powers, not a tax. *Edye*, 112 U.S. at 595-96. The Proclamation is thus a proper exercise of Congress's "sweeping" delegations to impose "any restrictions" on the entry of

aliens under §§1182(f) and 1185(a) and/or inherent Executive authority to exclude aliens. *Hawaii*, 585 U.S. at 684. **B.** Those authorities support the Proclamation even if it could be considered a tax. *See NFIB v. Sebelius*, 567 U.S. 519, 561 (2012). And in any event under the functional test, the payment is not a tax. *Id.* at 565-66. Again, this aligns with the Supreme Court's holding that imposing paywalls on the entry of aliens are regulations of immigration or foreign commerce, not a tax. *Edye*, 112 U.S. at 595-96. And even if the payment must exercise the taxing power, such a delegation would not require a special clear statement rule compared to other Article I powers. Regardless, the delegation of "any restrictions" would clearly meet any clear statement requirements, as the "sweeping" delegations in §§1182(f) and 1185(a) are closer to *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976) than *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026). **C.** Plaintiffs' alternative arguments, that no court has accepted, are meritless. The Proclamation does not conflict with the H-1B program or provisions in the INA implementing fees, all of which are non-exhaustive. Instead, the entire point of Sections 1182(f) and 1185(a) is to "vest[] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. The Proclamation is thus lawful.

**II.** This Court should also reverse because the Proclamation is nonjusticable under principles of consular nonreviewability. Decisions governing the admission

and exclusion of foreign nationals are "fundamental sovereign attribute[s]" immune from judicial intervention. *Dep't of State v. Muñoz*, 602 U.S. 899, 907 (2024). Proclamations pursuant to §§1182(f) and 1185(a) are just such decisions.

**III.** Plaintiffs also lack an *ultra vires* cause of action. Parties cannot transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were i*pso facto* unconstitutional" there would be "little need" for "specifying unconstitutional and ultra vires conduct as separate categories." *Dalton v. Specter*, 511 U.S. 462, 470 (1994). That is precisely what Plaintiffs do here. And they do so because they cannot meet the high standard for nonstatutory *ultra vires* claims. *See NRC v. Texas*, 605 U.S. 665, 666 (2025).

**IV.** The APA simply does not apply. **A.** The APA provides no cause of action to challenge presidential action, *Franklin v. Massachusetts*, 505 U.S. 788 (1992), nor does it permit challenges to ministerial agency guidance that merely executes a Presidential Proclamation without independent decision-making. Such guidance does not constitute final agency action. **B.** And any implementation is committed to agency discretion and thus unreviewable.

**V.** Furthermore, the district court's procedural APA rulings were premised on its faulty tax analysis and thus equally fail. **A.** Regardless, notice-and-comment procedures were not required for ministerial execution, as the agencies could not deviate from the payment requirement. Moreover, the guidance documents are not

legislative rules, and the good cause or foreign affairs exceptions would nonetheless apply. Likewise, any error would be harmless because again the agencies could not deviate from the Proclamation, and thus Plaintiffs lack redress. **B.** Similarly, the agencies could not have acted arbitrarily and capriciously because they could not deviate from the Proclamation. This also means any error would be harmless.

**VI.** Finally, universal vacatur violates equitable principles.

This Court should reverse.

## STANDARD OF REVIEW

Courts review the "grant or denial of summary judgment de novo" even for cross motions. *Colony Place S., Inc. v. Volvo Car USA, LLC*, 121 F.4th 973, 977–78 (1st Cir. 2024). Summary judgment is only appropriate "when the record reflects no genuine issue as to any material fact and indicates that the moving party is entitled to judgment as a matter of law." *Penate v. Sullivan*, 73 F.4th 10, 17 (1st Cir. 2023) (quotation omitted).

## ARGUMENT

### I. The Proclamation Is Authorized By 8 U.S.C. §§1182(f) and 1185(a).

The Proclamation is a lawful exercise of the immigration or foreign commerce power, and is thus justified either as part of Congress's comprehensive delegations in 8 U.S.C. §§1182(f) and 1185(a) or as inherent in executive authority. In the INA, Congress provided that the President "may by proclamation … impose on the entry

of aliens any restrictions he may deem to be appropriate," *id.* §1182(f), and that "it shall be unlawful" for an alien to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe," *id.* §1185(a)(1). The Proclamation falls well within that broad delegation.

The only response Plaintiffs, the district court, and the motions panel can muster is that the Proclamation is an exercise of the taxing power. That is wrong—the Proclamation is designed to regulate immigration, not to raise revenue. But it is also irrelevant. Even *if* §§1182(f) and 1185(a) were enacted under Congress's taxing power, they contain sufficient clarity and direction to authorize the Proclamation. The motions panel's short per curiam opinion denying a stay is non-binding and unpersuasive. *Democratic Executive Comm. of Fla. v. NRSC*, 950 F.3d 790, 795 (11th Cir. 2020) (noting that a "stay-panel opinion *cannot* spawn binding legal consequences regarding the merits of the case"). It failed to grapple with these points. This all requires rejecting Plaintiffs' APA excess of authority and *ultra vires* claim. This Court should thus reverse the district court's judgment in Plaintiffs' favor.

### A. The Proclamation is an Exercise of Delegated Immigration or Foreign Commerce Power and Inherent Authority.

The Proclamation's restriction on entry via a paywall is an exercise of the immigration and foreign commerce power. That authority stems both from the INA and the President's inherent executive authority.

**1.** Under the Proclamation, evidence of the $100,000 payment must be included when filing certain H-1B petitions. 90 Fed. Reg. at 46,027-29. If an alien subject to the entry restriction tries to enter the United States without submission of the payment, he or she is barred from doing so. *Id.* By conditioning entry on payment, the Proclamation is definitionally a regulation of immigration and foreign commerce.

History confirms that such payment requirements are based on the federal government's inherent power over immigration and foreign commerce, not the taxing power. Indeed, the Supreme Court invalidated numerous head count payments levied on the entry of aliens by states not because they were taxes (which states can impose), but because they were foreign commerce regulations (which states cannot impose). *See Smith v. Turner*, 48 U.S. 283, 421 (1849); *Henderson v. Mayor of N.Y.*, 92 U.S. 259, 270 (1875).

