**No. 26-1699**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs -Appellees*,

*v*.

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Acting Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants - Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts No. 1:25-cv-13829-LTS
Sorokin, J. presiding

# OPENING BRIEF FOR APPELLANTS

*(Counsel listed on inside cover)*

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

JEFFREY A. ALDERETTE
*Trial Attorney*

DAVID J. BYERLEY
*Senior Litigation Counsel*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)-860-8970

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

REASONS WHY ORAL ARGUMENT IS REQUESTED ........ ix

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION. ........ 3

STATEMENT OF THE ISSUES. ........ 3

STATEMENT OF THE CASE ........ 4

I. Statutory Background ........ 4

A. The Executive's Broad Authority ........ 4

B. H-1B Nonimmigrant Classification ........ 5

II. Factual Background ........ 7

A. Presidential Proclamation 10973 ........ 7

B. Agency Guidance and Memoranda ........ 10

III. Prior Proceedings ........ 11

SUMMARY OF ARGUMENT ........ 12

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 15

I. The Proclamation Is Authorized By 8 U.S.C. §§1182(f) and 1185(a). ........ 15

A. The Proclamation is an Exercise of Delegated Immigration or Foreign Commerce Power and Inherent Authority. ........ 17

B. The Proclamation is Not an Unconstitutional Tax ........ 22

C. Plaintiffs' Alternative Arguments Fail. ....................................32

II. Appellees' Challenges are Nonjusticiable. ........................................36

III. Appellees Lack an Ultra Vires Cause of Action. ................................40

IV. The Proclamation and its Implementation are not Reviewable under the APA. ..................................................................................42

A. There is No Reviewable Final Agency Action. .........................42

B. The Proclamation and its Implementation are Committed to Discretion. ......................................................................................46

V. The Proclamation and its Implementation are not Procedurally Infirm. ................................................................................................47

A. Notice and Comment Rulemaking is Inapplicable. ..................48

B. The Proclamations' Implementation is Not Subject to Arbitrary and Capricious Review. ............................................51

VI. The District Court Erred in Granting Universal Vacatur. ....................54

CONCLUSION ..........................................................................................56

## TABLE OF AUTHORITIES

### Cases

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986)....................................................................37

*Agatha v. Trump*,
151 F.4th 9 (1st Cir. 2025)..........................................................................45

*Allen v. Milas*,
896 F.3d 1094 (9th Cir. 2018) ...........................................................38, 46

*Am. Foreign Serv. Ass'n v. Trump*,
2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam)................................40

*Amanullah v. Nelson*,
811 F.2d 1 (1st Cir. 1987)(A) ............................................... 37-38, 39, 54

*Ancient Coin Collectors Guild v. CBP*,
801 F. Supp. 2d 383 (D. Md. 2011)..............................................................43

*Baaghil v. Miller*,
1 F.4th 427 (6th Cir. 2021) ...........................................................................38

*Bennett v. Spear*,
520 U.S. 154–78 (1997)...............................................................................44

*Biden v. Texas*,
597 U.S. 785 (2022)....................................................................................34

*Bradford v. DOL*,
101 F.4th 707 (10th Cir. 2024) ...............................................51, 52, 53

*Brock v. Washington Metro. Area Transit Auth.*,
796 F.2d 481 (D.C. Cir. 1986)......................................................................25

*California v. Mullin*,
183 F.4th 42 (1st Cir. 2026)...................................................12, 22, 26, 27

*Cboe Futures Exch., LLC v. SEC*,
77 F.4th 971 (D.C. Cir. 2023).....................................................................55

*Cent. Maine Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001)..........................................................................55

*Chamber of Com. of United States v. U.S. Dep't of Homeland Sec.*,
815 F. Supp. 3d 73 (D.D.C. 2025) .......... 31, 32, 33, 34, 35, 42, 49, 50, 51, 52, 53

*Colony Place S., Inc. v. Volvo Car USA, LLC*,
121 F.4th 973–78 (1st Cir. 2024) .......... 15

*Confiscation Cases*,
87 U.S. (20 Wall.) 92 (1873) .......... 46

*Conservation L. Found. v. Evans*,
360 F.3d 21 (1st Cir. 2004) .......... 50-51, 53

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) .......... 51

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 14, 40, 42, 46, 47

*Democratic Executive Comm. of Fla. v. NRSC*,
950 F.3d 790 (11th Cir. 2020) .......... 16

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) .......... 14, 36, 37, 38, 39

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) .......... 45, 47, 48, 53

*Doe #1 v. Trump*,
984 F.3d 848 (9th Cir. 2020) .......... 35

*Edye v. Robertson*,
112 U.S. 580 (1884) .......... 1-2, 12, 13, 18, 20, 23, 24, 25, 28, 32

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 26

*FEA v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) .......... 13, 29, 30

*Ford v. Mabus*,
629 F.3d 198 (D.C. Cir. 2010) .......... 28

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 14, 42

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 55

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 40, 41

*Haitian Refugee Ctr. v. Gracey*,
809 F.2d 794 (D.C. Cir. 1987) .......... 21

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) .......... 21

*Henderson v. Mayor of N.Y.*,
92 U.S. 259 (1875) .......... 17

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 49-50

*Hung Chi Doan v. INS*,
160 F.3d 508 (8th Cir. 1998) .......... 38

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) .......... 55

*Kerry v. Din*,
576 U.S. 86 (2015) .......... 38

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 13, 24, 27, 28, 29, 30

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) .......... 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 20

*Make The Rd. New York v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) .......... 45, 48, 51, 53

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) .......... 22

*Mullin v. Al Otro Lado*,
146 S. Ct. 2079 (2026) .......... 22

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020)..........42

*N.H. Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018)..........49

*NFIB v. Sebelius*,
567 U.S. 519 (2012)..........13, 23, 24

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)..........46, 47

*NRC v. Texas*,
605 U.S. 665 (2025)..........14, 41

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026)..........30, 33

*Pak v. Biden*,
91 F.4th 896 (7th Cir. 2024)..........39

*Patel v. Garland*,
596 U.S. 328 (2022)..........20

*Penate v. Sullivan*,
73 F.4th 10 (1st Cir. 2023)..........15

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)(A)..........49

*Pietersen v. U.S. Dep't of State*,
138 F.4th 552 (D.C. Cir. 2025)..........38

*Runkle v. United States*,
122 U.S. 543 (1887)..........44

*Saavedra Bruno v. Albright*,
197 F.3d 1153 (D.C. Cir. 1999)..........46

*Sale v. Haitian Ctrs. Council*,
509 U.S. 155 (1993) .......... 30-31, 44, 54

*Sherley v. Sebelius*,
689 F.3d 776–85 (D.C. Cir. 2012)..........45, 48, 53

*Shiba v. Mullin*,
173 F.4th 895 (7th Cir. 2026) ....................39

*Shinseki v. Sanders*,
556 U.S. 396 (2009)....................51

*Skinner v. Mid-American Pipeline Co.*,
490 U.S. 212 (1989)....................26, 29

*Smith v. Turner*,
48 U.S. 283 (1849)....................17

*State of S.C. ex rel. Tindal v. Block*,
717 F.2d 874 (4th Cir. 1983) ....................24, 25

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) ....................41

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021)....................43, 44

*Tulare County v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) .................... 42-43, 43

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................55

*Trump v. Boyle*,
145 S. Ct. 2653 (2025)....................45

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................55

*Trump v. Cook*,
146 S. Ct. 2234 (2026)....................28

*Trump v. Hawaii*,
585 U.S. 667 (2018).................... *passim*

*Trump v. Orr*,
146 S. Ct. 44 (2025)....................45, 48, 52, 53

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950)....................21, 22, 36, 49

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... 31

*United States v. Texas*,
599 U.S. 670 (2023) .......... 54

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 22

**Statutes**

5 U.S.C. §553 .......... 49
5 U.S.C. §701 .......... 46, 47
5 U.S.C. §702 .......... 46
5 U.S.C. §706 .......... 53, 54
8 U.S.C. §1101 .......... 4, 5, 7
8 U.S.C. §1182 .......... *passim*
8 U.S.C. §1184 .......... 5, 6, 34
8 U.S.C. §1185 .......... *passim*
8 U.S.C. §1356 .......... 33, 34
19 U.S.C. §1862 .......... 29
28 U.S.C. §1291 .......... 3
28 U.S.C. §1294 .......... 3

**Other**

8 C.F.R. §214.2 .......... 6, 7
85 Fed. Reg. 34,353 (June 4, 2020) .......... 31-32, 33, 36
86 Fed. Reg. 59,603 (Oct. 25, 2021) .......... 31
90 Fed. Reg. 46,027 (Sep. 24, 2025) .......... 1, 7, 8, 9, 10, 11, 17, 20, 35
Black's Law Dictionary (4th ed. 1951) .......... 19
Webster's New Int'l Dictionary Of the English Language (2d ed. 1936) .......... 19
Cambridge Advanced Learner's Dictionary & Thesaurus (4th ed. 2013) .......... 19-20
98 Cong. Rec. 4490-91 (Apr. 25, 1952) .......... 35

## REASONS WHY ORAL ARGUMENT IS REQUESTED

Appellants request oral argument because this case involves complex questions of statutory and constitutional interpretation. The Court would benefit from oral argument to clarify the specific points of disagreement between the parties, relates cases in the D.C. Circuit and Northern District of California, and to address the Supreme Court's recent opinion in *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). This case is also of national importance for the Executive Branch. For the foregoing reasons, Appellants respectfully request that the Court schedule oral argument on the Appellants' brief.

## INTRODUCTION

Though the H-1B nonimmigrant worker visa program was originally created by Congress to fill gaps in the labor market with qualified foreign workers, it has been exploited by corporations and aliens to import lower-paid, lower-skilled workers—thereby artificially depressing wages and employment opportunities for Americans. Responding to this pervasive abuse of the H-1B system, President Trump issued Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation") to temporarily restrict the entry of new H-1B workers "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." The Proclamation readily falls within both Congress's "sweeping" delegation to impose "any restrictions he may deem to be appropriate" or any "reasonable rules, regulations, and orders" under 8 U.S.C. §§1182(f), 1185(a) and the President's inherent authority. *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

Plaintiff-Appellee States (Plaintiffs), the district court, and motions panel disagreed, arguing that the payment imposed a tax that was not clearly delegated. As a result, the district court vacated the implementation of the Proclamation and opened the floodgates to aliens entering the country to take vital American jobs. That was wrong several times over. First, the Proclamation was an exercise of the immigration or foreign commerce powers, not a tax. *See Edye v. Robertson*, 112 U.S.

580, 594-95 (1884). It is thus well within Congress's comprehensive delegations and the President's inherent authority. While the payment is not a tax, even if it was those separate authorities support the Proclamation. Second, even if it was a tax there is no special clear statement rule and even then, the broad delegation of "any restrictions" can plainly encompass a limited tax. None of Plaintiffs' alternative arguments hold water either. That alone requires reversal.

There are also threshold reasons that this Court should reverse. To start, consular non-reviewability bars judicial second guessing of alien entry decisions. Furthermore, Plaintiffs lack a cause of action, as their *ultra vires* claim is a statutory argument masquerading as a constitutional one, and the statutes vest the President with unreviewable discretion. Likewise, neither the President's authority can be challenged under the Administrative Procedure Act (APA), nor can agencies' ministerial implementation of the President's authority be challenged. Regardless, the district court's procedural APA rulings were premised on its taxation conclusions and thus likewise fail. Even so, notice-and-comment rulemaking and arbitrary and capricious review cannot apply to the simple implementation of an exercise of Presidential power, and any error in foregoing notice-and-comment was harmless. Finally, the district court's nationwide vacatur was improper.

This Court should reject the district court's attempt to gut the President's broad authority over the entry of aliens, especially where the harms caused by the flood of H-1B workers to American workers is stark. This Court should reverse.

## STATEMENT OF JURISDICTION

On June 8, 2026, the district court entered final judgment against Defendants. On June 11, 2026, Appellants timely appealed. This Court has jurisdiction over that final order under 28 U.S.C. §§1291, 1294(1).

## STATEMENT OF THE ISSUES

1. Whether a Presidential Proclamation restricting alien admission by imposing a $100,000 entry payment falls within the President's sweeping delegated authority to impose "any restrictions he may deem to be appropriate" under 8 U.S.C. §§1182(f) and 1185(a)(1) and his inherent authority.
2. Whether the Proclamation overrides the H-1B program by adding additional restrictions to entry.
3. Whether review is precluded under consular non-reviewability.
4. Whether *ultra vires* review is unavailable to challenge executive action committed by statute to the President.
5. Whether ministerial, non-discretionary agency guidance effectuating a Presidential Proclamation is reviewable under the APA.

6. Whether the ministerial implementation of the Proclamation required notice and comment and is subject to arbitrary and capricious review.

7. Whether the district court erred in vacating the implementation of the Proclamation universally.

## STATEMENT OF THE CASE

### I. Statutory Background

#### A. The Executive's Broad Authority

Under the Immigration & Nationality Act (INA), ch. 477, 66 Stat. 163 (8 U.S.C. §1101, *et seq*.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203. Even with a visa, the alien must be found admissible upon inspection at a port of entry. *Id.* §§1201(h), 1185(d), 1225(a), §1101(a)(4). The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, *id.* §§1182(a), 1201(g). Congress has also accorded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. §1182(f). "By its terms, §1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed that

§1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." *Id.* §1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times since its passage.

**B. H-1B Nonimmigrant Classification**

The INA provides for the classification of qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." *Id.* §§1101(a)(15)(H)(i)(b); 1184(c)(1) (the "H-1B program"). A specialty occupation is defined as an occupation that requires (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum qualification for entry into the occupation in the United States." *Id.* §1184(i)(1). "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b.

By statute, H-1B petitions fall into two broad categories: cap-subject petitions and cap-exempt petitions. Cap-subject petitions are counted against the strict annual numerical limitations created by Congress, which is 65,000 ("Regular Cap"), with an additional 20,000 for individuals who have earned a master's or higher degree from a United States institution of higher education ("Master's Cap"). 8 U.S.C. §1184(g)(1)(A) (Regular Cap); §1184(g)(5)(C) (Master's Cap). Certain H-1B petitions are cap-exempt based on the nature of the petitioning employer or work location. *Id.* §1184(g)(5)(A)-(B). The demand for initial H-1B status invariably exceeds the congressionally-imposed numerical limitations, and as such, DHS regulations provide rules for the administration of an H-1B cap selection process, commonly referred to as a "lottery." 8 C.F.R. §214.2(h)(8)(iii).

Before a petitioning employer is eligible to submit a Form I-129, Petition for a Nonimmigrant Worker, requesting H-1B classification on behalf of a beneficiary who is subject to the H-1B cap ("an H-1B cap-subject petition"), the petitioner must register for the H-1B cap lottery through the USCIS website. *Id.* §214.2(h)(8)(iii)(A)(1) (discussing the registration requirement). Once the registration period closes, USCIS then determines whether it has received registrations for a sufficient number of unique beneficiaries projected as needed to meet the caps. *Id.* §214.2(h)(8)(iii)(A)(5)-(6). If a beneficiary is selected, USCIS sends a notification to the online account of each prospective petitioner who

submitted a registration for the selected beneficiary along with petition filing instructions. *Id.* §214.2(h)(8)(iii)(C)-(D). The employer must then file a Form I-129 to request the classification of the alien as an H-1B nonimmigrant worker (known as an "H-1B petition") and obtain authorization to employ the beneficiary. *Id.* §214.2(h)(4)(iii)(B)(1); 8 U.S.C. §1101(a)(15)(H)(i)(b). Under the applicable regulations, USCIS shall notify the petitioner of the approval, denial, intent to revoke, and revocation of any H-1B petitions. 8 C.F.R. §214.2(h)(9)(i), (h)(10)(ii), (h)(11).

## II. Factual Background

### A. Presidential Proclamation 10973

President Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of American workers," "suppress[ed] wages," and "a disadvantageous labor market for American citizens," which "has undermined both our economic and national security." 90 Fed. Reg. at 46,027. It found that H-1B workers account for an outsized share of the labor market in Science, Technology, Engineering, and Mathematics (STEM) fields, and that the information technology (IT) sector, and particularly outsourcing firms, have abused the H-1B system, providing H-1B workers for entry-level positions at a 36% discount compared to American workers. *Id.*

As the number of H-1B workers in STEM fields has increased, the unemployment rate for recent college graduates in those fields has also increased, and companies have at times laid off thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American worker wages and opportunities, and is antithetical to the purpose of the H-1B program, which is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

As the Proclamation explains, not only are H-1B program abuses detrimental to American workers, but such abuses also are a national security threat because they reduce American wages and "discourage Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response" and that "unrestricted entry into the United States of certain foreign workers … would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages." *Id.* The President accordingly determined that it was "therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the

abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed a paywall entry restriction on H-1B workers pursuant to the President's authority contained in §§1182(f) and 1185(a) for a one-year period. In particular, it restricted entry to only petitions accompanied by or supplemented by a payment of $100,000 after the effective date. *Id.* It permitted the Secretary of Homeland Security to grant exceptions in his discretion if entry of an alien is "in the national interest and do not pose a threat to the security or welfare of the United States." 90 Fed. Reg. at 46,029.

The Proclamation instructed the Secretary of Homeland Security to restrict decisions on H-1B petitions not accompanied by the $100,000 payment, and it instructed the Secretary of State to confirm payment of the $100,000 before addressing any H-1B visa application. *Id.* at 46,028-29. It also instructed the Department of State and the Department of Homeland Security to take all necessary steps to implement the Proclamation and deny entry to the United States of any H-1B nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also instructed the Department of Labor and the Department of Homeland Security to engage in rulemaking on issues relating to the prevailing wage levels and the H-1B lottery. *Id.* The restrictions are set to expire after 12 months from September 21, 2025, absent an extension. *Id.* at 46,028.

**B. Agency Guidance and Memoranda**

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining the contours of the Proclamation. JA129. USCIS explained that the Proclamation applied prospectively and did not impact the ability of any current H-1B visa holder to travel to or from the United States. *Id.* On its website, USCIS explained that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa." JA133. It explained that the $100,000 payment can be submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS", that "petitioners must submit proof that the payment has been scheduled" or evidence that they received an exception, and that "[p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." *Id.* It further provided information on where to submit a request for an exception. *Id.*

U.S. Customs and Border Protection (CBP) also issued brief guidance on September 20, 2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens who are the beneficiaries of approved petitions or who hold valid H-1B visas. JA113. It explained that "[t]he Proclamation does not impact the ability of any current visa holder to travel to or from the United States"

and that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." *Id.*

The State Department issued guidance on its website explaining that the Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000." JA462. The State Department unequivocally stated, "No visas have been revoked pursuant to the Proclamation." *Id.* The State Department "posted guidance to all consular offices, consistent with the guidance from [USCIS and CBP]." JA130.

## III. Prior Proceedings

Nearly three months after the Proclamation issued, Plaintiffs filed this action challenging the entry restriction. JA28. Counts I-III allege that the agency guidance and memoranda are arbitrary and capricious, *ultra vires*, and procedurally improper, in violation of the APA. JA86-91. Count IV alleges a claim in equity that the Proclamation (and thus the agency implementation) are *ultra vires* and violate separation of powers. JA91-94. The Plaintiffs seek to enjoin implementation and enforcement of the agency guidance and memoranda and the Proclamation. JA94-95.

On June 8, 2026, the district court issued an opinion (Addendum 01(Ad.) (Op.)) and order (Ad.43) granting summary judgment for Plaintiffs and vacating the implementation of the Proclamation's restriction on entry (the $100,000 payment requirement). Defendants timely appealed and sought a stay pending appeal. JA26. The district court denied a stay pending appeal but granted an administrative stay until this Court ruled on a stay pending appeal. *See California v. Mullin*, 183 F.4th 42, 48 (1st Cir. 2026). On June 18, 2026, Appellants filed an Emergency Motion for Stay Pending Appeal in the United States Court of Appeals for the First Circuit. *See id*. On July 24, 2026, the First Circuit Court of Appeals denied Appellants' Motion for Stay Pending Appeal. *See generally id*.

## SUMMARY OF ARGUMENT

The district court fundamentally erred by overriding the President's core constitutional and statutory powers over immigration and foreign affairs and ignoring bars on reviewability and causes of action to issue a universal vacatur of a vital Presidential policy. This Court should reverse.

**I.** The Proclamation was a lawful exercise of the President's delegated and inherent authority to restrict the entry of aliens. **A.** History makes clear that imposing a paywall on aliens is an exercise of the immigration or foreign commerce powers, not a tax. *Edye*, 112 U.S. at 595-96. The Proclamation is thus a proper exercise of Congress's "sweeping" delegations to impose "any restrictions" on the entry of

aliens under §§1182(f) and 1185(a) and/or inherent Executive authority to exclude aliens. *Hawaii*, 585 U.S. at 684. **B.** Those authorities support the Proclamation even if it could be considered a tax. *See NFIB v. Sebelius*, 567 U.S. 519, 561 (2012). And in any event under the functional test, the payment is not a tax. *Id.* at 565-66. Again, this aligns with the Supreme Court's holding that imposing paywalls on the entry of aliens are regulations of immigration or foreign commerce, not a tax. *Edye*, 112 U.S. at 595-96. And even if the payment must exercise the taxing power, such a delegation would not require a special clear statement rule compared to other Article I powers. Regardless, the delegation of "any restrictions" would clearly meet any clear statement requirements, as the "sweeping" delegations in §§1182(f) and 1185(a) are closer to *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976) than *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026). **C.** Plaintiffs' alternative arguments, that no court has accepted, are meritless. The Proclamation does not conflict with the H-1B program or provisions in the INA implementing fees, all of which are non-exhaustive. Instead, the entire point of Sections 1182(f) and 1185(a) is to "vest[] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. The Proclamation is thus lawful.

**II.** This Court should also reverse because the Proclamation is nonjusticable under principles of consular nonreviewability. Decisions governing the admission

and exclusion of foreign nationals are "fundamental sovereign attribute[s]" immune from judicial intervention. *Dep't of State v. Muñoz*, 602 U.S. 899, 907 (2024). Proclamations pursuant to §§1182(f) and 1185(a) are just such decisions.

**III.** Plaintiffs also lack an *ultra vires* cause of action. Parties cannot transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were i*pso facto* unconstitutional" there would be "little need" for "specifying unconstitutional and ultra vires conduct as separate categories." *Dalton v. Specter*, 511 U.S. 462, 470 (1994). That is precisely what Plaintiffs do here. And they do so because they cannot meet the high standard for nonstatutory *ultra vires* claims. *See NRC v. Texas*, 605 U.S. 665, 666 (2025).

**IV.** The APA simply does not apply. **A.** The APA provides no cause of action to challenge presidential action, *Franklin v. Massachusetts*, 505 U.S. 788 (1992), nor does it permit challenges to ministerial agency guidance that merely executes a Presidential Proclamation without independent decision-making. Such guidance does not constitute final agency action. **B.** And any implementation is committed to agency discretion and thus unreviewable.

**V.** Furthermore, the district court's procedural APA rulings were premised on its faulty tax analysis and thus equally fail. **A.** Regardless, notice-and-comment procedures were not required for ministerial execution, as the agencies could not deviate from the payment requirement. Moreover, the guidance documents are not

legislative rules, and the good cause or foreign affairs exceptions would nonetheless apply. Likewise, any error would be harmless because again the agencies could not deviate from the Proclamation, and thus Plaintiffs lack redress. **B.** Similarly, the agencies could not have acted arbitrarily and capriciously because they could not deviate from the Proclamation. This also means any error would be harmless.

**VI.** Finally, universal vacatur violates equitable principles.

This Court should reverse.

## STANDARD OF REVIEW

Courts review the "grant or denial of summary judgment de novo" even for cross motions. *Colony Place S., Inc. v. Volvo Car USA, LLC*, 121 F.4th 973, 977–78 (1st Cir. 2024). Summary judgment is only appropriate "when the record reflects no genuine issue as to any material fact and indicates that the moving party is entitled to judgment as a matter of law." *Penate v. Sullivan*, 73 F.4th 10, 17 (1st Cir. 2023) (quotation omitted).

## ARGUMENT

### I. The Proclamation Is Authorized By 8 U.S.C. §§1182(f) and 1185(a).

The Proclamation is a lawful exercise of the immigration or foreign commerce power, and is thus justified either as part of Congress's comprehensive delegations in 8 U.S.C. §§1182(f) and 1185(a) or as inherent in executive authority. In the INA, Congress provided that the President "may by proclamation … impose on the entry

of aliens any restrictions he may deem to be appropriate," *id.* §1182(f), and that "it shall be unlawful" for an alien to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe," *id.* §1185(a)(1). The Proclamation falls well within that broad delegation.

The only response Plaintiffs, the district court, and the motions panel can muster is that the Proclamation is an exercise of the taxing power. That is wrong—the Proclamation is designed to regulate immigration, not to raise revenue. But it is also irrelevant. Even *if* §§1182(f) and 1185(a) were enacted under Congress's taxing power, they contain sufficient clarity and direction to authorize the Proclamation. The motions panel's short per curiam opinion denying a stay is non-binding and unpersuasive. *Democratic Executive Comm. of Fla. v. NRSC*, 950 F.3d 790, 795 (11th Cir. 2020) (noting that a "stay-panel opinion *cannot* spawn binding legal consequences regarding the merits of the case"). It failed to grapple with these points. This all requires rejecting Plaintiffs' APA excess of authority and *ultra vires* claim. This Court should thus reverse the district court's judgment in Plaintiffs' favor.

### A. The Proclamation is an Exercise of Delegated Immigration or Foreign Commerce Power and Inherent Authority.

The Proclamation's restriction on entry via a paywall is an exercise of the immigration and foreign commerce power. That authority stems both from the INA and the President's inherent executive authority.

**1.** Under the Proclamation, evidence of the $100,000 payment must be included when filing certain H-1B petitions. 90 Fed. Reg. at 46,027-29. If an alien subject to the entry restriction tries to enter the United States without submission of the payment, he or she is barred from doing so. *Id.* By conditioning entry on payment, the Proclamation is definitionally a regulation of immigration and foreign commerce.

History confirms that such payment requirements are based on the federal government's inherent power over immigration and foreign commerce, not the taxing power. Indeed, the Supreme Court invalidated numerous head count payments levied on the entry of aliens by states not because they were taxes (which states can impose), but because they were foreign commerce regulations (which states cannot impose). *See Smith v. Turner*, 48 U.S. 283, 421 (1849); *Henderson v. Mayor of N.Y.*, 92 U.S. 259, 270 (1875).

Similarly, when Congress passed "An Act to Regulate Immigration" in 1882, it regulated immigration by directing the Secretary of the Treasury to collect a 50-

cent payment per alien landing at a United States' port. Pub. L. 47–376. Several American companies sued arguing the law was an unconstitutional direct tax. *Edye*, 112 U.S. at 594-95. The Supreme Court rejected those arguments, holding that "the power exercised in this instance is *not the taxing power*." *Id.* at 595-96 (emphasis added). Rather, the payment requirement was a "mere incident of the regulation of *commerce*—of that branch of *foreign commerce which is involved in immigration*." *Id.* (emphasis added). For that reason, said the Supreme Court, the "title of the act" was "well chosen" to "describe' the "real purpose and effect of the statute." *Id.* "Its provisions, from beginning to end, relate to the subject of immigration, and they are aptly designed to mitigate the evils inherent in the business of bringing foreigners to this country, as those evils affect both the immigrant and *the people among whom he is suddenly brought* and left to his own resources." *Id.* (emphasis added).

The Proclamation's paywall is virtually identical to the arrangement the Supreme Court blessed over a century ago. It applies to certain aliens seeking to enter the United States in a particular way, can (but need not) be paid by an American company, and is designed to mitigate the external costs of bringing such aliens into the country. Thus, the Proclamation's payment requirement stems from the foreign commerce power or immigration power.

**2.** Congress provided a "comprehensive delegation" of the immigration and foreign commerce power to restrict the entry of aliens under §§1182(f) and

1185(a). *Hawaii*, 585 U.S. at 684-85. By its "plain language," §1182(f) "grants the President broad discretion" to suspend or restrict the entry of aliens into this country. *Hawaii*, 585 U.S. at 683. "Whenever the President finds" that entry of aliens or a class of aliens "would be detrimental to the interests of the United States," he "may by proclamation" "suspend the entry of all aliens or any class of aliens" or "impose on the entry of aliens any restrictions *he may deem to be appropriate*." 8 U.S.C. §1182(f) (emphasis added). "By its terms, §1182(f) exudes deference to the President in every clause," and it "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684.

The Proclamation's payment requirement plainly qualifies as "any restriction" on the entry of aliens. A "restriction" includes "[a] limitation imposed upon a person or thing; a condition or regulation of this nature." *Restriction*, The Oxford English Dictionary (2d. ed. 1989). Or, according to a dictionary contemporaneous to §1182(f)'s passage, to "restrict" is to "restrain within bounds; to limit; to confine." *Restrict*, Black's Law Dictionary 1478 (4th ed. 1951); *Webster's New Int'l Dictionary Of the English Language* 2125 (2d ed. 1936) (same). The Proclamation definitionally "limit[s]" and "restrain[s]" entry; aliens subject to the Proclamation may not enter the United States as an H-1B nonimmigrant unless the payment has been made. And nothing about the definition of "restriction" excludes payment as

the method; indeed, "import/export/currency restrictions" and "trade restrictions" are commonplace uses of the term. *Restriction*, Cambridge Advanced Learner's Dictionary & Thesaurus (4th ed. 2013).

If there were any doubt, the modifier "any" removes it. The "word 'any' has an expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022). The phrase "any restriction" refers to restrictions "of whatever kind," *id.*—including monetary ones. The payment required by the Proclamation clearly places a limitation, qualification, or confinement on a person: an alien subject to the restriction on entry is limited from entering the United States on an H-1B visa unless they satisfy the additional qualification of a $100,000 payment. Fed. Reg. at 46,028 §1.

Section 1185(a)(1) also supports the Proclamation because it allows the President to set "reasonable rules, regulations and orders" for the entry and exit of aliens, subject to "such limitations and exceptions as the President may prescribe." 8 U.S.C. §1185(a)(1). The Proclamation—like the 50-cent payment in the 1882 Act—is a "regulation" of immigration and foreign commerce. *Edye*, 112 U.S. at 594-95. And given the undisputed justifications offered therefor, it is a manifestly "reasonable" regulation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (noting that "reasonable" is a term of "flexibility"). The Proclamation was designed to address severe abuses and detriments to American workers. 90 Fed. Reg. at 46,027-28. By requiring a $100,000 payment as a condition of entry, the

Proclamation protects American workers and ensures that only truly necessary foreign workers receive H-1B visas.

**3.** The President also has inherent authority to exclude aliens from entering the nation. *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 838 (D.C. Cir. 1987) (Edwards, J. concurring in part, dissenting in part) ("It is difficult to quibble with the conclusion of the district court that the President indubitably possessed both statutory [§§1182(f) and 1185(a)(1)] and inherent constitutional authority to establish the interdiction program [enforced by a naval blockade by the Coast Guard]."). The "right" to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). As the Supreme Court has repeatedly emphasized, "the political branches" possess near-plenary authority in the immigration context, and "any policy toward aliens" is "so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). That includes the President.

Plaintiffs have argued that only Congress has authority over immigration. *See* Pls' Motion for Summary Judgment (Dkt. No. 87) (Pls' MSJ) at 16-17. That is wrong. When "Congress prescribes a procedure concerning the admissibility of aliens," it "is implementing an inherent executive power." *Knauff*, 338 U.S. at 543;

*see also Mullin v. Al Otro Lado*, 609 U.S. ----, 146 S. Ct. 2079, 2099 (2026) (Thomas, J., concurring) (collecting authorities). And executive power to "exclu[de] aliens" (*Knauff*, 338 U.S. at 543) "necessarily includes the lesser power to place conditions on entry, on continued presence, or on [] conduct, such as a tax," *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 144, 148 (1982). Taken together, requiring a payment as a means of restricting the entry of aliens is inherent in the Executive. Given the President's inherent authority over immigration and Congress's "express … authorization," the President's "authority is at its maximum" here. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Thus, the Proclamation is well within the President's authority.

**B. The Proclamation is Not an Unconstitutional Tax.**

Plaintiffs argue, and the district court and motions panel agreed, that the payment was a tax that was not clearly delegated by Congress. *See generally California*, 183 F.4th at 49-50. That holding is unnecessary (because the Proclamation is independently justified by other sources of authority), wrong (because the Proclamation does not impose a tax), and irrelevant (because the INA provides sufficiently clear statements regardless).

**1.** As explained, the Proclamation is amply justified by the President's immigration and foreign commerce powers, both inherent and granted by statute. It

was thus unnecessary for the district court and motions panel to consider whether the Proclamation could *also* be justified as an exercise of the taxing power.

Courts routinely uphold actions if *any* legal authority can justify it. *See, e.g.*, *NFIB*, 567 U.S. at 561; *Edye*, 112 U.S. at 594-95. In *NFIB*, the Supreme Court held that the Affordable Care Act did not properly regulate interstate commerce, yet it upheld the Act as an exercise of the taxing power. *Id.* at 563. It did so based on the rule that, unless "unavoidable," no court should find a legislative act to "involve a violation, however unintentional, of the constitution." *Id.* at 562 (citation omitted). Thus, if any legal authority permits the President's action, it must be upheld.

The district court and motions panel did not grapple with these principles, instead invaliding the Proclamation because it could be a tax. Tax or not, since the Proclamation can be justified as a delegation of the commerce or immigration powers it is lawful. That is how Defendants have always justified the Proclamation. *See* Defendants' Motion for Summary Judgment (Dkt. No. 93) at 17-18, 23-27. Whether the Proclamation can be justified under the taxing power is no more relevant than whether it could be justified under the Copyright Clause or Congress's power to coin money. The district court and motions panel should never have even reached this issue, let alone invalidate the Proclamation on that basis.

**2.** Even if the Court were to consider the question (it should not), the payment requirement is not a tax at all. As explained, judicial and historical

precedents make clear that payment requirements, without more, are *regulations* of the activity they are tied to. *See Edye*, 112 U.S. at 595 (immigrant head count payment was not a tax); *State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983) ("deduction" on milk profits was a regulation payment, not a tax). The mere presence of a monetary transaction does not turn an immigration regulation into a tax.

The "functional" test from *NFIB*, 567 U.S. at 565-66, confirms this. In *NFIB*, the Supreme Court held that the health care mandate was a tax because it "c[ould] never be more" than "the price of insurance," was collected by "the IRS through the normal means of taxation," and raised revenue. *Id.* None of that is true here. Indeed, Plaintiffs' argument is that the Proclamation payment is excessive in relation to H-1B application fees. *Id.* And here, it is DHS, "an agency responsible for" enforcing immigration laws, "not collecting revenue," who collects the Proclamation payments. *Id.* Finally, "the defining feature of a tax" is to "raise[] revenue." *Learning Res., Inc.*, 607 U.S. at 241. Unlike *NFIB*, neither the purpose nor effect of the Proclamation is to raise revenue. *See Sebelius,* 567 U.S. at 567 (noting that the mandate "will raise considerable revenue"). The purpose is to incentivize the hiring of American workers, and H-1B revenue is predictably down by millions as a result of the Proclamation. Fed. Reg. at 46,027; JA654. Every factor cuts against the payment being a tax.

The district court disagreed by taking each factor in isolation and noting that taxes can be labeled various things, collected by DHS, and can serve regulatory purposes. Op.18-20. That reasoning defeats the point of the functional test, which is that no one fact is dispositive but all of them weighing against a payment being a tax (as here) strongly suggests it is not a tax. Especially so here, where there are other powers that support the payment.

The district court also claimed that any money being received increases revenue and that is the purpose even if it is ineffective. Op.19. That would render any payment—including penalties—a tax. It is also false. Again, the Supreme Court found that a similar payment was not a tax because the "real purpose and effect of the statute" is to regulate immigration and to "mitigate" the harms to the public and provide "for the protection of the citizens among whom they are landed." *Edye*, 112 U.S. at 595–96; *see also State of S.C. ex rel. Tindal*, 717 F.2d at 887 ("If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax."); *Brock v. Washington Metro. Area Transit Auth.*, 796 F.2d 481, 488 (D.C. Cir. 1986) (collecting similar cases). That mirrors the purpose of the Proclamation—the only evidence of purpose here—which says the payment is to restrict entry of H-1B workers for national security and economic purpose, not to raise revenue. Fed. Reg. at 46,027. Taken together, these factors

prove the paywall is not a tax. And even if it was, other authorities justify the payment.

**3.** Regardless, even if the Proclamation imposes a tax (it does not), §§1182(f) and 1185(a) delegate "sweeping" authority to impose "any restrictions he may deem to be appropriate" or "reasonable rules, [and] regulations" in the realm of "immigration" and "foreign affairs." *Hawaii*, 585 U.S. at 684, 708. That is sufficient to include a paywall to restrict the entry of a class of aliens.

Plaintiffs, the district court, and motions panel relied on *Skinner v. Mid-American Pipeline Co.*, 490 U.S. 212 (1989), to argue that "any restrictions" was not clear enough for Congress to delegate the taxing power. Op.25; *California*, 183 F.4th at 49-50; Pls.' MSJ at 14. But that very case declined to create a "stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power." *Skinner*, 490 U.S. at 223; *FCC v. Consumers' Rsch.*, 606 U.S. 656, 674 (2025). And the reason the Supreme Court rejected a heightened delegation requirement was that there is "nothing in this placement of the Taxing Clause that would distinguish Congress' power to tax from its other enumerated powers." *Skinner*, 490 U.S. at 220-21. That logic forecloses Plaintiffs', the district court's, and the motions panel's theory that, even if authority to delegate a tax is equal across powers, the delegation must be clearer for taxes than for other powers. Simply put, there is no such thing as taxing power exceptionalism. And

under ordinary principles of statutory interpretation, the delegations in §§1182(f) and 1185(a) are clearly broad enough to encompass the Proclamation.