Similarly, when Congress passed "An Act to Regulate Immigration" in 1882, it regulated immigration by directing the Secretary of the Treasury to collect a 50-

cent payment per alien landing at a United States' port. Pub. L. 47–376. Several American companies sued arguing the law was an unconstitutional direct tax. *Edye*, 112 U.S. at 594-95. The Supreme Court rejected those arguments, holding that "the power exercised in this instance is *not the taxing power*." *Id.* at 595-96 (emphasis added). Rather, the payment requirement was a "mere incident of the regulation of *commerce*—of that branch of *foreign commerce which is involved in immigration*." *Id.* (emphasis added). For that reason, said the Supreme Court, the "title of the act" was "well chosen" to "describe' the "real purpose and effect of the statute." *Id.* "Its provisions, from beginning to end, relate to the subject of immigration, and they are aptly designed to mitigate the evils inherent in the business of bringing foreigners to this country, as those evils affect both the immigrant and *the people among whom he is suddenly brought* and left to his own resources." *Id.* (emphasis added).

The Proclamation's paywall is virtually identical to the arrangement the Supreme Court blessed over a century ago. It applies to certain aliens seeking to enter the United States in a particular way, can (but need not) be paid by an American company, and is designed to mitigate the external costs of bringing such aliens into the country. Thus, the Proclamation's payment requirement stems from the foreign commerce power or immigration power.

**2.** Congress provided a "comprehensive delegation" of the immigration and foreign commerce power to restrict the entry of aliens under §§1182(f) and

1185(a). *Hawaii*, 585 U.S. at 684-85. By its "plain language," §1182(f) "grants the President broad discretion" to suspend or restrict the entry of aliens into this country. *Hawaii*, 585 U.S. at 683. "Whenever the President finds" that entry of aliens or a class of aliens "would be detrimental to the interests of the United States," he "may by proclamation" "suspend the entry of all aliens or any class of aliens" or "impose on the entry of aliens any restrictions *he may deem to be appropriate*." 8 U.S.C. §1182(f) (emphasis added). "By its terms, §1182(f) exudes deference to the President in every clause," and it "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684.

The Proclamation's payment requirement plainly qualifies as "any restriction" on the entry of aliens. A "restriction" includes "[a] limitation imposed upon a person or thing; a condition or regulation of this nature." *Restriction*, The Oxford English Dictionary (2d. ed. 1989). Or, according to a dictionary contemporaneous to §1182(f)'s passage, to "restrict" is to "restrain within bounds; to limit; to confine." *Restrict*, Black's Law Dictionary 1478 (4th ed. 1951); *Webster's New Int'l Dictionary Of the English Language* 2125 (2d ed. 1936) (same). The Proclamation definitionally "limit[s]" and "restrain[s]" entry; aliens subject to the Proclamation may not enter the United States as an H-1B nonimmigrant unless the payment has been made. And nothing about the definition of "restriction" excludes payment as

the method; indeed, "import/export/currency restrictions" and "trade restrictions" are commonplace uses of the term. *Restriction*, Cambridge Advanced Learner's Dictionary & Thesaurus (4th ed. 2013).

If there were any doubt, the modifier "any" removes it. The "word 'any' has an expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022). The phrase "any restriction" refers to restrictions "of whatever kind," *id.*—including monetary ones. The payment required by the Proclamation clearly places a limitation, qualification, or confinement on a person: an alien subject to the restriction on entry is limited from entering the United States on an H-1B visa unless they satisfy the additional qualification of a $100,000 payment. Fed. Reg. at 46,028 §1.

Section 1185(a)(1) also supports the Proclamation because it allows the President to set "reasonable rules, regulations and orders" for the entry and exit of aliens, subject to "such limitations and exceptions as the President may prescribe." 8 U.S.C. §1185(a)(1). The Proclamation—like the 50-cent payment in the 1882 Act—is a "regulation" of immigration and foreign commerce. *Edye*, 112 U.S. at 594-95. And given the undisputed justifications offered therefor, it is a manifestly "reasonable" regulation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (noting that "reasonable" is a term of "flexibility"). The Proclamation was designed to address severe abuses and detriments to American workers. 90 Fed. Reg. at 46,027-28. By requiring a $100,000 payment as a condition of entry, the

Proclamation protects American workers and ensures that only truly necessary foreign workers receive H-1B visas.

**3.** The President also has inherent authority to exclude aliens from entering the nation. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 838 (D.C. Cir. 1987) (Edwards, J. concurring in part, dissenting in part) ("It is difficult to quibble with the conclusion of the district court that the President indubitably possessed both statutory [§§1182(f) and 1185(a)(1)] and inherent constitutional authority to establish the interdiction program [enforced by a naval blockade by the Coast Guard]."). The "right" to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). As the Supreme Court has repeatedly emphasized, "the political branches" possess near-plenary authority in the immigration context, and "any policy toward aliens" is "so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). That includes the President.

Plaintiffs have argued that only Congress has authority over immigration. *See* Pls' Motion for Summary Judgment (Dkt. No. 87) (Pls' MSJ) at 16-17. That is wrong. When "Congress prescribes a procedure concerning the admissibility of aliens," it "is implementing an inherent executive power." *Knauff*, 338 U.S. at 543;

*see also Mullin v. Al Otro Lado*, 609 U.S. ----, 146 S. Ct. 2079, 2099 (2026) (Thomas, J., concurring) (collecting authorities). And executive power to "exclu[de] aliens" (*Knauff*, 338 U.S. at 543) "necessarily includes the lesser power to place conditions on entry, on continued presence, or on [] conduct, such as a tax," *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 144, 148 (1982). Taken together, requiring a payment as a means of restricting the entry of aliens is inherent in the Executive. Given the President's inherent authority over immigration and Congress's "express … authorization," the President's "authority is at its maximum" here. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Thus, the Proclamation is well within the President's authority.

**B. The Proclamation is Not an Unconstitutional Tax.**

Plaintiffs argue, and the district court and motions panel agreed, that the payment was a tax that was not clearly delegated by Congress. *See generally California*, 183 F.4th at 49-50. That holding is unnecessary (because the Proclamation is independently justified by other sources of authority), wrong (because the Proclamation does not impose a tax), and irrelevant (because the INA provides sufficiently clear statements regardless).

**1.** As explained, the Proclamation is amply justified by the President's immigration and foreign commerce powers, both inherent and granted by statute. It

was thus unnecessary for the district court and motions panel to consider whether the Proclamation could *also* be justified as an exercise of the taxing power.

Courts routinely uphold actions if *any* legal authority can justify it. *See, e.g.*, *NFIB*, 567 U.S. at 561; *Edye*, 112 U.S. at 594-95. In *NFIB*, the Supreme Court held that the Affordable Care Act did not properly regulate interstate commerce, yet it upheld the Act as an exercise of the taxing power. *Id.* at 563. It did so based on the rule that, unless "unavoidable," no court should find a legislative act to "involve a violation, however unintentional, of the constitution." *Id.* at 562 (citation omitted). Thus, if any legal authority permits the President's action, it must be upheld.