Even if there were some special clear statement rule for taxing power delegations, the "sweeping" and "comprehensive" delegation here is sufficient. *Hawaii*, 585 U.S. at 684, 708. Relying on *Learning Resources*, Plaintiffs, the district court, and motions panel argued that the lack of magic words like "tax" or "fee" means the Proclamation is unauthorized. *California*, 183 F.4th at 49-51; Op.21-22; Plaintiffs' Reply to Response to Pls.' MSJ (Dkt. No. 99) at 13-15. That analysis was misplaced.

Start with *Learning Resources*, which was careful to "not speculate on hypothetical cases not before us" and to limit its holding to IEEPA. 607 U.S. at 251 n.4. The Supreme Court rejected the argument that "[t]he power to 'regulate … importation'" included a power to tax, explaining that "regulate[]" appears sixteen words away from "importation," and noted that a broad construction of "regulate" would swallow the eight verbs in the remainder of the statute rendering them "wasted ink." *Id.* at 249. By contrast, §1182(f) contains no list of ways the President may "suspend" or "restrict" entry that would narrow the power conferred. The Supreme Court also reasoned that a statutory "grant of authority to 'regulate … importation'" did not authorize the imposition of duties because the statute "contains no reference to tariffs or duties" and "until now no President ha[d] read [the statute] to confer

such power." *Id.* at 646. The opposite is true here. *Edye* confirms that in the immigration context, a per-alien payment is a well-known means of restricting the entry of aliens and "mitigat[ing]" the negative externalities of such entry. 112 U.S. at 595. That is precisely what §§1182(f) and 1185(a) authorize the President to address, and precisely what the Proclamation addresses.

The motions panel reasoned that "any restriction" is synonymous with "regulate" in *Learning Resources*. *California*, 183 F.4th at 50. Wrong again. *First*, as explained in the preceding subsection, "restriction" is a broad term that includes limits and conditions like the ones imposed here. *Second*, the panel ignored that, unlike in *Learning Resources*, Congress chose to use the expansive term "any." *See Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) ("any" made authority more "sweeping"). Even if there is an implied limit on "regulate" or "restriction" to exclude taxing, the modifier "any" sweeps it away. *Id.* The panel's interpretation reads out that expander. *But see Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) (courts "must give effect to every word of a statute wherever possible"). *Third*, as noted, the Supreme Court has already held that similar head count payments are regulations of immigration, *see Edye*, 112 U.S. at 594-95, and Congress legislated against that background, *Trump v. Cook*, 146 S. Ct. 2234, 2251-55 (2026). *Finally*, unlike the word "regulate" in *Learning Resources*, there are not a slew of other statutes using language similar to that in §§1182(f) and 1185(a).

If anything, §§1182(f) and 1185(a) are more like the statute at issue in *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). There, the Court held that a statute authorizing the President to "take such action … as he deems necessary to adjust the imports" of certain goods included imposing "monetary exactions" on those goods despite the provision not referencing duties, tariffs, fees, or anything else. *Id.* at 550-52. *Skinner* even relied on *Algonquin* as an example of a sufficient delegation of the power to impose "fees." *Skinner*, 490 U.S. at 224. As *Learning Resources* explained, that holding was justified because of the "sweeping, discretion-conferring language" in the statute. 607 U.S. at 254. The language in §1182(f) is also "sweeping"—indeed, even more so due to the modifier "any." *Hawaii*, 585 U.S. at 684.

The district court and motions panel attempted to distinguish *Algonquin* because the statute in that case mentions duties. Op.22 (citing *Learning Res., Inc.*, 607 U.S. at 254-55). That section says "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction," 19 U.S.C. §1862(a), so it certainly does not imply that the ability to "adjust . . . imports" includes modifying those duties. Indeed, neither *Algonquin* nor *Skinner* relied on that provision. So there is no reason to take that crabbed view of *Algonquin* or *Learning Resources*. In *Algonquin*, the Supreme Court homed in on the term "adjust," and held that it should not "be read to encompass only quantitative methods—i.e., quotas—as opposed to monetary methods—i.e., license fees—of effecting such adjustments." 426 U.S. at

561. And in *Learning Resources*, the Supreme Court highlighted the statute's authorization to "take such action … as [the President] deems necessary," 607 U.S. at 254 (quoting 19 U.S.C. §1862(b))—language which finds an echo in §§1182(f) and 1185(a).

Nor does it make sense for Plaintiffs, the district court, and the motions panel to point to specific non-exhaustive fees in the INA as reason to limit §1182(f). *California*, 183 F.4th at 50; Op.32-33; Pls' MSJ at 11-13 (citing 8 U.S.C. §§1356(u)(1), 1184(c)(12)). The entire point of §1182(f) is to "vest[] the President with 'ample power' to impose entry restrictions *in addition* to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684 (emphasis added). Taken to its logical conclusion, Plaintiffs' argument that the INA's specific scheme leaves no space for §1182(f) to operate would render that "ample power" illusory. *See Pacito v. Trump*, 169 F.4th 895, 920 (9th Cir. 2026) (rejecting similar arguments).

That is not the statute Congress enacted. Given the broad purpose of the statute, it would make no sense to list the types of restrictions that could be employed such as fee, as like *Learning Resources*, that would be interpreted to limit the authority. Instead, Congress expressly allowed "any restrictions" to supplement the INA, which can include blockades, total suspensions, and even paywalls. *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 187 (1993) ("It is perfectly clear that 8 U.S.C. §1182(f)… grants the President ample power to establish a naval blockade that

would simply deny illegal Haitian migrants the ability to disembark on our shores.”). As the *Chamber* court correctly ruled, §1182(f)’s delegation used “exceeding[ly] broad language” that encompassed a restriction requiring an “additional payment obligation for entry of a nonimmigrant H-1B visa worker.” *Chamber of Com. of United States v. U.S. Dep’t of Homeland Sec.*, 815 F. Supp. 3d 73, 100 (D.D.C. 2025) (“*Chamber*”). This Court should hold the same.

Additionally, the major questions doctrine holds no purchase here. These statutes are no mouseholes; they are “sweeping” delegations that permit even a naval blockade. *Hawaii*, 585 U.S. at 684. And the power asserted, while significant, is no elephant; it is limited to the entry of aliens. Nor have Plaintiffs demonstrated a significant economic impact, much less one well beyond the impact of a travel ban on numerous large countries. *Id.* And that a payment has not been imposed using these statutes before does not mean it *could* not have been imposed before; Presidents do not always exercise their power “maximally,” and a contrary assumption would create “a law trapped in amber.” *United States v. Rahimi*, 602 U.S. 680, 739 (2024) (Barrett, J., concurring). As Congress intended with its broad delegation of “any restrictions,” Presidents have used proclamation in novel ways to address unique issues. *See, e.g.*, 86 Fed. Reg. 59,603 (Oct. 25, 2021) (suspending entry of certain covered aliens without COVID-19 vaccines); 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F student and J exchange visitor visas for certain Chinese

students and researchers). And again, head count payments have been used to restrict aliens before. *See Edye*, 112 U.S. at 589. At bottom, none of this justifies further limiting Congress's "comprehensive delegation" of "any restrictions he may deem to be appropriate[,]" which clearly includes the paywall here. *Hawaii*, 585 U.S. at 684-85.

**C. Plaintiffs' Alternative Arguments Fail.**

Plaintiffs did not lead with their taxation theory before the district court, instead focusing on arguments that the Proclamation overrode Congress's reticulated H-1B program and related fees. Pls' MSJ at 11. No court has adopted those arguments. Nor should this Court affirm on such weak alternative grounds. As noted, §§1182(f) and 1185(a)(1) "vest[] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. The Proclamation does not conflict with the INA's statutory framework; it supplements the INA and is thus lawful.

*First*, the Proclamation does not conflict with Congress's scheme for H-1B visas. The Proclamation does not change H-1B numerical caps, alter cap exemption criteria, or modify specialty occupation definitions. All of those statutory requirements remain intact. *Chamber*, 815 F. Supp. 3d at 103-07. Instead, the Proclamation supplements the INA by temporarily imposing a $100,000 payment for certain petitions to "impose higher costs on companies seeking to use the H-1B

program in order to address the abuse of that program." *Id.* at 94. The fact that Congress incorporated anti-abuse mechanisms into the INA confirms the legislative objective that the H-1B framework not be exploited. The Supreme Court rejected a nearly identical argument that a Congress created a reticulated scheme that a proclamation was altering because "plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting" system. *Hawaii*, 585 U.S. at 689.

Under Plaintiffs' theory, the Executive could never impose an entry restriction in an area where Congress has legislated—a result that would eviscerate §1182(f) and contradict *Hawaii*, 585 U.S. at 689. Nor is such a theory consistent with past proclamations. *See id.* at 693 (describing past proclamations); 85 Fed. Reg. 34,353 (June 4, 2020) (suspending F or J visas for certain Chinese students and researchers). Moreover, the Ninth Circuit recently rejected a similar argument that a proclamation overrode the reticulated statutory scheme for refugees by fully suspending their entry indefinitely despite a cap and specific provisions. *See Pacito*, 169 F.4th at 920. If a full suspension of entry for refugees is within the Presidents §1182(f) authority and does not unlawfully override the INA, then surely neither does this. *Id.*

Second, the Proclamation and agency implementing memoranda do not override the fee provisions of §1356(m). Section 1356(m) gives the Secretary of

Homeland Security discretion to impose "fees for providing adjudication and naturalization services," which "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." The Proclamation does not impose an administrative processing fee to cover costs, does not displace §1356(m) fees, and is not collected or used in the same manner. *See Chamber*, 815 F. Supp. 3d at 103-05.

Moreover, §1356(m) uses the permissive word "may" and in no way precludes separate regulatory entry conditions. *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("'may' clearly connotes discretion"). Statutory fee provisions across the INA are explicitly non-exclusive. For example, §1356(u) authorizes a "premium fee" collected "[i]n addition to any other fees authorized by law." 8 U.S.C. §1356(u)(1). Similarly, §1184(c)(12) mandates a fraud prevention fee "[i]n addition to any other fees authorized by law." Conversely, when Congress intends to enact an express prohibition on immigration fees, it does so explicitly. *See id.* §1356(e)(3) (providing that a specific fee "shall not apply" to certain immigrants arriving by ferry). The absence of such prohibition in §1356(m) confirms that general cost-recovery fees do not restrict presidential authority under §§1182(f) or 1185(a)(1). And the absence of any such limits on §§1182(f) and 1185(a) reinforce that the provisions do not exclude taxes.

*Third*, the Proclamation does not regulate domestic conduct and would not be unlawful in any event. Fundamentally, the Proclamation restricts the entry of certain aliens as detrimental to American workers and national security. 90 Fed. Reg. at 46,027. Regardless, as the D.C. District Court found when considering the same challenges to the Proclamation, "the distinction between foreign and domestic policy finds no support in the statutory text which simply speaks in terms of restricting entry of aliens 'detrimental to the United States' and contains no limitation to any particular sphere, foreign or domestic." *Chamber*, 815 F. Supp. 3d at 99 (cleaned up). The Ninth Circuit made this clear, holding that "it makes no difference whether the additional entry restrictions are imposed under [§1182(f)] based on assertedly domestic policy concerns… [as] all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree." *Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated*, *Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (collecting examples).

Indeed, congressional debates made clear the statute must be capable of restricting entry to improve the domestic job market, as the Proclamation here is designed to do. 98 Cong. Rec. 4490-91 (Apr. 25, 1952) (bill's author justified the scope because "[S]uppose we have a period of great unemployment?"). The proclamation upheld in *Hawaii* was also concerned about public safety and national security consequences within the United States, which are domestic concerns. 585

U.S. at 677-80. If Plaintiffs' arguments were credited, it would mean that no visas with domestic sponsors could be restricted, which is not the case. *See* 85 Fed. Reg. 34,353 (June 4, 2020) (suspending J visas for certain Chinese students and researchers, which require a domestic sponsor). The Proclamation and implementing guidance suspend entry absent satisfaction of specified conditions, regardless of the identity of any sponsoring employer, and thus operates as an entry restriction rather than a domestic economic regulation.

## II. Appellees' Challenges are Nonjusticiable.

The Proclamation is also nonjusticiable under principles of consular nonreviewability. The Supreme Court has long held that "[t]he admission and exclusion of foreign nationals is a fundamental sovereign attribute" that is "largely immune from judicial control." *Muñoz*, 602 U.S. at 907 (2024) (quotations omitted). Review of entry decisions is "not within the province of any court, unless expressly authorized by Congress." *Id.* On the flip side, "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." *Id.* (quotations omitted).

Plaintiffs' claims challenging the Proclamation are non-justiciable on both fronts. Congress has clearly not authorized the review of decisions to exclude aliens. *Knauff*, 338 U.S. at 543. Instead, Congress has delegated sweeping "discretionary

authority" over whether to admit aliens. *Muñoz*, 602 U.S. at 907. Congress made a policy choice in §§1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). "By its terms, §1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability). Since Plaintiffs are challenging the Executive's entry decisions, such claims are nonreviewable.

The district court took a myopic view of that precedent and confined its applicability to backward-looking challenges to "discretionary decisions" or "the denial of any visa," concluding that Plaintiffs could challenge the Proclamation prospectively as outside of the President's discretion. Op.10. The Supreme Court has explained, however, that its precedent on this subject applies "across different contexts and constitutional claims." *Hawaii*, 585 U.S. 667, 703 (2018) (citing *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J. concurring); *Fiallo v. Bell*, 430 U.S. 787, 796 (1977)) (finding the issue "difficult" in a similar case and assuming reviewability without deciding); *see also Amanullah v. Nelson*, 811 F.2d 1, 10-11

(1st Cir. 1987) (applying doctrine to INS district director's denial of §1182(d)(5)(A) parole to certain excludable aliens detained by the INS).

The district court held that consular nonreviewability did not apply because the Proclamation might fall outside the President's discretion. Op. 11. But that peek behind the curtain completely circumvents the doctrine. In *Hawaii*, *Din*, and *Muñoz* the plaintiffs argued the actions were outside the Executive's discretion but that did not preclude consular non-reviewability. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability); *Muñoz*, 602 U.S. at 907; *Din*, 576 U.S. at 105. Thus, courts have universally ruled that claims of factual, substantive, or procedural error do not overcome non-reviewability doctrine. *See Baaghil v. Miller*, 1 F.4th 427, 434 (6th Cir. 2021); *Allen v. Milas*, 896 F.3d 1094, 1098 (9th Cir. 2018); *Hung Chi Doan v. INS*, 160 F.3d 508, 509 (8th Cir. 1998). In short, it is the exclusionary nature of the decision—not the decision's underpinning, much less the theory of the challenge—that governs whether the doctrine applies.

The district court primarily relied on *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025), for its rule. That case is distinguishable because it involved an APA challenge to a "reason to believe" standard for §1182(a)(6)(C)(i) inadmissibility set by the State Department in its Foreign Affairs Manual as purportedly inconsistent with the statute. *Id.* at 554. But the Proclamation is not an agency's regulation or policy; rather, it is a Proclamation by the President committed

to his discretion by §1182(f). Further, the agencies are not setting a new standard for adjudications within their own authority for duties entrusted to them. 8 U.S.C. §§1103, 1104. At most, the agencies issued guidance simply implementing the President's Proclamation. In sum, *Pietersen*'s controversial backdoor around the non-reviewability doctrine has no bearing here.

To the extent *Pietersen* would be applicable, it is wrong. Indeed, the Seventh Circuit has applied consular nonreviewability and rejected a similar challenge to a prospective policy claiming the policy was outside the executive's authority. *See Pak v. Biden*, 91 F.4th 896, 900-01 (7th Cir. 2024). For good reason. Consular nonreviewability is premised on the "separation of powers" because "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments.'" *Shiba v. Mullin*, 173 F.4th 895, 903-04 (7th Cir. 2026) (quoting *Hawaii*, 585 U.S. at 702); *accord Amanullah*, 811 F.2d at 17 ("We recognize that Congress… has delegated the uniquely political decisions about the ultimate admission and exclusion of aliens to the executive branch[.]"). It also comes from the fact that aliens have no "right of entry to this country as a nonimmigrant or otherwise." *Muñoz*, 602 U.S. at 908 (quoting *Mandel*, 408 U.S, at 762). Both of those principles apply equally to the Proclamation and favor the application of consular nonreviewability.

## III. Appellees Lack an Ultra Vires Cause of Action.

Plaintiffs also lack an *ultra vires* cause of action. To start, it is doubtful that *ultra vires* review is available to challenge presidential actions at all. *See Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam). Regardless, parties cannot transform a violation of a statute into a constitutional claim because "if all executive actions in excess of statutory authority were *ipso facto* unconstitutional" there would be "little need" for "specifying unconstitutional and ultra vires conduct as separate categories." *Dalton*, 511 U.S. at 470. Making pure separation of powers arguments based on statutory limits is impermissible because "plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Glob. Health Council v. Trump*, 153 F.4th 1, 14-15 (D.C. Cir. 2025). That is precisely what Plaintiffs have attempted here. Plaintiffs brought an *ultra vires* claim that the Proclamation exceeded Congress's delegation of *statutory* authority and thus violated the separation of powers. JA91-94 (Count 4).

The district court attempted to distinguish those cases by claiming Plaintiffs brought distinct statutory and constitutional claims. Op.14-16. But Plaintiffs argue the President violated the separation of powers by exercising a taxing power that exceeded the authority delegated in the statutes. JA94 ¶¶ 229-36 (claim turned on whether the statutes delegated the power). In assessing the *ultra vires* claim, the

Court itself said "the relevant inquiry here is whether the provisions of the INA granting the President discretionary powers to regulate the entry of noncitizens reflect a delegation of Congress's taxing power" and then analyzed the text of the statute. Op.20-23, 29, 32-33 (excess of statutory authority is same analysis). And the district court noted Plaintiffs argue statutory and constitutional claims, Op.14, and the analysis was identical and focused on the statutory delegation, Op.33. That is the exact problem. The fundamental question has always been whether the Proclamation exceeded Congress's delegation in §§1182(f) and 1185(a), which is precisely the type of "constitutional" claim courts have said is impermissible. *See Glob. Health Council*, 153 F.4th at 14-15; *Sustainability Inst. v. Trump*, 165 F.4th 817, 831 (4th Cir. 2026).

Plaintiffs shift to arguing they can satisfy the requirements to bring an *ultra vires* statutory claim. Appellees' Opposition to Motion to Stay (Doc. #00118467437) at 16-17. That is not the claim they brought and they have never argued for this standard before. JA94 ¶¶229-36. Regardless, there is no "specific prohibition." *NRC*, 605 U.S. at 666. Just the opposite—§§1182(f) and 1185(a)(1) provide blanket *permissions* for the Proclamation. And even more fundamentally, Congress knows how to create a cause of action, and did not do so here. Plaintiffs' argument would render Congress's choice not to create a cause of action void. At minimum, to succeed on an *ultra vires* claim the statutory violation must be "obviously beyond

the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (finding the statute did not preclude review and then denying *ultra vires* claim). There is no plausible argument that the Proclamation fits the bill.

## IV. The Proclamation and its Implementation are not Reviewable under the APA.

### A. There is No Reviewable Final Agency Action.

"The APA provides for judicial review only of 'final agency action.'" *Dalton*, 511 U.S. at 469 (quoting 5 U.S.C. §704). Plaintiffs cannot identify such an action. They challenge the Proclamation itself, but the APA does not permit challenges to Presidential action. *Franklin*, 505 U.S. at 801 (1992) (holding that the President is not an agency under the APA).

With that door closed, Plaintiffs seek to smuggle their case through a window. They argued that short explanatory memoranda qualify as final agency actions. But the APA does not allow challenges to agency implementation that merely carries out presidential directives. *Chamber,* 815 F. Supp. 3d at 108-10 (collecting cases). That is merely logical. Agency implementations of a presidential proclamation are an "extension of the President's action" and thus cannot be challenged under the APA because those actions are "merely carrying out directives of the President." *Tulare County v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Forest Service is merely carrying out directives

of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President").

The memoranda Plaintiffs challenged are just that—agency implementations of the presidential Proclamation. The memoranda explain that the Proclamation applies prospectively and provide technical information on how to satisfy the $100,000 entry payment. Indeed, Plaintiffs and the district court admit the relevant legal consequence being challenged is the $100,000 payment itself, which is set by the Proclamation and which the agencies had no discretion to alter. Op.29-30; Pls' MSJ at 17. As mere extensions of the Proclamation itself, the memoranda are just as invisible to the APA.

The district court was thus wrong to permit Plaintiffs' APA challenge to proceed on the basis of those memoranda. To accept the district court's reasoning would lead to "the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare County*, 185 F. Supp. 2d at 21. That would circumvent *Franklin*. While not all implementations of executive directives are unreviewable, "mere ministerial implementation of presidential action" is non-final and unreviewable. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021). The

agency guidance involved no independent decision-making and did not expand the substantive scope of the Proclamation. *Id.*

Indeed, when subordinate executive agencies are enforcing a self-executing presidential command, simple agency obedience does not transform the underlying executive order into an independently reviewable agency action, as it is the President's authority they are carrying out. *See Sale*, 509 U.S. at 172 n.28 ("Even if [the Attorney General] had [exercised discretion allowed by the §1182(f) proclamation], she would have been carrying out an executive, rather than a legislative, command"). "There can be no doubt that the President, in the exercise of his executive power under the Constitution, may act through the head of the appropriate executive department. The heads of departments are his authorized assistants in the performance of his executive duties, and their official acts, promulgated in the regular course of business, are presumptively his acts." *Runkle v. United States*, 122 U.S. 543, 557 (1887).

Even run under the normal two-prong test for "final agency action," the agency memoranda cannot ground an APA suit. To be final under *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), (1) "the action must mark the 'consummation' of the agency's decisionmaking process," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" None of the agency guidance reflects decision-making by the agencies, as

they were legally bound to follow the President's binding Proclamation. *See Trump v. Orr*, 146 S. Ct. 44, 46 (2025); *Make The Rd. New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016); *see also Sherley v. Sebelius*, 689 F.3d 776, 784–85 (D.C. Cir. 2012) (holding that an agency "may not simply disregard" a binding presidential order).

The merits panel believed that Defendants could not claim an irreparable harm from vacatur without there being a final agency action. But the reason there is no final agency action in this case is not because the Proclamation has no legal consequences; rather, it is because the agency implementation is not a separate action from the President's and *the President is not an agency*. The panel also relied on an interim denial of a stay in *Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025). But that case was then stayed by the Supreme Court, and is thus unpersuasive. *See Orr*, 146 S. Ct. at 46; *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Moreover, the presidential directive in *Agatha* gave the agency substantial discretion, and the motions panel dismissed the argument that APA review of the agency's implementation of the presidential directive was barred by *Franklin* as underdeveloped. *Agatha*, 151 F.4th at 11-12. And, in all events, *Agatha*—like the motions panel decision in this case—is not binding as to the ultimate merits determination.

Here, the statutes clearly vest the President with the authority and discretion, which is generally unreviewable. *See Dalton*, 511 U.S. at 476. The Proclamation carries the force of law. This is different from most executive orders that tell agencies to use their statutory authority in certain ways. Where the agency is instead executing *Presidential* authority, then the agency's actions are legally those of the President, not the agency. *See Confiscation Cases*, 87 U.S. (20 Wall.) 92, 109 (1873) (President had authority to order ship seizure, so agencies' conduct attributed to him). As a result, the Proclamation and the agencies' implementation all stem from the President's authority and thus is unreviewable under the APA.

### B. The Proclamation and its Implementation are Committed to Discretion.

Even if APA review were generally available for Presidential actions and ministerial agency implementation of the same, it would still be unavailable here for at least two reasons. *First*, the APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. §702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* §I; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno*, 197 F.3d at 1160. *Second*, the APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. §701(a)(2); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Where Congress has supplied no judicially manageable standards and has instead committed the matter to executive judgment, review is barred under

§701(a)(2). *See Norton*, 542 U.S. at 64. There is no meaningful statutory standard against which to measure the agencies' implementation of the Proclamation. The only governing law is the President's Proclamation issued pursuant to §§1182(f) and 1185(a)(1), which "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. That discretion is carried over to the agencies that implement the Proclamation, thus foreclosing APA review. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06 (President had discretion and his order delegated discretion to Secretary, so no APA review of Secretary's decision since that was also committed to agency discretion). Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in §§1182(f) and 1185(a)(1)—"is not a matter for [ judicial] review." *Dalton*, 511 U.S. at 476.

## V. The Proclamation and its Implementation are not Procedurally Infirm.

In ruling that Plaintiffs succeeded on their APA claims, the district court made clear that its analysis all flowed from its ruling that the Proclamation exercised the taxing power without an adequate delegation, especially for the "exceeding authority" claim. Op.29, 32-33. Because the premise is wrong, the conclusion is flawed. The exceeding statutory authority claim fails for the same reasons explained before. *See supra* §I. And the procedural claims fail because they are inapplicable and any error would have been harmless.

### A. Notice and Comment Rulemaking is Inapplicable.

Notice-and-comment rulemaking does not apply to the implementation of the Proclamation, and even if it could any error was harmless. The district court ruled that the agencies had to go through notice-and-comment rulemaking but seemed to admit if it was wrong about the delegation (which it is) the agencies would not have to go through notice and comment. *Id.*; *Sherley*, 689 F.3d at 784-85. Even so, the district court was wrong on numerous levels.

*First*, as explained, §§1182(f) and 1185(a)'s powers belong to the *President* alone, and the agencies lack authority to either disobey or disregard that exercise pending a meaningless notice-and-comment process that does not excuse them from following the Proclamation. *See Orr*, 146 S. Ct. at 46; *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100. Indeed, the D.C. Circuit rejected an almost-identical argument that the Secretary of Homeland Security needed to go through notice-and-comment rulemaking to expand expedited removal. *Make The Rd. N.Y.*, 962 F.3d at 635. Because the statute gave the Secretary "sole discretion" to change the rule "at any time," the court held that he "would be free to ignore the comments" and "notice-and-comment procedure would be an empty, yet time-consuming, exercise." *Id.* Just so here. The laws here "exude[] deference to the President in every clause." *Hawaii*, 585 U.S. at 684. So there is no basis to require the agencies to engage in notice and comment rulemaking to implement the Proclamation, as they must.

*Second*, notice and comment rulemaking only apply to legislative rules, which "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citation omitted). The agency guidance and memoranda fail that test. The Proclamation has the force of law and creates new obligations, not the agencies' ministerial implementation. *See* 8 U.S.C. §§1182(f), 1185(a) (granting authority to president); *Chamber*, 815 F. Supp. 3d at 110-11. As such, the agency guidance is more akin to interpretive or internal procedural rules, which do not require notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. §553(b)(A)).

*Third*, several notice-and-comment exceptions apply. There is "good cause" to bypass notice-and-comment because it would be "impracticable" to announce rulemaking for a temporary one-year Proclamation and would undermine its very purpose. 5 U.S.C. §553(b)(B). Especially so here, where §§1182(f) and 1185(a) permit the President to take swift yet temporary action. The "foreign affairs" exception also applies, 5 U.S.C. §553(a)(1), because "[t]he exclusion of aliens ... is inherent in the executive power to control the foreign affairs of the nation," *Knauff*, 338 U.S. at 542; *Hines v. Davidowitz*, 312 U.S. 52, 65 (1941) (immigration and foreign affairs are closely linked). Sections 1182(f) and 1185(a) inherently deal with foreign affairs functions. *See Hawaii*, 585 U.S. at 708.

The district court was wrong that the exceptions did not apply due to insufficient evidence. Op.31-31. The harms justifying the foreign affairs exception are obvious, as aliens would flood into the country during this period, causing chaos abroad as they attempted to do when the Proclamation was announced. *See* JA57-58 ¶ 107 (recounting this situation). The same is true for good cause, as §1182(f) allows the President to restrict entry "whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" *Hawaii*, 585 U.S. at 683 (quoting 8 U.S.C. §1182(f)). Subjecting implementation of a yearlong Proclamation to a long period of notice and comment would undermine the entire statutory scheme and the time-limited Proclamation. There is a plethora of reasons why notice and comment rulemaking cannot apply, much of which the district court failed to grapple with.

*Fourth*, and relatedly, even if notice-and-comment rulemaking had been required, any failure to conduct it would be harmless error because the agencies were required by the Proclamation to collect the $100,00 payment, thus Plaintiffs lack redress. *See Chamber*, 815 F. Supp. 3d 110-11; *see also Conservation L. Found. v. Evans*, 360 F.3d 21, 29 (1st Cir. 2004) (any failure to engage in notice-and comment was harmless because it "clearly had no bearing on the procedure used or the substance of the decision reached" (citations omitted)). Plaintiff has the burden of showing any error causes harm, and here they cannot do so. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). As in *Chamber*, Plaintiffs cannot satisfy their burden to

show that "they could have mount[ed] a credible challenge" to the agencies' memoranda through notice and comment. *Chamber*, 815 F. Supp. 3d at 111 (internal quotations omitted). Nor could additional procedures have altered the outcome. *Id.* Because the agencies lacked discretion to deviate from the Proclamation's $100,000 payment requirement, "no amount of procedure would have remedied" Plaintiffs' alleged harm, meaning they lack redressability for standing purpose. *Id.; see Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023); *Bradford v. DOL*, 101 F.4th 707, 731 (10th Cir. 2024).

The district court simply concluded, without basis, that the procedures "could" have changed the decision. Op.31. But as explained, the agencies had no discretion to disregard the Proclamation. Indeed, the district court and Plaintiffs note the issue is not how the agencies implemented the Proclamation, but the payment itself. Pls' MSJ at 18-19; Op.30-31. So not only "would [the agencies] be free to ignore the comments" meaning the "notice-and-comment procedure would be an empty, yet time-consuming, exercise," *Make The Rd. N.Y.*, 962 F.3d at 635, the agencies could *not* alter the President's decision, *Chamber*, 815 F. Supp. 3d at 111.

### B. The Proclamations' Implementation is Not Subject to Arbitrary and Capricious Review.

The district court fundamentally erred in holding that the Proclamation and Agency memoranda implementing it are arbitrary and capricious because "the

President had no power or delegated authority to impose a tax on H-1B petitions." Op.33-36.

The district court found that the challenged agency memoranda and guidance are arbitrary and capricious because they fail to acknowledge the agencies' change in position, fail to consider reliance interests, and rely on factors Congress did not intend. *Id*. This fails. Even if APA review were available here (it is not), an agency does not act "arbitrarily and capriciously" or "contrary to law" when it merely executes a legally permissible presidential directive. *Chamber*, 815 F. Supp. 3d at 110-11; *Bradford*, 101 F.4th at 731 (holding that an agency cannot act arbitrarily and capriciously when rescinding prior guidance pursuant to a binding executive mandate). Under §§1182(f) and 1185(a)(1), Congress conferred broad authority upon the President to issue entry restrictions in his discretion. Consequently, the agencies had no choice in the matter: an agency "may not simply disregard" a binding presidential directive. *Chamber*, 815 F. Supp. 3d at 110-11 (quoting *Sherley*, 689 F.3d at 784–85). Defendants cannot have "acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Orr*, 146 S. Ct. at 46. That holds true even if the agency, in effectuating the directive, does not evaluate alternatives to executing the President's directive or formally acknowledge the change that the Presidential directive has on

a different position taken by the agency during another administration or before the proclamation was issued. *Bradford*, 101 F.4th at 731.

For these same reasons, even if the agencies had been required to weigh the factors the district court identified, any failure to do so would be harmless under 5 U.S.C. §706 because the agencies were legally bound to implement the Proclamation as written. *See Chamber*, 815 F. Supp. 3d at 110-11; *Conservation L. Found.*, 360 F.3d at 29 (holding that procedural omissions are harmless where they "clearly had no bearing on the procedure used or the substance of the decision reached"). As explained, *supra* §IV(A), the agencies could not simply disregard a Presidential mandate. *See Orr*, 146 S. Ct. at 46; *Make The Rd. N.Y.*, 962 F.3d at 634; *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100; *Sherley*, 689 F.3d at 784-85. And Plaintiffs and the district court have made clear their issue is with the $100,000 payment itself, not any specifics in how the agencies implemented the Proclamation. Since that payment was set by the Proclamation, the agencies had no ability to consider alternatives.

In any event, §1182(f) does not permit litigants to challenge a presidential entry-suspension order "based on their perception of its effectiveness and wisdom." *Hawaii*, 585 U.S. at 708. Congress did not authorize the Judiciary to substitute its own policy preferences "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Id.*; *Amanullah*, 811 F.2d at 17 ("We recognize that Congress… has delegated the

uniquely political decisions about the ultimate admission and exclusion of aliens to the executive branch[.]"). Whether the President's chosen strategy for addressing a perceived threat to the national interest "is justified from a policy perspective" is legally irrelevant; the President need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Hawaii*, 585 U.S. at 686-87 (citations omitted). Plaintiffs' arbitrary-and-capricious challenge is nothing more than an impermissible end-run around this deferential framework, aimed squarely at second-guessing the President's rationale and chosen remedy. *See Sale*, 509 U.S. at 165 (confirming that "[t]he wisdom of the policy choices" underlying Presidential Proclamations is not a "matter for our consideration"). As a result, no arbitrary and capricious claim could prevail.

## VI. The District Court Erred in Granting Universal Vacatur.

The district court universally vacated the agencies' implementation of the Proclamation under 5 U.S.C. §706(2). Universal vacatur, however, is unknown to equity and is not otherwise authorized by the APA. *See United States v. Texas*, 599 U.S. 670, 695-99 (2023) (Gorsuch, J., concurring). In any event, Plaintiffs' injuries all stem from the Proclamation's payment, not the vacated brief agency memoranda. Plaintiffs thus lack standing to seek vacatur because it does not redress their injuries. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each form of relief that they seek."). Regardless, vacatur

would be an appropriate remedy only on respondents' APA claims, not on their *ultra vires* claim.

And even for the APA claims vacatur is a discretionary equitable remedy, not a mandate. *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023); *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) ("balance of equities" must be considered). Issuing universal relief to non-parties violates basic equitable principles. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025); *Hawaii*, 585 U.S. at 713-21 (Thomas, J. concurring); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 986 (9th Cir. 2025) (equitable limits apply to §705 stays). Afterall, remedies must be strictly tailored to redress the concrete injuries of the parties before the court. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). The district court ignored these principles and vacated the implementation of the Proclamation universally, including for the same alleged injuries to Plaintiffs' institutions that were litigated in *Chamber* and lost, giving the same institutions a second bite at the apple. At a minimum, the district court should have considered this in the equities when issuing universal vacatur.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment below, vacate the order entering summary judgment for Plaintiffs, and remand with instructions to enter judgment for Appellants.

DATE: September 3, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

JEFFREY A. ALDERETTE
*Trial Attorney*

DAVID J. BYERLEY
*Senior Litigation Counsel*

*s/ Tiberius Davis*
Tiberius Davis

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)-860-8970

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,930 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*s/ Tiberius Davis*
Tiberius Davis

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Tiberius Davis*
Tiberius Davis

**No. 26-1699**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs -Appellees*,

*v.*

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Acting Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants - Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts No. 1:25-cv-13829-LTS
Sorokin, J. presiding

**ADDENDUM**

*(Counsel listed on inside cover)*

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*

DAVID J. BYERLEY
*Senior Litigation Counsel*

JEFFREY A. ALDERETTE
*Trial Attorney*
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franlink Station
Washington, DC 20044
(202)-860-9941

*Counsel for Defendants*

## TABLE OF CONTENTS

**Item** **Page**

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 86) AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS (DOC. NO. 92) .......... Addendum0001

JUDGMENT, June 8, 2026 .......... Addendum0043

5 U.S.C. 551 .......... Addendum0045

5 U.S.C. 553 .......... Addendum0050

5 U.S.C. 701 .......... Addendum0052

5 U.S.C. 702 .......... Addendum0054

5 U.S.C. 704 .......... Addendum0055

5 U.S.C. 706 .......... Addendum0056

8 U.S.C. 1182 .......... Addendum0058

8 U.S.C. 1185 .......... Addendum0166

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STATE OF CALIFORNIA et al., <br> Plaintiffs, <br> v. <br> MARKWAYNE MULLIN et al., <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil No. 25-13829-LTS |

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 86) AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS (DOC. NO. 92)

June 8, 2026

SOROKIN, J.

On September 19, 2025, President Trump signed a Proclamation instituting a $100,000 payment requirement for employers submitting petitions for new H-1B visas. Plaintiffs are twenty states that have sued various executive departments and officials for their role in implementing the Proclamation. Plaintiffs contend that Defendants' implementation of the Proclamation violates the separation of powers and the Administrative Procedure Act ("APA").

The parties have cross-moved for summary judgment. Doc. No. 86; Doc. No. 92.[1] Defendants have also moved to dismiss the complaint. Doc. No. 92. For the reasons that follow, the Court DENIES Defendants' motion for summary judgment. Defendants' motion to dismiss

[1] Citations to "Doc. No. _" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

is ALLOWED IN PART and DENIED IN PART. Plaintiffs' motion for summary judgment is ALLOWED.

## I. BACKGROUND

### A. The H-1B Program

The Constitution provides Congress with the power to "establish an uniform Rule of Naturalization . . . throughout the United States." U.S. Const. art. 1, § 8, cl. 4. Pursuant to this constitutional authority, Congress enacted the Immigration and Nationality Act of 1952 ("INA"), which "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 587 (2011) (citation modified).