The district court and motions panel did not grapple with these principles, instead invaliding the Proclamation because it could be a tax. Tax or not, since the Proclamation can be justified as a delegation of the commerce or immigration powers it is lawful. That is how Defendants have always justified the Proclamation. *See* Defendants' Motion for Summary Judgment (Dkt. No. 93) at 17-18, 23-27. Whether the Proclamation can be justified under the taxing power is no more relevant than whether it could be justified under the Copyright Clause or Congress's power to coin money. The district court and motions panel should never have even reached this issue, let alone invalidate the Proclamation on that basis.

**2.** Even if the Court were to consider the question (it should not), the payment requirement is not a tax at all. As explained, judicial and historical

precedents make clear that payment requirements, without more, are *regulations* of the activity they are tied to. *See Edye*, 112 U.S. at 595 (immigrant head count payment was not a tax); *State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983) ("deduction" on milk profits was a regulation payment, not a tax). The mere presence of a monetary transaction does not turn an immigration regulation into a tax.

The "functional" test from *NFIB*, 567 U.S. at 565-66, confirms this. In *NFIB*, the Supreme Court held that the health care mandate was a tax because it "c[ould] never be more" than "the price of insurance," was collected by "the IRS through the normal means of taxation," and raised revenue. *Id.* None of that is true here. Indeed, Plaintiffs' argument is that the Proclamation payment is excessive in relation to H-1B application fees. *Id.* And here, it is DHS, "an agency responsible for" enforcing immigration laws, "not collecting revenue," who collects the Proclamation payments. *Id.* Finally, "the defining feature of a tax" is to "raise[] revenue." *Learning Res., Inc.*, 607 U.S. at 241. Unlike *NFIB*, neither the purpose nor effect of the Proclamation is to raise revenue. *See Sebelius,* 567 U.S. at 567 (noting that the mandate "will raise considerable revenue"). The purpose is to incentivize the hiring of American workers, and H-1B revenue is predictably down by millions as a result of the Proclamation. Fed. Reg. at 46,027; JA654. Every factor cuts against the payment being a tax.

The district court disagreed by taking each factor in isolation and noting that taxes can be labeled various things, collected by DHS, and can serve regulatory purposes. Op.18-20. That reasoning defeats the point of the functional test, which is that no one fact is dispositive but all of them weighing against a payment being a tax (as here) strongly suggests it is not a tax. Especially so here, where there are other powers that support the payment.

The district court also claimed that any money being received increases revenue and that is the purpose even if it is ineffective. Op.19. That would render any payment—including penalties—a tax. It is also false. Again, the Supreme Court found that a similar payment was not a tax because the "real purpose and effect of the statute" is to regulate immigration and to "mitigate" the harms to the public and provide "for the protection of the citizens among whom they are landed." *Edye*, 112 U.S. at 595–96; *see also State of S.C. ex rel. Tindal*, 717 F.2d at 887 ("If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax."); *Brock v. Washington Metro. Area Transit Auth.*, 796 F.2d 481, 488 (D.C. Cir. 1986) (collecting similar cases). That mirrors the purpose of the Proclamation—the only evidence of purpose here—which says the payment is to restrict entry of H-1B workers for national security and economic purpose, not to raise revenue. Fed. Reg. at 46,027. Taken together, these factors

prove the paywall is not a tax. And even if it was, other authorities justify the payment.

**3.** Regardless, even if the Proclamation imposes a tax (it does not), §§1182(f) and 1185(a) delegate "sweeping" authority to impose "any restrictions he may deem to be appropriate" or "reasonable rules, [and] regulations" in the realm of "immigration" and "foreign affairs." *Hawaii*, 585 U.S. at 684, 708. That is sufficient to include a paywall to restrict the entry of a class of aliens.

Plaintiffs, the district court, and motions panel relied on *Skinner v. Mid-American Pipeline Co.*, 490 U.S. 212 (1989), to argue that "any restrictions" was not clear enough for Congress to delegate the taxing power. Op.25; *California*, 183 F.4th at 49-50; Pls.' MSJ at 14. But that very case declined to create a "stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power." *Skinner*, 490 U.S. at 223; *FCC v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025). And the reason the Supreme Court rejected a heightened delegation requirement was that there is "nothing in this placement of the Taxing Clause that would distinguish Congress' power to tax from its other enumerated powers." *Skinner*, 490 U.S. at 220-21. That logic forecloses Plaintiffs', the district court's, and the motions panel's theory that, even if authority to delegate a tax is equal across powers, the delegation must be clearer for taxes than for other powers. Simply put, there is no such thing as taxing power exceptionalism. And

under ordinary principles of statutory interpretation, the delegations in §§1182(f) and 1185(a) are clearly broad enough to encompass the Proclamation.

Even if there were some special clear statement rule for taxing power delegations, the "sweeping" and "comprehensive" delegation here is sufficient. *Hawaii*, 585 U.S. at 684, 708. Relying on *Learning Resources*, Plaintiffs, the district court, and motions panel argued that the lack of magic words like "tax" or "fee" means the Proclamation is unauthorized. *California*, 183 F.4th at 49-51; Op.21-22; Plaintiffs' Reply to Response to Pls.' MSJ (Dkt. No. 99) at 13-15. That analysis was misplaced.

Start with *Learning Resources*, which was careful to "not speculate on hypothetical cases not before us" and to limit its holding to IEEPA. 607 U.S. at 251 n.4. The Supreme Court rejected the argument that "[t]he power to 'regulate … importation'" included a power to tax, explaining that "regulate[]" appears sixteen words away from "importation," and noted that a broad construction of "regulate" would swallow the eight verbs in the remainder of the statute rendering them "wasted ink." *Id.* at 249. By contrast, §1182(f) contains no list of ways the President may "suspend" or "restrict" entry that would narrow the power conferred. The Supreme Court also reasoned that a statutory "grant of authority to 'regulate … importation'" did not authorize the imposition of duties because the statute "contains no reference to tariffs or duties" and "until now no President ha[d] read [the statute] to confer

such power." *Id.* at 646. The opposite is true here. *Edye* confirms that in the immigration context, a per-alien payment is a well-known means of restricting the entry of aliens and "mitigat[ing]" the negative externalities of such entry. 112 U.S. at 595. That is precisely what §§1182(f) and 1185(a) authorize the President to address, and precisely what the Proclamation addresses.