Within the INA, Congress created a predecessor for the H-1B visa—the "H visa"—establishing temporary visas for nonimmigrant foreign workers in specialty occupations. Doc. No. 1 ¶ 52. In 1990, Congress amended the INA and created the H-1B program that is still in effect today. Id. ¶ 53. The H-1B program allows a U.S. employer to petition the government to hire a nonimmigrant worker in a specialty occupation for a maximum duration of six years. Id. A "specialty occupation" is an occupation that requires "(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1).

To protect the domestic labor force, Congress has capped H-1B visa approvals for most private employers at 65,000 per year, with another 20,000 for holders of advanced degrees. 8 U.S.C. § 1184(g). Some employers, however, are not constrained by any cap. In particular, the cap does not apply to (1) "an institution of higher education" "or a related or affiliated nonprofit

entity," or (2) "a nonprofit research organization or governmental research organization." Id. § 1184(g)(5). These cap-exempt employers enjoy other benefits under the H-1B visa program. Unlike private employers, cap-exempt employers do not need to register in the annual H-1B lottery and may file petitions with United States Citizenship and Immigration Services ("USCIS") using Form I-129 at any time. Doc. No. 1 ¶ 57.

The H-1B program also requires employers to pay certain fees. Some are statutory fees set by Congress, which include a $500 fraud-prevention fee, 8 U.S.C. § 1184(c)(12)(A)-(C), as well as a $1,500 filing fee, id. § 1184(c)(9)(A)-(C). See also Doc. No. 1 ¶¶ 62-69 (listing fees set by Congress through statute).

The INA also delegates to the Department of Homeland Security ("DHS") the authority to set visa-related adjudication fees. That statutory provision reads:

> Provided . . . [t]hat fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

8 U.S.C. § 1356(m). Based on this authority, DHS has imposed various adjudication fees for H-1B visas through notice-and-comment rulemaking. Doc. No. 1 ¶¶ 70-73.

On occasion, Congress and DHS have waived certain fees for cap-exempt employers. For example, Congress has passed an education-and-training fee that does not apply to cap-exempt employers. Id. ¶¶ 63, 79. Similarly, cap-exempt employers do not have to pay a $215 non-refundable registration fee set by DHS. Id. ¶ 78.

B. Presidential Powers Under the INA

In addition to establishing a comprehensive federal statutory scheme governing immigration and naturalization, the INA also confers upon the President "broad discretion to suspend the entry of aliens

into the United States." Trump v. Hawaii, 585 U.S. 667, 683-84 (2018). In particular, Section 212(f) of the INA provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). The INA contains one more provision concerning the President's authority to regulate entry into the United States. Section 215(a) provides that, "[u]nless otherwise ordered by the President, it shall be unlawful . . . for any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). The President's authority under this section "substantially overlaps" with the President's power under Section 212(f). Hawaii, 585 U.S. at 693 n.1.

C. Proclamation 10973

Relying on the foregoing statutory powers under the INA, on September 19, 2025, President Trump signed Proclamation 10973 ("Proclamation"), which adds a $100,000 supplemental payment requirement to all H-1B petitions. See Proclamation 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46027 (Sep. 24, 2025). The Proclamation begins by setting out the President's reasons for instituting the measure. It notes that the H-1B program "has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor," which has subsequently "undermined both our economic and national security." Id. at 46027. It proceeds:

> Some employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary

> workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

Id. Additionally, the Proclamation lays out data about the rising share of STEM jobs filled by foreign workers, focusing on IT firms and tech companies. Id. at 46027-28. The Proclamation does not specifically address these employment trends as they pertain to state employers, nonprofit employers, or institutes of higher education.

The Proclamation contains five sections, the first three of which are relevant to the claims in this case. Section 1—"Restriction on Entry"—cites sections 212(f) and 215(a) of the INA as the statutory basis for the President's authority to impose the $100,000 payment. Id. at 46028. This section also states that the new payment requirement goes into effect on September 21, 2025, and expires after twelve months (if not extended). Id. Furthermore, subsection 1(b) directs the Secretary of Homeland Security to enforce the Proclamation and further directs the Secretary of State to "issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026." Id. at 46029. Subsection 1(c) grants the Secretary of Homeland Security broad discretion to waive the $100,000 fee for any "individual alien," "company," or "industry" where such waiver is "in the national interest and does not pose a threat to the security or welfare of the United States." Id.

Section 2—"Compliance"—requires employers to, "prior to filing an H-1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the [$100,000] payment . . . has been made." Id. In addition, it instructs the Secretary of State to "verify receipt of payment . . . during the H-1B visa petition process" and " approve only those visa petitions for which the filing employer has made the payment." Id. The section further directs DHS and the State Department to "coordinate to take all necessary and appropriate action

to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment." Id.

Section 3—"Scope and Implementation of Restriction on Entry"—notes that the Proclamation only applies to nonimmigrants entering the United States after the effective date of the Proclamation. Id. It also directs the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security to "jointly submit to the President . . . a recommendation" on whether to extend or renew the $100,000 payment beyond the twelve-month period established by the Proclamation. Id.

D. Defendants' Implementation of the Proclamation

Defendants swiftly took action to implement the terms of the Proclamation. On September 19, 2025, the same day the President announced the Proclamation, the Bureau of Consular Affairs of the Department of State sent an email to the Visa Office explaining that the Proclamation "takes effect at 12:01 a.m. EDT on September 21, 2025." Doc. No. 84-2 at 3. On September 20, 2025, USCIS published a memorandum, clarifying that the Proclamation "only applies prospectively to petitions that have not yet been filed." Doc. No. 84-3 at 3. U.S. Customs and Border Protection ("CBP") and the Department of State issued similar memoranda to their staff on the same day. Doc. No. 84-1 at 11; Doc. No. 84-2 at 4-8.

The next day, both the Department of State and USCIS issued "H-1B FAQ" documents further noting that the Proclamation's payment requirement applies prospectively. Doc. No. 84-2 at 9-10; Doc. No. 84-3 at 4-5. Also on September 21, 2025, the Department of State published a webpage entitled, "Restriction on Entry of Certain Nonimmigrant Workers," confirming that the Proclamation's restrictions only apply to H-1B petitions filed after the Proclamation's effective date of September 21, 2025. Doc. No. 84-2 at 12.

On October 20, 2025, USCIS published additional information on its "H-1B Specialty Occupations" webpage explaining that the $100,000 payment applies to new petitions filed on or after September 21, 2025, "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa"; new petitions that request "consular notification, port of entry notification, or pre-flight inspection for an alien in the United States"; and new petitions for change of status, amendment, or extension where the USCIS has determined that the individual is not eligible for the request. Doc. No. 84-3 at 7-8. That same day, USCIS published an updated fee schedule on its website listing the $100,000 payment as an additional fee requirement for H-1B petitions. Id. at 9-13. USCIS also created a payment website for petitioners paying the $100,000 fee. Id. at 14-15.

The foregoing materials (collectively, the "Policy") reflect the agency actions that are the subject of Plaintiffs' lawsuit.

E. Impact on Plaintiffs

The Proclamation and the corresponding Policy have significantly increased the cost of H-1B petitions, which, prior to the Proclamation, totaled somewhere between $960 and $7,595 in regulatory and statutory fees. Id. ¶ 80. Plaintiffs allege that they stand to suffer various harms from the new payment requirement. First, Plaintiffs allege that the Policy will impede their ability to hire educators for their primary and secondary schools, exacerbating existing teacher shortages. Id. ¶¶ 114-136. Second, Plaintiffs assert that the Policy will negatively impact their ability to staff public colleges and universities and stymie critical academic research. Id. ¶¶ 137-157. Finally, Plaintiffs allege that the Policy will lead to a decline in H-1B medical workers, which, in turn, will worsen staffing shortages in medical facilities and diminish access to healthcare. Id. ¶¶ 158-188. Plaintiffs contend that the Proclamation's impact on healthcare professionals "will cause cascading harm throughout the Plaintiff States" by impairing public

healthcare providers' ability to provide adequate services to residents and by heightening costs to state insurance programs. Id. ¶¶ 187-88.

F. Procedural History

Plaintiffs commenced this lawsuit on December 12, 2025. Doc. No. 1. Their complaint advances four causes of action: Count I alleges a violation of the APA's procedural requirements; Count II alleges a violation of the APA for an agency action in excess of statutory authority; Count III alleges arbitrary and capricious acts in violation of the APA; and Count IV alleges an unconstitutional ultra vires act.

On January 23, 2026, the parties jointly proposed a summary judgment briefing schedule, stipulating that the parties' claims and defenses are suitable for resolution through summary judgment. Doc. No. 83. The Court adopted the schedule. Doc. No. 85. Pursuant to the schedule, Plaintiffs filed their motion for summary judgment on February 6, 2026. Doc. No. 86. On March 9, 2026, Defendants filed a cross-motion for summary judgment, an opposition to Plaintiffs' motion for summary judgment, and a motion to dismiss, which were all supported by one memorandum. Doc. Nos. 92, 93. On March 17, 2026, the Federation for American Immigration Reform submitted an amicus brief in support of Defendants' cross-motion for summary judgment after obtaining leave to do so.[2] Doc. No. 97. On April 2, 2026, Plaintiffs submitted a single memorandum as their reply in support of their motion for summary judgment and their opposition to Defendants' cross-motion and motion to dismiss.[3] Doc. No. 99.

[2] The Court considers "the amicus brief[] only insofar as [it] concern[s] legal issues and positions raised by the parties." New Jersey v. Trump, 131 F.4th 27, 32 n.1 (1st Cir. 2025).
[3] In their reply, Plaintiffs agreed to voluntarily dismiss their claims against the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor without prejudice. Doc. No. 99 at 27 n.16. Accordingly, the Court ALLOWS Defendants' motion to dismiss the claims against these four parties and dismisses those claims without prejudice.

Defendants replied on April 13, 2026. Doc. No. 100. The Court held a hearing on the motions on May 29, 2026.

## II. LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the administrative law context, however, a motion for summary judgment "is simply a vehicle to tee up a case for judicial review." Bos. Redev. Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" was unlawful. Id.

In addition to their cross-motion for summary judgment, Defendants also move to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim. Doc. No. 93 at 21. On a motion to dismiss for lack of subject matter jurisdiction, a court must "construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). To survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

### A. Standing

The Court begins with standing. To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent;

(ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).

Plaintiffs have met these requirements. They allege that the imposition of the $100,000 H-1B payment requirement negatively impacts their ability to staff publicly run colleges and universities, primary and secondary schools, and healthcare systems. Doc. No. 1 ¶¶ 114-188. They contend that these hiring challenges will, in turn, exacerbate staffing shortages in these sectors and endanger Plaintiffs' ability to provide important medical and educational services. Id. ¶¶ 114-115, 134-136, 143, 161-169, 187-188. These allegations sufficiently demonstrate injuries caused by Defendants' actions in enacting the Policy, which are redressable by the judicial relief sought in this case—declaratory judgment, vacatur, and injunctive relief.

Nothing in the record before the Court undermines Plaintiffs' standing arguments. Nor do Defendants raise any objection to standing. Accordingly, the Court finds that Plaintiffs have standing to bring this lawsuit.

B. Consular-Nonreviewability Doctrine

As an initial matter, Defendants contend that Plaintiffs' claims are foreclosed by the doctrine of consular nonreviewability. That doctrine establishes that "the federal courts cannot review" an executive officer's "denial of a visa." Dep't of State v. Munoz, 602 U.S. 899, 908 (2024). This is because "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference," and, "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." Id. (citation modified).

Here, Plaintiffs' claims do not neatly fit within the ambit of consular nonreviewability. Plaintiffs do not seek to challenge the denial of any visa. Rather, they challenge the Proclamation and the Policy as actions exceeding the President's delegated authority under the

INA. Defendants argue that because the President's Proclamation arises from the "sweeping" discretionary authority granted to him via INA §§ 212(f) and 215(a), it is not reviewable unless Congress expressly authorizes such review—which it has not done here. Doc. No. 93 at 22. But this line of argument misses the central thrust of Plaintiffs' claims. Plaintiffs allege that the President treaded beyond the scope of his discretionary authority under the INA; indeed, one of Plaintiffs' theories is that the President created (and the Defendants implemented) an unauthorized tax on H-1B petitions. In other words, Plaintiffs' case centers on their contention that Congress did not leave the challenged actions to the executive's discretion. Such claims diverge from the types of discretionary actions that the consular-nonreviewability doctrine is designed to shield from judicial review. And, Defendants cite no cases expanding the scope of the consular-nonreviewability doctrine in the manner they urge.

In any event, "it is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them to assure that the executive departments abide by the legislatively mandated procedures." Pietersen v. U.S. Dep't of State, 138 F.4th 552, 560 (D.C. Cir. 2025) (citation modified). Here, Plaintiffs do not seek retrospective review of an executive officer's decision to exclude a noncitizen but rather advance a forward-looking challenge regarding the lawfulness of the Policy carrying out the Proclamation. For these reasons, the Court rejects Defendants' argument that the claims are not justiciable under the doctrine of consular reviewability. Having resolved that issue, the Court turns to evaluating Plaintiffs' claims. Because many aspects of Plaintiffs' ultra vires claim bear on their claims under the APA, the Court begins with the ultra vires claim before addressing the APA claims.

C. Ultra Vires Claim

1. *Reviewability*

Plaintiffs' separation-of-powers claim arises from their allegations that the Policy "usurps Congress's exclusive and plenary constitutional authority to set immigration policy and to raise revenue" and "exceeds the carefully and explicitly limited fee-setting authority delegated to the executive branch by Congress." Doc. No. 1 ¶¶ 234-235. Before evaluating the merits of this claim, the Court addresses the preliminary issue of whether Plaintiffs' separation-of-powers claim is reviewable as a non-statutory ultra vires claim.

"The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*." R.I. Dep't of Env't Mgmt. v. United States, 304 F.3d 31, 42 (1st Cir. 2002). "To act *ultra vires* a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority." New York v. McMahon, 784 F. Supp. 3d 311, 352 (D. Mass. 2025), appeal dismissed, No. 25-1495, 2025 WL 3451815 (1st Cir. Sep. 15, 2025) (citation modified).

Defendants raise various objections to ultra vires review, but their arguments are unavailing. Defendants first contend that "[i]t is doubtful that *ultra vires* review is available to challenge presidential actions at all." Doc. No. 93 at 28. They cite to American Foreign Service Association v. Trump, a per curiam decision of the District of Columbia Circuit, which found that an ultra vires action against President Trump was likely unavailable because "an *ultra vires* action is a suit in equity . . . and courts generally lack authority to enjoin the President." 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025). Plaintiffs do not face the same hurdle here because they seek to enjoin executive departments and their officials, rather than the President. While it is true that Plaintiffs seek to enjoin Defendants from taking action pursuant to the

President's instruction, this link between Defendants' actions and the President's directive is not enough to bar ultra vires review. It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting Franklin v. Massachusetts, 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). This is because "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." Id. (citation modified).

Next, Defendants argue that the Plaintiffs' ultra vires claim is statutory, rather than constitutional, in nature. Doc. No. 93 at 27. They contend that asserting "pure separation of powers concerns based on statutory limits is impermissible because 'plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one.'" Id. at 27-28 (quoting Glob. Health Council v. Trump, 153 F.4th 1, 14-15 (D.C. Cir. 2025)).

Defendants are correct that there is a different presumption of reviewability for constitutional versus statutory claims against the President and other executive officials. An executive official's action is reviewable for constitutionality. Franklin, 505 U.S. at 801. However, not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." Dalton v. Specter, 511 U.S. 462, 472 (1994). To the contrary, courts "often distinguish[] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." Id.

The Supreme Court elucidated this distinction in Dalton, which involved a lawsuit alleging that the President's decision to shut down a particular naval shipyard violated the procedural requirements of the Defense Base Closure and Realignment Act of 1990. Id. There,

the Court of Appeals concluded that the claim had a "constitutional" dimension, reasoning that the President violates the constitutional separation-of-powers doctrine when he acts in excess of his statutory authority. Id. at 471. The Supreme Court reversed, concluding that the plaintiffs' claim was "not a constitutional claim, but a statutory one," and that it could not go forward under the limited scope of judicial review available for such statutory claims. Id. at 477-78.

The Supreme Court reached this conclusion based upon several findings. The Court first noted that the plaintiffs' claim challenging the closure of the shipyard amounted only to a claim that the President had "exceeded his authority" under the relevant statute. Id. at 477. Namely, the plaintiffs alleged that the President exceeded his statutory authority by adopting recommendations to close certain military bases, even though those recommendations had violated the statute's procedural requirements. Id. at 474. Because the claim was premised on the President's alleged violation of the statute, the Court found that the claim was simply a statutory claim, rather than a constitutional claim subject to judicial review. Id. at 475-77. From there, the Court noted that the same statute did "not at all limit the President's discretion in approving or disapproving . . . recommendations." Id. at 476. Accordingly, the Court concluded that the plaintiffs' statutory claim was not reviewable because, "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." Id. at 477.

The matter before this Court is distinguishable from Dalton for a variety of reasons. First, Plaintiffs' challenge to the Policy is not a mere statutory claim. Plaintiffs allege both that the Policy exceeds the scope of the President's authority under the INA, and that it encroaches upon Congress's exclusive power to tax under the Constitution. Thus, Plaintiffs do not simply claim that the Executive Branch failed to comply with the terms of the INA. Their allegations

implicate weighty constitutional concerns regarding the balance of power between the executive and legislative branches. Indeed, Defendants, themselves, repeatedly contend that the Proclamation is a permissible exercise of the President's "inherent" executive power to control the foreign affairs of the nation—an argument that suggests that the President's relevant powers exceed his statutory authority under the INA or do not derive from the statutory provisions cited. Doc. No. 93 at 32, 36, 40; Doc. No. 100-1 at 10, 15. As such, this case presents significant constitutional separation-of-powers issues that veer far beyond the statute-based dispute at issue in Dalton.[4]

Moreover, even if the Court were to accept Defendants' assertion that Plaintiffs' claim is statutory rather than constitutional (it does not), Plaintiffs' claim differs materially from the one advanced in Dalton. In Dalton, the Supreme Court found that the challenged actions fell within the unlimited discretion granted to the President under the relevant statute to approve or reject recommendations for base closures. 511 U.S. at 476. As a result, the Court found that it could not review the claim, noting that, "where a claim 'concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves

[4] Defendants additionally argue that the ultra vires claim is unreviewable because "Plaintiffs fail to identify any 'specific prohibition in a statute' that . . . would render the Proclamation 'entirely in excess of [the President's] delegated powers.'" Doc. No. 93 at 29 (quoting Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 666, 681 (2025)). They contend that this deficiency "alone is fatal to" Plaintiffs' ultra vires claim. Id. But, the requirement articulated in the Nuclear Regulatory Commission case pertained to an allegation that an agency acted in violation of a relevant statute. 605 U.S. at 681. Based on the nature of the claim, the Court observed that the plaintiffs were "basically dress[ing] up a typical statutory-authority argument as an ultra vires claim." Id. at 682. In that particular context, the Court noted that ultra vires review applies "only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." Id. at 681 (citation modified). Defendants have not shown that the same requirement of a "specific prohibition in a statute" applies to cases, such as this one, that raise constitutional separation-of-powers concerns.

considerations which are beyond the reach of judicial power.'" Id. at 474 (quoting Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne, 250 U.S. 163, 184 (1919)).

Here, Plaintiffs' claim does not require the Court to evaluate whether the President abused the discretion granted to him by the INA. Instead, Plaintiffs contend that the President lacked the power to impose the additional $100,000 payment requirement to H-1B applications, alleging (among other things) that the payment obligation intrudes upon Congress's taxing power. Such a claim is plainly subject to judicial review. While Defendants urge that the President's policy decisions involving immigration and national security are squarely within the executive's discretion and immune from judicial intervention, Doc. No. 93 at 28-29, this line of argument misconstrues the nature of the issues here. The ultra vires claim in this case does not call upon the Court to question the President's exercise of his policy-making discretion. Rather, this case asks the Court to evaluate whether the President and Defendants had the requisite authority to issue and implement the Proclamation.[5] While "[t]he Executive has broad discretion over the admission and exclusion of aliens, . . . that discretion is not boundless." Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986), aff'd, 484 U.S. 1 (1987). Such discretion "may not transgress constitutional limitations" or "the statutory authority conferred by Congress." Id. It is "the duty of the courts . . . to say where those statutory and constitutional boundaries lie."

[5] The Court does not dispute Defendants' position that immigration and national security policies are within the prerogative of the political branches. However, "in areas of shared presidential and congressional authority," such as the entry of noncitizens, "the courts have presumptive authority to determine whether the President has usurped an authority that Congress neither delegated to him nor left for him to exercise unimpeded by statute." Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem, 793 F. Supp. 3d 19, 77-78 (D.D.C. 2025), aff'd sub nom. Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin, No. 25-5243, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026).

Id. This Court declines Defendants' invitation to step away from its essential duty in this matter.[6]

2. *Merits*

Having resolved the reviewability of Plaintiffs' ultra vires challenge, the Court evaluates the merits of the claim. Plaintiffs contend that the Policy violates separation-of-powers principles because it "usurps both" Congress's constitutional "powers to regulate the admission of noncitizens . . . and to levy taxes." Doc. No. 87 at 20.

The Court begins with Plaintiffs' assertion that the Policy intrudes upon Congress's taxing power. The first inquiry is whether the $100,000 payment requirement constitutes a tax. The parties quibble about whether the requirement resembles a tax or a "penalty" as characterized by two Supreme Court precedents: Bailey v. Drexel Furniture Company and National Federation of Independent Business v. Sebelius. In Drexel, the Supreme Court held that the Child Labor Tax Law—which required employers to pay the government one-tenth of their net income if they were found to knowingly employ child laborers—was a penalty, not a tax. 259 U.S. 20, 36 (1922). The Court reasoned that the "heavy exaction" functioned as a prohibitory regulation, rather than a mere tax, because it was "imposed to stop the employment of children within the age limits prescribed." Id. at 36-37.

[6] One more issue warrants mention. Case law suggests that a non-statutory ultra vires claim cannot proceed "if a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." Nuclear Regul., 605 U.S. at 681 (citation modified); see also President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs., 798 F. Supp. 3d 77, 133-35 (D. Mass. 2025) (granting defendants' motion for summary judgment as to plaintiff's ultra vires and separation-of-powers claims because plaintiffs successfully brought APA claim alleging same issues). Here, Plaintiffs bring several claims under the APA which overlap substantially with the allegations underlying their ultra vires claim. However, Defendants make no argument in their papers that Plaintiffs cannot proceed on their ultra vires claim because of their possible APA claims. Because this argument was not raised in the briefing, it is waived.

In Sebelius, the Supreme Court further clarified the distinction between a tax and a punishment. There, the Court found that the Affordable Care Act's requirement that individuals pay an additional fee to the Internal Revenue Service ("IRS") for not obtaining health insurance amounted to a tax, not a penalty. 567 U.S. 519, 574 (2012). In distinguishing penalties from taxes, the Court explained that, "if the concept of penalty means anything, it means punishment for an unlawful act or omission." Id. at 567 (citation modified). Applying this principle, the Court concluded:

> While the individual mandate clearly aims to induce the purchase of health insurance, it need not be read to declare that failing to do so is unlawful. Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS.

Id. at 567-68.

Here, the $100,000 payment requirement for all H-1B petitions does not aim to establish that hiring H-1B workers is illegal. The payment is not a penalty, just as the IRS fee in Sebelius was not, because it is not "punishment for an unlawful act or omission." Id. at 567. Hiring workers pursuant to the H-1B program is plainly lawful. Of course, rendering the hiring of H-1B workers "unlawful" would eliminate the program established by Congress through the statute, which would raise a different separation-of-powers concern. See Clinton v. City of New York, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); Hawaii, 585 U.S. at 689 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA."). Nor is this case analogous to Drexel. There, the exaction was clearly imposed to outlaw the hiring of child laborers and to punish employers who deviated from this standard. 259 U.S. at 37-38. The Supreme Court's reasoning in this pair of precedents supports a finding that the $100,000 payment requirement amounts to a tax, not a penalty.

Defendants' arguments to the contrary are unpersuasive. They note that the $100,000 fee is collected by DHS and not the IRS, which they argue resembles Drexel, where the penalty was collected by the Secretary of Labor. But neither Sebelius nor Drexel stands for the proposition that the particular agency charged with collecting the fee determines whether the fee constitutes a tax. Indeed, the Supreme Court recently found that tariffs assessed by DHS amount to taxes for the purposes of the Constitution's Taxing Clause. Learning Res., Inc. v. Trump, 146 S. Ct. 628, 638 (2026). Next, Defendants contend that that the payment requirement cannot constitute a tax because the purpose of a tax is to raise revenue, and the Policy has had the result of decreasing the number of H-1B petitions as well as the total fees collected by USCIS from H-1B applications. Doc. No. 93 at 36. This argument falls short. An obvious purpose of the Policy is to raise revenue—it charges a substantial fee for all H-1B petitions. That total revenue from H-1B petitions has declined does not mean raising revenue was not a purpose of the Policy; rather, it means that such a purpose was not achieved. Purpose and effect are different. Moreover, every $100,000 payment made pursuant to the Policy does raise revenue. That is indisputable. No legal authority suggests that a payment requirement qualifies as a tax only if it increases the total revenue generated from that particular tax.[7] Finally, as Plaintiffs point out, the government may impose a tax with the purpose of curbing the purchase of undesirable goods (e.g., a tobacco tax). Doc. No. 99 at 19; see also Sebelius, 567 U.S. at 572 (acknowledging that Congress can

[7] A simple example makes the point. If Congress lowered all income tax rates across the board to a flat 4% of taxable income, while making no change in the definition of taxable income, total revenue from income taxes would plainly decline. But this decline in total revenue would not change the nature of the tax. When a person pays 4% of their taxable income to the United States, that payment would still constitute a tax payment (and it would still generate revenue for the government).

"use its taxing power to influence conduct"). Such a tax does not lose its identity as a tax because its ultimate aim or effect is to reduce revenue.

Furthermore, Defendants claim that the $100,000 payment requirement is "a regulatory payment," which is "not the same as a tax." Doc. No. 93 at 35. This is mere ipse dixit. Defendants offer no definition for what constitutes "a regulatory payment," cite no cases or statutes employing the term, and advance no reasoned argument explaining how this term encompasses something different than a tax or a penalty. They have waived this theory. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). In any event, the manner in which a particular payment is labeled "does not determine whether the payment may be viewed as an exercise of Congress's taxing power," because what matters is the "substance and application" of the payment, not its "designation." Sebelius, 567 U.S. at 564-65. Here, the substance and application of the $100,000 payment reveal that it is a tax, regardless of what the payment is called.

That does not end the Court's analysis. While the Constitution exclusively vests Congress with the "Power To lay and collect Taxes, Duties, Imposts, and Excises," U.S. Const. art. 1, § 8, cl. 1, Congress can delegate the taxing power to the executive branch so long as it "clearly" indicates "its intention to delegate." Skinner v. Mid-Am. Pipeline Co., 490 U.S. 212, 224 (1989). Thus, the relevant inquiry here is whether the provisions of the INA granting the President discretionary powers to regulate the entry of noncitizens reflect a delegation of Congress's taxing power. Under INA § 212(f), the President has the authority to "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). INA

§ 215(a) additionally grants the President the power to impose "reasonable rules, regulations, and orders" as well as "limitations and exceptions" to the entry of noncitizens. Id. § 1185(a)(1).

Plaintiffs argue that these provisions do not confer the power to impose taxes, relying on the Supreme Court's recent guidance in Learning Resources. That case involved a challenge to the President's imposition of tariffs under the IEEPA. Learning Res., 146 S. Ct. at 635. The IEEPA permits the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any . . . importation or exploration of . . . any property in which any foreign country or a national thereof has any interest" when responding to a national emergency. Id. at 636. The Court found that the IEEPA does not delegate taxing powers to the President, noting that the specific powers listed in the IEEPA do not include "any mention of tariffs or duties." Id. at 642. The Court further noted that the power to "regulate . . . importation" does not encompass the power to tax, because the term "regulate" "means to 'fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule to restriction; to subject to governing principles or laws'"—none of which captures the power to tax. Id. at 642-43 (quoting Regulate, Black's Law Dictionary (5th ed. 1979)).

Applying Learning Resources to the case at hand, the Court finds that INA §§ 212(f) and 215(a) do not delegate taxing power to the President. These sections allow the President to impose "restrictions," "rules," "regulations," "orders," "limitations," and "exceptions" to the entry of noncitizens to the United States. Like the powers delineated in the IEEPA, none of these terms, by their ordinary meaning, include the power to tax. See, e.g., Restriction, Black's Law Dictionary (12th ed. 2024) (defining "restriction" as "[c]onfinement within bounds or limits; a limitation or qualification").

In response, Defendants contend that INA § 212(f)'s broad language allowing the President to "impose . . . any restrictions he may deem to be appropriate" provides a more sweeping delegation of power than the IEEPA. Doc. No. 93 at 37. They assert that this situation more closely mirrors Algonquin, in which the Supreme Court held that Section 232(b) of the Trade Expansion Act of 1962—which allows the President to "adjust . . . imports . . . as he deems necessary" to protect national security—includes the power to impose license fees. Id.

Learning Resources again provides instructive guidance on how to make sense of Algonquin's expressly "limited" holding. 607 U.S. at 645-46. The Court set out two factors distinguishing the IEEPA from Section 232(b). First, the Court noted that Section 232(b) authorizes the President not only to "adjust . . . imports" but also to "take such action . . . as he deems necessary" to adjust the imports of a good. Id. The Court pointed out that IEEPA "does not contain such sweeping, discretion-conferring language." Id. Second, the Court explained that the "context" of Section 232(b) makes it clear that the statute delegates the power to impose taxes; more specifically, the preceding provision of the statute, Section 232(a), states that "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction" if doing so would threaten national security, rendering it "natural for Section 232(b) itself to authorize duties." Id.

These distinguishing factors are not found in the INA. While § 212(f) arguably contains sweeping, discretion-conferring language (i.e., "any restrictions he may deem to be appropriate"), Defendants point to no other provision in the INA or elsewhere making it clear that Congress intended to delegate the taxing power through § 212(f). Without such "context," § 212(f) cannot be understood as falling within the scope of Algonquin's "limited" holding. Id. The most Defendants can do is point to language in § 212(f) that appears to provide broad

discretion to the President to restrict the entry of noncitizens. However, ambiguous language is not sufficient for establishing the delegation of the taxing power. The Supreme Court has "long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers." Id. at 638 (citation modified). Both "separation of powers principles and a practical understanding of legislative intent suggest Congress would not have delegated highly consequential power through ambiguous language." Id. (citation modified). And these principles "apply with particular force where, as here, the purported delegation involves the core congressional power of the purse." Id. at 639. Indeed, Defendants concede that the taxing power is "core to Congress." Doc. No. 100-1 at 12. These considerations preclude reading INA §§ 212(f) and 215(a) as delegating Congress's exclusive power to tax.

Finally, Defendants' miscellaneous arguments that the President has the authority to impose the $100,000 tax based on his "immigration and commerce powers" are nowhere to be found in the authorities they cite. They note that the "Supreme Court previously struck down a head count fee imposed on immigrants by states because the laws intruded on Congress's power over foreign *commerce*, not taxing," citing to Smith v. Turner and Henderson v. Mayor of New York. Doc. No. 93 at 36. From there, Defendants urge the Court to perceive the taxing power as somehow embedded within the foreign commerce powers delegated to the President. Doc. No. 100-1 at 12.

However, Defendants' cited cases do not support this logical leap. Smith and Henderson concerned a completely different separation-of-powers issue than the situation at hand. In both cases, states (not the President) attempted to impose a tax on vessels bringing foreign passengers to their ports. Smith v. Turner, 48 U.S. 283, 296 (1849); Henderson v. Mayor of N.Y., 92 U.S. 259, 267 (1875). In Smith, the Court struck down the state tax as unconstitutional without

producing a majority opinion; indeed, eight justices delivered separate opinions, failing to reach a "harmony of views as would give that weight to the decision which it lacks by reason of the divided judgments of the members of the court." Henderson, 92 U.S. at 269. Over twenty years later, the Court's opinion in Henderson clarified that a similar state tax was unconstitutional because it clashed with Congress's power to regulate foreign commerce. Id. at 274. In reaching this conclusion, the Court focused on the fact that Congress was in a superior position than states to deal with issues of foreign affairs that were "national in [their] character" and "may be, and ought to be, the subject of a uniform system or plan." Id. at 272-73. In this manner, the driving concern in Henderson was about drawing the line between the spheres of state and federal sovereignty. To the extent Smith and Henderson indicate that a tax on foreigners entering the country touches on Congress's commerce powers, they do not, by any means, establish that the tax falls solely within Congress's commerce powers rather than its taxing power. Nor do the cases come close to suggesting that Congress implicitly delegates such a taxing power to the Executive Branch when it delegates its commerce powers.[8] Indeed, such a premise overlooks the Supreme Court's admonition that Congress "must indicate clearly its intention to delegate" its taxing power to the Executive. Skinner, 490 U.S. at 225.

Defendants also cite Merrion v. Jicarilla Apache Tribe, in which the Supreme Court held that a Native American tribe's inherent "power to exclude" non-tribal members from its reservation includes "the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation." 455 U.S.

[8] In deciding Smith and Henderson, the Supreme Court had no reason to delve into the delegation of Congress's taxing power because states have the power to levy taxes (so long as they do not run afoul of constitutional limits). Unlike states, the President has no standalone power to impose taxes without congressional delegation.

130, 144 (1982). But that scenario is inapposite to the President's authority here. A tribe possesses the inherent authority to tax, "whether this authority is deemed to arise from the Tribe's inherent power of self-government or from its inherent power to exclude nonmembers." Id. at 159. The Court also emphasized that "[v]iewing the taxing power of Indian tribes as an essential instrument of self-government and territorial management has been a shared assumption of all three branches of the Federal Government." Id. at 139. The President enjoys no such "inherent" powers here. A tribe's power to tax does not derive from the Constitution or any federal statute; rather, it exists as an essential and unique feature of tribal sovereignty. Unlike a tribe, however, the President has no authority to levy a tax unless such a power is delegated by Congress through statute. See Skinner, 490 U.S. at 220-21; see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 631 (1952) (Douglas, J., concurring) ("The President has no power to raise [revenues]. That power is in the Congress by Article I, Section 8 of the Constitution."). And as already described, Defendants have not shown that Congress delegated its taxing power to the President through the INA.[9]

[9] Defendants' contrary interpretation regarding the scope of the President's power under INA § 212(f) offers no perceivable limits. Their position that § 212(f) allows the President to impose any tax so long as it connects to a "restriction" on the "entry of aliens" deviates from the text of the statute. Congress authorized the President to "impose on the entry of aliens any restrictions he may deem to be appropriate" when he finds that the entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). This phrase limits the President's authority to "restrictions." Taxes are not "restrictions." Notably, Congress did not authorize the President to "impose on the entry of aliens any conceivable tax, penalty, or condition." While this case does not squarely require resolution of the outer bounds of the authority delegated under INA § 212(f), it does require interpretation to some degree of the scope of the delegation by Congress. The government perceives no limits imposed by the terms of the statute such that, in its view, the President could: demand a business seeking an H-1B visa to forfeit to the United States ten percent of the equity in the business; or require a United States citizen seeking to sponsor entry of her foreign spouse to give over half her assets to the United States. In the government's view, even incarceration of the sponsoring citizen may well be within the scope of the statute, though the government's counsel recognized during the motion hearing that such a condition would run afoul of other constitutional provisions. These hypotheticals illustrate that the government offers

For these reasons, the Court finds that the Policy imposes a tax on H-1B petitions without the requisite delegation by Congress. Accordingly, Plaintiffs' motion for summary judgment is ALLOWED as to their separation-of-powers claim (Count IV), and Defendants' cross-motion for summary judgment and motion to dismiss are both DENIED as to this claim. Because the Court resolves the claim on the basis that the Policy improperly levies a tax on H-1B petitions, the Court need not address the merits of Plaintiffs' other arguments in support of Count IV.

D. APA Claims

1. *Reviewability*

The Court turns to Plaintiffs' claims under the APA. Plaintiffs contend that Defendants' Policy implementing the Proclamation violates the APA in three ways: (1) the Policy is a legislative rule that did not follow the APA's procedures for notice-and-comment rulemaking (Count I), (2) the Policy exceeds the fee-setting authority delegated by Congress (Count II), and (3) the Policy is arbitrary and capricious (Count III). Doc. No. 1 ¶¶ 189-219. Defendants counter that the Policy is not susceptible to judicial review under the APA because agency actions implementing the Proclamation merely reflect an "extension of the President's action" that "carry[] out directives of the President." Doc. No. 93 at 23 (quoting Tulare Cnty. v. Bush, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001)).

The APA provides for judicial review of "final agency action." 5 U.S.C. § 704. However, "the President is not an agency within the meaning of the [APA]," and his actions may not "be reviewed under the APA standards." Franklin, 505 U.S. at 796. This raises a critical line-drawing exercise: At what point does an agency's implementation of a presidential directive

no useful principle by which to interpret the statute beyond asserting that the delegation is "sweeping." Doc. No. 93 at 27.

amount to an exercise of the President's power (which is unreviewable under the APA) rather than an exercise of agency action (which is subject to APA review)?

A recent decision from this District offers helpful guidance. In New York v. Trump, plaintiffs brought APA claims against several agencies that had implemented the President's executive memorandum calling for an indefinite moratorium on the issuance of approvals for wind energy projects. 811 F. Supp. 3d 215, 225-26 (D. Mass. 2025). Confronting the question of whether such claims were subject to APA review, the court relied on Justice Kagan's treatment of the issue:

> It is true that the Supreme Court held in Franklin v. Massachusetts that the President is not an "agency" as defined in the APA and his actions therefore are not subject to the judicial review provisions of that statute. This decision, however, arose from a challenge to an action that Congress had committed to the sole discretion of the President, separate from and subsequent to agency involvement. When the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern.