The motions panel reasoned that "any restriction" is synonymous with "regulate" in *Learning Resources*. *California*, 183 F.4th at 50. Wrong again. *First*, as explained in the preceding subsection, "restriction" is a broad term that includes limits and conditions like the ones imposed here. *Second*, the panel ignored that, unlike in *Learning Resources*, Congress chose to use the expansive term "any." *See Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) ("any" made authority more "sweeping"). Even if there is an implied limit on "regulate" or "restriction" to exclude taxing, the modifier "any" sweeps it away. *Id.* The panel's interpretation reads out that expander. *But see Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) (courts "must give effect to every word of a statute wherever possible"). *Third*, as noted, the Supreme Court has already held that similar head count payments are regulations of immigration, *see Edye*, 112 U.S. at 594-95, and Congress legislated against that background, *Trump v. Cook*, 146 S. Ct. 2234, 2251-55 (2026). *Finally*, unlike the word "regulate" in *Learning Resources*, there are not a slew of other statutes using language similar to that in §§1182(f) and 1185(a).

If anything, §§1182(f) and 1185(a) are more like the statute at issue in *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). There, the Court held that a statute authorizing the President to "take such action … as he deems necessary to adjust the imports" of certain goods included imposing "monetary exactions" on those goods despite the provision not referencing duties, tariffs, fees, or anything else. *Id.* at 550-52. *Skinner* even relied on *Algonquin* as an example of a sufficient delegation of the power to impose "fees." *Skinner*, 490 U.S. at 224. As *Learning Resources* explained, that holding was justified because of the "sweeping, discretion-conferring language" in the statute. 607 U.S. at 254. The language in §1182(f) is also "sweeping"—indeed, even more so due to the modifier "any." *Hawaii*, 585 U.S. at 684.

The district court and motions panel attempted to distinguish *Algonquin* because the statute in that case mentions duties. Op.22 (citing *Learning Res., Inc.*, 607 U.S. at 254-55). That section says "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction," 19 U.S.C. §1862(a), so it certainly does not imply that the ability to "adjust . . . imports" includes modifying those duties. Indeed, neither *Algonquin* nor *Skinner* relied on that provision. So there is no reason to take that crabbed view of *Algonquin* or *Learning Resources*. In *Algonquin*, the Supreme Court homed in on the term "adjust," and held that it should not "be read to encompass only quantitative methods—i.e., quotas—as opposed to monetary methods—i.e., license fees—of effecting such adjustments." 426 U.S. at

561. And in *Learning Resources*, the Supreme Court highlighted the statute's authorization to "take such action … as [the President] deems necessary," 607 U.S. at 254 (quoting 19 U.S.C. §1862(b))—language which finds an echo in §§1182(f) and 1185(a).

Nor does it make sense for Plaintiffs, the district court, and the motions panel to point to specific non-exhaustive fees in the INA as reason to limit §1182(f). *California*, 183 F.4th at 50; Op.32-33; Pls' MSJ at 11-13 (citing 8 U.S.C. §§1356(u)(1), 1184(c)(12)). The entire point of §1182(f) is to "vest[] the President with 'ample power' to impose entry restrictions *in addition* to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684 (emphasis added). Taken to its logical conclusion, Plaintiffs' argument that the INA's specific scheme leaves no space for §1182(f) to operate would render that "ample power" illusory. *See Pacito v. Trump*, 169 F.4th 895, 920 (9th Cir. 2026) (rejecting similar arguments).

That is not the statute Congress enacted. Given the broad purpose of the statute, it would make no sense to list the types of restrictions that could be employed such as fee, as like *Learning Resources*, that would be interpreted to limit the authority. Instead, Congress expressly allowed "any restrictions" to supplement the INA, which can include blockades, total suspensions, and even paywalls. *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 187 (1993) ("It is perfectly clear that 8 U.S.C. §1182(f)… grants the President ample power to establish a naval blockade that

would simply deny illegal Haitian migrants the ability to disembark on our shores."). As the *Chamber* court correctly ruled, §1182(f)'s delegation used "exceeding[ly] broad language" that encompassed a restriction requiring an "additional payment obligation for entry of a nonimmigrant H-1B visa worker." *Chamber of Com. of United States v. U.S. Dep't of Homeland Sec.*, 815 F. Supp. 3d 73, 100 (D.D.C. 2025) ("*Chamber*"). This Court should hold the same.

Additionally, the major questions doctrine holds no purchase here. These statutes are no mouseholes; they are "sweeping" delegations that permit even a naval blockade. *Hawaii*, 585 U.S. at 684. And the power asserted, while significant, is no elephant; it is limited to the entry of aliens. Nor have Plaintiffs demonstrated a significant economic impact, much less one well beyond the impact of a travel ban on numerous large countries. *Id.* And that a payment has not been imposed using these statutes before does not mean it *could* not have been imposed before; Presidents do not always exercise their power "maximally," and a contrary assumption would create "a law trapped in amber." *United States v. Rahimi*, 602 U.S. 680, 739 (2024) (Barrett, J., concurring). As Congress intended with its broad delegation of "any restrictions," Presidents have used proclamation in novel ways to address unique issues. *See, e.g.*, 86 Fed. Reg. 59,603 (Oct. 25, 2021) (suspending entry of certain covered aliens without COVID-19 vaccines); 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F student and J exchange visitor visas for certain Chinese

students and researchers). And again, head count payments have been used to restrict aliens before. *See Edye*, 112 U.S. at 589. At bottom, none of this justifies further limiting Congress's "comprehensive delegation" of "any restrictions he may deem to be appropriate[,]" which clearly includes the paywall here. *Hawaii*, 585 U.S. at 684-85.

### C. Plaintiffs' Alternative Arguments Fail.

Plaintiffs did not lead with their taxation theory before the district court, instead focusing on arguments that the Proclamation overrode Congress's reticulated H-1B program and related fees. Pls' MSJ at 11. No court has adopted those arguments. Nor should this Court affirm on such weak alternative grounds. As noted, §§1182(f) and 1185(a)(1) "vest[] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. The Proclamation does not conflict with the INA's statutory framework; it supplements the INA and is thus lawful.

*First*, the Proclamation does not conflict with Congress's scheme for H-1B visas. The Proclamation does not change H-1B numerical caps, alter cap exemption criteria, or modify specialty occupation definitions. All of those statutory requirements remain intact. *Chamber*, 815 F. Supp. 3d at 103-07. Instead, the Proclamation supplements the INA by temporarily imposing a $100,000 payment for certain petitions to "impose higher costs on companies seeking to use the H-1B

program in order to address the abuse of that program." *Id.* at 94. The fact that Congress incorporated anti-abuse mechanisms into the INA confirms the legislative objective that the H-1B framework not be exploited. The Supreme Court rejected a nearly identical argument that a Congress created a reticulated scheme that a proclamation was altering because "plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting" system. *Hawaii*, 585 U.S. at 689.