Id. at 238 n.10 (quoting Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2351 (2001)). Following this approach, the court concluded that the agency actions at issue were subject to APA review because "Congress has not 'committed to the sole discretion of the President' the ability to suspend wind energy authorizations." Id. at 239 (quoting Kagan, supra).

New York v. Trump is not the only case promoting this reasoning. In Detroit International Bridge Company v. Government of Canada, the D.C. District Court noted:

> [T]here is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern."

189 F. Supp. 3d 85, 104 (D.D.C. 2016) (quoting Kagan, supra); see also Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec., 801 F. Supp. 2d 383, 404 (D. Md. 2011) (noting that agency actions "taken pursuant to delegated presidential authority under the [statute] will not be held subject to review under the APA"); Renew Ne. v. Dep't of Interior, No. 25-cv-13961-DJC, 2026 WL 1078282, at *16-17 (D. Mass. Apr. 21, 2026) (citing New York v. Trump with approval). This Court, too, is persuaded by the rule emerging from these cases, which is that an agency action implementing a presidential directive amounts to unreviewable presidential action when the action is taken pursuant to an authority delegated to the President by Congress. Applying this principle to the matter at hand, the question becomes whether Defendants' implementation of the Proclamation involved actions "that Congress had committed to the sole discretion of the President." Kagan, supra.

At first glance, Defendants' actions appear to carry out powers delegated to the President by the INA. The Proclamation expressly invokes the President's authority under INA §§ 212(f) and 215(a) to impose restrictions on the entry of noncitizens. By creating an additional payment obligation for H-1B petitions, the Proclamation narrows the entry of workers who are authorized to enter the country with an H-1B visa. While adding a payment requirement for H-1B petitions does not restrict noncitizens at the moment of entry and instead tacks on an eligibility requirement at an earlier stage of the visa-application process, the payment requirement is part of the process for legally entering the United States and effectively imposes a restriction on entry. See Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec., 815 F. Supp. 3d 73, 101-03 (D.D.C. 2025) (finding that Proclamation's payment obligation constitutes entry restriction authorized by INA § 212(f)); cf. Hawaii, 585 U.S. at 695 ("Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa)."). In

this light, the Proclamation and the Policy can be understood as creating an entry restriction—a type of measure that Congress committed to the President's discretion.

But, of course, the Proclamation does more than restrict the entry of noncitizens. As already discussed, the Proclamation's payment requirement amounts to a tax, which exceeds the scope of the President's discretionary authority under the INA. Neither INA § 212(f) nor § 215(a) delegates Congress's taxing power. Thus, Defendants' implementation of the payment requirement cannot be reasonably understood as an action "that Congress had committed to the sole discretion of the President."[10] Kagan, supra. Accordingly, the Court rejects Defendants' argument that their issuance of the Policy amounts to an unreviewable presidential action.

2. *Final Agency Action*

The next threshold question governing APA review is whether Defendants' issuance of the Policy amounts to a final agency action. For an agency action to be "final" within the meaning of § 704, two conditions must be satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation modified).

Both prongs are met here. First, Defendants' memoranda, FAQs, and other materials implementing the Proclamation have resulted in a policy imposing a $100,000 payment requirement on H-1B petitions. There is no indication that these actions are "of a merely

[10] For the same reason, Defendants' argument that APA review is unavailable because the challenged actions were committed to agency discretion fails. Doc. No. 93 at 26-27. It is true that an agency's action is not subject to APA review when the President delegates his own discretion under a statute to the agency. See, e.g., Detroit Int'l Bridge Co., 189 F. Supp. 3d at 105-06 (no APA review when Congress gave President broad authority to approve international bridges and President delegated this authority to Secretary of State). But that is not what occurred here. Because the President had no delegated power to levy a tax on H-1B petitions, he had no authority to delegate this power to Defendants.

tentative or interlocutory nature." Id. at 178. Second, legal consequences flow out of Defendants' actions. Because of the Policy, employers seeking to hire workers through the H-1B program face a new payment obligation that did not exist before. These agency actions have altered the legal status quo for applicants to the H-1B program. Therefore, Defendants' issuance of the Policy constitutes final agency action. As Defendants' actions are subject to APA review, the Court turns to the merits of Plaintiffs' APA claims.

3. *Procedural Violation*

Under Count I, Plaintiffs contend that Defendants violated the APA by issuing the Policy without complying with the APA's notice-and-comment procedures. It is undisputed that Defendants issued the challenged memoranda, FAQ documents, and other materials without undergoing notice and comment. Nonetheless, Defendants contend that Count I fails for the following reasons: (1) Defendants lacked authority to disobey a presidential directive made pursuant to INA §§ 212(f) and 215(a), (2) the agency materials are not legislative rules because the Proclamation already created new obligations with the force of law, (3) the good-cause exception to notice-and-comment rulemaking applies, (4) the foreign-affairs exception applies, and (5) any failure to engage in notice-and-comment rulemaking is harmless because the agencies lacked discretion to deviate from the Proclamation's $100,000 requirement. Doc. No. 93 at 39-41.

All of these arguments are unpersuasive. To begin, Defendants' first, second, and fifth arguments fail because the President's decision to implement a tax was not within his inherent constitutional powers nor his delegated authority under the INA. Because the Proclamation was not a proper exercise of the powers vested in the President, the agency was not obliged to follow it. Cf. Chamber of Com., 815 F. Supp. 3d at 111 n.16 (noting that agency does not violate APA when it "adheres closely to the [presidential] directive and the President acted in a constitutional

manner, pursuant to his inherent powers or under an enabling statute"). And because the President had no power to levy a tax on H-1B petitions, the Proclamation did not carry the force of law. Cf. Indep. Meat Packers Ass'n v. Butz, 526 F.2d 228, 234 (8th Cir. 1975) ("Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress." (emphasis added)).

Indeed, it was the agency materials that "create[d] rights, assign[ed] duties, [and] impose[d] obligations" by effectuating the $100,000 payment requirement. N.H. Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018). Therefore, these agency materials are legislative rules triggering the APA's procedural requirements. And here, Defendants' failure to undergo notice-and-comment rulemaking was not harmless error. These additional procedures could have altered Defendants' decision to impose an unconstitutional tax on the H-1B program or, at the very least, required Defendants to consider the impact of the $100,000 payment obligation on regulated entities, such as Plaintiffs.

Finally, the foreign-affairs and good-cause exceptions to the APA's procedural requirements cannot save the Policy. Courts approve of the foreign-affairs exception "where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule." E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 776 (9th Cir. 2018). In the immigration context, the exception applies only when the government shows that undergoing the ordinary notice-and-comment process will "provoke definitely undesirable international consequences." Id. (citation modified); accord. Roe v. Mayorkas, No. 22-cv-10808-ADB, 2023 WL 3466327, at *16 (D. Mass. May 12, 2023). Here, Defendants have not offered any evidence of the undesirable international consequences that would have flowed from

complying with the APA's procedural requirements. Nor have they explained any need for the immediate implementation of the $100,000 payment requirement.

Similarly, the good-cause exception to the APA's procedural requirements is "narrowly construed and only reluctantly countenanced," usually in "emergencies" where "delay would do real harm to life, property, or public safety." California v. Azar, 911 F.3d 558, 575-76 (9th Cir. 2018) (citation modified). Here, Defendants articulate no such emergency, merely arguing that notice and comment would have been "impracticable" and caused delay to the implementation of the Proclamation. Doc. No. 93 at 40. This explanation fails to overcome the "high bar" that agencies must clear in order to invoke the good-cause exception. Azar, 911 F.3d at 575. Furthermore, the exception applies when an agency publishes its "good cause" basis for bypassing the notice-and-comment procedure with its rule. 5 U.S.C. § 553(d). Here, the challenged agency materials were not accompanied by any statement invoking the good-cause exception. Under these circumstances, Defendants have not demonstrated any good cause for their failure to comply with the APA's procedures. Because Defendants issued a legislative rule without engaging in notice-and-commenting rulemaking, the Court ALLOWS Plaintiffs' motion for summary judgment and DENIES Defendants' cross-motion for summary judgment and motion to dismiss as to Count I.

4. *Excess of Statutory Authority*

Next, under Count II, Plaintiffs argue that the Policy constitutes agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Doc. No. 87 at 28 (quoting 5 U.S.C. § 706(2)(C)). They contend that the Policy is in excess of the President's authority under the INA and the fee-setting delegation to USCIS by Congress. Doc. No. 1 ¶ 205.

An agency "literally has no power to act . . . unless and until Congress confers power upon it." La. Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 374 (1986). Here, there are no

statutory powers authorizing Defendants to implement a $100,000 tax on H-1B petitions. As already discussed, INA §§ 212(f) and 215(a) do not authorize the President to levy a tax on the entry of noncitizens. Nor are there any statutory provisions granting this power to executive agencies. The INA authorizes the Attorney General to designate "adjudication fees" that "may be set at a level that will ensure recovery of the full costs of providing all such services" and of "any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). The $100,000 payment requirement plainly does not constitute an adjudication fee under this statutory provision. As Defendants concede, the Proclamation "does not impose a fee to cover costs, does not displace that fee, and is not collected or used in the same manner." Doc. No. 93 at 34. Defendants point to no other statute empowering agencies to impose a tax on H-1B petitions. Accordingly, the Court finds that Defendants' actions in issuing the Policy exceeded their statutory authority in violation of the APA. Plaintiffs' motion for summary judgment is ALLOWED for Count II, and Defendants' cross-motion for summary judgment and motion to dismiss as to this claim are DENIED.

5. *Arbitrary and Capricious*

Lastly, Count III alleges that the Policy is arbitrary and capricious in violation of the APA. Doc. No. 1 ¶¶ 208-219; see also 5 U.S.C. § 706(2)(A) (instructing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion"). An agency action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Here, Plaintiffs contend that Defendants acted arbitrarily and capriciously by (1) failing

"to acknowledge that the Policy represents a significant divergence from past practice or offer any justification for that shift"; (2) failing to consider Plaintiffs' "significant reliance interests"; and (3) relying on factors Congress did not intend for them to consider "by basing the Policy on domestic economic policy considerations and failing to consider Congress's statutory scheme." Doc. No. 87 at 29.

In response, Defendants do not dispute that they did not consider these aspects of the Proclamation before implementing it. However, they assert that Plaintiffs' claim fails because "an agency does not act 'arbitrarily and capaciously' or 'contrary to law' when it implements a legally permissible presidential directive." Doc. No. 93 at 41 (quoting Chamber of Com., 815 F. Supp. 3d at 110). But the operative phrase is "legally permissible," and here, the President had no power or delegated authority to impose a tax on H-1B petitions. While an agency may be bound to follow a legally valid presidential order, Defendants cite no cases suggesting that an agency is obligated to follow a presidential directive that falls outside of the President's powers, or that the Court lacks authority to set aside agency action on the theory the agency was merely following the illegal directive of the President. Cf. Bradford v. U.S. Dep't of Lab., 101 F.4th 707, 731 (10th Cir. 2024) (agency did not act arbitrarily and capriciously when it issued rule implementing valid executive order without considering alternatives to the rule); Trump v. Orr, 146 S. Ct. 44, 46 (2025) (no arbitrary and capricious agency action where agency followed "Presidential rules that Congress expressly required it to follow"); Sherley v. Sebelius, 689 F.3d 776, 784 (D.C. Cir. 2012) (agency "must implement the President's policy directives to the extent permitted by law" (emphasis added)).

Thus, the mere fact that Defendants followed a presidential directive does not grant them free rein to ignore the requirements of the APA. See Massachusetts v. Dep't of Educ., No. 26-

cv-11229-FDS, 2026 WL 918941, at *13 (D. Mass. Apr. 3, 2026) ("Presidential directives do not enable agencies to bypass [APA] requirements."). And here, the administrative record is devoid of any indication that Defendants "reasonably considered the relevant issues and reasonably explained the decision" to implement a $100,000 tax on H-1B petitions. FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). Even though the Policy significantly increases the cost of an H-1B visa, none of the Policy documents provide any "reasoned explanation" for this change in course. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). The September 20 memoranda issued by USCIS and CBP both note that the Proclamation was issued "to address systemic abuse of H-1B nonimmigrant visas." Doc. No. 84-3 at 3; Doc. No. 84-1 at 11. The FAQs published by the Department of State and USCIS state that the Proclamation marks "an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers." Doc. No. 84-2 at 9; Doc. No. 84-3 at 4. USCIS's "H-1B Specialty Occupations" webpage similarly echoes that the Proclamation reflects "an important initial step to reform the H-1B nonimmigration visa program." Doc. No. 84-3 at 7. None of these cursory policy rationales offer a reasoned explanation for enacting a heavy tax on the H-1B program.

Moreover, agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020). Nothing on the record indicates that Defendants accounted for reliance on the previous H-1B petition requirements when it added the new $100,000 payment obligation. Furthermore, no evidence before the Court suggests that Defendants contemplated any reasonable alternatives to

the Policy, such as discounting or exempting the payment requirement for cap-exempt employers or evaluating alternative payment amounts above or below $100,000.

To the extent Defendants incorporate the reasoning set out in the Proclamation as the basis for their actions, the policy justifications asserted in the Proclamation also fail to survive Plaintiffs' arbitrary-and-capricious challenge. The Proclamation expresses concern about the share of foreign workers filling jobs in the science and technology fields, specifically focusing on the IT sector. 90 Fed. Reg. 46027-28. However, the Proclamation fails to consider or discuss these policy concerns as they pertain to other human-services sectors, such as education and healthcare. Doc. No. 1 ¶ 97. Therefore, the Proclamation does not provide any explanation for imposing a tax on employers in these sectors, let alone address these employers' reliance interests on the H-1B program as it existed before the Policy.

Under these circumstances, the Court finds that the Policy is arbitrary and capricious and ALLOWS Plaintiffs' motion for summary judgment as to Count III. As to this claim, Defendants' cross-motion for summary judgment and motion to dismiss are DENIED.

## IV. <u>RELIEF</u>

Where, as here, a court determines that an agency action is arbitrary and capricious or contrary to law, the APA authorizes the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2). Defendants urge that any relief granted must be limited to Plaintiffs, arguing that the APA "makes no mention of vacatur" and that "remedies under the APA should reflect historical equitable remedies with the same limits." Doc. No. 93 at 43.

Both arguments are misguided. The APA's text, which allows the court to "set aside" unlawful agency action, has long been thought to include vacatur. 5 U.S.C. § 706(2); <u>see also</u> <u>Set Aside</u>, Black's Law Dictionary (12th ed. 2024) (defining "set aside" as "to annul or vacate"). "The Federal Government and the federal courts have long understood § 706(2) to authorize

vacatur of unlawful agency rules." Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). In light of this well-established understanding, courts in this Circuit routinely vacate agency action found to be unlawful. See, e.g., Gailius v. I.N.S., 147 F.3d 34, 47 (1st Cir. 1998); Harrington v. Chao, 280 F.3d 50, 60 (1st Cir. 2002); Ass'n of Am. Univs. v. Nat'l Sci. Found., 788 F. Supp. 3d 106, 138-39 (D. Mass. 2025).

Additionally, vacatur under the APA is "fundamentally unlike the equitable injunction with which Defendants incorrectly equate it." Ass'n of Am. Univs. v. Dep't of Def., 806 F. Supp. 3d 79, 122 (D. Mass. 2025). As another Judge in this District has recently explained:

> "[A]n injunction is a judicial process or mandate operating *in personam* . . . directed at someone, and govern[ing] that party's conduct." . . . "By contrast, instead of directing the conduct of a particular actor, [vacatur] operates upon the [agency action] itself." . . . Vacatur is not "a coercive order against the Government, but rather . . . [a] setting aside of the source of the Government's authority" to act.

Id. (quoting Nken v. Holder, 556 U.S. 418, 428-29 (2009)). This "act-centric nature" of the APA is precisely what distinguishes it from the party-specific considerations underlying traditional equitable remedies. Id. Accordingly, remedies under the APA do not have to be "tailored to injured parties before the Court" as Defendants argue. Doc. No. 93 at 43. The Court declines to depart from the longstanding view that vacatur of an unlawful agency action is a proper remedy under the APA.[11]

Defendants further assert that vacatur is "especially inappropriate here because there are obvious collateral estoppel and *res judicata* concerns, as many of the state universities' alleged

[11] Defendants' reliance on Trump v. CASA overextends that case's holding. There, the Supreme Court held that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts." 607 U.S. at 837-38. However, the Court expressly declined to resolve the "distinct question" of whether a similar principle circumscribes the federal courts' remedial powers under the APA. Id. at 847 n.10.

injuries are being litigated in two other cases challenging the Proclamation." Id. at 44. This argument is unavailing. As an initial matter, one of the cases cited by Defendants—Global Nurse Force v. Trump, 4:25-cv-08454-HSG (N.D. Cal. 2025)—has not yet reached a final judgment on the merits and thus has no preclusive effect. See Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 429-30 (1st Cir. 2005) (noting that claim preclusion and issue preclusion both require final judgment on the merits).

The other case raised by Defendants recently reached a final judgment on the merits. Chamber of Com., 815 F. Supp. 3d. at 113. There, the Chamber of Commerce and the Association of American Universities ("AAU") advanced ultra vires and APA claims against DHS, the Department of State, and their respective Secretaries based on their implementation of the Proclamation. Id. at 79. Both the Chamber of Commerce and AAU invoked standing to sue based on the harms that the Proclamation posed to their members. Id. at 89. The district court in that case granted final judgment in favor of the federal government and against the plaintiffs for all claims. Id. at 112-13. Relying on that judgment, Defendants contend that claim preclusion applies because "AAU's members include some of the allegedly injured entities here, especially many of the state universities." Doc. No. 93 at 44; see also Doc. No. 93-6 at 2-3 (listing public universities that are members of AAU). Consequently, they argue that, "[a]t a minimum, the overlapping members must be excluded from relief." Doc. No. 100-1 at 16.

While Defendants' briefing contains only a perfunctory reference to "collateral estoppel and *res judicata* concerns," Doc. No. 93 at 44, the Court analyzes their argument in light of the requirements governing claim preclusion.[12] "For a claim to be precluded, there must be:

---

[12] The term "res judicata" encompasses both claim preclusion and issue preclusion (also known as collateral estoppel). Taylor v. Sturgell, 553 U.S. 880, 892 (2008). While Defendants mention both "collateral estoppel" and "res judicata," Doc. No. 93 at 44, the Court limits its analysis to

(1) a final judgment on the merits in an earlier action; (2) sufficient identity between the causes of action asserted in the earlier and later suits; and (3) sufficient identity between the parties in the two suits." Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc., 181 F.3d 174, 177 (1st Cir. 1999). While the first two elements are likely satisfied here, Defendants falter on the third. Under that element, nonparties to the prior action may be precluded "if they were in privity with a party to the previous action." In re Iannochino, 242 F.3d 36, 45 (1st Cir. 2001). "Though privity is an elusive concept," courts have found privity "if a nonparty either substantially controlled a party's involvement in the initial litigation or, conversely, permitted a party to the initial litigation to function as his de facto representative." Id. at 46 (citation modified).

Defendants contend that many of Plaintiffs' public universities were represented by AAU in the Chamber of Commerce case, "creating the necessary privity as to those entities for *res judicata*." Doc. No. 100-1 at 16. However, they have not provided sufficient evidence to prove privity. See also Taylor v. Sturgell, 553 U.S. 880, 907 (2008) (noting that claim preclusion "is an affirmative defense for the defendant to plead and prove"). While it is true that AAU's standing to pursue the prior litigation depended on the Proclamation's alleged injury to its members, that alone does not establish privity between AAU and each of its members. "A final judgment in federal court against a trade association will not be res judicata against a member unless the member authorized the litigation in some way." Cal. Cosmetology Coal. v. Riley, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) (citation modified), aff'd, 110 F.3d 1454 (9th Cir. 1997). For example, the First Circuit has found privity between a trade association and its member where the member helped finance the trade association's prior litigation, thereby impliedly

---

claim preclusion, as Defendants' briefing does not contend with the required elements of issue preclusion in any manner.

authorizing the association to represent him in that action. Gen. Foods Corp. v. Mass. Dep't of Pub. Health, 648 F.2d 784, 787-88 (1st Cir. 1981). In another case, the D.C. District Court declined to find privity between a trade association and one of its members where defendants produced no evidence that the member actively participated in the trade association's prior litigation. Cigar Ass'n of Am. v. FDA, 436 F. Supp. 3d 70, 82 (D.D.C. 2020).

Here, Defendants have submitted no evidence that the overlapping members helped finance or otherwise participated in AAU's prior litigation, let alone authorized AAU to represent them in the lawsuit. The only piece of information they have produced is a list of AAU members, which shows that some of the members are public institutions within Plaintiff States. Doc. No. 93-6. But "[u]nder federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization." Cal. Cosmetology, 871 F. Supp. at 1267; see also 18A Wright & Miller's Federal Practice & Procedure § 4456 (2d ed. 2017) ("[G]reat care should be taken before binding all members to an association loss."). In the absence of any evidence about the overlapping members' roles in the previous litigation, the Court declines to find that the universities' claims are precluded by the final judgment in the Chamber of Commerce case.[13] Moreover, even assuming the universities are in privity with AAU, Defendants' res judicata argument still fails. They would also need to establish that these universities are in privity with the Plaintiffs in this matter, which they have not done. Public universities are typically separate legal entities from the state in which they are

[13] In any event, barring the claims of the specific public universities that are members of AAU on claim-preclusion grounds would not impact the Court's remedy of vacatur in this matter. While claim preclusion would lead to the dismissal of those universities' claims in this case, the Court would still grant vacatur based on the APA claims of the non-precluded parties. In that scenario, the Court would not need to carve out the precluded universities from vacatur, given that vacatur is a remedy targeted at an agency's unlawful action, rather than one limited to the particular parties in a given case. See Dep't of Def., 806 F. Supp. 3d at 122.

located. To establish privity, Defendants would need to submit either factual evidence or legal rules to demonstrate the necessary link. This Defendants have not done. Thus, the Court rejects their invocation of claim preclusion.

Accordingly, the Court VACATES the Policy materials implementing the Proclamation's $100,000 payment requirement. In addition to vacatur, Plaintiffs seek a "judicial declaration that the Policy is unlawful in violation of the APA and the Constitution." Doc. No. 87 at 31. Defendants' only objection to this requested relief is that "declaratory judgment alone would not redress Plaintiffs' alleged injuries because . . . that judgment would not affect the Proclamation nor would it enjoin any future action." Doc. No. 93 at 47. But this concern is not applicable here, where the Court has also ordered vacatur of the challenged agency action. Therefore, the Court issues declaratory judgment.

Finally, Plaintiffs state that they are "entitled to a permanent injunction" "to the extent vacatur does not provide Plaintiffs sufficient relief." Doc. No. 87 at 31-32. In light of the Court's decision to vacate the Policy in its entirety, which provides Plaintiffs with complete relief, a separate permanent injunction is not necessary. See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [agency action]) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").[14] The Court accordingly declines to grant a permanent injunction.

[14] "To be clear, a permanent injunction would be warranted, if . . . Defendants successfully contend on appeal that vacatur is not available under the APA." Nat'l Sci. Found., 788 F. Supp. 3d at 143 n.8.

V. CONCLUSION & ORDERS

For the foregoing reasons, the Court ALLOWS Plaintiffs' motion for summary judgment, Doc. No. 86, and DENIES Defendants' cross-motion for summary judgment, Doc. No. 92. At the parties' request, the Court DISMISSES WITHOUT PREJUDICE the claims against the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor. Defendants' motion to dismiss, id., is OTHERWISE DENIED. The Policy implementing the Proclamation is declared unlawful and is VACATED in its entirety. The Clerk shall enter judgment in favor of Plaintiffs and against Defendants, with each side bearing its own fees and costs.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN et al.,<br><br>Defendants. | Civil No. 25-13829-LTS |

JUDGMENT

June 8, 2026

SOROKIN, J.

Pursuant to the Court's Order, Doc. No. 106, dated June 8, 2026, it is hereby ordered:

1) Plaintiffs' claims against the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor are DISMISSED WITHOUT PREJUDICE.

2) Judgment is entered in favor of Plaintiffs and against the remaining Defendants on all claims in the complaint.

3) The following agency actions are VACATED pursuant to the Administrative Procedure Act and declared unlawful insofar as they impose a $100,000 payment obligation on H-1B petitions: (i) Memorandum from Matthew S. Davies to Executive Directors, Field Operations Directors, and Office of Field Operations (issued on September 20, 2025); (ii) Bureau of Consular Affairs' email to the Visa Office (issued on September 19, 2025); (iii) Bureau of Consular Affairs' action request (issued on September 20, 2025); (iv) the

Department of State's "H-1B FAQ" document (issued on September 21, 2025); (v) the Department of State's "Restriction on Entry of Certain Nonimmigrant Workers" webpage (issued on September 21, 2025); (vi) U.S. Citizenship and Immigration Services' memorandum on the Proclamation (issued on September 20, 2025); (vii) U.S. Citizenship and Immigration Services' "H-1B FAQ" document (issued on September 21, 2025); (viii) U.S. Citizenship and Immigration Services' "H-1B Specialty Occupations" webpage (issued on October 15, 2025); (ix) U.S. Citizenship and Immigration Services' G-1055 Fee Schedule (issued on October 20, 2025); and (x) U.S. Citizenship and Immigration Services' H-1B visa payment website (issued on October 20, 2025).

All parties shall bear their own fees and costs.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 5. Administrative Procedure (Refs & Annos)
Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 551

§ 551. Definitions

Effective: January 4, 2011
Currentness

For the purpose of this subchapter--

**(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

**(A)** the Congress;

**(B)** the courts of the United States;

**(C)** the governments of the territories or possessions of the United States;

**(D)** the government of the District of Columbia;

or except as to the requirements of section 552 of this title--

**(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

**(F)** courts martial and military commissions;

**(G)** military authority exercised in the field in time of war or in occupied territory; or

**(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; [1]

**(2)** "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

**(3)** "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

**(4)** "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

**(5)** "rule making" means agency process for formulating, amending, or repealing a rule;

**(6)** "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

**(7)** "adjudication" means agency process for the formulation of an order;

**(8)** "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

**(9)** "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

**(10)** "sanction" includes the whole or a part of an agency--

**(A)** prohibition, requirement, limitation, or other condition affecting the freedom of a person;

**(B)** withholding of relief;

**(C)** imposition of penalty or fine;

**(D)** destruction, taking, seizure, or withholding of property;

**(E)** assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

**(F)** requirement, revocation, or suspension of a license; or

**(G)** taking other compulsory or restrictive action;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(11)** "relief" includes the whole or a part of an agency--

**(A)** grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

**(B)** recognition of a claim, right, immunity, privilege, exemption, or exception; or

**(C)** taking of other action on the application or petition of, and beneficial to, a person;

**(12)** "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

**(13)** "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

**(14)** "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 381; Pub.L. 94-409, § 4(b), Sept. 13, 1976, 90 Stat. 1247; Pub.L. 103-272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub.L. 111-350, § 5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 13892**

Ex. Ord. No. 13892, Oct. 9, 2019, 84 F.R. 55239, which related to civil administrative enforcement and adjudication, was revoked by Ex. Ord. No. 13392, § 2, Jan. 20, 2021, 86 F.R. 7049, set out below.

**EXECUTIVE ORDER NO. 13979**

Ex. Ord. No. 13979, Jan. 18, 2021, 86 F.R. 6813, which required senior appointee participation in agency rulemaking, was revoked by Ex. Ord. No. 14018, § 1, Feb. 24, 2021, 86 F.R. 11855.

**EXECUTIVE ORDER NO. 13992**

<January 20, 2021, 86 F.R. 7049>

**Revocation of Certain Executive Orders Concerning Federal Regulation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered that:

**Section 1. Policy.** It is the policy of my Administration to use available tools to confront the urgent challenges facing the Nation, including the coronavirus disease 2019 (COVID-19) pandemic, economic recovery, racial justice, and climate change. To tackle these challenges effectively, executive departments and agencies (agencies) must be equipped with the flexibility to use robust regulatory action to address national priorities. This order revokes harmful policies and directives that threaten to frustrate the Federal Government's ability to confront these problems, and empowers agencies to use appropriate regulatory tools to achieve these goals.

**Sec. 2. Revocation of Orders.** Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs), Executive Order 13777 of February 24, 2017 (Enforcing the Regulatory Reform Agenda), Executive Order 13875 of June 14, 2019 (Evaluating and Improving the Utility of Federal Advisory Committees), Executive Order 13891 of October 9, 2019 (Promoting the Rule of Law Through Improved Agency Guidance Documents), Executive Order 13892 of October 9, 2019 (Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication), and Executive Order 13893 of October 10, 2019 (Increasing Government Accountability for Administrative Actions by Reinvigorating Administrative PAYGO), are hereby revoked.

**Sec. 3. Implementation.** The Director of the Office of Management and Budget and the heads of agencies shall promptly take steps to rescind any orders, rules, regulations, guidelines, or policies, or portions thereof, implementing or enforcing the Executive Orders identified in section 2 of this order, as appropriate and consistent with applicable law, including the Administrative Procedure Act, 5 U.S.C. 551 et seq. If in any case such rescission cannot be finalized immediately, the Director and the heads of agencies shall promptly take steps to provide all available exemptions authorized by any such orders, rules, regulations, guidelines, or policies, as appropriate and consistent with applicable law. In addition, any personnel positions, committees, task forces, or other entities established pursuant to the Executive Orders identified in section 2 of this order, including the regulatory reform officer positions and regulatory reform task forces established by sections 2 and 3 of Executive Order 13777, shall be abolished, as appropriate and consistent with applicable law.

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN JR.

Notes of Decisions (537)

## Footnotes

1 See References in Text note set out under this section.

5 U.S.C.A. § 551, 5 USCA § 551
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 5. Administrative Procedure (Refs & Annos)
Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 553

§ 553. Rule making

Effective: July 25, 2023
Currentness

**(a)** This section applies, according to the provisions thereof, except to the extent that there is involved--

**(1)** a military or foreign affairs function of the United States; or

**(2)** a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

**(1)** a statement of the time, place, and nature of public rule making proceedings;

**(2)** reference to the legal authority under which the rule is proposed;

**(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

**(4)** the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply--

**(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

**(B)** when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**(d)** The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--

**(1)** a substantive rule which grants or recognizes an exemption or relieves a restriction;

**(2)** interpretative rules and statements of policy; or

**(3)** as otherwise provided by the agency for good cause found and published with the rule.

**(e)** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 383; Pub.L. 118-9, § 2, July 25, 2023, 137 Stat. 55.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12044**

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

Notes of Decisions (1650)

5 U.S.C.A. § 553, 5 USCA § 553
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 701

§ 701. Application; definitions

Effective: January 4, 2011
Currentness

**(a)** This chapter applies, according to the provisions thereof, except to the extent that--

**(1)** statutes preclude judicial review; or

**(2)** agency action is committed to agency discretion by law.

**(b)** For the purpose of this chapter--

**(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

**(A)** the Congress;

**(B)** the courts of the United States;

**(C)** the governments of the territories or possessions of the United States;

**(D)** the government of the District of Columbia;

**(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

**(F)** courts martial and military commissions;

**(G)** military authority exercised in the field in time of war or in occupied territory; or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; [1] and

**(2)** "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 103-272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub.L. 111-350, § 5(a)(3) , Jan. 4, 2011, 124 Stat. 3841.)

Notes of Decisions (1107)

**Footnotes**

1 See References in Text note set out under this section.

5 U.S.C.A. § 701, 5 USCA § 701
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 702

§ 702. Right of review

Currentness

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 94-574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

Notes of Decisions (1530)

5 U.S.C.A. § 702, 5 USCA § 702
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 704

§ 704. Actions reviewable

Currentness

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392.)

Notes of Decisions (1481)

5 U.S.C.A. § 704, 5 USCA § 704
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

Notes of Decisions (7306)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
Subchapter II. Immigration
Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1182

§ 1182. Inadmissible aliens

Effective: January 29, 2025
Currentness

**(a) Classes of aliens ineligible for visas or admission**

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

**(1) Health-related grounds**

**(A) In general**

Any alien--

**(i)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance; [1]

**(ii)** except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

**(iii)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)--

**(I)** to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(II)** to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

**(iv)** who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is inadmissible.

**(B) Waiver authorized**

For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

**(C) Exception from immunization requirement for adopted children 10 years of age or younger**

Clause (ii) of subparagraph (A) shall not apply to a child who--

**(i)** is 10 years of age or younger,

**(ii)** is described in subparagraph (F) or (G) of section 1101(b)(1) of this title; [1] and

**(iii)** is seeking an immigrant visa as an immediate relative under section 1151(b) of this title,

if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

**(2) Criminal and related grounds**

**(A) Conviction of certain crimes**

**(i) In general**

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--

**(I)** a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

**(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21),

is inadmissible.

**(ii) Exception**

Clause (i)(I) shall not apply to an alien who committed only one crime if--

**(I)** the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

**(II)** the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

**(B) Multiple criminal convictions**

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible.

**(C) Controlled substance traffickers**

Any alien who the consular officer or the Attorney General knows or has reason to believe--

**(i)** is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; or

**(ii)** is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity,

is inadmissible.

**(D) Prostitution and commercialized vice**

Any alien who--

**(i)** is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status,

**(ii)** directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

**(iii)** is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

is inadmissible.

**(E) Certain aliens involved in serious criminal activity who have asserted immunity from prosecution**

Any alien--

**(i)** who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

**(ii)** for whom immunity from criminal jurisdiction was exercised with respect to that offense,

**(iii)** who as a consequence of the offense and exercise of immunity has departed from the United States, and

**(iv)** who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

is inadmissible.

**(F) Waiver authorized**

For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

**(G) Foreign government officials who have committed particularly severe violations of religious freedom**

Any alien who, while serving as a foreign government official, was responsible for or directly carried out, at any time, particularly severe violations of religious freedom, as defined in section 6402 of Title 22, is inadmissible.

**(H) Significant traffickers in persons**

**(i) In general**


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a trafficker in severe forms of trafficking in persons, as defined in the section 7102 of Title 22, is inadmissible.

**(ii) Beneficiaries of trafficking**

Except as provided in clause (iii), any alien who the consular officer or the Attorney General knows or has reason to believe is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

**(iii) Exception for certain sons and daughters**

Clause (ii) shall not apply to a son or daughter who was a child at the time he or she received the benefit described in such clause.

**(I) Money laundering**

Any alien--

**(i)** who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of Title 18 (relating to laundering of monetary instruments); or

**(ii)** who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with others in an offense which is described in such section;

is inadmissible.

**(3) Security and related grounds**

**(A) In general**

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in--

**(i)** any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

**(ii)** any other unlawful activity, or

**(iii)** any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is inadmissible.

**(B) Terrorist activities**

**(i) In general**

Any alien who--

**(I)** has engaged in a terrorist activity;

**(II)** a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));

**(III)** has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

**(IV)** is a representative (as defined in clause (v)) of--

**(aa)** a terrorist organization (as defined in clause (vi)); or

**(bb)** a political, social, or other group that endorses or espouses terrorist activity;

**(V)** is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

**(VI)** is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(VII)** endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

**(VIII)** has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

**(IX)** is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

is inadmissible. An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

**(ii) Exception**

Subclause (IX) of clause (i) does not apply to a spouse or child--

**(I)** who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

**(II)** whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

**(iii) "Terrorist activity" defined**

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

**(I)** The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

**(II)** The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

**(III)** A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

**(IV)** An assassination.

**(V)** The use of any--

**(a)** biological agent, chemical agent, or nuclear weapon or device, or

**(b)** explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

**(VI)** A threat, attempt, or conspiracy to do any of the foregoing.

**(iv) "Engage in terrorist activity" defined**

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

**(I)** to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

**(II)** to prepare or plan a terrorist activity;

**(III)** to gather information on potential targets for terrorist activity;

**(IV)** to solicit funds or other things of value for--

**(aa)** a terrorist activity;

**(bb)** a terrorist organization described in clause (vi)(I) or (vi)(II); or

**(cc)** a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

**(V)** to solicit any individual--

**(aa)** to engage in conduct otherwise described in this subsection;

**(bb)** for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

**(cc)** for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

**(VI)** to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

**(aa)** for the commission of a terrorist activity;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(bb)** to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

**(cc)** to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

**(dd)** to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

**(v) "Representative" defined**

As used in this paragraph, the term "representative" includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

**(vi) "Terrorist organization" defined**

As used in this section, the term "terrorist organization" means an organization--

**(I)** designated under section 1189 of this title;

**(II)** otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

**(III)** that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

**(C) Foreign policy**

**(i) In general**

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible.

**(ii) Exception for officials**

An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past,

current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

**(iii) Exception for other aliens**

An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

**(iv) Notification of determinations**

If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

**(D) Immigrant membership in totalitarian party**

**(i) In general**

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible.

**(ii) Exception for involuntary membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

**(iii) Exception for past membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that--

**(I)** the membership or affiliation terminated at least--

**(I)** 2 years before the date of such application, or

**(II)** 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

**(II)** the alien is not a threat to the security of the United States.

**(iv) Exception for close family members**

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

**(E) Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

**(i) Participation in Nazi persecutions**

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with--

**(I)** the Nazi government of Germany,

**(II)** any government in any area occupied by the military forces of the Nazi government of Germany,

**(III)** any government established with the assistance or cooperation of the Nazi government of Germany, or

**(IV)** any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

**(ii) Participation in genocide**

Any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in section 1091(a) of Title 18, is inadmissible.