Under Plaintiffs' theory, the Executive could never impose an entry restriction in an area where Congress has legislated—a result that would eviscerate §1182(f) and contradict *Hawaii*, 585 U.S. at 689. Nor is such a theory consistent with past proclamations. *See id.* at 693 (describing past proclamations); 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for certain Chinese students and researchers). Moreover, the Ninth Circuit recently rejected a similar argument that a proclamation overrode the reticulated statutory scheme for refugees by fully suspending their entry indefinitely despite a cap and specific provisions. *See Pacito*, 169 F.4th at 920. If a full suspension of entry for refugees is within the Presidents §1182(f) authority and does not unlawfully override the INA, then surely neither does this. *Id.*

Second, the Proclamation and agency implementing memoranda do not override the fee provisions of §1356(m). Section 1356(m) gives the Secretary of

Homeland Security discretion to impose "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." The Proclamation does not impose an administrative processing fee to cover costs, does not displace §1356(m) fees, and is not collected or used in the same manner. *See Chamber*, 815 F. Supp. 3d at 103-05.

Moreover, §1356(m) uses the permissive word "may" and in no way precludes separate regulatory entry conditions. *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("'may' clearly connotes discretion"). Statutory fee provisions across the INA are explicitly non-exclusive. For example, §1356(u) authorizes a "premium fee" collected "[i]n addition to any other fees authorized by law." 8 U.S.C. §1356(u)(1). Similarly, §1184(c)(12) mandates a fraud prevention fee "[i]n addition to any other fees authorized by law." Conversely, when Congress intends to enact an express prohibition on immigration fees, it does so explicitly. *See id.* §1356(e)(3) (providing that a specific fee "shall not apply" to certain immigrants arriving by ferry). The absence of such prohibition in §1356(m) confirms that general cost-recovery fees do not restrict presidential authority under §§1182(f) or 1185(a)(1). And the absence of any such limits on §§1182(f) and 1185(a) reinforce that the provisions do not exclude taxes.

*Third*, the Proclamation does not regulate domestic conduct and would not be unlawful in any event. Fundamentally, the Proclamation restricts the entry of certain aliens as detrimental to American workers and national security. 90 Fed. Reg. at 46,027. Regardless, as the D.C. District Court found when considering the same challenges to the Proclamation, "the distinction between foreign and domestic policy finds no support in the statutory text which simply speaks in terms of restricting entry of aliens 'detrimental to the United States' and contains no limitation to any particular sphere, foreign or domestic." *Chamber*, 815 F. Supp. 3d at 99 (cleaned up). The Ninth Circuit made this clear, holding that "it makes no difference whether the additional entry restrictions are imposed under [§1182(f)] based on assertedly domestic policy concerns… [as] all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree." *Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated*, *Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (collecting examples).

Indeed, congressional debates made clear the statute must be capable of restricting entry to improve the domestic job market, as the Proclamation here is designed to do. 98 Cong. Rec. 4490-91 (Apr. 25, 1952) (bill's author justified the scope because "[S]uppose we have a period of great unemployment?"). The proclamation upheld in *Hawaii* was also concerned about public safety and national security consequences within the United States, which are domestic concerns. 585

U.S. at 677-80. If Plaintiffs' arguments were credited, it would mean that no visas with domestic sponsors could be restricted, which is not the case. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending J visas for certain Chinese students and researchers, which require a domestic sponsor). The Proclamation and implementing guidance suspend entry absent satisfaction of specified conditions, regardless of the identity of any sponsoring employer, and thus operates as an entry restriction rather than a domestic economic regulation.

## II. Appellees' Challenges are Nonjusticiable.

The Proclamation is also nonjusticiable under principles of consular nonreviewability. The Supreme Court has long held that "[t]he admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Muñoz*, 602 U.S. at 907 (2024) (quotations omitted). Review of entry decisions is "not within the province of any court, unless expressly authorized by Congress." *Id.* On the flip side, "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." *Id.* (quotations omitted).

Plaintiffs' claims challenging the Proclamation are non-justiciable on both fronts. Congress has clearly not authorized the review of decisions to exclude aliens. *Knauff*, 338 U.S. at 543. Instead, Congress has delegated sweeping "discretionary

authority" over whether to admit aliens. *Muñoz*, 602 U.S. at 907. Congress made a policy choice in §§1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). "By its terms, §1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability). Since Plaintiffs are challenging the Executive's entry decisions, such claims are nonreviewable.

The district court took a myopic view of that precedent and confined its applicability to backward-looking challenges to "discretionary decisions" or "the denial of any visa," concluding that Plaintiffs could challenge the Proclamation prospectively as outside of the President's discretion. Op.10. The Supreme Court has explained, however, that its precedent on this subject applies "across different contexts and constitutional claims." *Hawaii*, 585 U.S. 667, 703 (2018) (citing *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J. concurring); *Fiallo v. Bell*, 430 U.S. 787, 796 (1977)) (finding the issue "difficult" in a similar case and assuming reviewability without deciding); *see also Amanullah v. Nelson*, 811 F.2d 1, 10-11

(1st Cir. 1987) (applying doctrine to INS district director's denial of §1182(d)(5)(A) parole to certain excludable aliens detained by the INS).

The district court held that consular nonreviewability did not apply because the Proclamation might fall outside the President's discretion. Op. 11. But that peek behind the curtain completely circumvents the doctrine. In *Hawaii*, *Din*, and *Muñoz* the plaintiffs argued the actions were outside the Executive's discretion but that did not preclude consular non-reviewability. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability); *Muñoz*, 602 U.S. at 907; *Din*, 576 U.S. at 105. Thus, courts have universally ruled that claims of factual, substantive, or procedural error do not overcome non-reviewability doctrine. *See Baaghil v. Miller*, 1 F.4th 427, 434 (6th Cir. 2021); *Allen v. Milas*, 896 F.3d 1094, 1098 (9th Cir. 2018); *Hung Chi Doan v. INS*, 160 F.3d 508, 509 (8th Cir. 1998). In short, it is the exclusionary nature of the decision—not the decision's underpinning, much less the theory of the challenge—that governs whether the doctrine applies.

The district court primarily relied on *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025), for its rule. That case is distinguishable because it involved an APA challenge to a "reason to believe" standard for §1182(a)(6)(C)(i) inadmissibility set by the State Department in its Foreign Affairs Manual as purportedly inconsistent with the statute. *Id.* at 554. But the Proclamation is not an agency's regulation or policy; rather, it is a Proclamation by the President committed

to his discretion by §1182(f). Further, the agencies are not setting a new standard for adjudications within their own authority for duties entrusted to them. 8 U.S.C. §§1103, 1104. At most, the agencies issued guidance simply implementing the President's Proclamation. In sum, *Pietersen*'s controversial backdoor around the non-reviewability doctrine has no bearing here.