**(iii) Commission of acts of torture or extrajudicial killings**

Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of--

**(I)** any act of torture, as defined in section 2340 of Title 18; or

**(II)** under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note),

is inadmissible.

**(F) Association with terrorist organizations**

Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Secretary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.

**(G) Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of Title 18 is inadmissible.

**(4) Public charge**

**(A) In general**

Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.

**(B) Factors to be taken into account**

**(i)** In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's--

**(I)** age;

**(II)** health;

**(III)** family status;

**(IV)** assets, resources, and financial status; and

**(V)** education and skills.

**(ii)** In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 1183a of this title for purposes of exclusion under this paragraph.

**(C) Family-sponsored immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1151(b)(2) or 1153(a) of this title is inadmissible under this paragraph unless--

**(i)** the alien has obtained--

**(I)** status as a spouse or a child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 1154(a)(1)(A) of this title;

**(II)** classification pursuant to clause (ii) or (iii) of section 1154(a)(1)(B) of this title; or

**(III)** classification or status as a VAWA self-petitioner; or

**(ii)** the person petitioning for the alien's admission (and any additional sponsor required under section 1183a(f) of this title or any alternative sponsor permitted under paragraph (5)(B) of such section) has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(D) Certain employment-based immigrants**

Any alien who seeks admission or adjustment of status under a visa number issued under section 1153(b) of this title by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible under this paragraph unless such relative has executed an affidavit of support described in section 1183a of this title with respect to such alien.

**(E) Special rule for qualified alien victims**

Subparagraphs (A), (B), and (C) shall not apply to an alien who--

**(i)** is a VAWA self-petitioner;

**(ii)** is an applicant for, or is granted, nonimmigrant status under section 1101(a)(15)(U) of this title; or

**(iii)** is a qualified alien described in section 1641(c) of this title.

**(5) Labor certification and qualifications for certain immigrants**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(A) Labor certification**

**(i) In general**

Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that--

**(I)** there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

**(II)** the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

**(ii) Certain aliens subject to special rule**

For purposes of clause (i)(I), an alien described in this clause is an alien who--

**(I)** is a member of the teaching profession, or

**(II)** has exceptional ability in the sciences or the arts.

**(iii) Professional athletes**

**(I) In general**

A certification made under clause (i) with respect to a professional athlete shall remain valid with respect to the athlete after the athlete changes employer, if the new employer is a team in the same sport as the team which employed the athlete when the athlete first applied for the certification.

**(II) "Professional athlete" defined**

For purposes of subclause (I), the term "professional athlete" means an individual who is employed as an athlete by--

**(aa)** a team that is a member of an association of 6 or more professional sports teams whose total combined revenues exceed $10,000,000 per year, if the association governs the conduct of its members and regulates the contests and exhibitions in which its member teams regularly engage; or

**(bb)** any minor league team that is affiliated with such an association.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(iv) Long delayed adjustment applicants**

A certification made under clause (i) with respect to an individual whose petition is covered by section 1154(j) of this title shall remain valid with respect to a new job accepted by the individual after the individual changes jobs or employers if the new job is in the same or a similar occupational classification as the job for which the certification was issued.

**(B) Unqualified physicians**

An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession is inadmissible, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C) Uncertified foreign health-care workers**

Subject to subsection (r), any alien who seeks to enter the United States for the purpose of performing labor as a health-care worker, other than a physician, is inadmissible unless the alien presents to the consular officer, or, in the case of an adjustment of status, the Attorney General, a certificate from the Commission on Graduates of Foreign Nursing Schools, or a certificate from an equivalent independent credentialing organization approved by the Attorney General in consultation with the Secretary of Health and Human Services, verifying that--

**(i)** the alien's education, training, license, and experience--

**(I)** meet all applicable statutory and regulatory requirements for entry into the United States under the classification specified in the application;

**(II)** are comparable with that required for an American health-care worker of the same type; and

**(III)** are authentic and, in the case of a license, unencumbered;

**(ii)** the alien has the level of competence in oral and written English considered by the Secretary of Health and Human Services, in consultation with the Secretary of Education, to be appropriate for health care work of the kind in which the alien will be engaged, as shown by an appropriate score on one or more nationally recognized, commercially available, standardized assessments of the applicant's ability to speak and write; and

**(iii)** if a majority of States licensing the profession in which the alien intends to work recognize a test predicting the success on the profession's licensing or certification examination, the alien has passed such a test or has passed such an examination.

For purposes of clause (ii), determination of the standardized tests required and of the minimum scores that are appropriate are within the sole discretion of the Secretary of Health and Human Services and are not subject to further administrative or judicial review.

**(D) Application of grounds**

The grounds for inadmissibility of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph (2) or (3) of section 1153(b) of this title.

**(6) Illegal entrants and immigration violators**

**(A) Aliens present without admission or parole**

**(i) In general**

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

**(ii) Exception for certain battered women and children**

Clause (i) shall not apply to an alien who demonstrates that--

**(I)** the alien is a VAWA self-petitioner;

**(II)** (a) the alien has been battered or subjected to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (b) the alien's child has been battered or subjected to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

**(III)** there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.

**(B) Failure to attend removal proceeding**

Any alien who without reasonable cause fails or refuses to attend or remain in attendance at a proceeding to determine the alien's inadmissibility or deportability and who seeks admission to the United States within 5 years of such alien's subsequent departure or removal is inadmissible.

**(C) Misrepresentation**

**(i) In general**

Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

**(ii) Falsely claiming citizenship**

**(I) In general**

Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible.

**(II) Exception**

In the case of an alien making a representation described in subclause (I), if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making such representation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such representation.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (i).

**(D) Stowaways**

Any alien who is a stowaway is inadmissible.

**(E) Smugglers**

**(i) In general**

Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible.

**(ii) Special rule in the case of family reunification**

Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as an immediate relative or under section 1153(a)(2) of this title (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(iii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(11).

**(F) Subject of civil penalty**

**(i) In general**

An alien who is the subject of a final order for violation of section 1324c of this title is inadmissible.

**(ii) Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(12).

**(G) Student visa abusers**

An alien who obtains the status of a nonimmigrant under section 1101(a)(15)(F)(i) of this title and who violates a term or condition of such status under section 1184(l) of this title is inadmissible until the alien has been outside the United States for a continuous period of 5 years after the date of the violation.

**(7) Documentation requirements**

**(A) Immigrants**

**(i) In general**

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission--

**(I)** who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

**(II)** whose visa has been issued without compliance with the provisions of section 1153 of this title,

is inadmissible.

**(ii) Waiver authorized**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

For provision authorizing waiver of clause (i), see subsection (k).

**(B) Nonimmigrants**

**(i) In general**

Any nonimmigrant who--

**(I)** is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

**(II)** is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

is inadmissible.

**(ii) General waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(4).

**(iii) Guam and Northern Mariana Islands visa waiver**

For provision authorizing waiver of clause (i) in the case of visitors to Guam or the Commonwealth of the Northern Mariana Islands, see subsection (l).

**(iv) Visa waiver program**

For authority to waive the requirement of clause (i) under a program, see section 1187 of this title.

**(8) Ineligible for citizenship**

**(A) In general**

Any immigrant who is permanently ineligible to citizenship is inadmissible.

**(B) Draft evaders**

Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency is inadmissible, except

that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

**(9) Aliens previously removed**

**(A) Certain aliens previously removed**

**(i) Arriving aliens**

Any alien who has been ordered removed under section 1225(b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(ii) Other aliens**

Any alien not described in clause (i) who--

**(I)** has been ordered removed under section 1229a of this title or any other provision of law, or

**(II)** departed the United States while an order of removal was outstanding,

and who seeks admission within 10 years of the date of such alien's departure or removal (or within 20 years of such date in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

**(iii) Exception**

Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the date of the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

**(B) Aliens unlawfully present**

**(i) In general**

Any alien (other than an alien lawfully admitted for permanent residence) who--

**(I)** was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e) [2] of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(II)** has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

**(ii) Construction of unlawful presence**

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

**(iii) Exceptions**

**(I) Minors**

No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(II) Asylees**

No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

**(III) Family unity**

No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

**(IV) Battered women and children**

Clause (i) shall not apply to an alien who would be described in paragraph (6)(A)(ii) if "violation of the terms of the alien's nonimmigrant visa" were substituted for "unlawful entry into the United States" in subclause (III) of that paragraph.

**(V) Victims of a severe form of trafficking in persons**

Clause (i) shall not apply to an alien who demonstrates that the severe form of trafficking (as that term is defined in section 7102 of Title 22) was at least one central reason for the alien's unlawful presence in the United States.

**(iv) Tolling for good cause**

In the case of an alien who--

**(I)** has been lawfully admitted or paroled into the United States,

**(II)** has filed a nonfrivolous application for a change or extension of status before the date of expiration of the period of stay authorized by the Attorney General, and

**(III)** has not been employed without authorization in the United States before or during the pendency of such application,

the calculation of the period of time specified in clause (i)(I) shall be tolled during the pendency of such application, but not to exceed 120 days.

**(v) Waiver**

The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

**(C) Aliens unlawfully present after previous immigration violations**

**(i) In general**

Any alien who--

**(I)** has been unlawfully present in the United States for an aggregate period of more than 1 year, or

**(II)** has been ordered removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law,

and who enters or attempts to reenter the United States without being admitted is inadmissible.

**(ii) Exception**

Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission.

**(iii) Waiver**

The Secretary of Homeland Security may waive the application of clause (i) in the case of an alien who is a VAWA self-petitioner if there is a connection between--

**(I)** the alien's battering or subjection to extreme cruelty; and

**(II)** the alien's removal, departure from the United States, reentry or reentries into the United States; or attempted reentry into the United States.

**(10) Miscellaneous**

**(A) Practicing polygamists**

Any immigrant who is coming to the United States to practice polygamy is inadmissible.

**(B) Guardian required to accompany helpless alien**

Any alien--

**(i)** who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 1222(c) of this title, and

**(ii)** whose protection or guardianship is determined to be required by the alien described in clause

(i), is inadmissible.

**(C) International child abduction**

**(i) In general**

Except as provided in clause (ii), any alien who, after entry of an order by a court in the United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, is inadmissible until the child is surrendered to the person granted custody by that order.

**(ii) Aliens supporting abductors and relatives of abductors**

Any alien who--

**(I)** is known by the Secretary of State to have intentionally assisted an alien in the conduct described in clause (i),

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(II)** is known by the Secretary of State to be intentionally providing material support or safe haven to an alien described in clause (i), or

**(III)** is a spouse (other than the spouse who is the parent of the abducted child), child (other than the abducted child), parent, sibling, or agent of an alien described in clause (i), if such person has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion, is inadmissible until the child described in clause (i) is surrendered to the person granted custody by the order described in that clause, and such person and child are permitted to return to the United States or such person's place of residence.

**(iii) Exceptions**

Clauses (i) and (ii) shall not apply--

**(I)** to a government official of the United States who is acting within the scope of his or her official duties;

**(II)** to a government official of any foreign government if the official has been designated by the Secretary of State at the Secretary's sole and unreviewable discretion; or

**(III)** so long as the child is located in a foreign state that is a party to the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980.

**(D) Unlawful voters**

**(i) In general**

Any alien who has voted in violation of any Federal, State, or local constitutional provision, statute, ordinance, or regulation is inadmissible.

**(ii) Exception**

In the case of an alien who voted in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such violation that he or she was a citizen, the alien shall not be considered to be inadmissible under any provision of this subsection based on such violation.

**(E) Former citizens who renounced citizenship to avoid taxation**

Any alien who is a former citizen of the United States who officially renounces United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is inadmissible.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(b) Notices of denials**

**(1)** Subject to paragraphs (2) and (3), if an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be inadmissible under subsection (a), the officer shall provide the alien with a timely written notice that--

**(A)** states the determination, and

**(B)** lists the specific provision or provisions of law under which the alien is inadmissible or adjustment [3] of status.

**(2)** The Secretary of State may waive the requirements of paragraph (1) with respect to a particular alien or any class or classes of inadmissible aliens.

**(3)** Paragraph (1) does not apply to any alien inadmissible under paragraph (2) or (3) of subsection (a).

**(c) Repealed. Pub.L. 104-208, Div. C, Title III, § 304(b), Sept. 30, 1996, 110 Stat. 3009-597**

**(d) Temporary admission of nonimmigrants**

**(1)** The Attorney General shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(S) of this title. The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(S) of this title, if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting removal proceedings against an alien admitted as a nonimmigrant under section 1101(a)(15)(S) of this title for conduct committed after the alien's admission into the United States, or for conduct or a condition that was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 1101(a)(15)(S) of this title.

**(2)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(3)(A)** Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3) (A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A) (iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

**(B)(i)** The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not apply with respect to an alien within the scope of that subsection or that subsection (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection, except that no such waiver may be extended to an alien who is within the scope of subsection (a)(3)(B)(i)(II), no such waiver may be extended to an alien who is a member or representative of, has voluntarily and knowingly engaged in or endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on behalf of, or has voluntarily and knowingly received military-type training from a terrorist organization that is described in subclause (I) or (II) of subsection (a)(3)(B)(vi), and no such waiver may be extended to a group that has engaged terrorist activity against the United States or another democratic country or that has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians. Such a determination shall neither prejudice the ability of the United States Government to commence criminal or civil proceedings involving a beneficiary of such a determination or any other person, nor create any substantive or procedural right or benefit for a beneficiary of such a determination or any other person. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review such a determination or revocation except in a proceeding for review of a final order of removal pursuant to section 1252 of this title, and review shall be limited to the extent provided in section 1252(a)(2)(D). The Secretary of State may not exercise the discretion provided in this clause with respect to an alien at any time during which the alien is the subject of pending removal proceedings under section 1229a of this title.

**(ii)** Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.

**(4)** Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands and residents thereof having a common nationality with such nationals, or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 1223(c) of this title.

**(5)(A)** The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

**(B)** The Secretary of Homeland Security may not parole into the United States an alien who is a refugee unless the Secretary of Homeland Security determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

**(C)** The attorney general of a State, or other authorized State officer, alleging a violation of the limitation under subparagraph (A) that parole solely be granted on a case-by-case basis and solely for urgent humanitarian reasons or a significant public benefit, that harms such State or its residents shall have standing to bring an action against the Secretary of Homeland Security on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subparagraph to the greatest extent practicable. For purposes of this subparagraph, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.

**(6)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(7)** The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, the Commonwealth of the Northern Mariana Islands, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. [4] Any alien described in this paragraph, who is denied admission to the United States, shall be immediately removed in the manner provided by section 1231(c) of this title.

**(8)** Upon a basis of reciprocity accredited officials of foreign governments, their immediate families, attendants, servants, and personal employees may be admitted in immediate and continuous transit through the United States without regard to the provisions of this section except paragraphs (3)(A), (3)(B), (3)(C), and (7)(B) of subsection (a) of this section.

**(9), (10)** Repealed. Pub.L. 101-649, Title VI, § 601(d)(2)(A), Nov. 29, 1990, 104 Stat. 5076

**(11)** The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(E) in the case of any alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of removal, and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title and in the case of an alien seeking admission or adjustment of status as an immediate relative or immigrant under section 1153(a) of this title (other than paragraph (4) thereof), if the alien has encouraged, induced, assisted, abetted, or aided only an individual who at the time of such action was the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

**(12)** The Attorney General may, in the discretion of the Attorney General for humanitarian purposes or to assure family unity, waive application of clause (i) of subsection (a)(6)(F)--

**(A)** in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation or removal and who is otherwise admissible to the United States as a returning resident under section 1181(b) of this title, and

**(B)** in the case of an alien seeking admission or adjustment of status under section 1151(b)(2)(A) of this title or under section 1153(a) of this title,

if no previous civil money penalty was imposed against the alien under section 1324c of this title and the offense was committed solely to assist, aid, or support the alien's spouse or child (and not another individual). No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this paragraph.

**(13)(A)** The Secretary of Homeland Security shall determine whether a ground for inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(T) of this title, except that the ground for inadmissibility described in subsection (a)(4) shall not apply with respect to such a nonimmigrant.

**(B)** In addition to any other waiver that may be available under this section, in the case of a nonimmigrant described in section 1101(a)(15)(T) of this title, if the Secretary of Homeland Security considers it to be in the national interest to do so, the Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of--

**(i)** subsection (a)(1); and

**(ii)** any other provision of subsection (a) (excluding paragraphs (3), (4), (10)(C), and (10(E)) [6] if the activities rendering the alien inadmissible under the provision were caused by, or were incident to, the victimization described in section 1101(a)(15)(T)(i)(I) of this title.

**(14)** The Secretary of Homeland Security shall determine whether a ground of inadmissibility exists with respect to a nonimmigrant described in section 1101(a)(15)(U) of this title. The Secretary of Homeland Security, in the Attorney General's [5] discretion, may waive the application of subsection (a) (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 1101(a)(15)(U) of this title, if the Secretary of Homeland Security considers it to be in the public or national interest to do so.

**(e) Educational visitor status; foreign residence requirement; waiver**

No person admitted under section 1101(a)(15)(J) of this title or acquiring such status after admission (i) whose participation in the program for which he came to the United States was financed in whole or in part, directly or indirectly, by an agency of the Government of the United States or by the government of the country of his nationality or his last residence, (ii) who at the time of admission or acquisition of status under section 1101(a)(15)(J) of this title was a national or resident of a country which the Director of the United States Information Agency, pursuant to regulations prescribed by him, had designated as clearly requiring the services of persons engaged in the field of specialized knowledge or skill in which the alien was engaged, or (iii) who came to the United States or acquired such status in order to receive graduate medical education or training, shall be eligible to apply for an immigrant visa, or for permanent residence, or for a nonimmigrant visa under section 1101(a)(15)(H) or section 1101(a)(15)(L) of this title until it is established that such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least two years following departure from the United States: *Provided,* That upon the favorable recommendation of the Director, pursuant to the request of an interested United States Government agency (or, in the case of an alien described in clause (iii), pursuant to the request of a State Department of Public Health, or its equivalent), or of the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien), or that the alien cannot return to the country of his nationality or last residence because he would be subject to persecution on account of race, religion, or political opinion, the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest except that in the case of a waiver requested by a State Department of Public Health, or its equivalent, or

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

in the case of a waiver requested by an interested United States Government agency on behalf of an alien described in clause (iii), the waiver shall be subject to the requirements of section 1184(l) of this title: *And provided further,* That, except in the case of an alien described in clause (iii), the Attorney General may, upon the favorable recommendation of the Director, waive such two-year foreign residence requirement in any case in which the foreign country of the alien's nationality or last residence has furnished the Director a statement in writing that it has no objection to such waiver in the case of such alien.

**(f) Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

**(g) Bond and conditions for admission of alien inadmissible on health-related grounds**

The Attorney General may waive the application of--

**(1)** subsection (a)(1)(A)(i) in the case of any alien who--

**(A)** is the spouse or the unmarried son or daughter, or the minor unmarried lawfully adopted child, of a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa,

**(B)** has a son or daughter who is a United States citizen, or an alien lawfully admitted for permanent residence, or an alien who has been issued an immigrant visa; or

**(C)** is a VAWA self-petitioner,

in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

**(2)** subsection (a)(1)(A)(ii) in the case of any alien--

**(A)** who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination,

**(B)** for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by section 34.2 of title 42 of the Code of Federal Regulations) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate, or

**(C)** under such circumstances as the Attorney General provides by regulation, with respect to whom the requirement of such a vaccination would be contrary to the alien's religious beliefs or moral convictions; or

**(3)** subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.

**(h) Waiver of subsection (a)(2)(A)(i)(I), (II), (B), (D), and (E)**

The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if--

**(1)(A)** in the case of any immigrant it is established to the satisfaction of the Attorney General that--

**(i)** the alien is inadmissible only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is inadmissible occurred more than 15 years before the date of the alien's application for a visa, admission, or adjustment of status,

**(ii)** the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

**(iii)** the alien has been rehabilitated; or

**(B)** in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; or

**(C)** the alien is a VAWA self-petitioner; and

**(2)** the Attorney General, in his discretion, and pursuant to such terms, conditions and procedures as he may by regulations prescribe, has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.

No waiver shall be provided under this subsection in the case of an alien who has been convicted of (or who has admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture. No waiver shall be granted under this subsection in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the

United States. No court shall have jurisdiction to review a decision of the Attorney General to grant or deny a waiver under this subsection.

**(i) Admission of immigrant inadmissible for fraud or willful misrepresentation of material fact**

**(1)** The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien or, in the case of a VAWA self-petitioner, the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident, or qualified alien parent or child.

**(2)** No court shall have jurisdiction to review a decision or action of the Attorney General regarding a waiver under paragraph (1).

**(j) Limitation on immigration of foreign medical graduates**

**(1)** The additional requirements referred to in section 1101(a)(15)(J) of this title for an alien who is coming to the United States under a program under which he will receive graduate medical education or training are as follows:

**(A)** A school of medicine or of one of the other health professions, which is accredited by a body or bodies approved for the purpose by the Secretary of Education, has agreed in writing to provide the graduate medical education or training under the program for which the alien is coming to the United States or to assume responsibility for arranging for the provision thereof by an appropriate public or nonprofit private institution or agency, except that, in the case of such an agreement by a school of medicine, any one or more of its affiliated hospitals which are to participate in the provision of the graduate medical education or training must join in the agreement.

**(B)** Before making such agreement, the accredited school has been satisfied that the alien (i) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States); or (ii)(I) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services), (II) has competency in oral and written English, (III) will be able to adapt to the educational and cultural environment in which he will be receiving his education or training, and (IV) has adequate prior education and training to participate satisfactorily in the program for which he is coming to the United States. For the purposes of this subparagraph, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners examination if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

**(C)** The alien has made a commitment to return to the country of his nationality or last residence upon completion of the education or training for which he is coming to the United States, and the government of the country of his nationality or last residence has provided a written assurance, satisfactory to the Secretary of Health and Human Services, that there is a need in that country for persons with the skills the alien will acquire in such education or training.

**(D)** The duration of the alien's participation in the program of graduate medical education or training for which the alien is coming to the United States is limited to the time typically required to complete such program, as determined by the Director of the United States Information Agency at the time of the alien's admission into the United States, based on criteria which are established in coordination with the Secretary of Health and Human Services and which take into consideration the published requirements of the medical specialty board which administers such education or training program; except that--

**(i)** such duration is further limited to seven years unless the alien has demonstrated to the satisfaction of the Director that the country to which the alien will return at the end of such specialty education or training has an exceptional need for an individual trained in such specialty, and

**(ii)** the alien may, once and not later than two years after the date the alien is admitted to the United States as an exchange visitor or acquires exchange visitor status, change the alien's designated program of graduate medical education or training if the Director approves the change and if a commitment and written assurance with respect to the alien's new program have been provided in accordance with subparagraph (C).

**(E)** The alien furnishes the Attorney General each year with an affidavit (in such form as the Attorney General shall prescribe) that attests that the alien (i) is in good standing in the program of graduate medical education or training in which the alien is participating, and (ii) will return to the country of his nationality or last residence upon completion of the education or training for which he came to the United States.

**(2)** An alien who is a graduate of a medical school and who is coming to the United States to perform services as a member of the medical profession may not be admitted as a nonimmigrant under section 1101(a)(15)(H)(i)(b) of this title unless--

**(A)** the alien is coming pursuant to an invitation from a public or nonprofit private educational or research institution or agency in the United States to teach or conduct research, or both, at or for such institution or agency, or

**(B)(i)** the alien has passed the Federation licensing examination (administered by the Federation of State Medical Boards of the United States) or an equivalent examination as determined by the Secretary of Health and Human Services, and

**(ii)** (I) has competency in oral and written English or (II) is a graduate of a school of medicine which is accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States).

**(3)** Omitted

**(k) Attorney General's discretion to admit otherwise inadmissible aliens who possess immigrant visas**

Any alien, inadmissible from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an immigrant visa may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside

foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

**(l) Guam and Northern Mariana Islands visa waiver program**

**(1) In general**

The requirement of subsection (a)(7)(B)(i) may be waived by the Secretary of Homeland Security, in the case of an alien applying for admission as a nonimmigrant visitor for business or pleasure and solely for entry into and stay in Guam or the Commonwealth of the Northern Mariana Islands for a period not to exceed 45 days, if the Secretary of Homeland Security, after consultation with the Secretary of the Interior, the Secretary of State, the Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands, determines that--

**(A)** an adequate arrival and departure control system has been developed in Guam and the Commonwealth of the Northern Mariana Islands; and

**(B)** such a waiver does not represent a threat to the welfare, safety, or security of the United States or its territories and commonwealths.

**(2) Alien waiver of rights**

An alien may not be provided a waiver under this subsection unless the alien has waived any right--

**(A)** to review or appeal under this chapter an immigration officer's determination as to the admissibility of the alien at the port of entry into Guam or the Commonwealth of the Northern Mariana Islands; or

**(B)** to contest, other than on the basis of an application for withholding of removal under section 1231(b)(3) of this title or under the Convention Against Torture, or an application for asylum if permitted under section 1158 of this title, any action for removal of the alien.

**(3) Regulations**

All necessary regulations to implement this subsection shall be promulgated by the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, on or before the 180th day after May 8, 2008. The promulgation of such regulations shall be considered a foreign affairs function for purposes of section 553(a) of Title 5. At a minimum, such regulations should include, but not necessarily be limited to--

**(A)** a listing of all countries whose nationals may obtain the waiver also provided by this subsection, except that such regulations shall provide for a listing of any country from which the Commonwealth has received a significant economic benefit from the number of visitors for pleasure within the one-year period preceding May 8, 2008, unless the Secretary of Homeland Security determines that such country's inclusion on such list would represent a threat to the welfare, safety, or security of the United States or its territories; and

**(B)** any bonding requirements for nationals of some or all of those countries who may present an increased risk of overstays or other potential problems, if different from such requirements otherwise provided by law for nonimmigrant visitors.

**(4) Factors**

In determining whether to grant or continue providing the waiver under this subsection to nationals of any country, the Secretary of Homeland Security, in consultation with the Secretary of the Interior and the Secretary of State, shall consider all factors that the Secretary deems relevant, including electronic travel authorizations, procedures for reporting lost and stolen passports, repatriation of aliens, rates of refusal for nonimmigrant visitor visas, overstays, exit systems, and information exchange.

**(5) Suspension**

The Secretary of Homeland Security shall monitor the admission of nonimmigrant visitors to Guam and the Commonwealth of the Northern Mariana Islands under this subsection. If the Secretary determines that such admissions have resulted in an unacceptable number of visitors from a country remaining unlawfully in Guam or the Commonwealth of the Northern Mariana Islands, unlawfully obtaining entry to other parts of the United States, or seeking withholding of removal or asylum, or that visitors from a country pose a risk to law enforcement or security interests of Guam or the Commonwealth of the Northern Mariana Islands or of the United States (including the interest in the enforcement of the immigration laws of the United States), the Secretary shall suspend the admission of nationals of such country under this subsection. The Secretary of Homeland Security may in the Secretary's discretion suspend the Guam and Northern Mariana Islands visa waiver program at any time, on a country-by-country basis, for other good cause.

**(6) Addition of countries**

The Governor of Guam and the Governor of the Commonwealth of the Northern Mariana Islands may request the Secretary of the Interior and the Secretary of Homeland Security to add a particular country to the list of countries whose nationals may obtain the waiver provided by this subsection, and the Secretary of Homeland Security may grant such request after consultation with the Secretary of the Interior and the Secretary of State, and may promulgate regulations with respect to the inclusion of that country and any special requirements the Secretary of Homeland Security, in the Secretary's sole discretion, may impose prior to allowing nationals of that country to obtain the waiver provided by this subsection.

**(m) Requirements for admission of nonimmigrant nurses**

**(1)** The qualifications referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to an alien who is coming to the United States to perform nursing services for a facility, are that the alien--

**(A)** has obtained a full and unrestricted license to practice professional nursing in the country where the alien obtained nursing education or has received nursing education in the United States;

**(B)** has passed an appropriate examination (recognized in regulations promulgated in consultation with the Secretary of Health and Human Services) or has a full and unrestricted license under State law to practice professional nursing in the State of intended employment; and

**(C)** is fully qualified and eligible under the laws (including such temporary or interim licensing requirements which authorize the nurse to be employed) governing the place of intended employment to engage in the practice of professional nursing as a registered nurse immediately upon admission to the United States and is authorized under such laws to be employed by the facility.

**(2)(A)** The attestation referred to in section 1101(a)(15)(H)(i)(c) of this title, with respect to a facility for which an alien will perform services, is an attestation as to the following:

**(i)** The facility meets all the requirements of paragraph (6).

**(ii)** The employment of the alien will not adversely affect the wages and working conditions of registered nurses similarly employed.

**(iii)** The alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility.

**(iv)** The facility has taken and is taking timely and significant steps designed to recruit and retain sufficient registered nurses who are United States citizens or immigrants who are authorized to perform nursing services, in order to remove as quickly as reasonably possible the dependence of the facility on nonimmigrant registered nurses.

**(v)** There is not a strike or lockout in the course of a labor dispute, the facility did not lay off and will not lay off a registered nurse employed by the facility within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition, and the employment of such an alien is not intended or designed to influence an election for a bargaining representative for registered nurses of the facility.

**(vi)** At the time of the filing of the petition for registered nurses under section 1101(a)(15)(H)(i)(c) of this title, notice of the filing has been provided by the facility to the bargaining representative of the registered nurses at the facility or, where there is no such bargaining representative, notice of the filing has been provided to the registered nurses employed at the facility through posting in conspicuous locations.

**(vii)** The facility will not, at any time, employ a number of aliens issued visas or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title that exceeds 33 percent of the total number of registered nurses employed by the facility.

**(viii)** The facility will not, with respect to any alien issued a visa or otherwise provided nonimmigrant status under section 1101(a)(15)(H)(i)(c) of this title--

**(I)** authorize the alien to perform nursing services at any worksite other than a worksite controlled by the facility; or

**(II)** transfer the place of employment of the alien from one worksite to another.

Nothing in clause (iv) shall be construed as requiring a facility to have taken significant steps described in such clause before November 12, 1999. A copy of the attestation shall be provided, within 30 days of the date of filing, to registered nurses employed at the facility on the date of filing.

**(B)** For purposes of subparagraph (A)(iv), each of the following shall be considered a significant step reasonably designed to recruit and retain registered nurses:

**(i)** Operating a training program for registered nurses at the facility or financing (or providing participation in) a training program for registered nurses elsewhere.

**(ii)** Providing career development programs and other methods of facilitating health care workers to become registered nurses.

**(iii)** Paying registered nurses wages at a rate higher than currently being paid to registered nurses similarly employed in the geographic area.

**(iv)** Providing reasonable opportunities for meaningful salary advancement by registered nurses.

The steps described in this subparagraph shall not be considered to be an exclusive list of the significant steps that may be taken to meet the conditions of subparagraph (A)(iv). Nothing in this subparagraph shall require a facility to take more than one step if the facility can demonstrate that taking a second step is not reasonable.

**(C)** Subject to subparagraph (E), an attestation under subparagraph (A)--

**(i)** shall expire on the date that is the later of--

**(I)** the end of the one-year period beginning on the date of its filing with the Secretary of Labor; or

**(II)** the end of the period of admission under section 1101(a)(15)(H)(i)(c) of this title of the last alien with respect to whose admission it was applied (in accordance with clause (ii)); and

**(ii)** shall apply to petitions filed during the one-year period beginning on the date of its filing with the Secretary of Labor if the facility states in each such petition that it continues to comply with the conditions in the attestation.

**(D)** A facility may meet the requirements under this paragraph with respect to more than one registered nurse in a single petition.

**(E)(i)** The Secretary of Labor shall compile and make available for public examination in a timely manner in Washington, D.C., a list identifying facilities which have filed petitions for nonimmigrants under section 1101(a)(15)(H)(i)(c) of this title and, for each such facility, a copy of the facility's attestation under subparagraph (A) (and accompanying documentation) and each such petition filed by the facility.

**(ii)** The Secretary of Labor shall establish a process, including reasonable time limits, for the receipt, investigation, and disposition of complaints respecting a facility's failure to meet conditions attested to or a facility's misrepresentation of a material fact in an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives, associations deemed appropriate by the Secretary, and other aggrieved parties as determined under regulations of the Secretary). The Secretary shall conduct an investigation under this clause if there is reasonable cause to believe that a facility fails to meet conditions attested to. Subject to the time limits established under this clause, this subparagraph shall apply regardless of whether an attestation is expired or unexpired at the time a complaint is filed.

**(iii)** Under such process, the Secretary shall provide, within 180 days after the date such a complaint is filed, for a determination as to whether or not a basis exists to make a finding described in clause (iv). If the Secretary determines that such a basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint within 60 days of the date of the determination.

**(iv)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that a facility (for which an attestation is made) has failed to meet a condition attested to or that there was a misrepresentation of material fact in the attestation, the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per nurse per violation, with the total penalty not to exceed $10,000 per violation) as the Secretary determines to be appropriate. Upon receipt of such notice, the Attorney General shall not approve petitions filed with respect to a facility during a period of at least one year for nurses to be employed by the facility.

**(v)** In addition to the sanctions provided for under clause (iv), if the Secretary of Labor finds, after notice and an opportunity for a hearing, that a facility has violated the condition attested to under subparagraph (A)(iii) (relating to payment of registered nurses at the prevailing wage rate), the Secretary shall order the facility to provide for payment of such amounts of back pay as may be required to comply with such condition.

**(F)(i)** The Secretary of Labor shall impose on a facility filing an attestation under subparagraph (A) a filing fee, in an amount prescribed by the Secretary based on the costs of carrying out the Secretary's duties under this subsection, but not exceeding $250.

**(ii)** Fees collected under this subparagraph shall be deposited in a fund established for this purpose in the Treasury of the United States.

**(iii)** The collected fees in the fund shall be available to the Secretary of Labor, to the extent and in such amounts as may be provided in appropriations Acts, to cover the costs described in clause (i), in addition to any other funds that are available to the Secretary to cover such costs.

**(3)** The period of admission of an alien under section 1101(a)(15)(H)(i)(c) of this title shall be 3 years.

**(4)** The total number of nonimmigrant visas issued pursuant to petitions granted under section 1101(a)(15)(H)(i)(c) of this title in each fiscal year shall not exceed 500. The number of such visas issued for employment in each State in each fiscal year shall not exceed the following:


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(A)** For States with populations of less than 9,000,000, based upon the 1990 decennial census of population, 25 visas.

**(B)** For States with populations of 9,000,000 or more, based upon the 1990 decennial census of population, 50 visas.

**(C)** If the total number of visas available under this paragraph for a fiscal year quarter exceeds the number of qualified nonimmigrants who may be issued such visas during those quarters, the visas made available under this paragraph shall be issued without regard to the numerical limitation under subparagraph (A) or (B) of this paragraph during the last fiscal year quarter.

**(5)** A facility that has filed a petition under section 1101(a)(15)(H)(i)(c) of this title to employ a nonimmigrant to perform nursing services for the facility--

**(A)** shall provide the nonimmigrant a wage rate and working conditions commensurate with those of nurses similarly employed by the facility;

**(B)** shall require the nonimmigrant to work hours commensurate with those of nurses similarly employed by the facility; and

**(C)** shall not interfere with the right of the nonimmigrant to join or organize a union.

**(6)** For purposes of this subsection and section 1101(a)(15)(H)(i)(c) of this title, the term "facility" means a subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(1)(B))) that meets the following requirements:

**(A)** As of March 31, 1997, the hospital was located in a health professional shortage area (as defined in section 254e of Title 42).

**(B)** Based on its settled cost report filed under title XVIII of the Social Security Act for its cost reporting period beginning during fiscal year 1994--

**(i)** the hospital has not less than 190 licensed acute care beds;

**(ii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of such title is not less than 35 percent of the total number of such hospital's acute care inpatient days for such period; and

**(iii)** the number of the hospital's inpatient days for such period which were made up of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX of the Social Security Act, is not less than 28 percent of the total number of such hospital's acute care inpatient days for such period.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(7)** For purposes of paragraph (2)(A)(v), the term "lay off", with respect to a worker--

**(A)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(B)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

Nothing in this paragraph is intended to limit an employee's or an employer's rights under a collective bargaining agreement or other employment contract.

**(n) Labor condition application**

**(1)** No alien may be admitted or provided status as an H-1B nonimmigrant in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status as an H-1B nonimmigrant wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question, or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the application, and

**(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the application--

**(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought, or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which H-1B nonimmigrants are sought.

**(D)** The application shall contain a specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(E)(i)** In the case of an application described in clause (ii), the employer did not displace and will not displace a United States worker (as defined in paragraph (4)) employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application.

**(ii)** An application described in this clause is an application filed on or after the date final regulations are first promulgated to carry out this subparagraph, and before [7] by an H-1B-dependent employer (as defined in paragraph (3)) or by an employer that has been found, on or after October 21, 1998, under paragraph (2)(C) or (5) to have committed a willful failure or misrepresentation during the 5-year period preceding the filing of the application. An application is not described in this clause if the only H-1B nonimmigrants sought in the application are exempt H-1B nonimmigrants.

**(F)** In the case of an application described in subparagraph (E)(ii), the employer will not place the nonimmigrant with another employer (regardless of whether or not such other employer is an H-1B-dependent employer) where--

**(i)** the nonimmigrant performs duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer; and

**(ii)** there are indicia of an employment relationship between the nonimmigrant and such other employer;

unless the employer has inquired of the other employer as to whether, and has no knowledge that, within the period beginning 90 days before and ending 90 days after the date of the placement of the nonimmigrant with the other employer, the other employer has displaced or intends to displace a United States worker employed by the other employer.