To the extent *Pietersen* would be applicable, it is wrong. Indeed, the Seventh Circuit has applied consular nonreviewability and rejected a similar challenge to a prospective policy claiming the policy was outside the executive's authority. *See Pak v. Biden*, 91 F.4th 896, 900-01 (7th Cir. 2024). For good reason. Consular nonreviewability is premised on the "separation of powers" because "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments.'" *Shiba v. Mullin*, 173 F.4th 895, 903-04 (7th Cir. 2026) (quoting *Hawaii*, 585 U.S. at 702); *accord Amanullah*, 811 F.2d at 17 ("We recognize that Congress… has delegated the uniquely political decisions about the ultimate admission and exclusion of aliens to the executive branch[.]"). It also comes from the fact that aliens have no "right of entry to this country as a nonimmigrant or otherwise." *Muñoz*, 602 U.S. at 908 (quoting *Mandel*, 408 U.S, at 762). Both of those principles apply equally to the Proclamation and favor the application of consular nonreviewability.

### III. Appellees Lack an Ultra Vires Cause of Action.

Plaintiffs also lack an *ultra vires* cause of action. To start, it is doubtful that *ultra vires* review is available to challenge presidential actions at all. *See Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam). Regardless, parties cannot transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were *ipso facto* unconstitutional" there would be "little need" for "specifying unconstitutional and ultra vires conduct as separate categories." *Dalton*, 511 U.S. at 470. Making pure separation of powers arguments based on statutory limits is impermissible because "plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Glob. Health Council v. Trump*, 153 F.4th 1, 14-15 (D.C. Cir. 2025). That is precisely what Plaintiffs have attempted here. Plaintiffs brought an *ultra vires* claim that the Proclamation exceeded Congress's delegation of *statutory* authority and thus violated the separation of powers. JA91-94 (Count 4).

The district court attempted to distinguish those cases by claiming Plaintiffs brought distinct statutory and constitutional claims. Op.14-16. But Plaintiffs argue the President violated the separation of powers by exercising a taxing power that exceeded the authority delegated in the statutes. JA94 ¶¶ 229-36 (claim turned on whether the statutes delegated the power). In assessing the *ultra vires* claim, the

Court itself said "the relevant inquiry here is whether the provisions of the INA granting the President discretionary powers to regulate the entry of noncitizens reflect a delegation of Congress's taxing power" and then analyzed the text of the statute. Op.20-23, 29, 32-33 (excess of statutory authority is same analysis). And the district court noted Plaintiffs argue statutory and constitutional claims, Op.14, and the analysis was identical and focused on the statutory delegation, Op.33. That is the exact problem. The fundamental question has always been whether the Proclamation exceeded Congress's delegation in §§1182(f) and 1185(a), which is precisely the type of "constitutional" claim courts have said is impermissible. *See Glob. Health Council*, 153 F.4th at 14-15; *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026).

Plaintiffs shift to arguing they can satisfy the requirements to bring an *ultra vires* statutory claim. Appellees' Opposition to Motion to Stay (Doc. #00118467437) at 16-17. That is not the claim they brought and they have never argued for this standard before. JA94 ¶¶229-36. Regardless, there is no "specific prohibition." *NRC*, 605 U.S. at 666. Just the opposite—§§1182(f) and 1185(a)(1) provide blanket *permissions* for the Proclamation. And even more fundamentally, Congress knows how to create a cause of action, and did not do so here. Plaintiffs' argument would render Congress's choice not to create a cause of action void. At minimum, to succeed on an *ultra vires* claim the statutory violation must be "obviously beyond

the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (finding the statute did not preclude review and then denying *ultra vires* claim). There is no plausible argument that the Proclamation fits the bill.

## IV. The Proclamation and its Implementation are not Reviewable under the APA.

### A. There is No Reviewable Final Agency Action.

"The APA provides for judicial review only of 'final agency action.'" *Dalton*, 511 U.S. at 469 (quoting 5 U.S.C. §704). Plaintiffs cannot identify such an action. They challenge the Proclamation itself, but the APA does not permit challenges to Presidential action. *Franklin*, 505 U.S. at 801 (1992) (holding that the President is not an agency under the APA).

With that door closed, Plaintiffs seek to smuggle their case through a window. They argued that short explanatory memoranda qualify as final agency actions. But the APA does not allow challenges to agency implementation that merely carries out presidential directives. *Chamber,* 815 F. Supp. 3d at 108-10 (collecting cases). That is merely logical. Agency implementations of a presidential proclamation are an "extension of the President's action" and thus cannot be challenged under the APA because those actions are "merely carrying out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Forest Service is merely carrying out directives

of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President").

The memoranda Plaintiffs challenged are just that—agency implementations of the presidential Proclamation. The memoranda explain that the Proclamation applies prospectively and provide technical information on how to satisfy the $100,000 entry payment. Indeed, Plaintiffs and the district court admit the relevant legal consequence being challenged is the $100,000 payment itself, which is set by the Proclamation and which the agencies had no discretion to alter. Op.29-30; Pls' MSJ at 17. As mere extensions of the Proclamation itself, the memoranda are just as invisible to the APA.

The district court was thus wrong to permit Plaintiffs' APA challenge to proceed on the basis of those memoranda. To accept the district court's reasoning would lead to "the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare County*, 185 F. Supp. 2d at 21. That would circumvent *Franklin*. While not all implementations of executive directives are unreviewable, "mere ministerial implementation of presidential action" is non-final and unreviewable. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021). The

agency guidance involved no independent decision-making and did not expand the substantive scope of the Proclamation. *Id.*

Indeed, when subordinate executive agencies are enforcing a self-executing presidential command, simple agency obedience does not transform the underlying executive order into an independently reviewable agency action, as it is the President's authority they are carrying out. *See Sale*, 509 U.S. at 172 n.28 ("Even if [the Attorney General] had [exercised discretion allowed by the §1182(f) proclamation], she would have been carrying out an executive, rather than a legislative, command"). "There can be no doubt that the President, in the exercise of his executive power under the Constitution, may act through the head of the appropriate executive department. The heads of departments are his authorized assistants in the performance of his executive duties, and their official acts, promulgated in the regular course of business, are presumptively his acts." *Runkle v. United States*, 122 U.S. 543, 557 (1887).

Even run under the normal two-prong test for "final agency action," the agency memoranda cannot ground an APA suit. To be final under *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), (1) "the action must mark the 'consummation' of the agency's decisionmaking process," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" None of the agency guidance reflects decision-making by the agencies, as

they were legally bound to follow the President's binding Proclamation. *See Trump v. Orr*, 146 S. Ct. 44, 46 (2025); *Make The Rd. New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016); *see also Sherley v. Sebelius*, 689 F.3d 776, 784–85 (D.C. Cir. 2012) (holding that an agency "may not simply disregard" a binding presidential order).