**(G)(i)** In the case of an application described in subparagraph (E)(ii), subject to clause (ii), the employer, prior to filing the application--

**(I)** has taken good faith steps to recruit, in the United States using procedures that meet industry-wide standards and offering compensation that is at least as great as that required to be offered to H-1B nonimmigrants under subparagraph (A), United States workers for the job for which the nonimmigrant or nonimmigrants is or are sought; and

**(II)** has offered the job to any United States worker who applies and is equally or better qualified for the job for which the nonimmigrant or nonimmigrants is or are sought.

**(ii)** The conditions described in clause (i) shall not apply to an application filed with respect to the employment of an H-1B nonimmigrant who is described in subparagraph (A), (B), or (C) of section 1153(b)(1) of this title.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The employer shall make available for public examination, within one working day after the date on which an application under this paragraph is filed, at the employer's principal place of business or worksite, a copy of each such application (and such accompanying documents as are necessary). The Secretary shall compile, on a current basis, a list (by employer and by occupational classification) of the applications filed under this subsection. Such list shall include the wage rate, number of aliens sought, period of intended employment, and date of need. The Secretary shall make such list available for public examination in Washington, D.C. The Secretary of Labor shall review such an application only for completeness and obvious inaccuracies. Unless the Secretary finds that the application is incomplete or obviously inaccurate, the Secretary shall provide the certification described in section 1101(a)(15)(H)(i)(b) of this title within 7 days of the date of the filing of the application. The application form shall include a clear statement explaining the liability under subparagraph (F) of a placing employer if the other employer described in such subparagraph displaces a United States worker as described in such subparagraph. Nothing in subparagraph (G) shall be construed to prohibit an employer from using legitimate selection criteria relevant to the job that are normal or customary to the type of job involved, so long as such criteria are not applied in a discriminatory manner.

**(2)(A)** Subject to paragraph (5)(A), the Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under such process, the Secretary shall provide, within 30 days after the date such a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary determines that such a reasonable basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), (1)(E), or (1)(F), a substantial failure to meet a condition of paragraph (1)(C), (1)(D), or (1)(G)(i)(I), or a misrepresentation of material fact in an application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an application, or a violation of clause (iv)--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an application, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the application--

**(I)** the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary determines to be appropriate; and

**(II)** the Attorney General shall not approve petitions filed with respect to that employer under section 1154 or 1184(c) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an application under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Attorney General shall devise a process under which an H-1B nonimmigrant who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an application under this subsection to require an H-1B nonimmigrant to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** It is a violation of this clause for an employer who has filed an application under this subsection to require an alien who is the subject of a petition filed under section 1184(c)(1) of this title, for which a fee is imposed under section 1184(c)(9) of this title, to reimburse, or otherwise compensate, the employer for part or all of the cost of such fee. It is a violation of this clause for such an employer otherwise to accept such reimbursement or compensation from such an alien.

**(III)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a full-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer, who has filed an application under this subsection and who places an H-1B nonimmigrant designated as a part-time employee on the petition filed under section 1184(c)(1) of this title by the employer with respect to the nonimmigrant, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on such petition consistent with the rate of pay identified on such petition.

**(III)** In the case of an H-1B nonimmigrant who has not yet entered into employment with an employer who has had approved an application under this subsection, and a petition under section 1184(c)(1) of this title, with respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States pursuant to the petition, or 60 days after the date the nonimmigrant becomes eligible to work for the employer (in the case of a nonimmigrant who is present in the United States on the date of the approval of the petition).

**(IV)** This clause does not apply to a failure to pay wages to an H-1B nonimmigrant for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to an H-1B nonimmigrant an established salary practice of the employer, under which the employer pays to H-1B nonimmigrants and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

**(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

**(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an application under this subsection to fail to offer to an H-1B nonimmigrant, during the nonimmigrant's period of authorized employment, benefits and eligibility

for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and noncash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** If an H-1B-dependent employer places a nonexempt H-1B nonimmigrant with another employer as provided under paragraph (1)(F) and the other employer has displaced or displaces a United States worker employed by such other employer during the period described in such paragraph, such displacement shall be considered for purposes of this paragraph a failure, by the placing employer, to meet a condition specified in an application submitted under paragraph (1); except that the Attorney General may impose a sanction described in subclause (II) of subparagraph (C)(i), (C)(ii), or (C)(iii) only if the Secretary of Labor found that such placing employer--

**(i)** knew or had reason to know of such displacement at the time of the placement of the nonimmigrant with the other employer; or

**(ii)** has been subject to a sanction under this subparagraph based upon a previous placement of an H-1B nonimmigrant with the same other employer.

**(F)** The Secretary may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date (on or after October 21, 1998) on which the employer is found by the Secretary to have committed a willful failure to meet a condition of paragraph (1) (or has been found under paragraph (5) to have committed a willful failure to meet the condition of paragraph (1)(G)(i)(II)) or to have made a willful misrepresentation of material fact in an application. The preceding sentence shall apply to an employer regardless of whether or not the employer is an H-1B-dependent employer. The authority of the Secretary under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(G)(i)** The Secretary of Labor may initiate an investigation of any employer that employs nonimmigrants described in section 1101(a)(15)(H)(i)(b) of this title if the Secretary of Labor has reasonable cause to believe that the employer is not in compliance with this subsection. In the case of an investigation under this clause, the Secretary of Labor (or the acting Secretary in the case of the absence of [8] disability of the Secretary of Labor) shall personally certify that reasonable cause exists and shall approve commencement of the investigation. The investigation may be initiated for reasons other than completeness and obvious inaccuracies by the employer in complying with this subsection.

**(ii)** If the Secretary of Labor receives specific credible information from a source who is likely to have knowledge of an employer's practices or employment conditions, or an employer's compliance with the employer's labor condition application under paragraph (1), and whose identity is known to the Secretary of Labor, and such information provides reasonable cause to believe that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor may conduct an investigation into the alleged

failure or failures. The Secretary of Labor may withhold the identity of the source from the employer, and the source's identity shall not be subject to disclosure under section 552 of Title 5.

**(iii)** The Secretary of Labor shall establish a procedure for any person desiring to provide to the Secretary of Labor information described in clause (ii) that may be used, in whole or in part, as the basis for the commencement of an investigation described in such clause, to provide the information in writing on a form developed and provided by the Secretary of Labor and completed by or on behalf of the person. The person may not be an officer or employee of the Department of Labor, unless the information satisfies the requirement of clause (iv)(II) (although an officer or employee of the Department of Labor may complete the form on behalf of the person).

**(iv)** Any investigation initiated or approved by the Secretary of Labor under clause (ii) shall be based on information that satisfies the requirements of such clause and that--

**(I)** originates from a source other than an officer or employee of the Department of Labor; or

**(II)** was lawfully obtained by the Secretary of Labor in the course of lawfully conducting another Department of Labor investigation under this chapter of [8] any other Act.

**(v)** The receipt by the Secretary of Labor of information submitted by an employer to the Attorney General or the Secretary of Labor for purposes of securing the employment of a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title shall not be considered a receipt of information for purposes of clause (ii).

**(vi)** No investigation described in clause (ii) (or hearing described in clause (viii) based on such investigation) may be conducted with respect to information about a failure to meet a condition described in clause (ii), unless the Secretary of Labor receives the information not later than 12 months after the date of the alleged failure.

**(vii)** The Secretary of Labor shall provide notice to an employer with respect to whom there is reasonable cause to initiate an investigation described in clauses [9] (i) or (ii), prior to the commencement of an investigation under such clauses, of the intent to conduct an investigation. The notice shall be provided in such a manner, and shall contain sufficient detail, to permit the employer to respond to the allegations before an investigation is commenced. The Secretary of Labor is not required to comply with this clause if the Secretary of Labor determines that to do so would interfere with an effort by the Secretary of Labor to secure compliance by the employer with the requirements of this subsection. There shall be no judicial review of a determination by the Secretary of Labor under this clause.

**(viii)** An investigation under clauses [9] (i) or (ii) may be conducted for a period of up to 60 days. If the Secretary of Labor determines after such an investigation that a reasonable basis exists to make a finding that the employer has committed a willful failure to meet a condition of paragraph (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), or (1)(G)(i)(I), has engaged in a pattern or practice of failures to meet such a condition, or has committed a substantial failure to meet such a condition that affects multiple employees, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing in accordance with section 556 of Title 5 within 120 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 120 days after the date of the hearing.

**(H)(i)** Except as provided in clauses (ii) and (iii), a person or entity is considered to have complied with the requirements of this subsection, notwithstanding a technical or procedural failure to meet such requirements, if there was a good faith attempt to comply with the requirements.

**(ii)** Clause (i) shall not apply if--

**(I)** the Department of Labor (or another enforcement agency) has explained to the person or entity the basis for the failure;

**(II)** the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure; and

**(III)** the person or entity has not corrected the failure voluntarily within such period.

**(iii)** A person or entity that, in the course of an investigation, is found to have violated the prevailing wage requirements set forth in paragraph (1)(A), shall not be assessed fines or other penalties for such violation if the person or entity can establish that the manner in which the prevailing wage was calculated was consistent with recognized industry standards and practices.

**(iv)** Clauses (i) and (iii) shall not apply to a person or entity that has engaged in or is engaging in a pattern or practice of willful violations of this subsection.

**(I)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(3)(A)** For purposes of this subsection, the term "H-1B-dependent employer" means an employer that--

**(i)**(I) has 25 or fewer full-time equivalent employees who are employed in the United States; and (II) employs more than 7 H-1B nonimmigrants;

**(ii)**(I) has at least 26 but not more than 50 full-time equivalent employees who are employed in the United States; and (II) employs more than 12 H-1B nonimmigrants; or

**(iii)**(I) has at least 51 full-time equivalent employees who are employed in the United States; and (II) employs H-1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

**(B)** For purposes of this subsection--

**(i)** the term "exempt H-1B nonimmigrant" means an H-1B nonimmigrant who--

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(I)** receives wages (including cash bonuses and similar compensation) at an annual rate equal to at least $60,000; or

**(II)** has attained a master's or higher degree (or its equivalent) in a specialty related to the intended employment; and

**(ii)** the term "nonexempt H-1B nonimmigrant" means an H-1B nonimmigrant who is not an exempt H-1B nonimmigrant.

**(C)** For purposes of subparagraph (A)--

**(i)** in computing the number of full-time equivalent employees and the number of H-1B nonimmigrants, exempt H-1B nonimmigrants shall not be taken into account during the longer of--

**(I)** the 6-month period beginning on October 21, 1998; or

**(II)** the period beginning on October 21, 1998, and ending on the date final regulations are issued to carry out this paragraph; and

**(ii)** any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26 shall be treated as a single employer.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the H-1B nonimmigrant is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an application with respect to one or more H-1B nonimmigrants by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)** The term "H-1B nonimmigrant" means an alien admitted or provided status as a nonimmigrant described in section 1101(a)(15)(H)(i)(b) of this title.

**(D)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract (other than a

temporary employment contract entered into in order to evade a condition described in subparagraph (E) or (F) of paragraph (1)); but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer (or, in the case of a placement of a worker with another employer under paragraph (1)(F), with either employer described in such paragraph) at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(E)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Attorney General, to be employed.

**(5)(A)** This paragraph shall apply instead of subparagraphs (A) through (E) of paragraph (2) in the case of a violation described in subparagraph (B), but shall not be construed to limit or affect the authority of the Secretary or the Attorney General with respect to any other violation.

**(B)** The Attorney General shall establish a process for the receipt, initial review, and disposition in accordance with this paragraph of complaints respecting an employer's failure to meet the condition of paragraph (1)(G)(i)(II) or a petitioner's misrepresentation of material facts with respect to such condition. Complaints may be filed by an aggrieved individual who has submitted a resume or otherwise applied in a reasonable manner for the job that is the subject of the condition. No proceeding shall be conducted under this paragraph on a complaint concerning such a failure or misrepresentation unless the Attorney General determines that the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.

**(C)** If the Attorney General finds that a complaint has been filed in accordance with subparagraph (B) and there is reasonable cause to believe that such a failure or misrepresentation described in such complaint has occurred, the Attorney General shall initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of such Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings. The Attorney General shall pay the fee and expenses of the arbitrator.

**(D)(i)** The arbitrator shall make findings respecting whether a failure or misrepresentation described in subparagraph (B) occurred. If the arbitrator concludes that failure or misrepresentation was willful, the arbitrator shall make a finding to that effect. The arbitrator may not find such a failure or misrepresentation (or that such a failure or misrepresentation was willful) unless the complainant demonstrates such a failure or misrepresentation (or its willful character) by clear and convincing evidence. The arbitrator shall transmit the findings in the form of a written opinion to the parties to the arbitration and the Attorney General.

Such findings shall be final and conclusive, and, except as provided in this subparagraph, no official or court of the United States shall have power or jurisdiction to review any such findings.

**(ii)** The Attorney General may review and reverse or modify the findings of an arbitrator only on the same bases as an award of an arbitrator may be vacated or modified under section 10 or 11 of Title 9.

**(iii)** With respect to the findings of an arbitrator, a court may review only the actions of the Attorney General under clause (ii) and may set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5. Notwithstanding any other provision of law, such judicial review may only be brought in an appropriate United States court of appeals.

**(E)** If the Attorney General receives a finding of an arbitrator under this paragraph that an employer has failed to meet the condition of paragraph (1)(G)(i)(II) or has misrepresented a material fact with respect to such condition, unless the Attorney General reverses or modifies the finding under subparagraph (D)(ii)--

**(i)** the Attorney General may impose administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation or $5,000 per violation in the case of a willful failure or misrepresentation) as the Attorney General determines to be appropriate; and

**(ii)** the Attorney General is authorized to not approve petitions filed, with respect to that employer and for aliens to be employed by the employer, under section 1154 or 1184(c) of this title--

**(I)** during a period of not more than 1 year; or

**(II)** in the case of a willful failure or willful misrepresentation, during a period of not more than 2 years.

**(F)** The Attorney General shall not delegate, to any other employee or official of the Department of Justice, any function of the Attorney General under this paragraph, until 60 days after the Attorney General has submitted a plan for such delegation to the Committees on the Judiciary of the United States House of Representatives and the Senate.

**(o) Omitted**

**(p) Computation of prevailing wage level**

**(1)** In computing the prevailing wage level for an occupational classification in an area of employment for purposes of subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) in the case of an employee of--

**(A)** an institution of higher education (as defined in section 1001(a) of Title 20), or a related or affiliated nonprofit entity; or

**(B)** a nonprofit research organization or a Governmental research organization,

the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment.

**(2)** With respect to a professional athlete (as defined in subsection (a)(5)(A)(iii)(II)) when the job opportunity is covered by professional sports league rules or regulations, the wage set forth in those rules or regulations shall be considered as not adversely affecting the wages of United States workers similarly employed and be considered the prevailing wage.

**(3)** The prevailing wage required to be paid pursuant to subsections (a)(5)(A), (n)(1)(A)(i)(II), and (t)(1)(A)(i)(II) shall be 100 percent of the wage determined pursuant to those sections.

**(4)** Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference between the 2 levels offered, adding the quotient thus obtained to the first level and subtracting that quotient from the second level.

**(q) Academic honoraria**

Any alien admitted under section 1101(a)(15)(B) of this title may accept an honorarium payment and associated incidental expenses for a usual academic activity or activities (lasting not longer than 9 days at any single institution), as defined by the Attorney General in consultation with the Secretary of Education, if such payment is offered by an institution or organization described in subsection (p)(1) and is made for services conducted for the benefit of that institution or entity and if the alien has not accepted such payment or expenses from more than 5 institutions or organizations in the previous 6-month period.

**(r) Exception for certain alien nurses**

Subsection (a)(5)(C) shall not apply to an alien who seeks to enter the United States for the purpose of performing labor as a nurse who presents to the consular officer (or in the case of an adjustment of status, the Attorney General) a certified statement from the Commission on Graduates of Foreign Nursing Schools (or an equivalent independent credentialing organization approved for the certification of nurses under subsection (a)(5)(C) by the Attorney General in consultation with the Secretary of Health and Human Services) that--

**(1)** the alien has a valid and unrestricted license as a nurse in a State where the alien intends to be employed and such State verifies that the foreign licenses of alien nurses are authentic and unencumbered;

**(2)** the alien has passed the National Council Licensure Examination (NCLEX);

**(3)** the alien is a graduate of a nursing program--

**(A)** in which the language of instruction was English;


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** located in a country--

**(i)** designated by such commission not later than 30 days after November 12, 1999, based on such commission's assessment that the quality of nursing education in that country, and the English language proficiency of those who complete such programs in that country, justify the country's designation; or

**(ii)** designated on the basis of such an assessment by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection; and

**(C)(i)** which was in operation on or before November 12, 1999; or

**(ii)** has been approved by unanimous agreement of such commission and any equivalent credentialing organizations which have been approved under subsection (a)(5)(C) for the certification of nurses under this subsection.

**(s) Consideration of benefits received as battered alien in determination of inadmissibility as likely to become public charge**

In determining whether an alien described in subsection (a)(4)(C)(i) is inadmissible under subsection (a)(4) or ineligible to receive an immigrant visa or otherwise to adjust to the status of permanent resident by reason of subsection (a)(4), the consular officer or the Attorney General shall not consider any benefits the alien may have received that were authorized under section 1641(c) of this title.

**(t)** [10] **Nonimmigrant professionals; labor attestations**

**(1)** No alien may be admitted or provided status as a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title in an occupational classification unless the employer has filed with the Secretary of Labor an attestation stating the following:

**(A)** The employer--

**(i)** is offering and will offer during the period of authorized employment to aliens admitted or provided status under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title wages that are at least--

**(I)** the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question; or

**(II)** the prevailing wage level for the occupational classification in the area of employment,

whichever is greater, based on the best information available as of the time of filing the attestation; and

**(ii)** will provide working conditions for such a nonimmigrant that will not adversely affect the working conditions of workers similarly employed.

**(B)** There is not a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment.

**(C)** The employer, at the time of filing the attestation--

**(i)** has provided notice of the filing under this paragraph to the bargaining representative (if any) of the employer's employees in the occupational classification and area for which aliens are sought; or

**(ii)** if there is no such bargaining representative, has provided notice of filing in the occupational classification through such methods as physical posting in conspicuous locations at the place of employment or electronic notification to employees in the occupational classification for which nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title are sought.

**(D)** A specification of the number of workers sought, the occupational classification in which the workers will be employed, and wage rate and conditions under which they will be employed.

**(2)(A)** The employer shall make available for public examination, within one working day after the date on which an attestation under this subsection is filed, at the employer's principal place of business or worksite, a copy of each such attestation (and such accompanying documents as are necessary).

**(B)(i)** The Secretary of Labor shall compile, on a current basis, a list (by employer and by occupational classification) of the attestations filed under this subsection. Such list shall include, with respect to each attestation, the wage rate, number of aliens sought, period of intended employment, and date of need.

**(ii)** The Secretary of Labor shall make such list available for public examination in Washington, D.C.

**(C)** The Secretary of Labor shall review an attestation filed under this subsection only for completeness and obvious inaccuracies. Unless the Secretary of Labor finds that an attestation is incomplete or obviously inaccurate, the Secretary of Labor shall provide the certification described in section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title within 7 days of the date of the filing of the attestation.

**(3)(A)** The Secretary of Labor shall establish a process for the receipt, investigation, and disposition of complaints respecting the failure of an employer to meet a condition specified in an attestation submitted under this subsection or misrepresentation by the employer of material facts in such an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary of Labor shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

**(B)** Under the process described in subparagraph (A), the Secretary of Labor shall provide, within 30 days after the date a complaint is filed, for a determination as to whether or not a reasonable basis exists to make a finding described in subparagraph (C). If the Secretary of Labor determines that such a reasonable basis exists, the Secretary of Labor shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint, in accordance with section 556 of Title 5, within 60 days after the date of the determination. If such a hearing is requested, the Secretary of Labor shall make a finding concerning the matter by not later than 60 days after the date of the hearing. In the case of similar complaints respecting the same applicant, the Secretary of Labor may consolidate the hearings under this subparagraph on such complaints.

**(C)(i)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B), a substantial failure to meet a condition of paragraph (1)(C) or (1)(D), or a misrepresentation of material fact in an attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 1 year for aliens to be employed by the employer.

**(ii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1), a willful misrepresentation of material fact in an attestation, or a violation of clause (iv)--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $5,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 2 years for aliens to be employed by the employer.

**(iii)** If the Secretary of Labor finds, after notice and opportunity for a hearing, a willful failure to meet a condition of paragraph (1) or a willful misrepresentation of material fact in an attestation, in the course of which failure or misrepresentation the employer displaced a United States worker employed by the employer within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition or application supported by the attestation--

**(I)** the Secretary of Labor shall notify the Secretary of State and the Secretary of Homeland Security of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $35,000 per violation) as the Secretary of Labor determines to be appropriate; and

**(II)** the Secretary of State or the Secretary of Homeland Security, as appropriate, shall not approve petitions or applications filed with respect to that employer under section 1154, 1184(c), 1101(a)(15)(H)(i)(b1), or 1101(a)(15)(E)(iii) of this title during a period of at least 3 years for aliens to be employed by the employer.

**(iv)** It is a violation of this clause for an employer who has filed an attestation under this subsection to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee (which term, for purposes of this clause, includes a former employee and an applicant for employment) because the employee has disclosed information to the employer, or to any other person, that the employee reasonably believes evidences a violation of this subsection, or any rule or regulation pertaining to this subsection, or because the employee cooperates or seeks to cooperate in an investigation or other proceeding concerning the employer's compliance with the requirements of this subsection or any rule or regulation pertaining to this subsection.

**(v)** The Secretary of Labor and the Secretary of Homeland Security shall devise a process under which a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who files a complaint regarding a violation of clause (iv) and is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.

**(vi)(I)** It is a violation of this clause for an employer who has filed an attestation under this subsection to require a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title to pay a penalty for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer. The Secretary of Labor shall determine whether a required payment is a penalty (and not liquidated damages) pursuant to relevant State law.

**(II)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has committed a violation of this clause, the Secretary of Labor may impose a civil monetary penalty of $1,000 for each such violation and issue an administrative order requiring the return to the nonimmigrant of any amount paid in violation of this clause, or, if the nonimmigrant cannot be located, requiring payment of any such amount to the general fund of the Treasury.

**(vii)(I)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a full-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status due to a decision by the employer (based on factors such as lack of work), or due to the nonimmigrant's lack of a permit or license, to fail to pay the nonimmigrant full-time wages in accordance with paragraph (1)(A) for all such nonproductive time.

**(II)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection and who places a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title designated as a part-time employee in the attestation, after the nonimmigrant has entered into employment with the employer, in nonproductive status under circumstances described in subclause (I), to fail to pay such a nonimmigrant for such hours as are designated on the attestation consistent with the rate of pay identified on the attestation.

**(III)** In the case of a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title who has not yet entered into employment with an employer who has had approved an attestation under this subsection with

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

respect to the nonimmigrant, the provisions of subclauses (I) and (II) shall apply to the employer beginning 30 days after the date the nonimmigrant first is admitted into the United States, or 60 days after the date the nonimmigrant becomes eligible to work for the employer in the case of a nonimmigrant who is present in the United States on the date of the approval of the attestation filed with the Secretary of Labor.

**(IV)** This clause does not apply to a failure to pay wages to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title for nonproductive time due to non-work-related factors, such as the voluntary request of the nonimmigrant for an absence or circumstances rendering the nonimmigrant unable to work.

**(V)** This clause shall not be construed as prohibiting an employer that is a school or other educational institution from applying to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title an established salary practice of the employer, under which the employer pays to nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title and United States workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, if--

**(aa)** the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment; and

**(bb)** the application of the salary practice to the nonimmigrant does not otherwise cause the nonimmigrant to violate any condition of the nonimmigrant's authorization under this chapter to remain in the United States.

**(VI)** This clause shall not be construed as superseding clause (viii).

**(viii)** It is a failure to meet a condition of paragraph (1)(A) for an employer who has filed an attestation under this subsection to fail to offer to a nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title, during the nonimmigrant's period of authorized employment, benefits and eligibility for benefits (including the opportunity to participate in health, life, disability, and other insurance plans; the opportunity to participate in retirement and savings plans; and cash bonuses and non-cash compensation, such as stock options (whether or not based on performance)) on the same basis, and in accordance with the same criteria, as the employer offers to United States workers.

**(D)** If the Secretary of Labor finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified in the attestation and required under paragraph (1), the Secretary of Labor shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed.

**(E)** The Secretary of Labor may, on a case-by-case basis, subject an employer to random investigations for a period of up to 5 years, beginning on the date on which the employer is found by the Secretary of Labor to have committed a willful failure to meet a condition of paragraph (1) or to have made a willful misrepresentation of material fact in an attestation. The authority of the Secretary of Labor under this subparagraph shall not be construed to be subject to, or limited by, the requirements of subparagraph (A).

**(F)** Nothing in this subsection shall be construed as superseding or preempting any other enforcement-related authority under this chapter (such as the authorities under section 1324b of this title), or any other Act.

**(4)** For purposes of this subsection:

**(A)** The term "area of employment" means the area within normal commuting distance of the worksite or physical location where the work of the nonimmigrant under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title is or will be performed. If such worksite or location is within a Metropolitan Statistical Area, any place within such area is deemed to be within the area of employment.

**(B)** In the case of an attestation with respect to one or more nonimmigrants under section 1101(a)(15)(H)(i)(b1) of this title or section 1101(a)(15)(E)(iii) of this title by an employer, the employer is considered to "displace" a United States worker from a job if the employer lays off the worker from a job that is essentially the equivalent of the job for which the nonimmigrant or nonimmigrants is or are sought. A job shall not be considered to be essentially equivalent of another job unless it involves essentially the same responsibilities, was held by a United States worker with substantially equivalent qualifications and experience, and is located in the same area of employment as the other job.

**(C)(i)** The term "lays off", with respect to a worker--

**(I)** means to cause the worker's loss of employment, other than through a discharge for inadequate performance, violation of workplace rules, cause, voluntary departure, voluntary retirement, or the expiration of a grant or contract; but

**(II)** does not include any situation in which the worker is offered, as an alternative to such loss of employment, a similar employment opportunity with the same employer at equivalent or higher compensation and benefits than the position from which the employee was discharged, regardless of whether or not the employee accepts the offer.

**(ii)** Nothing in this subparagraph is intended to limit an employee's rights under a collective bargaining agreement or other employment contract.

**(D)** The term "United States worker" means an employee who--

**(i)** is a citizen or national of the United States; or

**(ii)** is an alien who is lawfully admitted for permanent residence, is admitted as a refugee under section 1157 of this title, is granted asylum under section 1158 of this title, or is an immigrant otherwise authorized, by this chapter or by the Secretary of Homeland Security, to be employed.

**(t)** [10] **Foreign residence requirement**

**(1)** Except as provided in paragraph (2), no person admitted under section 1101(a)(15)(Q)(ii)(I) of this title, or acquiring such status after admission, shall be eligible to apply for nonimmigrant status, an immigrant visa, or permanent residence under this chapter until it is established that such person has resided and been physically present in the person's country of nationality or last residence for an aggregate of at least 2 years following departure from the United States.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** The Secretary of Homeland Security may waive the requirement of such 2-year foreign residence abroad if the Secretary determines that--

**(A)** departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or an alien lawfully admitted for permanent residence); or

**(B)** the admission of the alien is in the public interest or the national interest of the United States.

CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 212, 66 Stat. 182; July 18, 1956, c. 629, Title III, § 301(a), 70 Stat. 575; Pub.L. 85-508, § 23, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(b), Mar. 18, 1959, 73 Stat. 13; Pub.L. 86-648, § 8, July 14, 1960, 74 Stat. 505; Pub.L. 87-256, § 109(c), Sept. 21, 1961, 75 Stat. 535; Pub.L. 87-301, §§ 11-15, Sept. 26, 1961, 75 Stat. 654, 655; Pub.L. 89-236, §§ 10, 15, Oct. 3, 1965, 79 Stat. 917, 919; Pub.L. 91-225, § 2, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-484, Title VI, § 601(a), (c), (d), Oct. 12, 1976, 90 Stat. 2300, 2301; Pub.L. 94-571, §§ 5, 7(d), Oct. 20, 1976, 90 Stat. 2705, 2706; Pub.L. 95-83, Title III, § 307(q)(1), (2), Aug. 1, 1977, 91 Stat. 394; Pub.L. 95-549, Title I, §§ 101, 102, Oct. 30, 1978, 92 Stat. 2065; Pub.L. 96-70, Title III, § 3201(b), Sept. 27, 1979, 93 Stat. 497; Pub.L. 96-212, Title II, § 203(d), (f), Mar. 17, 1980, 94 Stat. 107; Pub.L. 96-538, Title IV, § 404, Dec. 17, 1980, 94 Stat. 3192; Pub.L. 97-116, §§ 4, 5(a)(1), (2), (b), 18(e), Dec. 29, 1981, 95 Stat. 1611, 1612, 1620; Pub.L. 98-454, Title VI, § 602[(a)], Oct. 5, 1984, 98 Stat. 1737; Pub.L. 98-473, Title II, § 220(a), Oct. 12, 1984, 98 Stat. 2028; Pub.L. 99-396, § 14(a), Aug. 27, 1986, 100 Stat. 842; Pub.L. 99-570, Title I, § 1751(a), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-639, § 6(a), Nov. 10, 1986, 100 Stat. 3543; Pub.L. 99-653, § 7(a), Nov. 14, 1986, 100 Stat. 3657; Pub.L. 100-204, Title VIII, § 806(c), Dec. 22, 1987, 101 Stat. 1399; Pub.L. 100-525, §§ 3(1)(A), 7(c)(1), (3), 8(f), 9(i), Oct. 24, 1988, 102 Stat. 2614, 2616, 2617, 2620; Pub.L. 100-690, Title VII, § 7349(a), Nov. 18, 1988, 102 Stat. 4473; Pub.L. 101-238, § 3(b), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(a), (c), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, § 162(e)(1), (f)(2)(B), Title II, §§ 202(b), 205(c)(3), Title V, §§ 511(a), 514(a), Title VI, § 601(a), (b), (d), Nov. 29, 1990, 104 Stat. 5011, 5012, 5014, 5020, 5052, 5053, 5067, 5075 to 5077; Pub.L. 102-232, Title III, §§ 302(e)(6), (9), 303(a)(5)(B), (6), (7)(B), 306(a)(10), (12), 307(a) to (g), 309(b)(7), Dec. 12, 1991, 105 Stat. 1746, 1747, 1751, 1753 to 1755, 1759; Pub.L. 103-43, Title XX, § 2007(a), June 10, 1993, 107 Stat. 210; Pub.L. 103-317, Title V, § 506(a), Aug. 26, 1994, 108 Stat. 1765; Pub.L. 103-322, Title XIII, § 130003(b)(1), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-416, Title II, §§ 203(a), 219(e), (z)(1), (5), 220(a), Oct. 25, 1994, 108 Stat. 4311, 4316, 4318, 4319; Pub.L. 104-132, Title IV, §§ 411, 412, 440(d), Apr. 24, 1996, 110 Stat. 1268, 1269, 1277; Pub.L. 104-208, Div. C, Title I, § 124(b)(1), Title III, §§ 301(b)(1), (c)(1), 304(b), 305(c), 306(d), 308(c)(2)(B), (d)(1), (e)(1)(B), (C), (2)(A), (6), (f)(1)(C) to (F), (3)(A), (g)(1), (4)(B), (10)(A), (H), 322(a)(2)(B), 341(a), (b), 342(a), 343, 344(a), 345(a), 346(a), 347(a), 348(a), 349, 351(a), 352(a), 355, Title V, § 531(a), Title VI, §§ 602(a), 622(b), 624(a), 671(e)(3), Sept. 30, 1996, 110 Stat. 3009-562, 3009-576, 3009-578, 3009-597, 3009-607, 3009-612, 3009-616, 3009-619 to 3009-622, 3009-625, 3009-629, 3009-635 to 3009-641, 3009-644, 3009-674, 3009-689, 3009-695, 3009-698, 3009-723; Pub.L. 105-73, § 1, Nov. 12, 1997, 111 Stat. 1459; Pub.L. 105-277, Div. C, Title IV, §§ 412(a) to (c), 413(a) to (e)(1), (f), 415(a), 431(a), Div. G, Title XXII, § 2226(a), Oct. 21, 1998, 112 Stat. 2681-642 to 2681-651, 2681-654, 2681-658, 2681-820; Pub.L. 105-292, Title VI, § 604(a), Oct. 27, 1998, 112 Stat. 2814; Pub.L. 106-95, §§ 2(b), 4(a), Nov. 12, 1999, 113 Stat. 1312, 1317; Pub.L. 106-120, Title VIII, § 809, Dec. 3, 1999, 113 Stat. 1632; Pub.L. 106-313, Title I, §§ 106(c)(2), 107(a), Oct. 17, 2000, 114 Stat. 1254, 1255; Pub.L. 106-386, Div. A, §§ 107(e)(3), 111(d), Div. B, Title V, §§ 1505(a), (c)(1), (d) to (f), 1513(e), Oct. 28, 2000, 114 Stat. 1478, 1485, 1525, 1526, 1536; Pub.L. 106-395, Title II, § 201(b)(1), (2), Oct. 30, 2000, 114 Stat. 1633, 1634; Pub.L. 106-396, Title I, § 101(b)(1), Oct. 30, 2000, 114 Stat. 1638; Pub.L. 107-56, Title IV, § 411(a), Title X, § 1006(a), Oct. 26, 2001, 115 Stat. 345, 394; Pub.L. 107-150, § 2(a)(2), Mar. 13, 2002, 116 Stat. 74; Pub.L. 107-273, Div. C, Title I, § 11018(c), Nov. 2, 2002, 116 Stat. 1825; Pub.L. 108-77, Title IV, § 402(b), (c), Sept. 3, 2003, 117 Stat. 940, 946; Pub.L. 108-193, §§ 4(b)(4), 8(a)(2), Dec. 19, 2003, 117 Stat. 2879, 2886; Pub.L. 108-447, Div. J, Title IV, §§ 422(a), 423, 424(a)(1), (b), Dec. 8, 2004, 118 Stat. 3353 to 3355; Pub.L. 108-449, § 1(b)(2), Dec. 10, 2004, 118 Stat. 3470; Pub.L. 108-458, Title V, §§ 5501(a), 5502(a), 5503,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Dec. 17, 2004, 118 Stat. 3740, 3741; Pub.L. 109-13, Div. B, Title I, §§ 103(a) to (c), 104, Title V, § 501(d), May 11, 2005, 119 Stat. 306 to 309, 322; Pub.L. 109-162, Title VIII, § 802, Jan. 5, 2006, 119 Stat. 3054; Pub.L. 109-271, § 6(b), Aug. 12, 2006, 120 Stat. 762; Pub.L. 110-161, Div. J, Title VI, § 691(a), (c), Dec. 26, 2007, 121 Stat. 2364, 2365; Pub.L. 110-229, Title VII, § 702(b)(2), (3), (d), May 8, 2008, 122 Stat. 860, 862; Pub.L. 110-293, Title III, § 305, July 30, 2008, 122 Stat. 2963; Pub.L. 110-340, § 2(b), Oct. 3, 2008, 122 Stat. 3736; Pub.L. 110-457, Title II, §§ 222(f)(1), 234, Dec. 23, 2008, 122 Stat. 5071, 5074; Pub.L. 111-122, § 3(b), Dec. 22, 2009, 123 Stat. 3481; Pub.L. 111-287, § 2, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 113-4, Title VIII, § 804, Mar. 7, 2013, 127 Stat. 111; Pub.L. 119-1, § 3(d), Jan. 29, 2025, 139 Stat. 4.)

## TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12324

Ex. Ord. No. 12324, Sept. 29, 1981, 46 F.R. 48109, relating to high seas interdiction of illegal aliens, was revoked by Ex. Ord. No. 12807, May 24, 1992, 57 F.R. 23133, set out as a note under this section.

### EXECUTIVE ORDER NO. 12807

<May 24, 1992, 57 F.R. 23133, as amended Ex. Ord. No. 13286, Sec. 30, Feb. 28, 2003, 68 F.R. 10625>

#### Interdiction of Illegal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title] and whereas:

**(1)** The President has authority to suspend the entry of aliens coming by sea to the United States without necessary documentation, to establish reasonable rules and regulations regarding, and other limitations on, the entry or attempted entry of aliens into the United States, and to repatriate aliens interdicted beyond the territorial sea of the United States;

**(2)** The international legal obligations of the United States under the United Nations Protocol Relating to the Status of Refugees (U.S. T.I.A.S. 6577; 19 U.S.T. 6223) to apply Article 33 of the United Nations Convention Relating to the Status of Refugees do not extend to persons located outside the territory of the United States;

**(3)** Proclamation No. 4865 [set out as a note under this section] suspends the entry of all undocumented aliens into the United States by the high seas; and

**(4)** There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally;

I, GEORGE BUSH, President of the United States of America, hereby order as follows:

**Section 1.** The Secretary of State shall undertake to enter into, on behalf of the United States, cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea.

**Sec. 2. (a)** The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appropriate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.

**(b)** Those instructions shall apply to any of the following defined vessels:

**(1)** Vessels of the United States, meaning any vessel documented or numbered pursuant to the laws of the United States, or owned in whole or in part by the United States, a citizen of the United States, or a corporation incorporated under the laws of the United States or any State, Territory, District, Commonwealth, or possession thereof, unless the vessel has been granted nationality by a foreign nation in accord with Article 5 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(2)** Vessels without nationality or vessels assimilated to vessels without nationality in accordance with paragraph (2) of Article 6 of the Convention on the High Seas of 1958 (U.S. T.I.A.S. 5200; 13 U.S.T. 2312).

**(3)** Vessels of foreign nations with whom we have arrangements authorizing the United States to stop and board such vessels.