The merits panel believed that Defendants could not claim an irreparable harm from vacatur without there being a final agency action. But the reason there is no final agency action in this case is not because the Proclamation has no legal consequences; rather, it is because the agency implementation is not a separate action from the President's and *the President is not an agency*. The panel also relied on an interim denial of a stay in *Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025). But that case was then stayed by the Supreme Court, and is thus unpersuasive. *See Orr*, 146 S. Ct. at 46; *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Moreover, the presidential directive in *Agatha* gave the agency substantial discretion, and the motions panel dismissed the argument that APA review of the agency's implementation of the presidential directive was barred by *Franklin* as underdeveloped. *Agatha*, 151 F.4th at 11-12. And, in all events, *Agatha*—like the motions panel decision in this case—is not binding as to the ultimate merits determination.

Here, the statutes clearly vest the President with the authority and discretion, which is generally unreviewable. *See Dalton*, 511 U.S. at 476. The Proclamation carries the force of law. This is different from most executive orders that tell agencies to use their statutory authority in certain ways. Where the agency is instead executing *Presidential* authority, then the agency's actions are legally those of the President, not the agency. *See Confiscation Cases*, 87 U.S. (20 Wall.) 92, 109 (1873) (President had authority to order ship seizure, so agencies' conduct attributed to him). As a result, the Proclamation and the agencies' implementation all stem from the President's authority and thus is unreviewable under the APA.

### B. The Proclamation and its Implementation are Committed to Discretion.

Even if APA review were generally available for Presidential actions and ministerial agency implementation of the same, it would still be unavailable here for at least two reasons. *First*, the APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. §702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* §I; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno*, 197 F.3d at 1160. *Second*, the APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. §701(a)(2); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Where Congress has supplied no judicially manageable standards and has instead committed the matter to executive judgment, review is barred under

§701(a)(2). *See Norton*, 542 U.S. at 64. There is no meaningful statutory standard against which to measure the agencies' implementation of the Proclamation. The only governing law is the President's Proclamation issued pursuant to §§1182(f) and 1185(a)(1), which "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. That discretion is carried over to the agencies that implement the Proclamation, thus foreclosing APA review. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06 (President had discretion and his order delegated discretion to Secretary, so no APA review of Secretary's decision since that was also committed to agency discretion). Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in §§1182(f) and 1185(a)(1)—"is not a matter for [ judicial] review." *Dalton*, 511 U.S. at 476.

## V. The Proclamation and its Implementation are not Procedurally Infirm.

In ruling that Plaintiffs succeeded on their APA claims, the district court made clear that its analysis all flowed from its ruling that the Proclamation exercised the taxing power without an adequate delegation, especially for the "exceeding authority" claim. Op.29, 32-33. Because the premise is wrong, the conclusion is flawed. The exceeding statutory authority claim fails for the same reasons explained before. *See supra* §I. And the procedural claims fail because they are inapplicable and any error would have been harmless.

### A. Notice and Comment Rulemaking is Inapplicable.

Notice-and-comment rulemaking does not apply to the implementation of the Proclamation, and even if it could any error was harmless. The district court ruled that the agencies had to go through notice-and-comment rulemaking but seemed to admit if it was wrong about the delegation (which it is) the agencies would not have to go through notice and comment. *Id.*; *Sherley*, 689 F.3d at 784-85. Even so, the district court was wrong on numerous levels.

*First*, as explained, §§1182(f) and 1185(a)'s powers belong to the *President* alone, and the agencies lack authority to either disobey or disregard that exercise pending a meaningless notice-and-comment process that does not excuse them from following the Proclamation. *See Orr*, 146 S. Ct. at 46; *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100. Indeed, the D.C. Circuit rejected an almost-identical argument that the Secretary of Homeland Security needed to go through notice-and-comment rulemaking to expand expedited removal. *Make The Rd. N.Y.*, 962 F.3d at 635. Because the statute gave the Secretary "sole discretion" to change the rule "at any time," the court held that he "would be free to ignore the comments" and "notice-and-comment procedure would be an empty, yet time-consuming, exercise." *Id.* Just so here. The laws here "exude[] deference to the President in every clause." *Hawaii*, 585 U.S. at 684. So there is no basis to require the agencies to engage in notice and comment rulemaking to implement the Proclamation, as they must.

*Second*, notice and comment rulemaking only apply to legislative rules, which "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citation omitted). The agency guidance and memoranda fail that test. The Proclamation has the force of law and creates new obligations, not the agencies' ministerial implementation. *See* 8 U.S.C. §§1182(f), 1185(a) (granting authority to president); *Chamber*, 815 F. Supp. 3d at 110-11. As such, the agency guidance is more akin to interpretive or internal procedural rules, which do not require notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. §553(b)(A)).

*Third*, several notice-and-comment exceptions apply. There is "good cause" to bypass notice-and-comment because it would be "impracticable" to announce rulemaking for a temporary one-year Proclamation and would undermine its very purpose. 5 U.S.C. §553(b)(B). Especially so here, where §§1182(f) and 1185(a) permit the President to take swift yet temporary action. The "foreign affairs" exception also applies, 5 U.S.C. §553(a)(1), because "[t]he exclusion of aliens ... is inherent in the executive power to control the foreign affairs of the nation," *Knauff*, 338 U.S. at 542; *Hines v. Davidowitz*, 312 U.S. 52, 65 (1941) (immigration and foreign affairs are closely linked). Sections 1182(f) and 1185(a) inherently deal with foreign affairs functions. *See Hawaii*, 585 U.S. at 708.

The district court was wrong that the exceptions did not apply due to insufficient evidence. Op.31-31. The harms justifying the foreign affairs exception are obvious, as aliens would flood into the country during this period, causing chaos abroad as they attempted to do when the Proclamation was announced. *See* JA57-58 ¶ 107 (recounting this situation). The same is true for good cause, as §1182(f) allows the President to restrict entry "whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" *Hawaii*, 585 U.S. at 683 (quoting 8 U.S.C. §1182(f)). Subjecting implementation of a yearlong Proclamation to a long period of notice and comment would undermine the entire statutory scheme and the time-limited Proclamation. There is a plethora of reasons why notice and comment rulemaking cannot apply, much of which the district court failed to grapple with.