**(c)** Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:

**(1)** To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.

**(2)** To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.

**(3)** To return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Secretary of Homeland Security, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.

**(d)** These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.

**Sec. 3.** This order is intended only to improve the internal management of the Executive Branch. Neither this order nor any agency guidelines, procedures, instructions, directives, rules or regulations implementing this order shall create, or shall be construed to create, any right or benefit, substantive or procedural (including without limitation any right or benefit under the Administrative Procedure Act [section 551 et seq. of Title 5, Government Organization and Employees]), legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person. Nor shall this order be construed to require any procedures to determine whether a person is a refugee.

**Sec. 4.** Executive Order No. 12324 [formerly set out as a note under this section] is hereby revoked and replaced by this order.

**Sec. 5.** This order shall be effective immediately.

GEORGE BUSH

**EXECUTIVE ORDER NO. 13276**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

<Nov. 15, 2002, 67 F.R. 69985, as amended Ex. Ord. No. 13286, Sec. 1, Feb. 28, 2003, 68 F.R. 10619>

**Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsecs. (f) and (a)(1) of this section], and section 301 of title 3, United States Code, and in order to delegate appropriate responsibilities to Federal agencies for responding to migration of undocumented aliens in the Caribbean region, it is hereby ordered:

**Section 1.** Duties and Authorities of Agency Heads. Consistent with applicable law,

**(a)(i)** The Secretary of Homeland Security may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region. In this regard, the Secretary of Homeland Security shall provide and operate a facility, or facilities, to house and provide for the needs of any such aliens. Such a facility may be located at Guantanamo Bay Naval Base or any other appropriate location.

**(ii)** The Secretary of Homeland Security may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent. If the Secretary of Homeland Security institutes such screening, then until a determination is made, the Secretary of Homeland Security shall provide for the custody, care, safety, transportation, and other needs of the aliens. The Secretary of Homeland Security shall continue to provide for the custody, care, safety, transportation, and other needs of aliens who are determined not to be persons in need of protection until such time as they are returned to their country of origin or transit.

**(b)** The Secretary of State shall provide for the custody, care, safety, transportation, and other needs of undocumented aliens interdicted or intercepted in the Caribbean region whom the Secretary of Homeland Security has identified as persons in need of protection. The Secretary of State shall provide for and execute a process for resettling such persons in need of protection, as appropriate, in countries other than their country of origin, and shall also undertake such diplomatic efforts as may be necessary to address the problem of illegal migration of aliens in the Caribbean region and to facilitate the return of those aliens who are determined not to be persons in need of protection.

**(c)(i)** The Secretary of Defense shall make available to the Secretary of Homeland Security and the Secretary of State, for the housing and care of any undocumented aliens interdicted or intercepted in the Caribbean region and taken into their custody, any facilities at Guantanamo Bay Naval Base that are excess to current military needs and the provision of which does not interfere with the operation and security of the base. The Secretary of Defense shall be responsible for providing access to such facilities and perimeter security. The Secretary of Homeland Security and the Secretary of State, respectively, shall be responsible for reimbursement for necessary supporting utilities.

**(ii)** In the event of a mass migration in the Caribbean region, the Secretary of Defense shall provide support to the Secretary of Homeland Security and the Secretary of State in carrying out the duties described in paragraphs (a) and (b) of this section regarding the custody, care, safety, transportation, and other needs of the aliens, and shall assume primary responsibility for these duties on a nonreimbursable basis as necessary to contain the threat to national security posed by the migration. The Secretary of Defense shall also provide support to the Coast Guard in carrying out the duties described in Executive Order 12807 of May 24, 1992 [set out under this section], regarding interdiction of migrants.

**Sec. 2.** Definitions. For purposes of this order, the term "mass migration" means a migration of undocumented aliens that is of such magnitude and duration that it poses a threat to the national security of the United States, as determined by the President.

**Sec. 3. Scope.**

**(a)** Nothing in this order shall be construed to impair or otherwise affect the authorities and responsibilities set forth in Executive Order 12807 of May 24, 1992.

**(b)** Nothing in this order shall be construed to make reviewable in any judicial or administrative proceeding, or otherwise, any action, omission, or matter that otherwise would not be reviewable.

**(c)** This order is intended only to improve the management of the executive branch. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity or otherwise against the United States, its departments, agencies, entities, instrumentalities, officers, employees, or any other person.

**(d)** Any agency assigned any duties by this order may use the provisions of the Economy Act, 31 U.S.C. 1535 and 1536, to carry out such duties, to the extent permitted by such Act.

**(e)** This order shall not be construed to require any procedure to determine whether a person is a refugee or otherwise in need of protection.

GEORGE W. BUSH

## EXECUTIVE ORDER NO. 13769

Ex. Ord. No. 13769, January 27, 2017, 82 F.R. 8977, relating to protecting the Nation from foreign terrorist entry into the United States, was revoked by Ex. Ord. No. 13780, § 13, March 9, 2017, 82 F.R. 13209.

## EXECUTIVE ORDER NO. 13780

Ex. Ord. No. 13780, Mar. 6, 2017, 82 F.R. 13209, which prevented nationals from certain countries from entering the United States, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## EXECUTIVE ORDER NO. 13815

Ex. Ord. No. 13815, Oct. 24, 2017, 82 F.R. 50055, which related to resuming the Unites States Refugee Admissions Program with enhanced vetting capabilities, was revoked by Ex. Ord. No. 14013, § 2(a), Feb. 4, 2021, 86 F.R. 8840.

## EXECUTIVE ORDER NO. 13940

<August 3, 2020, 85 F.R. 47879>

**Aligning Federal Contracting and Hiring Practices With the Interests of American Workers**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1. Policy.** It is the policy of the executive branch to create opportunities for United States workers to compete for jobs, including jobs created through Federal contracts. These opportunities, particularly in regions where the Federal Government remains the largest employer, are especially critical during the economic dislocation caused by the 2019 novel coronavirus (COVID-19) pandemic. When employers trade American jobs for temporary foreign labor, for example, it reduces opportunities

for United States workers in a manner inconsistent with the role guest-worker programs are meant to play in the Nation's economy.

**Sec. 2. Review of Contracting and Hiring Practices. (a)** The head of each executive department and agency (agency) that enters into contracts shall review, to the extent practicable, performance of contracts (including subcontracts) awarded by the agency in fiscal years 2018 and 2019 to assess:

**(i)** whether contractors (including subcontractors) used temporary foreign labor for contracts performed in the United States, and, if so, the nature of the work performed by temporary foreign labor on such contracts; whether opportunities for United States workers were affected by such hiring; and any potential effects on the national security caused by such hiring; and

**(ii)** whether contractors (including subcontractors) performed in foreign countries services previously performed in the United States, and, if so, whether opportunities for United States workers were affected by such offshoring; whether affected United States workers were eligible for assistance under the Trade Adjustment Assistance program authorized by the Trade Act of 1974; and any potential effects on the national security caused by such offshoring.

**(b)** The head of each agency that enters into contracts shall assess any negative impact of contractors' and subcontractors' temporary foreign labor hiring practices or offshoring practices on the economy and efficiency of Federal procurement and on the national security, and propose action, if necessary and as appropriate and consistent with applicable law, to improve the economy and efficiency of Federal procurement and protect the national security.

**(c)** The head of each agency shall, in coordination with the Director of the Office of Personnel Management, review the employment policies of the agency to assess the agency's compliance with Executive Order 11935 of September 2, 1976 (Citizenship Requirements for Federal Employment), and section 704 of the Consolidated Appropriations Act, 2020, Public Law 116-93.

**(d)** Within 120 days of the date of this order, the head of each agency shall submit a report to the Director of the Office of Management and Budget summarizing the results of the reviews required by subsections (a) through (c) of this section; recommending, if necessary, corrective actions that may be taken by the agency and timeframes to implement such actions; and proposing any Presidential actions that may be appropriate.y47880

**Sec. 3. Measures to Prevent Adverse Effects on United States Workers.** Within 45 days of the date of this order, the Secretaries of Labor and Homeland Security shall take action, as appropriate and consistent with applicable law, to protect United States workers from any adverse effects on wages and working conditions caused by the employment of H-1B visa holders at job sites (including third-party job sites), including measures to ensure that all employers of H-1B visa holders, including secondary employers, adhere to the requirements of section 212(n)(1) of the Immigration and Nationality Act (8 U.S.C. 1182(n)(1)).

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

**PROCLAMATIONS**

**Suspending Entry of Certain Aliens**

Suspension of entry of certain aliens into the United States were contained in the following Presidential proclamations:

Proc. No. 10685, Dec. 11, 2023, 88 F.R. 86541, relating to immigrants and nonimmigrants enabling corruption.

Proc. No. 10309, Nov. 16, 2021, 86 F.R. 64797, relating to immigrants and nonimmigrants responsible for policies or actions that threaten democracy in Nicaragua.

Proc. No. 10052, June 22, 2020, 85 F.R. 38263, as amended by Proc. No. 10054, June 29, 2020, 85 F.R. 40085; Proc. No. 10131, § 2, Dec. 31, 2020, 86 F.R. 418; Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847, relating to immigrants and nonimmigrants who present a risk to the United States labor market following the COVID-19 pandemic, expired Mar. 31, 2021.

Proc. No. 10043, May 29, 2020, 85 F.R. 34353, relating to certain students and researchers from the People's Republic of China.

Proc. No. 10014, Apr. 22, 2020, 85 F.R. 23441, as amended by Proc. No. 10052, § 1, June 22, 2020, 85 F.R. 38264; Proc. No. 10131, § 1, Dec. 31, 2020, 86 F.R. 418, relating to immigrants who present a risk to the United States labor market following the COVID-19 pandemic, was revoked by Proc. No. 10149, § 1, Feb. 24, 2021, 86 F.R. 11847.

Proc. No. 9945, Oct. 4, 2019, 84 F.R. 53991, relating to immigrants who will financially burden the United States healthcare system, was revoked by Proc. No. 10209, May 14, 2021, 86 F.R. 27015.

Proc. No. 9932, Sept. 25, 2019, 84 F.R. 51935, relating to senior officials of the government of Iran.

Proc. No. 9931, Sept. 25, 2019, 84 F.R. 51931, relating to persons responsible for policies or actions that threaten Venezuela's democratic institutions.

Proc. No. 8697, Aug. 4, 2011, 76 F.R. 49277, relating to persons who participate in serious human rights and humanitarian law violations and other abuses.

Proc. No. 8693, July 24, 2011, 76 F.R. 44751, relating to aliens subject to United Nations Security Council travel bans and International Emergency Economic Powers Act Sanctions.

Proc. No. 8342, Jan. 16, 2009, 74 F.R. 4093, relating to foreign government officials responsible for failing to combat trafficking in persons.

Proc. No. 7750, Jan. 12, 2004, 69 F.R. 2287, relating to persons engaged in or benefiting from corruption.

**Suspending Entry as Immigrants and Nonimmigrants of Persons Who Pose a Risk of Transmitting 2019 Novel Coronavirus:**

Proc. No. 10315, Nov. 26, 2021, 86 F.R. 68385, relating to noncitizens who were physically present within the Republic of Botswana, the Kingdom of Eswatini, the Kingdom of Lesotho, the Republic of Malawi, the Republic of Mozambique, the Republic of Namibia, the Republic of South Africa, and the Republic of Zimbabwe, was revoked by Proc. No. 10329, Dec. 28, 2021, 87 F.R. 149.

Proc. No. 10294, Oct. 25, 2021, 86 F.R. 59603, relating to certain noncitizens who are nonimmigrants and who are not fully vaccinated against COVID-19 arriving by air, was revoked in part, effective May 12, 2023, by Proc. No. 10575, May 9, 2023, 88 F.R. 30889.

Proc. No. 10199, Apr. 30, 2021, 86 F.R. 24297, relating to noncitizens entering as nonimmigrants who were physically present within the Republic of India, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10143, Jan. 25, 2021, 86 F.R. 7467, relating to noncitizens who were physically present within the Schengen Area, the United Kingdom (excluding overseas territories outside of Europe), the Republic of Ireland, and the Federative Republic of Brazil, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 10041, May 24, 2020, 85. F.R. 31933, as amended by Proc. No. 10042, May 25, 2020 85 F.R. 32291, relating to aliens present in the Federative Republic of Brazil, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9996, Mar. 14, 2020, 85 F.R. 15341, relating to aliens present in the United Kingdom and Republic of Ireland, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9993, Mar. 11, 2020, 85 F.R. 15045, relating to aliens present in the Schengen Area, was revoked by Proc. No. 10138, Jan. 18, 2021, 86 F.R. 6799.

Proc. No. 9992, Feb. 29, 2020, 85 F.R. 12855, as amended by Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the Islamic Republic of Iran, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

Proc. No. 9984, Jan. 31, 2020, 85 F.R. 6709, as amended by Proc. No. 9992, § 4, Feb. 29, 2020, 85 F.R. 12857; Proc. No. 10143, § 5, Jan. 25, 2021, 86 F.R. 7469, relating to aliens present in the People's Republic of China, was revoked by Proc. No. 10294, § 1, Oct. 25, 2021, 86 F.R. 59604.

## PROCLAMATION NO. 4865

<Sept. 29, 1981, 46 F.R. 48107>

### High Seas Interdiction of Illegal Aliens

The ongoing migration of persons to the United States in violation of our laws is a serious national problem detrimental to the interests of the United States. A particularly difficult aspect of the problem is the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States. These arrivals have severely strained the law enforcement resources of the Immigration and Naturalization Service and have threatened the welfare and safety of communities in that region.

As a result of our discussions with the Governments of affected foreign countries and with agencies of the Executive Branch of our Government, I have determined that new and effective measures to curtail these unlawful arrivals are necessary. In this regard, I have determined that international cooperation to intercept vessels trafficking in illegal migrants is a necessary and proper means of insuring the effective enforcement of our laws.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and the statutes of the United States, including Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)) [subsec. (f) of this section and section 1185(a)(1) of this title], in order to protect the sovereignty of the United States, and in accordance with cooperative arrangements with certain foreign governments, and having found that the entry of undocumented aliens, arriving at the borders of the United States from the high seas, is detrimental to the interests of the United States, do proclaim that:

The entry of undocumented aliens from the high seas is hereby suspended and shall be prevented by the interdiction of certain vessels carrying such aliens.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of September, in the year of our Lord nineteen hundred and eighty-one, and of the Independence of the United States of America the two hundred and sixth.

RONALD REAGAN

## PROCLAMATION NO. 7359

Proc. No. 7359, Oct. 10, 2000, 65 F.R. 60831, related to the suspension of entry as immigrants and nonimmigrants of persons impeding the peace process in Sierra Leone.

## PROCLAMATION NO. 7750

<Jan. 12, 2004, 69 F.R. 2287>

**To Suspend Entry as Immigrants or Nonimmigrants of Persons Engaged in or Benefitting from Corruption**

**By the President of the United States of America**

**A Proclamation**

In light of the importance of legitimate and transparent public institutions to world stability, peace, and development, and the serious negative effects that corruption of public institutions has on the United States efforts to promote security and to strengthen democratic institutions and free market systems, and in light of the importance to the United States and the international community of fighting corruption, as evidenced by the Third Global Forum on Fighting Corruption and Safeguarding Integrity and other intergovernmental efforts, I have determined that it is in the interests of the United States to take action to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons who have committed, participated in, or are beneficiaries of corruption in the performance of public functions where that corruption has serious adverse effects on international activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

NOW, THEREFORE, I, GEORGE W. BUSH, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States, including section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. 1182(f) [subsec. (f) of this section], and section 301 of title 3, United States Code, hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of persons described in section 1 of this proclamation would, except as provided in sections 2 and 3 of this proclamation, be detrimental to the interests of the United States.

I therefore hereby proclaim that:

**Section 1.** The entry into the United States, as immigrants or nonimmigrants, of the following persons is hereby suspended:

**(a)** Public officials or former public officials whose solicitation or acceptance of any article of monetary value, or other benefit, in exchange for any act or omission in the performance of their public functions has or had serious adverse effects on the national interests of the United States.

**(b)** Persons whose provision of or offer to provide any article of monetary value or other benefit to any public official in exchange for any act or omission in the performance of such official's public functions has or had serious adverse effects on the national interests of the United States.

**(c)** Public officials or former public officials whose misappropriation of public funds or interference with the judicial, electoral, or other public processes has or had serious adverse effects on the national interests of the United States.

**(d)** The spouses, children, and dependent household members of persons described in paragraphs (a), (b), and (c) above, who are beneficiaries of any articles of monetary value or other benefits obtained by such persons.

**Sec. 2.** Section 1 of this proclamation shall not apply with respect to any person otherwise covered by section 1 where entry of the person into the United States would not be contrary to the interests of the United States.

**Sec. 3.** Persons covered by sections 1 and 2 of this proclamation shall be identified by the Secretary of State or the Secretary's designee, in his or her sole discretion, pursuant to such standards and procedures as the Secretary may establish.

**Sec. 4.** For purposes of this proclamation, “serious adverse effects on the national interests of the United States” means serious adverse effects on the international economic activity of U.S. businesses, U.S. foreign assistance goals, the security of the United States against transnational crime and terrorism, or the stability of democratic institutions and nations.

**Sec. 5.** Nothing in this proclamation shall be construed to derogate from United States Government obligations under applicable international agreements.

**Sec. 6.** The Secretary of State shall have responsibility for implementing this proclamation pursuant to such procedures as the Secretary may, in the Secretary's discretion, establish.

**Sec. 7.** This proclamation is effective immediately.

**Sec. 8.** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twelfth day of January, in the year of our Lord two thousand four, and of the Independence of the United States of America the two hundred and twenty-eighth.

GEORGE W. BUSH

## PROCLAMATION NO. 9645

Proc. No. 9645, Sept. 24, 2017, 82 F.R. 45161, as amended by Proc. No. 9723, § 1, Apr. 10, 2018, 83 F.R. 15939; Proc. No. 9983, § 3, Jan. 31, 2020, 85 F.R. 6706, which prohibited entry into the United States by nationals of certain countries unless they are approved for a waiver, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 9723

Proc. No. 9723, Apr. 10, 2018, 83 F.R. 15937, which maintained enhanced vetting capabilities and processes for detecting attempted entry into the United States by terrorists or other public-safety threats, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 9983

Proc. No. 9983, Jan. 31, 2020 85 F.R. 6699, which prohibited entry into the United States by nationals of certain countries, was revoked by Proc. No. 10141, Jan. 20, 2021, 86 F.R. 7005.

## PROCLAMATION NO. 10773

<June 3, 2024, 89 F.R. 48487, as amended Sept. 27, 2024, 89 F.R. 80351>

**Securing the Border**

**By the President of the United States of America**

**A Proclamation**

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID-19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include

establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken--and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS to manage conditions on the southern border, as well as funding for

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

**(a)** over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

**(b)** over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

**(c)** 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

**(d)** shelter and critical services for newcomers in our cities and States; and

**(e)** 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118-47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system--the result of outdated laws and inadequate resources--has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Suspension and Limitation on Entry.** The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2. Applicability of Suspension and Limitation on Entry. (a)** The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to

section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

**(b)** Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

**(c)** [revoked by 89 F.R. 80351, § 2]

**Sec. 3. Scope and Implementation of Suspension and Limitation on Entry. (a)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

**(b)** The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

**(i)** any noncitizen national of the United States;

**(ii)** any lawful permanent resident of the United States;

**(iii)** any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

**(iv)** any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

**(v)** any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

**(A)** members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

**(B)** noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

**(C)** noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

**(D)** noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

**(vi)** any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

**(vii)** any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(c)** An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

**(d)** The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

**(e)** Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4. Definitions. (a)** The term “encounter” refers to a noncitizen who:

**(i)** is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

**(ii)** is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

**(iii)** is determined to be inadmissible at a southwest land border port of entry.

**(b)** The term “southern coastal borders” means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

**(c)** The term “southwest land border” means the entirety of the United States land border with Mexico.

**(d)** The term “southern border” means the southwest land border and the southern coastal borders.

**Sec. 5. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

J.R. BIDEN JR.

**PROCLAMATION NO. 10817**

<Sept. 27, 2024, 89 F.R. 80351>

**Amending Proclamation 10773**

**By the President of the United States of America**

**A Proclamation**

On June 3, 2024, I signed Proclamation 10773 (Securing the Border). That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted. Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect. July and August 2024 were the lowest 2 months of encounters between ports of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border. This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity. Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters. Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Amendment to Section 2(a) of Proclamation 10773.** Section 2(a) of Proclamation 10773 is amended to read as follows:

“The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.”

**Sec. 2. Revocation of Section 2(c) of Proclamation 10773.** Section 2(c) of Proclamation 10773 is revoked.

**Sec. 3. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 4. Effectiveness.** The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 FR 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Sec. 5. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.

J.R. BIDEN JR.

## PROCLAMATION NO. 10888

<Jan. 20, 2025, 90 F.R. 8333>

### Guaranteeing the States Protection Against Invasion

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

An essential feature of any sovereign nation is the existence of territorial boundaries and the inherent authority to decide who and what may cross those boundaries. The Supreme Court of the United States has described this power as a "fundamental act of sovereignty," which "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950). The Supreme Court has recognized the inherent right and duty of the Executive Branch to defend our national sovereignty, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." Id.

The Congress has, in establishing "an uniform Rule of Naturalization," created a complex and comprehensive Federal scheme in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., to control the entry and exit of people and goods across the borders of the United States. In routine circumstances, this complex and comprehensive scheme can protect the national sovereignty of the United States by facilitating the admission of individuals whose presence serves the national interest and preventing the admission of those who do not, such as those aliens who pose threats to public health, section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1); safety, section 212(a)(2) (8 U.S.C. 1182(a)(2)); and national security, section 212(a)(3) (8 U.S.C. 1182(a)(3)). Prospective immigrants who use the visa system are screened for such health, safety, and security concerns while outside of the United States, and are not permitted to enter the United States until they establish that they are eligible to be admitted as a matter of law and should be admitted as a matter of discretion.

But screening under those provisions of the INA can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States.

Due to significant information gaps--particularly in the border environment--and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by section 212(a)(2)-(3) of the INA, 8 U.S.C. 1182(a)(2)-(3). Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials.

The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. And the risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border.

The same is true for public health, where the Federal Government currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1). Effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as a lawful immigrant would. As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States.

Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States. The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those previously described that are intended to prevent aliens posing threats to public health, safety, and national security from entering the United States. As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide.

This ongoing influx of illegal aliens across the southern border of the United States has placed significant costs and constraints upon the States, which have collectively spent billions of dollars in providing medical care and related human services, and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries.

In joining the Union, the States agreed to surrender much of their sovereignty and join the Union in exchange for the Federal Government's promise in Article IV, Section 4 of the U.S. Constitution, to "protect each of [the States] against Invasion." I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its obligation to the States.

The INA provides the President with certain emergency tools. For example, it states that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). This statute "exudes deference to the President in every clause." Trump v. Hawaii, 585 U.S. 667, 684 (2018). Further, the INA renders it unlawful for "any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Historically, Presidents have used these statutory authorities to deny entry of designated classes and categories of aliens into the United States through ports of entry. But if the President has the power to deny entry of any alien into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of aliens into the United States and impose restrictions on access to portions of the immigration system, particularly when the number of aliens illegally crossing the southern border prevents the Federal Government from obtaining operational control of the border.

The INA does not, however, occupy the Federal Government's field of authority to protect the sovereignty of the United States, particularly in times of emergency when entire provisions of the INA are rendered ineffective by operational constraints, such as when there is an ongoing invasion into the States. The President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of aliens involved in an invasion into the United States, and to rapidly repatriate them to an alternative location. Only through such measures can the President guarantee the right of each State to be protected against invasion.

By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

NOW, THEREFORE, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby direct as follows:

**Section 1. Suspension of Entry.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended until I issue a finding that the invasion at the southern border has ceased.

**Sec. 2. Imposition of Restrictions on Entry for Aliens Invading the United States.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that aliens engaged in the invasion across the southern border of the United States on or after the date of this proclamation are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 3. Suspension of and Restriction on Entry for Aliens Posing Public Health, Safety, or National Security Risks.** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States, on or after the date of this order, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)-(3) of the INA, 8 U.S.C. 1182(a)(1)-(3), is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended and restrict their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158.

**Sec. 4. Constitutional Suspension of Physical Entry**. Under the authorities provided to me under Article II of the Constitution of the United States, including my control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4, I hereby suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and direct the Secretary of Homeland Security, in coordination with the Secretary of State and the

Attorney General, to take appropriate actions as may be necessary to achieve the objectives of this proclamation, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 5. Operational Actions to Repel the Invasion.** The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order, whether as an exercise of the suspension power in section 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), or as an exercise of my delegated authority under the Constitution of the United States, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 6. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

DONALD J.TRUMP

## PROCLAMATION NO. 10949

<June 4, 2025, 90 F.R. 24497>

<Presidential Proclamation location within the Code subject to final classification approval>

### Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United

States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Policy and Purpose. (a)** It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

**(b)** Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

**(c)** Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which

vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

**(d)** On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

**(e)** In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors--including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

**(f)** After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

**(g)** I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

**(h)** Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2. Full Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

**(a)** Afghanistan

**(i)** The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report ("Overstay Report"), Afghanistan had a business/tourist (B-1/B-2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

**(ii)** The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

**(b)** Burma

**(i)** According to the Overstay Report, Burma had a B-1/B-2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

**(ii)** The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

**(c)** Chad

**(i)** According to the Overstay Report, Chad had a B-1/B-2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B-1/B-2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

**(ii)** The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

**(d)** Republic of the Congo

**(i)** According to the Overstay Report, the Republic of the Congo had a B-1/B-2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

**(ii)** The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

**(e)** Equatorial Guinea

**(i)** According to the Overstay Report, Equatorial Guinea had a B-1/B-2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

**(ii)** The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

**(f)** Eritrea

**(i)** The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B-1/B-2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

**(ii)** The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

**(g)** Haiti

**(i)** According to the Overstay Report, Haiti had a B-1/B-2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

**(ii)** The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

**(h)** Iran

**(i)** Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

**(i)** Libya

**(i)** There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

**(ii)** The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

**(j)** Somalia

**(i)** Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

**(k)** Sudan

**(i)** Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B-1/B-2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

**(ii)** The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

**(l)** Yemen

**(i)** Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

**(ii)** The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3. Partial Suspension of Entry for Nationals of Countries of Identified Concern.**

**(a)** Burundi

**(i)** According to the Overstay Report, Burundi had a B-1/B-2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

**(ii)** The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

**(b)** Cuba

**(i)** Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B-1/B-2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

**(ii)** The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

**(c)** Laos

**(i)** According to the Overstay Report, Laos had a B-1/B-2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(d)** Sierra Leone

**(i)** According to the Overstay Report, Sierra Leone had a B-1/B-2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

**(e)** Togo

**(i)** According to the Overstay Report, Togo had a B-1/B-2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

**(ii)** The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

**(f)** Turkmenistan

**(i)** According to the Overstay Report, Turkmenistan had a B-1/B-2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

**(ii)** The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

**(g)** Venezuela

**(i)** Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B-1/B-2 visa overstay rate of 9.83 percent.

**(ii)** The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4. Scope and Implementation of Suspensions and Limitations. (a) Scope.** Subject to the exceptions set forth in subsection (b) of this section and any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of

and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

**(i)** are outside the United States on the applicable effective date of this proclamation; and

**(ii)** do not have a valid visa on the applicable effective date of this proclamation.

**(b) Exceptions.** The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

**(i)** any lawful permanent resident of the United States;

**(ii)** any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

**(iii)** any foreign national traveling with a valid nonimmigrant visa in the following classifications: A-1, A-2, C-2, C-3, G-1, G-2, G-3, G-4, NATO-1, NATO-2, NATO-3, NATO-4, NATO-5, or NATO-6;

**(iv)** any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

**(v)** immediate family immigrant visas (IR-1/CR-1, IR-2/CR-2, IR-5) with clear and convincing evidence of identity and family relationship (e.g., DNA);

**(vi)** adoptions (IR-3, IR-4, IH-3, IH-4);

**(vii)** Afghan Special Immigrant Visas;

**(viii)** Special Immigrant Visas for United States Government employees; and

**(ix)** immigrant visas for ethnic and religious minorities facing persecution in Iran.

**(c)** Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

**(d)** Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5. Adjustments to and Removal of Suspensions and Limitations. (a)** The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and

recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

**(b)** The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

**(c)** Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

**Sec. 6. Enforcement. (a)** The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

**(c)** No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

**(d)** This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

**Sec. 7. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 8. Effective Date.** This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

**Sec. 9. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

DONALD J.TRUMP

## PROCLAMATION NO. 10998

<Dec. 16, 2025, 90 F.R. 59717 >

<Presidential Proclamation location within the Code subject to final classification approval>

### Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of certain foreign nationals into the United States to prevent national security and public safety threats from reaching our borders. The Supreme Court upheld these restrictions. I reinstated these successful policies in Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), and Proclamation 10949 of June 4, 2025 (Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats).

It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes.

The United States must exercise extreme vigilance during the visa-issuance and immigration processes to identify, prior to their admission or entry into the United States, foreign nationals who intend to harm Americans or our national interests. The United States Government must ensure that admitted aliens do not intend to threaten its citizens; undermine or destabilize its culture, government, institutions, or founding principles; or advocate for, aid, or support designated foreign terrorists or other threats to our national security.

In order to protect our Nation, as directed in Executive Order 14161, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, identified countries throughout the world for which screening and vetting information was so deficient as to warrant a full or partial suspension of the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). Accordingly, in Proclamation 10949, I restricted the entry of foreign nationals into the United States from countries with deficient screening and vetting information to protect the national security and public safety of the United States and its people. The proclamation also directed the United States Government to immediately engage countries identified in the proclamation on measures that must be taken to comply with the screening, vetting, immigration, and security requirements of the United States.

Despite those engagements, most of the countries identified in Proclamation 10949, as well as others, continue to exhibit woeful inadequacies in screening, vetting, and provision of information. At least one country lacks mechanisms in hospitals to ensure births are reported, and widespread corruption, combined with a general lack of vetting and poor recordkeeping, result in any

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

non-citizen being able to obtain any civil document from that country, particularly if that person is willing to pay a fee or engage an individual that specializes in assisting in such fraud. In that same country, law enforcement records are not maintained with the accuracy or consistency necessary to provide representations of individuals' criminal histories to the United States Government. In another country, civil documents like marriage licenses and birth certificates are handwritten and stamped on regular paper, making them highly susceptible to alteration, and there is a fraudulent document market that produces all types of falsified records, making written corroboration of any visa application practically impossible. In yet another country, criminal records are widely unreliable and inaccessible. And in another, United States visas are used as a tool for illicit transborder movement of assets by corrupt government officials and organized criminal groups. Corruption in another country even extends to the national school system, which has provided falsified diplomas and grade information in the past to fraudsters who have tried to obtain student visas and eligibility for large athletic scholarships. The government of another country refuses to provide passport exemplars, undermining the United States Government's ability to detect fraudulent documents. In another country, the population, for the most part, does not formally document life events. This makes effective verification of basic biographical data such as birthdates, marriages, and parentage exceedingly difficult, if not impossible. Such countries warrant continued or new travel restrictions.

Further, after continuing their review, and in light of the experience gained since the issuance of Proclamation 10949 and the reaction of foreign countries to the issuance of that proclamation, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence have identified additional countries that cannot meet basic criteria for identifying their nationals and residents who pose national security and public safety threats and for sharing information with the United States. For example, only 40 percent of one country's territory is under complete government control, and officials there have noted that their ability to securely process, house, or monitor non citizens is constrained. In another country, corruption in various forms is pervasive. Other countries have been subject to successful efforts to overthrow or undermine their governments, with the result that radical terrorist groups operate with minimal, if any, interference from law enforcement, engaging in forced labor, sex trafficking, illegal drug manufacturing and distribution, and other activities that destabilize such countries. And, because of the poor documentation practices and corrupt governments in these countries, there can be little assurance that the foreign nationals from these countries who seek to come to America on immigrant or nonimmigrant visas are not bringing these criminal enterprises with them to the United States.

According to United States law enforcement reporting, foreign nationals from countries named in this proclamation have been involved with crimes that include murder, terrorism, embezzling public funds, human smuggling, human trafficking, and other criminal activity. Many of these countries are ranked in the top third of countries for criminality, and widely unreliable foreign civil documents and lack of authoritative criminal information make it extremely difficult for United States screening and vetting authorities to assess prior criminal activity and other grounds of inadmissibility.

Finally, some of these countries have offered Citizenship by Investment (CBI) without residency, which poses challenges for screening and vetting purposes. As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country. Additionally, United States law enforcement and the Department of State have found that, historically, CBI programs have been susceptible to several risks. These risks include allowing an individual to conceal his or her identity and assets to circumvent travel restrictions or financial or banking restrictions.

Foreign nationals from the countries described above have also exploited the historic generosity of the United States and violated our Nation's immigration laws by not adhering to the terms of their nonimmigrant or immigrant visas. As cited in the Department of Homeland Security (DHS) Entry/Exit Overstay Report, foreign nationals from many countries have high nonimmigrant visa overstay rates. These visa overstays and other abuses flagrantly violate United States immigration laws, despite generous incentives offered by my Administration--for example, the ability to self-deport using the CBP Home app. To faithfully uphold United States immigration law, the flow of foreigners from countries with high overstay rates or significant fraud must stop.

In addition, the implementation of Proclamation 10949 counsels narrowing the categorical exceptions described in that proclamation to prevent exploitation by foreign nationals. For example, immigrant visas for family members of individuals in the United States will no longer be a broad categorical exception. As described above, the countries to which this proclamation applies have persistent, chronic vetting deficiencies that impede conclusive admissibility determinations and that are readily exploitable to threaten United States national security and public safety. These deficiencies include poor civil documentation and recordkeeping practices, widespread corruption and fraud, unreliable or inaccessible criminal records, and unreliable government travel documents. These pervasive risks concerning nationals from the covered countries apply with at least equal force to family-based visa applications--which comprise most of the immigrant visa applications from such countries--and potentially with even greater force. Familial ties can serve--and, in the past, have in fact served, based on concrete information provided by United States law enforcement and the Department of State--as unique vectors for fraudulent, criminal, or even terrorist activity through means such as the domestic or international financing of such activity. Broadly excepting most immigrant visa applicants from the countries whose risks and deficiencies most gravely threaten America is inconsistent with protecting our national security and with the purpose of driving greater cooperation and vetting improvements by these specific countries. This is particularly true in light of the large numbers of individuals granted United States immigration status during the prior administration without sufficient documentation and vetting mechanisms in place, whose family members might take advantage of such an exception, just as criminals have taken advantage of family-based visas in the past. Accordingly, I have determined that the risks from the classes of aliens covered by this proclamation cannot be satisfactorily mitigated absent resolution of the predominating country-specific concerns, and any extraordinary cases can be appropriately addressed through the national-interest exceptions provided for in this proclamation and Proclamation 10949.

As a result of these reviews and considerations, I have decided--as described in sections 2 and 3 of this proclamation--to continue to impose and modify the limitations set forth in sections 2 and 3 of Proclamation 10949 on the entry into the United States by certain classes of foreign nationals. Also, I have decided--as described in sections 4 and 5 of this proclamation--to impose the limitations set forth below on the entry into the United States by certain other classes of foreign nationals.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2, 3, 4, and 5 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1. Policy and Purpose.** (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security and public safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols and procedures enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such foreign nationals from entering the United States.

**(b)** Identity-management and information-sharing standards and practices of foreign governments impact the effectiveness of the screening and vetting protocols and procedures of the United States. Foreign governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals and residents to other governments, including information about known and suspected terrorists and criminals.

It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their identity-management and information-sharing protocols and procedures and to regularly share their identity and threat information with the screening and vetting systems of the United States.

**(c)** Proclamation 10949 directed the United States Government to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan,

and Yemen. The proclamation directed the United States Government to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. Additionally, the proclamation directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to immediately engage each of the countries identified in the proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

**(d)** Proclamation 10949 directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by the proclamation should be continued, terminated, modified, or supplemented.

**(e)** The Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (d) of this section, recommending that entry restrictions and limitations continue to apply to foreign nationals of several countries. The report also identified additional countries for which vetting and screening information is so deficient as to warrant a full or partial suspension of admission. These recommendations follow the engagement with foreign countries that I directed in Proclamation 10949.

**(f)** In evaluating the recommendations from the Secretary of State and determining whether and to what extent to impose, or continue to impose, restrictions for each country, I consulted with the Secretary of State, the Secretary of War, the Attorney General, the Secretary of Homeland Security, the Director of National Intelligence, appropriate Assistants to the President, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. I further considered various factors, including each country's screening and vetting capabilities, information-sharing policies, and country-specific risk factors, including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals. Each of these factors, including visa-overstay rates, was just one of the factors considered in making the determinations in this proclamation, and the determinations in this proclamation are based on the totality of the circumstances with respect to each country after a review of all relevant factors.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas are, or can become, lawful permanent residents of the United States. Such persons admitted on immigrant visas may present national security or public safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security or public safety concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security or public safety of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the relevant countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary: to garner cooperation from foreign governments, including as to reducing overstay rates of their nationals; enforce our immigration laws; and advance other important foreign policy, national security, and counterterrorism objectives. Under the current circumstances, without the restrictions and limitations imposed in this proclamation, the entry or admission of such foreign nationals is detrimental to the national interest.

**(g)** After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to fully restrict and limit the entry

of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

**(h)** After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of 7 additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants. I have also determined to fully restrict and limit the entry of individuals using travel documents issued or endorsed by the Palestinian Authority (PA).