*Fourth*, and relatedly, even if notice-and-comment rulemaking had been required, any failure to conduct it would be harmless error because the agencies were required by the Proclamation to collect the $100,00 payment, thus Plaintiffs lack redress. *See Chamber*, 815 F. Supp. 3d 110-11; *see also Conservation L. Found. v. Evans*, 360 F.3d 21, 29 (1st Cir. 2004) (any failure to engage in notice-and comment was harmless because it "clearly had no bearing on the procedure used or the substance of the decision reached" (citations omitted)). Plaintiff has the burden of showing any error causes harm, and here they cannot do so. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). As in *Chamber*, Plaintiffs cannot satisfy their burden to

show that "they could have mount[ed] a credible challenge" to the agencies' memoranda through notice and comment. *Chamber*, 815 F. Supp. 3d at 111 (internal quotations omitted). Nor could additional procedures have altered the outcome. *Id.* Because the agencies lacked discretion to deviate from the Proclamation's $100,000 payment requirement, "no amount of procedure would have remedied" Plaintiffs' alleged harm, meaning they lack redressability for standing purpose. *Id.; see Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023); *Bradford v. DOL*, 101 F.4th 707, 731 (10th Cir. 2024).

The district court simply concluded, without basis, that the procedures "could" have changed the decision. Op.31. But as explained, the agencies had no discretion to disregard the Proclamation. Indeed, the district court and Plaintiffs note the issue is not how the agencies implemented the Proclamation, but the payment itself. Pls' MSJ at 18-19; Op.30-31. So not only "would [the agencies] be free to ignore the comments" meaning the "notice-and-comment procedure would be an empty, yet time-consuming, exercise," *Make The Rd. N.Y.*, 962 F.3d at 635, the agencies could *not* alter the President's decision, *Chamber*, 815 F. Supp. 3d at 111.

### B. The Proclamations' Implementation is Not Subject to Arbitrary and Capricious Review.

The district court fundamentally erred in holding that the Proclamation and Agency memoranda implementing it are arbitrary and capricious because "the

President had no power or delegated authority to impose a tax on H-1B petitions." Op.33-36.

The district court found that the challenged agency memoranda and guidance are arbitrary and capricious because they fail to acknowledge the agencies' change in position, fail to consider reliance interests, and rely on factors Congress did not intend. *Id*. This fails. Even if APA review were available here (it is not), an agency does not act "arbitrarily and capriciously" or "contrary to law" when it merely executes a legally permissible presidential directive. *Chamber*, 815 F. Supp. 3d at 110-11; *Bradford*, 101 F.4th at 731 (holding that an agency cannot act arbitrarily and capriciously when rescinding prior guidance pursuant to a binding executive mandate). Under §§1182(f) and 1185(a)(1), Congress conferred broad authority upon the President to issue entry restrictions in his discretion. Consequently, the agencies had no choice in the matter: an agency "may not simply disregard" a binding presidential directive. *Chamber*, 815 F. Supp. 3d at 110-11 (quoting *Sherley*, 689 F.3d at 784–85). Defendants cannot have "acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Orr*, 146 S. Ct. at 46. That holds true even if the agency, in effectuating the directive, does not evaluate alternatives to executing the President's directive or formally acknowledge the change that the Presidential directive has on

a different position taken by the agency during another administration or before the proclamation was issued. *Bradford*, 101 F.4th at 731.

For these same reasons, even if the agencies had been required to weigh the factors the district court identified, any failure to do so would be harmless under 5 U.S.C. §706 because the agencies were legally bound to implement the Proclamation as written. *See Chamber*, 815 F. Supp. 3d at 110-11; *Conservation L. Found.*, 360 F.3d at 29 (holding that procedural omissions are harmless where they "clearly had no bearing on the procedure used or the substance of the decision reached"). As explained, *supra* §IV(A), the agencies could not simply disregard a Presidential mandate. *See Orr*, 146 S. Ct. at 46; *Make The Rd. N.Y.*, 962 F.3d at 634; *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100; *Sherley*, 689 F.3d at 784-85. And Plaintiffs and the district court have made clear their issue is with the $100,000 payment itself, not any specifics in how the agencies implemented the Proclamation. Since that payment was set by the Proclamation, the agencies had no ability to consider alternatives.

In any event, §1182(f) does not permit litigants to challenge a presidential entry-suspension order "based on their perception of its effectiveness and wisdom." *Hawaii*, 585 U.S. at 708. Congress did not authorize the Judiciary to substitute its own policy preferences "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Id.*; *Amanullah*, 811 F.2d at 17 ("We recognize that Congress… has delegated the

uniquely political decisions about the ultimate admission and exclusion of aliens to the executive branch[.]"). Whether the President's chosen strategy for addressing a perceived threat to the national interest "is justified from a policy perspective" is legally irrelevant; the President need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Hawaii*, 585 U.S. at 686-87 (citations omitted). Plaintiffs' arbitrary-and-capricious challenge is nothing more than an impermissible end-run around this deferential framework, aimed squarely at second-guessing the President's rationale and chosen remedy. *See Sale*, 509 U.S. at 165 (confirming that "[t]he wisdom of the policy choices" underlying Presidential Proclamations is not a "matter for our consideration"). As a result, no arbitrary and capricious claim could prevail.

## VI. The District Court Erred in Granting Universal Vacatur.

The district court universally vacated the agencies' implementation of the Proclamation under 5 U.S.C. §706(2). Universal vacatur, however, is unknown to equity and is not otherwise authorized by the APA. *See United States v. Texas*, 599 U.S. 670, 695-99 (2023) (Gorsuch, J., concurring). In any event, Plaintiffs' injuries all stem from the Proclamation's payment, not the vacated brief agency memoranda. Plaintiffs thus lack standing to seek vacatur because it does not redress their injuries. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each form of relief that they seek."). Regardless, vacatur

would be an appropriate remedy only on respondents' APA claims, not on their *ultra vires* claim.

And even for the APA claims vacatur is a discretionary equitable remedy, not a mandate. *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023); *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) ("balance of equities" must be considered). Issuing universal relief to non-parties violates basic equitable principles. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025); *Hawaii*, 585 U.S. at 713-21 (Thomas, J. concurring); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (equitable limits apply to §705 stays). Afterall, remedies must be strictly tailored to redress the concrete injuries of the parties before the court. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). The district court ignored these principles and vacated the implementation of the Proclamation universally, including for the same alleged injuries to Plaintiffs' institutions that were litigated in *Chamber* and lost, giving the same institutions a second bite at the apple. At a minimum, the district court should have considered this in the equities when issuing universal vacatur.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment below, vacate the order entering summary judgment for Plaintiffs, and remand with instructions to enter judgment for Appellants.

DATE: August 26, 2026

Respectfully submitted,

*s/ Tiberius Davis*
Tiberius Davis

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

JEFFREY A. ALDERETTE
*Trial Attorney*

DAVID J. BYERLEY
*Senior Litigation Counsel*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)-860-8970

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,930 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*s/ Tiberius Davis*
Tiberius Davis

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Tiberius Davis*
Tiberius Davis