**(i)** After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to partially restrict and limit the entry of nationals of the following 4 countries: Burundi, Cuba, Togo, and Venezuela. I have also decided to modify the partial restriction and limitation on the entry of nationals of Turkmenistan. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

**(j)** After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to partially restrict and limit the entry of nationals of the following 15 countries: Angola, Antigua and Barbuda, Benin, Côte d'Ivoire, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

**(k)** Sections 4 and 5 of this proclamation describe some of the identity-management and information-sharing inadequacies that led me to impose, or continue to impose, the restrictions described in this proclamation. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2. Continued Full Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

**(a)** Afghanistan;

**(b)** Burma;

**(c)** Chad;

**(d)** Republic of the Congo;

**(e)** Equatorial Guinea;

**(f)** Eritrea;

**(g)** Haiti;

**(h)** Iran;

**(i)** Libya;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(j)** Somalia;

**(k)** Sudan; and

**(l)** Yemen.

**Sec. 3. Continued Partial Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

**(a)** Burundi;

**(b)** Cuba;

**(c)** Togo; and

**(d)** Venezuela.

**Sec. 4. Full Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

**(a)** Burkina Faso

**(i)** According to the Department of State, terrorist organizations continue to plan and conduct terrorist activities throughout Burkina Faso. According to the Fiscal Year 2024, Department of Homeland Security (DHS) Entry/Exit Overstay Report ("Overstay Report"), Burkina Faso had a B-1/B-2 visa overstay rate of 9.16 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 22.95 percent. Additionally, Burkina Faso has historically refused to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Burkina Faso as immigrants and as nonimmigrants is hereby fully suspended.

**(b)** Laos

**(i)** According to the Overstay Report, Laos had a B-1/B-2 visa overstay rate of 28.34 percent and an F, M, and J visa overstay rate of 11.41 percent. According to the Fiscal Year 2023, Department of Homeland Security (DHS) Entry/Exit Overstay Report ("2023 Overstay Report"), Laos had a B-1/B-2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Additionally, Laos has historically failed to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Laos as immigrants and as nonimmigrants is hereby fully suspended.

**(c)** Mali

**(i)** According to the Department of State, armed conflict between the Malian government and armed groups is common throughout the country. Terrorist organizations operate freely in certain areas of Mali.

**(ii)** The entry into the United States of nationals of Mali as immigrants and as nonimmigrants is hereby fully suspended.

**(d)** Niger

**(i)** According to the Department of State, terrorists and their supporters are active in planning kidnappings in Niger, and they may attack anywhere in the country. According to the Overstay Report, Niger had a B-1/B-2 visa overstay rate of 13.41 percent and an F, M, and J visa overstay rate of 16.46 percent.

**(ii)** The entry into the United States of nationals of Niger as immigrants and as nonimmigrants is hereby fully suspended.

**(e)** Sierra Leone

**(i)** According to the Overstay Report, Sierra Leone had a B-1/B-2 visa overstay rate of 16.48 percent and an F, M, and J visa overstay rate of 35.83 percent. According to the 2023 Overstay Report, Sierra Leone had a B-1/B-2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Additionally, Sierra Leone has historically failed to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of Sierra Leone as immigrants and as nonimmigrants is hereby fully suspended.

**(f)** South Sudan

**(i)** According to the Overstay Report, South Sudan had a B-1/B-2 visa overstay rate of 6.99 percent and an F, M, and J visa overstay rate of 26.09 percent. Additionally, South Sudan has historically failed to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of South Sudan as immigrants and as nonimmigrants is hereby fully suspended.

**(g)** Syria

**(i)** Syria is emerging from a protracted period of civil unrest and internal strife. While the country is working to address its security challenges in close coordination with the United States, Syria still lacks an adequate central authority for issuing passports or civil documents and does not have appropriate screening and vetting measures. According to the Overstay Report, Syria had a B-1/B-2 visa overstay rate of 7.09 percent and a F, M, and J visa overstay rate of 9.34 percent.

**(ii)** The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby fully suspended.

**(h)** Palestinian Authority Documents

**(i)** Several United States-designated terrorist groups operate actively in the West Bank or Gaza Strip and have murdered American citizens. Also, the recent war in these areas likely resulted in compromised vetting and screening abilities. In light of these factors, and considering the weak or nonexistent control exercised over these areas by the PA, individuals attempting to travel on PA-issued or endorsed travel documents cannot currently be properly vetted and approved for entry into the United States.

**(ii)** The entry into the United States of foreign nationals who seek to travel on any travel documents issued or endorsed by the PA, as immigrants and nonimmigrants, is hereby fully suspended.

**Sec. 5. Partial Suspension of Entry for Nationals of Countries of Identified Concern.** The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

**(a)** Angola

**(i)** According to the Overstay Report, Angola had a B-1/B-2 visa overstay rate of 14.43 percent and an F, M, and J visa overstay rate of 21.92 percent.

**(ii)** The entry into the United States of nationals of Angola as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Angola to the extent permitted by law.

**(b)** Antigua and Barbuda

**(i)** Antigua and Barbuda has historically had CBI without residency.

**(ii)** The entry into the United States of nationals of Antigua and Barbuda as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Antigua and Barbuda to the extent permitted by law.

**(c)** Benin

**(i)** According to the Overstay Report, Benin had a B-1/B-2 overstay rate of 12.34 percent and an F, M, and J visa overstay rate of 36.77 percent.

**(ii)** The entry into the United States of nationals of Benin as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Benin to the extent permitted by law.

**(d)** Côte d'Ivoire

**(i)** According to the Overstay Report, Côte d'Ivoire had a B-1/B-2 visa overstay rate of 8.47 percent and an F, M, and J visa overstay rate of 19.09 percent.

**(ii)** The entry into the United States of nationals of Côte d'Ivoire as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Côte d'Ivoire to the extent permitted by law.

**(e)** Dominica

**(i)** Dominica has historically had CBI without residency.

**(ii)** The entry into the United States of nationals of Dominica as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Dominica to the extent permitted by law.

**(f)** Gabon

**(i)** According to the Overstay Report, Gabon had a B-1/B-2 visa overstay rate of 13.72 percent and an F, M, and J visa overstay rate of 17.77 percent.

**(ii)** The entry into the United States of nationals of Gabon as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Gabon to the extent permitted by law.

**(g)** The Gambia

**(i)** According to the Overstay Report, The Gambia had a B-1/B-2 visa overstay rate of 12.70 percent and an F, M, and J visa overstay rate of 38.79 percent. Additionally, The Gambia has historically refused to accept back its removable nationals.

**(ii)** The entry into the United States of nationals of The Gambia as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of The Gambia to the extent permitted by law.

**(h)** Malawi

**(i)** According to the Overstay Report, Malawi had a B-1/B-2 visa overstay rate of 22.45 percent and an F, M, and J visa overstay rate of 31.99 percent.

**(ii)** The entry into the United States of nationals of Malawi as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Malawi to the extent permitted by law.

**(i)** Mauritania

**(i)** According to the Overstay Report, Mauritania had a B-1/B-2 visa overstay rate of 9.49 percent. According to the Department of State, the Government of Mauritania has little presence in certain parts of the country, which creates substantial screening and vetting difficulties.

**(ii)** The entry into the United States of nationals of Mauritania as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Mauritania to the extent permitted by law.

**(j)** Nigeria

**(i)** Radical Islamic terrorist groups such as Boko Haram and the Islamic State operate freely in certain parts of Nigeria, which creates substantial screening and vetting difficulties. According to the Overstay Report, Nigeria had a B-1/B-2 visa overstay rate of 5.56 percent and an F, M, and J visa overstay rate of 11.90 percent.

**(ii)** The entry into the United States of nationals of Nigeria as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Nigeria to the extent permitted by law.

**(k)** Senegal

**(i)** According to the Overstay Report, Senegal had a B-1/B-2 visa overstay rate of 4.30 percent and an F, M, and J visa overstay rate of 13.07 percent.

**(ii)** The entry into the United States of nationals of Senegal as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Senegal to the extent permitted by law.

**(l)** Tanzania

**(i)** According to the Overstay Report, Tanzania had a B-1/B-2 visa overstay rate of 8.30 percent and an F, M, and J visa overstay rate of 13.97 percent.

**(ii)** The entry into the United States of nationals of Tanzania as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tanzania to the extent permitted by law.

**(m)** Tonga

**(i)** According to the Overstay Report, Tonga had a B-1/B-2 visa overstay rate of 6.45 percent and an F, M, and J visa overstay rate of 14.44 percent.

**(ii)** The entry into the United States of nationals of Tonga as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tonga to the extent permitted by law.

**(n)** Turkmenistan

**(i)** Since the issuance of Proclamation 10949, Turkmenistan has engaged productively with the United States and demonstrated significant progress in improving its identity-management and information-sharing procedures. As a result, the restrictions imposed on Turkmenistan in this proclamation modify and supersede those set forth in section 3(f) of Proclamation 10949.

**(ii)** The suspension of entry into the United States of nationals of Turkmenistan as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas is lifted. Because some concerns remain, the entry into the United States of nationals of Turkmenistan as immigrants remains suspended.

**(o)** Zambia

**(i)** According to the Overstay Report, Zambia had a B-1/B-2 visa overstay rate of 10.73 percent and an F, M, and J visa overstay rate of 21.02 percent.

**(ii)** The entry into the United States of nationals of Zambia as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zambia to the extent permitted by law.

**(p)** Zimbabwe

**(i)** According to the Overstay Report, Zimbabwe had a B-1/B-2 visa overstay rate of 7.89 percent and an F, M, and J visa overstay rate of 15.15 percent.

**(ii)** The entry into the United States of nationals of Zimbabwe as immigrants, and as nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas, is hereby suspended.

**(iii)** Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zimbabwe to the extent permitted by law.

**Sec. 6. Scope and Implementation of Suspensions and Limitations. (a) Scope.** Subject to the exceptions set forth in subsection (b) of this section and any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall apply only to foreign nationals of the designated countries who:

**(i)** are outside the United States on the applicable effective date of this proclamation; and

**(ii)** do not have a valid visa on the applicable effective date of this proclamation.

**(b) Exceptions.** The suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall not apply to:

**(i)** any lawful permanent resident of the United States;

**(ii)** any dual national of a country designated under sections 2, 3, 4, or 5 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

**(iii)** any foreign national traveling with a valid nonimmigrant visa in the following classifications: A-1, A-2, C-2, C-3, G-1, G-2, G-3, G-4, NATO-1, NATO-2, NATO-3, NATO-4, NATO-5, or NATO-6;

**(iv)** any athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

**(v)** Special Immigrant Visas for United States Government employees under 8 U.S.C. 1101(a)(27)(D); and

**(vi)** immigrant visas for ethnic and religious minorities facing persecution in Iran.

**(c)** The exceptions in subsection (b) of this section amend and supersede the exceptions set forth in section 4(b) of Proclamation 10949 with respect to any countries listed in section 2 or 3 of Proclamation 10949 from and after the date of this proclamation.

**(d)** Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

**(e)** Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**(f)** Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of Homeland Security finds, in her discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of Homeland Security or her designee, in coordination with the Secretary of State or his designee.

**Sec. 7. Adjustments to and Removal of Suspensions and Limitations. (a)** Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, recommending whether any suspensions and limitations imposed by sections 2, 3, 4, and 5 of this proclamation should be continued, terminated, modified, or supplemented.

**(b)** The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall continue to engage each of the countries identified in sections 2 and 3 of this proclamation--and shall immediately engage each of the countries identified in sections 4 and 5 of this proclamation--on measures that must be taken to comply with screening, vetting, immigration, and security requirements of the United States.

**Sec. 8. Enforcement. (a)** The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

**(b)** In implementing this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

**(c)** No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

**(d)** This proclamation shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 9. Severability.** It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

**(a)** if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch official shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 10. Effective Date.** This proclamation is effective at 12:01 a.m. eastern standard time on January 1, 2026.

**Sec. 11. General Provisions. (a)** Nothing in this proclamation shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** The costs for publication of this proclamation shall be borne by the Department of State.

IN WITNESS WHEREOF, I have hereunto set my hand this sixteenth day of December, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

DONALD J.TRUMP

**MEMORANDA OF PRESIDENT**

**DELEGATION OF AUTHORITY UNDER SECTIONS 212(f) AND 215(a)(1) OF THE IMMIGRATION AND NATIONALITY ACT**

<Sept. 24, 1999, 64 F.R. 55809>

**Memorandum for the Attorney General**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U.S.C. 1182(f) and 1185(a)(1)), and in light of

Proclamation 4865 of September 29, 1981 [set out as a note under this section], I hereby delegate to the Attorney General the authority to:

**(a)** Maintain custody, at any location she deems appropriate, and conduct any screening she deems appropriate in her unreviewable discretion, of any undocumented person she has reason to believe is seeking to enter the United States and who is encountered in a vessel interdicted on the high seas through December 31, 2000; and

**(b)** Undertake any other appropriate actions with respect to such aliens permitted by law.

With respect to the functions delegated by this order, all actions taken after April 16, 1999, for or on behalf of the President that would have been valid if taken pursuant to this memorandum are ratified.

This memorandum is not intended to create, and should not be construed to create, any right or benefit, substantive or procedural, legally enforceable by any party against the United States, its agencies or instrumentalities, officers, employees, or any other person, or to require any procedures to determine whether a person is a refugee.

You are authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

**PRESIDENTIAL MEMORANDUM**

Memorandum of President of the United States, Mar. 6, 2017, 82 F.R. 16279, which related to increased enforcement of immigration laws, was revoked by Ex. Ord. No. 14013, § 2(b), Feb. 4, 2021, 86 F.R. 8840.

**PRESIDENTIAL MEMORANDUM**

<June 14, 2017, 82 F.R. 27965>

**Effective Date in Executive Order 13780**

**Memorandum for the Secretary of State[,] the Attorney General[,] the Secretary of Homeland Security[, and] the Director of National Intelligence**

This memorandum provides guidance for the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence in light of two preliminary injunctions that bar enforcement of certain provisions of Executive Order 13780, “Protecting the Nation from Foreign Terrorist Entry into the United States” (Mar. 6, 2017). The preliminary injunction entered by the United States District Court for the District of Maryland, and affirmed in substantial part by the United States Court of Appeals for the Fourth Circuit, bars enforcement of section 2(c) of the Executive Order. The portions of the preliminary injunction entered by the United States District Court for the District of Hawaii that were affirmed by the recent decision of the United States Court of Appeals for the Ninth Circuit bar enforcement of certain provisions of sections 2 and 6 of the Executive Order.

Various provisions of sections 2 and 6 of the Executive Order (as well as sections 3 and 12(c), which delineate the scope of the suspension contained in section 2(c)), refer to the Order's effective date. Section 14 of the Executive Order provides that the Order was effective at 12:01 a.m., eastern daylight time on March 16, 2017. Sections 2 and 6, however, were enjoined before that effective date, and the courts of appeals have affirmed the injunctions with respect to certain provisions of sections 2 and 6.

As a result, under the terms of the Executive Order, the effective date of the enjoined provisions (as well as related provisions of sections 3 and 12(c)) is delayed or tolled until those injunctions are lifted or stayed.

In light of questions in litigation about the effective date of the enjoined provisions and in the interest of clarity, I hereby declare the effective date of each enjoined provision to be the date and time at which the referenced injunctions are lifted or stayed with respect to that provision. To the extent it is necessary, this memorandum should be construed to amend the Executive Order.

Because the injunctions have delayed the effective date of section 12(c), no immigrant or nonimmigrant visa issued before the effective date of section 2(c) shall be revoked pursuant to the Executive Order.

I hereby direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to jointly begin implementation of each relevant provision of sections 2 and 6 of the Executive Order 72 hours after all applicable injunctions are lifted or stayed with respect to that provision, to ensure an orderly and proper implementation of those provisions. Prior to that time, consular officers may issue valid visas to, and the Secretary of Homeland Security may admit, otherwise eligible aliens without regard to sections 2 and 6. If not otherwise revoked, visas and other travel documents issued during this period remain valid for travel as if they were issued prior to the effective date.

DONALD J. TRUMP

**PRESIDENTIAL MEMORANDUM**

<July 26, 2024, 89 F.R. 61341>

**Deferred Enforced Departure for Certain Lebanese Nationals**

**Memorandum for the Secretary of State [and] the Secretary of Homeland Security**

Humanitarian conditions in southern Lebanon have significantly deteriorated due to tensions between Hezbollah and Israel. While I remain focused on de-escalating the situation and improving humanitarian conditions, many civilians remain in danger; therefore, I am directing the deferral of removal of certain Lebanese nationals who are present in the United States.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 18 months the removal of any Lebanese national subject to the conditions and exceptions provided below.

Accordingly, I hereby direct the Secretary of Homeland Security to take appropriate measures to defer for 18 months the removal of any Lebanese national who is present in the United States on the date of this memorandum, except for those:

**(1)** who have voluntarily returned to Lebanon after the date of this memorandum;

**(2)** who have not continuously resided in the United States since the date of this memorandum;

**(3)** who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

**(4)** who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet any of the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

**(5)** who are subject to extradition;

**(6)** whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

**(7)** whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

I further direct the Secretary of Homeland Security to take appropriate measures to authorize employment for noncitizens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral, and to consider suspending regulatory requirements with respect to F-1 nonimmigrant students who are Lebanese nationals as the Secretary of Homeland Security determines to be appropriate.

J.R. BIDEN JR.

**PRESIDENTIAL MEMORANDUM**

<Jan. 15, 2025, 90 F.R. 6749>

**Extending and Expanding Eligibility for Deferred Enforced Departure for Certain Hong Kong Residents**

**Memorandum for the Secretary of State [and] the Secretary of Homeland Security**

The United States supports the human rights and fundamental freedoms of the residents of Hong Kong. The People's Republic of China (PRC) has continued to significantly erode those rights and freedoms. I am therefore directing an extension and expansion of the deferral of removal of certain Hong Kong residents, regardless of country of birth, who are present in the United States.

By unilaterally imposing on Hong Kong the Law of the People's Republic of China on Safeguarding National Security in the Hong Kong Special Administrative Region (NSL) in June 2020, the PRC has undermined the enjoyment of rights and freedoms in Hong Kong, including those protected under the Basic Law and the Sino-British Joint Declaration. Following the NSL's enactment, the PRC has continued its assault on Hong Kong's autonomy, undermining its remaining democratic processes and institutions, imposing limits on academic freedom, and cracking down on freedom of the press. Since June 2020, at least 200 opposition politicians, activists, and protesters have been taken into custody on politically motivated NSL-related charges including secession, subversion, terrorist activities, and collusion with a foreign country or external elements. On November 19, 2024, Hong Kong authorities also sentenced 45 pro-democracy advocates to prison for their peaceful participation in political activities protected under the Basic Law of Hong Kong.

There are compelling foreign policy reasons to extend Deferred Enforced Departure (DED) for an additional period for those residents of Hong Kong presently residing in the United States who were under a grant of DED until February 5, 2025, as well as to defer enforced departure for other Hong Kong residents who arrived in the United States subsequent to the initial grant of DED. The United States is committed to a foreign policy that unites our democratic values with our foreign policy goals, which is centered on the defense of democracy and the promotion of human rights around the world. Offering safe haven for Hong Kong residents who have been deprived of their guaranteed freedoms in Hong Kong furthers United States interests in the region. The United States will continue to stand firm in our support of the people in Hong Kong.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 24 months the removal of any Hong Kong resident, regardless of country of birth, who is present in the United States on the date of this memorandum, except for those:

**(1)** who have voluntarily returned to Hong Kong or the PRC after the date of this memorandum;

**(2)** who have not continuously resided in the United States since the date of this memorandum;

**(3)** who are inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or deportable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4));

**(4)** who have been convicted of any felony or two or more misdemeanors committed in the United States, or who meet any of the criteria set forth in section 208(b)(2)(A) of the INA (8 U.S.C. 1158(b)(2)(A));

**(5)** who are subject to extradition;

**(6)** whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety; or

**(7)** whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States.

I further direct the Secretary of Homeland Security to take appropriate measures to authorize employment for noncitizens whose removal has been deferred, as provided by this memorandum, for the duration of such deferral, including by extending through February 5, 2027, employment authorization for individuals with current employment authorization under prior grants of DED for certain Hong Kong residents, and to consider suspending regulatory requirements with respect to F-1 nonimmigrant students who are Hong Kong residents as the Secretary of Homeland Security determines to be appropriate. The Secretary of Homeland Security shall also provide for the prompt issuance of new or replacement documents in appropriate cases.

The Secretary of Homeland Security is authorized and directed to publish this memorandum in the **Federal Register**.

J.R. BIDEN JR.

**PRESIDENTIAL MEMORANDUM**

<June 30, 2025, 90 F.R. 38913>

<Presidential Memorandum location within the Code subject to final classification approval>

**Reissuance of and Amendments to National Security Presidential Memorandum 5 on Strengthening the Policy of the United States Toward Cuba**

**Memorandum for the Vice President[,] the Secretary of State[,] the Secretary of the Treasury[,] the Secretary of Defense[,] the Attorney General[,] the Secretary of the Interior[,] the Secretary of Agriculture[,] the Secretary of Commerce[,] the Secretary of Health and Human Services[,] the Secretary of Transportation[,] the Secretary of Homeland Security[,] the Director of National Intelligence[,] the Director of the Central Intelligence Agency[,] the Chairman of the Joint Chiefs of Staff[,] the Assistant to the President and Chief of Staff[,] the Director of the Office of Management and Budget[,] the Assistant to the President for National Security Affairs[,] the Assistant to the President and Deputy Chief of Staff for Policy and Homeland Security Advisor[,] the Assistant to the President and the Counsel to the President[,] the Assistant to the President for Economic Policy[,] the United States Trade Representative[,] the Director of the Office of Science and Technology Policy[,] the Acting Permanent Representative of the United States of**

**America to the United Nations[,] the Administrator of the Small Business Administration[,] the Acting Administrator of the United States Agency for International Development[, and] the Director of the Office of Personnel Management**

**Section 1. Purpose.** The United States recognizes the need for more freedom and democracy, improved respect for human rights, and increased free enterprise in Cuba. The Cuban people have long suffered under a Communist regime that suppresses their legitimate aspirations for freedom and prosperity and fails to respect their essential human dignity.

My Administration's policy will be guided by the national security and foreign policy interests of the United States, as well as solidarity with the Cuban people. I will seek to promote a stable, prosperous, and free country for the Cuban people. To that end, we must channel funds toward the Cuban people and away from a regime that has failed to meet the most basic requirements of a free and just society.

In Cuba, dissidents and peaceful protesters are arbitrarily detained and held in terrible prison conditions. Violence and intimidation against dissidents occur with impunity. Families of political prisoners are retaliated against for peacefully protesting the improper confinement of their loved ones. Worshippers are harassed, and free association by civil society organizations is blocked. The right to speak freely, including through access to the internet, is denied, and there is no free press. The United States condemns these abuses.

The initial actions set forth in this memorandum, including restricting certain financial transactions and travel, encourage the Cuban government to address these abuses. My Administration will continue to evaluate its policies so as to improve human rights, encourage the rule of law, foster free markets and free enterprise, and promote democracy in Cuba.

**Sec. 2. Policy.** It shall be the policy of the executive branch to:

**(a)** End economic practices that disproportionately benefit the Cuban government or its military, intelligence, or security agencies or personnel at the expense of the Cuban people.

**(b)** Ensure adherence to the statutory ban on tourism to Cuba.

**(c)** Support the economic embargo of Cuba described in section 4(7) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the embargo), including by opposing measures that call for an end to the embargo at the United Nations and other international forums and through regular reporting on whether the conditions of a transition government exist in Cuba.

**(d)** Amplify efforts to support the Cuban people through the expansion of internet services, free press, free enterprise, free association, and lawful travel.

**(e)** Not reinstate the "Wet Foot, Dry Foot" policy, which encouraged untold thousands of Cuban nationals to risk their lives to travel unlawfully to the United States.

**(f)** Ensure that engagement between the United States and Cuba advances the interests of the United States and the Cuban people. These interests include: advancing Cuban human rights; encouraging the growth of a Cuban private sector independent of government control; enforcing final orders of removal against Cuban nationals in the United States; protecting the national security and public health and safety of the United States, including through proper engagement on criminal cases and working to ensure the return of fugitives from American justice living in Cuba or being harbored by the Cuban government; supporting United States agriculture and protecting plant and animal health; advancing the understanding of the United States regarding scientific and environmental challenges; and facilitating safe civil aviation.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**Sec. 3. Implementation.** The heads of executive departments and agencies (agencies) shall begin to implement the policy set forth in section 2 of this memorandum as follows:

**(a)** Within 30 days of the date of this memorandum, the Secretary of the Treasury and the Secretary of Commerce, as appropriate and in coordination with the Secretary of State and the Secretary of Transportation, shall initiate a process to adjust current regulations regarding transactions with Cuba.

**(i)** As part of the regulatory changes described in this subsection, the Secretary of State shall identify any entities or subentities, as appropriate, that are under the control of, or act for or on behalf of, or for the benefit of, the Cuban military, intelligence, or security services or personnel (such as Grupo de Administracion Empresarial S.A. (GAESA), its affiliates, subsidiaries, and successors), and publish a list of those identified entities and subentities with which direct or indirect financial transactions would disproportionately benefit such services or personnel at the expense of the Cuban people or private enterprise in Cuba.

**(ii)** Except as provided in subsection (a)(iii) of this section, the regulatory changes described in this subsection shall prohibit direct or indirect financial transactions with those entities or subentities on the list published pursuant to subsection (a)(i) of this section.

**(iii)** The regulatory changes described in this subsection shall not prohibit transactions that the Secretary of the Treasury or the Secretary of Commerce, in coordination with the Secretary of State, determines are consistent with the policy set forth in section 2 of this memorandum and:

**(A)** concern Federal Government operations, including Naval Station Guantanamo Bay and the United States mission in Havana;

**(B)** support programs to build democracy in Cuba;

**(C)** concern air and sea operations that support permissible travel, cargo, or trade;

**(D)** support the acquisition of visas for permissible travel;

**(E)** support the expansion of direct telecommunications and internet access for the Cuban people;

**(F)** support the sale of agricultural commodities, medicines, and medical devices sold to Cuba consistent with the Trade Sanctions Reform and Export Enhancement Act of 2000 (22 U.S.C. 7201 et seq.) and the Cuban Democracy Act of 2002 (22 U.S.C. 6001 et seq.);

**(G)** relate to sending, processing, or receiving authorized remittances;

**(H)** otherwise further the national security or foreign policy interests of the United States; or

**(I)** are required by law.

**(b)** Within 30 days of the date of this memorandum, the Secretary of the Treasury, in coordination with the Secretary of State, shall initiate a process to adjust current regulations to ensure adherence to the statutory ban on tourism to Cuba.

**(i)** The amended regulations shall require that educational travel be for legitimate educational purposes. Except for educational travel that was permitted by regulation in effect on January 27, 2011, all educational travel shall be under the auspices of an organization subject to the jurisdiction of the United States, and all such travelers must be accompanied by a representative of the sponsoring organization.

**(ii)** The regulations shall further require that those traveling for the permissible purposes of non academic education or to provide support for the Cuban people:

**(A)** engage in a full-time schedule of activities that enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities; and

**(B)** meaningfully interact with individuals in Cuba.

**(iii)** The regulations shall continue to provide that every person engaging in travel to Cuba shall keep full and accurate records of all transactions related to authorized travel, regardless of whether they were effected pursuant to license or otherwise, and such records shall be available for examination by the Department of the Treasury for at least 5 years after the date they occur.

**(iv)** The Secretary of State, the Secretary of the Treasury, the Secretary of Commerce, and the Secretary of Transportation shall review their respective agencies' enforcement of all categories of permissible travel within 90 days of the date the regulations described in this subsection are finalized to ensure such enforcement accords with the policies outlined in section 2 of this memorandum.

**(c)** The Secretary of the Treasury shall regularly audit travel to Cuba to ensure that travelers are complying with relevant statutes and regulations. The Secretary of the Treasury shall request that the Inspector General of the Department of the Treasury inspect the actions taken by the Department of the Treasury to implement this audit requirement. The Inspector General of the Department of the Treasury shall provide a report to the President, through the Secretary of the Treasury, summarizing the results of that inspection within 180 days of the adjustment of current regulations described in subsection (b) of this section and annually thereafter.

**(d)** The Secretary of the Treasury shall adjust the Department of the Treasury's current regulation defining the term "prohibited officials of the Government of Cuba" so that, for purposes of title 31, part 515 of the Code of Federal Regulations, it includes Ministers and Vice-Ministers; members of the Council of State and the Council of Ministers; members and employees of the National Assembly of People's Power; members of any provincial assembly; local sector chiefs of the Committees for the Defense of the Revolution; Director Generals and sub-Director Generals and higher of all Cuban ministries and state agencies; employees of the Ministry of the Interior (MININT); employees of the Ministry of Defense (MINFAR); secretaries and first secretaries of the Confederation of Labor of Cuba (CTC) and its component unions; chief editors, editors, and deputy editors of Cuban state-run media organizations and programs, including newspapers, television, and radio; and members and employees of the Supreme Court (Tribuno Supremo Nacional).

**(e)** The Secretary of State and the Representative of the United States of America to the United Nations shall oppose efforts at the United Nations or (with respect to the Secretary of State) any other international forum to lift the embargo until a transition government in Cuba, as described in section 205 of the LIBERTAD Act, exists.

**(f)** The Secretary of State, in coordination with the Attorney General, shall provide a report to the President assessing whether and to what degree the Cuban government has satisfied the requirements of a transition government as described in section 205(a) of the LIBERTAD Act, taking into account the additional factors listed in section 205(b) of that Act. This report shall include a review of human rights abuses committed against the Cuban people, such as unlawful detentions, arbitrary arrests, and inhumane treatment.

**(g)** The Attorney General shall, within 90 days of the date of this memorandum, issue a report to the President on issues related to fugitives from American justice living in Cuba or being harbored by the Cuban government.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(h)** The Secretary of State and the Administrator of the United States Agency for International Development shall review all democracy development programs of the Federal Government in Cuba to ensure that they align with the criteria set forth in section 109(a) of the LIBERTAD Act.

**(i)** The Secretary of State shall convene a task force, composed of relevant agencies, including the Office of Cuba Broadcasting, and appropriate non-governmental organizations and private-sector entities, to examine the technological challenges and opportunities for expanding internet access in Cuba, including through Federal Government support of programs and activities that encourage freedom of expression through independent media and internet freedom so that the Cuban people can enjoy the free and unregulated flow of information.

**(j)** The Secretary of State and the Secretary of Homeland Security shall continue to discourage dangerous, unlawful migration that puts Cuban and American lives at risk. The Secretary of Defense shall continue to provide support, as necessary, to the Department of State and the Department of Homeland Security in carrying out duties regarding interdiction of migrants.

**(k)** The Secretary of State, in coordination with the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of Commerce, and the Secretary of Homeland Security, shall annually report to the President regarding the engagement of the United States with Cuba to ensure that engagement is advancing the interests of the United States.

**(l)** All activities conducted pursuant to subsections (a) through (k) of this section shall be carried out in a manner that furthers the interests of the United States, including by appropriately protecting sensitive sources, methods, and operations of the Federal Government.

**Sec. 4. Earlier Presidential Actions. (a)** This memorandum amends sections 1 and 3 of National Security Presidential Memorandum 5 of June 16, 2017 (Strengthening the Policy of the United States Toward Cuba) (NSPM-5), and reissues NSPM-5 in its entirety. It does not otherwise amend the text or timelines reflected in the original NSPM-5 and is not intended to direct agencies to repeat actions already implemented under that NSPM.

**(b)** This memorandum supersedes and replaces both National Security Presidential Directive 52 of June 28, 2007 (U.S. Policy toward Cuba), and Presidential Policy Directive 43 of October 14, 2016 (United States-Cuba Normalization).

**(c)** This memorandum does not affect either Executive Order 12807 of May 24, 1992 (Interdiction of Illegal Aliens), or Executive Order 13276 of November 15, 2002 (Delegation of Responsibilities Concerning Undocumented Aliens Interdicted or Intercepted in the Caribbean Region).

**Sec. 5. General Provisions. (a)** Nothing in this memorandum shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**(d)** The Secretary of State is hereby authorized and directed to publish this memorandum in the **Federal Register**.

DONALD J.TRUMP

Notes of Decisions (2926)

## Footnotes

1 So in original. The semicolon probably should be a comma.

2 So in original. Probably should be a reference to section 1229c of this title.

3 So in original. Probably should be preceded by "ineligible for".

4 So in original.

5 So in original. Probably should be "Secretary's".

6 So in original. Probably should be "(10)(E))".

7 So in original.

8 So in original. Probably should be "or".

9 So in original. Probably should be "clause".

10 So in original. Two subsecs. (t) have been enacted.

8 U.S.C.A. § 1182, 8 USCA § 1182
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
Subchapter II. Immigration
Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1185

§ 1185. Travel control of citizens and aliens

Currentness

**(a) Restrictions and prohibitions**

Unless otherwise ordered by the President, it shall be unlawful--

**(1)** for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;

**(2)** for any person to transport or attempt to transport from or into the United States another person with knowledge or reasonable cause to believe that the departure or entry of such other person is forbidden by this section;

**(3)** for any person knowingly to make any false statement in an application for permission to depart from or enter the United States with intent to induce or secure the granting of such permission either for himself or for another;

**(4)** for any person knowingly to furnish or attempt to furnish or assist in furnishing to another a permit or evidence of permission to depart or enter not issued and designed for such other person's use;

**(5)** for any person knowingly to use or attempt to use any permit or evidence of permission to depart or enter not issued and designed for his use;

**(6)** for any person to forge, counterfeit, mutilate, or alter, or cause or procure to be forged, counterfeited, mutilated, or altered, any permit or evidence of permission to depart from or enter the United States;

**(7)** for any person knowingly to use or attempt to use or furnish to another for use any false, forged, counterfeited, mutilated, or altered permit, or evidence of permission, or any permit or evidence of permission which, though originally valid, has become or been made void or invalid.

**(b) Citizens**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Except as otherwise provided by the President and subject to such limitations and exceptions as the President may authorize and prescribe, it shall be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid United States passport.

**(c) Definitions**

The term "United States" as used in this section includes the Canal Zone, and all territory and waters, continental or insular, subject to the jurisdiction of the United States. The term "person" as used in this section shall be deemed to mean any individual, partnership, association, company, or other incorporated body of individuals, or corporation, or body politic.

**(d) Nonadmission of certain aliens**

Nothing in this section shall be construed to entitle an alien to whom a permit to enter the United States has been issued to enter the United States, if, upon arrival in the United States, he is found to be inadmissible under any of the provisions of this chapter, or any other law, relative to the entry of aliens into the United States.

**(e) Revocation of proclamation as affecting penalties**

The revocation of any rule, regulation, or order issued in pursuance of this section shall not prevent prosecution for any offense committed, or the imposition of any penalties or forfeitures, liability for which was incurred under this section prior to the revocation of such rule, regulation, or order.

**(f) Permits to enter**

Passports, visas, reentry permits, and other documents required for entry under this chapter may be considered as permits to enter for the purposes of this section.

CREDIT(S)

(June 27, 1952, c. 477, Title II, c. 2, § 215, 66 Stat. 190; Pub.L. 95-426, Title VII, § 707(a) to (d), Oct. 7, 1978, 92 Stat. 992, 993; Pub.L. 103-416, Title II, § 204(a), Oct. 25, 1994, 108 Stat. 4311.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12172**

<Nov. 26, 1979, 44 F.R. 67947, as amended by Ex. Ord. No. 12206, Apr. 7, 1980, 45 F.R. 24101>

**Delegation of Authority of President to Secretary of State and Attorney General Respecting Entry of Iranian Aliens into the United States**

By virtue of the authority vested in me as President by the Constitution and laws of the United States, including the Immigration and Nationality Act, as amended [this chapter], 8 USC 1185 [this section] and 3 USC 301 [3 U.S.C.A. § 301], it is hereby ordered as follows:

**Section 1-101.** Delegation of Authority. The Secretary of State and the Attorney General are hereby designated and empowered to exercise in respect of Iranians the authority conferred upon the President by section 215(a)(1) of the Act of June 27, 1952 (8 USC 1185) [subsec. (a)(1) of this section], to prescribe limitations and exceptions on the rules and regulations governing the entry of aliens into the United States.

**Section 1-102.** Effective Date. This order is effective immediately.

JIMMY CARTER

**EXECUTIVE ORDER NO. 13323**

<Dec. 30, 2003, 69 F.R. 241>

**Assignment of Functions Relating to Arrivals in and Departures from the United States**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 215 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1185), and section 301 of title 3, United States Code, and to strengthen the national security of the United States through procedures and systems to manage and control the arrival and departure of persons from the United States, it is hereby ordered as follows:

**Section 1. Functions of the Secretary of Homeland Security.** The Secretary of Homeland Security is assigned the functions of the President under section 215(a) of the INA [subsec. (a) of this section] with respect to persons other than citizens of the United States. In exercising these functions, the Secretary of Homeland Security shall not issue, amend, or revoke any rules, regulations, or orders without first obtaining the concurrence of the Secretary of State.

**Sec. 2. Functions of the Secretary of State.** The Secretary of State is assigned the functions of the President under section 215(a) and (b) of the INA [subsecs. (a), (b) of this section] with respect to citizens of the United States, including those functions concerning United States passports. In addition, the Secretary may amend or revoke part 46 of title 22, Code of Federal Regulations, which concern persons other than citizens of the United States. In exercising these functions, the Secretary of State shall not issue, amend, or revoke any rules, regulations, or orders without first consulting with the Secretary of Homeland Security.

**Sec. 3. Judicial Review.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its departments, agencies, entities, officers, employees or agents, or any other person.

GEORGE W. BUSH

Notes of Decisions (143)

8 U.S.C.A. § 1185, 8 USCA § 1185
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.