**No. 26-1699**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs -Appellees*,

*v.*

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Acting Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants - Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts No. 1:25-cv-13829-LTS
Sorokin, J. presiding

**JOINT APPENDIX**

***(Counsel listed on inside cover)***

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*

DAVID J. BYERLEY
*Senior Litigation Counsel*

JEFFREY A. ALDERETTE
*Trial Attorney*
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franlink Station
Washington, DC 20044
(202)-860-9941

*Counsel for Defendants*

# APPENDIX
# TABLE OF CONTENTS


| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Docket | N/A | N/A | JA0001 |
| Defendants' Notice of Appeal | Jun. 11, 2026 | 108 | JA0026 |
| Plaintiff's Complaint for Declaratory and Injunctive Relief | Dec. 12, 2025 | 1 | JA0028 |
| Administrative Record | Jan. 23, 2026 | 84 | JA0101 |
| Certification of Administrative Record | Jan. 23, 2026 | 84-1 | JA0103 |
| Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* | Jan. 23, 2026 | 84-1 | JA0106 |
| Memo from Matthew S. Davies to Executive Directors, Field Operations Directors, and Office of Field Operations, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]* | Jan. 23, 2026 | 84-1 | JA0113 |
| Certification of Administrative Record | Jan. 23, 2026 | 84-2 | JA0114 |
| Email Guidance Transmitted from the Bureau of Consular Affairs to Consular Sections | Jan. 23, 2026 | 84-2 | JA0116 |
| ALDAC from the Bureau of Consular Affairs to Consular Sections | Jan. 23, 2026 | 84-2 | JA0117 |
| Announcement from the Department's Website (travel.state.gov) Regarding Implementation of the Proclamation | Jan. 23, 2026 | 84-2 | JA0122 |
| FAQs on the Department's Website (travel.state.gov) Regarding the Proclamation | Jan. 23, 2026 | 84-2 | JA0125 |
| List of Websites Considered | Jan. 23, 2026 | 84-2 | JA0126 |
| Certification of Index to Administrative Record | Jan. 23, 2026 | 84-3 | JA0127 |
| USCIS H-1B Proclamation Memo | Jan. 23, 2026 | 84-3 | JA0129 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| USCIS H-1B FAQ | Jan. 23, 2026 | 84-3 | JA0130 |
| USCIS Alert Banner and Information Regarding Proclamation on H-1B Specialty Occupations Website | Jan. 23, 2026 | 84-3 | JA0132 |
| USCIS G-1055, Fee Schedule (Updated for $100K Fee) | Jan. 23, 2026 | 84-3 | JA0135 |
| USCIS Pay.gov H1B Payment Page | Jan. 23, 2026 | 84-3 | JA0140 |
| Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* | Jan. 23, 2026 | 84-3 | JA0142 |
| Declaration of James E. Richardson | Feb. 6, 2026 | 88 | JA0149 |
| Table of Exhibits | Feb. 6, 2026 | 88-1 | JA0155 |
| Declaration of Karen Pugliesi, Executive Vice President and Provost of Northern Arizona University | Feb. 6, 2026 | 88-2 | JA0158 |
| Declaration of Daniel R. Erickson | Feb. 6, 2026 | 88-3 | JA0161 |
| Declaration of Carolyn W. Stewart | Feb. 6, 2026 | 88-4 | JA0164 |
| Declaration of Ruben Diaz | Feb. 6, 2026 | 88-5 | JA0169 |
| Declaration of Pamela Brown | Feb. 6, 2026 | 88-6 | JA0175 |
| Declaration of Nathan Evans | Feb. 6, 2026 | 88-7 | JA0179 |
| Declaration of Chief Deputy Superintendent Ingrid Roberson | Feb. 6, 2026 | 88-8 | JA0186 |
| Declaration of Dr. Silvia Greenwood | Feb. 6, 2026 | 88-9 | JA0191 |
| Declaration of Dr. Matt Gianneschi | Feb. 6, 2026 | 88-10 | JA0198 |
| Declaration of Leticia Levi | Feb. 6, 2026 | 88-11 | JA0205 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Declaration of Connecticut State Colleges and Universities | Feb. 6, 2026 | 88-12 | JA0218 |
| Declaration of Nancy Navarretta | Feb. 6, 2026 | 88-13 | JA0227 |
| Declaration of Cynthia Marten | Feb. 6, 2026 | 88-14 | JA0236 |
| Declaration of Jan N.S. Gouveia | Feb. 6, 2026 | 88-15 | JA0243 |
| Declaration of Debora Halbert | Feb. 6, 2026 | 88-16 | JA0248 |
| Declaration of Leonard R. Gouveia, Jr. | Feb. 6, 2026 | 88-17 | JA0254 |
| Declaration of Dr. Marie Lynn Miranda | Feb. 6, 2026 | 88-18 | JA0260 |
| Declaration of Dr. Tony Sanders | Feb. 6, 2026 | 88-19 | JA0268 |
| Declaration of Christine Murphy Judson | Feb. 6, 2026 | 88-20 | JA0273 |
| Declaration of David L. Di Maria | Feb. 6, 2026 | 88-21 | JA0281 |
| Declaration of Amy Ramirez | Feb. 6, 2026 | 88-22 | JA0289 |
| Declaration of Emily Nielson | Feb. 6, 2026 | 88-23 | JA0296 |
| Declaration of Denise Barton | Feb. 6, 2026 | 88-24 | JA0301 |
| Declaration of Elizabeth Hertel | Feb. 6, 2026 | 88-25 | JA0309 |
| Declaration of Eric Davis | Feb. 6, 2026 | 88-26 | JA0316 |
| Declaration of Diane Rydrych | Feb. 6, 2026 | 88-27 | JA0321 |
| Declaration of Kate Korgan, Acting Executive Vice President and Provost, UNLV | Feb. 6, 2026 | 88-28 | JA0325 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Declaration of John A.Pelesko, Ph.D. | Feb. 6, 2026 | 88-29 | JA0330 |
| Declaration of Eric Garfunkel | Feb. 6, 2026 | 88-30 | JA0341 |
| Declaration of Christopher Coulston | Feb. 6, 2026 | 88-31 | JA0345 |
| Declaration of Anne Bink | Feb. 6, 2026 | 88-32 | JA0352 |
| Declaration of Dr. Sewit Teckie | Feb. 6, 2026 | 88-33 | JA0362 |
| Declaration of Maurice O. Green | Feb. 6, 2026 | 88-34 | JA0369 |
| Declaration of Eric L. Cunningham | Feb. 6, 2026 | 88-35 | JA0376 |
| Declaration of Dr. Roy Haggerty | Feb. 6, 2026 | 88-36 | JA0383 |
| Declaration of University of Oregon | Feb. 6, 2026 | 88-37 | JA0391 |
| Declaration of Kristen Johnson | Feb. 6, 2026 | 88-38 | JA0399 |
| Declaration of Dr. Kirk Dombrowski | Feb. 6, 2026 | 88-39 | JA0406 |
| Declaration of Dr. Tim Dellit | Feb. 6, 2026 | 88-40 | JA0412 |
| Declaration of Ursula Elspeth Owen, JD | Feb. 6, 2026 | 88-41 | JA0420 |
| Declaration of Katherine Hellmann | Feb. 6, 2026 | 88-42 | JA0428 |
| Declaration of Faye-Lynn Gallant | Feb. 6, 2026 | 88-43 | JA0437 |
| Declaration of Caren Lincoln | Feb. 6, 2026 | 88-44 | JA0445 |
| Declaration of Frances Vavrus | Feb. 6, 2026 | 88-45 | JA0452 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Declaration of Jeffrey Alderette | Mar. 9, 2026 | 93-1 | JA0459 |
| Table of Exhibits | Mar. 9, 2026 | 93-2 | JA0461 |
| Exhibit 1 - A screenshot of the webpage located at https://travel.state.gov/content/travel/en/News/visasnews/restriction-on-entry-of-certain-nonimmigrant-workers.html as of February 25, 2026. | Mar. 9, 2026 | 93-3 | JA0462 |
| Exhibit 2 - Plaintiffs' Complaint in Chamber of Commerce of the United States of America et al. v. U.S. Department of Homeland Security, et al., 25-cv-3675 (D.D.C.). | Mar. 9, 2026 | 93-4, 5 | JA0464 |
| Exhibit 3 - The Association of American Universities membership list, downloaded from its website: https://www.aau.edu/who-we-are/our-members/aau-member-universities-year-entry. | Mar. 9, 2026 | 93-6 | JA0514 |
| Exhibit 4 - Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2) in Global Nurse Force, et al. v. Donald J. Trump, et al., 4:25-cv-08454-HSG (N.D. Cal. 2025). | Mar. 9, 2026 | 93-7, 8 | JA0522 |
| Exhibit 5 - Plaintiffs' Complaint in Global Nurse Force, et al. v. Donald J. Trump, et al., 4:25-cv-08454-HSG (N.D. Cal. 2025). | Mar. 9, 2026 | 93-9, 10 | JA0587 |
| Exhibit 6 - Declaration of Cara M. Selby, Acting Associate Director of USCIS Service Center Operations, dated March 4, 2026. | Mar. 9, 2026 | 93-11 | JA0653 |
| Exhibit 7 - Declaration of Jerome Jackson, Branch Manager of the Budget Reporting Branch in the Central Accounting and Reporting Division at the Department of the Treasury's Bureau of the Fiscal Services, dated December 1, 2025. | Mar. 9, 2026 | 93-12 | JA0656 |
| Clerk's Certificate and appeals Cover Sheet | Jun. 11, 2026 | 109 | JA0661 |

APPEAL,PACERFEEEXEMPT

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:25-cv-13829-LTS

State of California et al v. Noem et al
Assigned to: District Judge Leo T. Sorokin
Case in other court: USCA - First Circuit, 26-01699
Cause: 05:702 Administrative Procedure Act

Date Filed: 12/12/2025
Date Terminated: 06/08/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**State of California** represented by

**Denise Yesenia Levey**
Office of The Attorney General of the State of California
300 S Spring Street
Ste 1702
Los Angeles, CA 90013
213-269-6269
Email: denise.levey@doj.ca.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerard J. Cedrone**
Massachusetts Attorney General's Office
Office of the State Solicitor
One Ashburton Place
20th Floor
Boston, MA 02108
617-963-2282
Email: gerard.cedrone@mass.gov
*ATTORNEY TO BE NOTICED*

**James Everett Richardson**
Office of The Attorney General
Civil Rights Enforcement Section
1515 Clay Street
Suite 2000
Oakland, CA 94612
510-879-0285
Email: james.richardson@doj.ca.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Edward Stanley**
California Department of Justice

Civil Rights Enforcement Section
1300 I Street
Sacramento, CA 95814
916-210-6475
Email: james.stanley@doj.ca.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeanelly Orozco Alcala**
Office of The Attorney General
Civil Rights Enforcement Section
1515 Clay St.
Ste 20th Floor.
Oakland, CA 94612
510-879-1303
Email: jeanelly.orozcoalcala@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Lorraine Lopez**
Office of the Attorney General of the State of California
300 S. Spring Street
Los Angeles, CA 90013
213-269-6616
Email: lorraine.lopez@doj.ca.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marissa Malouff**
Office of the Attorney General of the State of California
Civil Rights Enforcement Section
300 S. Spring Street
Ste 1702
Los Angeles, CA 90026
719-252-2589
Email: marissa.malouff@doj.ca.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Louis Newman**
Office of The Attorney General
Civil Rights Enforcement Section
300 S. Broadway
Suite 1702
Los Angeles, CA 90013
213-269-6280
Fax: 213-897-7605
Email: michael.newman@doj.ca.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Commonwealth of Massachusetts** | represented by | **Gerard J. Cedrone**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Nita Kumaraswami Klunder**<br>Massachusetts Attorney General's Office<br>Office of State Trial Counsel<br>One Ashburton Place<br>Boston, MA 02108<br>617-963-2394<br>Email: nita.klunder@mass.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Julia S. Canney**<br>Office of the Massachusetts Attorney General<br>Civil Rights Division<br>One Ashburton Place<br>Boston, MA 02108<br>617-963-2851<br>Email: julia.s.canney@mass.gov<br>*ATTORNEY TO BE NOTICED*<br><br>**Michelle R. Pascucci**<br>Massachusetts Office of the Attorney General<br>State Trial Counsel<br>1 Ashburton Place<br>Boston, MA 02108<br>617-963-2255<br>Email: michelle.pascucci@mass.gov<br>*ATTORNEY TO BE NOTICED* |
| **<u>Plaintiff</u>** | | |
| **State of Arizona** | represented by | **Gerard J. Cedrone**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Joshua Nomkin**<br>Arizona Attorney General's Office<br>2005 N. Central Avenue<br>Phoenix, AZ 85004<br>602-542-4288<br>Fax: 602-542-8308<br>Email: joshua.nomkin@azag.gov<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| **<u>Plaintiff</u>** | | |
| **State of Colorado** | represented by | **David Moskowitz**<br>Colorado Department of Law<br>Ralph L. Carr Judicial Building |

1300 Broadway, 10th Floor
Denver, CO 80203
720-508-6784
Email: david.moskowitz@coag.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerard J. Cedrone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Q.E. Passamaneck**
Colorado Department of Law
1300 Broadway
10th Floor
Denver, CO 80203
720-508-6633
Email: nora.passamaneck@coag.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Connecticut** represented by **Francesca Testa**
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
203-988-4472
Email: francesca.testa@ct.gov
*ATTORNEY TO BE NOTICED*

**Gerard J. Cedrone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Delaware** represented by **Ian Liston**
Delaware Department of Justice
Fraud and Consumer Protection Division, White Collar Crime U
820 North French Street
Wilmington, DE 19801
302-683-8875
Email: ian.liston@delaware.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Kate Aaronson**
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
856-430-8881
Email: kate.aaronson@delaware.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nita Kumaraswami Klunder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vanessa L Kassab**
Delaware Department of Justice
Division of Fraud and Consumer Protection
Carvel State Building
820 N. French St.
Wilmington, DE 19801
302-683-8881
Email: vanessa.kassab@delaware.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Hawaii** represented by **David Dana Day**
State of Hawaii - Department of the Attorney General
Appellate Division
425 Queen Street
Honolulu, HI 96813
808-586-1346
Email: david.d.day@hawaii.gov
*TERMINATED: 08/20/2026*
*ATTORNEY TO BE NOTICED*

**Kalikoonalani Diara Fernandes**
Department of the Attorney General, State of Hawaii
425 Queen Street
Honolulu, HI 96813
808-586-1360
Email: kaliko.d.fernandes@hawaii.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Illinois** represented by **Aleeza M. Strubel**
Illinois Attorney General's Office
Special Litigation
115 S. LaSalle
Chicago, IL 60603
312-814-3000
Fax: 312-814-4452
Email: aleeza.strubel@ilag.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Morris**
Illinois Attorney General's Office
115 S. LaSalle St
Chicago, IL 60603

312-814-3000
Email: elizabeth.morris@ilag.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia S. Canney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Maryland** represented by **Nita Kumaraswami Klunder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Anne Williamson**
Maryland Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
410-576-6584
Email: vwilliamson@oag.state.md.us
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Michigan** represented by **Gerard J. Cedrone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Neil Giovanatti**
MI Department of Attorney General
Health, Education & Family Services Division
525 W. Ottawa Street
P.O. Box 30758
Lansing, MI 48909
517-335-7603
Email: giovanattin@michigan.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **State of Minnesota** | represented by | **Joseph Robert Richie**<br>Minnesota Attorney General's Office<br>445 Minnesota Street<br>Suite 600<br>St. Paul, MN 55102<br>651-300-0921<br>Email: joseph.richie@ag.state.mn.us<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Julia S. Canney**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **State of Nevada** | represented by | **Kiel Ireland**<br>Nevada Attorney General's Office<br>1 State of Nevada Way<br>Ste 100<br>Las Vegas, NV 89119<br>702-486-3420<br>Email: kireland@ag.nv.gov<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Nita Kumaraswami Klunder**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **State of New Jersey** | represented by | **Max Gabriel Lesser**<br>New Jersey Attorney General's Office<br>Division of Law - Special Litigation Section<br>Richard J. Hughes Justice Complex<br>25 Market Street<br>8th Fl., P.O. Box 112<br>Trenton, NJ 08625<br>609-575-6143<br>Email: max.lesser@law.njoag.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Julia S. Canney**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Melina Maria Meneguin Layerenza**<br>New Jersey Office of the Attorney General<br>Division of Law<br>124 Halsey Street<br>PO Box 45029<br>Newark, NJ 07101<br>609-414-4366 |

Email: melina.meneguin@law.njoag.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of New York** represented by **Julia S. Canney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria Ochoa**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Email: victoria.ochoa@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Zoe Levine**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-8329
Email: zoe.levine@ag.ny.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of North Carolina** represented by **Daniel Paul Mosteller**
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
Email: dmosteller@ncdoj.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gerard J. Cedrone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Oregon** represented by **Thomas H. Castelli**
Oregon Department of Justice
Special Litigation Unit
100 SW Market Street
Portland, OR 97201
971-673-1880
Email: thomas.castelli@doj.oregon.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia S. Canney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **State of Rhode Island** | represented by | **Julia S. Canney**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Kyla Duffy**<br>RI Department of Attorney General<br>Civil Division<br>150 South Main Street<br>Providence, RI 02903<br>401-274-4400<br>Email: kduffy@riag.ri.gov<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **State of Vermont** | represented by | **Jonathan T Rose**<br>Office of the Attorney General<br>Appellate Unit<br>109 State Street<br>Montpelier, VT 05609<br>802-793-1646<br>Email: jonathan.rose@vermont.gov<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Julia S. Canney**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **State of Washington** | represented by | **Julia S. Canney**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Kate S. Worthington**<br>State of Washington Attorney General's Office<br>Complex Litigation Division<br>7141 Cleanwater Drive SW<br>Olympia, WA 98504-0100<br>360-570-7402<br>Fax: 360-664-4170<br>Email: kate.worthington@atg.wa.gov<br>*ATTORNEY TO BE NOTICED*<br><br>**Sara L. Wilmot**<br>Washington State Office of the Attorney General<br>1116 West Riverside Ave<br>Suite 100<br>Spokane, WA 99201<br>509-458-3501 |

Email: sara.wilmot@atg.wa.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Wisconsin** represented by **Faye B. Hipsman**
WIsconsin Department of Justice
Special Litigation & Appeals Unit
17 West Main Street
Madison, WI 53707
608-264-9487
Email: hipsmanfb@doj.state.wi.us
*ATTORNEY TO BE NOTICED*

**Julia S. Canney**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Secretary Kristi L. Noem**
*in her official capacity as Secretary of Homeland Security* represented by **Jeffrey Alderette**
DOJ-Civ
P.O. Box 868
Ben Franklin Station
District of Columbia, DC 20044
202-860-9941
Email: jeffrey.alderette@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
DOJ-Civ
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001
202-514-4357
Email: tiberius.davis@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Homeland Security** represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marco Rubio**
*in his official capacity as Secretary of State* represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of State** represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lori Chavez-DeRemer**
*in her official capacity as Secretary of Labor*
represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Labor** represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pamela Bondi**
*in her official capacity as Attorney General of the United States*
represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Justice** represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States of America** represented by **Jeffrey Alderette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**Rajiv Panda**

**Movant**

**Federation for American Immigration Reform**

represented by **Matthew James O'Brien**
Federation for American Immigration Reform
25 Massachusetts Avenue NW
Suite 330
Washington, DC 20001
571-236-8146
Email: mobrien@fairus.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/12/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants Filing fee: $ 405, receipt number AMADC-11417610 (Fee Status: Filing Fee paid), filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Cedrone, Gerard) (Entered: 12/12/2025) |
| 12/12/2025 | 2 | NOTICE of Appearance by Gerard J. Cedrone on behalf of Commonwealth of Massachusetts (Cedrone, Gerard) (Entered: 12/12/2025) |
| 12/12/2025 | 3 | NOTICE of Appearance by Michelle R. Pascucci on behalf of Commonwealth of Massachusetts (Pascucci, Michelle) (Entered: 12/12/2025) |
| 12/13/2025 | 4 | MOTION for Leave to Appear Pro Hac Vice for admission of James E. Richardson, Marissa Malouff, Denise Levey, and Lorraine Lopez Filing fee: $ 500, receipt number AMADC-11417925 by State of California. (Attachments: # 1 Certificate of James E. Richardson, # 2 Certificate of Marissa Malouff, # 3 Certificate of Denise Levey, # 4 Certificate of Lorraine Lopez)(Cedrone, Gerard) (Entered: 12/13/2025) |
| 12/13/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Jeanelly Orozco Alcala, James Stanley, and Michael L. Newman Filing fee: $ 375, receipt number AMADC-11417926 by State of California. (Attachments: # 1 Jeanelly Orozco Alcala, # 2 Certificate of James Stanley, # 3 Certificate of Michael L. Newman)(Cedrone, Gerard) (Entered: 12/13/2025) |
| 12/15/2025 | 6 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jessica D. Hedges. (CM) (Entered: 12/15/2025) |

| | | |
|---|---|---|
| 12/15/2025 | 7 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (FGD) (Entered: 12/15/2025) |
| 12/15/2025 | 8 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 4 Motion for Leave to Appear Pro Hac Vice Added James E. Richardson, Marissa Malouff, Denise Levey, and Lorraine Lopez.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/15/2025) |
| 12/15/2025 | 9 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added Jeanelly Orozco Alcala, James Stanley, and Michael L. Newman.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/15/2025) |
| 12/15/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Neil Giovanatti Filing fee: $ 125, receipt number AMADC-11420548 by State of Michigan. (Attachments: # 1 Certificate of Neil Giovanatti)(Cedrone, Gerard) (Entered: 12/15/2025) |
| 12/16/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of David Moskowitz and Nora Q. Passamaneck Filing fee: $ 250, receipt number AMADC-11421841 by State of Colorado. (Attachments: # 1 Certificate of David Moskowitz, # 2 Certificate of Nora Q. Passamaneck)(Cedrone, Gerard) (Entered: 12/16/2025) |
| 12/16/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Daniel P. Mosteller Filing fee: $ 125, receipt number AMADC-11421917 by State of North Carolina. (Attachments: # 1 Certificate of Daniel P. Mosteller)(Cedrone, Gerard) (Entered: 12/16/2025) |
| 12/16/2025 | 13 | NOTICE of Appearance by Denise Yesenia Levey on behalf of State of California (Levey, Denise) (Entered: 12/16/2025) |
| 12/16/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua G. Nomkin Filing fee: $ 125, receipt number AMADC-11422660 by State of Arizona. (Attachments: # 1 Certificate of Joshua G. Nomkin)(Cedrone, Gerard) (Entered: 12/16/2025) |

8/24/26, 12:20 PM CM/ECF - USDC Massachusetts - Version 1.8.5 as of 12/19/2025

| | | |
|---|---|---|
| 12/16/2025 | 15 | NOTICE of Appearance by Lorraine Lopez on behalf of State of California (Lopez, Lorraine) (Entered: 12/16/2025) |
| 12/16/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Francesca Testa Filing fee: $ 125, receipt number AMADC-11423156 by State of Connecticut. (Attachments: # 1 Certificate of Francesca Testa)(Cedrone, Gerard) (Entered: 12/16/2025) |
| 12/16/2025 | 17 | NOTICE of Appearance by Julia Suzanna Canney on behalf of Commonwealth of Massachusetts (Canney, Julia) (Entered: 12/16/2025) |
| 12/16/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice for admission of Kalikoonlani D. Fernandes, David D. Day Filing fee: $ 250, receipt number AMADC-11423563 by State of Hawaii. (Attachments: # 1 Certificate of Kalikoonlani D. Fernandes, # 2 Certificate of David D. Day)(Canney, Julia) (Entered: 12/16/2025) |
| 12/16/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice for admission of Aleeza Strubel, Elizabeth A.F. Morris Filing fee: $ 250, receipt number AMADC-11423670 by State of Illinois. (Attachments: # 1 Certificate of Aleeza Strubel, # 2 Certificate of Elizabeth A.F. Morris) (Canney, Julia) (Entered: 12/16/2025) |
| 12/17/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice for admission of Joseph Richie Filing fee: $ 125, receipt number AMADC-11424515 by State of Minnesota. (Attachments: # 1 Certificate of Joseph Richie)(Canney, Julia) (Entered: 12/17/2025) |
| 12/17/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice for admission of Melina Meneguin Layerenza, Max Lesser Filing fee: $ 250, receipt number AMADC-11424594 by State of New Jersey. (Attachments: # 1 Certificate of Melina Meneguin Layerenza, # 2 Certificate of Max Lesser)(Canney, Julia) (Entered: 12/17/2025) |
| 12/17/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice for admission of Kyla Duffy Filing fee: $ 125, receipt number AMADC-11424649 by State of Rhode Island. (Attachments: # 1 Certificate of Kyla Duffy)(Canney, Julia) (Entered: 12/17/2025) |
| 12/17/2025 | 23 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Neil Giovanatti.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 24 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added David Moskowitz and Nora Q. Passamaneck.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |

| | | |
|---|---|---|
| 12/17/2025 | 25 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice Added Daniel P. Mosteller.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 26 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 14 Motion for Leave to Appear Pro Hac Vice Added Joshua G. Nomkin.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 27 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice Added Francesca Testa.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 28 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 18 Motion for Leave to Appear Pro Hac Vice Added Kalikoonlani D. Fernandes, and David D. Day.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 29 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 19 Motion for Leave to Appear Pro Hac Vice Added Aleeza Strubel, and Elizabeth A.F. Morris. |

| | | |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 30 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 20 Motion for Leave to Appear Pro Hac Vice Added Joseph Richie.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 31 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 21 Motion for Leave to Appear Pro Hac Vice Added Melina Meneguin Layerenza, Max Lesser.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 32 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 22 Motion for Leave to Appear Pro Hac Vice Added Kyla Duffy.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/17/2025) |
| 12/17/2025 | 33 | NOTICE of Appearance by Jeanelly Orozco Alcala on behalf of State of California (Orozco Alcala, Jeanelly) (Entered: 12/17/2025) |
| 12/17/2025 | 34 | NOTICE of Appearance by Kyla Duffy on behalf of State of Rhode Island (Duffy, Kyla) (Entered: 12/17/2025) |

| | | |
|---|---|---|
| 12/17/2025 | 35 | NOTICE of Appearance by David Moskowitz on behalf of State of Colorado (Moskowitz, David) (Entered: 12/17/2025) |
| 12/17/2025 | 36 | NOTICE of Appearance by Nora Q.E. Passamaneck on behalf of State of Colorado (Passamaneck, Nora) (Entered: 12/17/2025) |
| 12/17/2025 | 37 | NOTICE of Appearance by James Everett Richardson on behalf of State of California (Richardson, James) (Entered: 12/17/2025) |
| 12/17/2025 | 38 | NOTICE of Appearance by Michael Louis Newman on behalf of State of California (Newman, Michael) (Entered: 12/17/2025) |
| 12/17/2025 | 39 | NOTICE of Appearance by Nita Kumaraswami Klunder on behalf of Commonwealth of Massachusetts (Klunder, Nita) (Entered: 12/17/2025) |
| 12/17/2025 | 40 | NOTICE of Appearance by Marissa Malouff on behalf of State of California (Malouff, Marissa) (Entered: 12/17/2025) |
| 12/17/2025 | 41 | NOTICE of Appearance by Joseph Robert Richie on behalf of State of Minnesota (Richie, Joseph) (Entered: 12/17/2025) |
| 12/17/2025 | 42 | NOTICE of Appearance by James Edward Stanley on behalf of State of California (Stanley, James) (Entered: 12/17/2025) |
| 12/17/2025 | 43 | NOTICE of Appearance by Kalikoonalani Diara Fernandes on behalf of State of Hawaii (Fernandes, Kalikoonalani) (Entered: 12/17/2025) |
| 12/17/2025 | 44 | NOTICE of Appearance by David Dana Day on behalf of State of Hawaii (Day, David) (Entered: 12/17/2025) |
| 12/18/2025 | 45 | NOTICE of Appearance by Joshua Nomkin on behalf of State of Arizona (Nomkin, Joshua) (Entered: 12/18/2025) |
| 12/18/2025 | 46 | NOTICE of Appearance by Neil Giovanatti on behalf of State of Michigan (Giovanatti, Neil) (Entered: 12/18/2025) |
| 12/18/2025 | 47 | Notice of Service of Process filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin. Individual(s)/Entities served: All Defendants.(Attachments: # 1 Affidavit of Certified Mail Service on Defendants)(Cedrone, Gerard) **Modified on 12/19/2025: Updated docket text to properly reflect document filed.** (FGD) (Entered: 12/18/2025) |
| 12/18/2025 | 48 | NOTICE of Appearance by Elizabeth Morris on behalf of State of Illinois (Morris, Elizabeth) (Entered: 12/18/2025) |
| 12/18/2025 | 49 | MOTION for Leave to Appear Pro Hac Vice for admission of Jonathan Rose Filing fee: $ 125, receipt number AMADC-11428284 by State of Vermont. (Attachments: # 1 Certificate of Jonathan Rose)(Canney, Julia) (Entered: 12/18/2025) |
| 12/19/2025 | 50 | MOTION for Leave to Appear Pro Hac Vice for admission of Zoe Levine, Victoria Ochoa Filing fee: $ 250, receipt number AMADC-11429778 by State of New York. (Attachments: # 1 Certificate of Zoe Levine, # 2 Certificate of Victoria Ochoa)(Canney, Julia) (Entered: 12/19/2025) |
| 12/19/2025 | 51 | NOTICE of Appearance by Francesca Testa on behalf of State of Connecticut (Testa, Francesca) (Entered: 12/19/2025) |

| | | |
|---|---|---|
| 12/19/2025 | 52 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 49 Motion for Leave to Appear Pro Hac Vice Added Jonathan Rose.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/19/2025) |
| 12/19/2025 | 53 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 50 Motion for Leave to Appear Pro Hac Vice Added Zoe Levine, and Victoria Ochoa.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/19/2025) |
| 12/19/2025 | 54 | NOTICE of Appearance by Jonathan T Rose on behalf of State of Vermont (Rose, Jonathan) (Entered: 12/19/2025) |
| 12/22/2025 | 55 | NOTICE of Appearance by Aleeza M. Strubel on behalf of State of Illinois (Strubel, Aleeza) (Entered: 12/22/2025) |
| 12/22/2025 | 56 | MOTION for Leave to Appear Pro Hac Vice for admission of Sara Wilmot, Kate Worthington Filing fee: $ 250, receipt number AMADC-11433991 by State of Washington. (Attachments: # 1 Certificate of Sara Wilmot, # 2 Certificate of Kate Worthington)(Canney, Julia) (Entered: 12/22/2025) |
| 12/22/2025 | 57 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 56 Motion for Leave to Appear Pro Hac Vice Added Sara L. Wilmot, and Kate. S. Worthington.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/22/2025) |

| | | |
|---|---|---|
| 12/22/2025 | 58 | NOTICE of Appearance by Kate S. Worthington on behalf of State of Washington (Worthington, Kate) (Entered: 12/22/2025) |
| 12/22/2025 | 59 | NOTICE of Appearance by Sara L. Wilmot on behalf of State of Washington (Wilmot, Sara) (Entered: 12/22/2025) |
| 12/23/2025 | 60 | MOTION for Leave to Appear Pro Hac Vice for admission of Thomas H. Castelli Filing fee: $ 125, receipt number AMADC-11436337 by State of Oregon. (Attachments: # 1 Certificate of Thomas H. Castelli)(Canney, Julia) (Entered: 12/23/2025) |
| 12/23/2025 | 61 | MOTION for Leave to Appear Pro Hac Vice for admission of Faye B. Hipsman Filing fee: $ 125, receipt number AMADC-11436513 by State of Wisconsin. (Attachments: # 1 Certificate of Faye B. Hipsman)(Canney, Julia) (Entered: 12/23/2025) |
| 12/23/2025 | 62 | MOTION for Leave to Appear Pro Hac Vice for admission of Ian R. Liston, Jennifer Kate Aaronson, Vanessa L. Kassab Filing fee: $ 375, receipt number AMADC-11436773 by State of Delaware. (Attachments: # 1 Certificate of Ian R. Liston, # 2 Certificate of Vanessa L Kassab, # 3 Certificate of Jennifer Kate Aaronson)(Klunder, Nita) (Entered: 12/23/2025) |
| 12/23/2025 | 63 | MOTION for Leave to Appear Pro Hac Vice for admission of Virginia A. Williamson Filing fee: $ 125, receipt number AMADC-11436977 by State of Maryland. (Attachments: # 1 Certificate of Virginia A. Williamson)(Klunder, Nita) (Entered: 12/23/2025) |
| 12/23/2025 | 64 | MOTION for Leave to Appear Pro Hac Vice for admission of K. Brunetti Ireland Filing fee: $ 125, receipt number AMADC-11436987 by State of Nevada. (Attachments: # 1 Certificate of K. Brunetti Ireland)(Klunder, Nita) (Entered: 12/23/2025) |
| 12/23/2025 | 65 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 60 Motion for Leave to Appear Pro Hac Vice Added Thomas H. Castelli.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/23/2025) |
| 12/23/2025 | 66 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 61 Motion for Leave to Appear Pro Hac Vice Added Faye B. Hipsman.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(FGD) (Entered: 12/23/2025) |
| 12/23/2025 | 67 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 62 Motion for Leave to Appear Pro Hac Vice Added Ian R. Liston, Jennifer Kate Aaronson, Vanessa L. Kassab.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/23/2025) |
| 12/23/2025 | 68 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 63 Motion for Leave to Appear Pro Hac Vice Added Virginia A. Williamson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/23/2025) |
| 12/23/2025 | 69 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 64 Motion for Leave to Appear Pro Hac Vice Added K. Brunetti Ireland.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(FGD) (Entered: 12/23/2025) |
| 12/29/2025 | 70 | NOTICE of Appearance by Max Gabriel Lesser on behalf of State of New Jersey (Lesser, Max) (Entered: 12/29/2025) |
| 12/30/2025 | 71 | NOTICE of Appearance by Zoe Levine on behalf of State of New York (Levine, Zoe) (Entered: 12/30/2025) |
| 01/02/2026 | 72 | NOTICE of Appearance by Kiel Ireland on behalf of State of Nevada (Ireland, Kiel) (Entered: 01/02/2026) |
| 01/06/2026 | 73 | NOTICE of Appearance by Ian Liston on behalf of State of Delaware (Liston, Ian) (Entered: 01/06/2026) |
| 01/06/2026 | 74 | NOTICE of Appearance by Vanessa L Kassab on behalf of State of Delaware (Kassab, Vanessa) (Entered: 01/06/2026) |

| | | |
|---|---|---|
| 01/06/2026 | 75 | NOTICE of Appearance by Jennifer Kate Aaronson on behalf of State of Delaware (Aaronson, Jennifer) (Entered: 01/06/2026) |
| 01/07/2026 | 76 | NOTICE of Appearance by Victoria Ochoa on behalf of State of New York (Ochoa, Victoria) (Entered: 01/07/2026) |
| 01/12/2026 | 77 | NOTICE of Appearance by Jeffrey Alderette on behalf of United States Department of Justice (Alderette, Jeffrey) (Entered: 01/12/2026) |
| 01/12/2026 | 78 | NOTICE of Appearance by Virginia Anne Williamson on behalf of State of Maryland (Williamson, Virginia) (Entered: 01/12/2026) |
| 01/13/2026 | 79 | NOTICE of Appearance by Faye B. Hipsman on behalf of State of Wisconsin (Hipsman, Faye) (Entered: 01/13/2026) |
| 01/16/2026 | 80 | NOTICE of Appearance by Melina Maria Meneguin Layerenza on behalf of State of New Jersey (Meneguin Layerenza, Melina) (Entered: 01/16/2026) |
| 01/23/2026 | 81 | NOTICE of Appearance by Daniel Paul Mosteller on behalf of State of North Carolina (Mosteller, Daniel) (Entered: 01/23/2026) |
| 01/23/2026 | 82 | NOTICE of Appearance by Thomas H. Castelli on behalf of State of Oregon (Castelli, Thomas) (Entered: 01/23/2026) |
| 01/23/2026 | 83 | Joint MOTION for Summary Judgment *Briefing Schedule and Extension of Time for Defendants to Answer* by State of California.(Richardson, James) **Modified on 1/26/2026: Corrected docketing event.** (FGD) (Entered: 01/23/2026) |
| 01/23/2026 | 84 | Document disclosure by United States Department of Justice. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Alderette, Jeffrey) (Entered: 01/23/2026) |
| 01/26/2026 | 85 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 83 Joint MOTION for Summary Judgment Briefing Schedule and Extension of Time for Defendants to Answer.<br><br>ALLOWED. The Court ADOPTS the schedule proposed by the parties. (FGD) **Modified on 1/26/2026: Corrected docket text.** (FGD) (Entered: 01/26/2026) |
| 02/06/2026 | 86 | MOTION for Summary Judgment by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin.(Richardson, James) (Entered: 02/06/2026) |
| 02/06/2026 | 87 | MEMORANDUM in Support re 86 MOTION for Summary Judgment filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin. (Richardson, James) (Entered: 02/06/2026) |
| 02/06/2026 | 88 | DECLARATION re 86 MOTION for Summary Judgment by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin. (Attachments: # 1 Exhibit, # 2 Exhibit, |

| | | |
|---|---|---|
| | | # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Errata, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit)(Richardson, James) (Entered: 02/06/2026) |
| 02/09/2026 | 89 | Motion for Exemption from PACER Fees. Requests for an exemption from fees will be directed to the Presiding Judge for review. If granted, the exemption is limited only to the customer's access to the records from the court that issued the exemption order. If the PACER account is used to access records from another court, that usage would be billed to the customer at the rate set forth in the EPA Fee Schedule filed by Rajiv Panda. (McLaughlin, Tracy) (Entered: 02/11/2026) |
| 02/11/2026 | 90 | District Judge Leo T. Sorokin: ORDER entered.<br><br>A non-party requests an exemption from the pacer fees for research purposes. Doc. No. 89 . This Motion is DENIED WITHOUT PREJUDICE as it is properly directed to the pacer center and then onto the chief judge. See https://pacer.uscourts.gov/pacer-pricing-how-fees-work.<br><br>(FGD) (Entered: 02/11/2026) |
| 02/11/2026 | 91 | Copy re 90 Order on Motion for Exemption from PACER Fees, emailed to Rajiv Panda on 2/11/2026. (FGD) (Entered: 02/11/2026) |
| 03/09/2026 | 92 | MOTION for Summary Judgment *, Opposition, Motion to Dismiss & Memorandum in Support* by Pamela J. Bondi, Lori Chavez-DeRemer, Kristi Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America. (Alderette, Jeffrey) **Modified on 3/10/2026: Supporting documents have been removed and properly refiled as a separate entry. Please see entry 93 .** (FGD) (Entered: 03/09/2026) |
| 03/09/2026 | 93 | MEMORANDUM in Support re 92 MOTION for Summary Judgment *, Opposition, Motion to Dismiss & Memorandum in Support* filed by Pamela J. Bondi, Lori Chavez-DeRemer, Kristi Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America. (Attachments: # 1 Declaration of Jeffrey Alderette, # 2 Table of Exhibits, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 2 pt. 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 4 pt. 2, # 9 Exhibit 5, # 10 Exhibit 5 pt. 2, # 11 Exhibit 6, # 12 Exhibit 7)(FGD) (Entered: 03/10/2026) |
| 03/17/2026 | 94 | Assented to MOTION for Leave to File *an amicus brief* by Federation for American Immigration Reform. (Attachments: # 1 Amicus Brief, # 2 Proposed Order)(O'Brien, Matthew) (Entered: 03/17/2026) |
| 03/17/2026 | 95 | NOTICE of Appearance by Matthew James O'Brien on behalf of Federation for American Immigration Reform (O'Brien, Matthew) (Entered: 03/17/2026) |
| 03/17/2026 | 96 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered re: 94 Assented to MOTION for Leave to File an amicus brief.<br><br>ALLOWED. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF |

| | | |
|---|---|---|
| | | Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (FGD) (Entered: 03/17/2026) |
| 03/17/2026 | 97 | AMICUS BRIEF filed by Federation for American Immigration Reform *in support of Defendants' cross motion for summary judgment*. (O'Brien, Matthew) (Entered: 03/17/2026) |
| 03/31/2026 | 98 | NOTICE of Appearance by Tiberius T Davis on behalf of Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America (Davis, Tiberius) (Entered: 03/31/2026) |
| 04/02/2026 | 99 | REPLY to Response to 86 MOTION for Summary Judgment , 92 MOTION for Summary Judgment *, Opposition, Motion to Dismiss & Memorandum in Support* filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin. (Richardson, James) (Entered: 04/02/2026) |
| 04/13/2026 | 100 | REPLY to Response to 92 MOTION for Summary Judgment *, Opposition, Motion to Dismiss & Memorandum in Support* filed by Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America. (Attachments: # 1 Supplement Reply Memorandum) (Alderette, Jeffrey) (Entered: 04/13/2026) |
| 05/12/2026 | 101 | NOTICE of Appearance by Tiberius T Davis on behalf of Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America (Davis, Tiberius) (Entered: 05/12/2026) |
| 05/14/2026 | 102 | ELECTRONIC NOTICE Setting Hearing on Motion 86 MOTION for Summary Judgment , and 92 MOTION for Summary Judgment *, Opposition, Motion to Dismiss & Memorandum in Support* :<br><br>Motion Hearing set for 5/20/2026 02:00 PM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin. (SED) (Entered: 05/14/2026) |
| 05/14/2026 | 103 | Joint MOTION to Continue Hearing on Cross-Motions for Summary Judgment to the week of May 25; June 1, 3, 4, or 5; or the weeks of June 8, 15, 22, and 29 by State of California.(Malouff, Marissa) (Entered: 05/14/2026) |
| 05/15/2026 | 104 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 103 Joint MOTION to Continue Hearing on Cross-Motions for Summary Judgment to the week of May 25; June 1, 3, 4, or 5; or the weeks of June 8, 15, 22, and 29.<br><br>ALLOWED. Motion Hearing reset for 5/29/2026 10:00 AM in Courtroom 13 (In person only) before District Judge Leo T. Sorokin. (SED) (Entered: 05/15/2026) |
| 05/29/2026 | 105 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin:<br><br>Motion Hearing held on 5/29/2026 re 86 MOTION for Summary Judgment, and 92 MOTION for Summary Judgment Opposition, Motion to Dismiss & Memorandum in |

| | | |
|---|---|---|
| | | Support. The Court hears arguments on the pending motions. The motions are taken under advisement.<br><br>(Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: James Everett Richardson, Gerard J. Cedrone, Marissa Malouff, Nita Kumaraswami Klunder, Julia Suzanna Canney, Michelle R. Pascucci for the plaintiffs and Tiberius T Davis for the defendants) (SED) (Entered: 05/29/2026) |
| 06/08/2026 | 106 | District Judge Leo T. Sorokin: ORDER entered. MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 86 ) AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS (DOC. NO. 92 ). (FGD) (Entered: 06/08/2026) |
| 06/08/2026 | 107 | District Judge Leo T. Sorokin: ORDER entered. JUDGMENT. (FGD) (Entered: 06/08/2026) |
| 06/11/2026 | 108 | NOTICE OF APPEAL as to 107 Judgment, 106 Memorandum & ORDER,, Terminate Motions, by Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/1/2026. (Alderette, Jeffrey) (Entered: 06/11/2026)** |
| 06/11/2026 | 109 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 108 Notice of Appeal. (EZG) (Entered: 06/11/2026) |
| 06/11/2026 | 110 | USCA Case Number 26-1699 for 108 Notice of Appeal, filed by Kristi L. Noem, United States Department of Justice, United States Department of Labor, United States of America, Pamela Bondi, United States Department of State, Lori Chavez-DeRemer, Marco Rubio, United States Department of Homeland Security. (EZG) (Entered: 06/11/2026) |
| 06/12/2026 | 111 | MOTION to Stay *Pending Appeal* by Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America.(Alderette, Jeffrey) (Entered: 06/12/2026) |
| 06/12/2026 | 112 | MEMORANDUM in Support re 111 MOTION to Stay *Pending Appeal* filed by Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America. (Attachments: # 1 Supplement, # 2 Exhibit)(Alderette, Jeffrey) (Entered: 06/12/2026) |
| 06/12/2026 | 113 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered: re 111 MOTION to Stay Pending Appeal.<br><br>The Motion to Stay, Doc. No. 111, is DENIED for the same reasons set forth in the Court's Memorandum and Order, Doc. No. 106. The alternative request for an administrative stay is ALLOWED IN PART to this extent: The Court STAYS its Order as |

| | | |
|---|---|---|
| | | reflected in Doc. Nos. 106, 107, pending a decision by the United States Court of Appeals for the First Circuit on the anticipated Motion to Stay pending appeal from the Defendants, provided the Defendants file such a Motion in the Circuit no later than Thursday, June 18, 2026. (SED) (Entered: 06/12/2026) |
| 06/17/2026 | 114 | Transcript of Motion Hearing held on May 29, 2026, before Judge Leo T. Sorokin. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 7/8/2026. Redacted Transcript Deadline set for 7/20/2026. Release of Transcript Restriction set for 9/15/2026. (DRK) (Entered: 06/18/2026) |
| 06/17/2026 | 115 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 06/18/2026) |
| 06/18/2026 | 116 | NOTICE by Pamela Bondi, Lori Chavez-DeRemer, Kristi L. Noem, Marco Rubio, United States Department of Homeland Security, United States Department of Justice, United States Department of Labor, United States Department of State, United States of America *of Motion to Stay Filed* (Attachments: # 1 As Filed Motion to Stay)(Davis, Tiberius) (Entered: 06/18/2026) |
| 07/27/2026 | 117 | ORDER of USCA as to 108 Notice of Appeal, filed by Kristi L. Noem, United States Department of Justice, United States Department of Labor, United States of America, Pamela Bondi, United States Department of State, Lori Chavez-DeRemer, Marco Rubio, United States Department of Homeland Security. (FGD) (Entered: 07/27/2026) |
| 08/19/2026 | 118 | NOTICE of Withdrawal of Appearance by David Dana Day (Day, David) (Entered: 08/19/2026) |



| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/24/2026 12:21:11 | | | |
| **PACER Login:** | ardenratana | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-13829-LTS |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>Defendants. | Civil Action No. 1:25-cv-13829-LTS<br><br>**DEFENDANTS' NOTICE OF APPEAL** |

Notice is hereby given that Markwayne Mullin, et al., hereby appeal to the United States Court of Appeals for the First Circuit from the final judgment entered in this action on the 8th day of June 2026.

DATE: June 11, 2026

Respectfully Submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation

**August Flentje**
Special Counsel for Immigration

**Tiberius Davis**
Counsel to the Assistant Attorney General

**David J. Byerley**
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation

By: *_/s/ Jeffrey Alderette_*
**Jeffrey Alderette**
Trial Attorney (D.C. No. 1738711)
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 860-9941
Jeffrey.Alderette@usdoj.gov
*Counsel for Appellants-Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN

*Plaintiffs,*

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in his official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; LORI CHAVEZ-DeREMER, in her official capacity as Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; PAMELA J. BONDI, in her official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; and UNITED STATES OF AMERICA,

*Defendants.*

No. 1:25-cv-13829

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The State of California, the Commonwealth of Massachusetts, the State of Arizona, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Hawai'i, the State

of Illinois, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New York, the State of North Carolina, the State of Oregon, the State of Rhode Island, the State of Vermont, the State of Washington, and the State of Wisconsin ("Plaintiff States") allege as follows:

**INTRODUCTION**

1. Congress created the H-1B visa program to address "specific labor shortages" and meet "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found."[1] The program has garnered widespread support over the past decades as a tool for addressing specific shortages of skilled professionals; indeed, President Trump recently advocated for the H-1B program.[2]

2. H-1B visas do not just support the needs of the private sector. Facing a nationwide shortage of teachers, nurses, physicians, researchers, engineers, and other vital workers, state and local agencies and public-serving institutions like universities, schools, and hospitals have turned to H-1B workers to provide education, healthcare, and other services.

3. Without access to skilled overseas workers, public schools would be forced to subject American children to larger class sizes, public research centers would lack staffing to support cutting-edge research, and hospitals would lose capacity to treat seriously ill patients. These concerns are particularly acute in rural areas and communities with relatively limited wealth and resources, where state and local governments and other service providers face even greater difficulties in recruiting the skilled workers required to support their missions.

---

[1] H.R. Rep. No. 101-723 (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6721, 1990 WL 200418.

[2] Dan Gooding & Gabe Whisnant, *Donald Trump Says Bringing in Foreign Workers Is 'MAGA,'* Newsweek (Nov. 19, 2025), https://www.newsweek.com/donald-trump-immigration-h1b-visa-maga-deportation-workers-11076200.

4. While governments and other service providers hope for these devastating nationwide labor shortages to abate, they have turned to the H-1B visa program as a reliable and consistent stopgap, permitting them to make necessary plans for hiring, training, student enrollment, investments in institutional infrastructure, and other activities critical to their continued operation.

5. That public institutions have come to rely on the H-1B program follows directly from Congress's longstanding efforts to ensure that public institutions benefit from the program. Congress first created the predecessor to the modern H-1B program in 1952. In the decades that followed, Congress repeatedly adjusted and refined the program. In so doing, Congress was particularly responsive to the needs of public- and nonprofit-sector employers, exempting many of them from the cap on the number of H-1B visa holder employees imposed on other employers and in some instances providing for reduced fees in connection with H-1B petitions. In the program's nearly 75-year history, Congress has never shown any intent to discontinue the H-1B visa program or to make it effectively inaccessible to government and non-profit employers.

6. To the contrary, fees for H-1B petitions are subject to the same safeguards as other immigrations fees, which ensure that employers can rely on H-1B petitions without fear of arbitrary or dramatic changes in the costs associated with hiring H-1B workers. Under the Administrative Procedure Act ("APA"), unless Congress provides otherwise, changes in H-1B visa fees must be made through a transparent notice-and-comment process that requires the government to consider the public's ideas and concerns. Congress has also mandated more specifically that visa fees be kept to a level commensurate with the federal government's costs in processing applications. *See* 8 U.S.C. § 1356(m). These congressional mandates have been particularly important to public- and nonprofit-sector employers, which desperately need H-1B

workers but are unable to absorb significant added costs.

7. On September 19, 2025, President Trump upended Congress's H-1B visa program by announcing a $100,000 supplemental fee to be imposed on H-1B petitions. *See* Proclamation 10,973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 24, 2025) ("Proclamation").[3] In contrast to the most recent revisions to the H-1B fee schedule—which the Department of Homeland Security ("DHS") published on January 31, 2024, following a lengthy notice-and-comment process pursuant to the APA—the President's Proclamation was made without any notice to or input from affected parties or other members of the public.

8. The Proclamation makes various overtures to domestic economic policy goals to justify the unprecedented $100,000 fee. But the Proclamation gives no indication that the President gave any consideration to how the fee would affect Plaintiff States and their ability to provide their residents access to education, healthcare, and other basic human needs. It focuses instead on supposed abuses of the H-1B visa program within the private sector. And the Proclamation's statements about the program are completely at odds with the President's statements just a few weeks ago emphasizing the need for and value of H-1B visas to address specific shortages in the United States labor market.

9. Defendants' implementation of the Proclamation has been similarly flawed. Defendants have haphazardly issued—and revised and reissued—various documents (collectively, "the Policy") to implement the $100,000 fee. Defendants have not once solicited public comment on the Policy. And none of the Policy's substance reflect the reasoned decisionmaking required by law.

[3] Available at https://www.federalregister.gov/documents/2025/09/24/2025-18601/restriction-on-entry-of-certain-nonimmigrant-workers.

10. The Policy plainly violates the APA. Congress "enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). The act "was the culmination of a 'comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers.'" *Id.* (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–671 (1986)). In issuing and implementing the Policy, Defendants exceeded the bounds of that fundamental statute in at least three ways.

11. First, Defendants failed to adhere to the APA's procedural requirements. The APA requires an agency to pursue notice-and-comment rulemaking in promulgating a legislative rule like the Policy. *See* 5 U.S.C. § 553. Defendants flouted that requirement, and the Policy must accordingly be held unlawful and set aside. *See id.* § 706(2)(D).

12. Second, the Policy exceeds the fee-setting authority conferred by Congress and tramples on the intricate structure created by the Immigration and Nationality Act of 1952 ("INA") and subsequent legislation. It is thus contrary to statute in violation of the APA. *See id.* § 706(2)(C).

13. Third, the Policy is arbitrary and capricious in multiple senses: not only is it ungrounded from careful consideration of relevant concerns, but it reflects policy goals of the President that were so fleeting that he no longer appears to maintain them even as the Policy remains in effect. In this regard, the Policy violates the APA. *See id.* § 706(2)(A).

14. In addition to violating the APA, the policy is also *ultra vires* because it usurps Congress's constitutional authority to set immigration policy and to raise revenues.

15. Plaintiff States now bring this action to protect their ability to provide for the

fundamental needs of their residents in spite of the difficulties imposed by nationwide labor conditions. The Court should hold unlawful and set aside the Policy so that Plaintiff States can continue to fulfil their most basic obligations.

**JURISDICTION AND VENUE**

16. This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the United States Constitution and the APA, 5 U.S.C. §§ 701–706.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are the United States and its agencies and officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this district.

**PARTIES**

18. Plaintiff State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta. The Attorney General is the chief legal representative of the state and is authorized to pursue this action by California State Constitution, article V, section 13.

19. Plaintiff Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

20. Plaintiff State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state in the United States of America. The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in federal court[.]" Ariz. Rev. Stat. § 41-193(A)(3); *see* Ariz. Const. art. V, § 1(A).

21. Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

22. Plaintiff State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

23. Plaintiff State of Delaware is a sovereign state in the United States of America. The Attorney General of Delaware is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

24. Plaintiff State of Hawai'i, represented by and through its Attorney General, Anne E. Lopez, is a sovereign state in the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statues § 28-1 to pursue this action.

25. Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul. As the chief legal officer of Illinois, Attorney General Raoul is authorized to act on its behalf in this matter.

26. Plaintiff State of Maryland is a sovereign state in the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

27. Plaintiff State of Michigan is a sovereign state in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

28. Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's proprietary, sovereign, and quasi-sovereign interests.

29. Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

30. Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew J. Platkin, who is the chief law enforcement officer of New Jersey.

31. Plaintiff State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

32. Plaintiff State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

33. Plaintiff State of Oregon is a sovereign state in the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is Oregon's chief law enforcement officer and is authorized to act on behalf of the State in this matter.

34. Plaintiff State of Rhode Island is a sovereign state in the United States of America. The Attorney General of Rhode Island is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

35. Plaintiff State of Vermont is a sovereign state in the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

36. Plaintiff State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Wash. Rev. Code 43.10.

37. Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

38. Defendant Kristi Noem is the Secretary of Homeland Security. She is named in her official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Secretary of Homeland Security.

39. Defendant United States Department of Homeland Security is a cabinet agency in the executive branch of the federal government with responsibility for implementing laws and policies concerning the adjudication of H-1B visa petitions. The Proclamation assigns the responsibility for implementing the Proclamation.

40. Defendant Marco Rubio is the Secretary of State. He is named in his official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Secretary of State.

41. Defendant United States Department of State is a cabinet agency in the executive branch of the federal government. The Proclamation assigns the Department responsibility for implementing the Proclamation.

42. Defendant Lori Chavez-DeRemer is the Secretary of Labor. She is named in her official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Secretary of Labor.

43. Defendant United States Department of Labor is a cabinet agency in the executive branch of the federal government.

44. Defendant Pamela J. Bondi is the Attorney General. She is named in her official capacity. Certain provisions of the Proclamation are directed to, and assign responsibilities to, the Attorney General.

45. Defendant United States Department of Justice is a cabinet agency in the executive branch of the federal government.

46. Defendant United States of America is a sovereign nation. *See* 5 U.S.C. § 702 ("The United States may be named as a defendant in any [APA] action, and a judgment or decree may be entered against the United States.").

## LEGAL BACKGROUND

### I. The H-1B Visa Program

#### A. Congress has consistently exercised its constitutional prerogative to control immigration policy.

47. Article I, section 8, clause 4 of the United States Constitution provides that Congress shall establish a "uniform Rule of Naturalization." "The [Supreme] Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (noting that the Supreme Court "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens"); *Galvan v. Press*, 347 U.S. 522, 531 (1954) (observing that "[p]olicies pertaining to the entry of aliens" are "entrusted exclusively to Congress"); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (discussing "the complete and absolute power of Congress" and "the plenary power of Congress" over immigration policy).

48. Pursuant to its constitutional authority, Congress enacted the INA, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)); *see also Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d. 549, 561 (N.D. Cal. 2020) ("Congress has created a complex, highly reticulated set of immigration laws and regulations" and has "continued to establish policy regarding immigration in the United States.")

49. Congress originally created a predecessor version of the H-1B program in 1952. Since then, Congress has legislated extensively, enacting a comprehensive scheme to allow U.S. employers to hire skilled workers from around the world to fill jobs in critical areas, while still protecting the interests of workers in the United States and preventing abuse of the system.

50. The primary goal of the modern H-1B program is to "balance the short term employment demands of employers with the need to train and educate the new generation of American workers." H.R. Rep. No. 101-723 (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6725, 1990 WL 200418. In service of that goal, Congress has repeatedly addressed concerns about misuse of the H-1B program and impact on U.S. workers by enhancing enforcement, increasing penalties, and requiring employers to pay specific fees to hire an H-1B worker. *See, e.g.*, H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, § 426, 118 Stat. 2809, 3357-58 (2004) (imposing certain anti-fraud fees).

51. In short, Congress has expressly exercised its authority over immigration and naturalization to direct the nation's policy for the admission of this category of noncitizen workers by constructing a program that addresses the needs of the American economy while protecting American workers. In doing so, Congress bound the executive branch to follow the plan it set forth. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

**B. Congress created the H-1B visa program to address shortages in the United States labor market.**

52. Congress created the H-1B visa program to address "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which

domestic personnel cannot be found and the need for other workers to meet specific labor shortages." H.R. Rep. No. 101-723 (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6721, 1990 WL 200418; *see also U.S. v. Patnaik*, 125 F.4th 1223, 1225 (9th Cir. 2025) ("The Immigration and Nationality Act . . . authorizes employers to 'request H-1B status for nonimmigrant foreign workers in specialty occupations' that American workers cannot fill." (quoting *U.S. v. Prasad*, 18 F.4th 313, 316 n.2 (9th Cir. 2021) (citing 8 U.S.C. § 1101(a)(15)(H)(i)(b)). The H-1B classification traces back to the INA of 1952, which established an "H visa" for "an alien having a residence in a foreign country which he has no intention of abandoning who is of distinguished merit and ability and who is coming temporarily to the United States to perform temporary services of an exceptional nature requiring such merit and ability." Pub. L. No. 82-414, § 101(a)(15)(H), 66 Stat. 163, 168 (1952).

53. The Immigration Act of 1990 amended the INA and created the H-1B nonimmigrant classification still in effect today, allowing an employer in the United States to petition to hire a nonimmigrant worker in a "specialty occupation" in the United States for a maximum duration of six years. Pub. L. No. 101-649, 104 Stat. 4978; *see* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(g)(4); 8 C.F.R. § 214.2(h)(1)(i). A "specialty occupation" is an occupation that requires "(A) theoretical and practical application of a body of highly specialized knowledge and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii).

54. Today, H-1B workers are employed across the country by a wide variety of employers, including state government agencies that rely on H-1B workers to address labor shortages affecting the public sector.

55. To protect the domestic labor force, Congress has capped H-1B visa approvals for most private employers (excluding certain government and nonprofit employers) at 65,000 per year, with another 20,000 holders of advanced degrees. 8 U.S.C. § 1184(g).

56. Certain employers, however, are exempt from the H-1B cap. Specifically, the H-1B cap does not apply to institutions of higher education, or a related or affiliated nonprofit entity, nonprofit research organizations, or governmental research organizations. 8 U.S.C. § 1184(g)(5). These employers are referred to as "cap-exempt."

57. To obtain an H-1B visa for a worker, an employer in the United States subject to the H-1B cap must enter an annual lottery that is generally held in March of each year for employment starting at the beginning of the federal fiscal year in October. 8 C.F.R. § 214.2(h)(8)(iii). Cap-exempt employers who have formally established their cap-exempt status do not need to register or participate in the annual lottery and may file petitions with the United States Citizenship and Immigration Services ("USCIS") using Form I-129, Petition for Nonimmigrant Worker at any time. *See Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting Other Nonimmigrant Workers*, 89 Fed. Reg. 103,054, 103,183 (Dec. 18, 2024).

58. Unlike the H-1B employees of employers who must participate in the lottery, H-1B employees of cap-exempt employers have more flexibility on their start dates. *See id.* (stating that "petitioners that qualify under the cap exemptions will also benefit from not having to wait for H-1B cap season to commence employment. This may allow approved petitioners to have their H-1B workers commence employment earlier, prior to the beginning of the fiscal year on October 1").

59. Since its inception, Congress has continually tailored the H-1B visa program to carry balance employers' labor needs with the interests of American workers to ensure that they are not wrongfully displaced.[4] To that end, employers seeking to hire H-1B workers—including cap-exempt employers—must pay certain fees and make certain attestations to the Department of Labor ("DOL") aimed at protecting U.S. workers and H-1B workers. *See* 8 U.S.C. § 1182(n)(1).

60. Specifically, an employer must submit a labor condition application in which the petitioning employer attests to DOL that the position will pay the greater of (1) the actual wage level paid by the employer to all other individuals with similar experience and qualifications; or (2) the prevailing wage for that occupational classification. *See* 8 U.S.C. § 1182(n)(1)(A). The employer must also state that it will provide working conditions for the position that will not adversely affect the working conditions of workers similarly employed; that there is not a strike or lockout in the course of a labor dispute in the occupational classification of the H-1B worker at the place of employment; and that the employer has provided certain forms of notice regarding the position. 8 U.S.C. § 1182(n)(1)(A)–(D). DOL then reviews and certifies the employer's application. 20 C.F.R. § 655.730(b). Once certified, the employer files a Form I-129 petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. *See* 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i)–(2)(i)(A).

---

[4] *See*, *e.g.*, Muzaffar Chrishti & Stephen Yale-Loehr, *The Immigration Act of 1990: Unfinished Business a Quarter-Century Later*, Migration Policy Institute Issue Brief (July 2016), https://www.migrationpolicy.org/sites/default/files/publications/1990-Act_2016_FINAL.pdf; *see also*, American Competitiveness and Workforce Improvement Act of 1998, Pub. L. No. 105-277, §§ 411-15, 112 Stat. 2681, 2681-642 (1998); H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, § 422, 118 Stat. 2809 (2004).

## II. Legislative and Regulatory Scheme for H-1B Fees

61. When petitioning for an H-1B worker, employers are required to pay certain fees. Some are statutory fees set by Congress. *See* 8 U.S.C. § 1356(m); 8 U.S.C. § 1184(c)(9)–(13). Others are USCIS "adjudication" fees set by notice-and-comment rulemaking pursuant to pursuant to Congress's grant of authority to DHS to promulgate regulations and charge fees to ensure recovery of full costs to provide services. *See* 8 U.S.C. § 1103(a)(3); 8 U.S.C. § 1356(m). These fees are to be paid by the petitioning employer, not by the H-1B worker. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C).

### A. Congress has consistently exercised its power over H-1B visa fees and to exempt employers serving the interests of the public.

62. On numerous occasions, Congress has passed statutes specifying fees associated with H-1B petitions.

63. In 1998, through the American Competitiveness and Workforce Improvement Act ("ACWIA"), Congress required certain H-1B petitioners to pay an education and training fee of $500 to address concerns about the potential adverse impact of the H-1B program on domestic workers and possible abuse of the program. *See* Pub. L. No. 105-277, § 414, 112 Stat. 2681, 2681-652; *see also* 144 Cong. Rec. S10877–78 (daily ed. Sept 24, 1998) (statement of Sen. Abraham). The ACWIA fee revenue is placed into funds for scholarships, grants, and training programs to help U.S. workers and students and to fund DOL's administration and enforcement of the program. 8 U.S.C. § 1356(s). Colleges, universities, and non-profit research institutions are exempt from this fee. 8 U.S.C. § 1184(c)(9)(A).

64. In 2000, Congress increased the education and training fee from $500 to $1,000. *See* Pub. L. No. 106-311, 114 Stat. 1247. At the same time, Congress exempted universities and nonprofit research institutions from the H-1B cap. American Competitiveness in the Twenty-First

Century Act of 2000, Pub. L. No. 106-313, § 103, 114 Stat. 1251, 1252 (2000). Congress reasoned that such an exclusion from the H-1B cap was necessary, in part, because

> [b]y virtue of what they are doing, people working in universities are necessarily immediately contributing to educating Americans. The more highly qualified educators in specialty occupation fields we have in this country, the more Americans we will have ready to take positions in these fields upon completion of their education.

S. Rep. No. 106-260, at 21–22 (2000.)

65. The education and training fee in the ACWIA expired in 2003. In the H-1B Visa Reform Act of 2004, Congress revived the fee, increasing it from $1,000 to $1,500 for employers with 26 or more employees and reducing it to $750 for all other employers. Pub. L. No. 108-447, § 422, 118 Stat. at 3353.

66. The H-1B Visa Reform Act of 2004 also added a new $500 fraud prevention and detection fee (anti-fraud fee) to be paid by the employer with all initial H-1B petitions. Employers that are exempt from the H-1B education and training fee are still subject to the anti-fraud fee. Pub. L. No. 108-447, § 426, 118 Stat. at 3357–58 (2004).

67. In 2010, Congress mandated that the filing fee and anti-fraud fee be increased by $2,000 for those employers with 50 or more employees in the United States, where more than 50% of their employees are on H-1B or L-1 nonimmigrant status[5] (often referred to as "50/50 employers"). Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010).

68. In 2016, Congress increased the fee for 50/50 employers to $4,000 for each H-1B petition in addition to the other filing and petition fees ("Public Law 114-113 Fee," lso known as

[5] The L-1 nonimmigrant status allows a U.S. employer to temporarily transfer an individual that is in a capacity that is managerial, executive, or involves specialized knowledge to an office in the United States. 8 U.S.C. § 1101(a)(15)(L).

the "border security fee" or "9-11 response fee"). Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 402(g), 129 Stat. 2242, 3006 (2015).

69. In the 2020 Emergency Stopgap USCIS Stabilization Act ("USCIS Stabilization Act"), Congress authorized USCIS to establish and collect premium processing fees, *i.e.*, additional fees for expedited processing for certain immigration benefit types, including H-1B petitions. Pub. L. No. 116-159, § 4102, 134 Stat. 739 (2020); 8 U.S.C. § 1356(u). The USCIS Stabilization Act authorized DHS to adjust premium processing fees on a biennial basis to keep pace with inflation. 8 U.S.C. § 1356(u)(3)(C). The premium processing fee, which is currently $2,805 for H-1B petitions, is an optional fee that can be paid by those seeking an expedited decision on an H-1B petition for various reasons, such as petitioning employers seeking to fill a critical role quickly or beneficiaries facing the expiration of a current visa status.

**B. Congress delegated limited authority to USCIS to set visa-related adjudication fees pursuant to 8 U.S.C. § 1356(m).**

70. Congress explicitly limits the scope of DHS's authority to set visa-related adjudication fees. Under INA § 286(m) (8 U.S.C. § 1356(m)), Congress has limited the fees that DHS may charge for adjudication and naturalization services to those that (1) "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and (2) "recover any additional costs associated with the administration of the fees collected." Pursuant to this directive, DHS has set H-1B fees through notice-and-comment rulemaking, justifying fee increases based on administrative expenses. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (stating that an "increase from $10 to $215" in the lottery registration fee "may appear to be exorbitant" but was necessary to "cover the expenses of the H-1B registration program").

71. To ensure that its filing fees accurately recover the full costs of providing the services rendered, pursuant to the Chief Financial Officers Act ("CFO Act"), USCIS reviews the fees it charges every two years. 31 U.S.C. § 902(a)(8).

72. The fees prescribed in the regulations that are not set or limited by statute may be adjusted for inflation, but not more than once per year, and only by publication of a rule in the Federal Register. 8 C.F.R. § 106.2(d).[6]

73. Under this statutory authority, DHS has historically promulgated regulations for adjudication fees for H-1B petitions through the notice-and-comment rulemaking process. Only when Congress has specifically prescribed that the agency need not go through the APA process to change fees has DHS foregone notice-and-comment rulemaking.[7]

**C. The current visa-related adjudication fees set pursuant to DHS's circumscribed delegation of authority are fractions of the fee implemented by the Policy.**

74. DHS has adjusted H-1B adjudication fees several times, most recently in 2024, by means of a notice-and-comment rulemaking process pursuant to the APA.

75. On January 31, 2024, DHS implemented revised fees for the adjudication of immigration applications, including H-1B petitions ("January 2024 rule"), recognizing that the INA requires "USCIS fees to be based on total costs for USCIS to carry out adjudication and naturalization services." *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit*

---

[6] The regulation does not explicitly require that the agency go through the notice-and-comment rulemaking process for inflation adjustments to fees that are not set or limited by statute. *See* 8 C.F.R. § 106.2(d); *see also infra* note 12.

[7] For example, in 2023, DHS published a rule effective February 2024 increasing premium processing fees without going through the notice-and-comment requirements under the APA, citing 8 U.S.C. 1356(u)(3)(C), which provides that "the provisions of section 553 of Title 5 shall not apply to an adjustment authorized under [section 286(u)(3)(C) of the INA, 8 U.S.C. § 1356(u)(3)(c)]." 8 U.S.C. 1356(u)(3)(C); *Adjustment to Premium Processing Fees*, 88 Fed. Reg. 89,539-02 (Dec. 28, 2023).

*Request Requirements*, 89 Fed. Reg. 6194, 6288 (Jan. 31, 2024). This was the first major adjustment of immigration benefit fees since 2016. *See U.S. Citizenship and Immigration Fee Schedule,* 81 Fed. Reg. 73,292 (Oct. 24, 2016) (adjusting USCIS immigration benefits fee schedule for the first time in more than 6 years, increasing fees by a weighted average of 21 percent).[8]

76. Typically, DHS considers many factors when increasing its adjudication fees, including the ability to pay for small employers and non-profits. For example, under the January 2024 rule, the basic filing fee for Form I-129 (Petition for a Nonimmigrant Worker, filed in connection with H-1B visa petitions) was increased from $460 to $780.[9] The fee, however, remained at $460 for small employers and nonprofits. *See USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 Fed. Reg. 6194, 6291 (Jan. 31, 2024); 8 C.F.R. § 106.2(a)(3)(i).

77. The January 2024 rule also established a new $600 "Asylum Program Fee" to be paid by employers who file certain petitions, including Form I-129, "in order to maintain lower fees for other immigration benefit requestors than if these asylum costs were spread among all other fee payers." 89 Fed. Reg. 6194*,* 6208 (Jan. 31, 2024). DHS again considered employers' ability to pay, and the fee was reduced to $300 for small employers and waived for nonprofit organizations. *See id.*; 8 C.F.R. § 106.2(c)(13).

---

[8] USCIS published a final rule in 2020 (*USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788 (Aug. 03, 2020) that was enjoined by a federal court before it was implemented. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 549 (N.D. Cal. 2020).

[9] Additionally, a $50 discount is available if the I-129 is filed electronically. 8 C.F.R. § 106.1(g).

78. Lastly, the January 2024 rule created a non-refundable H-1B registration fee of $215 per beneficiary for petitioners to enter the H-1B lottery.[10] 8 C.F.R. § 106.2(c)(11). Cap-exempt employers are not required to file this registration or pay the H-1B registration fee.

79. Thus, following the January 2024 rule and prior to the Proclamation, regulatory and statutory fees for an H-1B petition included the following:

a. A $780 petition fee, $460 for small employers and nonprofits, set via noticed rulemaking.[11] 8 C.F.R. § 106.2(a)(3).

b. A $215 H-1B Registration Process fee for employers subject to the H-1B cap, set by noticed rulemaking. 8 C.F.R. § 106.2(c)(11).

c. An Asylum Program Fee of $600 or $300 for a small employer, set by noticed rulemaking. Non-profits are exempt from this fee. 8 C.F.R. § 106.2(c)(13);

d. An ACWIA fee, set by Congress, of either $1,500 or $750. 8 U.S.C. § 1184(c)(9)(A)–(B); 8 C.F.R. § 214.2(h)(19); 8 C.F.R. § 106.2(c)(4). Cap-exempt employers are exempt from this fee. 8 C.F.R. § 214.2(h)(19)(iii).

e. A fraud prevention and detection fee, set by Congress, of $500 for certain H-1B petitions. 8 U.S.C. § 1184(c)(12)(A)–(C); 8 C.F.R. § 106.2(c)(5)(i).

[10] Employers subject to the H-1B cap seeking to file H-1B petitions must electronically register each person for whom they plan to file an H-1B petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). After the initial registration period closes, USCIS then runs a lottery to select the beneficiaries that may file an H-1B petition.

[11] A "small employer" is defined under the Code of Federal Regulations as a "firm or individual that has 25 or fewer full-time equivalent employees in the United States, including any affiliates and subsidiaries." 8 C.F.R. § 106.1(f)(1). "Non-profit" is defined as "not-for-profit primary or secondary educational institutions, or institutions of higher education, as defined in section 101(a) of the Higher Education Act of 1965, 20 U.S.C. § 1001(a); organizations organized as tax exempt under the Internal Revenue Code of 1986, section 501(c)(3), 26 U.S.C. § 501(c)(3); or governmental research organizations as defined under 8 C.F.R. § 214.2(h)(19)(iii)(C)." 8 C.F.R. § 106.1(f)(2).

f. A $2,805 "premium processing fee" if the sponsoring employer elects to have a petition processed within a shorter timeframe, set by noticed rulemaking.[12] 8 U.S.C. § 1356(u)(3); 8 C.F.R. § 106.4.

g. A $ 4,000 Public Law 114-113 Fee, set by Congress, for 50/50 employers. 8 C.F.R. § 106.2(c)(8).[13]

80. In total, an employer filing an initial H-1B petition would pay between $960 to $7,595 in regulatory and statutory fees,[14] at least one or two orders of magnitude less than the $100,000 fee announced in the Proclamation.

**III. INA Sections 212(f) and 215(a)**

81. The Proclamation invokes two provisions of the INA: sections 212(f) and 215(a), 8 U.S.C. §§ 1182(f) and 1185, respectively.

82. Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

83. This provision delegates to the President authority to impose immigration restrictions to advance interests in foreign relations or national security. However, "Congress' delegation of authority in the immigration context under Section 1182(f) does not afford the

[12] DHS published a final rule, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023. *See Adjustment to Premium Processing Fees*, 88 Fed. Reg. 89,539 (Dec. 28, 2023). The adjustment increased premium processing fees for H-1B petitions from $2,500 to $2,805.

[13] Collection of this fee is scheduled to end on September 30, 2027. 8 C.F.R. § 106.2(c)(8).

[14] For example, a nonprofit organization that is cap-exempt would pay a $460 petition fee, and a $500 anti-fraud fee ($460 + $500 = $960), while a non-exempt employer could potentially pay upwards of $7,595 ($780 petition fee + $1500 ACWIA fee + $500 anti-fraud fee + $215 lottery registration fee + $600 asylum program fee + $ 4000 Public Law 114-113 Fee).

President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners." *Nat'l Assoc. of Mfrs.*, 491 F. Supp. 3d at 563.

84. Section 215(a) of the INA provides that it is unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policymaking authority stemming from this provision "substantially overlap[s]" with the President's authority under Section 212(f). *Trump v. Hawaii*, 585 U.S. 667, 693 n.1 (2018).

85. The President's authority under Section 212(f) to restrict noncitizens from entering the United States is not unlimited. The Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Hawaii*, 585 U.S. at 689. Other courts that have considered the scope of Section 212(f) have held that that provision does not delegate to the President the authority to depart from INA as enacted. *See, e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020) (holding the Section 212(f) does not grant the President power to "effectively rewrit[e] provisions of the INA" or "eviscerate[] the statutory scheme"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d. 19, 80 (D.D.C. 2025) (Section 212(f) "cannot plausibly be read to authorize the President . . . to supplant" the express provisions of the INA).

86. The President lacks "authority to alter the rules" created by Congress, or to render other INA provisions "dead letters." *Refugee & Immigrant Ctr. for Educ. & Legal Servs.*, 793 F. Supp. 3d. at 81, 85. "[T]here must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative." *Nat'l Assoc. of Mfrs.*, 491 F. Supp. 3d at 563.

87. A prerequisite for restricting entry into the United States under Section 212(f) is that the President "find[] that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). While the Proclamation alleges abuses of the H-1B visa program by the information technology industry, it provides no other basis for the broad imposition of a fee across all employment sectors, including for public employers. The Proclamation provides no findings showing that the existing statutory scheme for preventing and penalizing abuse is inadequate.

88. The Proclamation also fails to identify the "class of aliens" that will be the subject of the $100,000 fee. *See Hawaii*, 585 U.S. at 687, 688 (acknowledging that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f)). The only noncitizens identified in the Proclamation whose entry (according to the Proclamation) would be detrimental to the United States are noncitizens "whose petitions are [not] accompanied or supplemented by a payment of $100,000." The Proclamation would include all H-1B applicants, regardless of the employment they are seeking, their respective qualifications for employment, the economic and public benefit of their employment, or the need they are fulfilling in the industry in which they work.

89. Congress has carefully crafted the H-1B visa system to meet the needs of the domestic economy. While the executive branch has "the fundamental authority . . . to manage our nation's foreign policy and national security affairs," *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020), the President is not afforded the same deference when "executive action under § 1182(f) is taken for reasons grounded in domestic policy, and not on international affairs and national security," *Young v. Trump*, 506 F. Supp. 3d 921, 942 (N.D. Cal. 2021). An executive action does not implicate the President's foreign affair powers "simply because [it] affects immigrants," and

the President's "power is more circumscribed when he addresses a purely domestic economic issue." *Doe #1*, 957 F.3d at 1067 (citing *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1279 (9th Cir. 2020)).

## FACTUAL ALLEGATIONS

### I. The Policy

#### A. President Trump prompts promulgation and implementation of the Policy by issuing the Proclamation.

90. On September 19, 2025, President Trump issued the Proclamation. The Proclamation's preamble asserts—without evidence—that some employers have abused the H-1B program, which purportedly has undermined the U.S. economy and significantly harmed American workers, by artificially suppressing wages, "resulting in a disadvantageous labor market for American citizens," and making it more challenging for college graduates to find jobs, "allowing employers to hire foreign workers at a significant discount to American workers." The preamble specifically focuses on the information technology sector, noting that IT firms "in particular have prominently manipulated the H-1B system, significantly harming American workers in computer-related fields."

91. The Proclamation further alleges that these abuses "present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields," and that it is therefore "necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." The Proclamation, however, fails to offer any specific factual basis for these assertions, nor does it provide an explanation as to why a broadly applied fee increase, without regard to employer or industry, is necessary.

92. The Proclamation contains five sections. Sections 1 through 3 invoke the President's purported authority and direct the Secretary of Homeland Security to impose the new $100,000 fee. *See Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027, 46,028–46,029 (Sept. 19, 2025).

93. Section 1 is entitled "Restriction on Entry."[15] Subsection 1(a) cites the President's discretionary authority to limit immigration under sections 212(f) and 215(a) of the Immigration and Nationality Act[16] to impose a $100,000 fee on all petitions for visas under the H-1B program. This subsection states that the requirement goes into effect on September 21, 2025, and expires after twelve months if not extended. Subsection 1(b) directs the Secretary of Homeland Security to enforce the Proclamation and further directs the Secretary of State to issue guidance "to prevent the misuse" of H-1B visas by foreign nationals with employment beginning before October 1, 2026.

94. Subsection 1(c) grants the Secretary of Homeland Security broad discretion to waive the $100,000 fee for any "individual alien," "company," or "industry" where such waiver is "in the national interest." Concerningly, neither the Proclamation nor any subsequent materials issued by DHS provide rules, standards, clarification, or guidance for what constitutes "national interest" or how such exceptions may be applied. In light of the importance of H-1B visas to many employers, such exemptions—or the withholding of exemptions—could easily be used to reward behavior favoring the administration and to coerce compliance with the administration's agenda. The administration's efforts to shape the behavior of public universities, research facilities, and schools has already been the subject of considerable litigation.

[15] *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027, 46,028–46,029 (Sept. 19, 2025).

[16] Codified at 8 U.S.C. §§ 1182(f), 1185(a).

95. Section 2 of the Proclamation, entitled "Compliance," requires that employers, prior to filing an H-1B petition, obtain documentation showing payment of the $100,000 fee, and requires that the Secretary of State verify receipt of payment of the $100,000 fee. It further directs DHS and the Department of State to "coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation."

96. Section 3 of the Proclamation—"Scope and Implementation of Restriction on Entry"—states that the Proclamation's restriction on entry shall apply only to nonimmigrants who enter or attempt to enter the United States after the effective date of the Proclamation. It further states that no later than 30 days following the completion of the H-1B lottery that immediately follows the Proclamation, the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President a recommendation on whether the $100,000 fee should be extended beyond its initial 12-month period.

97. While the Proclamation purports to address concerns related to the technology sector, it fails to discuss the role of H-1B visas in alleviating worker shortages in other human service sectors like education and healthcare. The Proclamation also fails to address the relationship between H-1B employment and broader national interests.

### B. President Trump and his administrations have ignored the role of H-1B visas in public sector employment, while espousing conflicting positions on the value of the H-1B program and justification for the Proclamation and Policy.

98. Before executing the Proclamation and during its ongoing implementation, President Trump and other administration officials have offered conflicting statements regarding H-1B visas and their role in the nation's labor market and economy, while neglecting the role of

H-1B visas in public- and nonprofit-sector employment—indeed, in any economic sector outside of the technology sector.

99. To the knowledge of Plaintiff States, no representative of the administration has publicly addressed the role of H-1B visas in alleviating nationwide teacher and healthcare worker shortages and ensuring that residents of Plaintiff States—or any States—have access to basic human services.

100. Prior to his election and during his first presidential term, President Trump made various statements criticizing the program. In 2016, he stated: "I will end forever the use of the H-1B as a cheap labor program, and institute an absolute requirement to hire American workers first for every visa and immigration program. No exceptions."[17] Subsequently, in 2017, President Trump signed the "Buy American and Hire American" executive order, directing DHS to review and propose reforms on the H-1B program. Exec. Order No. 18837, 82 Fed. Reg. 18,837 (Apr. 18, 2017).

101. More recently, President Trump acknowledged the importance of the H-1B program to fill labor needs due to the lack of skilled labor in the United States. For example, in 2024 then President-elect Trump stated: "I have many H-1B visas on my properties. I've been a believer in H-1B. I have used it many times. It's a great program."[18] Just last month, he reiterated that H-1B workers are necessary to domestic labor and industry, stating that "we're not going to

---

[17] Donald J. Trump, Statement by Donald J. Trump on Position on Visas (Mar. 03, 2016), archived at https://www.presidency.ucsb.edu/node/314461.

[18] Jon Levine, *Trump Supports Immigration Visas Backed by Musk: 'I Have Many H-1B Visas on My Properties*,' N.Y. Post (Dec. 28, 2024), https://nypost.com/2024/12/28/us-news/donald-trump-backs-h-1b-visa-program-supported-by-elon-musk.

be successful if we don't allow people that invest billions of dollars in plants and equipment to bring a lot of their people from their country to get that plant open, operating and working."[19]

102. Although the Proclamation asserts that H-1B visa employers have abused the program and driven down wages, the Proclamation fails to offer any evidence for this proposition, much less that it extends to public- or nonprofit-sector employers. The Proclamation also contains no assertion that the purported "abuse" is present outside of the IT sector (thereby warranting the breadth of the Policy). Moreover, statements made by President Trump and administration officials do not evince consideration of how the fee would impact public sector or nonprofit employers.

103. For example, in announcing the Proclamation, statements by Secretary of Commerce Howard Lutnick suggest that the administration did not consider impacts outside the private sector and, in particular, large technology companies:

> The whole idea is no more will these *big tech companies, or other big companies* train foreign workers. They have to pay the government $100,000, then they have to pay the employee. So it's just not economic. If you're going to train somebody, you are going to train one of the recent graduates from one of the great universities across our land. Train Americans. Stop bringing in people to take our jobs. That's the policy here. $100,000 a year for H-1B visas and *all of the big companies* on board.[20]

104. Secretary Lutnick's statements further demonstrated a lack of knowledge of the fees already set by Congress to protect American workers: "Stop the nonsense of letting people just come into the country on these visas that were given away for free." *Id*.

---

[19] Dan Gooding & Gabe Whisnant, *Donald Trump Says Bringing in Foreign Workers is 'MAGA,' Newsweek* (Nov. 19, 2025), https://www.newsweek.com/donald-trump-immigration-h1b-visa-maga-deportation-workers-11076200.

[20] *Trump Signs Order That Adds $100k Annual Fee to H-1B Visas for High-Skilled Workers*, PBS News (Sep. 20, 2025), https://www.pbs.org/newshour/politics/trump-signs-proclamation-that-adds-100k-annual-fee-to-h-1b-visas-for-high-skilled-workers (emphasis added).

105. But later, in November 2025, during an interview with Fox News, President Trump acknowledged the necessity of the H-1B program to "bring in talent" and recognized that "[y]ou don't have certain talents and people have to learn—you can't take people off an unemployment line and say 'I'm going to put you into a factory where we're going to make missiles.'"[21]

**C. Defendants implemented the Policy without observing required procedures or considering the enormous disruption it would cause.**

106. The terms of the Proclamation require that implementation and enforcement be carried out by the named Defendants.[22] Following the announcement of the Proclamation, USCIS eventually issued written documents addressing whether the H-1B visa fee would apply to preexisting H-1B visa holders, how payment of the $100,000 of the fee should be made, and how employers could seek an exception to the fee.

107. Initially, Secretary Lutnick stated at the announcement of the Proclamation that the fee would be an annual cost: "If you have a very sophisticated engineer and you want to bring them in . . . then you can pay $100,000 a year for your H-1B visa."[23] These statements and the resulting lack of clarity as to the application of the Policy caused widespread chaos and confusion in the immediate aftermath of the announcement. This was especially true for current H-1B visa

---

[21] *See* Siladitya Ray, *Trump Defends Need for H-1B Visas in Fox News Interview*, Forbes (Nov. 12, 2025), https://www.forbes.com/sites/siladityaray/2025/11/12/you-dont-have-certain-talents-trump-defends-need-for-h-1b-visas-in-fox-news-interview.

[22] *See* Section I.A., *supra*.

[23] Barbara Ortutay & Seung Min Kim, *Trump Signs Proclamation Adding $100k Annual Fee for H-1B Visa Applications*, AP News (Sep. 19, 2025), https://apnews.com/article/h1b-visa-trump-immigration-8d39699d0b2de3d90936f8076357254e.

holders traveling internationally and for prospective employers unsure about whether the fee applied to them.[24]

108. To address confusion from foreign nationals who had been granted H-1B visas but had not yet entered or had temporarily left the United States, USCIS published a memorandum dated September 20, 2025 ("September Memorandum"), and a Frequently Asked Questions document dated September 21, 2025 ("FAQ"), directing that the Proclamation's effect is limited to visa petitions that had not yet been filed.[25]

109. In addition, on September 20, 2025, White House Press Secretary Karoline Leavitt stated that the $100,000 fee is a one-time fee that applies only to new visas, and not renewals, contradicting Secretary Lutnick's earlier statements.[26]

110. On October 20, 2025, USCIS issued a second memorandum ("October Memorandum"), clarifying that the fee applies to new petitions filed on or after September 21, 2025, "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa"; new petitions that request "consular notification, port of entry notification, or pre-flight inspection for an alien in the United States"; and new petitions for change of status, amendment, or extension where the USCIS has determined that the individual is not eligible for the request.[27]

---

[24] Aditya Soni & Echo Wang, '*Fast and Furious': H-1B Workers Abroad Race to US as Trump Order Sparks Dismay, Confusi*on, Reuters (Sep. 21, 2025), https://www.reuters.com/sustainability/sustainable-finance-reporting/fast-furious-h-1b-workers-abroad-race-us-trump-order-sparks-dismay-confusion-2025-09-21.

[25] U.S. Citizenship and Immigration Services, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B* (Sep. 20, 2025), https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf; Press Release, U.S. Citizenship and Immigration Services, *H-1B FAQ* (Sep. 21, 2025), https://www.uscis.gov/newsroom/alerts/h-1b-faq.

[26] Karoline Leavitt (@PressSec), X (Sept. 20, 2025, 4:16 PM), https://x.com/PressSec/status/1969495900478488745.

[27] U.S. Citizenship and Immigration Services, *H-1B Specialty Occupations*, https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations.

111. The additional guidance also stated that petitions not subject to the $100,000 fee include: (a) any petition filed before September 21, 2025; (b) any petition filed before September 21 where a beneficiary already holds a valid H-1B visa, or will apply for a visa based on an approved petition that was filed before September 21 (even if approved afterward); and (c) any new petition filed on or after September 21 requesting an amendment, change of status, or extension of stay for a beneficiary who is physically present in the United States when USCIS approves the request. *Id*.

112. As of this filing, Plaintiff States understand the Policy to include the September and October Memoranda, FAQ, and any non-public rules implementing the $100,000 fee announced in the Proclamation.

**II. Harms to Plaintiff States**

113. Plaintiff States, their agencies, and their political subdivisions hire H-1B workers to fill critical vacancies in education, healthcare, and other specialized fields where worker shortages are prevalent. Other nonprofit providers of core services to Plaintiff States' residents, organizations like hospitals, also rely on H-1B workers to recruit essential workers in the face of a labor shortage. The Policy will cause irreparable harm to the Plaintiff States by curtailing their ability to fill critical roles in their institutions. The resulting shortages, both within and outside Plaintiff States' institutions and agencies, will impact Plaintiff States' operations, systems, and services in healthcare, education, and other essential areas.

**A. The Policy will harm primary and secondary education.**

114. The United States faces a nationwide teacher shortage. For example, in the 2024–2025 school year, 74% of school districts reported having trouble filling open positions,

particularly in special education, physical sciences, ESL or bilingual education, and foreign languages.[28]

115. This shortage is particularly acute in areas that face difficulty attracting skilled educators. Due to the difficulty in filling vacant teaching positions, local educational agencies ("LEAs") nationwide, including public-school districts, often turn to the H-1B visa program to fill vital educator roles that cannot be filled by domestic workers. [29]

116. Educators are the third-largest occupation using H-1B visas—nearly 30,000 educators in total were the subject of H-1B petition approvals in FY 2024.[30] In fiscal year 2025, over 500 K-12 public school districts employed more than 2,300 H-1B visa holders nationwide.[31] Rural areas are particularly dependent on H-1B workers. [32] As an Alaska superintendent observed with respect to the Proclamation, "[w]ith a pen stroke, we possibly have ruined the future of

[28] *See* Press Release, National Center for Education Statistics, *Most U.S. Public Elementary and Secondary Schools Faced Hiring Challenges for the Start of the 2024–25 Academic Year* (Oct. 17, 2024), https://nces.ed.gov/whatsnew/press_releases/10_17_2024.asp; Jenny Brundin, *$100,000 Visa Fee Could Stifle Colorado Schools' Ability to Hire International Teachers—Who Were Helping Fill Gaps,* Colorado Public Radio (Oct. 3, 2025) ("While headlines focus on whether foreign workers displace U.S. tech workers, schools face a different reality: a chronic teacher shortage exacerbated by low wages and a polarized political culture.").

[29] *See* Madeleine Ngo, *Trump's H-1B Visa Fee Could Strain Universities and Schools*, N.Y. Times (Oct. 8, 2025), https://www.nytimes.com/2025/10/08/us/politics/trump-h-1b-visa-fee-universities.html; Carrie Jung, *How Are Some Districts Responding to the Teacher Shortage? With H-1B Visa*s, WBUR News (May 18, 2023), https://www.wbur.org/news/2023/05/18/bilingual-teachers-recruitment-framingham-visas.

[30] *See* U.S. Citizenship and Immigration Services, *Characteristics of H-1B Specialty Occupation Workers Fiscal Year 2024 Annual Report to Congre*ss (Apr. 29, 2025), https://www.uscis.gov/sites/default/files/document/reports/ola_signed_h1b_characteristics_congressional_report_FY24.pdf.

[31] *See* National Education Ass'n, *NEA Data Brief: H-1B Visas in Public School Districts* (Oct. 8, 2025), https://www.nea.org/resource-library/nea-data-brief-h-1b-visas-public-school-districts.

[32] Sequoia Carrillo, *Many Rural Schools Rely on International Teachers. Trump's Visa Changes Threaten That*, NPR (Oct. 15, 2025), https://www.npr.org/2025/10/15/nx-s1-5552240/trump-visa-cuts-schools-interational-teachers.

education for Alaska students."[33] A South Dakota superintendent remarked, "[w]e've hired the H-1B teachers because we quite simply don't have other applicants for those positions. So they're certainly not taking jobs from Americans. They're filling jobs that otherwise just simply would not get filled."[34]

117. Ultimately the effects of the Policy will be felt in schools nationwide. A Colorado superintendent observed, "I think we're shutting down, maybe, having the best teachers in front of kids, because that's what this—intentionally or unintentionally—may do."[35]

118. California public school districts are affected by the nationwide teacher shortage and face the same challenges recruiting qualified educators. According to the California Department of Education, "there is currently an extensive shortage of qualified educators in the state."[36] For the 2023–2024 school year, 89 California LEAs[37] requested 317 H-1B visas for teachers.[38] Of these, 287 visas were granted.[39] The number of visas requests has increased

---

[33] Brian Venua, *The White House Raised the Cost of H-1B visas. Alaska Schools Could Face Major Consequences*, Alaska Public Media (Sept. 29, 2025), https://alaskapublic.org/news/2025-09-29/the-white-house-raised-the-cost-of-h1b-visas-alaska-schools-could-face-major-consequences.

[34] Sarah Raza, *Trump's $100,000 H-1B Visa Fee Threatens Rural Schools and Hospitals Reliant on Immigrant Workers*, PBS (Oct. 8, 2025), https://www.pbs.org/newshour/politics/trumps-100000-h-1b-visa-fee-threatens-rural-schools-and-hospitals-reliant-on-immigrant-workers.

[35] Anna Merod, *Hiring Foreign Teachers? What to Look Out for as Trump Targets H-1B Visas*, K-12 Dive (Oct. 2, 2025), https://www.k12dive.com/news/h-1b-visa-fee-impact-schools-teacher-shortages/795034.

[36] Cal. Dep't of Educ., *Report to the Legislature: Teacher Credentialing: Teacher Preparation Outside of the United States and H-1B Work Visas* at 3 (November 2024), https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.cde.ca.gov%2Fci%2Fpl%2Fdocuments%2Flegrpt2024-h1b.docx.

[37] California LEAs include school districts and charter schools.

[38] Cal. Dep't of Educ., s*upra* note 36, at 1.

[39] *Id.*

consistently over the past six years, with the exception of the 2020–2021 school year, when a significant number of schools were closed and in-person instruction was dramatically curtailed.[40]

119. According to the California Department of Education, "California LEAs embody the type of employer that may benefit from [the H-1B] program."[41] Teachers on H-1B visas are required to obtain and keep in good standing all licenses, certifications, or authorizations required.[42] Like other employers, LEAs are required to submit a labor condition application to confirm that teachers on H-1B visas are paid consistently with domestic workers with similar education, credentials, and experience.[43]

120. Public schools within the Commonwealth of Massachusetts rely on H1-B visas to fill critical positions. The availability of H-1B visas ensures that Massachusetts public schools can provide adequate educational programming for their students and meet the needs of their students.

121. Likewise in Delaware, in the 2023–2024 school year, at least eight Delaware LEAs requested 33 H-1B visas for their Dual Language Immersion ("DLI") programming, which represents 15.2% of all of Delaware's DLI teachers. All of these visa applications were granted.

122. The State of Illinois is also experiencing a teacher and school staffing shortage. In the 2023–2024 school year, 3,864 teaching positions alone remained unfilled.[44] The majority of school districts reported that the teaching and staffing shortage was compounded by few applicants

[40] *Id.* at 7.

[41] *Id.* at 2–3.

[42] *Id.* at 3.

[43] *Id.*

[44] Illinois State Board of Education et al., *Educator Shortage Report: Academic Year 2024-2025*, at 2, 5 (2025), *available at* https://iarss.org/wp-content/uploads/2025/03/IWERC-Educator-Shortage-SY25-250313.pdf.

and underqualified individuals seeking positions, particularly in rural and urban areas.[45] Many anticipate that these needs will continue to grow in their districts.[46]

123. Some districts in Illinois have successfully recruited international teachers to fill these vacancies.[47] Unfortunately, rising H-1B visa costs are already disrupting international recruitment to address staffing needs. For example, Chicago Public Schools ("CPS"), one of the largest school districts in the United States, actively uses the H-1B program to hire specialized staff who are primarily educators. CPS frequently targets positions that are difficult to fill locally, including bilingual teachers (typically for Spanish and Mandarin Chinese), special education teachers, math teachers, computer science teachers, and bilingual speech-language pathologists. CPS currently employs 82 H-1B visa holders, including 58 teachers, clinicians, or service providers in school-based roles, and 24 highly-skilled technical workers in the central office who provide critical district-wide services.

124. As of December 8, 2025, CPS has 711 teacher vacancies, including 446 in high need subject areas. The average length of time required to fill high need vacancies is nearly five months. Despite interest from at least 15 candidates who reside outside of the United States, CPS cannot pursue these applicants because of the $100,000 fee for H-1B visas. Moreover, the fee prevents CPS from rehiring former CPS international teachers who have returned to their home country or who have already successfully completed their 212(e) home residency requirements from a J-1 cultural exchange program. In addition, confusion and vagueness around the

[45] *Id.* at 4, 13–14, 38, 59.

[46] *Id.* at 16, 23, 30, 34.

[47] *Id.* at 52, 62, 64.

applicability of the $100,000 fee has also required CPS to decline at least 20 candidates who are present in the United States.

125. In short, the $100,000 fee has effectively eliminated CPS's use of the H1-B visa program as a viable recruitment pipeline for specialized roles (like bilingual and special education teachers) that are essential for serving Chicago's diverse student population and meeting legal mandates. The result is that critical vacancies remain open, leading to increased class sizes, reduced course offerings, and greater reliance on temporary staff. Disadvantaged students are disproportionately impacted, as they are statistically more likely to attend schools with high vacancy rates.

126. CPS is not the only school district impacted in Illinois. Rockford Public Schools District #205 has four certified teachers with current H-1B visas. Though Rockford has a teacher shortage, the $100,000 fee halted progress on approximately four teachers that school district would have sponsored, impacting its plan to employ teachers that are licensed bilingual teachers.

127. Similarly, the State of Maryland faces persistent K-12 teacher shortages. There were more than 1,600 teacher vacancies across Maryland's public-school systems at the start of the 2024–2025 school year.[48] Teacher retention is also a significant challenge: on average, about 10% of Maryland's public-school teachers do not return each year.[49] Currently, more than 10% of Maryland's teacher workforce consists of conditionally licensed teachers, who hold a bachelor's

---

[48] *See* Rachel Hise & Alex Reese, *Teacher Recruitment, Development, and Retention*, Maryland State Department of Education (Jan. 28, 2025), https://marylandpublicschools.org/stateboard/Documents/2025/0128/AM/Teacher-Recruitment-Development-and-Retention-A.pdf.

[49] *See* Carey M. Wright, State Superintendent of Schools, *Educator Workforce Data Update* at 6 Maryland State Department of Education (Feb. 25, 2025), https://marylandpublicschools.org/stateboard/Documents/2025/0225/Educator-Workforce-Overview-A.pdf.

degree but have not yet completed the requirements for professional licensure.[50] These teaching shortages and retention issues have led some Maryland public school systems—including the Baltimore City Board of School Commissioners ("BCBSC"), which oversees Baltimore City Public Schools; Prince George's County Public Schools; and Montgomery County Public Schools—to rely heavily on H-1B visa teachers to fill critical positions in hard-to-staff schools.[51]

128. BCBSC, which serves more than 76,000 pre-kindergarten through 12th grade students, has long relied on highly qualified teachers employed through the H-1B visa program to meet chronic staffing shortages, particularly in hard-to-fill subject areas such as math, science, special education, and English as a Second Language or English Language Development. BCBSC's use of H-1B visa teachers has been driven not by preference, but by necessity: Baltimore City's schools face persistent teacher vacancies, high turnover, and difficulty attracting enough qualified teaching candidates despite sustained domestic recruitment efforts. BCBSC currently sponsors 80 H-1B visa holders, including 78 teachers. These teachers are an essential part of BCBSC's ability to provide legally required educational services to Maryland students.

129. BCBSC already has begun active recruitment to staff schools for the 2026–2027 school year, and it intends to and has made progress toward hiring approximately 58 new educators who would teach in the school system through the H-1B visa program. However, BCBSC is unable to afford the H-1B visa fee imposed under the Policy and will be unable to hire these highly qualified candidates if the Policy is not enjoined. Losing access to this pathway for hiring qualified teachers would create a grave risk that more Baltimore City classrooms would go unstaffed for the 2026–2027 school year, student-to-teacher ratios would rise, course offerings may be reduced, and

---

[50] *Id*. at 10, 15.

[51] *See* U.S. Citizenship and Immigration Services, H-1B Employer Data Hub, https://www.uscis.gov/tools/reports-and-studies/h-1b-employer-data-hub (last visited Dec. 8, 2025).

Baltimore City, students and families who depend on qualified public-school teachers would not get the resources and attention they deserve.

130. Likewise, New Jersey has faced a years-long teacher shortage, resulting in increased class sizes, overburdened teachers, and less diverse curricula.[52] This shortage is only expected to worsen, given the substantial decline in provisional teacher certifications relative to the number of professionals permanently exiting the teaching profession.[53]

131. Thus, like many Plaintiff States, New Jersey has turned to H-1B visas to help address the teacher shortage in K-12 education. For example, in New Jersey, the Camden County School District passed a resolution in 2022 to utilize the H-1B visa program to fill months long vacancies, with a focus on foreign language positions.[54] Camden County's Superintendent Katrina McCombs stated that the "H-1B visa program that we're launching is just one of the ways that we are trying to make sure that we are wrapping support around our students who are non-native English speakers."[55]

---

[52] Nikita Biryukov, *New Jersey School Districts Still Face Teacher Shortages As New School Year Begins*, N.J. Monitor (Sept. 3, 2024), https://newjerseymonitor.com/2024/09/03/new-jersey-districts-still-face-teacher-shortages-as-new-school-year-begins.

[53] Daniel Douglas, Ann Obadan, Marjory F. Palius & Stephanie Walsh, *New Jersey's Teacher Workforce Landscape: 2024 Annual Report*, Heldrich Center for Workforce Development at Rutgers University at 24, https://www.nj.gov/education/rpi/docs/2024_New_Jersey_Teacher_Workforce_Landscape_Annual_Report.pdf

[54] Norris McLaughlin P.A., *New Jersey School District Votes to Utilize H-1B Program for Teaching Vacancies*, Nat'l L. Rev. (Mar. 3, 2022), https://natlawreview.com/article/new-jersey-school-district-votes-to-utilize-h-1b-program-teaching-vacancies.

[55] *Id.*

132. USCIS data indicates that Camden is one of many schools petitioning for H-1B educators. Approximately 20 K-12 school systems in New Jersey secured at least one H-1B approval in 2025 alone.[56]

133. Arizona also struggles with a critical and persistent teacher shortage, with over 1,000 teachers resigning since July 2025 and 4,200 teaching positions remaining vacant.[57] These positions often go unfilled, are covered by staff not fully certified for their positions, or require existing staff to provide coverage.[58] In order to address growing need and lack of recruitment success, Arizona public schools rely on international educators. Ten percent of Maricopa Unified School District's certified staff, and 26% of all its teachers, are international.[59] Arizona public schools requested 130 H-1B visa approvals in 2025.[60] Superior Unified School District superintendent affirmed that he does not "even have candidates to speak with and interview . . . [their] only choice is hiring international teachers."[61]

134. Because of the reliance by LEAs on H-1B visas to fulfill core educational needs, the Policy will cause significant harm to LEAs and to the students and communities they serve.

---

[56] *See* USCIS, H-1B Employer Data Hub, *supra* note 51.

[57] *See* Ariz. Dep't of Educ., *Arizona Teacher Shortage Impact Fall 2025 Report* (2025), https://www.azed.gov/sites/default/files/2025/11/AZ_Teacher_Shortage_Impact_Fall_2025_Report_September_2025_Data.pdf

[58] Susan Kemper Patrick, Tiffany S. Tan, & Samuel Comai, *2025 Update: Latest National Scan Shows Teacher Shortages Persist*, Learning Policy Institute (Jul. 15, 2025), https://learningpolicyinstitute.org/blog/2025-update-latest-national-scan-shows-teacher-shortages-persist.

[59] Erica Little, *Short on Teachers, Pinal Districts Increasingly Turn to International Educators*, PinalCentral (Aug. 21, 2025), https://www.pinalcentral.com/free-access/short-on-teachers-pinal-districts-increasingly-turn-to-international-educators/article_0173fed6-06f1-42d7-93d7-0283e343671c.html.

[60] National Education Association, *NEA Data Brief: H-1B Visas in Public School Districts* (Oct. 8, 2025), https://www.nea.org/resource-library/nea-data-brief-h-1b-visas-public-school-districts.

[61] Little, *supra* note 59.

LEAs typically do not have excess funds available to pay an additional $100,000 for each H-1B visa petition.

135. As a result, LEAs are faced with a difficult choice: leave educator roles unfilled or divert money from other needs to pay the fee required under the Policy. But even that difficult choice is fraught with uncertainty, as the shifting iterations of the Policy and shifting positions of the administration make it impossible for educational administrators to have confidence in their hiring plans, budgets, and strategic plans.

136. The Policy will cause irreparable harm to Plaintiff States' school systems, which already face hiring difficulties in ensuring their schools are adequately staffed. As a result, school systems will be unable to provide essential services to students, with larger class sizes, less individualized attention for students, and cuts to programs and course offerings. All of these effects lead to diminished academic development and learning loss at critical stages in childhood development. Such harms can never be fully remedied.

**B. The Policy will harm the higher education and research facilities, in turn harming the States more broadly.**

137. American colleges and universities depend on H-1B visas to recruit world-class educators and researchers to teach students and to conduct cutting-edge research in the sciences, medicine, and other fields.

138. As of June 30, at least 930 colleges and universities employ personnel on H-1B visas.[62] More than half of these institutions are public four-year universities, and more than 10% are medical schools.[63]

---

[62] *See* Katherine Knott, *Higher Ed's H-1B Visas in 4 Charts*, Inside Higher Ed (Sept. 29, 2025), https://www.insidehighered.com/news/government/2025/09/29/4-charts-breaking-down-h-1b-visas-and-higher-ed.

[63] *See id*.

139. According to a review by *Inside Higher Ed* of the 304,000 H-1B visas issued in fiscal year 2025 as of September 2025, fully 5.5% (16,733) were issued in the higher education sector.[64]

140. Large research universities may employ hundreds of H-1B personnel to support their research and education missions. For example, as of September 2025, the University of Michigan received 359 approved H-1B visas for FY 2025, the University of Wisconsin-Madison, 232, the University of Maryland 230, and the University of California, San Francisco, 210.[65]

141. Similarly, other public universities in Plaintiff States employ H-1B personnel, many in positions that are difficult to fill such as in science, technology, engineering, and mathematics ("STEM") fields. For example, in California, California State University ("CSU"), the largest public university system in the United States, employs around 550 faculty and staff on H-1B visas. In Connecticut, the University of Connecticut alone has 133 active and current employees on H-1B visas, and Connecticut's State College and University System has 36. In Minnesota, Minnesota State Colleges and Universities employ 62 H-1B personnel across ten of its campuses. In New Jersey, Rutgers University secured 152 H-1B approvals in 2025; New Jersey Institute of Technology, 39; and Rowan University, 30.[66] Across New York, the State University of New York ("SUNY") employs 693 employees on H-1B visas, many who serve students in rural and suburban areas of New York state. Of these, 396 are faculty members, 110 are health sciences and clinical faculty, and 90 are medical residents. And in New York City, the City University of

[64] *See id.*

[65] *See id.*

[66] *See* USCIS, H-1B Employer Data Hub, *supra* note 51.

New York ("CUNY") employs more than 125 faculty on H-1B visas. In Rhode Island, the University of Rhode Island employs 58 H-1B visa holders and Rhode Island College employs 9.

142. Congress intentionally designed the H-1B visa program to facilitate the development of higher education and research capacity in order to benefit the nation more broadly. As referenced above, in exempting certain visas related to higher education from the standard cap on total annual H-1B visas, Congress observed that professionals in higher education bring significant benefits to the nation as a whole.[67]

143. Harms to higher education will negatively affect the nation, including Plaintiff States, by stymying critical research and developments. According to an analysis by the Federal Reserve Bank of Richmond, "[e]ven though pay is lower, the workers hired by universities and research institutes often play an outsized role in advancing innovation and academic research. Curtailing their access to H-1Bs could therefore have ripple effects well beyond the nonprofit sector itself."[68]

144. Because higher education institutions are generally government or non-profit entities, they are incapable of absorbing an additional $100,000 for each H-1B hire. Within the University of California system, for example, roughly half of H-1B personnel earn less than $100,000 in salary each year. Accordingly, the fee would dramatically increase personnel costs.

145. Plaintiff States' institutions will be significantly harmed by the Policy.

146. For example, in California, the University of California, the world's largest public academic research system, employs over 1700 individuals on H-1B visas, representing about 0.6%

---

[67] S. Rep. 106-260, 21-22 (Apr. 11, 2000).

[68] See Nicolas Morales, *Understanding the Potential Impact of H-1B Visa Program Changes*, Federal Reserve Bank of Richmond (Oct. 2025), https://www.richmondfed.org/publications/research/economic_brief/2025/eb_25-39.

of its workforce. Almost a quarter of these personnel are located at the University of California, San Francisco, a dedicated health sciences university and home to one of the most highly regarded medical schools in the word. These employees across UC's campuses are integral to UC's core operations, with most H-1B personnel directly involved in educating students and conducting research. Twenty-four percent are faculty, 30% are researchers, 19% are postdoctoral scholars, medical interns or residents, and 30% are other academics like researchers or librarians. Collectively, they sustain UC's strategic capacity in teaching, research, and public service, directly reinforcing UC's long-term institutional mission and impact.

147. Likewise, California State University employs individuals on H-1B visas in faculty positions where it is often difficult to find qualified applicants within the United States, such as in STEM fields, or where the number of Ph.D. candidates who are U.S. citizens has not increased to meet workforce demands, resulting in a lower portion of U.S. citizens in the applicant pool for faculty job postings compared to international applicants.[69]

148. However, the fee imposed by the Policy will make it difficult for CSU to fill vacant positions in hard-to-fill areas by placing a financial burden on CSU campuses. CSU campuses may in some cases be forced to stop sponsoring H-1B applicants resulting in less course offerings, a greater service workload on faculty if vacancies cannot be filled, and increased class sizes, particularly in STEM courses. The Policy has already begun to impact CSU's ability to recruit and hire international job candidates for vacant positions. For example, some CSU campuses had job offers pending that have not been accepted and will likely be recalled due to the exorbitant fee imposed by the Policy. Similarly, some CSU campuses that had made job offers to international

---

[69] *See* National Center for Science and Engineering Statistics (NCSES), *Doctorate Recipients from U.S. Universities: 2024 Data Tables,* NSF 25-349, tbl. 1-6 (Aug. 2025), https://ncses.nsf.gov/surveys/earned-doctorates/2024.

applicants that were accepted, are unsure if they will be able hire applicants because they do not have funding to pay the $100,000 fee.

149. The Commonwealth of Massachusetts's public colleges and universities frequently rely on H-1B visa holders to fill faculty, researcher, and staff roles, including through the hiring of medical residents who attend the University of Massachusetts Chan Medical School. The University of Massachusetts currently sponsors more than 340 H-1B faculty, staff, and researchers, and intends to hire additional staff, faculty, and researchers through the H-1B program. However, the fee imposed under the Policy will make doing so cost prohibitive. Eliminating access to H-1B faculty, staff, and researchers for the University of Massachusetts would cause immediate institutional harm given a much narrowed applicant pool which would render it all the more difficult for the University of Massachusetts to employ individuals necessary to support the University's research activities and educational offerings.

150. In Connecticut, the University of Connecticut ("UConn") endeavors to engage with and hire the most qualified candidates, a pool that is often exceedingly small in specialized fields. These workers contribute to the process of training students and moving science forward whether through direct teaching, research, or professional administration. When the applicant most capable of filling the role is a foreign national, the H-1B visa allows UConn to hire qualified applicants even when they are difficult to find among U.S. nationals, particularly in research-intensive and highly technical fields like STEM fields. The H-1B visa fee would harm the residents of the State of Connecticut and the public in general because public institutions cannot pay these high fees, but still have a direct responsibility to provide world-class teaching and research to educate the next generation. Connecticut's public research university, UConn, cannot cover the cost of the $100,000 fee for new applicants. Similarly, Connecticut's State College and University System

has 4 additional faculty with anticipated H-1B visa requests, which will be directly impacted as the public system cannot cover the cost of the $100,000 fee for new applicants. This fee jeopardizes ongoing and future research projects, potentially leaving science and building classes understaffed, leading to lower enrollment to UConn.

151. The State of Maryland faces similar circumstances. Maryland's public colleges and universities frequently rely on H-1B visa holders to fill faculty and researcher roles that require certain advanced degrees or certain highly specialized expertise or training. Institutions within the University System of Maryland ("USM"), which comprises 12 public universities, currently sponsor more than 530 H-1B faculty, staff, and researchers, most focused in engineering, computer science, biomedical research, and other STEM fields where the U.S. labor market does not supply adequate candidates. Maryland's public colleges and universities use the H-1B program because it enables them to maintain competitive academic departments, sustain grant-funded research, and offer programs essential to the State of Maryland's workforce pipeline.

152. USM colleges and universities intend to hire additional staff, faculty, and researchers through the H-1B program. However, the fee imposed under the Policy will make doing so cost prohibitive. Eliminating access to H-1B faculty, staff, and researchers for USM colleges and universities would cause immediate institutional harm, including loss of active research projects, diminished grant competitiveness, and reduced course offerings. The resulting harm to the public would also be substantial: Maryland's innovation economy, medical research ecosystem, and STEM workforce development would all be weakened by the universities' inability to employ the qualified instructors and researchers the H-1B program currently enables them to retain.

153. Illinois also faces similar harmful impacts given financial constraints on its public higher education institutions. The University of Illinois at Chicago ("UIC") would be disproportionately impacted, both in Chicago and downstate. It has the fifth highest number of H-1B visa holders in the education sector education nationally, with 292 active H-1B visa holders—267 in Chicago, 19 in Peoria, and 6 in Rockford. Next year, UIC anticipates a need to sponsor at least 25 new H-1B visa applicants for fiscal year 2026, but the $100,000 fee per applicant would strain university resources tremendously. Even institutions with smaller needs, like the University of Illinois at Springfield ("UIS") will be impacted by the $100,000 fee. UIS currently has 18 active H-1B visa holders, 15 of whom were initially sponsored within the past two years.

154. In Hawai'i, the University of Hawai'i at Mānoa, the largest campus in the University of Hawai'i ("UH") system, has 95 H-1B workers, most in STEM positions that are otherwise difficult to fill. UH has two new recent hires that the $100,000 fee will apply to, where it is unclear how the fee will even be paid for. In addition, the Research Corporation of the University of Hawai'i ("RCUH"), a public instrumentality that, among other things, hires staff to support UH projects, employs 55 H-1B workers. As a result of the Policy, RCUS is not initiating new applications because it does not have funding to pay the $100,000 fee.

155. In Oregon, Oregon's flagship universities consistently depend on H-1B visa holders to fill faculty, researcher, and staff roles. For example, Oregon State University currently sponsors more than 150 H-1B faculty, researchers, and staff, and intends to hire additional faculty, researchers, and staff through the H-1B program. Eliminating access to H-1B faculty, researchers, and staff would inflict significant institutional harm, depriving students of critical educational opportunities. This will acutely impact Oregon State University's ability to continue to provide its students with world-class education in STEM fields. Many of OSU's H-1B faculty, researchers,

and staff specialize in STEM fields where the U.S. labor market does not supply enough qualified candidates. Likewise, the University of Oregon currently sponsors more than 50 H-1B faculty, researchers, and staff. The University of Oregon relies on these H-1B faculty, researchers, and staff not only to provide education to its students, but also to expand community access to scientific innovation and research developments. The University of Oregon already struggles to pay the existing fee, thus the increased financial burden threatens to leave critical positions unfilled and impede the University of Oregon's public-serving mission. The salary for the majority of employees hired through the H-1B program are less than the $100,000 fee. Due to tight budgets, Oregon universities would be incapable of absorbing an additional $100,000 for each H-1B hire.

156. In Washington, approximately 485 H-1B visa holders are employed across more than 30 of Washington's state agencies, public universities, and public colleges. Washington's public colleges and universities frequently rely on H-1B visa holders to fill faculty, researcher, and staff roles. For example, the University of Washington sponsored over 200 H-1B visas last academic year; these sponsorships were primarily within the School of Medicine and Colleges of Arts and Sciences and Engineering, and about 50 included some element of clinical training or patient care. Additionally, Washington State University employs over 100 H-1B visa holders, with those holders primarily filling highly specialized areas of education and research including in agriculture, human and natural resources sciences, and engineering fields.

157. The $100,000 fee for new H-1B applications will likely have a major and ongoing impact in Washington, particularly in higher education. Many public universities and colleges will simply be unable to hire for specialized positions due to a lack of qualified American candidates and lack of funding to cover the new H-1B fee. As a result, those universities and colleges may not be able to meet requirements for very niche areas and programs. Classes will not be able to be

offered. Laboratories will sit empty. Research output will be decreased. The institutes of higher education will lose their competitive edge, particularly in the areas of artificial intelligence, cybersecurity, and medical fields, which will likely have a cascading effect on the State of Washington and its citizens. That loss of competitive edge is likely to translate to a loss of student applicants for educational programs, which will in turn perpetuate the cycle.

**C. The Policy will diminish access to healthcare.**

158. The H-1B visa program is a critical pathway to hiring healthcare workers to fill staffing shortages nationwide. Plaintiff States' agencies, public healthcare centers, public hospitals and private hospitals and healthcare providers rely on the H-1B visa program to hire healthcare personnel such as physicians, surgeons, and nurses, particularly in institutions serving low-income and working-class neighborhoods.[70]

159. Approximately 8,492 H-1B visas went to workers in medicine and health occupations in the 2024 fiscal year;[71] and many of these medical professionals serve Plaintiff States' residents. These H-1B workers have been critical in ensuring access to care when healthcare professional shortages continue to increase in the United States.

160. Hospitals in Plaintiff States have the overarching goals of providing high-quality, affordable, and accessible care to all patients, advancing public health, and improving the health of their communities.

---

[70] *See* Fran Smith, *The Health Divide: Trump's New H-1B Visa Fee Could Worsen America's Doctor Shortage,* USC Annenberg (Oct. 13, 2025), https://centerforhealthjournalism.org/our-work/insights/health-divide-trumps-new-h-1b-visa-fee-could-worsen-americas-doctor-shortage.

[71] In FY 2024, 141,205 initial employment H-1B petitions were granted. *See* USCIS, *Characteristics of H-1B Specialty Occupation Workers Fiscal Year 2024 Annual Report to Congress, supra* note 30, at 3.

161. The loss of H-1B medical workers will harm communities around the United States. The American Medical Association ("AMA") has expressed grave concerns about the impact of the $100,000 requirement on the availability and quality of medical care in the United States. In a September 25, 2025, letter to Secretary Noem urging DHS to exempt foreign-trained physicians from the fee, the AMA, along with more than 50 national specialty societies and state medical associations, noted that the United States is projecting a shortfall of 86,000 physicians by 2036.[72] The National Center for Health Workforce analysis projects an even greater physician shortage of 187, 130 by 2037.[73]

162. By 2036, the United States will be short 50,440 psychiatrists.[74] In 2024, about 61.5 million adults in the U.S. had a mental illness, yet roughly 48% received no treatment.[75] This shortage of healthcare professionals, including psychiatrists, affects patients' ability to find care and places a greater burden on mental health care providers.

---

[72] *Letter to Kristi Noem from National Medical Societies and State Medical Associations* (Sept. 25, 2025), https://searchlf.ama-assn.org/letter/documentDownload?uri=/unstructured/binary/letter/LETTERS/lfimg.zip/Sign-on-Letter-Restriction-on-Entry-of-Certain-Nonimmigrant-Workers-Proclamation-9-25-25.pdf.

[73] National Center for Health Workforce Analysis, *State of the U.S. Health Care Workforce*, *2024* (Nov. 2024), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/state-of-the-health-workforce-report-2024.pdf.

[74] Health Resources and Services Administration, *Health Workforce Projections* (Nov. 2024), https://bhw.hrsa.gov/data-research/projecting-health-workforce-supply-demand.

[75] Substance Abuse and Mental Health Svc. Admin., *Key Substance Use and Mental Health Indicators in the United States: Results from the 2024 National Survey on Drug Use and Health* (July 2024), https://www.samhsa.gov/data/sites/default/files/reports/rpt56287/2024-nsduh-annual-national-report.pdf.

163. This shortage is especially concerning because America's population is aging, increasing the likelihood that our nation will lack sufficient doctors to care for older adults, many of whom suffer increased rates of chronic disease and have other complex medical needs.[76]

164. Just as H-1B medical workers are critical to filling physician shortages, they are just as critical in the nursing profession. The National Center for Health Workforce Analysis projects a shortage of 207,980 full-time equivalent registered nurses ("RNs").[77] This same report also analyzed which states would have the largest projected shortages of RNs. Among those states is California, which is facing a projected shortage of 65,000 RNs by 2037.

165. Nationwide, many Americans already do not have access to primary care services. In the United States, approximately 75 million people live in a primary care Health Professional Shortage Area ("HPSA") and 122 million people live in a mental health HPSA.[78]

166. The AMA letter to Secretary Noem explains that the fee endangers access to quality care for some of the Americans who most need it.[79] Of the 23% of physicians in the United States who are foreign trained, 65% practice in medically underserved areas or HPSAs and of those, 46% practice in rural areas.[80]

167. Without access to H-1B physicians and nurses, hospitals will be forced to reduce capacity in ICUs, emergency rooms, and surgical units. Wait times will increase and patient

---

[76] *See* National Center for Health Workforce Analysis, *State of the U.S. Health Care Workforce 2024, supra* note 73, at 3.

[77] National Center for Health Workforce Analysis, *Nurse Workforce Projections*, *2022-2037* (Nov. 2024), https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/nursing-projections-factsheet.pdf.

[78] *See* National Center for Health Workforce Analysis, *State of the U.S. Health Care Workforce 2024, supra* note 73, at 2.

[79] *See Letter to Kristi Noem, supra* note 72.

[80] *Id*.

outcomes will worsen, especially in rural and inner-city communities which are already medically underserved.

168. Indeed, hospitals and other health care facilities that hire H-1B workers are generally public or non-profit entities and are unable to afford the fee mandated in the Policy. As the President of the AMA explained, "[i]f a hospital needs 50 foreign residents, and it's $100,000 each for each one, that's $5 million, and that's not going to happen . . . . There will be shortages."[81] The consequences, he explained, are that "spots at hospitals will not be filled. Wait times will go up, and people will wait even longer at emergency departments."[82] The fee, coupled with cuts in health insurance subsidies and reduced Medicaid payments, will exacerbate the financial stress many hospitals are already experiencing.[83]

169. These harms will be felt throughout the States.

170. For example, in Connecticut, UConn Health currently has 58 employees on H-1B visas, and in 2025 alone, UConn has filed 39 H-1B petitions, up since 2023. UConn Health, the State's only public academic medical center, is committed to improving the health and wellness of those especially living in underserved communities.

171. New Jersey has particularly struggled with shortages of primary care doctors, with one of the lowest concentrations of primary care physicians in the country with roughly 17 doctors

---

[81] Roni Caryn Rabin, *Medical Groups Warn Against Visa Fees for Foreign Doctors*, N.Y. Times (Sept. 26, 2025), https://www.nytimes.com/2025/09/26/health/trump-h1b-visa-fee-doctors.html.

[82] *Id.*

[83] *Id.*

per 100,000 people.[84] New Jersey is also facing a significant shortage of nurses, with a projected 12% shortage of nurses by 2035.[85]

172. Foreign-born healthcare workers have played an important role in addressing those shortages. A significant percentage of New Jersey's healthcare workforce is comprised of foreign-born workers, including those on H-1B visas. For instance, in 2021, 32% of New Jersey's healthcare workforce, 37% of its physicians and surgeons, and 32% of its registered nurses were noncitizens born abroad.[86] New Jersey also has nine medical residency programs that sponsor H-1B Visas.

173. The same is true for New York, where 36% of the healthcare workforce is comprised of foreign-born workers, including H-1B visa holders. Additionally, 33% of its physicians and surgeons, and 27% of its registered nurses are noncitizens born abroad.[87] New York also has 193 medical residency programs that sponsor H-1B visas.

---

[84] *See Primary Care in New Jersey: Findings and Recommendations to Support Advanced Primary Care*, New Jersey Healthcare Quality Institute (Jan. 2024), https://www.njhcqi.org/wp-content/uploads/2024/01/Primary-Care-Report_2024_v11.pdf.

[85] American Assoc. of Colleges of Nursing, *Fact Sheet: Nursing Shortage* (May 2024), https://www.aacnnursing.org/Portals/0/PDFs/Fact-Sheets/Nursing-Shortage-Factsheet.pdf.

[86] *See* Jeanne Batalova, *Immigrant Health-Care Workers in the United States*, Migration Policy Institute (Apr. 7, 2023), https://www.migrationpolicy.org/article/immigrant-health-care-workers-united-states-2021. In this article, the term "immigrants" refers to census data on individuals who were not U.S. citizens at birth, including naturalized citizens, lawful permanent residents, and other noncitizens including those on H-1B visas. *See* https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.migrationpolicy.org%2Fsites%2Fdefault%2Ffiles%2Fsource_charts%2FImmigrantShareHealthWorkersByOccupationAndState2021.xlsx&wdOrigin=BROWSELINK.

[87] *Id.*

174. New York hospitals also face pervasive nursing shortages as New York is projected to face a shortage of almost 40,000 nurses by 2030.[88]

175. So too, Arizona faces a critical shortage of primary care physicians, and will need 493 additional primary care physicians by 2035 to erase current shortages.[89] Obstetrics and gynecology physicians are also in short supply, with approximately 400 OB-GYNs responsible for the entire state's needs.[90] Of applicants to an Arizonan women's health clinic, approximately 75% were H-1B visa holders.[91]

176. In 2019, noncitizens made up 14.2% of Arizona's healthcare workers, and 25.8% of all physicians and surgeons.[92] Foreign-born healthcare workers are exceedingly qualified, with 26.2% of foreign-born persons with professional and doctorate decrees working in healthcare occupations that did not require this level of education.[93]

177. Rhode Island is also experiencing severe workforce shortages within the health care sector. The Rhode Island Department of Labor and Training has projected 75,596 open positions in the health care field between 2022 and 2032, including 25,554 openings for health care

---

[88] *See* Center for Health Workforce Studies, *A $51 Million Investment in New York's Nursing Workforce Aims to Bolster Staff Well-Being, Patient Care* (May 14, 2025), https://www.chwsny.org/a-51-million-investment-in-new-yorks-nursing-workforce-aims-to-bolster-staff-well-being-patient-care.

[89] Ariz. Dep't of Health Servs., *Arizona Medically Underserved Areas – Biennial Report* at 21-22 (Oct. 2024), https://www.azdhs.gov/documents/prevention/health-systems-development/data-reports-maps/reports/azmua-biennial-report.pdf.

[90] Michael Castillo, *Arizona women's health clinics sound alarm over new visa fees for foreign doctors,* AZFamily (Oct. 21, 2025), https://www.azfamily.com/2025/10/22/arizona-womens-health-clinics-sound-alarm-over-new-visa-fees-foreign-doctors.

[91] *Id.*

[92] American Immigration Council, *The Growing Demand for Healthcare Workers in Arizona* (Sept. 2025), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/09/growing_demand_healthcare_workers_arizona.pdf.

[93] *Id.*

practitioners and technical occupations.[94] Rhode Island has witnessed significant health care workforce shortages that continue to grow while the supply of workers shrinks, mirroring national trends. Registered nurses and physicians are among the occupations that will see substantial demand between 2022 and 2032.[95] One study estimated there are nearly 700 primary care providers for Rhode Island's population of 1.1 million, which is roughly one clinician for every 1,700 people.[96] The researchers estimated nearly 300 additional physicians are needed to cover the state.[97] In the 2025 fiscal year, 121 H-1B visas were approved for Rhode Island's health care industry.[98]

178. These problems are especially acute in rural and low-income areas. A 2023 study by the National Bureau of Economic Research found that foreign-born and trained doctors help serve rural and low-income communities without reducing the employment of U.S.-trained physicians.[99] The study notes that while about 20% of the U.S. population lives in rural areas, only about 11% of physicians practice in these locations; and disparities in access to physicians

---

[94] R.I. Executive Office of Health & Human Servs., *Rhode Island Health Care System Planning: 2024 Foundational Report* (Dec. 2024), https://eohhs.ri.gov/sites/g/files/xkgbur226/files/2025-02/Chapter%2010%20-%20Health%20Care%20System%20Planning%20Foundational%20Report%20-%20December%202024.pdf.

[95] *Id.*

[96] Alexandra Leslie, *Hundreds More Physicians Needed to Address RI Primary Care Shortage, Experts Say,* WPRI (Feb. 19, 2025) https://www.wpri.com/target-12/hundreds-more-physicians-needed-to-address-ri-primary-care-shortage-experts-say/

[97] *Id.*

[98] *See* USCIS, *H-1B Employer Data Hub*, *supra* note 51.

[99] Breno Braga, Gaurav Khanna & Sarah Turner, *Migration Policy and the Supply of Foreign Physicians: Evidence from the Conrad 30 Waiver Program*, Nat'l Bureau of Econ. Research Working Paper No. 32005 (Dec. 2023), https://www.nber.org/system/files/working_papers/w32005/w32005.pdf.

contribute to disparities in population health.[100] After examining the data, the study concluded that foreign-born doctors were not "crowding out" U.S. born physicians, but rather that foreign-born physicians were filling essential gaps in coverage, particularly in rural areas.[101]

179. A recent study by Mass General Brigham found that the percentage of H-1B sponsored physicians was nearly two times higher in rural areas compared with urban counties, and nearly four times greater in counties with higher poverty rates.[102] The study's authors found that "foreign healthcare workers fill critical gaps in health systems such as primary care and rural health, and millions of Americans depend on them to receive timely and high-quality care."[103]

180. In California, access to specialists and primary care providers in rural areas is already extremely limited and is projected to worsen as physicians retire and these communities struggle to attract new doctors. According to a study by the National Institute of Health, 64.1% of International Medical Graduates practiced in medically underserved areas, with 45.6% of those practicing in a rural area.[104] About 11.4 million Californians, about one quarter of California's population in 2024, live in federally designated Primary Care HPSAs.[105]

---

[100] *Id*.

[101] *Id*. at 3.

[102] Mass General Brigham, *Study Shows Increase of H-1B Visa Fees Will Most Impact Rural and High-Poverty Counties* (Press Release, Oct. 30, 2025), https://www.massgeneralbrigham.org/en/about/newsroom/press-releases/increase-of-h1-b-visa-fees-will-impact-rural-and-high-poverty-counties.

[103] *Id*.

[104] Srikrishna Malayala et al., *Medically Underserved Areas and International Medical Graduates (IMGs) in the United States: Challenges During the COVID-19 Era*, 11 J. of Community Hosp. Internal Med. Perspectives 458 (2021).

[105] California Health Care Foundation, *New Survey Highlights Worsening Shortage of Physicians in Rural California* (June 26, 2025) https://www.chcf.org/resource/new-survey-highlights-worsening-shortage-physicians-rural-northern-california.

181. And in 2023, 25% or 120,957 of active physicians in California were age 65 or older or older.[106] The number of new graduates practicing in California will not be adequate to replace all physicians who will reach retirement age during the coming decade.[107]

182. In Minnesota, for every 100,000 people in metropolitan areas, there are close to 33 family medicine physicians. In stark contrast, rural areas only have 2.5 physicians for every 100,000 people. In internal medicine, per 100,000 people, there are around 31 physicians in metropolitan areas and 0.2 in rural areas. There are similarly striking disparities across other specialties such as pediatrics, psychiatry, general surgery, obstetrics and gynecology. Almost 1 in 3 rural physicians in Minnesota plan to leave the workforce within the next 5 years.[108]

183. New York similarly struggles with a shortage of primary care physicians in the rural regions of the state. In sixteen of New York's rural counties, there are four primary care physicians for every 10,000 people.[109]

184. The fee will harm both public and private hospitals who rely on the H-1B program to hire researchers to staff critical medical research projects. One study found that 80% of nephrology fellowship programs, which provide specialty training after residency, had J-1 or H-1B visa holders among their clinical or research fellows.[110]

---

[106] Ass'n of Am. Med. Colleges, *U.S. Physician Workforce Dashboard,* https://www.aamc.org/data-reports/report/us-physician-workforce-data-dashboard (last accessed on Nov. 12, 2025)

[107] Healthforce Center at UCSF*, Annual Report: Update on California's Physician Workforce* (Dec. 2024), https://healthforce.ucsf.edu/sites/g/files/tkssra14981/files/doc/2024-annual-ret_californias-physician-workforce_final-reviewed_accessibility-checked.pdf.

[108] Agency for Healthcare Research and Quality, National Healthcare Quality and Disparities Report Chartbook on Rural Healthcare (Nov. 2021), https://www.ahrq.gov/sites/default/files/wysiwyg/research/findings/nhqrdr/chartbooks/2019-qdr-rural-chartbook.pdf.

[109] *See* N.Y. State Comptroller, *The Doctor Is . . . Out: Shortages of Health Professionals in Rural Areas* (Aug. 2025), https://www.osc.ny.gov/files/reports/pdf/rural-health-shortages.pdf.

[110] Smith, *supra* note 70.

185. A shortage of qualified researchers will force hospitals to eliminate projects aimed at developing new treatments and therapies, severely limit the availability of clinical trials to assess the safety and efficacy of new treatments and stymie the Plaintiff State's ability to remain on the forefront of medical innovation that improves and protects the well-being of its residents.

186. For example, at the University of Illinois Chicago ("UIC") in Illinois, the $100,000 fee would significantly impact the University's ability to fill critical positions not only in healthcare, but in research and teaching, with a particular impact on dentistry and pharmacy. The majority of UIC's H-1B visa holders are in the applied health colleges for medicine, dentistry, pharmacy, applied health sciences, and nursing, as well as within the UI Health system, with 187 active visa-holders total; 59 visa holders are in clinical and patient-facing positions. The clinical positions are spread throughout Illinois, with 45 in Chicago, eleven in Peoria, and 3 in Rockford. In addition, UIC has fifteen pending H-1B visa applications for positions in Chicago and Peoria. Seven of the impacted positions are clinical and patient-facing.

187. The H-1B visa fee's impact on healthcare professionals will cause cascading harm throughout the Plaintiff States. For Plaintiff States with state healthcare providers (such as Illinois and Connecticut), those providers will be unable to employ sufficient healthcare professionals. As a result, the Plaintiff State institutions will suffer, as insufficient staffing levels will harm their ability to provide adequate services to residents.

188. Similarly, Plaintiff States without state healthcare providers will also face harm from shortages of healthcare professionals. Shortfalls in doctors and nurses, absent the ability of healthcare providers to fill these vacancies with qualified foreign doctors, will render it more difficult for Plaintiff States' residents to obtain the regular medical care they need. These shortages

will in turn cost Plaintiff States' insurance programs as more residents need to rely on emergency medical care in lieu of routine appointments.

## CAUSES OF ACTION

### <u>Count 1—Against All Defendants</u>
### Administrative Procedure Act, 5 U.S.C. §706(2)(D): Acts Not in Observance of Procedure Required by Law

189. Plaintiff States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

190. DHS is an "agency" as defined by the APA, 5 U.S.C. § 551(1), and the Policy is a final agency action subject to review under the APA. *See Bennett v. Spear*, 520 U.S. 157, 177–78 (1997) (holding that a final agency action (1) "must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow" (internal citations and quotation marks omitted).

191. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

192. The Policy—including the September and October Memoranda, FAQ, and any non-public rules implementing the $100,000 fee announced in the Proclamation—is a legislative rule because it "'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)); *see also Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (observing that legislative rules "purport[] to impose legally binding obligations or prohibitions on regulated parties").

Specifically, the Policy imposes a requirement that a fee of $100,000 be paid when an H-1B petition is filed, subject to limited exceptions not relevant here.

193. That an agency action is taken to implement an executive order does not exempt it from the requirements of the APA. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

194. When promulgating legislative rules, federal agencies must follow the APA's procedures for notice-and-comment rulemaking. "First, the agency must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553(b)). Next, "the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments'" and must consider and respond to "significant comments." *Id.* (quoting 5 U.S.C. § 553(c)). "When the agency promulgates the final rule, it must include in the rule's text 'a concise general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. § 553(c)). Finally, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date," 5 U.S.C. § 553(d), except, as relevant here, as otherwise provided by the agency for good cause found and published with the rule, *id*. § 553(d)(3).

195. As recently as last year, USCIS has engaged in the robust notice-and-comment process required by the APA in setting its fee schedule for H-1B and other visas. *See USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194, 6194–6400 (Jan. 31, 2024). "It is, of course, black-letter administrative law that ordinarily an agency that promulgates a rule [using notice and comment] must use the same procedure to revoke that rule." *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020)

196. USCIS's prior adherence to required procedures in setting the H-1B fee schedule underscores the agency's obligation to engage in notice-and-comment rulemaking in revising that schedule by adding the novel $100,000 fee.

197. Here, however, the agency has failed to engage in any of the APA's requirements for rulemaking. No public notice was given before Defendants issued documents implementing the Policy, nor was public notice given in advance of the underlying Proclamation. No opportunity has been given for interested members of the public to comment on a proposed rule. And no concise statement has been given for the Policy's general purpose; indeed, USCIS has continued to tweak the policy while affected parties are faced with new questions after each version. Moreover, the agency failed to wait at least 30 days before enacting the Policy and made no statement of good cause.

198. Defendants' failures to comply with required APA procedures violate 5 U.S.C. § 553(b)–(d) and § 706(2)(D).

**Count 2—Against All Defendants**
**Administrative Procedure Act, 5 U.S.C. §706(2)(C):**
**Acts in Excess of Statutory Authority**

199. Plaintiff States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

200. A court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

201. In reviewing an agency's actions under § 706(2)(C), a court must interpret the scope of an agency's statutory authority without deference to the agency's own interpretation. "[B]y directing courts to 'interpret constitutional and statutory provisions' without differentiating between the two, [the APA] makes clear that agency interpretations of statutes—like agency

interpretations of the Constitution—are *not* entitled to deference." *Loper Bright*, 603 U.S. at 371 (quoting 5 U.S.C. § 706). "Under the APA, it thus "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* at 392 (quoting *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

202. DHS's authority to assess fees in connection with H-1B visas is circumscribed by 8 U.S.C. § 1356(m), which requires that fees be limited to a level commensurate with agency costs for "adjudication and naturalization services" and administrative costs.

203. The $100,000 fee assessed under the Policy bears no connection to any costs borne by USCIS. By the Proclamation's own terms, the Policy is intended as an intervention into domestic economic policy rather than an effort to recover costs.

204. In the Proclamation, President Trump claims authority under Sections 212(f) and 215(a) of the INA to establish a $100,000 fee for H-1B petitions.

205. Neither statute confers upon any of Defendants the power to act outside of Congress's comprehensive scheme for immigration generally, or to exceed the limits imposed by 8 U.S.C. § 1356(m) specifically.

206. No provision of the INA or any other statute grants any agency the authority to set fees associated with H-1B visas with the aim of advancing domestic economic goals.

207. Because it exceeds the fee-setting authority delegated by Congress, the Policy violates 5 U.S.C. § 706(2)(C).

**Count 3—Against All Defendants**
**Administrative Procedure Act, 5 U.S.C. §706(2)(A):**
**Arbitrary and Capricious Acts**

208. Under the APA, a court must "hold unlawful and set aside" final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

209. In formulating a policy, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp*., 318 U.S. 80, 87 (1943)).

210. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

211. An agency changes its position when it acts inconsistently with an earlier position. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 (2025). "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221–22 (2016). In such a situation, the agency is required to provide "a more detailed justification" for the change in position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

212. Defendants claim to have based the Proclamation on domestic economic policy considerations which Congress never intended to be a basis for the establishment of H-1B fees, including the general need to raise revenues—a power vested in Congress exclusively.

213. Defendants have also failed to consider the statutory scheme enacted by Congress in connection with the H-1B program, including provisions enacted by Congress with the aim of preventing abuse of the H-1B visa program.

214. Defendants have failed to consider alternative means of addressing domestic economic policy concerns or concerns about abuse of the H-1B visa program that are consistent with the authority granted to them by Congress.

215. Defendants have failed to consider the important concerns that the H-1B program addresses, including grave shortages of physicians, nurses, teachers, civil engineers, and other providers of basic human services. The Proclamation underlying the Policy focuses solely on the technology sector without considering "the interests of the United States," 8 U.S.C. § 1182(f), more broadly.

216. Defendants have failed to consider the ability of government and not-for-profit employers to absorb the $100,000 fee demanded under the Policy.

217. Defendants have departed from the existing fee schedule, produced through the required notice-and-comment procedure only last year, without giving a reasoned explanation for the departure.

218. Defendants have rolled out the Policy in an incoherent and inconsistent manner.

219. The Policy is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

**Count 4—Against All Defendants**
**Separation of Powers:**
**Acts *Ultra Vires***

220. Plaintiff States reallege and incorporate by reference the allegations contained in the preceding paragraphs.

221. Under the Constitution, Congress exercises "plenary power" over immigration policy. *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("The Court without exception has

sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'" (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of [policies pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 343 (1909) (discussing "the complete and absolute power of Congress" and "the plenary power of Congress" over immigration policy).

222. Under its constitutional authority, Congress enacted the INA, which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)).

223. As part of this scheme, Congress has established the H-1B visa program to ensure that U.S. employers could hire highly skilled workers necessary to their operations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b) (defining H-1B program requirements).

224. Congress also has the exclusive constitutional authority to raise revenue. *See* U.S. Const. art. I § 7, cl. 1; *id.* § 8, cl. 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643 (1952) (Jackson, J., concurring) ("Congress alone controls the raising of revenues and their appropriation.")

225. Pursuant to its authority over immigration policy and its authority to raise revenue, Congress has provided for the assessment of fees in connection with H-1B visa petitions and other immigration visa applications in two ways. First, Congress has fixed certain fees by statute. *See,*

*e.g.,* 8 U.S.C. § 1356(u)(3) (establishing premium processing fees at $1500 and $2500). Second, Congress has delegated to the Executive Branch carefully circumscribed authority to establish a fee schedule for H-1B petitions. *See id*. § 1356(m); *see also USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194, 6288 (Jan. 31, 2024) (identifying 8 U.S.C. § 1356(m) as authority for USCIS's authority to engage in rulemaking to establish a fee schedule).

226. Congress's fee-setting delegation to USCIS requires "[t]hat fees for providing adjudication and naturalization services" be limited to "a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). USCIS has recognized that Congress has limited its collection of fees to those "based on total costs for USCIS to carry out adjudication and naturalization services," 89 Fed. Reg. at 6288, and it has sought to comply with these limitations by setting H-1B registration fees based on actual costs, *id.* at 6289.

227. By its own terms, the Policy is not based on or limited by the cost-based factors that Congress has required the Executive Branch to consider in setting H-1B fees. The Executive Branch usurped Congress's authority over immigration and revenues by enacting the Policy outside of the boundaries delimited by Congress.

228. In the Proclamation, President Trump claims authority under Sections 212(f) and 215(a) of the INA to establish a $100,000 fee for H-1B petitions.

229. Neither statute confers upon any of Defendants the power to act outside of Congress's comprehensive scheme for immigration generally, or to exceed the limits imposed by 8 U.S.C. § 1356(m) specifically.

230. With Section 212(f), Congress has delegated to the President power to impose immigration restrictions in support of foreign policy or national security interests. But that power does not extend to taking actions that directly contradict any provisions of the INA or comprehensive scheme implemented by Congress.

231. More specifically, Section 212(f) does not confer authority to impose conditions or restrict immigration for the purpose of advancing domestic economic policy. By its own terms, the Proclamation is intended solely to advance domestic economic aims.

232. Section 212(f) also does not confer upon the President authority to raise revenue outside of existing delegations of carefully limited authority permitting the executive branch to impose fees in connection with visa applications.

233. Section 215(a) confers authority that "substantially overlap[s]" with the authority conferred by Section 212(f). *Hawaii*, 85 U.S. at 693 n.1.

234. The Policy exceeds the carefully and explicitly limited fee-setting authority delegated to the executive branch by Congress. *See* 8 U.S.C. § 1356(m).

235. Moreover, the Policy usurps Congress's exclusive and plenary constitutional authority to set immigration policy and to raise revenues.

236. Neither Section 212(f) nor Section 215(a) confer upon the executive branch authority to breach this existing separation of powers.

237. The Policy is an *ultra vires* act and unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their

favor and grant the following relief:

I. Declare that the Policy is unlawful because it exceeds the executive branch's constitutional and statutory authority;

II. Pursuant to the APA, vacate and set aside the Policy and any other actions intended to give effect to the Proclamation;

III. Enjoin Defendants from taking any actions with respect to Plaintiff States, their agencies, or their political subdivisions intended to give effect to the Proclamation or Policy;

IV. Award Plaintiff States reasonable attorney's fees and costs; and

V. Grant Plaintiff States any other relief that the Court may deem just and proper.

December 12, 2025

Respectfully submitted.

**ROB BONTA**
*Attorney General of California*

/s/ *James E. Richardson*
MICHAEL L. NEWMAN*
*Senior Assistant Attorney General*
MARISSA MALOUFF*
JAMES E. STANLEY*
*Supervising Deputy Attorneys General*
DENISE LEVEY*
LORRAINE LOPEZ*
JAMES E. RICHARDSON*
JEANELLY OROZCO ALCALÁ*
*Deputy Attorney General*
Office of the Attorney General
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6341
james.richardson@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*

/s/ *Gerard J. Cedrone*
Michelle Pascucci (BBO No. 690889)
*State Trial Counsel*
Gerard J. Cedrone (BBO No. 699674)
*Deputy State Solicitor*
Julia S. Canney (BBO No. 717328)**
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
*Attorney General of Arizona*

/s/ *Joshua G. Nomkin*
JOSHUA G. NOMKIN*
*Assistant Attorney General*
Office of the Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
joshua.nomkin@azag.gov

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
*Attorney General of Colorado*

/s/ *David Moskowitz*
DAVID MOSKOWITZ*
*Deputy Solicitor General*
NORA PASSAMANECK*
*Senior Assistant Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

*/s/ Francesca Testa*
FRANCESCA TESTA*
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5210
francesca.testa@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of Delaware*

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
*Director of Impact Litigation*
VANESSA L. KASSAB*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
*Attorney General of Hawai'i*

*/s/ Kaliko'ōnālani D. Fernandes*
DAVID D. DAY*
*Special Assistant to the Attorney General*
KALIKO'ŌNĀLANI D. FERNANDES*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**KWAME RAOUL**
*Attorney General of Illinois*

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
*Complex Litigation Counsel*
ELIZABETH MORRIS*
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
(312) 814-3000
aleeza.strubel@ilag.gov

*Counsel for the State of Illinois*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

/s/ *Virginia A. Williamson*
VIRGINIA A. WILLIAMSON*
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Counsel for the State of Maryland*

**DANA NESSEL**
*Attorney General of Michigan*

/s/ *Neil Giovanatti*
NEIL GIOVANATTI*
*Assistant Attorney General*
Michigan Department of the Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
*Attorney General of Minnesota*

/s/ *Joseph R. Richie*
JOSEPH R. RICHIE*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
*Attorney General of Nevada*

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
*Chief of Special Litigation*
MELINA MENEGUIN LAVERENZA*
*Assistant Attorney General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
*Attorney General of New Jersey*

/s/ *Max G. Lesser*
MAX G. LESSER*
*Deputy Attorney General*
MELINA MENEGUIN LAVERENZA*
*Assistant Attorney General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 575-6143
max.lesser@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
*Attorney General of New York*

/s/ *Zoe Levine*
ZOE LEVINE*
*Special Counsel for Immigrant Justice*
VICTORIA OCHOA*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(212) 416-8329
zoe.levine@ag.ny.gov

*Counsel for the State of New York*

**JEFF JACKSON**
*Attorney General of North Carolina*

/s/ *Daniel P. Mosteller*
LAURA HOWARD*
*Chief Deputy Attorney General*
DANIEL P. MOSTELLER*
*Associate Deputy Attorney General*
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State North Carolina*

**DAN RAYFIELD**
*Attorney General of Oregon*

/s/ *Thomas H. Castelli*
THOMAS H. CASTELLI*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 S.W. Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

/s/ *Kyla Duffy*
KYLA DUFFY*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
*Attorney General of Washington*

/s/ *Sara L. Wilmot*
SARA L. WILMOT*
*Assistant Attorney General*
KATE S. WORTHINGTON*
*Assistant Attorney General*
7141 Cleanwater Drive S.W.
P.O. Box 40111
Olympia, WA 98504
(360) 709-6470
sara.wilmot@atg.wa.gov

*Counsel for the State of Washington*

**CHARITY R. CLARK**
*Attorney General of Vermont*

/s/ *Jonathan T. Rose*
JONATHAN T. ROSE*
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
*Attorney General of Wisconsin*

/s/ *Faye B. Hipsman*
FAYE B. HIPSMAN*
*Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
(608) 264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

* application for admission *pro hac vice* forthcoming
** admission pending

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>*Defendants.* | No. 1:25-cv-13829 |

**NOTICE OF COMPLIANCE**

Defendants, through their undersigned counsel, hereby file the certified administrative records for the alleged agency actions Plaintiffs challenged in the above-captioned case, in compliance with the parties' Joint Scheduling Motion of January 23, 2026. Defendants' production does not constitute a waiver of any of Defendants' arguments including that there is no final agency action in this case nor that an administrative record is not required to decide the issues presented. Defendants note that these are the same certified administrative records that were produced in *Chamber of Commerce of the United States & Association of American Universities v. U.S. Dep't of Homeland Security, et al.*, No. 1:25-cv-3675 (D.D.C.).

Respectfully Submitted,

TIBERIUS DAVIS
Counsel To The Assistant Attorney General

ALEXANDRA McTAGUE
Senior Litigation Counsel

*/s/ Jeffrey Alderette*

JEFFREY ALDERETTE
Trial Attorney (D.C. No. 1738711)
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 860-9941
e-Mail: Jeffrey.Alderette@usdoj.gov
*Attorney for Defendant*

Dated: January 23, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,** ***et al.*** **Plaintiffs,** v. **U.S. DEPARTMENT OF HOMELAND SECURITY,** ***et al.,*** **Defendants.** | ) | **No. 1:25-cv-3675-BAH** |

**CERTIFICATION OF THE ADMINISTRATIVE RECORD**

Dale Johnson, pursuant to 5 U.S.C. § 706, deposes and says as follows:

1. I am the Branch Chief, Enforcement Programs Division (EPD), Admissibility and Passenger Programs (APP), Office of Field Operation (OFO), U.S. Customs and Border Protection, Department of Homeland Security, in Washington, D.C. APP was principally responsible for issuing guidance to OFO personnel at U.S. ports of entry implementing the President's September 19, 2025 Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation), which is the subject of the above-captioned case. As a Branch Chief with EPD, I am a senior member of the law enforcement team at CBP Headquarters which oversees admissibility policy development in conjunction with oversight for the processing of travelers seeking entry to the United States at ports of entry. I have served in this role since February 12, 2025.

2. To the best of my knowledge, information, and belief, the attached documents, also designated in the accompanying Index of Certified Administrative Record, constitute a true and complete copy of all non-privileged documents and materials considered by the agency in issuing

initial guidance to OFO personnel regarding the implementation of the Proclamation.

3. I certify under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of December, in Washington, DC.

DALE P JOHNSON
Digitally signed by DALE P JOHNSON
Date: 2025.12.05 16:40:00 -05'00'

Dale Johnson
Branch Chief, Enforcement Programs Division
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection

# INDEX

| DATE | DOCUMENT |
|---|---|
| September 19 2025 | Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*<br><br>https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/ |
| September 20, 2025 | Memo from Matthew S. Davies to Executive Directors, Field Operations Directors, and Office of Field Operations, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B].*<br><br>https://www.cbp.gov/document/foia-record/restriction-entry-certain-non-immigrant-workers-h-1b-memo |

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

# RESTRICTION ON ENTRY OF CERTAIN NONIMMIGRANT WORKERS

Proclamations

September 19, 2025

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA
A PROCLAMATION

The H-1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor. The large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security. Some employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

The number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time. Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019. And the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa.

Information technology (IT) firms in particular have prominently manipulated the H-1B system, significantly harming American workers in computer-related fields. The share

of IT workers in the H-1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years. In addition, some of the most prolific H-1B employers are now consistently IT outsourcing companies. Using these H 1B-reliant IT outsourcing companies provides significant savings for employers: one study of tech workers showed a 36 percent discount for H-1B "entry-level" positions as compared to full-time, traditional workers. To take advantage of artificially low labor costs incentivized by the program, companies close their IT divisions, fire their American staff, and outsource IT jobs to lower-paid foreign workers.

Further, the abuse of the H-1B visa program has made it even more challenging for college graduates trying to find IT jobs, allowing employers to hire foreign workers at a significant discount to American workers. These effects of abuse of H-1B visas have coincided with increasing challenges in the labor market in which H-1B workers serve. According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively — more than double the unemployment rates of recent biology and art history graduates. Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025.

Reports also indicate that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. One software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees. Another IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July. A third company has reduced its workforce by approximately 27,000 American workers since 2022, while being approved for over 25,000 H-1B workers since FY 2022. A fourth company reportedly eliminated 1,000 jobs in February; it was approved for over 1,100 H-1B workers for FY 2025.

American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance. This suggests H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States.

The high numbers of relatively low-wage workers in the H-1B program undercut the integrity of the program and are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated. These abuses also prevent American employers in other industries from utilizing the H-1B program in the manner in which it was intended: to fill jobs for which highly skilled and educated American workers are unavailable.

The abuse of the H-1B program is also a national security threat. Domestic law enforcement agencies have identified and investigated H-1B-reliant outsourcing companies for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities to encourage foreign workers to come to the United States.

Further, abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields. A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field.

It is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers.

The severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response. I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Restriction on Entry. (a) Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment

of $100,000 — subject to the exceptions set forth in subsection (c) of this section. This restriction shall expire, absent extension, 12 months after the effective date of this proclamation, which shall be 12:01 a.m. eastern daylight time on September 21, 2025.

(b) The Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers under section 101(a)(15)(H)(i)(b) of the INA, who are currently outside the United States, for 12 months following the effective date of this proclamation as set forth in subsection (a) of this section. The Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026.

(c) The restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States.

Sec. 2. Compliance. (a) Employers shall, prior to filing an H-1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the payment described in section 1 of this proclamation has been made.

(b) The Secretary of State shall verify receipt of payment of the amount described in section 1 of this proclamation during the H-1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation.

(c) The Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation.

Sec. 3. Scope and Implementation of Restriction on Entry. (a) The restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation as set forth in section 1(a) of this proclamation.

(b) No later than 30 days following the completion of the H-1B lottery that immediately follows this proclamation, the Secretary of State, the Attorney General, the

Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President and Homeland Security Advisor, a recommendation on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States.

Sec. 4. Amending the Prevailing Wage Levels. (a) The Secretary of Labor shall initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation consistent with section 212(n) of the INA, 8 U.S.C. 1182(n). (b) The Secretary of Homeland Security shall initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens, consistent with sections 101, 212, and 214 of the INA, 8 U.S.C. 1101, 1182, and 1184.

Sec. 5. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this nineteenth day of September, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

DONALD J. TRUMP






Subscribe to The White House newsletter

Your email

SIGN UP

JA0111

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and
Border Protection

September 20, 2025

MEMORANDUM FOR: Executive Directors
Directors, Field Operations
Office of Field Operations

FROM: Matthew S. Davies (b)(6);(b)(7)(c)
Executive Director, Admissibility and Passenger Programs
Office of Field Operations

SUBJECT: Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* [H-1B]

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H1-B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose *petitions are" accompanied or supplemented"* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This Proclamation only applies prospectively to petitions that have not yet been filed.** It does not impact aliens who are the beneficiaries of currently approved petitions, any petitions filed prior to 12:01 AM ET on September 21, 2025, or aliens in possession of validly issued H-1B non-immigrant visas. United States Citizenship and Immigration Services and the Department of State have been instructed to begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only. The Proclamation does not impact the ability of any current visa holder to travel to or from the United States. CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures. Aliens found inadmissible should be processed in alignment with existing guidance for the appropriate Title 8 disposition.

Please ensure this memorandum is distributed to port personnel. Should you require additional information, please contact (b)(6);(b)(7)(c) Director, Enforcement Programs Division.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>Defendants. | Case No. 1:25-cv-3675-BAH |

**CERTIFICATION OF**
**ADMINISTRATIVE RECORD**

I, Larry W. Talbott, hereby declare under penalty of perjury:

1. I am employed by the United States Department of State, Bureau of Consular Affairs, Visa Office, Office of Information Management and Liaison. The facts attested to herein are based upon my personal knowledge and upon information provided to me in my official capacity.

2. I certify that the following documents annexed hereto constitutes the Department of State's Administrative Record in this matter:

   A. Email guidance transmitted on September 19, 2025 from the Bureau of Consular Affairs to consular sections;

B. ALDAC transmitted on September 20, 2025 from the Bureau of Consular Affairs to consular sections;

C. Announcement on the Department's website (travel.state.gov) regarding implementation of the proclamation, posted September 21, 2025,

D. FAQs on the Department's website (travel.state.gov) regarding the proclamation, posted September 21, 2025; and.

E. List of websites considered.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1476, that the foregoing is true and correct to the best of my knowledge.

Executed on December 5, 2025

Larry W Talbott Digitally signed by Larry W Talbott Date: 2025.12.05 20:35:04 -05'00'

Larry W. Talbott
Deputy Director
Office of Information Management and Liaison
Visa Office, Bureau of Consular Affairs
U.S. Department of State



SBU - LEGAL

[redacted]

**From:** The-Visa-Office
**Sent:** Friday, September 19, 2025 10:21 PM
**To:** The-Visa-Office
**Subject:** ACTION REQUEST: Operational Guidance – Restriction on Entry of Certain Nonimmigrant Workers

Dear Colleagues,

Presidential Proclamation Restriction on Entry of Certain Nonimmigrant Workers, issued on September 19, 2025, restricts the entry of aliens in H-1B status and restricts issuance of H-1B visas, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000. This proclamation takes effect at 12:01 a.m. EDT on September 21, 2025.

Posts are instructed to immediately implement the following operational guidance in this email pending additional guidance via ALDAC:

- **Continue to adjudicate all H-1B applicants:** Posts should not cancel appointments of individuals affected by the suspension. Posts should continue to adjudicate applications as per regular procedures.
- Until additional press guidance is available on CA Web, refer external inquiries to the White House announcement at whitehouse.gov.

**VO will provide additional guidance – we ask that you please hold all questions until after the release of the ALDAC.**

Sincerely,
The Visa Office

*Sent to:* [redacted]

*Sent by:* [redacted]

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED

SBU

| | |
|---|---|
| **MRN:** | 25 STATE 92902 |
| **Date/DTG:** | Sep 20, 2025 / 202243Z SEP 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CMGT, CVIS |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 State 5914 |
| **Subject:** | Action Request: Restriction on Entry to the United States of Certain Nonimmigrant Workers Pursuant to Section 212(f) of the INA (8 U.S.C. 1182(f)) |

1. (U) This is an action request. **See paragraphs 3-9**.

2. **(SBU) SUMMARY:** Presidential Proclamation (PP) "Restriction on Entry of Certain Nonimmigrant Workers," issued on September 19, 2025, restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation. This PP restricts the issuance of H-1B visas, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000. The PP's restrictions on visa issuance and entry apply ONLY to aliens seeking visa issuance or entry into the United States based on H-1B petitions filed after the PP's effective date of September 21, 2025 at 12:01 a.m. Eastern Daylight Time (EDT). The PP does NOT direct the revocation of valid H-1B visas issued before the effective date. **END SUMMARY.**

## ACTION REQUEST/IMPLEMENTATION GUIDANCE

**Prior to September 21, 2025, at 12:01 a.m. EDT**

3. (SBU) From the release of this ALDAC until September 21, 2025, at 12:01 a.m. EDT, GSS vendors and posts should continue scheduling H-1B and H-4 applicants, and posts should continue visa processing in accordance with standard procedures, including approving eligible applicants, printing visas, and returning passports with issued visas. Posts should not cancel appointments for individuals who might be affected by the PP.

**As of September 21, 2025, at 12:01 a.m. EDT**

4. (SBU) As of September 21, 2025, at 12:01 a.m. EDT, GSS vendors and posts should continue scheduling H-1B and H-4 applicants, and posts should continue adjudicating all applications, for petitions submitted prior to September 21, 2025, at 12:01 a.m. EDT. The Department will send guidance SEPTEL on identifying and adjudicating any applications affected by the proclamation. The Department will not provide refunds for MRV receipts, as these applicants are still permitted to proceed with their application, including an interview appointment. Posts should continue to review and approve, as appropriate, expedite requests for H-1B and H-4 applicants in accordance with standard guidance on expediting appointments, even if the applicant is affected by the PP. The restrictions of the PP apply to H-1B visa applicants with petitions filed after the effective date.

**Restriction on Issuance**

5. (SBU) The PP's restriction on issuance and entry under INA 212(f) applies to H-1B visa applicants with petitions filed AFTER 12:01 a.m. EDT on

September 21, 2025, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000, as verified by DHS. Guidance on confirming payments and exceptions will come SEPTEL.

**B in Lieu of H**

6. (SBU) The PP further instructs the Secretary of State to "prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026." If you encounter a B visa applicant who you suspect is seeking a B visa to carry out activities in the United States that would otherwise more appropriately fall under an H-1B visa, including a B-1 visa in lieu of an H-1 visa, you must carefully consider the applicant's eligibility for the B visa and whether he or she overcomes INA 214(b). **If the applicant is otherwise eligible, including based on careful review of 9 FAM 402.2-5(F), which outlines circumstances in which a B-1 visa may be issued in lieu of an H-1, you must consult with the Visa Office before proceeding with issuance by emailing your VO/F Visa Policy Analyst.** CA is reviewing relevant guidance to make any necessary updates in accordance with the proclamation.

**H-1 Categories Not Subject to the PP**

7. (SBU) The PP applies only to H-1B applicants seeking to perform services in the United States in a specialty occupation. Visa applicants with an approved H-1B1, H-1B2, or H-1B3 petition from USCIS are not subject to the PP, as their basis for status and visa issuance falls outside the scope of the PP, and should continue to be admitted to the United States as normal per the terms of their visas. Consular sections may proceed with adjudication and issuance for any qualified applicants in these categories.

**Petition Revocations**

8. (SBU) Consular sections should not return H-1B petitions for revocation based solely on lack of payment as described in the PP. However, consular sections should continue to return petitions in all other circumstances where a revocation recommendation is warranted. See CAWeb for additional resources.

9. (U) **Additional Guidance:** CA will provide additional guidance SEPTEL and will schedule webinars in the coming days to provide information to the field and answer additional questions.

10. (U) **Mission Website:** CA will coordinate with GPA to publish a notice at the top of the visa page on mission websites. CA/EX will work with GSS vendors to provide cleared language for their websites. Posts should not ask their local GSS contacts to put alternative language on post-specific GSS websites.

11. (U) **Inquiries:** Posts must refer any U.S. media inquiries regarding E.O.s and PPs to [redacted] and congressional inquiries regarding E.O.s and PPs to [redacted]. Posts should refer local media inquiries regarding payment to USCIS. Posts should refer local media inquiries regarding entry to CBP. Posts may continue to reply to routine case-specific constituent inquiries about cases subject to the PP. Posts may respond to requests from international media regarding E.O.s and PPs using CA's cleared press guidance, on [redacted] copying [redacted]

| | |
|---|---|
| **Signature:** | RUBIO |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

UNCLASSIFIED

SBU

An official website of the United States Government Here's how you know



# H-1B FAQ

SEPTEMBER 21, 2025

On Friday, September 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025.

Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.

U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available **here** .

U.S. Customs and Border Protection has also issued guidance, available **here** .

Cookie Settings

The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025.

Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.

Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.

A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.

America 250

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Restriction on Entry of Certain Nonimmigrant Workers

Last Updated: September 21, 2025

Presidential Proclamation (PP) *Restriction on Entry of Certain Nonimmigrant Workers*, issued on September 19, 2025, restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation. This restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000. **The Proclamation's restrictions on visa issuance and entry apply only to aliens seeking visa issuance or entry into the United States based on H-1B petitions filed with USCIS after the Proclamation's effective date of September 21, 2025, at 12:01 a.m. Eastern Daylight Time (EDT).**

No visas have been revoked pursuant to the Proclamation. All exceptions to this Proclamation will be determined by the Department of Homeland Security as set forth in the Proclamation.

The full text of the proclamation is available here: https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/

**White House Fact Sheet:** https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-suspends-the-entry-of-certain-alien-nonimmigrant-workers/

**H-1B FAQs on state.gov:** https://www.state.gov/h-1b-faq/

## E. LIST OF WEBSITES CONSIDERED

1. https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/

2. https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-suspends-the-entry-of-certain-alien-nonimmigrant-workers/

3. https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf

4. https://x.com/CBP/status/1969512486627095007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al*.<br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al*.,<br>Defendants. | ) | No. 1:25-cv-3675-BAH |

**CERTIFICATION OF INDEX TO ADMINISTRATIVE RECORD**

I, ANDREW JENSEN, BEST Portfolio Director (Acting) within the Service Center Operations of the United States Citizenship and Immigration Services, hereby certify that the USCIS documents indexed in the appended document constitute the administrative record of the implementation documents challenged in Plaintiffs' amended complaint.

Executed this 5th day of December, 2025, in Lincoln, NE.

ANDREW D JENSEN

Digitally signed by ANDREW D JENSEN
Date: 2025.12.05 19:20:38 -06'00'

ANDREW JENSEN

Service Center Operations

US Citizenship and Immigration Services

INDEX

| DATE | DOCUMENT | BATES NUMBER |
|---|---|---|
| 09/20/2025 | USCIS H-1B Proclamation Memo | USCIS000001 |
| 09/21/2025 | USCIS H-1B FAQ | USCIS000002 |
| 10/15/2025 | USCIS Alert Banner and Information Regarding Proclamation on H-1B Specialty Occupations website | USCIS000004 |
| 10/20/2025 | USCIS G-1055, Fee Schedule (Updated for $100K Fee) | USCIS000007 |
| 10/20/2025 | USCIS Pay.gov H1B payment page | USCIS000012 |
| 9/19/2025 | Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* | USCIS000014 |

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

September 20, 2025

# Memorandum

TO: Associate Directors,
Deputy Associate Directors,
Program Office Chiefs

FROM: Joseph B. Edlow
Director, United States Citizenship and Immigration Services

SUBJECT: Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H-1B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This proclamation only applies prospectively to petitions that have not yet been filed.** The proclamation does not apply to aliens who: are the beneficiaries of petitions that were filed prior to the effective date of the proclamation, are the beneficiaries of currently approved petitions, or are in possession of validly issued H-1B non-immigrant visas. All officers of United States Citizenship and Immigration Services shall ensure that their decisions are consistent with this guidance. The proclamation does not impact the ability of any current visa holder to travel to or from the United States.

cc: David V. Roy, Chief Counsel (A)

U.S. Citizenship and Immigration Services

MENU

Home > Newsroom > All News > Alerts > H-1B FAQ

# H-1B FAQ

Release Date : 09/21/2025

On Friday, Sept. 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

- Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on Sept. 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on Sept. 21, 2025.
- Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.
    - U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available here (PDF, 177.48 KB).
    - U.S. Customs and Border Protection has also issued guidance, available here.
    - The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

- Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on Sept. 21, 2025.
- Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.
- Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

- A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.
- A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.

Need Help?
Chat with Emma™

For more information on USCIS and its programs, please visit uscis.gov or follow us on X (formerly Twitter), Instagram, YouTube, Facebook and LinkedIn.

Last Reviewed/Updated: 09/21/2025

U.S. Citizenship and Immigration Services

MENU

Home > Working in the United States > Temporary Workers > H-1B Specialty Occupations

# H-1B Specialty Occupations

**ALERT:** On Sept. 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility. Additional information is available in the "Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers" section below.

**ALERT:** USCIS will process H-1B, H-2A, and H-2B related Form I-129 petitions and CW-1 related Form I-129CW petitions during the government shutdown. We recognize, however, that the shutdown may affect a petitioner's ability to get required documentation (such as a labor condition application or a temporary labor certification from the U.S. Department of Labor), which may delay their ability to file Form I-129 or Form I-129CW.

If an H-1B, H-2A, H-2B, or CW-1 petitioner meets all other applicable requirements and submits evidence establishing that the primary reason they did not timely file an extension of stay or change of status request was due to the government shutdown, we will consider the government shutdown an extraordinary circumstance beyond the petitioner's control when we determine whether to excuse their failure to timely file the extension of stay or change of status request. We will monitor the situation closely and publish additional guidance if needed. Find additional information in Vol. 2, Part A, Chapter 4 of the USCIS Policy Manual.

**Alert:** We have received enough petitions to reach the congressionally mandated 65,000 H-1B visa regular cap and the 20,000 H-1B visa U.S. advanced degree exemption, known as the master's cap, for fiscal year 2026.

This nonimmigrant classification applies to people who wish to perform services in a specialty occupation, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability.

Close All Open All

Need Help? Chat with Emma™

## Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, certain H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility.

**Who is subject to the $100,000 payment:**

The Proclamation applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. The Proclamation also applies if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests consular notification, port of entry notification, or pre-flight inspection for an alien in the United States.

In addition, if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests a change of status or amendment or extension of stay and USCIS determines that the alien is ineligible for a change of status or an amendment or extension of stay (e.g., is not in a valid nonimmigrant visa status or if the alien departs the United States prior to adjudication of a change of status request), the Proclamation will apply and the payment must be paid according to the instructions provided by USCIS.

The Proclamation does not apply to any previously issued and currently valid H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025. In addition, the Proclamation does not prevent any holder of a current H-1B visa, or any alien beneficiary following petition approval, from traveling in and out of the United States.

The Proclamation also does not apply to a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, that is requesting an amendment, change of status, or extension of stay for an alien inside the United States where the alien is granted such amendment, change, or extension. Further, an alien beneficiary of such petition will not be considered to be subject to the payment if he or she subsequently departs the United States and applies for a visa based on the approved petition and/or seeks to reenter the United States on a current H-1B visa.

**How to pay the $100,000 payment:**

Petitioners should submit the required $100,000 payment using pay.gov, following the instructions on pay.gov at the following link: https://www.pay.gov/public/form/start/1772005176.

**When to pay the $100,000 payment:**

Payment must be made prior to filing a petition with USCIS, as petitioners must submit proof that the payment has been scheduled from pay.gov or evidence of an exception from the $100,000 payment from the Secretary of Homeland Security at the time of filing the H-1B petition. Petitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied.

**Exceptions granted by the Secretary of Homeland Security:**

Exceptions to the $100,000 payment are granted by the Secretary of Homeland Security in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States. Petitioning employers who believe their alien worker satisfies this high threshold may seek an exception by sending their request and all supporting evidence to H1BExceptions@hq.dhs.gov.

Eligibility Criteria

H-1B Licensing

H-1B Electronic Registration Process

Petition Filing Process

Labor Condition Application (LCA)

Period of Stay

H-1B Cap

Changing Employers or Employment Terms with the Same Employer (Portability)

Family of H-1B Nonimmigrants

More Information

Close All Open All

Last Reviewed/Updated: 10/20/2025

U.S. Citizenship and Immigration Services

MENU



# G-1055, Fee Schedule

**ALERT:** On Oct. 1, 2025, we began sending notices to all aliens with a pending Form I-589, Application for Asylum and for Withholding of Removal, who are required to pay the new Annual Asylum Fee (AAF) as provided in the July 22, 2025 Federal Register notice titled "USCIS Immigration Fees Required by HR-1 Reconciliation Bill." We also sent notices to any representatives of these aliens listed on Form G-28.

On Oct. 30, 2025, the United States District Court for the District of Maryland in *Asylum Seeker Advocacy Project v. United States Citizenship and Immigration Services, et al.*, SAG-25-03299 (D. Md.), temporarily stayed the AAF implementation provisions by USCIS. USCIS strongly disagrees with the Court's order but will follow its terms pending possible further judicial review.

In accordance with the Oct. 30 order, USCIS has paused the issuance of AAF notices pending further litigation developments. Any applicant who has received a notice from USCIS instructing him or her to pay the AAF may disregard that notice while the temporary stay is in place. USCIS will not refund previously paid annual asylum fees, and applicants who paid the fee should retain their receipts. USCIS will issue updated instructions on payment of the AAF pending further litigation developments.

**ALERT**: On Nov. 14, 2025, we published a new edition of Form G-1055, Fee Schedule. The new edition changed the filing fees for EB-5 related petitions and applications to the pre April 1, 2024, Fee Rule filing fees for:

- Form I-526, Immigrant Petition by Standalone Investor;
- Form I-526E, Immigrant Petition by Regional Center Investor;
- Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status;
- Form I-956, Application for Regional Center Designation;
- Form I-956F, Application for Approval of an Investment in a Commercial Enterprise; and
- Form I-956G, Regional Center Annual Statement

Read more here: Court Order on Partial Stay of DHS 2024 USCIS Fee Rule.

Use this form to verify fee information for immigration forms.

Need Help?
Chat with Emma™

Each application, petition, or request must be accompanied by the correct fee(s) unless you are exempt from paying the fee(s) or are eligible for a fee waiver. If the fee is incorrect, your application, petition, or request will be rejected.

Fees for applications, petitions, or requests can be paid by ACH debit, or credit card.

**Filing at a USCIS Office**

If you are filing your application or petition at a USCIS office, you must pay for the filing fee through pay.gov via a credit card or debit card, or electronic funds transfer (EFT) from a U.S. banking institution using Form G-1650, Authorization for ACH Transactions. Cash can never be used to pay a filing and/or biometric services fee, even when filing at a USCIS Office.

**Fees required under Public Law 119-21 (Pub. L. 119-21)**

Certain forms require additional fees along with any filing fee. Additional fees are not eligible for fee waivers and must be paid by separate payment concurrent with any filing fee. If your form does not have a filing fee or you have applied for a fee waiver for the form's filing fee, you must still pay the new fee mandated by Pub. L. 119-21.

**NOTE:** Pub. L. 119-21 fees adjust each year as required by law. For specific information regarding the form you are filing, please see the Additional Fee for the form you are filing.

**Fee Waivers**

Certain filers may qualify for a fee waiver for certain forms. To determine your eligibility for a fee waiver, please review Form I-912, Request for Fee Waiver. If you are not eligible for a fee waiver, you must submit the correct fee(s). For most forms, you cannot request a fee waiver when filing online. You must file a paper version of Form I-912, or a written request for a fee waiver, and the form for which you are requesting a fee waiver. You may not request a fee waiver of the additional fees required by Pub. L. 119-21. However, you may request a waiver of the filing fee set by USCIS, if otherwise eligible, while submitting the additional fee required by Pub. L. 119-21.

**Fee Exemptions**

Fee-exempt forms and filing categories list $0 as the Filing Fee. You do not need to file Form I-912, Request for Fee Waiver, or make a formal request to qualify for a fee exemption. However, the fee exemptions in this schedule only indicate that the form is free to file. They do not indicate eligibility to file those benefit requests in all circumstances. Eligibility to file a particular benefit request is set forth in the applicable regulations and form instructions.

**Edition Date**

11/14/25. You can find the edition date at the bottom of the page of Form G-1055, Fee Schedule.

**Downloads**

USCIS Fee Schedule

If you need help downloading and printing forms, read our instructions.

## Select a Form for Fee Information

I-129, Petition for a Nonimmigrant Worker – H-1B and H-1B1 Petitions

# I-129, Petition for a Nonimmigrant Worker – H-1B and H-1B1 Petitions

Visit the I-129 page for more information.

| Filing Category | Paper Filing Fee | Online Filing Fee |
|---|---|---|
| 1. If you are filing H-1B or H-1B1 petitions.<br>2. If you are filing as a Small Employer or Nonprofit. | 1. $780 plus additional fees<br>2. $460 plus additional fees, if applicable | 1. $730 plus additional fees<br>2. $460 plus additional fees, if applicable |
| Additional Fees:<br>Asylum Program Fee<br>a. If you are filing as a Regular Petitioner<br>b. If you are filing as a Non-profit<br>c. If you are filing as a Small Employer | Varies<br>a. $600<br>b. $0<br>c. $300 | Varies<br>a. $600<br>b. $0<br>c. $300 |

| Filing Category | Paper Filing Fee | Online Filing Fee |
|---|---|---|
| Additional Fees:<br><br>H-1B petitioners must submit a Fraud Prevention and Detection fee if they are:<br><br>a. Seeking initial approval of H-1B nonimmigrant status for a beneficiary; or<br>b. Seeking approval to employ an H-1B nonimmigrant currently working for another petitioner.<br><br>Petitioners for Chile or Singapore H-1B1 Free Trade Nonimmigrants do not have to pay the Fraud Prevention and Detection fee. Fraud Prevention and Detection fee, when applicable, may not be waived. | $500 | $500 |
| Additional Fees:<br><br>H-1B petitioners are required to submit an additional fee mandated by Public Law 114-113, if:<br><br>a. They are required to submit the Fraud Prevention and Detection fee; **and**<br>b. They employ 50 or more individuals in the United States; and<br>c. More than 50 percent of those employees are in H-1B, L-1A, or L-1B nonimmigrant status. | $4,000 | $4,000 |

| Filing Category | Paper Filing Fee | Online Filing Fee |
|---|---|---|
| Additional Fees:<br><br>American Competitiveness and Workforce Improvement Act (ACWIA). Petitioners filing for:<br><br>a. An H-1B nonimmigrant; or<br>b. A Chile or Singapore H-1B1 Free Trade Nonimmigrant must submit an additional ACWIA fee unless they are exempt under Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement.<br><br>To determine which ACWIA fee to pay, complete Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement. | $1,500 or $750 (depending on number of workers the petitioner employs) | $1,500 or $750 (depending on number of workers the petitioner employs) |
| Additional Fees:<br><br>Presidential Proclamation on Restriction of Entry of Certain Nonimmigrant Workers.<br><br>Do not submit payment for this fee with your petition. You must use pay.gov to pay this fee prior to filing your petition. For additional information, see our H-1B Specialty Occupations page. | N/A | $100,000 (unless an exception has been granted by the Secretary of Homeland Security) |

File Online

Last Reviewed/Updated: 11/18/2025

An official website of the United States government Here's how you know

MENU

# H-1B VISA PAYMENT TO REMOVE RESTRICTION

1 **Before You Begin** | 2 Complete Agency Form | 3 Enter Payment Info | 4 Review & Submit | 5 Confirmation

**About this form**

Use this form to pay your H-1B VISA PAYMENT TO REMOVE RESTRICTION.

**Attention!** You must capture the Pay.gov and Agency Tracking ID information after completing your transaction. Keep this information for your records.

**Accepted Payment Methods:**

- Bank account (ACH)

**With an account you can:**

- See the payments you made since you created an account.
- Store payment information so you don't have to re-enter it.
- Copy a form you already submitted the next time you need to make a payment.

**To take advantage of these benefits, you can Sign In . If you don't have an existing account, you will have the option to create an account on the sign-in page. To continue as a guest user, click the 'Continue to the Form' button.**

Preview Form | Cancel | Continue to the Form

This is a secure service provided by United States Department of the Treasury. The information you will enter will remain private. Please review our privacy policy for more information.

**We're here to help!**

Return to top

**Accessibility Policy**

**Privacy and Security Policy**

**Notices and Agreements**

**For Agencies**

*

**Feedback**

**Pay.gov**

Pay.gov is a program of the U.S. Department of the Treasury, Bureau of the Fiscal Service

**Pay.gov Support**

WARNING WARNING WARNING

You have accessed a U.S. Government information system, which includes (1) this computer, (2) this network, (3) all computers connected to this network, and (4) all devices and storage media attached to this network or to a computer on this network. U.S. Government information systems are provided for the processing of official U.S. Government information only. Unauthorized or improper use of this information system is prohibited and may subject you to disciplinary action, as well as civil and criminal penalties. All data contained on U.S. Government information systems is owned by the U.S. Government and may, for the purpose of protecting the rights and property of the U.S. Government, be monitored, intercepted, recorded, read, searched, copied, or captured in any manner and disclosed or used for any lawful government purpose at any time. THERE IS NO RIGHT TO PRIVACY IN THIS SYSTEM. System personnel may give to law enforcement officials any potential evidence of crime found on U.S. Government information systems. USE OF THIS SYSTEM BY ANY USER, AUTHORIZED OR UNAUTHORIZED, CONSTITUTES YOUR UNDERSTANDING AND CONSENT TO THIS MONITORING, INTERCEPTION, RECORDING, READING, COPYING, OR CAPTURING AND DISCLOSURE.

Note: This system may contain Sensitive But Unclassified (SBU) data that requires specific data privacy handling.

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

# RESTRICTION ON ENTRY OF CERTAIN NONIMMIGRANT WORKERS

Proclamations

September 19, 2025

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA
A PROCLAMATION

The H-1B nonimmigrant visa program was created to bring temporary workers into the United States to perform additive, high-skilled functions, but it has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor. The large-scale replacement of American workers through systemic abuse of the program has undermined both our economic and national security. Some employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

The number of foreign STEM workers in the United States has more than doubled between 2000 and 2019, increasing from 1.2 million to almost 2.5 million, while overall STEM employment has only increased 44.5 percent during that time. Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019. And the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa.

Information technology (IT) firms in particular have prominently manipulated the H-1B system, significantly harming American workers in computer-related fields. The share

of IT workers in the H-1B program grew from 32 percent in Fiscal Year (FY) 2003 to an average of over 65 percent in the last 5 fiscal years. In addition, some of the most prolific H-1B employers are now consistently IT outsourcing companies. Using these H 1B-reliant IT outsourcing companies provides significant savings for employers: one study of tech workers showed a 36 percent discount for H-1B "entry-level" positions as compared to full-time, traditional workers. To take advantage of artificially low labor costs incentivized by the program, companies close their IT divisions, fire their American staff, and outsource IT jobs to lower-paid foreign workers.

Further, the abuse of the H-1B visa program has made it even more challenging for college graduates trying to find IT jobs, allowing employers to hire foreign workers at a significant discount to American workers. These effects of abuse of H-1B visas have coincided with increasing challenges in the labor market in which H-1B workers serve. According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively — more than double the unemployment rates of recent biology and art history graduates. Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025.

Reports also indicate that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. One software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees. Another IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July. A third company has reduced its workforce by approximately 27,000 American workers since 2022, while being approved for over 25,000 H-1B workers since FY 2022. A fourth company reportedly eliminated 1,000 jobs in February; it was approved for over 1,100 H-1B workers for FY 2025.

American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance. This suggests H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States.

The high numbers of relatively low-wage workers in the H-1B program undercut the integrity of the program and are detrimental to American workers' wages and labor opportunities, especially at the entry level, in industries where such low-paid H-1B workers are concentrated. These abuses also prevent American employers in other industries from utilizing the H-1B program in the manner in which it was intended: to fill jobs for which highly skilled and educated American workers are unavailable.

The abuse of the H-1B program is also a national security threat. Domestic law enforcement agencies have identified and investigated H-1B-reliant outsourcing companies for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities to encourage foreign workers to come to the United States.

Further, abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields. A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field.

It is therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers.

The severe harms that the large-scale abuse of this program has inflicted on our economic and national security demands an immediate response. I therefore find that the unrestricted entry into the United States of certain foreign workers who are described in section 1 of this proclamation would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Restriction on Entry. (a) Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment

of $100,000 — subject to the exceptions set forth in subsection (c) of this section. This restriction shall expire, absent extension, 12 months after the effective date of this proclamation, which shall be 12:01 a.m. eastern daylight time on September 21, 2025.

(b) The Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers under section 101(a)(15)(H)(i)(b) of the INA, who are currently outside the United States, for 12 months following the effective date of this proclamation as set forth in subsection (a) of this section. The Secretary of State shall also issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026.

(c) The restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States.

Sec. 2. Compliance. (a) Employers shall, prior to filing an H-1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the payment described in section 1 of this proclamation has been made.

(b) The Secretary of State shall verify receipt of payment of the amount described in section 1 of this proclamation during the H-1B visa petition process and shall approve only those visa petitions for which the filing employer has made the payment described in section 1 of this proclamation.

(c) The Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation.

Sec. 3. Scope and Implementation of Restriction on Entry. (a) The restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation as set forth in section 1(a) of this proclamation.

(b) No later than 30 days following the completion of the H-1B lottery that immediately follows this proclamation, the Secretary of State, the Attorney General, the

Secretary of Labor, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President and Homeland Security Advisor, a recommendation on whether an extension or renewal of the restriction on entry pursuant to section 1 of this proclamation is in the interests of the United States.

Sec. 4. Amending the Prevailing Wage Levels. (a) The Secretary of Labor shall initiate a rulemaking to revise the prevailing wage levels to levels consistent with the policy goals of this proclamation consistent with section 212(n) of the INA, 8 U.S.C. 1182(n).

(b) The Secretary of Homeland Security shall initiate a rulemaking to prioritize the admission as nonimmigrants of high-skilled and high-paid aliens, consistent with sections 101, 212, and 214 of the INA, 8 U.S.C. 1101, 1182, and 1184.

Sec. 5. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this nineteenth day of September, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

DONALD J. TRUMP



WH WIRE

GET THE FACTS →

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS

Subscribe to The White House newsletter

Your email

SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Document: 00118399 Page: 158 Date Filed: 03/08/2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br>*Plaintiffs,*<br>v.<br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br>*Defendants.* | No. 1:25-cv-13829-LTS |

**DECLARATION OF JAMES E. RICHARDSON**

I, James E. Richardson, hereby state the following pursuant to 28 U.S.C. § 1746:

1. I hold the title of Deputy Attorney General in the Office of the Attorney General of the State of California, and I appear on behalf of Plaintiffs in this action.

2. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.

3. The facts set forth herein are based upon my personal knowledge or a review of the files in my possession.

4. I have attached to this declaration true and correct copies of factual declarations. The exhibits are described as follows:

**Arizona**

5. Attached hereto as AZ-1 is the declaration of Karen Pugliesi, Executive Vice President and Provost of Northern Arizona University.

6. Attached hereto as AZ-2 is the declaration of Daniel R. Erickson, Superintendent of Sonoita Elementary School District.

7. Attached hereto as AZ-3 is the declaration of Carolyn W. Stewart, Superintendent of Bullhead City School District #15.

8. Attached hereto as AZ-4 is the declaration of Ruben Diaz, Superintendent of Baboquivari Unified School District.

**California**

9. Attached hereto as CA-1 is the declaration of Pamela Brown, Vice President of Institutional Research and Academic Planning for the University of California.

10. Attached hereto as CA-2 is the declaration of Nathan S. Evans, Associate Vice Chancellor, Academic Affairs for the California State University.

11. Attached hereto as CA-3 is the declaration of Ingrid Roberson, Chief Deputy Superintendent at the California Department of Education.

12. Attached hereto as CA-3 is the declaration of Dr. Sylvia Greenwood, Acting Associate Superintendent of Human Resources for West Contra Costa Unified School District.

**Colorado**

13. Attached hereto as CO-1 is the declaration of Dr. Matt Gianneschi, President of Colorado Mountain College.

14. Attached hereto as CO-2 is the declaration of Leticia Levi, Senior Manager of the Educator Pathways and Development for Denver Public Schools.

**Connecticut**

15. Attached hereto as CT-1 is the declaration of Karen Buffkin, General Counsel and Secretary to the Board Regents for the Connecticut State Colleges and Universities (CSCU) system.

16. Attached hereto as CT-2 is the declaration of Nancy Navarretta, Commissioner of the State of Connecticut Department of Mental Health and Addiction Services.

**Delaware**

17. Attached hereto as DE-1 is the declaration of Cynthia Marten, Secretary of Education for the Delaware Department of Education.

**Hawaii**

18. Attached hereto as HI-1 is the declaration of Jan N.S. Gouveia, Vice President of Administration for the University of Hawai'i System.

19. Attached hereto as HI-2 is the declaration of Debora Halbert, Vice President for Academic Strategy for the University of Hawaii System.

20. Attached hereto as HI-3 is the declaration of Leonard R. Gouveia, Jr., Executive Director of the Research Corporation of the University of Hawai'i.

**Illinois**

21. Attached hereto as IL-1 is the declaration of Dr. Marie Lynn Miranda, Chancellor of the University of Illinois Chicago, and Vice President of the University of Illinois System.

22. Attached hereto as IL-2 is the declaration of Dr. Tony Sanders, State Superintendent of Education of the Illinois State Board of Education.

23. Attached hereto as IL-3 is the declaration of Christine Murphy Judson, Executive Director, Talent Acquisition for Chicago Public Schools.

**Maryland**

24. Attached hereto as MD-1 is the declaration of David L. Di Maria, Vice Provost for Global Engagement at the University of Maryland, Baltimore County.

25. Attached hereto as MD-2 is the declaration of Amy Ramirez, Executive Director, Global Learning and International Services for the University of Maryland, Baltimore.

26. Attached hereto as MD-3 is the declaration of Emily Nielson, Chief Capital Officer for Baltimore City Public Schools.

**Massachusetts**

27. Attached hereto as MA-1 is the declaration of Denise Barton, Chief Deputy General Counsel for the University of Massachusetts.

**Michigan**

28. Attached hereto as MI-1 is the declaration of Elizabeth Hertel, Director of the Michigan Department of Health and Human Services.

**Minnesota**

29. Attached hereto as MN-1 is the declaration of Eric Davis, Vice Chancellor for Human Resources for the Minnesota State Colleges and Universities.

30. Attached hereto as MN-2 is the declaration of Diane Rydrych, Division Director of the Minnesota Department of Health.

**Nevada**

31. Attached hereto as NV-1 is the declaration of Katie Korgan, Acting Executive Vice President and Provost of the University of Nevada, Las Vegas.

**New Jersey**

32. Attached hereto as NJ-1 is the declaration of John A. Pelesko, Ph.D., Provost and Executive Vice President for Academic Affairs at the New Jersey Institute for Technology.

33. Attached hereto as NJ-2 is the declaration of Eric Garfunkel, Vice President for Global Affairs at Rutgers University.

**New York**

34. Attached hereto as NY-1 is the declaration of Christopher Coulston, University Executive Deputy General Counsel for the City University of New York.

35. Attached hereto as NY-2 is the declaration of Anne Bink, Senior Vice Chancellor for Operations and Management and Chief Operating Officer for the State University of New York.

36. Attached hereto as NY-3 is the declaration of Dr. Sewit Teckie, Vice President Clinical Operations at New York City Health and Hospitals Corporation.

**North Carolina**

37. Attached hereto as NC-1 is the declaration of Maurice Green, North Carolina Superintendent of Public Instruction.

38. Attached as hereto NC-2 is the declaration of Dr. Eric L. Cunningham, Superintendent of Halifax County Schools.

**Oregon**

39. Attached hereto as OR-1 is the declaration of Dr. Roy Haggerty, Provost and Executive Vice President for Oregon State University.

40. Attached hereto as OR-2 is the declaration of Lindsay Pepper, Director of Scholar Services for the University of Oregon.

**Rhode Island**

41. Attached hereto as RI-1 is the declaration of Kristin Johnson, Vice Provost at the University of Rhode Island.

**Vermont**

42. Attached hereto as VT-1 is the declaration of Dr. Kirk Dombrowski, Vice President for the University of Vermont.

**Washington**

43. Attached hereto as WA-1 is the declaration of Timothy H. Dellit, M.D., Chief Executive Officer of University of Washington School of Medicine.

44. Attached hereto as WA-2 is the declaration of Ursula Elspeth Owen, J.D., International Scholars Operations Manager for the University of Washington.

45. Attached hereto as WA-3 is the declaration of Katherine Hellmann, Director of International Student and Scholar Services for Washington State University.

46. Attached hereto as WA-4 is the declaration of Faye-Lynn Gallant, Associate Vice President of Strategy, Management and Budget for Western Washington University.

47. Attached hereto as WA-5 is the declaration of Caren Lincoln, Senior Director of Human Resources for Eastern Washington University.

**Wisconsin**

48. Attached hereto as WI-1 is the declaration of Frances Vavrus, Vice Provost and Dean at the University of Wisconsin-Madison.

Dated: February 6, 2026
Los Angeles, California

/s/ *James E. Richardson*____________
JAMES E. RICHARDSON
Attorney for Plaintiff, State of California

# T BLE OF E IBITS

| E | D r |
|---|---|
| A -1 | eclaration of aren Pugliesi xecutive ice President and Provost of Northern Ari ona niversity |
| A -2 | eclaration of aniel . rickson uperintendent of onoita lementary chool istrict |
| A -3 | eclaration of Carolyn . tewart uperintendent of Bullhead City chool istrict 15 |
| A -4 | eclaration of u en ia uperintendent of Ba o uivari nified chool istrict |
| CA-1 | eclaration of Pamela Brown ice President of Institutional esearch and Academic Planning for the niversity of California |
| CA-2 | eclaration of Nathan . vans Associate ice Chancellor Academic Affairs for the California tate niversity. |
| CA-3 | eclaration of Ingrid o erson Chief eputy uperintendent at the California epartment of ducation |
| CA-4 | eclaration of r. ylvia reenwood Acting Associate uperintendent of Human esources for est Contra Costa nified chool istrict |
| C -1 | eclaration of r. Matt ianneschi President of Colorado Mountain College |
| C -2 | eclaration of Leticia Levi enior Manager of the ducator Pathways and evelopment for enver Pu lic chools |
| C -1 | eclaration of aren Buffkin eneral Counsel and ecretary to the Board egents for the Connecticut tate Colleges and niversities C C system |
| C -2 | eclaration of Nancy Navarretta Commissioner of the tate of Connecticut epartment of Mental Health and Addiction ervices |
| -1 | eclaration of Cynthia Marten ecretary of ducation for the elaware epartment of ducation |
| HI-1 | eclaration of an N. . ouveia ice President of Administration for the niversity of Hawai i ystem |
| HI-2 | eclaration of e ora Hal ert ice President for Academic trategy for the niversity of Hawaii ystem |
| HI-3 | eclaration of Leonard . ouveia r. xecutive irector of the esearch Corporation of the niversity of Hawai i |
| IL-1 | eclaration of r. Marie Lynn Miranda Chancellor of the niversity of Illinois Chicago and ice President of the niversity of Illinois ystem |
| IL-2 | eclaration of r. ony anders tate uperintendent of ducation of the Illinois tate Board of ducation |
| IL-3 | eclaration of Christine Murphy udson xecutive irector alent Ac uisition for Chicago Pu lic chools |
| M -1 | eclaration of avid L. i Maria ice Provost for lo al ngagement at the niversity of Maryland Baltimore County |
| M -2 | eclaration of Amy amire xecutive irector lo al Learning and International ervices for the niversity of Maryland Baltimore |

| | |
|---|---|
| M -3 | eclaration of mily Nielson Chief Capital fficer for Baltimore City Pu lic chools |
| MA-1 | eclaration of enise Barton Chief eputy eneral Counsel for the niversity of Massachusetts |
| MI-1 | eclaration of li a eth Hertel irector of the Michigan epartment of Health and Human ervices |
| MN-1 | eclaration of ric avis ice Chancellor for Human esources for the Minnesota tate Colleges and niversities |
| MN-2 | eclaration of iane ydrych ivision irector of the Minnesota epartment of Health |
| N -1 | eclaration of atie organ Acting xecutive ice President and Provost of the niversity of Nevada Las egas |
| N -1 | eclaration of ohn A. Pelesko Ph. . Provost and xecutive ice President for Academic Affairs at the New ersey Institute for echnology |
| N -2 | eclaration of ric arfunkel ice President for lo al Affairs at utgers niversity |
| N -1 | eclaration of Christopher Coulston niversity xecutive eputy eneral Counsel for the City niversity of New ork |
| N -2 | eclaration of Anne Bink enior ice Chancellor for perations and Management and Chief perating fficer for the tate niversity of New ork |
| N -3 | eclaration of r. ewit eckie ice President Clinical perations at New ork City Health and Hospitals Corporation |
| NC-1 | eclaration of Maurice reen North Carolina uperintendent of Pu lic Instruction |
| NC-2 | eclaration of r. ric L. Cunningham uperintendent of Halifax County chools. |
| -1 | eclaration of r. oy Haggerty Provost and xecutive ice President for regon tate niversity |
| -2 | eclaration of Lindsay Pepper irector of cholar ervices for the niversity of regon |
| I-1 | eclaration of ristin ohnson ice Provost at the niversity of hode Island |
| -1 | eclaration of r. irk om rowski ice President for the niversity of ermont |
| A-1 | eclaration of imothy H. ellit M. . Chief xecutive fficer of niversity of ashington chool of Medicine |
| A-2 | eclaration of rsula lspeth wen . . International cholars perations Manager for the niversity of ashington |
| A-3 | eclaration of atherine Hellmann irector of International tudent and cholar ervices for ashington tate niversity |
| A-4 | eclaration of Faye-Lynn allant Associate ice President of trategy Management and Budget for estern ashington niversity |
| A-5 | eclaration of Caren Lincoln enior irector of Human esources for astern ashington niversity |
| I-1 | eclaration of Frances avrus ice Provost and ean at the niversity of isconsin-Madison |

# Exhibit AZ-1

**DECLARATION OF KAREN PUGLIESI**

I, Karen Pugliesi, declare:

1. I am a resident of the State of Arizona. I have served as the Executive Vice President and Provost at Northern Arizona University (NAU) since 2021.

2. As Executive Vice President and Provost, I have personal knowledge of the matters set forth below, or I have knowledge of the matters based on my review of information and records provided to me by NAU employees, and I believe that information to be true. In my capacity as Executive Vice President and Provost, I oversee and foster collaboration across NAU's academic units and support initiatives that enhance teaching, learning, and student success, aimed to advance NAU's mission.

3. NAU participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot be otherwise obtained in the U.S. workforce, including international faculty.

4. Between 2020 and 2025, NAU obtained over 50 approvals from the United States Citizenship and Immigration Services for new employment of H-1B workers, who have filled critically important positions supporting specialized teaching, research, and operational needs at NAU.

5. In the future, NAU intends to submit H-1B petitions for international workers who are currently outside of the United States. Absent the $100,000 fee, NAU reasonably expects that it would submit approximately four such petitions in each of the next two years to employ new teaching faculty. Like other H-1B workers, these new teaching faculty would be critically important to NAU. A $100,000 fee would prohibit NAU from sponsoring these H-1B workers.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Flagstaff, Arizona this 4th day of February, 2026.

By Karen Pugliesi

Karen Pugliesi
Executive Vice President and Provost
Northern Arizona University

# Exhibit AZ-2

Sonoita Elementary School District
Elgin Elementary School
23 Elgin Rd
Elgin, AZ 85611
(520) 455-5514
Daniel R. Erickson, Superintendent
Successfully Empowering Students Diversely Every Eagle Shines

**DECLARATION OF DANIEL R. ERICKSON**

I, Daniel Erickson hereby declare:

1. I am a resident of the State of Arizona. I have 30 years as an educator, including 2 years as the Superintendent of Sonoita Elementary School District as well as 22 years in other administrative roles including assistant principal, elementary school principal, middle school principal, director, assistant superintendent, and superintendent.
2. As Superintendent of Sonoita Elementary School District, I have personal knowledge of the matters set forth below. In my capacity as Superintendent, I am responsible for collaborating with my business manager to set a budget for each fiscal year. I also provide a recommended budget for the Governing Board's review and approval. My business manager, under my supervision, coordinates the hiring process including advertising, screening, interviewing and completing background checks. After this process is complete we make recommendations to the Governing Board for new hires. This includes approvals for hiring international teachers and filing Sonoita Elementary School District's petitions for H-1B visas.
3. Sonoita Elementary School District has one school. This school enrolls around 110 students and is located in Elgin, Arizona. The district has twenty-six employees, thirteen of whom are teachers. Of these teachers, two are noncitizens who require a work visa.
4. In order to fill a vacancy, Sonoita Elementary School District engages in multiple activities, including but not limited to - posting positions on our website and other recruitment sites, attending job fairs at state colleges and universities, and posting positions in local newspapers and publications. Recruiting processes for foreign employees do not differ from recruiting for domestic candidates. On average, Sonoita Elementary School District receives approximately one application for each teaching position. Often the applicant lacks the basic requirement of the open teaching position thereby causing the district to recruit qualified teachers from outside of the United States who require a work visa.
5. Overall, it takes 3-4 months to hire a suitable candidate for a teaching position. It takes longer for specialized or hard-to-fill positions, such as those serving students with special needs or teaching Science, Technology, Engineering, and Math classes.
6. Recruiting is now much more difficult compared to years past. During my tenure as a school principal from 2004-2016, I would post openings and have well over fifty highly qualified teacher applicants. However, as time goes on and the teacher shortage in Arizona continues to get worse, we are struggling to find qualified applicants.
7. Sonoita Elementary School District's status as a small rural district makes hiring even more difficult. It is located over fifty miles from the city of Tucson, and many new graduates are not willing or able to make the drive each day. The large majority of new teachers cannot afford to buy a home in Sonoita or the surrounding communities. Furthermore, the lack of adequate funding for Arizona schools makes it difficult to recruit new teachers who can make more money

Sonoita Elementary School District
Elgin Elementary School
23 Elgin Rd
Elgin, AZ 85611
(520) 455-5514
Daniel R. Erickson, Superintendent
Successfully Empowering Students Diversely Every Eagle Shines

in a larger school/school district. Therefore, Sonoita Elementary School District relies on foreign teachers to supplement staffing.

8. H-1B visas are a crucial tool to recruit and retain qualified teachers. The district's ability to petition for H-1B visas attracts more qualified candidates to apply and further enables school districts to retain talented educators.
9. For the past three school years, Sonoita Elementary School District intended to submit H-1B petitions for international teachers, including teachers that may be outside the United States.
10. If it were not subject to a $100,000 fee, Sonoita Elementary School District estimates that it would submit one-two H-1B petitions to fill teaching positions for the next school year, and one-two the following year. These positions would be a significant portion of the District's thirteen-teacher staff. If the $100,000 fee is in place, Sonoita Elementary School District will be unable to sponsor any petition. This will likely result in vacancies for middle school, elementary, and specialist positions.
11. If in the likely event that Sonoita Elementary School District is unable to fill these positions, students will suffer. We have been able to provide one teacher per grade level and keep small class sizes, which greatly benefit our student's education. By not filling open positions, we would have to combine classes, increase class sizes, eliminate our art program, reduce classified staff positions, and have teachers cover added duty. Each of these will cause harm to the academic achievement of our students as well undue stress on our hard-working teachers and staff.

Executed on January 6, 2026 Sonoita, Arizona.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

By Daniel R. Erickson
Superintendent
Sonoita Elementary School District

# Exhibit AZ-3

# DECLARATION OF CAROLYN W. STEWART

I, Carolyn W. Stewart, hereby declare:

1. I am a resident of the State of Arizona. I have fifty-six years as an educator, including twenty-six years as a Principal in the Bullhead City School District #15 ("BCSD"). This is my seventh year as Superintendent of the District.
2. As a former Principal and as Superintendent of BCSD, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by District employees.
3. As Superintendent, I am responsible for recommending to the Governing Board candidates and budgeting for those hired. Since BCSD is a small district, I am intimately aware of the number and qualifications of applicants. This includes approvals for hiring international teachers and filing BCSD petitions for H-1B visas.
4. In my capacity as a Principal, I was responsible for recruiting, interviewing, and recommending teachers for hire. For the first twenty years in that role, finding qualified, desirable teachers was easy: there were usually five to twenty applicants for most positions. For the last six years, applications from the US dropped to one to three applicants for most vacancies and zero for others.
5. BCSD has five PreK-8th grade schools. These schools enroll 2,121 students and are located in Bullhead City, Arizona. The district has 309 employees, 150 of whom are teachers. Of these teachers, fifty-three are noncitizens who require a work visa. BCSD is currently awaiting approval for H-1B visas for four teachers to fill the remaining vacancies in the District.

6. In order to fill a vacancy, BCSD posts positions on its website, on state job boards, with Arizona colleges and universities, and with other colleges and universities from which we have hired outstanding candidates in the past. BCSD also has a strong relationship with Northern Arizona University through its "Grow Your Own" program. Individuals from Mohave County interested in becoming teachers can participate in a fully funded undergraduate program without leaving the area. Over the past ten years, BCSD and other districts in the county have "grown" several dozen teachers.
7. But there still are not enough teachers to fill all the vacancies. On average, Bullhead City School District receives from one to twenty-five applications for a job, depending on the role. Of these applicants, approximately 98% meet the minimum qualifications for the position. And, of this number, approximately 99% are from candidates who require a work visa. Teacher candidates from the U.S. are not as interested in positions in rural districts, particularly those whose salaries cannot compete with urban and suburban districts.
8. Recruiting is now much more difficult compared to years past. For many years, BCSD enjoyed a rich pipeline of well-trained teacher candidates from midwestern colleges and universities. As veteran teachers retired, new candidates chose to stay closer to home and the number of applications fell off. BCSD relies on foreign-born teachers to fill these staffing gaps.
9. On the whole, it takes one-to-two months to hire a suitable candidate for a teaching position. It takes longer for specialized or hard-to-fill positions, such as those serving students with special needs or teaching Science, Technology, Engineering, and Math classes.

10. For several years, BCSD has hired international teachers through the J-1 cultural exchange program. For school year 2025-26 and on, BCSD has committed to becoming a sponsor for H-1B teachers so that we can retain teachers for longer than the J-1 visa permits. The District contracted with an outside agency to find and vet H-1B candidates.

11. H-1B visas are becoming a crucial tool to recruit and retain qualified teachers. The ability to petition for H-1B visas attracts more qualified candidates to apply and further enables school districts to retain talented educators. Stability of staffing increased students' academic outcomes. Thus, BCSD seeks to host H-1B employees with longer-term commitment to the district.

12. Beginning near the end of calendar year 2024, BCSD initiated recruitment of H-1B teachers (through the partner agency) and began the H-1B petition process for international teachers, including for teachers who had previously worked for BCSD. Teachers who have worked here want to return.

13. The district currently has six teacher vacancies, four of which have been offered to those awaiting approval through the H-1B portal. If it were not subject to a $100,000 fee, BCSD estimates that it would submit at least five additional H-1B petitions to fill positions for the next school year, and five the following year for positions in special education, speech therapy, junior high math and science, and kindergarten through 5th grade general education. BCSD cannot afford to sponsor any petition to which a $100,000 fee applies.

14. In the likely event that BCSD is unable to fill these positions, students will suffer. There are few substitute teachers available and most of those are hired as long-term substitutes in vital classrooms. As with the current school year, students will be reassigned to other

general education teachers, increasing class sizes dramatically and "specials" classes such as music, band, chorus, art, physical education, and library—all of which have been retained through times of tight budgets—are at risk of disappearing.

15. The most significant outcome will affect BCSD programs for students with disabilities: 20 of the 24 special education teachers in the District are international teachers requiring a visa. Stability of staff is critical in those classrooms – BCSD would prefer to continue to employ these specific teachers to better assist students with disabilities. Absent a $100,000 fee, BCSD would use the H-1B visa program to provide stability

Executed on 29 January 2026, in Bullhead City, Arizona.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

By [signature]
Carolyn Stewart, PhD
Superintendent
Bullhead City School District #15

# Exhibit AZ-4

**DECLARATION OF RUBEN DIAZ**

I, Ruben Diaz, hereby declare:

1. I have twenty-six years as an educator, including three as the Superintendent of the Baboquivari Unified School District ("BUSD").

2. As Superintendent of BUSD, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records provided to me by BUSD employees.

3. In my capacity as Superintendent, I am responsible for all the oversight under state, federal, and board policy as it relates to the operational, financial, and educational duties and responsibilities. This includes overseeing the approvals for hiring international teachers and filing BUSD petitions for H-1B visas.

4. BUSD has six schools. These schools enroll about 1,000 K-12 students and are located in the Tohono O'odham Nation in Southern Arizona. The district has approximately 200 employees, sixty of whom are teachers. Of these teachers, twenty are noncitizens who require a work visa. BUSD averages between ten to fifteen vacancies each year. The district currently has eleven teacher and twelve staff vacancies.

5. Recruiting is now much more difficult compared to years past. BUSD is located within a rural American Indian Reservation. Our District serves an attendance area similar to the state of Connecticut. Some of our students drive two hours each way to be in school. To incentivize teachers to apply, the district offers subsidized affordable housing, one of the highest teacher salaries in Arizona, and a bus that travels ninety minutes each way to transport teachers from Tucson, our closest city. But recruitment remains difficult. BUSD must rely on foreign-born teachers to supplement staffing.

6. In order to fill a vacancy, BUSD posts vacancies in multiple local and nation-wide platforms including Handshake, LinkedIn, Indeed, and local university job boards. In addition, BUSD airs commercials on the radio in English and Spanish, attends local and out-of-state universities' recruitment fairs, holds a recruitment fair in the district, and offers virtual as well as in person tours to prospective candidates. For prospective international teachers, BUSD works with some sponsoring agencies assisting international teachers with the paperwork related to working visas, credentialing, fingerprinting, traveling arrangements, translation of documents, and more. BUSD encourages international teachers to apply the same way prospective national candidates apply on our application platform. As part of the process, BUSD supports all teacher applicants by providing them with an online tour and a presentation to answer as many questions they may have about our district, students, community, and paperwork. Lastly, BUSD also informs international and domestic teachers of our affordable housing opportunities in the District as part of its recruitment and retention strategy.

7. Despite its extensive efforts, BUSD has not been able to fill all teaching vacancies in the last fifteen years, even with a pool of international applicants. On average, BUSD receives a single application for each job vacancy. The applicant often does not meet the minimum qualifications for the position. And, if there is an applicant satisfying the qualification requirements, the applicant is often international and requires a work visa. International applicants apply to 70% of our teaching vacancies.

8. BUSD now recruits ten months ahead in order to hire a suitable candidate for a teaching position. It takes longer for vacancies in a rural American Indian Reservation, and even more challenging to fill specialized or hard-to-fill positions, such as those serving

students with special needs or teaching Science, Technology, Engineering, and Math classes. Based on the anticipated vacancies, BUSD started posting 2026-2027 positions as early as December 2025.

9. H-1B visas are a crucial tool to recruit and retain qualified teachers. The ability to petition for H-1B visas attracts more qualified candidates to apply. H-1B visas provide stability for international teachers willing to leave their country, families, friends, and jobs with the hope of a teaching job, and also provides staffing stability to rural and American Indian communities such our District.

10. For spring of 2026 and the 2026-27 school year, BUSD intended to submit H-1B petitions for international teachers, including for teachers that may be outside the United States.

11. If it were not subject to a $100,000 fee, BUSD would rely on the H-1B to fill upcoming vacancies, which historically, have been filled by international candidates. If the $100,000 fee is in place, BUSD cannot afford to sponsor any H1-B petition. This will result in vacancies for all six schools in all areas. For the upcoming 2026-2027 school year, the district will face additional difficulty, as ten out of our sixty teachers will be finishing the allowable term of their visas and must return to their country of origin, plus an additional 7 teachers that will retire or seek a job opportunity closer to their home, that's 28% of BUSD entire teaching staff. In the following year, BUSD will face at least another ten vacancies due to visas expiring. BUSD had intended to attempt to fill these vacancies with H-1B candidates.

12. International teachers have greatly improved educational outcomes for BUSD students, and BUSD has invested accordingly. In the last three years, BUSD increased its Arizona

Department of Education School Letter Grades from D's and C's to B's thanks to our staff, including international teachers. BUSD invested over $150,000 providing quality training to our international teachers, resulting not only in substantial growth in all schools, but also an increase of our daily attendance and decrease of chronic absenteeism rates. This improvement has greatly impacted how our rural and American Indian District is perceived. One of our international teachers was recognized as the Teacher of Year last May. Our families in BUSD see that our schools are working diligently on improving the educational experiences of our students.

13. If in the likely event that BUSD is unable to fill these positions, students will suffer. As Superintendent, I fear that if the District is unable to tap into the pool of H-1B international teachers, the District will face academic regression of our students and instability.

Executed on February 4, 2026, in Sells, Arizona.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

By [signature]

Rubén Díaz
Superintendent
Baboquivari Unified School District

# Exhibit CA-1

Declaration of Pamela Brown

I, Pamela Hope Brown, hereby declare:

1. I am a resident of the State of California. I am over 18 years of age.

2. Since 2013, I have been employed by the University of California (UC), Office of the President, as Vice President of Institutional Research and Academic Planning (IRAP). Previously I was employed by UC at its Berkeley campus in the Office of Planning and Analysis, initially as Principal Administrative Analyst (1997-2000), then as Assistant Director (2000-2011), and then as Executive Director (2011-2013). I worked for the U.S. General Accounting Office from 1991-1997. I have degrees in Applied Mathematics (B.A. 1989) and Public Policy (M.A. 1991) from UC Berkeley.

3. UC is a public university system in the State of California. As the UC system's Vice President of IRAP, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by UC staff. If called as a witness, I could and would testify competently to the matters set forth below.

4. I am submitting this Declaration in support of the States' Motion for Summary Judgment.

Institutional Research and Academic Planning (IRAP)

5. IRAP works with all locations in the UC system, including its 10 research-intensive campuses, six academic medical centers, 21 health professional sciences schools, multiple student health centers, a statewide agriculture research and extension division, and the Lawrence Berkeley National Laboratory ("LBNL"). At present, UC employs more than 250,000 employees and is California's second-largest employer.

6. IRAP's mission, and its regular practice, is to collect data from across the UC system and produce trustworthy, unbiased, relevant, and thorough analyses that provide context, inform policy, assist program development, and guide decision-making at UC. As Vice President of IRAP, I supervise 34 data management, institutional research, survey administration, and academic planning staff who review data and produce analyses. In this role, I am familiar with UC's and IRAP's data collection, data management, and record-keeping practices and procedures.

The University of California and Its Hiring

7. The University of California is widely recognized as one of the top research universities in the world. Maintaining status as a world-class research institution often requires

hiring faculty and personnel who may not currently reside in or have been trained in the United States.

8. Accordingly, UC has often needed to employ faculty, researchers, and engineers, among others, on H-1B visas to carry out its mission of teaching, research, healthcare, and public service. As of September 2025, the University of California employed 1,724 individuals on H-1B (specialty occupation) visas, representing about 0.6% of its workforce. More than two-thirds of these employees are based at UC San Francisco (426), UCLA (334), UC Berkeley (190), and LBNL (187). The remaining H1-B employees are based at UC San Diego (167), UC Davis (153), UC Irvine (69), UC Santa Cruz (66), UC Riverside (52), UC Santa Barbara (43), Agriculture and Natural Resources (17), UC Merced (13), and the UC Office of the President (7).

9. H1-B employees are integral to UC's core operations, encompassing faculty (24%), researchers (30%), postdoctoral scholars (17%), as well as librarians, medical residents, IT specialists, and laboratory professionals, among others. Collectively, they sustain the university's strategic capacity in teaching, research, healthcare, and public service, directly reinforcing UC's long-term institutional mission and impact.

<u>H1-B Policy and Its Impact</u>

10. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." The Department of Homeland Security then issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy").

11. About half of UC employees on H-1B visas (820) earn less than $100,000 annually, emphasizing the potential impact on this group if future versions of the policy extend to visa renewals. There are 815 H-1B employees that earn between $100,000 and $200,000, 62 earn between $200,000 and $250,000, and 27 earn between $250,000 and $400,000.

12. The recruitment of H-1B employees at the University of California has grown in the last few years after dipping during the pandemic. In 2019, there were 542 new H1-B visa hires; in 2020, 496 new hires; in 2021, 512 new hires; in 2022, 601 new hires; in 2023, 632 new hires; and in 2024, 616 new hires. Based on hiring patterns and assuming no further policy changes, UC is projected to hire approximately 612 individuals needing new H-1B petitions annually. The estimated financial impact to hire new employees on H-1B visas with the fees imposed by the September 19, 2025 Proclamation is $12.8 million for UC San Francisco, $9.5 million for UCLA, $7.4 million for UC San Diego, $7.2 million for UC Berkeley, $6.9 million

for UC Irvine, $4.6 million for UC Davis, $3.8 million for UC Santa Cruz, $3.2 million for LBNL, $2.6 million for UC Riverside, $2.0 million for UC Santa Barbara, $600,000 for UC Merced, and $600,000 for Agriculture and Natural Resources. Hence, this Policy is potentially disruptive to UC's mission in that it would impose an estimated annual cost of $61.2 million on UC's talent acquisition efforts.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of February, 2026, in Oakland, California.

DocuSigned by:
Pamela Brown
32D63569073841F...

Pamela Brown
Vice President for Institutional Research and Planning, University of California

# Exhibit CA-2

**DECLARATION OF NATHAN EVANS**

I Nathan . vans here y declare as follows

1. I am the Associate ice Chancellor Academic Affairs for the California tate niversity California tate niversity . I have een employed in that position since uly 2021 except for the period 2023-2025 when I served as the eputy ice Chancellor Academic Affairs.

2. My current responsi ilities include ut are not limited to leadership and strategic guidance for matters related to academic programs accreditation professional and continuing education online education educator and leadership programs faculty development academic technology student transfer articulation graduate education and student and academic usiness systems for the C system.

3. California tate niversity creates and maintains usiness records created in the ordinary course of usiness at or near the time of the act condition or event including records relating to and documenting employee hiring.

4. All of the facts and information provided herein are ased on my personal knowledge or are facts and information gathered y California tate niversity employees ased on their review of usiness records maintained and created in the ordinary course of usiness. I am informed and elieve that California tate niversity employees have used their est efforts in gathering the facts and information they provided to me and that those facts and information are true and correct.

5. If called upon to testify I could and would testify competently and completely to the facts information and matters set forth elow.

6. I am su mitting this eclaration in support of the tates Motion for ummary udgment.

**California State University And H-1B Faculty**

7. California tate niversity is the nited tates largest four-year pu lic university with 23 universities and seven off-campus centers located throughout the tate of California. Currently there are approximately 470 000 students and 56 000 faculty and staff who study work and/or conduct research at the undergraduate graduate and postgraduate levels.

8. California tate niversity was created in 1960 under the California Master Plan for Higher ducation. he university system draws its students from the top third of the state s high school graduates and is California s primary undergraduate teaching institution. In continuing to expand its educational scope and help meet the state s workforce demands for skilled professionals California tate niversity offers independent doctorates in audiology education nursing practice occupational therapy physical therapy and pu lic health.

9. California tate niversity currently employs approximately 510 faculty mem ers holding an H-1B visa. hose faculty mem ers teach in approximately 106 uni ue ndergraduate and 84 uni ue raduate programs such as Nursing and Health ciences Audiology peech Language Pathology pecial ducation Computer ngineering and ciences Industrial and ystems ngineering Aerospace ngineering Cy er and Information ecurity oftware ngineering rajectory esign in Cislunar pace and Physics.

10. uring Academic ears 2022-2023 2023-2024 2024-2025 and 2025-2026 there were approximately 467 newly hired H-1B faculty mem ers. California tate niversity has continually hired new faculty to support the academic offerings research capa ilities and the numerous other student programs re uired to meet the academic and related needs of the hundreds of thousands of students annually enrolled in its system.

**Impact of the H-1B Policy on University Hiring**

11. California tate niversity relies on the H-1B visa program to fill employment vacancies primarily faculty positions. California tate niversity employs individuals on H-1B visas in faculty positions ecause in certain instances it is difficult to find ualified applicants within the nited tates. In some instances California tate niversity campuses such as Cal tate Monterey Bay and an iego tate niversity have hired H-1B faculty mem ers ecause those persons were the only candidates that had the re uired ualifications.

12. I understand that earlier this year the epartment of Homeland ecurity implemented a policy re uiring employers to pay a 100 000 supplemental fee in conjunction with any new petition for an H-1B visa the Policy .

13. I understand that on eptem er 19 2025 President rump issued a Proclamation Proclamation that restricts the entry of certain applicants seeking to enter the nited tates with H-1B visas except for those aliens whose petitions are accompanied y a payment of 100 000. I understand that this Proclamation provided the asis for the promulgation and implementation of the Policy.

14. he Proclamation purports to address systematic a use of the H-1B program that according to the Proclamation allows industries to replace rather than supplement American workers with lower-paid lower-skilled la or. his description does not accurately descri e California tate niversity s hiring practices. California tate niversity does not and has not used the H-1B visa program to hire low-paid lower-skilled employees. o the contrary all California tate niversity H-1B faculty mem ers have a graduate degree and/or training in a speciali ed field. Additionally H-1B faculty mem ers at California tate niversity are unioni ed and su ject to a

collective argaining agreement which ensures they are paid at the same level and range as non-H-1B faculty mem ers.

15. he Proclamation also claims that many American tech companies have laid off their ualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. hat description does not apply to California tate niversity. California tate niversity is not a tech company and it does not and has not used the H-1B visa program as a vehicle or a way to lay off domestic workers or replace domestic workers with international employees.

16. he Proclamation also addresses claimed national security threat s arising from reliance on H-1B-reliant outsourcing companies that have een investigated . . . for engaging in visa fraud conspiracy to launder money conspiracy under the acketeer Influenced and Corrupt rgani ations Act and other illicit activities. California tate niversity has not relied and has no intention of relying on outsourcing companies in order to fill employment vacancies.

17. In addition the H-1B isa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example for every employee hired through the H-1B visa program California tate niversity must complete a La or Condition Application LCA for Nonimmigrant orkers Form A-9035 9035 . he LCA contains multiple re uirements including that the employer pay at least the prevailing wage or the employer s actual wage whichever is higher and pay for nonproductive time and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed among other things. ee 20 C.F. . 655.731 655.732. Moreover ecause faculty mem ers at California tate niversity are su ject to a collective argaining agreement notice in the form of the LCA or other means must e provided to the applica le argaining representative. he argaining representative is

a le to o ject to the hiring if the representative elieves the hiring improperly displaces existing . . workers.

18. California tate niversity operates consistently with the re uirements set forth in the LCA and all applica le H-1B laws and regulations.

19. he Policy has and will continue to adversely impact the a ility of California tate niversity to hire ualified applicants. he fee of 100 000 is prohi itive for California tate niversity which is a non-profit educational institution that operates with a tight udget. In many instances the 100 000 fee would effectively dou le or even more than dou le California tate niversity s hiring cost for a faculty mem er.

20. he financial urden created and imposed y the Policy will force and in fact has forced California tate niversity campuses to stop hiring candidates who re uire an H-1B visa su ject to the fee. For all practical purposes the 100 000 fee imposed y the Policy means that California tate niversity is and will e una le to hire any candidate who re uires an H-1B visa to work within the nited tates even if the candidate is the only ualified applicant.

21. As a result of the 100 000 fee California tate niversity has een forced to halt the hiring of international faculty and researchers particularly in critical fields like science and technology. he ina ility of California tate niversity to recruit necessary talent due to the fee will ultimately curtail speciali ed instruction and research making California tate niversity less competitive in the California and national academic landscape.

22. he fee imposed y the Policy compounds the existing difficulty for California tate niversity to hire employees in hard-to-fill vacant positions y adding a financial urden. Because California tate niversity campuses will in some cases e forced to stop sponsoring H-1B applicants it will result in fewer course offerings a

greater service workload on faculty due to unfilled vacancies and increased class si es particularly in science technology engineering and mathematics M courses.

23. he Policy has already egun to impact California tate niversity s a ility to recruit and hire international candidates for vacant positions. . At the time the Policy went into effect there were numerous open faculty positions which California tate niversity was actively attempting to fill. As a result of the financial urden created y the Policy California tate niversity was forced to stop considering or hiring highly ualified applicants who re uired an H-1B visa for those positions.

24. niversities including California tate niversity often compete to hire a handful of eligi le applicants some of whom are individuals who re uire an H-1B visa to work within the nited tates. In such situations California tate niversity is already at a disadvantage in competing with private universities which generally have greater financial resources than California tate niversity a state pu lic institution. he 100 000 fee imposed y the Policy increases and worsens the existing disadvantage faced y California tate niversity in competing for eligi le candidates who re uire an H-1B visa to work within the nited tates.

I declare under penalty of perjury that the foregoing is true and correct to the est of my knowledge.

xecuted this 30th day of anuary 2026 in an iego California.

NA HAN AN

# Exhibit CA-3

**DECLARATION OF CHIEF DEPUTY SUPERINTENDENT INGRID ROBERSON**

I, Ingrid Roberson, declare as follows:

1. I am a resident of California. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the California Department of Education (CDE) as Chief Deputy Superintendent. In my role, I supervise CDE divisions that oversee the following in TK-12 education in California: curriculum, professional learning, multilingual, State Special Schools, career and college transition, student achievement, expanded learning, accountability, technology services, educational data management, assessment, literacy, nutrition, special education and early education.

3. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. As Chief Deputy Superintendent, I have personal knowledge of the matters set forth below; with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from the CDE's records by others within the organization.

**California Department of Education Background**

4. The CDE is a state agency whose work supports the State's efforts to carry out the State's constitutional responsibility to provide Californians with a free public education. Cal. Const. art. IX, §§ 5-6. The CDE's mission is to provide a world-class education for all of California's 5.8 million public school students – across more than 9,000 schools – from early childhood to adulthood. The CDE innovates and collaborates with educators, schools, parents, and community partners to prepare students to live, work, and thrive in a multicultural, multilingual, and highly connected world.

5. In California, the CDE supports nearly 2,000 local educational agencies ("LEAs"), including school districts, county offices of education, and charter schools. Consistent with federal and state laws, LEAs within the State serve all school-age children, regardless of their race, nationality, ethnic origin, sex, gender, religion, disability, or immigration status. An LEA – such as a school district – is a public authority legally constituted by the State as an administrative agency to provide control of and direction for kindergarten through grade twelve public educational institutions.

**The Policy**

6. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with any new petition for an H-1B visa (the "Policy").

7. As described below, it is my understanding that the Policy will inflict significant harm upon California's efforts to provide a high-quality education to all children.

8. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

**Teacher Shortage in California and Role of H-1B Workers**

9. Like many states, California faces persistent teacher shortages, and many LEAs face challenges filling vacancies with fully credentialed teachers, especially in math, science, special education, and bilingual education. To address these shortages, LEAs historically have had to hire inexperienced or substitute teachers, increase class sizes, and reduce course offerings.

Teacher shortages are often most severe in schools serving students of color and students from low-income backgrounds.

10. The H-1B program has been an important tool for LEAs to fill teacher vacancies where hiring has been challenging. During the 2024-25 school year, 110 LEAs submitted a request for H-1B teacher work visas in California. A total of 403 work visas were requested by LEAs, and 371 work visas were granted. That total represented an increase in need from the 2023-24 school year, when 89 LEAs in California submitted a total of 317 H-1B teacher work visas, and 287 work visas were granted.

11. LEAs in California have reported that teachers on H-1B visas have filled much-needed gaps in their teaching force, and that these teachers have been placed in important dual-language and special education programs.

**Impact on LEAs and Their Students**

12. The $100,000 fee for new H-1B petitions will cause irreparable harm and jeopardize programs and services that support thousands of children and youths across the State.

13. If the Policy remains in place, California's LEAs will face an insurmountable financial barrier to hiring teachers on H-1B visas. These LEAs will likely have to rely on underprepared, inexperienced, and substitute teachers to fill vacant positions, and may need to cut course offerings, especially in the programs made possible by educators on H-1B visas.

14. The lack of clarity over how the H-1B program will be implemented will create significant challenges for LEAs that employ teachers on H-1B visas, leading to challenges budgeting and preparing for the upcoming school year, and potentially an inability to implement programs where teachers on H-1B visas are staffed.

15. For LEAs where educators on H-1B visas make dual-language public schools possible, giving families in California a unique multicultural education, the lack of clarity over the program and potential loss of teachers on H-1B visas will be detrimental to their ability to run the program entirely.

16. For LEAs that rely on teachers on H-1B visas as special education teachers, a shortage of teachers resulting from the Policy would cause immediate and irreparable harm to students with disabilities by depriving them of time-sensitive, necessary educational services for which there is no adequate remedy at law. The loss of special education teachers could delay implementation of individualized education programs (IEPs) for students with disabilities or special needs. LEAs with teachers on H-1B visas serving "hard to serve" students would be especially impacted, as regional programs for students with complex or intensive needs, which are not easily addressed in a regular school environment, may be scaled back or eliminated. Delays in or denials of IEP services inflict irreparable harm by interrupting individualized progress.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2026, at Sacramento, CA.

Ingrid Roberson

Case 1:25-cv-13829-LTS Document 88-9 Filed 02/06/26 Page 1 of 7

# Exhibit CA-4

**DECLARATION OF DR S LVIA REEN OOD**

I ylvia reenwood declare as follows:

1. I am a resident of the tate of California. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness I could and would testify competently to the matters set forth elow.

2. I am the Acting Associate uperintendent of Human esources for est Contra Costa nified chool istrict CC a pu lic school district in California. In my capacity as Acting Associate uperintendent of Human esources for est Contra Costa nified chool istrict I am responsi le for recruitment and staffing legal compliance compensation and enefits negotiations and the entire human resources department.

3. I have een employed y CC since 1991 and I have served as Acting Associate uperintendent of Human esources since August 2025. I have worked at CC my entire career I held the following positions: Instructional Assistant Campus ecurity fficer eacher ice Principal Principal and irector.

4. I su mit this declaration in support of the Plaintiffs Motion for ummary udgment. As Acting Associate uperintendent of Human esources I have personal knowledge of the matters set forth elow with respect to the matters for which I do not have personal knowledge I have reviewed information gathered from CC s records y others within the organi ation.

**Bac ground on est Contra Costa Unified School District**

5. Nestled in the heart of the an Francisco Bay Area CC is a dynamic diverse and vi rant district that serves a thriving community of over 28 000 students. ith 56

schools spread across five cities and unincorporated areas in the Bay Area we offer an exceptional educational experience that reflects the rich diversity of our region.

6. CC serves families who speak more than 50 different languages. ith approximately 54 Latino 18 African American 10 Asian 10 hite and 6 Filipino students our schools are a true reflection of the vi rant multicultural landscape of the Bay Area.

7. ur mission is to provide an e uita le rigorous and supportive educational experience for all students while fostering an inclusive environment that cele rates diversity and encourages lifelong learning. e are committed to preparing students to succeed in college career and eyond through high standards of academic achievement social-emotional learning and community engagement.

8. Consistent with federal and state laws CC serves all school-age children regardless of their race nationality ethnic origin sex gender religion disa ility or immigration status. CC is a pu lic authority legally constituted y the tate as an administrative agency to provide control of and direction for kindergarten through grade twelve pu lic educational institutions.

**The Policy**

9. I understand that earlier this year the epartment of Homeland ecurity issued a policy re uiring employer payment of a 100 000 supplement fee in conjunction with any new petition for an H-1B visa the Policy .

10. As descri ed elow it is my understanding that the Policy will inflict significant harm upon CC s efforts to provide a high- uality education to all children.

11. n eptem er 19 2025 President rump issued a Proclamation estriction on ntry of Certain Nonimmigrant orkers Proclamation that restricts the entry of certain

applicants seeking to enter the nited tates with H-1B visas except for those aliens whose petitions are accompanied y a payment of 100 000. I understand that this Proclamation provided the asis for the promulgation and implementation of the Policy.

12. he Proclamation purports to address systematic a use of the H-1B program that according to the Proclamation allows industries to replace rather than supplement American workers with lower-paid lower-skilled la or. his description does not accurately descri e CC s hiring practices. CC does not and has not used the H-1B visa program to hire low-paid lower-skilled employees. o the contrary many of our employees currently in possession of H-1B visas have highly speciali ed training and advanced degrees.

13. he Proclamation also claims that many American tech companies have laid off their ualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. hat description does not apply to CC twice over: CC is not a tech company and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

14. he Proclamation also addresses claimed national security threat s arising from reliance on H-1B-reliant outsourcing companies that have een investigated . . . for engaging in visa fraud conspiracy to launder money conspiracy under the acketeer Influenced and Corrupt rgani ations Act and other illicit activities. CC has not and does not intend to rely on outsourcing companies in order to fill employment vacancies. o the est of my knowledge CC has never relied on an outsourcing company for hiring that was accused of fraud y any state or federal agency.

**Teacher Shortage in CCUSD and Role of H-1B or ers**

15. CC faces a significant teacher shortage crisis with the most common shortages in special education and ilingual education. hough CC works diligently to recruit ualified educators filling vacancies has een difficult as there is not a large enough pool of applicants.

16. Like many school districts CC has seen a decline in enrollment in educator preparation programs and therefore CC faces persistent challenges recruiting candidates to fill vacancies especially in special education. In addition CC s location in the Bay Area next to other school districts with more resources has made it difficult to attract jo candidates.

17. he H-1B program has thus een an important tool to fill vacancies where hiring a domestic worker has een challenging. In 2023 CC had 711 vacancies leading the district to turn to teachers on H-1B visas to teach in mostly special education and dual-language programs. For the 2023-2024 school year CC su mitted a total of 28 H-1B visa re uests and was granted 20. Likewise in the 2024-2025 school year CC su mitted a total of 20 H-1B visa re uests and was granted 18.

18. he majority of H-1B teachers at CC are in pecial ducation. CC currently has a out 81 pecial ducation teachers on H-1B visas out of the 250 in the pecial ducation program.

19. H-1B educators are working at the following sites Bayview lementary Cameron lementary Chave lementary Collins lementary Coronado lementary e An a High chool e ean Middle chool over lementary downer lementary l Cerrito High chool llerhorst lementary rant lementary reenwood Academy Helms Middle chool

Hercules High chool ennedy H ing lementary orematsu M Lincoln lementary Lupine lementary Madera lementary Middle College Mira ista lementary Murphy lementary Peres lementary Pinole M Pinole H ichmond High hannon lementary oskin M pecial ducation tege lementary tewart lementary ara Hills lementary ransition alley iew lementary erde lementary est County Mandarin. hey cover the following fields: pecial ducation ual Language Immersion peech herapy Assistant Principal Coordinator of ransition.

20. H-1B educators are speciali ed educators that serve as a critical ridge for underserved communities that struggle to fill high-need roles. In rural and low-income communities these educators address chronic staffing shortages that would otherwise lead to increased caseloads or elimination of essential services.

**Impact on CCUSD and Its Students**

21. he 100 000 fee for H-1B petitions will cause irrepara le harm and jeopardi e programs and services that support millions of children and youths across the district.

22. If the Policy remains in place CC will e una le to pay the 100 000 fee. CC has already had to stop all of its recruitment efforts for applicants who would re uire new H-1B visas for the 2026-2027 school year as the district is una le to pay the 100 000 fee.

23. At a minimum I expect that CC s ina ility to seek employees through the H-1B visa program will increase the likelihood that vacancies persist into the next school year. As a majority of H-1B teachers fill vacancies in special education eing una le to rely on the H-1B visa program means that CC will face challenges supporting some of our most vulnera le students.

24. Losing H-1B educators will lead to critical staffing shortages and compromise student support. For schools that rely on international hires the new H-1B fee of up to 100 000 may make recruitment and retention financially impossi le.

25. he Policy will cause significant organi ational harm primarily y disrupting financial planning and the delivery of legally mandated services to our special education students. he drastic fee increases have left our school district una le to account for hiring costs in our current and future udgets.

26. he fee will also have an impact on student s learning if positions have to go unfilled. Learning loss during critical developmental windows can have a long-lasting effect especially for students with disa ilities and nglish learners who are vulnera le to more severe set acks than the general student population. If students foundational skills like reading and comprehension are not mastered during their formative years they are likely to not ecome fluent readers which will then hinder their future educational career.

27. Although we are looking at ways to redesign and improve the efficiency of programs to meet contractual guidelines and to ensure that we can still meet our student needs due to the fiscal solvency of the district we are una le to pay the 100 000 fee for incoming international teachers to support programs.

I declare under penalty of perjury that the foregoing is true and correct.

xecuted on Fe ruary 4 2026 at ichmond California

ylvia . reenwood

# Exhibit CO-1

**DECLARATION OF DR. MATT GIANNESCHI**

1. I am a resident of the tate of Colorado. I am over the age of eighteen.

2. I am the President of Colorado Mountain College. I have held this position since July 1, 2024. As president, I oversee the college's operations including finance and administration, human resources, and student and academic affairs. Prior to my role as president, for ten years I served as Colorado Mountain College's Chief Operating Officer and Chief of Staff.

3. As President for Colorado Mountain College, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by Colorado Mountain College' employees and I believe that information to be true.

4. Colorado Mountain College maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at the college.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**Colorado Mountain College and Its Hiring**

6. Colorado Mountain College is a public institution granting two- and four-year degrees at eleven campuses located in eight counties covering 7,500 square miles throughout the north-central Rocky Mountain region of Colorado. Organized in 1965, the college offers classes in a variety of areas, ranging from traditional bachelor's degrees in subjects such as nursing, business administration, education, and human services to associates degrees in early childhood and elementary teacher education, health sciences, paramedic, and hospitality management to certificates in law enforcement training, automotive service, medical assistance, and the ski and snowboard industry. Colorado Mountain College has approximately 12,875 students and about

1608 full and part time employees and adjunct faculty who study and work on its eleven campuses. There are individuals who hold an H-1B visa who work at Colorado Mountain College in such functions as information technology, institutional research, administration, and faculty members who teach in fields such as applied economics, mathematics, business, and accounting.

7. Each year, Colorado Mountain College hires approximately 354 new faculty and staff. Colorado Mountain College must continually hire new faculty and staff to support its academic offerings and student programs to meet the academic and related needs of its approximately 12,875 students.

**Impact of the H-1B Policy on College Hiring**

8. Colorado Mountain College relies on the H-1B visa program to fill employment vacancies. Today, Colorado Mountain College employs approximately six faculty and staff who are holders of H-1B visas. Colorado Mountain College plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of Colorado Mountain College to hire qualified applicants because as a public institution with limited funding, the college cannot pay the $100,000 fee for new and existing employees.

10. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe Colorado Mountain College' hiring practices. Colorado Mountain College does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; of the six H-1B visa holders currently employed by Colorado Mountain College, all six of those employees are faculty or staff who hold advanced degrees.

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to Colorado Mountain College because the college is not a tech company, and more importantly it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." Colorado Mountain College has not and does not intend to rely on "outsourcing companies" in order to fill employment vacancies and therefore has never relied on an outsourcing company accused of fraud by any state or federal agency.

14. In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, Colorado Mountain College must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA has multiple

requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

15. Colorado Mountain College complies with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

16. Many vacant and hard to fill positions at Colorado Mountain College within areas such as institutional research, data analytics, accounting, and economics—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants may satisfy these requirements. The college's applicant pool is further negatively affected by the rural geographical region and cost of living where the college's eleven campuses are located, such as in Aspen, Vail, and Steamboat Springs, Colorado. The fee imposed by the Policy will further limit the pool of applicants that Colorado Mountain College can consider as the college is not in a position to pay the $100,000 fee for any position given fiscal constraints. The result will be the frustration of Colorado Mountain College' ability to employ qualified individuals necessary to support the educational offerings it provides to its students in the rural Rocky Mountain region in Colorado.

17. Colorado Mountain College has used the H-1B via program to fill positions that otherwise may go vacant due to lack of other qualified candidates. For example, in late 2022, Colorado Mountain College sought to hire a Professor of Accounting, and the only two qualified candidates both required a H-1B visa sponsorship. As another example, in April of 2025, the

college sought to hire for an Institutional Research Data Architect position and out of twenty-two applicants, two of the three finalists were international candidates who required an H-1B visa.

18. Given the specialized nature of staff and faculty positions and the limited number of eligible candidates, many universities and colleges often vie to hire a handful of eligible applicants. In such situations, Colorado Mountain College must compete with private institutions and companies, some of which have more expansive financial resources than does Colorado Mountain College, which is a public institution. Colorado Mountain College' inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

19. The fee imposed by the Policy will preclude Colorado Mountain College from hiring individuals outside of the United States and requiring an H-1B visa to work within the United States.

20. Depending on experience and specialty, faculty at Colorado Mountain College are typically paid an average annual salary of $100,722 and staff are typically paid an average annual salary of $87,756. The fee would double the costs for faculty and more than double the costs for staff to Colorado Mountain College to hire new candidates requiring an H-1B visa, reducing the overall number of new hires that it could afford.

21. The Policy will have a significant and irreparable impact on Colorado Mountain College beginning in January 2026. With certain exceptions, hiring for staff and faculty positions is cyclical. Many departments, including biological science and business faculty have posted vacancies and are expecting to hire new candidates over the upcoming months. With the H-1B program being prohibitively costly, Colorado Mountain College may not be able to fill some of

these positions. Colorado Mountain College requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

22. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of February, 2026, in Glenwood Springs, Colorado.

/s/
Matt Gianneschi, President
Colorado Mountain College
802 Grand Avenue
Glenwood Springs, CO 81601

# Exhibit CO-2

**DECLARATION OF LETICIA LEVI, SENIOR MANAGER OF THE EDUCATOR PATHWAYS AND DEVELOPMENT FOR DENVER PUBLIC SCHOOLS**

I, Leticia Levi, declare as follows:

1. I am a resident of the State of Colorado. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Senior Manager of the Educator Pathways and Development who leads all of our efforts for the International Educator Institute in Denver Public Schools. In my capacity as the Senior Manager, I am responsible for leading and managing our strategies and efforts in recruitment, learning and development, and retention of educators from our different pathways. Specifically related to the International Educator Institute, I am responsible for not only creating quality candidate rigorous selection and preparation, ensuring well-being in a new setting, promoting growth and expertise, but also leading the team members who operate and support the visa sponsorship programming and processes.

3. I have been employed by Denver Public Schools since April 2011, and I have served as a Director and Senior Manager of this work since November 2023, and visa sponsorship since 2012. Before starting at Denver Public Schools, I worked in various HR roles in creating pipelines and employee training and professional development.

4. I submit this declaration in support of the Plaintiffs' Motion for Summary Judgment. As Senior Manager, I have personal knowledge of the matters set forth below; with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from Denver Public Schools records by others within the organization.

**Background on Denver Public Schools**

5. Denver Public Schools, also known as School District No. 1, located in the City and County of Denver, Colorado, is a Colorado public school district and political subdivision of the State of Colorado. DPS is the local education agency responsible for providing public education services to students residing within its geographic boundaries and for operating a system of public schools in Denver.

6. DPS is governed by an elected Board of Education. The Board establishes district policy, adopts the district's budget, and provides overall governance and oversight consistent with authorities granted to Colorado school districts. The Superintendent serves as the district's chief executive and is responsible for the day-to-day administration of DPS, including implementing Board policy and managing district operations and personnel.

7. DPS exists to provide free public education to eligible students. Colorado's Constitution establishes the State's obligation to maintain a thorough and uniform system of free public schools, and Colorado statutes assign local school districts the responsibility to deliver public education to resident students. *See* Colo. Const. art. IX, §§ 2, 15; C.R.S. §§ 22-1-102(1), 22-32-109(1)(f)(I), (t), (v), (aa). DPS carries out that public mandate by operating schools, employing and supervising educators and staff, delivering instruction aligned to state academic standards, and providing educational supports and services necessary for students to access learning.

8. DPS's mission is to ensure that all students in Denver have access to a high-quality public education that prepares them for postsecondary success, civic participation, and meaningful opportunity. DPS pursues that mission by delivering instruction and educational programming, providing safe and supportive learning environments, and working with families and community partners to meet student needs.

9. DPS is subject to extensive federal and state requirements governing the provision of educational services. These include obligations to provide equal access and nondiscrimination in district programs and activities, and to provide language access and meaningful participation for students and families where required. DPS also has specific legal obligations to identify and serve eligible students with disabilities and to provide a free appropriate public education through individualized supports and services. DPS is further responsible for protecting student records and privacy consistent with applicable law.

10. DPS fulfills these obligations by allocating resources across schools and programs, maintaining systems of accountability and compliance, contracting for services when appropriate, and ensuring staffing levels and specialized expertise sufficient to provide required instruction and student supports. Recruiting and retaining qualified staff is necessary to maintain continuity of educational services and to meet DPS's legal obligations to students. DPS's ability to attract and retain specialized employees, including roles that support instruction and student services, directly affects its capacity to deliver educational services and to comply with its legal obligations to Denver students.

11. Denver Public Schools serves a large, diverse student population across the City and County of Denver. DPS educates approximately 90,000 students each year through a portfolio of roughly 200 district operated and district authorized schools, including elementary, middle, and high schools, as well as charter schools authorized by the Board. DPS employs approximately 5000 educators and staff and manages an annual operating budget of approximately $1.4 billion, with responsibility for delivering instruction, special education services, multilingual learner supports, transportation, food service, and other student facing programs at districtwide scale. In addition to day-to-day school operations, DPS oversees facilities across Denver, administers state

and federally funded programs, and is accountable for districtwide student outcomes and compliance obligations across all schools and programs it operates or authorizes.

12. Denver Public Schools serves students and families from every neighborhood in the City and County of Denver, encompassing a wide range of communities with diverse racial, ethnic, cultural, linguistic, and socioeconomic backgrounds. DPS students and families include long established Denver residents as well as newcomers to the region, and many families speak languages other than English at home. DPS also serves students with disabilities, students experiencing housing instability, students in foster care, and other students who require additional supports to access education. Because DPS is the primary public education provider for Denver, the district's programs and services must be accessible and responsive to the full spectrum of student needs across the city, including ensuring meaningful family engagement and equitable access to educational opportunities.

13. As a public education agency, DPS must plan staffing and programming on an annual cycle, including hiring educators and specialized service providers, assigning staff to schools based on student enrollment and individualized needs, and ensuring appropriate credentials and compliance with state and federal requirements. DPS also must respond to changing student needs throughout the year, including serving students who enroll after the start of the school year and maintaining continuity of instruction and required student services. The district's ability to meet these obligations depends on recruiting and retaining qualified personnel across a range of hard to fill positions, including specialized roles that support instruction and legally required services. Unanticipated and substantial increases in employment related costs can disrupt staffing plans, divert resources from student services, and impair the district's capacity to provide consistent

educational programming and to meet its statutory and regulatory obligations to Denver students and families.

**The Policy**

14. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with any new petition for an H-1B visa (the "Policy").

15. As described below, it is my understanding that the Policy will inflict significant harm upon Denver Public Schools' efforts to provide a high-quality education to all children.

16. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

17. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe Denver Public Schools hiring practices. Denver Public Schools does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; Bachelor's, Master's degrees as well as meeting the Colorado Department of Education state licensing requirements.

18. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B

workers." That description does not apply to Denver Public Schools twice over: DPS is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

19. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." Denver Public Schools has not and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, Denver Public Schools has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

20. In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, Denver Public Schools must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

21. Denver Public Schools operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

**Teacher Shortage in Denver Public Schools and Role of H-1B Workers**

22. In the state of Colorado, we have experienced educator shortages. In Denver Public Schools (The Denver County 1 district), recruiting qualified educators is a constant struggle.

23. In general, identifying and retaining qualified, skilled educators and other hard to fill school based staff has become increasingly difficult. Like many school systems, Denver Public Schools has seen a decline in enrollment in traditional educator preparation programs, and we face persistent challenges recruiting candidates with the specialized credentials and experience our students need.

24. Against that backdrop, DPS has taken proactive steps to build a more resilient recruitment and retention ecosystem. We have implemented structures that support strategic recruitment, selection, and development, including talent pipelines from within our workforce and partnerships with educational institutions abroad that align with our shared goals of cross cultural exchange and educational excellence.

25. The H-1B program is an important part of that strategy because it helps address positions that would otherwise remain unfilled or be filled after prolonged vacancies. By allowing DPS to recruit and retain highly qualified international educators for hard to staff roles, the program helps prevent critical shortages, sustain continuity of services, and support student outcomes, while also advancing our commitment to global competency.

26. As the largest urban school district in Colorado, Denver Public Schools serves a diverse community where the majority of campuses are Title I schools, with over 30% of our student body identified as English Language Learners, and 34% primarily Spanish-speaking, it is vital that we recruit and hire educators capable of providing the robust linguistic support necessary for academic success.

27. Denver Public Schools faces a significant teacher shortage crisis with the most common shortages in our ELA-S designated classroom (bilingual in Spanish), Math, Science and Special Education.

28. I am familiar with DPS staffing levels and vacancy data for the 2025 to 2026 school year, including positions required to deliver instruction and legally required student services. DPS competes in a constrained labor market for qualified educators and specialized staff. In that environment, the district relies on all lawful recruiting pathways, including the ability to recruit and retain qualified candidates through the H-1B program for certain hard to fill roles. When vacancies persist, DPS must either reassign existing staff, increase caseloads, reduce service minutes, rely on substitutes, or contract for services, each of which can affect educational quality, continuity, and compliance obligations.

29. For the 2025 to 2026 school year, DPS has identified 199 special education teacher positions as vacant or projected vacancies. One month into the second semester, DPS had filled only approximately 94 percent of special education teacher positions. Special education teacher vacancies create immediate compliance risk because special education services are required by law to be delivered consistent with individualized education programs and applicable federal and state requirements. When DPS cannot staff required positions with qualified personnel, the district faces heightened risk of missed or delayed services, inability to meet legally required timelines, increased due process and complaint exposure, and potential state oversight or corrective action related to special education compliance.

30. For the 2025 to 2026 school year, DPS has identified 676 special education paraprofessional positions, including one to one assignments, as vacant or projected vacancies. One month into the second semester, DPS had filled only approximately 87 percent of these positions. Special education paraprofessionals are often necessary to implement IEP services, provide required student supports, and maintain safe and appropriate learning environments for students with disabilities. Persistent vacancies in these roles can result in the district being unable

to deliver services as written, requiring emergency staffing adjustments that disrupt student programming, and increasing legal and regulatory risk associated with service delivery, student safety, and compliance monitoring by state authorities.

31. For the 2025 to 2026 school year, DPS has identified 242 positions in English language acquisition and support as vacant or projected vacancies. One month into the second semester, DPS had filled approximately 98 percent of these positions, largely due to the district's International Educator Initiative program, which supports recruitment of qualified educators, including through visa sponsorship where permitted. These roles are essential to ensuring meaningful access to instruction for multilingual learners and to meeting legal obligations to provide appropriate language services. DPS's experience with these positions demonstrates that specialized recruiting pipelines, including visa based pathways, can materially improve fill rates and reduce compliance risk.

32. For the 2025 to 2026 school year, DPS has identified 37 elementary, math, and science teacher positions as vacant or projected vacancies. These vacancies impact core instruction and can have cascading effects on class sizes, course availability, and the district's ability to provide consistent educational programming. In addition to educational harm, persistent vacancies can trigger additional legal risk where staffing shortages impede delivery of required services for students with disabilities or multilingual learners within general education settings and can increase the likelihood of complaints and enforcement activity tied to access and service delivery.

33. These vacancy numbers would be higher without our use of the H-1B program. During the 2024-2025 school year, DPS submitted a total of 69 H-1B visa requests, and was granted 68. This current school year, 2025-26, DPS submitted 62 petitions and only 49 have been approved.

34. Our H-1B visa sponsorship program helps address our highest needs subject areas. The two cohorts described above filled vacancies; 64 in Elementary ELA-S (bilingual in Spanish), 3 ECE ELA-S, 14 Math, 6 Science, 18 Secondary ELA-S, 9 SPED, and 3 Special Service Providers.

35. It is necessary for H-1B workers to support these areas where we have historically difficulty filling due to the lack of professionals with the experience and state teaching requirements.

36. In the last three years our H-1B visa hire projections have remained consistent year over year around 65-70 petitions. This will drastically impact our ability to fill vacancies in our hardest to staff roles.

**Substantial and Irreparable Harm**

37. The $100,000 fee for H-1B petitions will cause irreparable harm and jeopardize programs and services that support tens of thousands of children and youths across the district.

38. If the Policy remains in place, DPS will not be able to pay this fee and will miss out on providing highly qualified educators necessary for some of our most vulnerable classrooms. At a minimum, I expect the $100,000 fee and DPS's inability to seek employees through H-1B visas, would increase the likelihood that vacancies persist into the school year, thereby increasing the risk that DPS cannot consistently provide legally required services and supports to students and increasing the district's exposure to regulatory enforcement, complaints, and related remedial obligations. Further, DPS will potentially face drastic challenges supporting our students, including but not limited to meeting the dictates of the federally approved consent decree. See *Congress of Hispanic Educators v. DPS*, 1:95-cv-02313-RPM (D. Colo. 2012).

39. Denver Public Schools is the city's leading employer of H-1B visa holders, the potential loss of H-1B teachers is not merely an administrative hurdle; it is a direct interference with student

learning. We are currently in our recruitment window for the 2026-27 school year and are facing a crisis in our ability to fill upcoming vacancies, specifically in our bilingual classrooms where linguistic bridge-building is essential. Math is one of the core subjects where specialized instruction is prerequisite for graduation. And Special Education and Special Service Provider roles which are critical positions mandated by federal law to ensure every child has access to education. These roles are being filled by individuals who are far more than, "placeholders". Our H-1B colleagues are highly qualified professionals, often holding multiple advanced degrees and bringing decades of classroom experience. They consistently meet or exceed rigorous state licensure requirements, providing a level of expertise that cannot be easily replaced. The nation has recently experienced the irreparable cost of learning loss. I feel that the disruptions caused by prolonged vacancies mirror the catastrophic learning loss experienced during COVID-19. However, while the pandemic was a global anomaly, a failure to retain H-1B teachers creates a self-inflicted, structural deficit.

40. Beyond the classroom, this instability threatens the reputation of Denver Public Schools and the state of Colorado. A district that cannot reliably staff its most sensitive roles loses the trust of its community and its standing as a leader in educational innovation and global competencies. Furthermore, current federal policy shifts have introduced significant confusion regarding H-1B fees. The sudden introduction of a $100,000 supplemental fee for new petitions has created an atmosphere of uncertainty. This financial and administrative friction prevents us from planning for the future, leaving both the district and our dedicated international educators in a state of professional limbo. Without these experts, we cannot fully meet the needs of our district - and more importantly, we fail to meet the needs of our students.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 2, 2026, at Denver, Colorado.

Leticia Levi

Senior Manager, Educator Pathways and Development

Denver Public Schools

# Exhibit CT-1

**DECLARATION OF CONNECTICUT STATE COLLEGES AND UNIVERSITIES (CSCU)**

1. I am a resident of Connecticut. I am over the age of eighteen.

2. I am currently employed by the CSCU system Office as the General Counsel and Secretary to the Board of Regents.

3. As General Counsel and Board Secretary for the CSCU system, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by the CSCU system employees and I believe that information to be true.

4. The CSCU system maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at the CSCU System Office and at each of the six institutions within the CSCU System.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**The Connecticut State Colleges and Universities System and Its Hiring**

6. The CSCU system is the public college and university system within the State of Connecticut with six institutions across 16 campuses and has approximately, as of the Fall of the 2025-2026 Academic Year, 75,600 undergraduate and graduate students. In addition, another 2,226 students are enrolled in certificate programs. The CSCU System has about 17,020 full and part time employees who study, work, and/or conduct research work at each of its four universities and its on-line college campuses at the undergraduate, graduate, postgraduate, and doctoral levels and within the System Office. At the Connecticut State Community College, undergraduate and certificate programs are offered. The CSCU system academic programs with the largest number

of students and faculty who hold H-1B visas are in science, mathematics, technology, engineering, accounting, finance, marketing, management information systems, and management & organization development.

7. Each year, the CSCU system hires new full-time faculty based on a number of factors. For example, the universities within the CSCU system are hiring over 40 faculty positions. CT State Community College is advertising for over 18 full-time faculty positions. The CSCU system must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 75,000 students.

**Impact of the H-1B Policy on University Hiring**

8. The CSCU system relies on the H-1B visa program to fill employment vacancies. Today, the CSCU system employs approximately 39 faculty and staff who are holders of H-1B visas. The CSCU system plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of the CSCU system to hire qualified applicants. In fact, it has already done so as the institutions within the CSCU System either do not have current resources to support the $100,000 payment or have made the decision to utilize available funding to support other operations. In fact, for current position announcements, at least one institution advertises employment openings with the language: "WCSU is unable to sponsor applicants for work visas at this time. Applicants must currently be authorized to work in the United States on a full-time basis."

10. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe the CSCU system hiring practices. The CSCU system does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly-specialized training and advanced degrees; the approximately 39 H-1B visa holders are faculty.

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to the CSCU system twice over: the CSCU system is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." The CSCU system has not and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my

knowledge, the CSCU system has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

14. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, the CSCU must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

15. CSCU operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

16. Many vacant CSCU system faculty—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, it is possible that only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that the CSCU system can consider. The result will be the frustration for the institutions within the CSCU system, one of whom has recently qualified as an R-2 institution based on it research portfolio, based on their ability to employ the individuals necessary to support the research activities and educational offerings it provides to over its 35,378 university undergraduate and graduate students.

17. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, the CSCU system must compete with private universities, some of which have more expansive financial resources than does the CSCU system, which is a public institution. The CSCU system inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

18. The fee imposed by the Policy will preclude the CSCU system from hiring individuals outside of the United States and requiring an H-1B visa to work within the United States.

19. The CSCU system are public institutions that rely on a variety of funding sources including tuition and fees, federal and state funding, and grants. The CSCU System for the current fiscal year 25-26 in order to meet its needs across the system has relied on institutional reserves to balance its current year budget.

20. The Policy will have a significant and irreparable impact on the CSCU system beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Chemistry, Biochemistry and Molecular Biology, Biology, Mathematics, Business Information Systems, Finance, Management and International Business, have posted vacancies and are expecting to hire new candidates for Academic Year 26-27. The CSCU system requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

**Impact of the Policy on Student Enrollment**

21. In addition to adversely impacting the ability of the CSCU system to hire, the Policy will also reduce the number of the international students who apply to attend the institutions in the

CSCU system and thus will adversely impact the revenues that the CSCU system receives from tuition each year.

22. International students are an integral part of the student population – at all levels – who attend the CSCU system. Currently, 1% of undergraduate students and graduate students at the CSCU system are from outside the United States.

23. Tuition and fees at the institutions in the CSCU system —as at many public universities—is much lower for Connecticut residents (currently averaging $13,474 per year for undergraduates) than for international students (currently average $20,676 per year for undergraduates). International students typically pay the out-of-state tuition rate and must show advance proof of funding sufficient for a full academic year, according to United States student visa regulations. In addition, because international students are ineligible for need-based federal aid, they are much more likely to pay full tuition than domestic students. Accordingly, the tuition and fees received from international students constitute a significant source of revenue for the CSCU system and ensures that the CSCU system can continue to provide affordable in-state tuition for Connecticut residents and scholarships to students who may otherwise lack the financial resources to attend college.

24. Many international students attend the CSCU system with the expectation that they will be able to secure employment in the United States following graduation. The fee imposed by the Policy will make it much more difficult for international students to remain in the United States and will likely deter such students from seeking an education in the United States, including in the CSCU system

25. Already, the CSCU system is seeing impacts to the number of international students seeking admission. The total number of international students enrolled in credit bearing courses

at the undergraduate and graduate level for Academic Year 24-25 was 924 students. For the fall semester of the 25-26 Academic Year, the number of international students is 860 enrolled in credit bearing courses at the graduate and undergraduate level.

26. Applications for first-year regular decision applicants for the fall semester of the 26-27 academic year are typically on a rolling basis for each institution with priority deadlines varying between March 1st and April 1st, and certain institutions have transfer applications due on June 1st. International student application deadlines vary within the institutions in the CSCU system such as June 1st and July 15th for fall admission. The CSCU system requires relief from the Policy prior to these dates to ensure that it can continue to enroll adequate numbers of international students.

27. The decline in the number of international students resulting from the Policy will harm the CSCU system by reducing the amount of tuition and fees that it receives per year, thereby adversely impacting the CSCU system budget and its ability to provide affordable in-state tuition and merit-based scholarships.

28. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 30th th day of January, 2026, in Hartford, Connecticut

/s/ [signature]
Karen K. Buffkin
System Office
Connecticut State Colleges and Universities
Office of the General Counsel
61 Woodland Street
Hartford, CT 06105

# Exhibit CT-2

**<u>DECLARATION OF NANC NAVARRETTA FOR DEPART ENT OF ENTAL HEALTH AND ADDICTION SERVICES D HAS</u>**

I Nancy Navarretta declare as follows:

1. I am a resident of the tate of Connecticut. I am over the age of 18 and have personal knowledge of all the facts stated herein except to those matters stated upon information and elief as to those matters I elieve them to e true. If called as a witness I could and would testify competently to the matters set forth elow.

2. I am the Commissioner of the tate of Connecticut epartment of Mental Health and Addiction ervices MHA .

3. As the Commissioner I am responsi le for leading MHA in its role in promoting and administering comprehensive recovery-oriented services in the areas of mental health and su stance use health promotion and prevention treatment and recovery supports throughout Connecticut.

4. I have compiled the information in the statements set forth elow through personal knowledge through agency personnel who have assisted me in gathering this information from our agency and ased on documents that have een provided to and/or reviewed y me.

**D HAS s Role in eeting Connecticut s Health Care Needs**

5. MHA promotes and administers comprehensive recovery-oriented services in the areas of mental health treatment and su stance a use prevention and treatment throughout Connecticut. MHA is responsi le for providing a wide range of services in each of the five MHA regions in Connecticut including inpatient hospitali ation outpatient clinical services 24-hour emergency care day treatment psychosocial and vocational reha ilitation restoration to competence and forensic services outreach services for persons with serious mental illness who

are homeless and comprehensive community- ased mental health treatment and support services.

**The Policy**

6. I understand that earlier this year the epartment of Homeland ecurity issued a policy re uiring employer payment of a 100 000 supplemental fee in conjunction with any new petition for an H-1B visa the Policy .

7. As descri ed elow I elieve that the Policy will have significant impacts on MHA and its mission to promote the overall health and wellness of persons in Connecticut with ehavioral health needs through an integrated network of holistic comprehensive effective and efficient services and supports that foster dignity respect and self-sufficiency in those we serve. he MHA system offers high uality ehavioral health care that offers residents choices from an array of accessi le services and effective supports for each individual to esta lish or reesta lish a safe dignified and meaningful life in the community of their choice. MHA operates two state hospitals including Connecticut alley Hospital C H the state s oldest and largest psychiatric hospital with 361 inpatient eds and hiting Forensic Hospital which provides maximum security and enhanced security psychiatric care for adults referred y the courts MHA and correctional facilities with 239 inpatient eds. he agency also operates an additional 6 facilities that offer inpatient and outpatient services. Collectively the agency serves approximately 10 000 inpatient and outpatient clients annually on average through its state operated facilities with 9 263 clients served in 2025.

8. n eptem er 19 2025 President rump issued a Proclamation estriction on ntry of Certain Nonimmigrant orkers Proclamation that restricts the entry of certain applicants seeking to enter the nited tates with H-1B visas except for those aliens whose

petitions are accompanied y a payment of 100 000. I understand that this Proclamation provided the asis for the promulgation and implementation of the Policy.

9. he Policy purports to address systematic a use of the H-1B program that according to the Proclamation allows industries to replace rather than supplement American workers with lower-paid lower-skilled la or. his description does not accurately descri e MHA s hiring practices. MHA does not and has not used the H-1B visa program to hire low-paid lower-skilled employees. n the contrary many of our employees currently in possession of H-1B visas have highly speciali ed training and advanced degrees MHA currently has two individuals on an H-1B visa oth are psychiatrists with medical degrees and oard certifications.

10. he Proclamation also claims that many American tech companies have laid off their ualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. hat description does not apply to MHA twice over: MHA is not a tech company and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

11. he Proclamation also claims national security threat s arising from reliance on H-1B-reliant outsourcing companies that have een investigated . . . for engaging in visa fraud conspiracy to launder money conspiracy under the acketeer Influenced and Corrupt rgani ations Act and other illicit activities. MHA has not and does not intend to rely on outsourcing companies in order to fill employment vacancies. o the est of my knowledge MHA has never relied on an outsourcing company for hiring that was accused of fraud y any state or federal agency.

12. In addition the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example for every employee hired through the H-1B visa program MHA must complete a La or Condition Application LCA for Nonimmigrant orkers Form A-9035 9035 . he LCA contains multiple re uirements including that the employer pay at least the prevailing wage or the employer s actual wage whichever is higher and pay for nonproductive time and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed among other things. 20 C.F. . 655.731 655.732.

13. MHA operates consistently with the re uirements set forth in the LCA and all applica le H-1B laws and regulations.

**The Role of H-1B or ers at D HAS**

14. MHA currently employs two H-1B visa holders oth oard certified psychiatrists. hile there were no petitions su mitted in 2024 one petition was su mitted in 2025 for a psychiatrist.

15. All MHA locations are within Health Professional hortage Areas HP As as classified y the Health esources and ervices Administration H A . HP As are defined as geographic areas population groups or facilities with shortages of primary care dental or mental health providers

16. he H A estimates the supply of adult Psychiatrists to decrease y 20 y 2030 while demand for psychiatric services increases.[1]

---

[1] H A Nov. 2024 https:// hw.hrsa.gov/sites/default/files/ ureau-health-workforce/state-of-the- ehavioral-health-workforce-report-2024.pdf.

17. By 2036 the will e short 42 130 psychiatrists according to research from the federal National Center for Health orkforce.[2]

18. More than 60 of psychiatrists are 55 or older.[3]

19. he shortage of healthcare professionals including psychiatrists is affecting patients a ility to find care and placing a greater urden on healthcare professionals who provide mental health care. As of Novem er 2024 a out 59 million Americans or nearly a uarter of the population had a mental illness yet 46 received no treatment.[4]

20. MHA recruitment efforts are also affected y the new opportunities for employment in telehealth. Many professionals are attracted to this kind of structure for their work/life alance. However MHA client s level of need and lack of resources make it difficult to provide those options to employees. MHA has increased resources for recruitment of psychiatrists nurses and licensed social workers. trategies include paid national advertising in specialty outlets virtual and regional jo fairs hosted y third parties placing jo listings in paid list serves retaining an external recruitment firm hiring a clinical recruiter organi ing agency sponsored jo fairs and online advertising. MHA has also developed programs to upskill its current workforce. Psychiatrists provide supervision to nurses pursuing their AP N.

21. he scarcity of ualified psychiatrists and sharp increase in demand for mental health services has driven up market rate for salaries. Historically this puts us at a disadvantage when competing with private employers. H-1B visas re uire psychiatrists to accept positions in pu lic service health care shortage areas and have ecome one of the most important resources

---

2 H A Nov. 2024 https:// hw.hrsa.gov/data-research/projecting-health-workforce-supply-demand.

3

4

for the agency s recruitment for these positions. he H-1B visa employees make a multiyear commitment upon hire and are assigned to a single facility which adds greater sta ility to our system for patient care.

**Impact on D HAS**

22. MHA is a Connecticut state agency operating state-run facilities. he Policy has placed an unnecessary financial urden on MHA limiting the a ility to sponsor international candidates.

23. MHA currently has 3 Psychiatrist candidates potentially impacted y the 100 000 fee for the H-1B non-immigrant visa petition. hese 3 Psychiatrists are current fellows 2 and fourth-year resident 1 on 1 visas looking to e employed y MHA at the finish of their programs in 2026. he 100 000 fee far exceeds agency funding availa le.

24. he 100 000 fee for an H-1B petition will force MHA to stop sponsoring H-1B visa holders or e unduly limited in the jo s they sponsor.

25. Assuming MHA su mits a similar num er of H-1B petitions this year as it did last year the new fee would result in the need for MHA to pay approximately 300 000 in additional fees.

26. his is a significant amount that MHA will e una le to cover without redirecting funds from medical services or medical research programs which will disrupt the agency s availa ility of resources. If the agency is una le to recruit and hire the necessary ualified personnel it will force MHA to rely upon locum tenens temporary workers and result in increased costs. Market rate for locum tenens is 250 an hour and up. Furthermore the locum tenens are not eligi le to support on-call re uirements of hospitals.

27. he Policy will have other impacts as well including the agency s a ility to meet minimum staffing fulfill the re uirements of a hospital on-call system increased caseloads increased overtime hours and increased risk for medical error. MHA clients who come from underserved communities will e most negatively impacted. hey have very little resources and are medically complex often with co-occurring diagnosis of mental health and addiction. hey often have traumatic experiences and for their care to e successful MHA must e a le to uild a trusting relationship. taffing shortages especially in key titles fuel low morale increase employee turnover and ultimately undermine the consistency of patient care and the sta ility of our programs.

28. MHA hospitals and its six other facilities are re uired to meet regulatory and statutory re uirements for staffing ratios standards of care the scope of professional licenses as well as other operational re uirements. Failure to comply may result in loss of industry accreditation ina ility to ill and other penalties. hese pu lic failures will cause reputational harm to the agency s facilities and in turn discourage patients to seek care and discourage healthcare professionals from working at MHA .

29. As a pu lic healthcare agency MHA is for many the only availa le option. ithout these necessary ualified professionals Connecticut residents living with serious pervasive mental illness su stance use or co-occurring conditions would have no other healthcare options and will e una le to uild a sta le independent life in the community. hey may ecome unhoused extremely vulnera le to exploitation y others or involved in criminal activity or the justice system. he MHA system of care offers them care and support to reali e a healthier more independent future.

I declare under penalty of perjury that the foregoing is true and correct.

xecuted on January 29 2026 at Hartford, Connecticut.

Nancy Navarretta, *Commissioner*
Connecticut Department of
Mental Health and Addiction
Services

# Exhibit DE-1

**DECLARATION OF SECRETAR OF EDUCATION C NTHIA ARTEN**

I Cynthia Marten declare as follows:

1. I am a resident of the tate of elaware. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness I could and would testify competently to the matters set forth elow.

2. I am currently employed by the Delaware Department of Education (DDOE) as Secretary of Education.

3. DDOE, as the State Educational Agency (SEA) for Delaware, is responsible for overseeing public education, which includes the recruitment and retention of the public education educator workforce.

4. I submit this declaration in support of the Plaintiff's Motion for ummary udgment. As the ecretary I have personal knowledge of the matters set forth elow or have knowledge of the matters ased on my review of information and records gathered y my staff.

**Bac ground on Dela are Department of Education**

5. The Delaware Department of Education is the state's central administrative body, statutorily mandated to exercise general control and supervision over all pu lic schools to ensure every learner receives a high- uality education. For the 2024–2025 school year the oversees a statewide network of 19 school districts and 23 charter schools serving approximately 142 495 students from Pre- through grade 12.

6. his vast scope includes managing an educator workforce of over 11 000 instructional educators and maintaining critical oversight of licensing federal compliance and speciali ed programs for adult and prison education.

7. he communities served y the are highly diverse reflecting a demographic landscape that is roughly 31 Black 20 Hispanic and 38 hite. eographically the agency s jurisdiction spans from the dense ur an centers of ilmington to the remote rural agricultural regions of ussex County. his diversity re uires the to fulfill specific statutory o ligations for vulnera le populations including speciali ed support for students with disabilities and the state's rapidly growing population of Multilingual Learners.

8. By centrali ing resources and technical assistance the aims to ridge the gap etween these varying environments ensuring that whether a student is in a high-need ur an school or a rural district they have access to the same standard of instructional excellence.

**The Policy**

9. I understand that earlier this year the epartment of Homeland ecurity issued a policy re uiring employer payment of a 100 000 supplement fee in conjunction with any new petition for an H-1B visa (the "Policy").

10. As descri ed elow it is my understanding that the Policy will inflict significant harm upon the elaware epartment of ducation's efforts to provide a high- uality education to all children.

11. n eptem er 19 2025 President rump issued a Proclamation estriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain

applicants seeking to enter the nited tates with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the asis for the promulgation and implementation of the Policy.

12. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid lower-skilled labor." This description does not accurately descri e our hiring practices. he elaware epartment of ducation and its representative L As do not and has not used the H-1B visa program to hire "low-paid lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly speciali ed training and advanced degrees. In fact ecoming a teacher in elaware re uires a com ination of academic degrees supervised field experience and state-specific licensing including:

a. A achelor's degree or higher in a teaching and/or education related field from a Council for the Accreditation of ducator Preparation CA P accredited college or university

i. lementary: elaware re uires a degree in elementary education

ii. econdary: High school and middle school teachers often need a degree in the specific su ject they intend to teach e.g. math iology

. tudent eaching: elaware re uires a period of fieldwork often at least a semester long where you teach under the supervision of a mentor.

13. Further if teaching in ual Language Immersion teachers must demonstrate near-native proficiency in either Chinese reek or panish and pass oth an oral proficiency interview and a writing proficiency test. hey must also e proficient in nglish. hese ilingual skills are often hard to find in domestic candidates.

**Teacher Shortage in Dela are and Role of H-1B or ers**

14. Among the approximately 11 000 instructional teachers in elaware there is a well-documented teacher shortage. In the past 5 years many efforts have een taken to close the teacher shortage gap especially y focusing on recruiting new educators to the field and retaining the existing educators working. Additional programmatic efforts included paid teacher residencies registered apprenticeship programs and a strategic four-year plan to raise starting teacher salaries to match competitive wages of neigh oring states. For school year 2023-2024 the state reported approximately 400 teacher vacancies remaining across its districts.

15. eacher shortages remain persistent in critical su ject areas such as world language dual language immersion high school math science and special education. Furthermore while jo satisfaction has marginally improved with recent pay raises many educators still report concerns regarding student ehavioral challenges and difficult working conditions which continue to impact long-term retention across the state.

16. H-1B workers address teacher shortages y filling speciali ed high-need positions that school districts often struggle to staff with domestic candidates. In elaware these educators provide critical sta ility in su jects like world language instruction dual language immersion M science technology engineering math and pecial ducation. Because H-1B visas are designed for "specialty occupations" re uiring a achelor s degree or

higher they ensure that students have access to highly ualified experts even when local la or supplies are low.

17. he inclusion of rural and underserved communities within Local ducation Agency L A jurisdictions highlights the critical role of educators in addressing systemic ine uities. hese communities often face the highest vacancy rates and struggle to compete with wealthier districts for domestic talent particularly in speciali ed fields. For example for school year 2024-2025 we estimate that over 4 000 low-income and nglish learner students in LI programs were supported y 85 teachers employed on H-1B visas.

18. he H-1B program has een an important tool to fill vacancies where hiring a domestic worker has een challenging. For school years 2022-2023 to current we estimate that 65 teachers applied for teaching licensure in the state that may have re uired an H-1B visa.

19. Further within the speciali ed LI teaching area in the school year 2023-2024 a minimum of 8 elaware Local ducation Agencies L As re uested 33 H-1B visas for teachers due to a lack of ualified local candidates. his represents 15.2 of LI-focused teachers.

**Su stantial and Irrepara le Harm**

20. he 100 000 fee for H-1B petitions will cause irrepara le harm and jeopardi e programs and services that support children and youths across the district.

21. If the Policy remains in place some L As may face additional and significant challenges in filling speciali ed teaching positions. his could lead to a reliance on long-term su stitutes or an increase in class si es potentially impacting the uality of instruction for students in high-need su jects such as M and pecial ducation. ithout ilingual

teachers LI programs may e forced to close or reduce the num er of students they serve. Additionally the ina ility to recruit from a wider pool of candidates could limit opportunities to offer speciali ed courses and reduce the capacity for professional development and training efforts aimed at enhancing teacher effectiveness.

22. he loss of H-1B personnel would severely disrupt instructional continuity. his interference creates a "revolving door" effect that erodes the state and schools' reputation for sta ility making it harder to attract future talent and leading to a reliance on underprepared staff or increased class si es that further undermine learning.

23. Confusion a out fees for visa programs such as the H-1B can create uncertainty for large hiring organi ations including school districts and charter schools. hen the re uirements for fees are unclear particularly when those fees can e su stantial organi ations may ecome hesitant to use the program.

I declare under penalty of perjury that the foregoing is true and correct.

xecuted on Fe ruary 5 2026 at over elaware.

Cynthia Marten

Cynthia Marten ecretary of ducation
elaware epartment of ducation

# Exhibit HI-1

**DECLARATION OF JAN N.S. GOUVEIA**

1. I am a resident of the State of Hawai'i. I am over the age of eighteen.

2. I am currently employed by the University of Hawai'i ("UH") as its Vice President for Administration for the University of Hawai'i System. In that role, I manage risk management, capital improvements, communications, and human resources.

3. As the Vice President for Administration for the University of Hawai'i System, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UH employees and I believe that information to be true.

4. The University of Hawai'i maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at the University of Hawai'i.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**The University of Hawai'i and Its Hiring**

6. The University of Hawai'i is the only public university system within the State of Hawai'i. As of Fall, 2025, there were 51,411 enrolled students across the ten-campus System, and about 10,846 full and part time employees who study, work, and/or conduct research at the undergraduate, graduate, postgraduate, and doctoral levels across its ten campuses (UH Mānoa, UH Hilo, UH West O'ahu, Hawai'i Community College, Honolulu Community College, Kapi'olani Community College, Kaua'i Community College, Leeward Community College, UH Maui College, and Windward Community College). The University of Hawai'i's academic programs with the largest number of faculty and staff who hold H-1B visas are the Colleges of Engineering, Natural Sciences, and Tropical Agriculture and Human Resilience.

7. Each year, the University of Hawai'i hires approximately 507 new faculty and staff (average for past five years). The University of Hawai'i must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 50,000 students.

**Impact of the H-1B Policy on University Hiring**

8. The University of Hawai'i relies on the H-1B visa program to fill employment vacancies for highly specialized positions. Across our ten campuses, the University of Hawai'i currently employs 94 faculty and staff who are holders of H-1B visas.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). Specifically, on September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

10. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe the University of Hawai'i's hiring practices. The University of Hawai'i does not and has not used the H-1B visa program to hire "lower-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and

advanced degrees; of the 94 H-1B visa holders currently employed by the University of Hawai‘i, 84 of those employees are members of the faculty.

11. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to the University of Hawai‘i twice over: the University of Hawai‘i is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

12. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." The University of Hawai‘i has not and does not intend to rely on such "H-1B reliant outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, the University of Hawai‘i has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

13. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, the University of Hawai‘i must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for non-productive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

14. The University of Hawai'i operates consistently within the requirements set forth in the LCA and all applicable H-1B laws and regulations.

15. As a state agency, the University of Hawai'i has a finite budget each year from which it must make business decisions related to hiring of faculty and staff. From a staff perspective, the University of Hawai'i may not be able to afford to pay the $100,000 fee imposed by the Policy for the hiring of staff.

16. The fee imposed by the Policy may preclude the University of Hawai'i from hiring staff outside of the United States who require an H-1B visa to work within the United States.

17. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of February, 2026, in Honolulu, Hawai'i

Jan N.S. Gouveia
University of Hawai'i
Office of the Vice President for Administration
2444 Dole Street
Bachman Hall 102
Honolulu, HI 96822

Case 1:25-cv-13829-LTS Document 88-16 Filed 02/06/26 Page 1 of 6

# Exhibit HI-2

**DECLARATION OF DE ORA HAL ERT**

1. I am a resident of the State of Hawai‘i. I am over the age of eighteen.

2. I am currently employed by the University of Hawai‘i ( UH ) System as the Vice President for Academic Strategy. In that role, I serve as the chief academic officer for the UH System with the overall responsibility for leadership, planning, and intercampus coordination of academic affairs, student affairs, policy and planning, institutional research and analysis, and international and strategic initiatives.

3. As the Vice President for Academic Strategy, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UH employees and I believe that information to be true. Among the items I reviewed to provide this declaration is the Declaration of Jan N.S. Gouveia, the Vice President for Administration for the UH System.

4. The University of Hawai‘i maintains business records in the ordinary course of business which include, **r** records concerning hiring at the University of Hawai‘i.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**The University of Hawai‘i and Its Hiring**

6. The University of Hawai‘i is the only public university system within the State of Hawai‘i. It has approximately 51,411 enrolled students and about 10,846 full and part time employees who study, work, and/or conduct research at the undergraduate, graduate, postgraduate, and doctoral levels across its ten campuses (UH Mānoa, UH Hilo, UH West O‘ahu, Hawai‘i Community College, Honolulu Community College, Kapi‘olani Community College, Kaua‘i Community College, Leeward Community College, UH Maui College, and Windward Community College). The University of Hawai i's academic programs with the largest number of

faculty and staff who hold H-1B visas reside in the College of Engineering, the College of Natural Sciences, and the College of Tropical Agriculture and Human Resilience at the University of Hawaiʻi at Mānoa.

7. The University of Hawaiʻi has approximately 3,400 faculty across all campuses, and of those, approximately 84 are international and here on H1-B visas.

8. Each year, the University of Hawaiʻi hires approximately 507 new faculty and staff. The University of Hawaiʻi must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 50,000 students.

9. The University of Hawaiʻi relies on the H-1B visa program to fill employment vacancies. The University of Hawaiʻi plans to continue to rely on the H-1B visa process to fill vacant positions for faculty when those needs are so specialized that recruitment must be on an international basis.

**The H olicy**

10. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a 100,000 supplemental fee in con unction with any new petition for an H-1B visa (the Policy ). The Policy will adversely impact the ability of the University of Hawaiʻi to hire qualified applicants. In fact, it has already done so.

11. On September 19, 2025, President Trump issued a Proclamation, **r**

**r r r r r** ( Proclamation ), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas except for those aliens whose petitions are accompanied or supplemented by a payment of 100,000. I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

12. As discussed in the Declaration of Jan Gouveia, several of the Proclamation's claims do not apply to the University of Hawai'i and so are not discussed here. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, the University of Hawai'i must complete a Labor Condition Application ( LCA ) for Nonimmigrant Workers (Form ETA-9035 9035E). The LCA contains multiple requirements, including that the employer pay at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for non-productive time, and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed, among other things. 20 C.F.R. §§ 655.731 655.732.

13. The University of Hawai'i operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

**The Im act of the H olicy on Faculty Hiring**

14. Many vacant University of Hawai'i faculty or post-doctoral positions particularly those in science, technology, engineering and mathematics ( STEM ) have highly technical and specialized requirements. For example, these positions require applicants, **r** , to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements.

15. The fee imposed by the Policy will further limit the pool of applicants that the University of Hawai'i can consider. The pool of applicants will be further limited because the University will be forced to decide not ust that an international applicant is the only qualified candidate for a specialized position, but also that the international applicant is so vital that the

University will make cuts elsewhere to pay the 100,000 fee. Effectively, the choice to fill a specialized faculty vacancy with an international candidate may be the best for the needs of the students at UH, but will come at a budgetary cost.

16. The University of Hawai i's flagship campus at Mānoa employs the vast ma ority of faculty on H1-B visas in the University of Hawaiʻi System. The University of Hawai i, Mānoa has agreed to hire two faculty on H1-B visas sub ect to the 100,000 fee due to extenuating circumstances however, moving forward, the Mānoa campus will not use institutional funds to hire any faculty sub ect to the 100,000 fee. As a matter of policy and budget, the flagship campus cannot afford to pay the 100,000 fee without sacrificing elsewhere and ultimately affecting its ability to provide services to students.

17. Given the highly specialized nature of many faculty positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, the University of Hawaiʻi must compete with private universities, some of which have more expansive financial resources than does the University of Hawaiʻi, which is a public institution.

18. The fee imposed by the Policy will preclude the University of Hawaiʻi from hiring individuals outside of the United States and requiring an H-1B visa to work within the United States.

19. The University as a public institution receives state General Funds to cover faculty salaries and fringe benefits but such funds do not cover the costs of H-1B visa application.

a. For the University of Hawaiʻi to pay the 100,000 fee would unduly restrict the number of employees that it could onboard in any given year to continue to meet academic needs, programming, and research goals.

Nor can the University of Hawai'i simply increase the amount of funds for hiring without potentially depleting other necessary funding.

b. The fee would drastically increase the costs to the University of Hawai'i necessary to hire new candidates requiring a H-1B visa, reducing the overall number of new hires that it could afford.

20. The Policy will have a significant and irreparable impact on the University of Hawai'i beginning in January 2026. In addition to fiscal and budgetary issues, the harm is irreparable from a reputational perspective. For every internationally ranked scholar we are unable to hire, UH's national and international reputation is diminished. The lasting impacts of the Policy will be far reaching for the University, including in the areas of research and scholarship.

21. I declare under penalty of per ury that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of January, 2026, in Honolulu, Hawai'i

Debora Halbert
University of Hawai'i
Office of Academic Strategy
2444 Dole Street
Bachman Hall 204
Honolulu, HI 96822

# Exhibit HI-3

**DECLARATION OF LEONARD R. GOUVEIA, JR.**

1. I am a resident of the State of Hawai'i. I am over the age of eighteen.

2. I am currently employed by the Research Corporation of the University of Hawai'i (RCUH) as its Executive Director.

3. As the Executive Director of RCUH, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by RCUH's employees and I believe that information to be true.

4. RCUH maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at the RCUH.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**RCUH and Its Hiring**

6. RCUH is a public instrumentality that supports research, development, and training in Hawai'i, with a focus on the University of Hawai'i. RCUH hires personnel and procures goods and services for the University of Hawai'i, state agencies, and private non-profits. RCUH supports approximately 4,100 research and training projects by employing around 2,500 individuals.

7. Each year, RCUH hires approximately 1,300 employees. The vast majority of its new hires are affiliated with the University of Hawai'i, although RCUH will also hire for other government employers and nonprofits.

**Impact of the H-1B Policy on RCUH Hiring**

8. RCUH relies on the H-1B visa program to fill employment vacancies. Today, RCUH employs approximately 55 individuals who hold H-1B visas, of whom 50 are affiliated

with University of Hawai'i projects. RCUH needs to continue to rely on the H-1B visa process to fill vacant positions as necessary and appropriate to support research in the State of Hawai'i.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of RCUH to hire qualified applicants. In fact, it has already done so.

10. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe RCUH's hiring practices. RCUH does not and has not used the H-1B visa program to hire "lower-paid, lower-skilled" employees. To the contrary, RCUH strictly complies with all federal prevailing wage requirements, and in practice, most RCUH projects compensate at rates that exceed the required prevailing wage. Further, RCUH actively monitors compensation practices to ensure internal equity. In the event that any pay inequities arise between H-1B employees and similarly situated non-foreign workers, RCUH addresses such inequities through appropriate compensation adjustments, consistent with policy, funding availability, and applicable regulations. Many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; of the approximately 55 H-1B visa holders currently employed by RCUH, over 50% are Astronomers, Scientists, Biologists, and Researchers specializing in their

fields and holding advanced degrees. All H-1B visa holders employed by RCUH possess at least a Master's Degree, with most jobs requiring PhD Degrees and specialized experience, knowledge, and abilities and skills.

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to RCUH twice over: RCUH is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." RCUH has not and does not intend to rely on "outsourcing companies" to fill employment vacancies. To the best of my knowledge, RCUH has never relied on an outsourcing company for hiring, let alone one that was accused of fraud by any state or federal agency.

14. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, RCUH must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for non-productive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

15. RCUH operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

16. Many positions for which RCUH hires (particularly those in science, technology, and research) have highly technical and specialized requirements. For example, these positions require applicants to, *inter alia*, possess advanced research capabilities and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that RCUH can consider. Positions may go unfilled. The result will be the frustration of RCUH's ability to employ the individuals necessary to support critical research, development, and training in Hawai'i.

17. Given the highly specialized nature of many positions and the limited number of eligible candidates, RCUH often vies to hire a handful of eligible applicants. In such situations, RCUH must compete with private universities and other employers, many of which have more expansive financial resources than does RCUH, which is a public instrumentality. RCUH's inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these important positions.

18. The fee imposed by the Policy will preclude RCUH from hiring individuals outside of the United States who require an H-1B visa to work within the United States. As a result, RCUH is currently not initiating new H-1B applications.

19. RCUH does not receive general-fund appropriations from the Hawai'i State Legislature. Instead, RCUH relies on the project sponsor—in other words, the University of Hawai'i, a state agency, or a private non-profit—to fund the position for a specific project. To cover the operational expenses of RCUH's hiring and procurement services, RCUH receives a

small fee collected from the expenditures run through RCUH to support its core team. RCUH is not a for-profit organization.

20. Because of this funding structure, RCUH does not have surplus funds to pay the $100,000 fee. Instead, funds to cover the $100,000 fee must come directly from the project sponsor. That decision is largely outside the control of RCUH.

21. For the 50 H-1B employees working on projects affiliated with the University of Hawai‘i, the average annual salary is approximately $83,000. The Policy's $100,000 fee is more than the average annual salary. When fringe benefits are included, the average annual cost per position is about $112,000, just slightly more than the $100,000 fee. Accordingly, the Policy's $100,000 fee could reduce the length of time for which an employee can be hired by about a year.

22. The Policy will have a significant and irreparable impact on RCUH, the University of Hawai‘i, state agencies, and private non-profits that use RCUH's services. RCUH requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of January, 2026, in Honolulu, Hawai‘i.

Leonard R. Gouveia, Jr.
Research Corporation of the University of Hawai‘i
1601 East-West Road
Honolulu, HI 96848

# Exhibit IL-1

**DECLARATION OF DR. MARIE LYNN MIRANDA**

I, Dr. Marie Lynn Miranda., pursuant to 28 U.S.C. § 1746 declare that the following is true and correct:

1. I am a resident of the State of Illinois. I am over the age of 18.

2. I am the Chancellor of the University of Illinois Chicago ( UIC or University ) and vice president, University of Illinois System ( System ). I have held that position since July 5, 2023.

3. In my role as Chancellor, I have personal knowledge of the contents of this declaration or have knowledge of the matters based on my review of information and records gathered by University personnel and could testify thereto.

4. The University of Illinois Chicago is a university within the System, which is governed by the Board of Trustees of the University of Illinois, a body corporate and politic established by the Illinois General Assembly (110 ILCS 305). The System is composed principally of its three best-in-class universities located in Urbana-Champaign (UIUC ), Chicago ( UIC ), and Springfield ( UIS ).

5. I am familiar with the presidential proclamation of September 19, 2025, *Restriction on Entr of ertain onimmi rant or ers* (the Proclamation ). I understand that the Proclamation requires a 100,000 payment to accompany certain new H-1B petitions filed on or after 12:01 a.m. EDT on September 21, 2025. Specifically, the fee applies to petitions for beneficiaries who are outside the United States and do not already hold a valid H-1B visa. In effect, the Proclamation imposes a substantial new cost on many future H-1B petitions, which may limit the ability of such individuals to enter the United States unless the fee is paid.

6. UIC is Chicago's largest university campus, with more than 35,000 students, 13,000 faculty and staff, and 16 academic colleges, including one of the nation's largest medical

schools and Chicago's first and only public law school. UIC also operates the state's ma or academic health enterprise, the University of Illinois Hospital Health Sciences System ( UI Health ), along with a network of federally qualified health centers and regional health sciences campuses in Peoria, Rockford, Springfield, and Urbana-Champaign. UIC is also the City's largest and only public university that holds the distinguished R1 research status in the Carnegie Classification of Institutions of Higher Education.

7. UIC participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skills that are not readily available in the United States' labor market. These employees fill unique knowledge gaps and often emerge as top candidates from highly competitive searches where domestic applicant pools are limited. Through the H-1B visa program, the University can attract exceptional talent from around the world to participate in scientific and medical research and development that benefits both Illinois and the United States.

8. Currently, UIC employs a total of 296 H-1B visa holders. There are 267 H-1B visa holders employed at our Chicago campus, of whom 121 are faculty 101 are staff members and 45 hold clinical or patient-facing positions. UIC employs 19 H-1B visa holders at our Peoria campus of whom six are faculty, two are staff members, and 11 hold clinical or patient-facing positions. And at our Rockford campus, UIC employs six H-1B visa holders of whom six are staff, and three hold clinical or patient-facing positions. Across all campuses, 187 of our H-1B visa holders work at UIC's applied health colleges (i.e. the colleges of Medicine, Dentistry, Pharmacy, Applied Health Sciences, and/or Nursing) and/or in our hospital or clinics.

9. In particular, the University's H-1B visa holders play a critical role in health science research, teaching, and service at UIC's College of Medicine. Recently, the University has hired 17 H-1B holders for positions in hard-to-fill research and teaching appointments in the College's

Departments of Anatomy and Cell Biology, Microbiology and Immunology, Physiology and Biophysics, and Biochemistry and Molecular Genetics. These acclaimed scientists and practitioners not only have advanced degrees in these sub ects but also have acquired specific skill sets to engage in the complex and sophisticated areas of research undertaken at the various labs within the College of Medicine.

10. Some examples of the complex scientific study of our H-1B visa holders include the medical research conducted by the College's Department of Anatomy and Cell Biology and Department of Microbiology. The College's Department of Anatomy and Cell Biology's research labs primarily focus on the development and aging of the human brain. This includes the study of neurodegenerative disease such as Alzheimer's, Parkinsons, and Huntington's and demyelinating diseases, such as Multiple Sclerosis, and their genetic, immunological or developmental origins the biology of brain synapses the study of human sensory synaptic mechanisms and motor systems and the neurodevelopment, neurogenesis and plasticity of the brain, including neurodevelopmental vulnerability to drug addiction.

11. The Department of Microbiology and Immunology's research labs concentrate on the biology, transmission and pathogenesis of viruses and bacteria, and the innate and adaptive immune systems that contribute to both health and disease. Specific areas of study include the pathogenic bacterium Staphylococcus aureus (commonly known as Staph infections) and the development of novel therapeutics designed to treat diseases caused by Staphylococcus aureus and similar pathogens, as well as researching endemic retro-viruses in mice to study new world hemorrhagic fever arenaviruses such as Jun n virus (currently widespread in new world rodents in South America with potential to spread to humans via aerosolization).

12. Additionally, H-1B visa holders provide valuable patient clinical and surgical care at UI Health's hospital and clinics. For example, UIC has hired H-1B visa holders in the

departments of Pediatric Surgery - providing surgical care for children and infants with complex congenital diseases Neurosurgery - performing complex vascular and endovascular surgical procedures and Pulmonary, treating patients identified by the University's lung cancer screening program and those with thoracic malignancies, as well as performing the highly specialized procedures of flexible and rigid bronchoscopy, therapeutic bronchoscopy, thoracoscopy, and advanced diagnostic and robotic bronchoscopy. These accomplished doctors and surgeons also teach University medical students, residents, and fellows in their respective fields enhancing the education and clinical training offered at our University.

13. The H-1B visas holders employed by the College of Medicine in these departments, and other several other departments across the University, provide a substantive contribution to the University's impactful medical and scientific research, clinical services, as well as invaluable instruction to our students based on their world-renown experience and expertise in their sub ect areas.

14. In 2025, the University submitted 162 H-1B visa petitions, including 14 petitions that I understand would have been sub ect to the 100,000 fee had the Proclamation been in effect at the time. This represents approximately 11 of the total H-1B petitions submitted.

15. UIC intends to submit H-1B petitions in 2026 and in future years to come. But for the Policy, the University reasonably anticipates that it would submit H-1B petitions at a similar rate in the coming years as it has in recent years. However, the Policy introduces significant uncertainty and potential financial burden into the hiring process, particularly as academic units begin recruitment for the next academic year.

16. Before the Proclamation was issued, based on past hiring trends, UIC anticipated employing similar proportions of new employees requiring H-1B status following global searches for qualified candidates, but petitions for certain prospective employees who need an H-1B visa are now sub ect to a 100,000 fee per petition. These positions would contribute to critical functions including researching, teaching and clinical services in highly specialized sub ect matters that are integral to the university's mission to be a leader in learning, discovery, engagement, and economic development.

17. By imposing a 100,000 fee on certain H-1B petitions, the Policy has complicated the University's ability to recruit outstanding international talent and its plans to employ those critical workers without adversely impacting other university programs.

18. If the Policy remains in effect, UIC will have to choose between paying a 100,000 fee for certain prospective H-1B visa holders, hiring a less-qualified candidate, or leaving the position unfilled. Each of these outcomes would negatively affect the university's mission and operations. Paying the fee will necessarily require using funds that would have otherwise been used to support the university's educational, research, or healthcare mission. Hiring a less-qualified candidate would impact the University's ability to hire based on merit alone and would compromise academic excellence. Leaving the positions unfilled, which is a particular concern in certain disciplines that have a persistent shortage of domestic applicants, would compromise the University's ability to continue its work as a pre-eminent public research university and healthcare provider.

19. If the Policy remains in effect, UIC's ability to attract qualified employees from around the world and conduct high-impact research, specifically in the fields of health sciences, will be compromised. Institutional risks include a decline in research capacity, fewer successful applications for funding, slower innovation, and weakened relationships with funding partners. Economic and social risks involve fewer high-skill professionals available for critical roles, which would ultimately limit Illinois' and the United States' ability to respond to pressing medical and scientific challenges.

20. Even if the University paid the fees, doing so would require reductions in programs and services supporting UIC's faculty, students, staff, research, and teaching infrastructure and community health.

21. The requirement to pay 100,000 to hire certain H-1B employees compromises the University's ability to hire scientists and practitioners not otherwise available in the United States. This in turn could make it easier for competitor nations to recruit highly qualified individuals away from the United States. UIC has already anecdotally observed a general increase in reluctance from international students and scholars to apply to positions at the University and elsewhere within the System.

I declare under penalty of per ury that the foregoing is true and correct.

Executed on the 2nd of February, 2026, at Chicago, Illinois.



Dr. Marie Lynn Miranda

# Exhibit IL-2

## DECLARATION OF DR. TONY SANDERS

I, Dr. Tony Sanders, declare as follows:

1. I am a resident of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the State Superintendent of Education of the Illinois State Board of Education (ISBE), a position I have held since February 2023. Prior to holding this position, I served as the superintendent of School District U-46, the second-largest school district in Illinois, for nearly a decade.

3. I have been employed by the Illinois State Board of Education, our State Education Agency (SEA), as the State Superintendent of Education since February 2023. I am responsible for setting educational policies and guidelines for public schools, preschool through grade 12, including vocational education and transition programs for students who are served until their 22nd birthday; analyzing the aims, needs, and requirements of education; and making legislative recommendations to the Illinois General Assembly and Governor. Prior to holding this position, I served as the superintendent of School District U-46, the second largest school district in Illinois, for nearly a decade.

4. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. As State Superintendent of Education, I have personal knowledge of the matters set forth below; with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from ISBE's records by others within the organization.

5. ISBE supports approximately 862 Local Education Agencies ("LEAs") serving more than 1.8 million public-school students in pre-kindergarten through twelfth grade. Certain

federally funded programs also benefit Illinois' non-public schools either through direct funding or a requirement that services supported by the program be provided to nonpublic schools and students.

**The Policy**

6. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with any new petition for an H-1B visa (the "Policy").

7. As described below, it is my understanding that the Policy will inflict significant harm upon Illinois' efforts to provide a high-quality education to all children.

8. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

**Teacher Shortage in Illinois and Role of H-1B Workers**

9. Illinois faces a significant teacher shortage crisis, with the most common shortages in English Language Arts, Math, Science, Physical Education, and World Languages.

10. According to the Educator Shortage Report and Unfilled Positions data collection,[1] 3,864 teaching positions were unfilled for the 2024-2025 school year. This total number includes classroom teachers and special education teachers.

11. The H-1B program has been an important tool to fill vacancies where hiring a domestic worker has been challenging. H-1B workers are utilized in various districts across the

[1] https://www.isbe.net/Documents/IARSS-2024-2025-Ed-Shortage-Report.pdf

state including rural, low-income, and vulnerable communities. Often, these districts struggle to find qualified staff and therefore rely on H-1B workers to fill open positions. H-1B workers are highly qualified and specialized teachers in subjects such as Special Education, Bilingual/ESL education, Math and Science, and other content areas.

**Impact on State LEAs**

12. The $100,000 fee for new H-1B petitions will cause irreparable harm and jeopardize programs and services that support millions of children and youths across the State.

13. If the Policy remains in place, State LEAs will not be able to pay $100,000 towards each H-1B visa, which means that the H-1B worker program no longer is a viable means of filling hard-to-fill positions. As H-1B visas are issued when employers are unable to fill positions with American workers, H-1B teachers often fill teacher shortage areas. Illinois' hardest to fill positions include the specializations of Special Education, Bilingual Education, Math, Science, and other content areas. This will result in positions continuing to be unfilled, students not receiving required services (if the H-1B teachers are specialists such as Special Education or Bilingual/ESL teachers), and course offerings being cut.

14. Students do not make appropriate learning gains without licensed, qualified educators, including those with H-1B visas. Under IDEA (for Special Education Students) and *Lau v. Nichols*, 414 U.S. 563 (1974), and *Castañeda v. Pickard*, 648 F.2d 989 (5th Cir. 1981) (for English Learners), LEAs and SEAs must provide meaningful access to curriculum, including the free appropriate education to students with disabilities. H-1B teachers meet this need for schools who are unable to fill positions with American teachers.

15. Moreover, the Policy has already led to lack of clarity among districts who utilize the H-1B program. The Illinois State Board of Education has received calls asking for guidance, which ISBE is unable to provide.

16. Paying the $100,000 per H-1B worker also reduces the amount of district funds available to serve students directly.

17. Finally, the Policy has led to additional fears and concerns by districts not only about the H-1B program, but also about other visa programs, specifically the J-1 Teacher Exchange program. Districts, teachers, and their J-2 dependent family members expressed concern about their status and whether they will need to pay additional fees. There are further concerns as to whether that J-1 program will also be impacted by future fees. Subsequent to the administration's actions, ISBE has seen a reduction in the number of highly qualified teachers willing and interested in coming to Illinois through the J-1 visa program that can be directly tied to confusion around information available about the H-1B fees and other rapidly shifting immigration policies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 28, 2026, at Springfield, Illinois.

Dr. Tony Sanders

# Exhibit IL-3

**DECLARATION OF CHRISTINE MURPHY JUDSON**

I, Christine Murphy Judson, declare as follows:

1. I am a resident of the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Executive Director, Talent Acquisition for the Chicago Public Schools ("CPS"). In my capacity as Executive Director, Talent Acquisition, I am responsible for guiding strategic staffing policy for over 40,000 positions. My professional background includes a Master of Arts in Teaching from Dominican University and extensive experience in federal grant management for teacher and clinical recruitment. I am the Responsible Officer for the district's J-1 visa program under the US Department of State. I oversee all visa processing and work authorization for foreign national employees in the district. I hold a Senior Professional in Human Resources certification from the Human Resources Certification Institute.

3. I have been employed by CPS since February 2016, and I have served as Executive Director, Talent Acquisition since June 2023. Within the CPS Talent Office, I have also held positions as the Director of Talent Acquisition, Manager of Talent Acquisition, and Senior Recruiter. Before starting at CPS, I held several roles with the Academy for Urban School Leadership (November 2013 – January 2016), United Neighborhood Organization Charter Schools (June 2011 – June 2013), and Teach For America (August 2010 – August 2011).

4. I submit this declaration in support of the Plaintiff's Motion for Summary Judgment. As Executive Director, Talent Acquisition, I have personal knowledge of the matters set forth below; with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from CPS's records by others within the organization.

**Background on Chicago Public Schools**

5. CPS was established in 1837 and currently has over 600 schools with over 315,000 students. The district's school system has an operating budget of approximately $6.9 billion and employs over 44,000 employees. The district's mission is to provide a high-quality public education for every child, in every neighborhood, that prepares each for success in college, career, and civic life. We define student success by robust measures connected to daily learning experiences, creating strong support systems to meet students' diverse needs. CPS serves students from a diverse range of countries and backgrounds. 86,172 of our students are learning English as a second language.

**The Policy**

6. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with any new petition for an H-1B visa (the "Policy").

7. As described below, it is my understanding that the Policy will inflict significant harm upon CPS's efforts to provide a high-quality education to all children.

8. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

9. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately

describe CPS's hiring practices. CPS does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; specifically, we use the program to hire specialized staff licensed through the Illinois State Board of Education such as Bilingual Teachers (Spanish/Mandarin), Special Education Teachers, and bilingual Speech-Language Pathologists.

10. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to CPS twice over: CPS is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

11. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." CPS has not and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, CPS has never utilized an outsourcing company to recruit H-1B holders, nor have we relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency. CPS actively uses the H-1B program to hire specialized staff directly, targeting positions that are difficult to fill locally, and exercises direct oversight on the recruitment and verification process for new hires.

12. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee

hired through the H-1B visa program, Chicago Public Schools must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. See 20 C.F.R. §§ 655.731 & 655.732.

13. CPS operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

**Teacher Shortage in Chicago Public Schools and Role of H-1B Workers**

14. CPS faces a significant teacher shortage crisis with the most common shortages in Special Education, Science, Bilingual Education, Math and the clinical roles of School Psychology and Speech Language Pathology.

15. The 2024-2025 Illinois Educator Shortage Report found that 3,864 teaching positions were unfilled statewide as of Fall 2024, with shortages occurring in 55% of education entities in Illinois. As of December 8, 2025, CPS has 711 teacher vacancies. H-1B petitions frequently target positions that are difficult to fill locally, serving as a vital pipeline for educators. Of the 711 teacher vacancies currently facing the district, 446 are in high needs subject areas: 248 in Special Education, 50 in Bilingual Education, and 27 for Related Service Providers. The average length of time to fill these high needs vacancies is 146 days—nearly 5 months.

16. These shortages disproportionately impact disadvantaged students who are already more likely to attend schools with high vacancy rates.

17. The H-1B program has been an important tool to fill vacancies where hiring a domestic worker has been challenging. During the 2024-2025 school year, CPS submitted a total of 37 H-1B visa requests, and was granted 100%. CPS currently employs 82 H-1B visa holders, representing 30 different countries. While the exact number fluctuates, we actively use the program to hire specialized staff.

18. Of these H-1B visa holders, 58 are teachers or clinicians/related service providers in school-based roles, and 24 are highly skilled technical workers in the central office providing critical district-wide services. These staff members fill essential roles, including Bilingual Teachers (Spanish/Mandarin), Special Education Teachers, and bilingual Speech-Language Pathologists.

19. These roles are essential for teaching our diverse student population and meeting legal mandates for service delivery.

20. Currently, new H-1B petitions have been stalled or cancelled for applicants who are in the country due to the vagueness and uncertainties of the policy, to whom the fee applies, and whether future international travel will trigger the fee requirement. We are also not initiating new H-1B cases for at least 15 external applicants outside of the U.S. who have expressed interest. The de facto result is a suspension of potential sponsorship for more than 3 dozen new candidates who would otherwise be contributing to student success in CPS.

**Impact on Chicago Public Schools**

21. The $100,000 fee for H-1B petitions will cause irreparable harm and jeopardize programs and services that support millions of children and youths across the district.

22. If the Policy remains in place, CPS will be unable to absorb the cost, as a public school district operating on a limited budget cannot pay a $100,000 fee for a single hire - a cost

that exceeds the annual salary and benefits of new teachers in the district. Consequently, the fee effectively eliminates the H-1B visa program as a viable recruitment pipeline. Without this program, critical vacancies will remain open, leading to increased class sizes, reduced course offerings (e.g., specialized math, science, or world language classes), and greater reliance on temporary staff.

23. The policy also causes organizational harm by preventing the re-hiring of international teachers with U.S. teaching experience who wish to return. For years, the district has hosted cultural exchange teachers from various countries who have learned about the United States educational system. Dozens have expressed interest in coming back to Chicago to work with students after the conclusion of their home residency requirement and successful completion of a J-1 program. This fee prevents successful previous visa holders from working in our schools again with students they are familiar with, and who have strong experience in our district.

24. The loss of H-1B personnel and the inability to fill these vacancies interferes with learning and disproportionately impacts disadvantaged students. The policy disrupts the continuity of education and prevents the district from meeting legal mandates for bilingual and special education services. As extensive research has noted, learning loss at critical ages cannot be repaired later in life.

25. Impacts are being felt now: new H-1B petitions for applicants currently in the country have been stalled or cancelled due to the uncertainty of the fee. As mentioned above, we have effectively suspended sponsorship for over three dozen candidates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 29, 2026, at Chicago, Illinois.

Christine Murphy Judson

Case 1:25-cv-13821-LTS Document 88-21 Filed 02/06/26 Page 1 of 8

# Exhibit MD-1

**DECLARATION OF DAVID L. DI MARIA**

I, David L. Di Maria declare as follows:

1. I am a resident of the State of Maryland. I am over the age of eighteen.

2. I am currently employed as Vice Provost for Global Engagement at the University of Maryland, Baltimore County ("UMBC"), a constituent institution of the University System of Maryland, the State of Maryland's public system of higher education.

3. As Vice Provost for Global Engagement of UMBC, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UMBC's employees, and I believe that information to be true.

4. UMBC maintains business records in the ordinary course of business, which include, inter alia, records concerning hiring at UMBC.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**UMBC and Its Hiring**

6. During the current 2025–2026 academic year, UMBC enrolls 13,530 students and employs more than 2,000 full- and part-time employees who study, work, and/or conduct research at the undergraduate, graduate, postgraduate, and doctoral levels.

7. UMBC must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its students.

**Impact of the H-1B Policy on UMBC Hiring**

8. UMBC relies on the H-1B visa program to fill employment vacancies,

particularly for highly technical and specialized positions. Today, UMBC employs approximately 90 faculty and staff who are holders of H-1B visas. UMBC must continue to rely on the H-1B visa process to recruit and hire qualified individuals to fill vacant positions for staff and faculty.

9. The largest number of current UMBC employees who hold H-1B visas work within the Goddard Earth Sciences Technology and Research II Center and the Center for Space Sciences Technology, which account for 48% of UMBC's total federally funded research portfolio. In addition, there are a significant number of H-1B visa holders working at UMBC in such functions as Computer Science and Electrical Engineering, Information Systems, Physics, Mathematics and Statistics and Mechanical Engineering.

10. I understand that earlier this year, the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee with any new petition for an H-1B visa (the "Policy").

11. UMBC cannot pay the $100,000 fee imposed by the Proclamation, which will preclude it from hiring individuals outside of the United States who require an H-1B visa to work within the United States. As a result, the Policy will adversely impact UMBC's ability to hire qualified applicants. In fact, it has already done so.

12. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas, "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

13. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UMBC's hiring practices. UMBC does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, nearly all of UMCB's employees currently in possession of H-1B visas have highly specialized training and advanced degrees. Of the approximately 90 H-1B visa holders currently employed by UMBC, 95% of those employees are faculty, post-doctoral employees, or medical residents holding terminal degrees.

14. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to UMBC. It is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

15. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." UMBC has not relied on and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, UMBC has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

16. In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers, which predate the Proclamation. For example, for every

employee hired through the H-1B visa program, UMBC must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9034 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

17. UMBC operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

18. Many vacant UMBC faculty or post-doctoral positions—particularly those in science, technology, engineering, and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants to, among other things, possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that UMBC can consider. This would seriously hamper UMBC's ability to employ the individuals necessary to support the research activities and educational offerings it provides to its students.

19. In highly technical fields, such as Earth and space sciences, UMBC's hiring draws from a relatively small global scientific community of experts suited to fulfill a highly specialized research need. As a result, applicant pools have historically been small. The Policy has further limited the talent pipeline, compounding the difficult of attracting and hiring the strongest candidates for these roles.

20. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities compete to hire from among a handful of eligible applicants. In such situations, UMBC must compete with private universities, some of which have more expansive financial resources than UMBC, which is a public institution. UMBC's inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

21. Depending on experience and specialty, full-time faculty at UMBC are typically paid an average salary of $120,171. UMBC is not able to pay the $100,000 fee imposed by the Policy, which would prohibitively increase the costs necessary to hire new candidates requiring an H-1B visa.

22. The Policy has started to have a significant and irreparable impact on UMBC beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Chemistry & Biochemistry and Computer Science & Electrical Engineering—historically, subject matters for which UMBC has had to turn to candidates who will require an H-1B visa—will soon post vacancies and expect to hire new candidates for Fall 2026. UMBC requires relief from the fee imposed by the Policy or else it will be critically undermined in hiring for these essential positions.

**<u>Impact of the Policy on Student Enrollment</u>**

23. In addition to adversely impacting UMBC's ability to hire, the Policy will also likely reduce the number of international students who apply to attend UMBC and thus will adversely impact the revenues that UMBC receives from tuition each year.

24. International students are an integral part of the student population—at all levels—who attend UMBC. Currently, 4.9% of undergraduate students and 41.4% of

graduate students at UMBC are from outside of the United States.

25. Tuition and fees at UMBC—as at many public universities—are much lower for Maryland residents (currently $ 13,689 per year for undergraduates and $17,262 for graduate students) than for out-of-state residents (currently $ 32,745 per year for undergraduates and $27,126 for graduate students). International students pay out-of-state tuition (with certain, limited exceptions) and must show advance proof of funding sufficient for a full academic year, according to United States student visa regulations. In addition, because international students are ineligible for need-based federal and state aid, they are much more likely to pay full tuition than domestic students. Accordingly, the tuition and fees received from international students constitute a significant source of revenue for UMBC and serve to subsidize the costs of educating domestic students, ensuring that UMBC can continue to provide affordable in-state tuition for Maryland residents and scholarships to students who may otherwise lack the financial resources to attend college.

26. Many international students attend UMBC with the expectation that they will be able to secure temporary employment in the United States following graduation. Moreover, as I understand it, many U.S. employers rely on a stable pipeline for STEM workers.

27. The fee imposed by the Policy will make it much more difficult for U.S.-trained scientists and engineers to return to the United States as they are reasonably likely to assess that U.S. employers will not be able to hire as many workers requiring H-1B visas as in previous years. In fact, it has been reported to me by student counselors abroad, that the Policy and the $100,000 fee are already deterring prospective students from seeking an

education in the United States, including at UMBC.

28. Already, UMBC is seeing impacts on the number of international graduate students seeking admission. At this time last year, UMBC received 1,060 applications from international students for master's degree programs and 1,126 applications for doctoral degree programs for Fall 2025. This year, following the issuance of the Policy, only 227 international students have applied to master's degree programs and 506 applied to doctoral degree programs for Fall 2026, with the greatest declines seen in STEM fields.

29. Applications for many of UMBC's STEM graduate programs for Fall 2026 are due on May 19, 2026. Unless the Policy and $100,000 fee are set aside, it is unlikely that UMBC will be able to continue to enroll adequate numbers of international students to support teaching, research, and economic development within our state and region.

30. The decline in the number of international students resulting from the Policy will harm UMBC by reducing the amount of tuition and fees that it receives per year, thereby adversely impacting UMBC's budget and its ability to provide affordable in-state tuition and merit-based scholarships.

31. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 05 day of February 2026, in Baltimore, Md.

/s/ David DiMaria

David L. Di Maria
Vice Provost for Global Engagement
University of Maryland, Baltimore County
1000 Hilltop Circle, Administration Building 225, Baltimore, MD 21250

# Exhibit MD-2

**DECLARATION OF A RA IRE**

I Amy amire declare as follows:

1. I am a resident of the tate of Maryland. I am over the age of eighteen.

2. I am currently employed as xecutive irector lo al Learning and International Services for the University of Maryland, Baltimore ("UMB"), a constituent institution of the University System of Maryland, the State of Maryland's public system of higher education.

3. As xecutive irector of International ervices for MB I have personal knowledge of the matters set forth elow or have knowledge of the matters ased on my review of information and records provided to me y UMB's employees and I elieve that information to e true.

4. MB maintains usiness records in the ordinary course of usiness which include among other things records concerning hiring at MB.

5. I su mit this eclaration in support of the States' Motion for ummary udgment.

**U B and Its Hiring**

6. Opened in 1807, UMB is Maryland's public health, law, and human services university dedicated to excellence in education research clinical care and service. uring the current 2025–2026 academic year MB enrolls nearly 6 700 students in six nationally ranked professional schools—dentistry law medicine nursing pharmacy and social work—and an interdisciplinary School of Graduate Studies. UMB offers 97 doctoral, master's, baccalaureate, and certificate programs and confers most of the professional practice doctoral degrees awarded in Maryland. MB employs more than 8 200 full- and part-time employees who study work and/or conduct research at the undergraduate graduate postgraduate and doctoral levels.

7. ach year MB hires approximately 1 138 new faculty and staff. MB must continually hire new faculty and staff to support its academic offerings research capa ilities and student programs to meet the academic and related needs of its students.

**Impact of the H-1B Policy on U B Hiring**

8. MB relies on the H-1B visa program to fill employment vacancies. oday MB employs approximately 146 faculty and staff who are holders of H-1B visas including faculty physicians that recently completed medical residency and fellowship training. MB plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. UMB's academic programs with the largest num er of faculty who hold H-1B visas are raduate Programs in Life ciences. In addition there are a significant num er of H-1B visa holders working at MB in such functions as postdoctoral fellows and physicians contri uting to UMB's education, research and patient care missions.

10. I understand that earlier this year the epartment of Homeland ecurity issued a policy re uiring employer payment of a 100 000 supplemental fee with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact UMB's ability to hire qualified applicants. In fact it has already done so.

11. n eptem er 19 2025 President rump issued a Proclamation

("Proclamation"), that restricts the entry of certain applicants seeking to enter the nited tates with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the asis for the promulgation and implementation of the Policy.

12. The Proclamation purports to address "systematic abuse of the [H-1B] program" that according to the Proclamation allows industries to "replace, rather than supplement

American workers with lower-paid lower-skilled labor." his description does not accurately describe UMB's hiring practices. MB does not and has not used the H-1B visa program to hire "low-paid lower-skilled" employees. o the contrary many of our employees currently in possession of H-1B visas have highly speciali ed training and advanced degrees. f the approximately 146 H-1B visa holders currently employed y MB 140 of those employees are faculty post-doctoral employees or staff holding advanced degrees.

13. The Proclamation also claims that "many American tech companies have laid off their ualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." hat description does not apply to MB. It is not a tech company and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

14. he Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud conspiracy to launder money conspiracy under the acketeer Influenced and Corrupt rgani ations Act and other illicit activities." MB has not relied and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. o the est of my knowledge MB has never relied on an outsourcing company for hiring that was accused of fraud y any state or federal agency.

15. In addition the H-1B isa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example for every employee hired through the H-1B visa program, UMB must complete a Labor Condition Application ("LCA") for Nonimmigrant orkers Form A 9035 . he LCA provides that an employer will pay the greater of the actual wage rate or the prevailing wage rate. 20 CF 655.731 a .

16. he wage re uirements governing the H-1B visa program encourages employers to identify . . workers to fill positions as sponsoring H-1B visas imposes additional sponsorship costs as well as potential salary differentials for H-1B employees to meet prevailing wage re uirements. Consistent with the LCA and the regulations governing the H-1B visa program MB does not use the H-1B isa program to displace domestic workers and it undertakes every re uired effort to employ domestic workers when it makes hiring decisions.

17. Many vacant MB faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and speciali ed re uirements. For example these positions re uire applicants to among other things possess advanced research capa ilities have teaching experience have a track record of pu lications and/or have the appropriate academic credentials. epending on the vacancy only a handful of applicants in the world may satisfy these re uirements. he fee imposed y the Policy will further limit the pool of applicants that MB can consider. he result will e the frustration of UMB's ability to employ the individuals necessary to support the research activities patient care services and educational offerings it provides to its students.

18. For example similar to institutions across the country MB is encountering challenges hiring radiologists in our chool of Medicine. his is a field experiencing severe . . physician shortages where there are nearly twice as many radiology vacancies as there are availa le radiologists in the nited tates. adiologists hired y MB are re uired to have the skills necessary to educate medical students and meet urgent patient care needs. ne employment offer that UMB made to a Canadian nuclear medicine specialist is on hold due to UMB's inability to pay the 100 000 H-1B visa fee. here is currently only one nuclear medicine specialist at MB and that specialist is approaching retirement. If MB is una le to timely fill this position and

positions like it, it will not only negatively impact patient care; it will also compromise UMB's a ility to educate future radiologists and nuclear medicine specialists. Further radiology is a specialty on which many other specialties rely so unfilled vacancies create delays and compromise medical education and patient care in multiple arenas.

19. iven the highly speciali ed nature of many faculty and staff positions and the limited num er of eligi le candidates many universities compete to hire from among a handful of eligi le applicants. In such situations MB must compete with private universities some of which have more expansive financial resources than does MB which is a pu lic institution. UMB's ina ility to pay the 100 000 fee imposed y the Policy will further limit its a ility to hire candidates for these positions.

20. For example UMB's chool of entistry was forced to withdraw several jo offers to prospective faculty mem ers outside the . . ecause the school is una le to afford the 100 000 fee. he chool of entistry faces challenges filling vacancies for ualified academic dentists who serve as teaching faculty mem ers due to la or market shortages. In turn these unfilled vacancies compromise the School of Dentistry's ability to educate students, to ensure appropriate faculty to student teaching ratios that are critical to successful preparation of future dentists, and to serve patients that rely upon the School's dental clinics.

21. he fee imposed y the Policy will preclude MB from hiring individuals outside of the nited tates and re uiring an H-1B visa to work within the nited tates.

22 he Policy has started to have a significant and irrepara le impact on MB eginning in anuary 2026. Many MB programs in the chool of raduate tudents and chool of entistry including enomics and Bioinformatics and Cancer Biostatistics and many clinical departments in the chool of Medicine have posted vacancies and are expecting to hire new

candidates y uly August and eptem er 2026. MB re uires relief from the fee imposed y the Policy to ensure that it can hire for these essential positions.

23. I declare under penalty of perjury that the foregoing is true and correct to the est of my knowledge.

xecuted this 5 day of Fe ruary 2026 in Baltimore Md.

Amy amire
xecutive irector lo al
Learning International ervices
niversity of Maryland Baltimore
620 est Lexington treet
Baltimore M 21201

# Exhibit MD-3

**DECLARATION OF EMILY NIELSON**

I, Emily Nielson, declare as follows:

1. I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Chief Human Capital Officer for Baltimore City Public Schools, a system of public schools in Baltimore, Maryland, which is operated by the Baltimore City Board of School Commissioners (hereinafter BCBSC or City Schools ). As the Chief Human Capital Officer, I lead City Schools' efforts to attract, develop, and retain high-quality staff at all levels of the system.

3. Prior to becoming the Chief Human Capital Officer for City Schools in 2022, I served as Senior Vice President of Talent Acquisition for IDEA Public Schools, a Texas-based network of free, college preparatory public charter schools operating in four states. Previously, I served as the Chief Talent Officer for Camden City School District in New Jersey for three years. I started my career as a ninth-grade geography teacher in a small town on the Texas/Mexico border. I received my bachelor's degree and a master's degree in public policy from Harvard University.

4. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. As Chief Human Capital Officer, I have personal knowledge of the matters set forth below with respect to the matters for which I do not have personal knowledge, I have reviewed and familiarized myself with City Schools' records compiled by others within the school system.

5. City Schools is responsible for providing public education to the students of Baltimore City. For the 2025-2026 school year, City Schools operates more than 159 schools and programs, which enroll more than 76,000 students, pre-kindergarten through twelfth grade, many

from urban neighborhoods of highly concentrated poverty. City Schools employs more than 10,000 employees, of whom more than 5,300 are teachers.

6. I understand that the U.S. Department of Homeland Security issued a policy requiring employers to pay a 100,000 supplement fee in con unction with any new petition for an H-1B visa for temporary workers with experience in specialized occupations (the Policy ).

7. The Policy was promulgated after President Trump issued a Proclamation on September 19, 2025, entitled Restriction on Entry of Certain Nonimmigrant Workers ( Proclamation ), which restricts the entry of certain applicants seeking to enter the United States with H-1B visas except for those aliens whose petitions are accompanied by a payment of 100,000.

8. As described below, it is my understanding that the Policy will significantly harm City Schools' efforts to provide a high-quality education to all of its students.

9. Like other school systems throughout the nation, City Schools has long relied on highly qualified teachers employed through the H-1B visa program to meet chronic staffing shortages. City Schools used the H-1B visa program between 2001 and 2019, and the ma ority of teachers that City Schools sponsored have historically come from the Philippines. After a several-year hiatus, the Office of Human Capital relaunched its H-1B visa program in 2023, and it has recently focused on broadening recruitment efforts in Africa, South America, and elsewhere.

10. City Schools relies on the H-1B visa program to hire teachers not by preference, but out of necessity. Each year, City Schools must replace hundreds of educators due to retirements, relocations, and career changes, yet Maryland colleges and universities produce only a fraction of the teacher candidates required to meet the staffing needs of City Schools and other Maryland school systems. Although City Schools has invested in multiple pipeline initiatives,

including grow-your-own pathways for current employees and students, and programs supporting career changers, these efforts have not historically and do not currently generate enough qualified educators to keep pace with persistent vacancies. As a result, City Schools must recruit internationally and hire highly qualified teachers through the H-1B visa program to fill positions that would otherwise remain vacant.

11. City Schools has a strategy to build and sustain a strong, diverse, multi-faceted pipeline of educators from U.S. institutions, including graduates of Baltimore's public schools, as well as paraeducators and other staff seeking to transition into teaching roles. However, these efforts require time to develop a sufficient pool of qualified candidates. Without access to the international educators hired through the H-1B visa program, City Schools' ability to maintain adequate staffing levels will be significantly impeded.

12. Currently, City Schools sponsors 80 H-1B visa holders for the 2025-2026 school year, including 78 teachers filling positions in hard-to-staff areas like math, science, and English as a Second Language or English Language Development. These teachers are essential to City Schools' ability to provide legally required educational services to Maryland students.

13. The recruitment season to fully staff schools for the upcoming 2026-2027 school year has already begun, and it will intensify in the coming months. As part of our active and targeted recruitment strategy, City Schools intends to and has made progress toward hiring approximately 58 new educators who will need H-1B visas to teach in the school system. Under the new Policy, City Schools would be forced to pay an estimated 5.8 million to sponsor these teachers, in addition to their salaries an amount that would vastly exceed available budgetary resources.

14. Accordingly, if the Policy remains, City Schools will be unable to afford the H-1B visa fee imposed for new H-1B petitions and will be unable to hire these highly qualified candidates.

15. Losing access to this pathway for hiring qualified teachers would create the grave risk that more Baltimore City classrooms would go unstaffed for the 2026  2027 school year. This gap in teacher recruitment and hiring would likely result in student-to-teacher ratios rising and course offerings being reduced, as well as additional burdens that would fall on the remaining teachers, and the Baltimore City students and families who depend on qualified public-school teachers would not receive the resources and attention that they deserve. For these reasons, the H-1B program provides a critical supplement to City Schools' workforce strategy and is essential to ensuring that classrooms remain staffed.

16. Thus, the   100,000 fee for new H-1B petitions will cause irreparable harm and  eopardize the educational programming and services that City Schools provides.

I solemnly affirm under the penalties of per ury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 28, 2026, at Baltimore, Maryland.

Emily Nielson

Case 1:25-cv-13829-LTS Document 88-24 Filed 02/06/26 Page 1 of 8

# Exhibit MA-1

## DECLARATION OF DENISE BARTON

1. I am a resident of the Commonwealth of Massachusetts. I am over the age of eighteen. I have been an attorney since 1994 and am licensed to practice in the Commonwealth of Massachusetts.

2. I am currently employed by the University of Massachusetts in its Office of the General Counsel as its Chief Deputy General Counsel.

3. As Chief Deputy General Counsel for the University of Massachusetts I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by University of Massachusetts' employees and I believe that information to be true.

4. The University of Massachusetts maintains business records in the ordinary course of business which include, *inter alia,* records concerning international student enrollment and hiring and employment information for the University of Massachusetts.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

### The University of Massachusetts and Its Hiring

6. The University of Massachusetts is the largest public university system within the Commonwealth of Massachusetts and has approximately 73,555 students and about 26,615 full and part time employees who study, work, and/or conduct research on its five campuses at the undergraduate, graduate, postgraduate, and doctoral levels (University of Massachusetts Amherst, University of Massachusetts Boston, University of Massachusetts Chan Medical School, University of Massachusetts Dartmouth, and University of Massachusetts Lowell), as well as the University of Massachusetts Office of the President. *See* M.G.L. c. 75. Some of the

University of Massachusetts' academic programs with the largest number of staff and faculty who hold H-1B visas are Graduate Medical Education, Genetics & Cellular Medicine, Engineering (multiple disciplines), Biochemistry & Molecular Biotechnology, Molecular Medicine, Computer Science, and Mathematics & Statistics. In addition, there are many H-1B visa holders working at the University of Massachusetts in various administrative functions.

7. In fiscal year 2025, the University of Massachusetts hired at least 2,000 new faculty and staff. The University of Massachusetts must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 73,000 students.

**Impact of the H-1B Policy on University Hiring**

8. The University of Massachusetts relies on the H-1B visa program to fill employment vacancies. Today, the University of Massachusetts employs approximately 340 faculty and staff who are holders of H-1B visas, importantly including medical residents. The University of Massachusetts plans to continue to rely on the H-1B visa program to fill vacant positions for staff and faculty.

9. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain foreign nationals seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of Department of Homeland Security memoranda and guidance requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of the University of Massachusetts to hire qualified

applicants because as a public institution with limited funding, the university cannot pay the $100,000 fee for new employees without considerable harm and disruption.

10. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe the University of Massachusetts' hiring practices. The University of Massachusetts does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly-specialized training and advanced degrees; of the approximately 340 H-1B visa holders currently employed by the University of Massachusetts, over 200 of those employees are faculty, post-doctoral employees, or medical residents holding advanced degrees.

11. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to the University of Massachusetts twice over: the University of Massachusetts is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

12. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Policy. For example, for every employee hired through the H-1B visa program, the University of Massachusetts must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA has multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide

working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

13. The University of Massachusetts complies with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

14. Many vacant University of Massachusetts faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that the University of Massachusetts can consider and, in some cases, leave the University of Massachusetts with no applicants who meet the minimum qualifications of the position. The result will be the frustration of the University of Massachusetts' ability to employ the individuals necessary to support the research activities and educational offerings it provides to over 73,000 students in the Commonwealth.

15. For example, in October 2024, the University of Massachusetts Medical School sought to hire a Senior Research Scientist for Neurology. For a candidate to be considered, they needed to meet the minimum qualifications of the position, which included, *inter alia*, a Bachelor's degree in a Biological Science or the equivalent; seven years of research experience in gene modulation therapy; and expertise in procedures and instrumentation necessary to complete specific research programs. In addition to meeting these qualifications, candidates also needed to be willing to live in or commute to central Massachusetts (where the campus is located) and accept a salary lower than what they could expect to receive in the private sector for

comparable positions. The University of Massachusetts received 37 applications, only one of which met our minimum qualifications. That individual required H-1B sponsorship. The $100,000 fee would have made this hire unworkable or would have prevented the University of Massachusetts from hiring anyone to fill this position. Leaving the position vacant would have limited the research program and delayed data generation, research projects, and upcoming grant applications in Neurology.

16. Some teaching positions posted at University of Massachusetts require specialized professional backgrounds of which there are shortages across the United States. For some of these positions in recent years, the University of Massachusetts has received fewer than 10 qualified applications, many of which required visa sponsorship. In such scenarios, the University of Massachusetts must be able to assess and consider each application, regardless of nationality and citizenship status, in order to hire for the position and provide an effective education to students.

17. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, the University of Massachusetts must compete with private universities, some of which have more expansive financial resources than does the University of Massachusetts, which is a public institution. The University of Massachusetts' inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

18. The fee imposed by the Policy will frustrate the ability of the University of Massachusetts from hiring individuals outside of the United States who require an H-1B visa.

19. Depending on experience and specialty, faculty at the University of Massachusetts are typically paid a median salary of less than $160,000. The fee would vastly increase the costs to the University of Massachusetts necessary to hire certain new candidates requiring a H-1B visa, reducing the overall number of new hires that it could afford.

20. The Policy will have a significant and irreparable impact on the University of Massachusetts. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Biology, Civil & Environmental Engineering, Biomedical Engineering, Mathematics, Physics, and Computer Science have posted vacancies and are required to hire new candidates over the next few months, as the new hires are expected to begin work in early September 2026 for the fall semester. The University of Massachusetts requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

21. The University of Massachusetts is also concerned that the H-1B visa fee will impact international students seeking to attend its programs. International students provide an important source of revenue for University of Massachusetts and help make it possible for the school to provide cost-effective tuition for in-state students and scholarships. Already, the University of Massachusetts has heard concerns from the international student population regarding the H-1B visa fee and seen decreases in applications from international students. While some students may be able to transition from a student visa to an H-1B visa without a fee, the University of Massachusetts is concerned that the H-1B visa fee will signal to international students that the United States does not welcome the international community and will further impact our international student population.

22. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of February 2026, in Westborough, Massachusetts

Denise Barton
Chief Deputy General Counsel
University of Massachusetts
Office of the General Counsel
50 Washington Street
Westborough, Massachusetts 01581

# Exhibit MI-1

**DECLARATION OF ELI ABETH HERTEL**

I LI AB H H L declare as follows:

1. I am a resident of the tate of Michigan. I am over the age of 18 and have personal knowledge of all the facts stated herein except to those matters stated upon information and elief as to those matters I elieve them to e true. If called as a witness I could and would testify competently to the matters set forth elow.

2. I am the irector of Michigan epartment of Health and Human ervices M HH . M HH is responsi le for providing services and administering programs to improve the health safety and prosperity of the residents of the tate of Michigan. In my role as director I oversee the entire department including the tate Hospital Administration M HH Health ervices which oversees Michigan Medicaid and human resources.

3. I make this declaration ased on personal knowledge and on my review of information consultation with M HH staff and records gathered y agency staff.

**DHHS s Role in eeting ichigan s Health Care Needs**

4. As noted a ove M HH is responsi le for providing services and administering programs to improve the health safety and prosperity of the residents of the tate of Michigan.

5. Consistent with this mission M HH operates four inpatient psychiatric hospitals. Michigan s state-operated psychiatric hospitals provide assessment treatment care and services for individuals with serious mental illnesses who re uire a long-term inpatient stay to safely integrate ack into the community. he state-operated hospitals serve a mixture of forensic and pro ate patients and work closely with community mental health partners throughout the state.

6. M HH also operates Michigan s Medicaid program typically referred to as Michigan Medicaid. Michigan Medicaid covers more than twenty-five percent of the state s

population. In total M HH insures approximately 2.6 million people including over 1 million children almost half of all of Michigan s kids and almost half a million seniors and people with disa ilities.

7. In addition M HH provides pu lic health services to promote and protect the health wellness and safety of all Michigan residents. M HH must e ready to provide timely and cost-effective responses to a variety of threats to pu lic health such as emerging infectious diseases iological or chemical agents and environmental exposure to toxic chemicals.

8. M HH is authori ed to consult and work with the Michigan Pu lic Health Institute MPHI a statutorily esta lished non-profit pu lic health institute in performing its duties and may contract with MPHI for the performance of specific functions if determined necessary y the director of the department. Mich. Comp. Laws 333.21787.

**The Ne H-1B Policy**

9. I understand that earlier this year the epartment of Homeland ecurity issued a policy re uiring employer payment of a 100 000 supplemental fee in conjunction with any new petition for an H-1B visa the Policy .

10. As descri ed elow I elieve that the Policy will impact M HH and have significant impacts M HH s mission to improve the health of Michigan residents.

11. n eptem er 19 2025 President rump issued a Proclamation estriction on ntry of Certain Nonimmigrant orkers Proclamation that restricts the entry of certain applicants seeking to enter the nited tates with H-1B visas except for those aliens whose petitions are accompanied y a payment of 100 000. I understand that this Proclamation provided the asis for the promulgation and implementation of the Policy.

12. he Proclamation purports to address systematic a use of the H-1B program that according to the Proclamation allows industries to replace rather than supplement American workers with lower-paid lower-skilled la or. his description does not accurately descri e M HH s hiring practices. M HH does not and has not used the H-1B visa program to hire low-paid lower-skilled employees. o the contrary employees in possession of H-1B visas have highly speciali ed training and advanced degrees.

13. he Proclamation also claims that many American tech companies have laid off their ualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. hat description does not apply to M HH twice over: M HH is not a tech company and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

14. he Proclamation also addresses national security threat s arising from reliance on H-1B-reliant outsourcing companies that have een investigated . . . for engaging in visa fraud conspiracy to launder money conspiracy under the acketeer Influenced and Corrupt rgani ations Act and other illicit activities. M HH has not and does not intend to rely on outsourcing companies in order to fill employment vacancies. o the est of my knowledge M HH has never relied on an outsourcing company for hiring that was accused of fraud y any state or federal agency.

15. In addition the H-1B isa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example for every employee hired through the H-1B visa program M HH must complete a La or Condition Application LCA for Nonimmigrant orkers Form A-9034 9035 . he LCA provides multiple re uirements including that the employer pay at least the prevailing wage or the employer s

actual wage whichever is higher and pay for nonproductive time and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed among other re uirements. 20 C.F. . 655.731 20 C.F. . 655.732.

16. M HH operates consistently with the re uirements set forth in the LCA and all applica le H-1B laws and regulations.

**The Role of H-1B or ers at DHHS and in ichigan s Healthcare System**

17. M HH currently employs two H-1B visa holders at its state-operated hospitals.

18. At M HH H-1B visa holders are typically employed as psychiatrists or other highly speciali ed professionals.

19. ecruitment in M HH s state-operated hospitals is an ongoing challenge. ome positions are posted ut sit vacant for months or even years.

20. In addition as there are fewer Americans pursuing medical degrees in primary care and the portion of citi ens in the applicant pool compared to international applicants is decreasing it is more difficult to fill vacancies with domestic workers.

21. hus M HH has relied and intended to continue to rely on the H-1B program to fill vacancies at M HH s state-operated hospitals.

22. Before turning to the H-1B program to fill these vacancies M HH exhausts all recruitment and hiring strategies availa le. In some roles traditional recruitment of classified state employees does not result in any ualified candidates. As such the H-1B program is utili ed to fill these positions in rare circumstances.

23. Additionally although M HH s pu lic health programs do not employ H-1B visa holders as state employees the H-1B program has een critical to MPHI in ringing in speciali ed expertise in la oratory science epidemiology and data moderni ation. MPHI

currently employs 11 H-1B visa holders who provide support to M HH s pu lic health activities.

24. tatewide more than 500 H-1B workers were employed y 165 employers throughout Michigan s healthcare system in 2025.[1] he healthcare employers that employ the most H-1B workers are located in Health Professional hortage Areas which are areas experiencing a shortage of primary care dental or mental health providers and which are designated as such y the . . Health esources and ervices Administration. he num er of healthcare providers availa le in Health Professional hortage Areas is insufficient to meet the needs of the specific geography or population therefore Health Professional hortage Areas are considered underserved areas. hese areas experience a disproportionate difficulty in recruiting and retaining medical professionals for a wide variety of reasons. he H-1B workers in the Health Professional hortage Areas of Michigan and in other areas of the state are essential to meeting the state s healthcare needs. ithout the a ility to utili e H-1B workers to care for Michigan s patients these areas would e further impacted y shortages. Nota ly these same areas that need the H-1B workforce are less likely to e a le to afford an increase in fees for H-1B applications.

**The Impact on DHHS and ichigan s Healthcare System**

25. he Policy has placed an unnecessary financial urden on M HH limiting its a ility to sponsor international candidates.

26. he 100 000 fee for an H-1B petition will force M HH to stop sponsoring H-1B visa holders or will unduly limit M HH in the jo s it sponsors.

---

[1] ee . . Citi enship and Immigration ervices *r* availa le at: https://www.uscis.gov/tools/reports-and-studies/h-1 -employer-data-hu last accessed anuary 21 2026 .

27. he 100 000 fee per H-1B petition is a significant amount that M HH will e una le to cover without redirecting funds from medical services or medical research programs. Because of the fee M HH will not e a le to hire highly speciali ed professionals through the H-1B program who provide essential services in this state.

28. Beyond the impacts to M HH the Policy will have widespread ramifications for Michigan s healthcare system. he H-1B healthcare professionals practicing in Michigan fill critical gaps in the healthcare safety net for underserved citi ens. he increased fees will stifle the recruitment and retention of H-1B candidates which will worsen existing workforce shortages. ithout H-1B workers many healthcare systems will struggle to provide critical timely care to Michigan s residents. ecruiting H-1B healthcare providers is a very important tool widely used throughout Michigan s healthcare system to address staffing shortages for highly skilled workers. ith a significant fee increase Michigan s healthcare system would not e a le to afford to recruit and retain H-1B workers and patient care will therefore suffer. ithout utili ing a strong H-1B workforce many Michigan patients will need to travel further and wait longer to access the care they need to live a healthy life.

I declare under penalty of perjury that the foregoing is true and correct.

xecuted on anuary 28 2026 at Lansing Michigan.

li a eth Hertel
irector
M HH

Case 1:25-cv-13829-LTS Document 88-26 Filed 02/06/26 Page 1 of 5

# Exhibit MN-1

**DECLARATION OF ERIC DAVIS**

1. I am a resident of the State of Minnesota. I am over the age of eighteen.

2. I am currently employed by the Minnesota State Colleges and Universities as Vice Chancellor for Human Resources.

3. As Vice Chancellor for Human Resources for the Minnesota State Colleges and Universities, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by Minnesota State Colleges and Universities' employees and I believe that information to be true.

4. I submit this Declaration in support of the States' Motion for Summary Judgment.

**The Minnesota State Colleges and Universities**

5. The Minnesota State Colleges and Universities ("Minnesota State") is the third largest system of state colleges and universities in the United States with twenty-six colleges, seven universities, and fifty-four campuses. Minnesota State serves 270,000 students each year and employs 14,500 faculty and staff. Minnesota State provides nearly 4,000 academic programs and awards more than 34,000 degrees, certificates, and diplomas annually.

6. Minnesota State institutions must continually hire new faculty and staff to support its academic offerings and student programs to meet the academic and related needs of its over 270,000 students.

**Impact of the H-1B Policy on Minnesota State Hiring**

7. This year, ten Minnesota State institutions collectively employ approximately 62 faculty and staff who are holders of H-1B visas. Minnesota State institutions plan to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

8. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new

petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of Minnesota State institutions to hire qualified applicants.

9. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

10. Minnesota State does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly-specialized training and advanced degrees; of the approximately 62 H-1B visa holders currently employed by Minnesota State, most of those employees are faculty.

11. Minnesota State is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

12. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, Minnesota State institutions must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay to all nonimmigrant workers "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

13. Minnesota State operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

14. Many vacant Minnesota State faculty positions—particularly those in science, technology (like computer science and cybersecurity), engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. The fee imposed by the Proclamation will limit the pool of applicants that Minnesota State can consider, particularly in emerging fields like cybersecurity. Many of these programs we offer are in high demand by our students and many employers who look to hire our students. The new $100,000 fee will hamper the Minnesota State Colleges and Universities' ability to employ the individuals necessary to support the educational offerings it provides to over 270,000 students in Minnesota.

15. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, often many colleges and universities vie to hire a handful of eligible applicants. In such situations, Minnesota State must compete with private universities, some of which have more expansive financial resources than does Minnesota State, which is a system of public colleges and universities. Minnesota State Colleges and Universities' inability to pay the $100,000 fee imposed by the Proclamation will further limit its ability to hire candidates for these positions.

16. The fee imposed by the Proclamation will preclude Minnesota State from hiring individuals outside of the United States who require an H-1B visa to work within the United States.

17. If Minnesota State institutions were to pay the $100,000 fee for each worker necessarily hired to meet its academic needs, programming, and research goals, given its budgetary

restrictions, it would unduly restrict the number of employees that it could onboard in any given year. Nor can Minnesota State simply increase the amount of funds for hiring without potentially depleting other necessary funding.

18. The Proclamation will have a significant and irreparable impact on Minnesota State.

19. With certain exceptions, hiring for faculty positions is cyclical. Many academic departments at our colleges and universities post vacancies and are expecting to hire new candidates this spring. Minnesota requires relief from the fee imposed by the Proclamation immediately to ensure that it can hire for these essential positions.

20. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 30th day of January, 2026, in St. Paul, Minnesota.

Eric Davis
Vice Chancellor for Human Resources
30 E 7th Street, Suite 350
St. Paul, MN 55101

Case 1:25-cv-13821-LTS Document 38-27 Filed 02/06/26 Page 1 of 4

# Exhibit MN-2

# DECLARATION OF DIANE RYDRYCH

1. I am the Division Director for the Health Policy Division of the Minnesota Department of Health ("MDH"), a position I have held since 2023. I have been at MDH since the year 2000.

2. I make this declaration in my official capacity. I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff. Our work regularly relies on statistical data gathered by sources other than MDH itself, and those sources are also relied upon in MDH's analysis of effects on Minnesota.

3. I submit this Declaration in support of the States' Motion for Summary Judgment.

## The Minnesota Department of Health

4. In Minnesota, MDH is responsible for protecting, maintaining and improving the health of all Minnesotans. Among other things, our agency is responsible for ensuring that nursing homes, hospitals, and other facilities are providing quality care to Minnesotans. In that capacity, we collect data, we inspect facilities, manage the statewide trauma system, and more.

5. The Office of Rural Health and Primary Care ("ORHPC") is a unit within the Health Policy Division at MDH and is primarily responsible for promoting access to quality health care for all Minnesotans. ORHPC is focused on improving healthcare access and outcomes for rural Minnesotans by supporting providers, managing loan forgiveness programs, and fostering rural health initiatives, including recruiting providers for

underserved areas. It works on increasing the supply of culturally competent primary care, managing grants, and addressing rural hospital sustainability through strategic plans.

**<u>Impact of the H-1B Policy on the State of Minnesota's Access to Healthcare</u>**

6. I am providing this declaration to explain some of the adverse impacts on Minnesota based on the Trump Administration significantly increasing the barrier to obtain H1B visas by imposition of a $100,000 supplemental fee for any new visa applicant.

7. MDH collects and analyzes data about the licensed health care workforce, which shows information about the population-to-provider ratio in regions of Minnesota. As of 2024, for every 100,000 people in metro areas, there are close to 33 family medicine physicians. In rural areas, there are only 2.5. In internal medicine, per 100,000 people, there are around 31 physicians in metro areas and 0.2 in rural areas. There are similarly striking disparities across other specialties including pediatrics, psychiatry, general surgery, obstetrics and gynecology. Almost 1 in 3 rural physicians plan to leave the workforce within the next 5 years.

8. In 2024, there were 13,700 job vacancies in Minnesota for healthcare practitioners and technical occupations according to the data reported by the Minnesota Department of Employment and Economic Development.[1]

9. According to data from a 2017 article in the Journal of the American Medical Association, which collected H1B data across all states, as of 2016, approximately 1.5% of physicians in Minnesota held H1B visas - approximately 200 physicians.[2] The H1B visa

[1] https://apps.deed.state.mn.us/lmi/jvs/Results.aspx
[2] https://pmc.ncbi.nlm.nih.gov/articles/PMC5815043/

program has grown bigger since 2016. According to ORHPC's own data, in 2019, 16.5% of physicians practicing in Minnesota were internationally trained. National data estimates that approximately 77% of those physicians were from other countries, with the rest likely to be U.S. citizens training abroad.

10. In many locations in the United States, including Minnesota, and especially in parts of Northwest Minnesota, at least half of the doctors are foreign-trained. This is according to data from the American Immigration Council.[3]

11. According to a Cicero Institute article[4], approximately 30% of Minnesota physicians are within retirement age, and by 2030, we are projected to be short 2260 physicians in the state. This is a major public health issue for Minnesota. The H1B program is one of many tools that helps Minnesota fill its need for medical care for all.

12. With nearly constant shortages in the health care workforce in Minnesota, especially in the rural areas, the impact of the H1B visa fee increase will have significant negative consequences, including health consequences, for Minnesotans.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 29, 2026, at St. Paul, Minnesota.

Diane Rydrych
Health Policy Division Director
Minnesota Department of Health

[3] https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/foreign-trained_doctors_are_critical_to_serving_many_us_communities.pdf
[4] https://ciceroinstitute.org/research/minnesota-physician-shortage-facts/

Case 1:25-cv-13821-LTS Document 38-28 Filed 02/06/26 Page 1 of 5

# Exhibit NV-1

**DECLARATION OF KATE KORGAN**
**ACTING EXECUTIVE VICE PRESIDENT AND PROVOST, UNLV**

1. I ate organ am a resident of the tate of Nevada. I am over the age of 18.

2. I am currently employed y the niversity of Nevada Las egas the niversity a pu lic institution within the Nevada ystem of Higher ducation.

3. As Acting xecutive ice President and Provost of the niversity I have personal knowledge of the matters set forth elow or have knowledge of the matters ased on my review of information and records provided to me y niversity employees and I elieve that information to e true.

4. I su mit this eclaration in support of the tates Motion for ummary udgment.

**The University and Its Hiring**

5. Founded in 1957 NL is a doctoral-degree-granting institution comprised of approximately 34 000 students and more than 4 451 faculty and staff. o date NL has conferred more than 186 000 degrees producing more than 151 000 alumni around the world. NL is classified y the Carnegie Foundation for the Advancement of eaching as an 1 research university with very high research activity and is a recipient of the Carnegie Classification for Community ngagement. he niversity is committed to recruiting and retaining top students and faculty educating the region s diversifying population and workforce driving economic activity through increased research and community partnerships and creating an academic health center for outhern Nevada that includes the launch of a new NL chool of Medicine. NL is located on a 332-acre main campus and two satellite campuses in outhern Nevada.

6. he niversity s academic programs with the largest num er of faculty who hold H-1B status are eoscience Hospitality ngineering multiple departments Chemistry and Biochemistry and Pu lic Health among others. In addition there are numerous H-1B scholars working at the niversity in administrative functions in a num er of offices including ut not limited to Athletics the Barrick Museum Counseling and Psychological ervices CAP the chool of Medicine and the ffice of Information echnology I .

7. ach year the niversity hires approximately 500 new faculty and staff. It must continually hire new faculty and staff to support its academic offerings research capa ilities and student programs to meet the academic and related needs of its approximately 34 000 students.

**Impact of the H-1B Policy on University Hiring**

8. he niversity relies on the H-1B visa program to fill employment vacancies. oday it employs approximately 75 faculty and staff who are holders of H-1B visas. he niversity plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. I understand that earlier this year the epartment of Homeland ecurity issued a policy re uiring employer payment of a 100 000 supplemental fee in conjunction with any new petition for an H-1B visa the Policy . he Policy will adversely impact the a ility of the niversity to hire ualified applicants.

10. Many vacant niversity faculty or post-doctoral positions particularly those in science technology engineering and mathematics M have highly technical and speciali ed re uirements. For example these positions re uire applicants to among other things possess advanced research capa ilities have teaching experience have a track record of pu lications and/or have the appropriate academic credentials. epending on the vacancy only

a handful of applicants in the world may satisfy these re uirements. he fee imposed y the Policy will further limit the pool of applicants that the niversity can consider. he result will e the frustration of the niversity s a ility to employ the individuals necessary to support the research activities and educational offerings it provides to approximately 34 000 students at NL .

11. iven the highly speciali ed and competitive nature of many positions at the niversity we routinely have jo openings that have very specific re uirements that cannot e filled with . . citi ens. If we are una le to hire ualified H-1B candidates the niversity will e at a significant disadvantage and it will e challenging to fulfill our mission.

12. iven the highly speciali ed nature of many faculty and staff positions and the limited num er of eligi le candidates many universities often vie to hire a handful of eligi le applicants. In such situations the niversity must compete with private universities some of which have more expansive financial resources than does the niversity which is a pu lic institution. he niversity s difficulty in paying the 100 000 fee imposed y the Policy will further limit its a ility to hire candidates for these positions.

13. he fee imposed y the Policy will make it difficult if not impossi le for the niversity to hire individuals outside of the nited tates and re uiring an H-1B visa to work within the nited tates.

14. Funds availa le for hiring each Fiscal ear are limited. As a state university in recent years we have only een a le to support approximately 50 of our position needs across campus. For this reason we make difficult decisions and prioriti e positions that we most need and that most positively impact our mission to support students. hen the est ualified person to fill one of these high-need high-priority positions is international it is very important that we are a le to hire them. For the niversity to pay the 100 000 fee would unduly restrict the num er

of employees that it could on oard in any given year and hinder our a ility to successfully and strategically meet academic needs programming and research goals.

15. epending on experience and specialty faculty at the niversity receive a median salary including executives and faculty in our professional schools is approximately 100 000. he 100 000 H-1B fee would thus significantly and materially increase the cost of employing new candidates re uiring a H-1B visa reducing the overall num er of new hires that the university could afford.

16. I declare under penalty of perjury that the foregoing is true and correct to the est of my knowledge.

xecuted this 23rd day of anuary 2026 in Las egas Nevada.

ate organ Ph. .
Acting xecutive ice President and Provost
niversity of Nevada Las egas
4505 . Maryland Parkway
Las egas N 89154

# Exhibit NJ-1

**DECLARATION OF JOHN A. ELES O H.D.**

I, JOHN A. PELESKO, declare under the penalty of per ury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am a resident of New Jersey. I am over the age of eighteen.

2. I am the Provost and Executive Vice President for Academic Affairs at the New Jersey Institute for Technology ( NJIT ). I have served in this capacity since 2023. Previously, I served as the Dean of the College of Arts and Sciences at the University of Delaware. I have also held a faculty position at Georgia Institute of Technology and a post-doctoral position at California Institute of Technology.

3. As Provost, I sit at the intersection of academic strategy and financial realities. I have broad responsibility for Academic Affairs and research and provide oversight and guidance for the university's academic and research budgets. I have knowledge of both the overall financial landscape of NJIT and the specific mechanisms of indirect cost allocation and rate calculation. This knowledge is vital for me to provide effective resource management for the advancement of the university's academic mission. I am responsible for the development and management of the university's academic budget, which encompasses a significant portion of the university's overall budget including faculty salaries, academic programs, research initiatives, and academic support services like libraries and technology. I work closely with the President and other senior administrators to make critical decisions about how the university's financial resources are allocated across various colleges, departments, and units. This involves understanding diverse funding sources, including tuition revenue, state appropriations, federal and private grants, and endowment income, and a strong understanding of financial data, such as enrollment trends, research funding success rates, and cost-effectiveness of academic operations.

4. As Provost and Executive Vice President for Academic Affairs for NJIT, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by NJIT's employees and I believe that information to be true.

5. NJIT maintains business records in the ordinary course of business which include,

**r** records concerning hiring at NJIT.

6. I submit this Declaration in support of the States' Motion for Summary Judgment.

**New Jersey Institute of Technology and Its Hiring**

7. NJIT was founded in 1881 as the Newark Technical School, becoming the Newark College of Engineering in 1930. Today, NJIT has six schools and colleges: Newark College of Engineering (1930), the Hillier College of Architecture and Design (1973), the College of Science and Liberal Arts (1982), the Martin Tuchman School of Management (1988), the Albert Dorman Honors College (1993), and the Ying Wu College of Computing (2001).

8. NJIT is a polytechnic university and its designation as a Very High R1 Research Activity doctoral institution was reaffirmed by the Carnegie Classification of Institutions of Higher Education, placing NJIT among 146 of the most elite and productive research institutions in the nation and one of three in New Jersey. As New Jersey's public, polytechnic research university, NJIT enrolls approximately 12,000 students across its six schools and colleges.

9. As an R1 research-active university, NJIT's vision is to provide undergraduate students with a STEM focused education through research training and mentorship in order to produce the future generation of scientists and engineers. NJIT is also one of the largest producers of engineers and computer scientists in the tri-state area.

10. NJIT has over 140 labs, centers, and institutes that strive to lead in five areas of multidisciplinary research: bioscience and bioengineering, data science and management,

environment and sustainability, material science and engineering, and robotics and machine intelligence. NJIT is continuously growing its research enterprise with approximately 167 million of annual research expenditures in FY2023. NJIT aims for national and international prominence in research through new discoveries in areas ranging from medical sensors and devices to robotics, nanotechnology, and cybersecurity, to next-generation materials, among other topics of vital importance in basic, applied, and translational research.

11. NJIT's statutory mission is as a public research university, deemed to be public and essential governmental functions necessary for the welfare of the State and the people of New Jersey.

12. NJIT stands as the state's preeminent public polytechnic research university, distinguished by its strong emphasis on science, technology, engineering, and mathematics fields.

13. NJIT employs 560 researchers and 230 technicians.

14. In 2025, NJIT hired approximately 195 new faculty and staff. NJIT must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 12,000 students.

**Im act of the H olicy on University Hiring**

15. NJIT relies on the H-1B visa program to fill employment vacancies. NJIT currently employs 76 H-1B visa holders, 9 of whom started their employment in the 2025 calendar year. NJIT plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

16. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a 100,000 supplemental fee in con unction with any new

petition for an H-1B visa (the Policy ). The Policy will adversely impact the ability of NJIT to hire qualified applicants. In fact, it has already done so.

17. On September 19, 2025, President Trump issued a Proclamation, **r** **r** **r** **r** **r** **r** ( Proclamation ), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas except for those aliens whose petitions are accompanied by a payment of 100,000. I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

18. The Proclamation purports to address systematic abuse of the H-1B program that, according to the Proclamation, allows industries to replace, rather than supplement, American workers with lower-paid, lower-skilled labor. This description does not accurately describe NJIT's hiring practices. NJIT does not and has not used the H-1B visa program to hire low-paid, lower-skilled employees. To the contrary, many of our employees currently in possession of H-1B visas have highly-specialized training and advanced degrees of the approximately 76 H-1B visa holders currently employed by NJIT, over 62 of those employees are faculty or post-doctoral employees.

19. The Proclamation also claims that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. That description does not apply to NJIT twice over: NJIT is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

20. The Proclamation also claimed there are national security threat s arising from reliance on H-1B-reliant outsourcing companies that have been investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt

Organizations Act, and other illicit activities. NJIT has not and does not intend to rely on outsourcing companies in order to fill employment vacancies. To the best of my knowledge, NJIT has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

21. In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, NJIT must complete a Labor Condition Application ( LCA ) for Nonimmigrant Workers (Form ETA-9035 9035E). Under the LCA, NJIT attests to multiple wage and labor condition requirements designed to protect both H-1B workers and the U.S. labor market. Specifically, NJIT certifies that the employer will pay at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time, and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed, among other things. 20 C.F.R. §§ 655.731 655.732. These requirements ensure that the employment of H-1B workers does not adversely affect wages or working conditions and does not create unfair competition with U.S. employees. NJIT fully complies with these wage and labor condition requirements, demonstrating its commitment to transparency, equity, and regulatory compliance, and reinforcing that the H-1B program is used to hire qualified individuals based on merit and institutional need while safeguarding the rights, wages, and working conditions of U.S. workers.

22. Consistent with the LCA and regulations governing the H-1B visa program, NJIT does not use the H-1B Visa program to displace domestic workers and it undertakes every required effort to employ domestic workers when it makes hiring decisions.

23. Many vacant NJIT faculty or post-doctoral positions particularly those in science, technology, engineering and mathematics ( STEM ) have highly technical and specialized requirements. For example, these positions require applicants, r to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that NJIT can consider. The result will be the frustration of NJIT's ability to employ the individuals necessary to support the research activities and educational offerings it provides to over 12,000 students in New Jersey.

24. NJIT has had multiple faculty and staff hires in highly specialized fields where recruitment efforts yielded a limited pool of qualified applicants, requiring NJIT to rely on international talent. Across both faculty and staff searches, certain roles demand highly specialized expertise, advanced technical skills, or niche research backgrounds that are not widely available in the domestic labor market. In these cases, applicant pools are often small, and a significant percentage of qualified candidates are international.

25. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, NJIT must compete with private universities, some of which have more expansive financial resources than does NJIT, which is a public institution. NJIT's inability to pay the 100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

26. The fee imposed by the Policy will preclude NJIT from hiring individuals outside of the United States and requiring an H-1B visa to work within the United States.

27. Faculty hiring at NJIT proceeds on annual cycle with each of our six colleges presenting plans for approval in early spring of each year. At the start of each new fiscal year (the fiscal year runs July 1 - June 30), colleges are authorized to hire based upon pro ected available budget capacity. Across the institution the total number of new faculty hires ranges from ten to thirty positions. Depending on experience and specialty, faculty at NJIT typically have a starting salary on order of  100,000. For NJIT to pay the  100,000 fee would unduly restrict the number of new faculty that could be hired in any given year to continue to meet academic and research goals of the institution.

28. The Policy will have a significant and irreparable impact on NJIT beginning in January 2026. Many departments, including Computer Science, Data Science, Applied Engineering and Technology, Mechanical and Industrial Engineering, Mathematical Sciences, Biological Sciences, and Chemistry and Environmental Science, have posted vacancies and are expecting to hire new candidates by August 2026. NJIT requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

**Im act of the  olicy on Student Enrollment**

29. In addition to adversely impacting the ability of NJIT to hire, the Policy will also reduce the number of the international students who apply to attend NJIT and thus will adversely impact the revenues that NJIT receives from tuition each year.

30. International students are an integral part of the student population  at all levels who attend NJIT. Currently, 7.2  of undergraduate students and 41.62  of graduate students at the NJIT are from outside the United States, as of Fall 2025.

31. Tuition and fees at NJIT  as at many public universities  are much lower for New Jersey residents (currently averaging  17,312 per year for undergraduates) than for out-of-state

residents (currently over 39,920 per year for undergraduates). International students must pay out-of-state tuition (with certain, limited exceptions based on New Jersey guidelines) and must show advance proof of funding sufficient for a full academic year, according to United States student visa regulations. In addition, because international students are ineligible for need-based federal aid, they are much more likely to pay full tuition than domestic students. Accordingly, the tuition and fees received from international students constitute a significant source of revenue for NJIT and ensures that NJIT can continue to provide affordable in-state tuition for New Jersey residents and scholarships to students who may otherwise lack the financial resources to attend college.

32. Many international students attend NJIT with the expectation that they will be able to secure employment in the United States following graduation. The fee imposed by the Policy may make it more difficult for international students to remain in the United States and, regardless, will likely deter such students from seeking an education in the United States, including at NJIT.

33. Already, NJIT is seeing impacts to the number of international students seeking admission. For the Spring 2026 semester, the deadline for First-Year and Transfer students was November 16. Last year, 28 of NJIT's applicants were international students. This year, following issuance of the Policy, only 15 of NJIT's applicants were international students. More specifically, NJIT experienced a 40.5 decrease in applications from international undergraduate students (-171). NJIT experienced an enrollment decline of 58 (-8) for international undergraduate students: 19 international undergraduate students in Spring 2025 vs. 11 international undergraduate students in Spring 2026. As a result, NJIT is preparing for an expected loss of 159,648 in undergraduate tuition and fees for the Spring 2026 semester based on these declines. NJIT also experienced a 61 decrease in applications from international graduate students (-

2,298). NJIT experienced an enrollment decline of 65 (-45) for international graduate students: 69 international graduate students in Spring 2025 vs. 24 international graduate students registered Spring 2026. As a result, NJIT is preparing for an expected loss of 916,515 in graduate tuition and fees for the Spring 2026 semester based on these declines. Thus, NJIT's total expected loss of tuition and mandatory fees for Spring 2026 for international undergraduate and graduate students is approximately 1,076,163.

34. For the Fall 2026 semester, NJIT's application deadline for First-Year and Transfer Students is March 1, 2026. At the undergraduate level, NJIT has already experienced a 33 decrease in international applications and 21.7 expected decrease in admission offers as compared to Fall 2025. As a result, NJIT is preparing for an expected loss of 239,520 in undergraduate tuition and fees based on these declines. At the graduate level, NJIT has experienced a 60 decrease in international applications and 40 expected decrease in admission offers as compared to Fall 2025. As a result, NJIT is preparing for an expected loss of 1,873,764 in graduate tuition and fees based on these declines. Overall, NJIT's current total expected loss of tuition and mandatory fees for Fall 2026 based on declining international undergraduate and graduate enrollment is approximately 2,113,284.

35. Applications for first-year regular decision applicants for the Fall 2026 semester are due on March 1, 2026 and transfer applications are due on June 1, 2026. NJIT requires relief from the Policy prior to these dates to ensure that it can continue to enroll adequate numbers of international students.

36. The decline in the number of international students resulting from the Policy will harm NJIT by reducing the amount of tuition and fees that it receives per year, thereby adversely

impacting NJIT's budget and its ability to provide affordable in-state tuition and merit-based scholarships.

37. I declare under penalty of per ury that the foregoing is true and correct to the best of my knowledge.

Executed this _6_ day of February, 2026, in Newark, New Jersey.

John A. Pelesko, Ph.D.
Provost and Executive Vice President for
Academic Affairs at NJIT

# Exhibit NJ-2

**DECLARATION OF ERIC ARFUN EL**

1. I am a resident of New Jersey. I am over the age of eighteen.

2. I am currently employed by Rutgers University as the Vice President for Global Affairs.

3. As the Vice President for Global Affairs at Rutgers University, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by Rutgers University employees and I believe that information to be true.

4. Rutgers University maintains business records in the ordinary course of business which include, **r** records concerning hiring at Rutgers.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**University Hos ital s Role in Meeting New Jersey s Health Care Needs**

6. Pursuant to New Jersey Statutes Annotated Title 18A, Subchapter 9, Chapter 64G, University Hospital is an instrumentality of the State of New Jersey and is a body corporate and politic separate from Rutgers University.

7. University Hospital is the principal hospital of New Jersey Medical School (NJMS) and Rutgers School of Dental Medicine (RSDM), which are both units within Rutgers University.

8. Rutgers University hires the faculty of NJMS and RSDM and if applicable, manages the immigration sponsorship and associated compliance of the clinical faculty working at University Hospital.

**The  olicy**

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a  100,000 supplemental fee in con unction with any new petition for an H-1B visa (the  Policy ).

10. As described below, I believe that the Policy will have significant impacts on Rutgers University's ability to hire clinical faculty working at University Hospital.

11. President Trump's September 19, 2025 Proclamation  Restriction on Entry of Certain Nonimmigrant Workers  ( Proclamation ) states that it is intended to address  systemic abuse of the  H-1B  program.  This description does not accurately describe Rutgers University's hiring practices for clinical faculty working at University Hospital. Rutgers University does not use the H-1B program to hire  lower-paid, lower-skilled  employees as stated in the Proclamation. To the contrary, all Rutgers University clinical faculty working at University Hospital have the equivalent of a doctorate degree in the United States.

12. The Proclamation also claims that  many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers.  That description does not apply to Rutgers University: Rutgers University is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also claimed there are  national security threat s  arising from reliance on  H-1B-reliant outsourcing companies  that have been  investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities.  To the best of my knowledge, Rutgers University

has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

**The Role of H Workers at University Hos ital**

14. Rutgers University currently employs 20 clinical faculty working at University Hospital who hold H-1B status. These clinical faculty members who hold H-1B status are employed in the medicine, pathology, neurology, surgery, radiology, and pediatrics departments.

15. In addition, as there are fewer Americans pursuing Doctor of Medicine degrees (MDs) in primary care, the portion of citizens in the applicant pool compared to international applicants is decreasing, making it more difficult to fill vacancies with domestic workers.

**Im act on Rutgers University and University Hos ital**

16. Both Rutgers University and University Hospital are instrumentalities of the state. The Policy has placed an unnecessary financial burden on Rutgers University, limiting its ability to sponsor international candidates.

17. Since September, Rutgers University has been unable to sponsor two prospective clinical faculty members to work at University Hospital whose sponsorship would have been sub ect to the Policy and related fee.

18. The 100,000 fee for an H-1B petition will force Rutgers University to limit H-1B sponsorship and will negatively impact our ability to hire clinical faculty for necessary health care positions.

I declare under penalty of per ury that the foregoing is true and correct. Executed on February 5, 2026, at New Brunswick, New Jersey.

Eric Garfunkel

Eric Garfunkel, Vice President for Global Affairs

Rutgers, the State University of New Jersey

# Exhibit NY-1

**DECLARATION OF CHRISTOPHER COULSTON**

1. I am a resident of the State of New York. I am over the age of eighteen.

2. I am currently employed by the City University of New York ("CUNY") in its Office of the General Counsel as its University Executive Deputy General Counsel.

3. As University Executive Deputy General Counsel for CUNY, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by CUNY employees and discussions with CUNY employees, and I believe that information to be true.

4. CUNY's constituent colleges maintain business records in the ordinary course of business which include, *inter alia,* records concerning hiring at its 26 colleges and the hiring of employees on H-1B visas.

5. I submit this Declaration in support of the Plaintiff States' Motion for Summary Judgment.

**The City University of New York and Its Hiring**

6. The City University of New York is the public university system of New York City and is the largest urban university system in the United States. CUNY has approximately 240,000 students and about 40,000 full and part time employees who study, work, and/or conduct research on its 26 colleges at the undergraduate, graduate, postgraduate, and doctoral levels. These colleges include the City College of New York, Baruch College, Borough of Manhattan Community College, Bronx Community College, Brooklyn College, the CUNY Graduate Center, CUNY Graduate School of Public Health and Health Policy, CUNY School of Medicine, CUNY School

of Professional Studies, Hunter College, and New York City College of Technology, among others.[1]

7. CUNY currently employs more than 125 faculty on H-1B visas. These faculty members teach across an array of disciplines including Accountancy, Information Systems & Statistics, Marketing and International Business, Mathematics, Physics, and Chemistry. Within the CUNY System, Baruch College currently employs the most H-1B faculty members (33) while Lehman College employs the second most (19).

8. Each year, CUNY colleges must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 240,000 students.

**Impact of the H-1B Policy on University Hiring**

9. Many colleges within the CUNY system rely on the H-1B visa program to fill employment vacancies, relying on this expanded pool of talent to identify qualified applicants to conduct cutting edge research and teach students. Today, CUNY employs more than 125 faculty and staff who are holders of H-1B visas. CUNY seeks to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

10. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new

---

[1] A full list of CUNY's 26 colleges is available here: https://www.cuny.edu/about/colleges/

petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of CUNY to hire qualified applicants. In fact, it has already done so.

11. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

12. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe CUNY's hiring practices. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees.

13. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to CUNY twice over: CUNY is not a tech company, and it does not use the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

14. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, CUNY must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for

nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. See 20 C.F.R. §§ 655.731 & 655.732.

15. CUNY operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

16. Many vacant CUNY faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a small number of applicants may satisfy these requirements. The fee imposed by the Proclamation will further limit the pool of applicants that CUNY can consider. The result will be the frustration of CUNY's ability to employ the individuals necessary to support the research activities and educational offerings it provides to over 240,000 students in the State of New York.

17. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, colleges within the CUNY system must compete with private universities, some of which have more expansive financial resources than our colleges, which are public institutions. CUNY's inability to pay the $100,000 fee imposed by the Proclamation will further limit its ability to hire candidates for these positions.

18. The $100,000 fee imposed by the Policy is prohibitively expensive for colleges within the CUNY system. For CUNY to pay the $100,000 fee would unduly restrict the number of employees that it could onboard in any given year to continue to meet academic needs, programming, and research goals. Nor can CUNY increase the amount of funds for hiring without

potentially depleting other necessary funding. CUNY maintains annual tuition at low rates relative to other college and university systems, and passing on any additional costs to students would make CUNY less affordable and accessible. Consequently, the Policy effectively prohibits CUNY from hiring individuals outside of the United States who need an H-1B visa to work within the United States.

19. At Baruch College, administrators anticipate that some of the college's 30 open faculty roles—many of which are in STEM and business disciplines—may remain unfilled because the College is unable to hire talent on an H-1B visa. Losing access to this talent pool would negatively impact Baruch's academic output: Between Fall 2024 and Fall 2025, 49 faculty members who had at one point received H-1B visas produced more than 68 peer-reviewed articles, two books, and 12 book chapters.

20. Lehman College also anticipates that it will have difficulty filling roles in STEM-related areas including Speech and Hearing Sciences, Chemistry, Physics, and other similar disciplines. Lehman's Department of Speech and Hearing Sciences is uniquely burdened by the Policy: The Department must hire a specific number of faculty with certain terminal degrees to meet the credentialing standards of the American Speech-Language-Hearing Association. These degree requirements often result in a limited pool of qualified candidates who are citizens and permanent residents. Historically, Lehman has been able to expand this pool by considering talent that could be sponsored on an H-1B visa, but because of the Policy Lehman may now face the difficult financial decision of paying a $100,000 fee to avoid jeopardizing the accreditation of a critical program.

21. Collectively, CUNY's inability to fill highly specialized roles ultimately impacts students, endangering the system's ability to offer robust course offerings, lower student-to-faculty

ratios, and smaller classes. By making it harder to hire and recruit faculty, the Policy makes it harder for CUNY students to enroll in the courses they need to graduate and succeed in them when they do.

22. The Policy will have a significant and irreparable impact on CUNY beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Physics, Astrophysics, Mathematics, AI Computing, Neuroscience, Photonics, and others, have posted vacancies and are expecting to hire new candidates by the beginning of the Fall 2026 Semester. CUNY requires relief from the fee imposed by the Proclamation to ensure that it can hire for these essential positions.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of February, 2026, in New York, New York

Christopher Coulston

# Exhibit NY-2

**DECLARATION OF ANNE BINK**

1. I am a resident of the State of New York. I am over the age of eighteen.

2. I am currently employed by the State University of New York ("SUNY") at its System Administration location as its Senior Vice Chancellor for Operations and Management & Chief Operating Officer.

3. As Senior Vice Chancellor for Operations and Management & Chief Operating Officer for SUNY, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by SUNY employees and I believe that information to be true.

4. SUNY maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at its System Administration and 29 State-operated campuses. For purposes of SUNY's hiring, employment, and workforce matters addressed in this Declaration, my references to "SUNY" mean SUNY System Administration and SUNY's 29 state-operated campuses, unless I state otherwise.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**The State University of New York**

6. The State University of New York is New York's public university system and the largest comprehensive university system in the United States. SUNY's system includes 64 campuses comprised of 29-State-Operated campuses, five statutory colleges and 30 community colleges. The SUNY State-Operated campuses include one law school, 20 university and technology colleges, 30 community colleges, and four academic medical centers, three of which integrate its medical school with a SUNY-operated university hospital. SUNY serves nearly 1.3 million students in more than 7,500-degree, certificate, & continuing education programs

throughout New York State and employs approximately 87,956 full and part time employees who teach, work, and/or conduct research at its campuses at the undergraduate, graduate, postgraduate, and doctoral levels.

7. SUNY is committed to offering educational services of the highest quality through a geographically distributed comprehensive system of campuses dedicated to serving both traditional and non-traditional students and addressing local, regional, and state needs. SUNY executes this mission by bringing educational opportunity within commuting distance of nearly all New Yorkers and by operating several public hospitals, including Upstate University Hospital, Stony Brook University Hospital, and University Hospital at Downstate.

8. Across SUNY's 64 colleges, universities, and medical centers, our system is committed to serving New York state's diverse populations in its rural, suburban, and urban regions.

9. SUNY's student population is also diverse. In Fall 2025, 48.0% of SUNY students identify as White, 17.3% identify as Hispanic/Latino, 11.1% as Black or African American, 8.8% as Asian, and 5.3% as International. SUNY awarded 81,777 degrees in the 2023–2024 academic year and 84,313 degrees awarded in 2024–2025 (as of December 15, 2025).

10. SUNY hospitals have the distinction of being the leading providers of medical care in the regions they serve. Located in Syracuse, Upstate University Hospital is the only Level-1 Trauma Center in Central New York and operates New York state's designated Stroke, Burn, AIDS, and Poison Centers. Stony Brook University Hospital serves as Suffolk County's only tertiary care and Regional Trauma Center and operates the state-designated AIDS, Comprehensive Psychiatric Emergency Program, and Burn Centers in the region. Downstate Health Sciences University is the only academic medical center in Brooklyn and is a leader in health equity and research. All three

of these hospitals are also home to medical, nursing, and health professions schools, playing an integral role in developing New York state's next generation of doctors, nurses, scientists, and public health leaders.

**The Role of H-1B Workers at SUNY**

11. SUNY's ability to recruit and hire qualified talent to work in all regions of our state directly influences SUNY's ability to serve the nearly 1.3 million students and provide medical care to countless patients. Each year, SUNY hires approximately 12,000 new faculty and staff.

12. H-1B visas have helped SUNY to recruit and retain qualified employees to fulfill its mission and address the educational and medical needs of New York. At present, SUNY employs 693 individuals in H-1B status. The employees are primarily faculty members (396), health sciences and clinical faculty (110), and medical residents (90).

13. SUNY relies on talent with H-1B visas to serve rural and suburban regions of the state. A total of 156 H-1B employees work at Stony Brook University with the second- and third-highest totals working at Upstate Medical University (116) and University at Buffalo (89), respectively.

14. It is notable that many H-1B employees work in healthcare roles in upstate New York. At Upstate Medical University in Syracuse, 61 H1-B visa holders are clinical and health science faculty and 48 are medical residents. At the University at Buffalo, 19 of the university's 89 H1-B visa holders are clinical and health science faculty. Healthcare workforce shortages persist throughout New York and SUNY faces these shortages most acutely in the upstate region. Recruiting and hiring U.S. citizen or permanent resident medical professionals to work in these regions has been challenging. As a result, SUNY has had to rely extensively on expensive contract nurses and locum tenens physicians to maintain patient care coverage.

15. For example, based on information provided to me by SUNY Upstate Medical University ("Upstate") personnel involved in physician and faculty recruitment, Upstate experiences significant difficulty recruiting physician and faculty talent due to national workforce shortages, strong market competition, and Upstate's geographic location. Upstate's designation as a Level I Trauma Center requires coverage by subspecialty physicians, and Upstate has seen a shrinking candidate pool for these roles. Upstate uses recruitment firms, specialty journals, and professional networking to recruit candidates, and the candidate pool for both clinical and research positions, which includes foreign nationals. Upstate also relies on candidates requiring H-1B sponsorship to fill certain medical residency positions, which are filled through the national residency match process.

16. In SUNY's experience, recruiting for certain physician roles—particularly in primary care and other hard-to-fill specialties—has become more difficult as the domestic applicant pool has narrowed. Access to qualified international candidates through H-1B sponsorship helps SUNY address these shortages.

17. SUNY's academic institutions also rely on the H-1B program to fill employment vacancies in specialized fields, allowing it to hire qualified candidates to conduct cutting edge research and teach its students. Indeed, many of SUNY's state-operated campuses employ faculty and staff in H-1B status.

18. At both its hospitals and academic institutions, SUNY expects to continue relying on the H-1B process to fill vacant positions for staff and faculty that would otherwise remain vacant. For example, Stony Brook hospital recently hired 12 Clinical Lab Technologists from the Philippines after unsuccessful efforts to fill these positions locally.

**Impact of the H-1B Policy on SUNY Hiring**

19. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with certain new H-1B petitions that require consular visa issuance and entry under the Policy, including petitions filed for beneficiaries outside the United States (and certain petitions requesting consular notification) (the "Policy"). The Policy will adversely impact the ability of SUNY to hire qualified applicants.

20. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

21. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe SUNY's hiring practices. SUNY does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many SUNY employees currently in H-1B status have specialized training and advanced degrees; SUNY's 396 faculty H-1B employees are faculty, post-doctoral employees, or graduate students holding advanced degrees.

22. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to SUNY twice over: SUNY is not a tech company, and

it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

23. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, the [University] must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. See 20 C.F.R. §§ 655.731 & 655.732.

24. SUNY operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

25. Many vacant SUNY faculty and post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that SUNY can consider. The same is true of many clinical faculty and medical positions. The result will be the frustration of SUNY's ability to employ the individuals necessary to support the research activities and educational offerings it provides to its nearly 1.3 million students in the State of New York.

26. Given the highly specialized nature of many faculty, staff, and medical positions and the limited number of eligible domestic candidates, many universities and hospitals often compete for a small number of eligible applicants. SUNY must compete with private hospitals and universities, some of which have far greater financial resources. SUNY's inability to pay the $100,000 supplemental fee will further limit its ability to hire candidates for these positions.

27. The $100,000 supplemental fee imposed by the Policy is prohibitively expensive for public institutions such as SUNY. It would materially restrict the number of employees that it could onboard in any given year to continue to meet academic, clinical, programming, research, and operational needs. SUNY cannot increase hiring funds to cover this fee without diverting funds from other necessary purposes. As a result, the Policy effectively prevents SUNY from hiring otherwise qualified candidates who require H-1B sponsorship.

28. With a limited talent pool, hospitals within the SUNY system will be less able to address healthcare workforce shortages throughout New York, particularly in the state's rural and suburban areas. In this way, the Policy will impact the provision of healthcare by reducing staffing, increasing workloads for existing staff, and limiting SUNY's ability to serve underserved communities, and increase patient wait times.

29. The Policy will also impact SUNY's ability to serve students. A shortage of faculty members, particular in the sciences, will increase class sizes and the student-to-faculty ratio and ultimately result in the limitation of SUNY's robust and flexible course offerings. This jeopardizes SUNY's mission to offer a high-quality education to New York's diverse student population.

30. The Policy will have a significant and irreparable harm on SUNY beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical based on the academic year. Many departments, including Neurology, Pediatrics, Genetics, Psychology,

Cardiology, Infectious Disease, have posted vacancies and are expecting to hire new candidates in time for the Fall 2026 semester. Thus, SUNY requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

**Impact of the Policy on Student Enrollment**

31. In addition to impairing SUNY's ability to hire, the Policy will likely reduce the number of international students who apply to SUNY and will adversely affect tuition revenue.

32. International students are an integral part of SUNY's student body. SUNY enrolls nearly 18,000 international students per year from approximately 180 nations.

33. Tuition and fees at SUNY are lower for New York residents than for non-residents. For example, for 2025–2026 baccalaureate programs at SUNY state-operated campuses, tuition is approximately $7,070 per year for New York residents and approximately $17,730 per year for non-residents, plus mandatory fees. International students generally pay non-resident rates and must show proof of sufficient funding for at least one academic year under federal student visa requirements. Because international students are ineligible for need-based federal aid, they are more likely to pay full tuition. As a result, tuition and fees from international students are a meaningful revenue source that supports SUNY's operations, and helps SUNY to continue to provide affordable in-state tuition for New York residents and scholarships to students who may otherwise lack the financial resources to attend college.

34. Many international students attend SUNY in part based on the expectation that they will have a realistic opportunity to work in the United States after graduation, including through employment-based sponsorship. The Policy imposes a $100,000 cost in connection with certain new H-1B cases that require visa issuance and entry, including cases processed through consular notification. That cost and the uncertainty surrounding post-graduation sponsorship will deter

some prospective international students from seeking an education in the United States, including at SUNY.

35. Applications for first-year international applicants are ongoing, and admissions decisions are made on a rolling basis at many SUNY campuses. SUNY requires relief from the Policy to avoid immediate harm to international student enrollment.

36. A decline in international student enrollment resulting from the Policy and the Policy will harm SUNY by reducing the amount of tuition and fees that it receives each year, thereby adversely impacting SUNY's budget and its ability to provide affordable in-state tuition and scholarships.

37. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of February 2026, in Albany, New York.

ANNE BINK

# Exhibit NY-3

**DECLARATION OF DR. SEWIT TECKIE**

I, Dr. Sewit Teckie, declare as follows:

1. I am the Vice President, Clinical Operations at New York City Health and Hospitals Corporation ("NYC H+H"), a position that I have held since November 2025. NYC H+H is a public benefit corporation that operates eleven acute care hospitals, five long-term care facilities, four skilled nursing facilities, six large diagnostic and treatment centers, and about 30 community clinics. Each year, NYC H+H provides essential inpatient, outpatient, and home-based services to over one million New Yorkers. We are the largest municipal health care system in the United States, and we care for individuals without regard to ability to pay.

2. Before joining NYC H+H as System Chief of Radiation Oncology in February 2022, I was an Attending Physician Member at Northwell Health Physician Partners and the Director of Head and Neck Radiation Oncology at Lenox Hill Hospital, a facility consistently recognized nationally for excellence in its cancer care and other specialty areas.

3. I am also a practicing radiation oncologist, a Clinical Associate Professor of Radiation Oncology at NYU Grossman School of Medicine, and have been a member of the Editorial Board of the International Journal of Radiation Oncology, Biology & Physics and ASTRONews. I am a graduate of Harvard College, cum laude, and Harvard Medical School, and a member of numerous scientific and medical societies. I completed my residency in radiation oncology at the Memorial Sloan-Kettering Cancer Center where I was also selected Chief Resident. I also hold an executive MBA with highest honors from Columbia University.

4. I am familiar with the matters set forth herein, either from professional knowledge, conversations with NYC H+H staff, or on the basis of documents that have been provided and reviewed by me.

**NYC H+H's Role in Meeting New York's Health Care Needs**

5. NYC H+H is a public health care system funded by insurance payments and direct government support. The system receives federal funds in the form of Medicaid and Medicare payments, disproportionate share payments and various federally funded grants. Some of the System's funds are provided by New York State, and other funds are provided by New York City.

6. NYC H+H is New York City's municipal hospital system and the largest municipal health care system in the United States. Our dedicated, culturally competent workforce of 42,000-plus health care workers protects and promotes the health and well-being of 8.5 million New York City residents across all five boroughs. In its role as the public health care safety net, NYC H+H's mission is to deliver the best care for all patients, regardless of ability to pay.

7. NYC H+H serves the communities most in need of medical care. Many of its hospitals are located in a Health Professional Shortage Area or Medically Underserved Area as designated by the U.S. Department of Health and Human Services, which are areas that lack sufficient health professionals to meet the needs of the population.

**The Role of H-1B Workers in NYC H+H's Medical Residency Programs**

8. NYC H+H currently relies heavily on the H-1B Visa program to fill each year's incoming class of medical residents who are engaged in graduate medical education residency programs, critical professional training programs, and who also fill crucial staffing needs at its hospitals ("Medical Residency Programs"). As of May 2025, NYC H+H operates over 349 accredited residency programs of varying sizes independently and through academic affiliate

institutions. Every July, a new class of medical residents enter Medical Residency Programs, which generally last for three to five years (sometimes more, for residents pursuing medical careers in certain specialties). During their time in Medical Residency Programs, medical residents receive training and education and may be involved in all aspects of patient care, including inpatient, critical care, emergency department, and outpatient care, under the supervision of an attending physician. After completing a Medical Residency Program, many of the medical residents are then hired by NYC H+H affiliates and continue to work at NYC H+H's hospitals as physicians. Thus, H-1B Visas allow NYC H+H to staff its Medical Residency Programs each year, and to create a pipeline of physicians who will be available to staff its hospitals after completing their Medical Residency Programs and becoming licensed doctors.

9. In 2024, NYC H+H submitted 91 H-1B Visa petitions for its incoming medical residents across its hospitals. In 2025, this number was even larger, totaling 122.

10. The United States is already seeing a shortage of physicians. This shortage disproportionately affects the population NYC H+H serves.

11. Thus, NYC H+H relies on the H-1B program to allow it to fill the Medical Residency Programs at its hospitals.

**The Policy**

12. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B Visa (the "Policy").

13. As described below, I believe that the Policy will have significant impacts on NYC H+H and its mission to deliver the best care for all patients, regardless of ability to pay.

14. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B Visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

15. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe how NYC H+H uses the H-1B Visa Program. All of the medical residents who are currently in possession of an H-1B Visa have attained a medical degree or the equivalent. In fact, the U.S. does not educate enough American citizens to meet the healthcare needs of the American population. Therefore, we and other hospital systems must often look to international medical degree holders to meet the demand for medical professionals in the U.S.

16. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to NYC H+H twice over: NYC H+H is not a tech company, and it does not and has not used the H-1B Visa program to lay off domestic workers or replace domestic workers with international employees.

17. The Proclamation also addresses "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." NYC H+H has not and does not intend to rely on "outsourcing companies" in order to fill its medical residency programs. To the best of

my knowledge, NYC H+H has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

18. NYC H+H does not use the H-1B Visa program to displace domestic workers; instead, it uses the H-1B Visa program to fill vacancies in its Medical Residency Program that it cannot fill through domestic workers alone.

**Impact on NYC H+H**

19. NYC H+H is a public benefit corporation. The Policy places an unnecessary, and unsustainable, financial burden on NYC H+H, limiting the ability to sponsor international medical graduates to join its medical residency programs.

20. Assuming NYC H+H submitted a similar number of H-1B petitions this year as it did last year, the new fee would result in the need for NYC H+H to pay millions of dollars in additional fees. This is a significant amount that NYC H+H would be unable to cover each year without putting into jeopardy its ability to provide medical care to vulnerable populations who are unable to pay for medical services.

21. The effects of the Policy are already being felt. NYC H+H made the decision that it could not pay such an exorbitant fee and will not sponsor any individuals for H-1B Visas that are subject to that fee, making it difficult to fill its Medical Residency Programs, and ultimately putting in peril the training-to-physician pipeline it counts on for physicians to staff its hospitals.[1]

22. Thus, not only will this affect NYC H+H's ability to fill its Medical Residency Programs in the short-term, but it will have devastating effects on the ability for NYC H+H's affiliates to fill the physician positions in NYC H+H's hospitals.

---

[1] While the majority of H-1B Visas benefitting international medical graduates for an incoming resident class will be subject to the $100,000 fee, a relatively small number of H-1B petitions are for change of status, extension, or amendment and therefore not subject to the fee.

23. The Policy's disruption to the training pipeline and NYC H+H's affiliates' ability to staff hospitals can be expected to lead to reduced staffing, increased hours for existing staff, and a diminished capacity for NYC H+H to continue to serve underserved communities.

24. The Policy will thus hamper NYC H+H's ability to fulfill its mission of providing medical care to all individuals, without regard to ability to pay.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 29, 2026, at New York City, New York.

Dr. Sewit Teckie

Case 1:25-cv-13821-LTS Document 88-34 Filed 02/06/26 Page 1 of 7

# Exhibit NC-1

**DECLARATION OF MAURICE O. GREEN**

I, Maurice O. Green, declare as follows:

1. I am a resident of the State of North Carolina. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief. As to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.
2. I serve as the elected North Carolina Superintendent of Public Instruction and have been in this position since January of 2025. Before I was elected to this office, I served as a district superintendent, deputy superintendent, chief operating officer, and school board attorney for local school districts in North Carolina for a total of 15 years.
3. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. As the North Carolina Superintendent of Public Instruction, I have personal knowledge of the matters set forth below or, with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from the records of the North Carolina State Board of Education and the North Carolina Department of Public Instruction, as compiled by others within the organization.

**State Background**

4. The North Carolina Superintendent of Public Instruction is a position created by the North Carolina Constitution. N.C. Const. art. III, sec. 7. The duties of my position include serving as secretary and chief administrative officer to the North Carolina State Board of Education (State Board). N.C. Const. art. IX, sec. 4. The State Board is established by the North Carolina Constitution to "supervise and administer the free public school system, and the educational funds provided for its support . . . ." N.C. Const. art. IX, sec. 5. In addition to

serving as Secretary to the State Board, my duties include establishing, organizing, and overseeing the North Carolina Department of Public Instruction (NCDPI). See N.C. Gen. Stat. §115C-21.

5. The State Board is the State Education Agency (SEA) for North Carolina for purposes of implementing federal law. NCDPI, under my leadership, oversees the day-to-day administration and supervision of the North Carolina public school system. *See* N.C. Gen. Stat. §§ 143A-44.3; 115C-21. That system includes 100 county school districts, 15 city school districts, and 213 charter schools. In addition, the system includes several specialty schools, such as laboratory schools operated by universities, schools for the deaf and blind, and one regional school. The State considers each school district, charter school, or specialty school a Local Education Agency (LEA) for purposes of implementing federal law and allocating federal resources. *See, e.g.*, N.C. Gen. Stat. § 115C-106.3(11). The State's public schools serve approximately 1.5 million students in Pre-Kindergarten through Grade 12.

6. NCDPI regularly collects information regarding teacher vacancy rates and related data from LEAs across the State.

**The Policy**

7. Earlier this year, the United States Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with certain new petitions for an H-1B visa (the "Policy").

8. As described below, the Policy will inflict significant harm upon North Carolina's efforts to provide a high-quality education to all children. The North Carolina State Constitution provides that the people of our State "have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, sec. 15. The North Carolina

Supreme Court has interpreted this provision to guarantee the right to every North Carolinian of a "sound basic education." *Leandro v. State*, 346 N.C. 336, 345, 488 S.E.2d 249 (1997).

9. On September 19, 2025, United States President Donald Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." Upon information and belief, I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

**Teacher Shortage in North Carolina and Role of H-1B Workers**

10. North Carolina faces a significant teacher shortage, with the most common shortages in elementary education, special education, math, and science. The statewide teaching position vacancy rate as of September 1, 2024, was approximately 7.5 percent. Much of that shortage is concentrated in LEAs in rural and impoverished areas of the State. For example, Washington County Schools in northeastern North Carolina had vacancy rate at the beginning of the 2024-2025 school year at 21.3 percent, Nash County Public Schools had a vacancy rate of 11.3 percent, and Bertie County Schools and Halifax County Schools each had a vacancy rate of around 10.5 percent.

11. The H-1B program has been an important tool to fill vacancies where hiring a domestic worker has been challenging. Based on the latest available data, North Carolina LEAs employed at least 1,100 H-1B visa holders at the beginning of the 2025-2026 school year. These workers are, unsurprisingly, disproportionately located LEAs in rural and impoverished areas of the State where vacancies are higher and qualified domestic workers are less inclined to live. Bertie County Schools employs 23 H-1B visa holders, which constitute 19 percent of its 127

teachers. The Bertie County Assistant Superintendent for Human Resources noted that, without H-1B visa holders, there would be no math teachers at Bertie High School. Nash County Public Schools currently employs the most H-1B visa holders of any LEA at 89, which constitutes approximately 16 percent of its teacher workforce. Halifax County Schools, with 75 H-1B visa holders in a teaching workforce of 183, had the highest percentage of any school district at 41 percent. Alpha Academy, a charter school in Fayetteville, had the highest percentage of any LEA, with 45 out of 69 teachers, or 65 percent of its teacher workforce, holding an H-1B visa.

12. At the beginning of the 2024-2025 school year, 43 percent of all teachers hired across the state were hired on some form of alternative license. These alternative licenses allow workers to temporarily serve in teaching roles while working toward full licensure in North Carolina. All teachers holding an alternative license were domestic workers. By contrast, all H-1B visa holders who teach in North Carolina are hired as a fully licensed teacher, which is a condition of obtaining the visa. As the numbers above demonstrate, many of our LEAs with high vacancy rates rely on H-1B visa holders to fill licensed teacher positions. Thus, H-1B visa holders are a critical component of fulfilling our constitutional obligation to provide a "sound basic education" for all students. *See Leandro*, 346 N.C. at 345, 488 S.E.2d at 249.

**Substantial and Irreparable Harm**

13. The $100,000 fee for new H-1B petitions will cause irreparable harm and jeopardize programs and services that support millions of young people across the State.

14. Given current budget restraints, if the Policy remains in place, North Carolina LEAs will in most, if not all cases, be unable to pay the fee in the absence of additional funding. The $100,000 fee is more than twice the annual salary of a beginning teacher in North Carolina ($41,000 for the 2025-2026 school year). As a result, LEAs would not be able to use the H-1B

visa program to fill critical vacancies. The most likely consequences of this, in the absence of any remedial measures to address the shortage of domestic workers, is that LEAs will leave positions vacant, fill positions with unqualified or under-qualified substitute teachers, offer fewer courses in important subjects such as math and science, increase class sizes, or cut training and other efforts to make teachers more effective.

15. As noted above, LEAs in North Carolina currently employ at least 1,100 H-1B visa holders, all of whom are fully licensed teachers. We expect a continuation in such hiring practices if the Policy is rescinded or enjoined by this Court. If, however, the Policy remains in place, North Carolina LEAs will be unable to hire new H-1B visa workers subject to the policy, and it will have a detrimental impact on our public schools. The loss such an important pipeline for fully licensed teachers will cause irreparable harm to teaching and learning at a time when students are still recovering from the learning loss inflicted by the COVID-19 pandemic. Furthermore, to the extent H-1B visa holders are employed as special education or English as a Second Language teachers, North Carolina LEAs may be unable to fulfill federal requirements to provide a free appropriate public education under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 *et seq.*, or help English learners achieve English proficiency under the English Language Acquisition, Language Enhancement, and Academic Achievement Act, 20 U.S.C. § 6811 *et seq.* That could lead to the loss of millions of dollars in federal funding.

16. Finally, the loss of H-1B visa holders will undermine the efforts of the State Board and NCDPI to make North Carolina public schools the best in the nation, as outlined in the 2025-2030 strategic plan, *Achieving Educational Excellence*. That plan calls for, among other objectives, increasing standardized test scores, improving four-year cohort high school graduation rates, and expanding opportunities for dual enrollment in college courses. Highly

qualified, fully licensed international teachers holding H-1B visas are an essential part of achieving those objectives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2026, at Raleigh, North Carolina.

Maurice O. Green

Case 1:25-cv-13821-LTS Document 88-35 Filed 02/06/26 Page 1 of 7

# Exhibit NC-2

**DECLARATION OF ERIC L. CUNNINGHAM**

I, Dr. Eric L. Cunningham, declare as follows:

1. I am a resident of North Carolina. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief. If called as a witness, I could and would testify competently to the matters set forth below. I have served as the Superintendent of Halifax County Schools since 2016 and, prior to that, I served as Associate Superintendent of Nash County Public Schools for four years and Assistant Superintendent of Caroline County Schools (Virginia) for four years.

2. In my capacity as Superintendent of Halifax County Schools, I am responsible for the overall leadership, administration, and supervision of district operations, including instructional programming, staffing, school performance, and ensuring compliance with federal and state education laws and requirements.

3. I have dedicated my career to supporting and improving outcomes for children, schools, and the communities in which students live. I believe in leading by example while providing guidance, motivation, and support to advance educational excellence for all students served by Halifax County Schools.

4. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. As Superintendent, I have personal knowledge of the matters set forth below; with respect to the matters for which I do not have personal knowledge, I have reviewed information gathered from Halifax County Schools records compiled by others within the organization.

## Halifax County Schools Background

5. Halifax County Schools is a county school district located in North Carolina. Halifax County Schools is governed by the Halifax County Board of Education, which is composed of individuals elected by the eligible residents of the jurisdiction served by the LEA. *See* N.C. Gen. Stat. § 115C-37. The Halifax County Board of Education has "general control and supervision of all matters pertaining to the public schools" in Halifax County and is responsible for enforcing relevant laws applicable to the district. *See* N.C. Gen. Stat. § 115C-36. The specific responsibilities of the board include hiring teachers and other public school personnel within Halifax County Schools and ensuring compliance with all federal and state employment laws.

6. Halifax County Schools is a rural district that has eleven school sites and serves more than 2,000 students. The district covers more than 750 square miles. Halifax County Schools is committed to providing every student with access to a sound, basic education, in alignment with the three tenets of the *Leandro* mandate:

a. hiring highly qualified principals,

b. hiring highly qualified teachers, and

c. ensuring teachers have adequate resources to be successful.

## The Policy

7. I understand that earlier this year the United States Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplement fee in conjunction with certain new petitions for an H-1B visa (the "Policy").

8. As described below, the Policy will inflict significant harm upon North Carolina's efforts to provide a high-quality education to all children. The North Carolina State Constitution provides that the people of our State "have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, sec. 15. The North Carolina Supreme Court has interpreted this provision to guarantee the right to every North Carolinian of a "sound basic education." *Leandro v. State*, 346, N.C. 336, 345, 488 S.E.2d 249 (1997).

9. On September 19, 2025, United States President Donald Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

**Teacher Shortage in Halifax County Schools and Role of H-1B Workers**

10. Meeting the requirement to hire "highly qualified" teachers has presented ongoing challenges for our district. As a rural school system, Halifax County often experiences a limited pool of applicants who meet state licensure and qualification requirements, particularly in high-need and tested subject areas.

11. To address these challenges, Halifax County Schools petitioned and received authorization from the State Board of Education to operate eight of our eleven schools with the same flexibility and statutory exemptions afforded to charter schools in North Carolina. *See* N.C. Gen. Stat. § 115C-105.37B. This flexibility allows us to hire teachers who may not initially meet

the "highly qualified" designation, but who are employed with a clear pathway and support to work toward meeting those requirements.

12. When teacher vacancies arise, Halifax County Schools advertises positions in multiple venues for several weeks before considering the recruitment of international teachers. In every instance where an American applicant has applied and either met the required qualifications or was eligible to obtain them within the required timeframe, that individual has been hired. Despite these efforts, our rural location often limits our ability to attract enough qualified American applicants to meet staffing needs.

13. Currently, Halifax County Schools employs 75 teachers under the H-1B visa program. Of those, 53 were hired from 2023 to the present; 22 were hired prior to 2023 and remain employed. Of these, 96 percent are teaching in tested subject areas and have demonstrated strong instructional effectiveness, with students under their purview having "Met Expected Growth" or "Exceeded Expected Growth" for one or more years across the past three academic tracking years. *See* N.C. Gen. Stat. § 115C-83.15. These data confirm that these teachers are value-added educators who positively impact student achievement and meet the intent of the "highly qualified" standard.

14. It is important to note that, when possible, hiring American teachers is preferable for Halifax County Schools. American teachers often share cultural, linguistic, and community connections that may enhance student relatability and engagement. However, in the absence of qualified national applicants, the employment of H-1B visa holders as teachers has been essential in ensuring that classrooms are staffed with effective, high-quality educators who support student learning and academic growth. Halifax County Schools remains committed to prioritizing

American hires whenever feasible while continuing to fulfill its legal and moral obligation to provide all students with highly effective teachers.

15. Halifax County Schools faces a significant teacher shortage due to its location in a very rural district in northeastern North Carolina. It continues to experience significant and persistent teacher shortages that directly impact our ability to provide a high-quality education for all students. Due to the limited local labor pool and ongoing challenges in recruiting licensed educators to rural communities, the district has relied heavily on H-1B teachers to meet critical instructional needs. From January 2023 through current year, Halifax County Schools hired 53 H-1B teachers, of which 52 have had visas approved and one remains pending. These educators serve in high-need classrooms across the district, including elementary (K–5), middle and high school mathematics, English Language Arts, Exceptional Children's programs, and essential elective areas such as Career and Technical Education, Music, Art, and Spanish. The need for Spanish-speaking educators is particularly vital, as the district operates one dual language school, the Aurelian Springs Institute of Global Learning, where Spanish is taught at every grade level, and ensures at least one Spanish teacher is assigned to each of the 11 schools. The continued use of H-1B teachers is essential to maintaining instructional continuity, meeting state and federal requirements, and supporting the academic success of students in this rural community.

**Substantial and Irreparable Harm**

16. The $100,000 fee for certain new H-1B petitions will cause irreparable harm and jeopardize programs and services that support millions of children and youths across the State.

17. If the Policy remains in place, Halifax County Schools will not be able to pay these fees, some positions will go unfilled, some course offerings will be cut, substitute coverage will increase, class sizes will grow, personnel will be lost, and the district will need to reduce training and other efforts to strengthen teacher effectiveness. This will violate the *Leandro* tenet of having a highly qualified teacher for each class.

18. In addition, Halifax County Schools would not have been able to meet the requirement to provide a free appropriate education to students with disabilities without the H-1B visa program as it would have been more difficult, if not impossible to fill positions working with Exceptional Children with qualified teachers. We currently have eight H-1B visa holders serving as Exceptional Children teachers across our district and anticipate continuing to rely on them to fill these critical positions. The inability to do so would risk the loss of hundreds of thousands of dollars in federal funding in our district alone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 28, 2026, at Halifax, North Carolina

Eric L. Cunningham

Dr. Eric L. Cunningham, Superintendent

Case 1:25-cv-13821-LTS Document 88-36 Filed 02/06/26 Page 1 of 8

# Exhibit OR-1

# DECLARATION OF ROY HAGGERTY

1. I, Dr. Roy Haggerty, am a resident of the State of Oregon and over the age of eighteen.

2. I am currently employed by Oregon State University ("OSU") as Provost and Executive Vice President, where I serve as the university's chief academic and operating officer and senior international officer.

3. As Provost and Executive Vice President for OSU, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by OSU's employees and I believe that information to be true.

4. OSU maintains business records in the ordinary course of business, which include records concerning hiring at OSU.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

## Oregon State University and Its Hiring

6. OSU is a public research university within the State of Oregon and has approximately 36,000 students and about 17,000 full and part time employees who study, work, and/or conduct research on its two campuses and at other research and outreach locations across Oregon. Faculty teach students at the undergraduate, graduate, postgraduate, and doctoral levels. OSU sponsors H-1B visas for faculty working mainly in the Colleges of: Engineering, Agricultural Sciences, Science, Veterinary Medicine, and Earth, Ocean and Atmospheric Sciences. In addition, there are a significant number of H-1B visa holders working at OSU in student support and administrative functions.

7. In 2025 alone, OSU hired approximately 1,600 new faculty and staff. The university must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its students.

**Impact of the H-1B Policy on University Hiring**

8. OSU relies on the H-1B visa program to fill some employment vacancies. As of today, OSU sponsors approximately 161 employees on H-1B visas. OSU plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty for reasons more fully explained below.

9. I understand that last year the Department of Homeland Security issued a policy restricting the entry of new H-1B specialty occupation workers unless employers pay a $100,000 supplemental fee in conjunction with applicable new petitions for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of OSU to hire qualified applicants. In fact, it has already done so.

10. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe OSU's hiring practices. OSU does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in

possession of H-1B visas have highly specialized training and advanced degrees; of the approximately 160 H-1B visa holders currently employed by OSU, 127 of those employees hold advanced degrees. Under federal law, OSU is required to pay H-1B visa holders the regional prevailing wage or the actual wage, whichever is higher. There is also no financial advantage to hiring a specialty occupation worker on H-1B visas in a second respect: before the Policy, hiring units typically spent between $3,000 and $25,000 to sponsor and retain these non-domestic employees.

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to OSU. OSU is not a tech company, and it does not, and has not, used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." OSU has only hired H-1B visa holders directly without any intermediary. OSU has never relied on "H-1B reliant outsourcing companies" to fill employment vacancies and does not plan to do so in the future. To the best of my knowledge, OSU has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

14. Many vacant faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants to possess advanced research

capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Proclamation will further limit the pool of applicants that OSU can hire for the specialized role. The result will be the frustration of OSU's ability to employ the individuals necessary to support the research activities and educational offerings it provides to students in the State.

15. For example, filling highly specialized veterinary faculty positions is difficult; searches often yield only one or two qualified applicants and can take more than two years. These roles require board certification, which involves a 3–4-year residency and a national exam, limiting the pool of eligible candidates and increasing demand. Private-sector compensation typically exceeds public university salaries and start-up costs for these faculty exceed $200,000 annually. Many vacancies attract predominantly international applicants—for a recent critical care opening, only three candidates were qualified and all were international. These faculty train U.S. veterinary students and most international hires completed their specialty training in the United States. At $100,000 per hire, the College of Veterinary Medicine cannot afford even a single H-1B supplemental fee.

16. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, OSU must compete with private universities, some of which have more expansive financial resources than does OSU, which is a public institution. OSU's inability to pay the $100,000 fee imposed by the Proclamation will further limit its ability to hire candidates for these positions. As a public university, this added cost affects the class offerings and research

opportunities available to our tens of thousands of domestic students seeking an affordable education.

17. This month, the mechanical engineering department was unable to hire an international academic with important and rare expertise in the Artificial Intelligence (AI) field due to the inability to afford the $100,000 fee, resulting in research cancelled and a class unoffered to mainly domestic students (88% of the students in this department are from the United States). The research and training for domestic students on using AI in manufacturing design would have aided the reshoring goals of increasing United States manufacturing capacity. The individual needing an H-1B visa was the only qualified candidate.

18. In the College of Agricultural Sciences, a high proportion of recent hires were international. They were the top candidates in competitive searches, and if the $100,000 fee is in place in future searches, the college's ability to hire the best talent and in turn its ability to address grower, producer and consumer needs will be hampered.

19. The fee imposed by the Policy will preclude OSU from hiring individuals in specialty occupations who are outside of the United States and require an H-1B visa to work within the United States.

20. Even if another visa is available for the same talented faculty, the O-1 visa process for individuals with extraordinary ability or achievement takes additional months and expense (involving hiring immigration attorneys), putting hiring of sought-after, talented academics outside the United States out of reach for a public research university like OSU.

21. The University structures its budget two years in advance because Oregon operates on a biennial state budget cycle. State Education and General Funds supplement tuition to support instruction, research, and outreach, and these appropriations directly influence college personnel

budgets. For example, when the Legislature approved the 2025–2027 budget in June 2025, that decision essentially determined funding available for hiring in 2026. Each College receives its annual budget allocation, including personnel resources, before the July 1 start of the fiscal year. Because OSU cannot increase personnel funds without reducing other essential budget areas, paying the $100,000 fee would significantly limit the number of employees the University could hire to meet academic, programmatic, and research needs.

22. Depending on experience and specialty, the average annual faculty salary at OSU is approximately $100,000, not including benefits. The $100,000 fee would double the costs to OSU when hiring a top candidate requiring an H-1B visa, reducing the overall ability to hire.

23. The Policy will continue to have a significant and irreparable impact on OSU beginning in January 2026. Hiring for faculty occurs constantly and not at fixed periods and the process takes many months. Many departments, including Physics, Mathematics, Psychology (with focus on Human-AI interaction), Robotics engineering, and Electrical Engineering and Computer Science (in high performance computing and Artificial Intelligence), have posted vacancies and are expecting to hire new candidates by June 2026. Inability to hire some H-1B positions can imperil grants, which in turn could imperil chiefly domestic hires in roles such as Research Assistants, in addition to detrimental effects on key research and course offerings for domestic students. OSU requires relief from the fee imposed by the Proclamation to ensure that it can hire for these essential positions.

24. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of February, 2026, in Benton Oregon.

Dr. Roy Haggerty
Provost and Executive Vice President
Oregon State University
624 Kerr Administration Building
Corvallis, OR 97331

# Exhibit OR-2

**DECLARATION OF UNIVERSIT OF ORE ON**

1. I am a resident of the State of Oregon and over the age of eighteen.

2. I am currently employed by the University of Oregon ("UO") in the Division of Global Engagement as its Director of International Scholar Services.

3. As Director of Scholar Services for UO, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UO's employees and I believe that information to be true.

4. UO maintains business records in the ordinary course of business which include records concerning hiring at UO.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**University of Oregon and Its Hiring**

6. UO is a public research university within the State of Oregon and has approximately 24,462 students and about 11,000 full and part time employees who study, work, and/or conduct research on its two campuses at the undergraduate, graduate, postgraduate, and doctoral levels. UO's academic programs with staff and faculty who hold H-1B visas include the Lundquist College of Business, the College of Arts and Sciences, College of Design, College of Education, School of Journalism and Communication, the School of Law, and the Phil and Penney Knight Campus for Accelerating Scientific Impact. In addition, there are a significant number of H-1B visa holders working at UO in functions across campus including various research institutes, Athletics, and other advising and student support services offices.

7. Each year, UO hires new faculty and staff. The university must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its students.

**Impact of the H-1B Policy on University Hiring**

8. UO relies on the H-1B visa program to fill employment vacancies. Today, UO employs approximately 60 faculty and staff who are holders of H-1B visas. UO plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of UO to hire qualified applicants. In fact, it has already done so.

10. On September 19, 2025, President Trump issued a Proclamation, *r* *r* *r* *r* *r* *r* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UO's hiring practices. UO does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in

possession of H-1B visas have highly-specialized training and advanced degrees; of the approximately 60 H-1B visa holders currently employed by UO, over 50 of those employees are faculty, post-doctoral employees.

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to UO. UO is not a tech company, and it does not, and has not, used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." UO has never relied on "outsourcing companies" to fill employment vacancies and does not plan to do so in the future. To the best of my knowledge, UO has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

14. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, UO must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working

conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. 20 C.F.R. §§ 655.731 & 655.732.

15. UO operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

16. Many vacant faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Proclamation will further limit the pool of applicants that UO can consider. The result will be the frustration of UO's ability to employ the individuals necessary to support the research activities and educational offerings it provides to students in the State.

17. The University of Oregon's Jordan Schnitzer Museum of Art began the first round of its search for an inaugural Curator of Contemporary & Traditional Chinese Art with applications received in December 2022. At the time, there were 5 applicants, however, none met minimum qualifications, so the search failed. During a second search in July 2023, again, the committee received a total of 5 applications, but only one candidate met requirements, and that candidate required H-1B sponsorship. The position requires a very specific academic area knowledge in modern and contemporary Chinese art, language ability (fluency in English and Chinese), plus relevant publication, curatorial, and teaching experience—a combination that

very few have.

18. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, UO must compete with private universities, some of which have more expansive financial resources than does UO, which is a public institution. UO's inability to pay the $100,000 fee imposed by the Proclamation will further limit its ability to hire candidates for these positions.

19. The fee imposed by the Policy will preclude UO from hiring individuals outside of the United States who require an H-1B visa to work within the United States.

20. Funds available to schools and colleges for each Fiscal Year ("FY") are determined by enrollment and fixed for each FY (July 1 to June 30th) during the winter before the beginning of the FY. Under current conditions, labor costs are increasing faster than funding available to schools and colleges, so funding is already insufficient for replacement costs for faculty and staff who leave every year. For UO to pay the $100,000 fee would unduly restrict the number of employees that it could onboard in any given year to continue to meet academic needs, programming, and research goals. Nor can UO simply increase the amount of funds for hiring without potentially depleting other necessary funding.

21. Depending on experience and specialty, faculty at UO can be paid salaries in the $50,000-$60,000 range. The fee would double or triple the costs to UO necessary to hire new candidates requiring a H-1B visa, reducing the overall number of new hires that it could afford.

22. The Policy will have a significant and irreparable impact on UO beginning in

January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Chemistry, the Institute of Neuroscience, and Data Science, have posted vacancies and are expecting to hire new candidates by June 2026. UO requires relief from the fee imposed by the Proclamation to ensure that it can hire for these essential positions.

**Impact of the Policy on Student Enrollment**

23. In addition to adversely impacting the ability of UO to hire, the Policy will also reduce the number of the international students who apply to attend UO and thus will adversely impact the revenues that UO receives from tuition each year.

24. International students are an integral part of the student population – at all levels – who attend UO. Currently, 1.4% of undergraduate students and 13% of graduate students at UO are from outside the United States.

25. Tuition and fees at UO—as at many public universities—is much lower for Oregon residents (currently averaging $16,000 per year for undergraduates) than for out-of-state residents (currently over $45,000 per year for undergraduates). International students must pay out-of-state tuition and must show advance proof of funding sufficient for a full academic year, according to United States student visa regulations. In addition, because international students are ineligible for need-based federal aid, they are much more likely to pay full tuition than domestic students. Accordingly, the tuition and fees received from international students constitute a significant source of revenue for UO and ensures that UO can continue to provide affordable in-state tuition for Oregon residents and scholarships to students who may otherwise lack the financial resources to attend college.

26. Many international students attend UO with the expectation that they will be able to secure employment in the United States following graduation. The fee imposed by the Policy will make it much more difficult for international students to remain in the United States and will likely deter such students from seeking an education in the United States, including at UO.

27. Applications for first-year regular decision applicants and transfer applicants are due on May 1. UO requires relief from the Policy prior to these dates to ensure that it can continue to enroll adequate numbers of international students.

28. The decline in the number of international students resulting from the Policy will harm UO by reducing the amount of tuition and fees that it receives per year, thereby adversely impacting UO's budget and its ability to provide affordable in-state tuition and merit-based scholarships.

29. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of February, 2026, in Lane County, Eugene, Oregon.

/s/ ______________________
Lindsay Pepper
Director of Scholar Services
University of Oregon

# Exhibit RI-1

**DECLARATION OF Kristin Johnson**

1. I am a resident of hode Island. I am over the age of eighteen.

2. I am currently employed by the University of Rhode Island in its Office of the Provost as its Vice Provost for Global Initiatives.

3. As Vice Provost at the University of Rhode Island, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by University of Rhode Island's employees and I believe that information to be true.

4. The University of Rhode Island maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at the University of Rhode Island.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**The University of Rhode Island and Its Hiring**

6. The University of Rhode Island is the largest public university system within Rhode Island and has approximately 17,441 students and about 2,898 full and part time employees who study, work, and/or conduct research on its 3 campuses at the undergraduate, graduate, postgraduate, and doctoral levels. The University of Rhode Island's academic programs with the largest number of students and faculty who hold H-1B visas are College of Engineering, College of Pharmacy, College of Arts & Sciences and College of Environment & Life Sciences. In addition, there are a significant number of H-1B visa holders working at the University of Rhode Island in such functions as Financial Strategy & Planning and Institutional Research Offices.

7. In Fiscal year 2025, the University of Rhode Island hired approximately 293 new faculty and staff. The University of Rhode Island must continually hire new faculty and staff to

support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 17,000 students.

**Impact of the H-1B Policy on University Hiring**

8. The University of Rhode Island relies on the H-1B visa program to fill employment vacancies. Today, the University of Rhode Island employs approximately 59 faculty and staff who are holders of H-1B visas. The University of Rhode Island plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy"). The Policy will adversely impact the ability of the University of Rhode Island to hire qualified applicants. In fact, it has already done so.

10. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* ("Proclamation"), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe the University of Rhode Island's hiring practices. The University of Rhode Island does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; of the 58 H-1B visa holders currently employed by the University

of Rhode Island, approximately 48 of those employees are faculty, post-doctoral employees holding advanced degrees.

12. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, the University of Rhode Island must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

13. The University of Rhode Island operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

14. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, the University of Rhode Island must compete with private universities, some of which have more expansive financial resources than does the University of Rhode Island, which is a public institution. The University of Rhode Island's inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

15. Since 2025, we have seen a wide range of positions that have been difficult to fill due to a limited number of applicants with the required qualifications. This has been especially true for faculty and across fields such as Chemistry, Nursing, Physical Therapy, and Political Science.

16. The fee imposed by the Policy will preclude the University of Rhode Island from hiring individuals outside of the United States and requiring an H-1B visa to work within the United States.

17. Depending on experience and specialty, faculty at the University of Rhode Island are typically paid a salary of $117,000. The fee would double the costs to the University of Rhode Island necessary to hire new candidates requiring a H-1B visa, reducing the overall number of new hires that it could afford.

18. The Policy will have a significant and irreparable impact on the University of Rhode Island beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Research Assistants and Port-Doctoral Fellows in the university's College of Environment and Life Sciences, have posted vacancies and are expecting to hire new candidates between January and September 2026. The University of Rhode Island requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

**Impact of the Policy on Student Enrollment**

19. In addition to adversely impacting the ability of the University of Rhode Island to hire, the Proclamation will also reduce the number of the international students who apply to attend the University of Rhode Island and thus will adversely impact the revenues that the University of Rhode Island receives from tuition each year.

20. International students are an integral part of the student population – at all levels – who attend the University of Rhode Island. Currently, 1% of undergraduate students and 13% of graduate students at the University of Rhode Island are from outside the United States.

21. Tuition and fees at the University of Rhode Island—as at many public universities—is much lower for Rhode Island residents (currently averaging $17,984 per year for undergraduates) than for out-of-state residents (currently over $39,544 per year for undergraduates). International students must pay out-of-state tuition (with certain, limited exceptions for humanitarian entrants residing in Rhode Island) and must show advance proof of funding sufficient for a full academic year, according to United States student visa regulations. In addition, because international students are ineligible for need-based federal aid, they are much more likely to pay full tuition than domestic students. Accordingly, the tuition and fees received from international students constitute a significant source of revenue for the University of Rhode Island and ensures that the University of Rhode Island can continue to provide affordable in-state tuition for Rhode Island residents and scholarships to students who may otherwise lack the financial resources to attend college.

22. Many international students attend the University of Rhode Island with the expectation that they will be able to secure employment in the United States following graduation. The fee imposed by the Proclamation will make it much more difficult for international students to remain in the United States and will likely deter such students from seeking an education in the United States, including at the University of Rhode Island.

23. Already, the University of Rhode Island is seeing impacts on the number of international students seeking admission. The deadline for First-Year Action for the Spring 2026 semester was December 15, 2025, and the deadline for First-Year Early Decision (FEA) for September 2026 was November 1, 2026. There has been a decrease of about 21% in FEA applications received from 2025 to 2026. Graduate applications have also seen a decrease of about

53.7%. Last year, there were 770 international students who applied by these deadlines. This year, following issuance of the Proclamation, only 356 applied.

24. Applications for first-year regular decision applicants are due on February 1 and transfer applications are due on July 31. The University of Rhode Island requires relief from the Policy prior to these dates to ensure that it can continue to enroll adequate numbers of international students.

25. The decline in the number of international students resulting from the Policy will harm the University of Rhode Island by reducing the amount of tuition and fees that it receives per year, thereby adversely impacting the University of Rhode Island's budget and its ability to provide affordable in-state tuition and merit-based scholarships.

26. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 28th day of January, 2026, in Kingston, Rhode Island



Kristin Johnson
Vice Provost for Global Initiatives
University of Rhode Island
Office of the Provost
35 Campus Ave.
Kingston, Rhode Island 02881

# Exhibit VT-1

**DECLARATION OF DR IR DO BRO S I**

1. I am a resident of the State of Vermont. I am over the age of eighteen.

2. I am currently employed by the University of Vermont (UVM) in its Office of Vice President for Research as its Vice President for Research and Economic Development.

3. As Vice President for UVM, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UVM's employees and I believe that information to be true.

4. UVM maintains business records in the ordinary course of business which include, records concerning hiring at UVM.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

**UV and Its Hiring**

6. UVM is the State of Vermont's public-instrumentality state university and has approximately 14,425 students and about 5,431 full and part time employees who study, work, and/or conduct research at the undergraduate, graduate, postgraduate, and doctoral levels.

7. UVM must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its students.

**Impact of the H-1B Policy on University Hiring**

8. UVM relies on the H-1B visa program to fill employment vacancies, particularly for highly technical and specialized positions. Today, UVM employs approximately 97 faculty and staff who are holders of H-1B visas. UVM plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

9. The largest number of current UVM employees who hold H-1B visas work within the Larner College of Medicine at UVM, where they are engaged in cutting-edge biomedical

research, education of the next generation of medical practitioners, and direct patient care in affiliation with the UVM Health Network. In addition, there are a significant number of H-1B visa holders who hold faculty positions in UVM's other academic colleges and who are essential for advancing the teaching and research missions of the university.

10. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a 100,000 supplemental fee in con unction with any new petition for an H-1B visa (the Policy ). The Policy will adversely impact the ability of UVM to hire qualified applicants. In fact, it has already done so.

11. On September 19, 2025, President Trump issued a Proclamation, ( Proclamation ), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas except for those aliens whose petitions are accompanied by a payment of 100,000. I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

12. The Proclamation purports to address systematic abuse of the H-1B program that, according to the Proclamation, allows industries to replace, rather than supplement, American workers with lower-paid, lower-skilled labor. This description does not accurately describe UVM's hiring practices. UVM does not and has not used the H-1B visa program to hire low-paid, lower-skilled employees. To the contrary, many of our employees currently in possession of H-1B visas have highly-specialized training and advanced degrees of the approximately 97 H-1B visa holders currently employed by UVM, over 80 of those employees are faculty and post-doctoral employees holding advanced degrees.

13. The Proclamation also claims that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B

workers. That description does not apply to UVM: UVM is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

14. The Proclamation also addresses claimed national security threat s arising from reliance on H-1B-reliant outsourcing companies that have been investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities. UVM has not and does not intend to rely on outsourcing companies in order to fill employment vacancies. To the best of my knowledge, the UVM has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

15. In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, UVM must complete a Labor Condition Application ( LCA ) for Nonimmigrant Workers (Form ETA-9035 9035E). The LCA contains multiple requirements, including that the employer pay at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time, and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed, among other things. 20 C.F.R. §§ 655.731 655.732.

16. UVM operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

17. Many vacant UVM faculty or post-doctoral positions particularly those in science, technology, engineering, and mathematics ( STEM ) have highly technical and specialized requirements. For example, these positions require applicants, to possess

advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants UVM can consider. The result will be the frustration of the UVM's ability to employ the individuals necessary to support the research activities and educational offerings it provides to its students in Vermont.

18. In highly technical fields, such as biomedical sciences, UVM's hiring draws from a relatively small global scientific community of experts suited to fulfill a highly specialized research need. As a result, applicant pools have historically been small. The Policy has further limited the talent pipeline, compounding the difficulty of attracting and hiring the strongest candidates for these roles.

19. On three recent recruitments for the UVM Department of Medicine, the ability to sponsor H-1B visas allowed UVM to make successful hires even with a low number of qualified applicants..

20. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often seek to hire a handful of eligible applicants. In such situations, UVM must compete with private universities, some of which have more expansive financial resources than does UVM, which is a public institution. The 100,000 fee imposed by the Policy will further limit UVM's ability to hire candidates for these positions.

21. The Policy has started to have a significant and irreparable impact on UVM beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including the College of Engineering and Mathematical Sciences and the College of Medicine historically sub ect matters for which UVM has had to turn to candidates who will

require an H-1B visa will soon post vacancies and expect to hire new candidates by August 2026. UVM's Department of Medicine has several open faculty recruitments, and of the five who have accepted offers, two will require visa sponsorships. Without relief from the fee imposed by the Policy, UVM will be undermined in hiring for these essential positions.

22. I declare under penalty of per ury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of February, 2026, in Burlington, Vermont

/s/ ____________________
Dr. Kirk Dombrowski
Vice President for Research
and Economic Development
University of Vermont

# Exhibit WA-1

**DECLARATION OF DR. TIM DELLIT, MD**

I, Timothy H. Dellit, MD, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am employed by the University of Washington (UW) as the Chief Executive Officer of UW School of Medicine, Executive Vice President for Medical Affairs, and Paul G. Ramsey Endowed Dean of the UW School of Medicine. I have held this position since December 1, 2023. As Dean of the School of Medicine, I oversee one of the nation's leading medical schools.

3. I previously served as Chief Medical Officer for UW Medicine, Executive Vice Dean for Clinical Affairs for the School of Medicine, Vice President for Medical Affairs for UW, and President of UW Physicians, the physician group practice for faculty in the School of Medicine. I earned my medical degree from Cornell University Medical College and am board-certified in Infectious Diseases.

4. I have compiled the information in the statements set forth below through personal knowledge, UW personnel who have assisted me in gathering this information, and systems available to me.

**The Policy**

5. The University of Washington is the flagship university in the state of Washington. Since its founding in 1861, it has been a hub for learning, innovation, problem solving, economic development and community building. Driven by a mission to serve the greater good, UW's students, faculty and staff tackle today's most pressing challenges with courage and creativity,

making a difference across Washington state – and around the world. As part of its mission, UW engages in research and direct service, which frequently rely on H-1B visa holders to accomplish its mission.

6. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa holder coming from outside the U.S. (the Policy).

7. As described below, I believe that the Policy will have significant impacts on UW and its mission to serve the greater good.

8. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers (Proclamation), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

9. The Proclamation purports to address "systemic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UW's hiring practices. UW does not and has not used the H-1B visa program to hire "lower-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees.

**UW's Role in Meeting Washington's Health Care Needs**

10. The UW School of Medicine is dedicated to improving the general health and well-being of the public. In pursuit of its goals, the School of Medicine is committed to excellence in

biomedical education, research and healthcare. The School of Medicine is also dedicated to ethical conduct in all of its activities.

11. The UW School of Medicine is a component entity of UW Medicine, an integrated clinical, research and learning health system with a single mission to improve the health of the public. UW Medicine is a family of organizations that are operated or managed as part of an integrated health system. These organizations include UW Medical Center (Montlake and Northwest campuses), UW Medicine Primary Care, the UW School of Medicine, UW Physicians, Harborview Medical Center, and Airlift Northwest. The UW School of Medicine conducts world-leading research across thirty-one clinical and biomedical research departments and multiple research institutes and centers with areas of focus including behavioral health, neuroscience and Alzheimer's disease, heart disease and stroke, infectious diseases, cancer, health metrics, genomics and precision medicine, protein design and regenerative medicine.

12. As the preeminent academic medical center in our region and as a national leader in biomedical research, UW places a special emphasis on educating and training physicians, scientists and allied health professionals dedicated to two distinct goals: (1) meeting the healthcare needs of our region, especially by recognizing the importance of primary care and providing service to underserved populations; and (2) advancing knowledge and assuming leadership in the biomedical sciences and in academic medicine. As the only comprehensive clinical, research and learning health system in the five-state WWAMI region (Washington, Wyoming, Alaska, Montana, Idaho), UW Medicine provides a higher degree of healthcare, ranging from primary and preventive care to the most highly specialized care for the most complex medical conditions.

13. No matter what type of care is needed—primary, specialty, urgent or emergent care or air medical transport—UW Medicine's world-class healthcare professionals are nearby, at more than 300 locations around the Puget Sound region.

14. With one of the largest medical research programs in the world, UW Medicine enables scientists to advance knowledge and health innovations with groundbreaking discoveries. The research community at the UW School of Medicine has access to comprehensive instrumentation, facilities and services at multiple research locations in Seattle, and our faculty and staff collaborate widely with thousands of colleagues nationally and around the world.

15. UW School of Medicine also supports research to underserved communities, especially rural and tribal populations throughout the Pacific Northwest. Through our partnerships in the WWAMI region, we work to extend research on cutting edge therapies and innovative methods of healthcare delivery to every corner of the Pacific Northwest. The Institute for Translational Health Science (ITHS) has a vast regional network of academic and clinical partners that support these efforts, including delivery of experimental drugs and vaccines to rural regions during the recent pandemic.

16. UW sponsors H-1B visas to support its research, teaching, and clinical care mission. UW looks for world class experts in fields aligned with our strategic initiatives, and sometimes those individuals are from other countries.

**Impact of the Policy**

17. UW Medicine, similar to other academic medical centers nationwide, is experiencing severe shortages of physicians in certain specialties. *See*, *e.g.*, *New AAMC Report Shows Continuing Projected Physician Shortage*, AAMC (March 21, 2024) https://www.aamc.org/news/press-releases/new-aamc-report-shows-continuing-projected-physici

an-shortage ("The United States will face a physician shortage of up to 86,000 physicians by 2036.") Across the country, academic medical centers are grappling with an unprecedented shortage of physicians and in particular, anesthesiologists, radiologists, and neurologists, resulting in the need to look for an international workforce due to the limited availability within the United States and leading to operating room closures, long waitlists, and requiring departments to offer significant compensation increases. Despite significant ongoing and robust recruitment efforts, with high demand to hire for these specialties we have not been able to achieve full staffing in years. This places more significant workload on our existing workforce, in turn leading to burnout and more separations. The specialty of transplant surgery has had a two-year accredited fellowship through the American Society for Transplant Surgeons (ASTS) for many years, and in the most recent decade, the predominant number of applicants were and are foreign medical graduates. These fellows go on to seek positions as transplant surgeons in the United States, having benefited from the rigorous training and desiring to contribute to our mission.

18. In addition, as there are fewer Americans pursuing medical practice in primary care, the portion of citizens in the applicant pool compared to international applicants is decreasing, making it more difficult to fill vacancies with domestic workers, especially in rural communities.

19. H-1B visa holders bring highly specialized, extensive medical training to their employment with UW, many of which are in a skill set of one - they may be the only person who can do what they do in their areas of expertise. Some are coming as teachers, necessary to the development of their field. They are physicians and scientists with specialized training or knowledge that are willing to come to the United States and share their expertise. This specialized training and knowledge they bring benefits students and patients across the Pacific Northwest.

Case 1:25-cv-13821-LTS Document 88-40 Filed 02/06/26 Page 7 of 8

20. The Policy will have other impacts as well, such as reduced staffing, increased hours for existing staff, projected shortages, cutting of programs and/or the ability to staff service lines such as transplant surgery, inability to serve underserved communities, and increased wait times. For research hospitals like UW Medical Center, it will create a shortage of qualified researchers to staff critical medical research projects and lead innovative cutting-edge research that will shape and transform the future of the healthcare field.

21. I made the decision to pay the $100,000 fee in only one pending H-1B application, for a transplant surgeon to support the Department of Surgery's and UW Medical Center—Montlake's abdominal transplant service line. UW Medical Center—Montlake and the Department of Surgery have waitlists for solid organ transplants, including pancreas, kidneys and livers. Patients on the wait lists are from all over the region, not just Washington state. The current surgeon complement in the Department of Surgery is shifting, with two surgeons on the verge of retirement. The need for another transplant surgeon is critical not just to the institution but to the broader regional community to continue to save and prolong lives. This money will now not be available to pay for other necessary infrastructure or employees in that unit.

22. The new fee has also created a chilling effect for hiring of foreign nationals across the UW. While the fee ostensibly applies only to new H-1Bs for persons coming from outside the United States, hiring units cannot easily separate foreign national candidates who would be subject to the fee from those who would not. It is therefore likely that units will consider not hiring anyone requiring H-1B visa sponsorship in order to avoid the chance of either paying the fee or having the hire fail.

23. The $100,000 fee for any new H-1B employee coming from outside the U.S. will force UW Medicine to stop sponsoring H-1B visas for high-priority hires from abroad. UW

Medicine may have to consider other, more restrictive visas (like the O-1A) as an alternative. In very limited instances, like the one described above, UW Medicine would be forced to pay the fee because a specific position is critical to UW's mission to improve the health of the public. In other instances, positions would remain vacant. Teaching and patient care will suffer as a result.

24. A significant number of H-1B visas sponsored by UW are for individuals within the School of Medicine. The new $100,000 H-1B visa fee is a significant amount that UW Medicine would be unable to cover without redirecting funds from other institutional funds intended for teaching, research, or medical care. It would be passed on, either to students through their tuition, or to Washington State or U.S. taxpayers through the grants and other payments that support UW's research and clinical care missions. Alternatively, programs may need to be eliminated or reduced to fund the new H-1B fees.

25. A shortage of qualified researchers will force UW to eliminate projects that develop new treatments and therapies, severely limit the availability of clinical trials to assess the safety and efficacy of new treatments, and impede UW's ability to remain on the forefront of medical innovation that improves and protects the well-being of all residents across the five-state WWAMI (Washington, Wyoming, Alaska, Montana, Idaho) region.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15 day of January 2026.

TIMOTHY H. DELLIT, MD
CEO, UW Medicine
Executive Vice President for Medical Affairs and
Dean of the School of Medicine, University of
Washington

# Exhibit WA-2

## DECLARATION OF URSULA ELSPETH OWEN, JD

I, Ursula Elspeth Owen, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am employed by the University of Washington (UW) as the International Scholars Operations Manager. The International Scholars Operations team (ISO) processes employment-based visas for UW employees, including H-1B temporary workers. My job duties include managing this team in furtherance of UW's teaching, research, and service mission; reporting and data and policy analysis regarding UW visa sponsorship; and managing an individual caseload that includes hands-on processing of H-1Bs. I report to the university's Vice Provost for Academic Personnel and Faculty.

3. I have been employed by UW since October 1, 2011, and I have served as the International Scholars Operations Manager since 2020. Before my role as International Scholars Operations Manager, I served as an International Scholar Advisor in ISO. Prior to joining UW, I worked in and for various immigration law firms as a contract attorney and paralegal. I have a Juris Doctor, hold an active membership in the Washington State Bar Association, and belong to the American Immigration Lawyers Association. I am also an active participant in the National Association of Foreign Student Advisors community.

4. I have compiled the information in the statements set forth below through personal knowledge and systems available to me.

## University of Washington and Its Hiring

5. In the 2024–25 academic year, UW had approximately 37,400 full-time-equivalent employees across its three campuses (UW Seattle, UW Bothell and UW Tacoma). The vast majority of these employees are eligible to work as U.S. nationals. A smaller, but still significant portion, hold an independent employment authorization, for example F-1 Optional Practical Training. UW estimates its H-1B employee population at under 1% of its total employee count. The UW colleges with the largest number of H-1B employees are the School of Medicine, the College of Arts and Sciences, and the College of Engineering.

6. All UW-sponsored H-1Bs are processed through ISO. Of the 199 H-1B sponsorship requests ISO received and processed in the 2024–25 academic year, forty-eight of those included some element of clinical training or patient care. Other common H-1B job duties at UW are undergraduate and graduate teaching and clinical or laboratory research.

7. UW must continually hire new faculty and staff to support its academic and clinical offerings, research capabilities, and student programs to meet the academic and related needs of its over 62,700 students.

## The Policy

8. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa holder coming from outside the U.S. (the Policy).

9. As described below, I believe that the Policy will have significant impacts on UW and its mission to serve the greater good.

10. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers (Proclamation), that restricts the entry of certain

applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

11. The Proclamation purports to address "systemic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UW's hiring practices. UW does not and has not used the H-1B visa program to hire "low-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees. For example, of the 199 H-1B visa requests that ISO received in the 2024–25 academic year, the highest degrees held by the beneficiaries were as follows:

| | |
|---|---|
| Bachelor's | 1 |
| Master's | 12 |
| MD or MD equivalent | 41 |
| PhD | 145 |

12. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to UW twice over: UW is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

13. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." While UW does occasionally use third-party

staffing services to assist with sourcing and screening in some situations, UW has not and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, UW has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

14. The H-1B Visa Program already contains specific provisions that apply to employers that over-rely on H-1B visas. The Department of Labor's regulations define an "H-1B-dependent employer" at 20 C.F.R. § 655.736 as, for employers with at least fifty-one full-time equivalent employees who are employed in the U.S., one that employs H-1B nonimmigrants equal to at least 15% of that total. H-1B employees represent approximately 1% of UW's full-time equivalent employee population; UW is therefore not an H-1B-dependent employer.

15. In addition, the H-1B Visa Program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, UW must complete a Labor Condition Application (LCA) for Nonimmigrant Workers (Form ETA-9035 & 9035E). In order to submit the LCA, UW must provide notice to U.S. workers and make other attestations confirming that employment of the H-1B worker will not adversely affect pay, benefits, and working conditions for U.S. workers, and that the H-1B employee will not replace striking workers. *See* 20 C.F.R. §§ 655.731–.734.

16. Consistent with the LCA and regulations governing the H-1B visa program, UW does not use the H-1B Visa program to displace domestic workers, and it complies with all relevant notice, wage, and benefits requirements for H-1B sponsorship.

**The Role of H-1B Workers at the University of Washington**

17. UW relies on the H-1B visa program to fill a small, but very specialized, number of employment vacancies. During the 2024–25 academic year, for example, UW sponsored the following 199 positions for H-1Bs:

| | |
|---|---|
| Junior faculty | 25 |
| Medical trainees | 20 |
| Other professional staff | 4 |
| Postdoctoral researchers | 41 |
| Professional researchers | 17 |
| Professorial faculty | 92 |

18. UW has relied on the H-1B program to fill vacancies in most of its 19 academic schools, colleges, and campuses, as well as some of its non-academic administrative units, its school of medicine, its hospitals and clinics and within its research departments. UW plans to continue to use the H-1B visa as part of its hiring strategy to fill vacant positions for faculty and staff.

19. H-1B holders are critical to UW's programs. Without them, students are not getting a world class education and will lose out competitively to students that have that expertise available. Patients will lose access to critical specialized medical care. Entire practice groups for significant medical specialties will not be able to serve patients. Much of UW's grant funding comes through employees on H-1B visas. UW's research mission is supported in large part by researchers on H-1B visas who are publishing and receiving awards. These workers are not displacing qualified Americans; they are filling positions that would otherwise go unfilled, and staffing programs that would otherwise become unviable.

**Impact on the University of Washington**

20. UW is a public university of the state of Washington. The Policy has placed an unnecessary financial burden on UW, limiting the university's ability to sponsor international candidates.

21. When the fee was initially announced, ISO identified eight ongoing H-1B cases that would hypothetically be subject to the fee. Of those eight, four were for medical care providers in specialties including anesthesiology, surgery, and radiology. Another three were for high-priority incoming faculty hires in the School of Medicine and the College of the Environment. All of the candidates in these cases held either a professional degree in medicine or a PhD.

22. UW leadership has made the decision to pay the $100,000 fee in only one of these eight cases, for a transplant surgeon to support the Department of Surgery's abdominal transplant practice. That money will then not be available to pay for other necessary tools, infrastructure, or employees in that unit.

23. The new fee has also created a chilling effect for hiring of foreign nationals across the University. While the fee ostensibly applies only to new H-1Bs for persons coming from outside the U.S., hiring units can't easily separate foreign national candidates who would be subject to the fee from those who wouldn't. It's therefore likely that units will consider not hiring anyone requiring H-1B visa sponsorship in order to avoid the chance of either paying the fee or having the hire fail.

24. The $100,000 fee for any new H-1B employee coming from outside the U.S. will force UW to stop sponsoring H-1B visas for high-priority hires from abroad. UW may have to consider other, more restrictive visas (like the O-1A) as an alternative. In very limited instances, like the one described above, UW would be forced to pay the fee because the position is critical to

UW's mission and patient care activities. In other instances, positions would remain vacant. Teaching and patient care will suffer as a result.

25. In the 2024–25 academic year, ISO processed twenty-two H-1B visa requests for new employees coming from outside the U.S. If UW were to sponsor the same number of new H-1Bs from abroad this year, and pay the new fee for all of them, it would pay approximately $2.2 million in additional fees.

26. This is a significant amount that UW would be unable to cover without redirecting funds from other institutional funds intended for teaching, research, or medical care. There is no centralized funding source that can be used to bear this cost. It would be passed on to Washington State or U.S. taxpayers through the grants and other payments that support UW's research and clinical care missions.

27. A shortage of qualified researchers will force UW to eliminate projects that develop new treatments and therapies, severely limit the availability of clinical trials to assess the safety and efficacy of new treatments, and impede UW's ability to remain on the forefront of medical innovation that improves and protects the well-being of all Washington residents.

28. More broadly, the fee represents yet another disincentive to highly-skilled workers considering making a life in the U.S. The loss of these professionals will have a significant negative impact not only on the UW community, but on Washington State and the United States as a whole.

I declare under penalty of perjury Under the Laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 15 day of January, 2026.

Ursula Elspeth Owen, JD
International Scholars Operations Manager

# Exhibit WA-3

**DECLARATION OF KATHERINE HELLMANN**

I, Katherine Hellmann, declare as follows:

1. I am a resident of the State of Idaho. I am over the age of eighteen and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by Washington State University (WSU) as the Director of International Student and Scholar Services. My team manages the processing of employment visas and H-1B visas. My job duties include supporting the retention of the international community including international students and scholars with immigration regulations, language support, events and activities among other things. I report to the Interim Vice President of International Programs, Dr. Paul Whitney.

3. I have been employed by WSU since October 2012, and I have served as the Director of International Student and Scholar Services since October 2020. Before my role as Director of International Student and Scholar Services, I served as Director of the Intensive American Language Center, Associate Director of International Programs and International Center Coordinator at Washington State University. I have held various leadership positions in NAFSA: Association of International Educators' Teaching, Learning and Scholarship Knowledge Community since 2015. NAFSA, formerly called the National Association of Foreign Student Advisers, is the professional organization for international education in the United States. I have over two decades of experience at six schools working in international education in the United States.

4. I have compiled the information in the statements set forth below through personal knowledge, through university personnel who have assisted me in gathering this information from our university, and on the basis of documents that have been provided to and/or reviewed by me.

**Washington State University and Its Hiring**

5. WSU has approximately 25,477 students and about 7,000 full- and part-time employees who study, work, and/or conduct research on its six campuses at the undergraduate, graduate, postgraduate, and doctoral levels (WSU Pullman, WSU Spokane, WSU Tri-Cities, WSU Vancouver, WSU Global Campus). WSU's academic programs with the largest number of faculty who hold H-1B visas are Veterinary Medicine, Arts & Sciences, Engineering & Architecture and the College of Agricultural, Human and Natural Resources Sciences; these faculty members include tenure-track assistant professors and post-doctoral research associates.

6. Each year, WSU hires approximately 1,000 new faculty and staff each year, with between 200–300 of those being international faculty and staff, of which some are H-1B visa holders. WSU must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 25,000 students.

**Impact of the H-1B Policy on University Hiring**

7. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the Policy).

8. As described below, I believe that the Policy will have significant impacts on WSU and its mission to serve the greater good.

9. On September 19, 2025, President Trump issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* (Proclamation), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

10. The Proclamation purports to address "systemic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe WSU's hiring practices. WSU does not and has not used the H-1B visa program to hire "lower-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; of the approximately 121 H-1B visa holders currently employed by WSU, over 95% of those employees are faculty or post-doctoral employees holding advanced degrees. To be a postdoctoral researcher, one must hold a Ph.D. degree. The vast majority of faculty hires at WSU hold a Ph.D.

11. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to WSU twice over: WSU is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

12. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." WSU has not and does not intend to rely on

"outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, WSU has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

13. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, WSU must complete a Labor Condition Application (LCA) for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

14. WSU operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

**The Role of H-1B Workers at Washington State University**

15. Today, WSU employs approximately 121 faculty and staff who are holders of H-1B visas, and WSU relies on the H-1B visa program to fill employment vacancies. For example, WSU recently hired an Assistant Professor in the School of Design and Construction on an H-1B in the fall of 2025 and that search had thirty applicants, only three of which were U.S. applicants. In another example, from 2022, there were only four applicants for a faculty hire for Veterinary Medicine, all of which were foreign nationals, due to the required specialization. These situations are typical of faculty searches at WSU and elsewhere, with increasing numbers of foreign nationals in candidacy pools as compared to domestic applicants. WSU plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

16. In 2024, WSU submitted ninety-one H-1B visa petitions. H-1B visa holders are mostly employed as faculty and post-doctoral researchers in science, technology, engineering, and mathematics (STEM), and other key areas that support major research initiatives and degree programs with large enrollments.

17. Many vacant WSU faculty or post-doctoral positions—particularly those STEM fields—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants from which WSU needs to hire, or even force WSU to leave positions unfilled. The result will be the frustration of WSU's ability to employ the individuals necessary to support the research activities and educational offerings it provides to over 25,000 students on its campuses in the State of Washington.

18. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, WSU must compete with private universities, some of which have more expansive financial resources than does WSU, which is a public institution. WSU's inability to pay the $100,000 fee imposed by the Policy will further limit its ability to hire candidates for these positions.

19. Applications since 2025 for faculty positions show the same trend of foreign national applicants for STEM faculty and post-doctoral positions. However, WSU is receiving fewer applications for open positions because more attractive offers are available from Canada,

the U.K., Australia, China, and elsewhere, effectively pricing the United States out of top talent due to the financial obligations related to the Policy.

20. H-1B holders are critical to WSU's programs. Without them, students are not getting a world class education and will lose out competitively to students that have that expertise available. Much of WSU's grant funding comes through employees on H-1B visas—WSU's research mission is supported in large part by researchers on H-1B visas who are publishing and receiving awards. A majority of WSU's top performing faculty in STEM and post-doctoral researchers began their careers at WSU on an employment-based visa such as the H-1B. These individuals make hugely significant contributions to WSU's research endeavors, bringing in millions in grant funding per year, as well as staffing and supporting educational efforts in labs, classrooms and other settings. The Policy will effectively cripple WSU's financial ability to support research and key high-interest degree programs.

**Substantial and Irreparable Harm**

21. WSU is a public university in the state of Washington. The Policy has placed an unnecessary financial burden on WSU, limiting the university's ability to sponsor international candidates.

22. WSU is seeing fewer successful searches for faculty and staff due to this policy with fewer applicants overall in these key positions. WSU departments and colleges are already struggling financially and do not have an additional $100,000 to pay to hire faculty or post-doctoral positions. In fact, the new fee doubles or even triples the cost of employing such individuals in many cases, putting WSU in a situation where it cannot hire and must leave positions open for key research or teaching obligations. This situation impacts all WSU students and prevents WSU from

fulfilling its mission as the state's land-grant institution, with its significant contributions to the state economy among other effects.

23. WSU budgetary situation is such that it cannot redirect funds from other programs or departments in order to cover the Policy's $100,000 fee for new H-1B visa holders. Even taking into account the guidance received from the Department of Homeland Security following issuance of the Policy, WSU would be unable to absorb the additional cost. The guidance clarified that individuals in the United States seeking a change of status to H-1B visas are not impacted by the new fee, but those outside the U.S. who are subject to consular processing are impacted by the new fee. The new fee would still apply to approximately 5% of WSU's H-1B hires, which would add approximately $500,000 to WSU's hiring costs, and WSU simply cannot cover such an increase.

24. The Policy's prohibitive cost will in all likelihood result in vacant positions, which would be devastating to WSU's research and teaching mandates. The Policy will have other impacts as well, including reduced staffing, increased hours for existing staff, and potential closure of graduate programs that rely on H-1B visa holders to fill faculty positions; these impacts would be especially acute across STEM fields. The new fee may stop classes from running and potentially prevent students from completing degree programs as undergraduate or graduate students because of WSU's inability to hire key faculty and post-doctoral STEM field positions. Further, the Policy may precipitate the closure of WSU Extension Centers and carries major implications for the WSU Veterinary Teaching Hospital, up to and potentially including its closure.

25. The Policy will have a significant and irreparable impact on WSU beginning in 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Electrical Engineering and Computer Science, Biological Systems and Engineering, Institute of Materials Research, Veterinary Microbiology and Pathology, Crop and Soil Sciences, Apparel,

Merchandising, Design and Textiles and a host of others, have posted vacancies with start dates in fall 2026 and are expecting to hire new candidates during the spring and summer of 2026 for those fall-start positions. WSU requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of January 2026.

KATHERINE HELLMANN
Director of International Student and Scholar Services
Washington State University

# Exhibit WA-4

**DECLARATION OF FA E-L NN ALLANT**

I, Faye-Lynn Gallant, declare as follows:

1. I am a resident of the State of Washington. I am over the age of eighteen and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by Western Washington University (WWU) as its Associate Vice President of Strategy, Management and Budget. I manage the university's budget, including the cost of faculty and staff employment visas and H-1B visas. I am ointly responsible for the development and administration of procedures and processes surrounding the immigration program for faculty and staff in con unction with the Provost, Human Resources, hiring departments and state-approved attorneys. I report to the Vice President for Business and Financial Affairs, Joyce Lopes.

3. I have been employed by WWU since January 6, 2020, and I have served as the Associate Vice President since July 16, 2025. Before my role as Associate Vice President, I served as an Assistant Vice President and Executive Director for Budget and Financial Planning. Prior to coming to WWU, I was employed by the University of Alaska.

4. I have compiled the information in the statements set forth below through personal knowledge, through university personnel who have assisted me in gathering this information from our university, and on the basis of documents that have been provided to and/or reviewed by me.

**estern ashington University and Its Hiring**

5. WWU has approximately 14,651 students and about 2,450 full- and part-time employees including faculty, staff, and graduate assistants, who study, work, and/or conduct research at its main campus and educational locations in Everett, Poulsbo, Bremerton and Port Angeles at the undergraduate, graduate, and postgraduate levels. WWU's academic programs with the largest number of students and faculty who hold H-1B visas are in computer science and engineering. In addition, there are a number of H-1B visa holders working at WWU in humanities and social sciences, business and economics, education, fine and performing arts, and student services.

6. Each year, WWU hires or rehires approximately 350 450 faculty and staff. WWU must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 14,000 students.

**Impact of the H-1B Policy on University Hiring**

7. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a 100,000 supplemental fee in con unction with any new petition for an H-1B visa (the Policy).

8. As described below, I believe that the Policy will have significant impacts on WWU and its mission to serve the greater good.

9. On September 19, 2025, President Trump issued a Proclamation,

(Proclamation), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas except for those aliens whose petitions are accompanied or supplemented by a payment of 100,000. I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

10. The Proclamation purports to address systemic abuse of the H-1B program that, according to the Proclamation, allows industries to replace, rather than supplement, American workers with lower-paid, lower-skilled labor. This description does not accurately describe WWU's hiring practices. WWU does not and has not used the H-1B visa program to hire lower-paid, lower-skilled employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees of the approximately forty H-1B visa holders currently employed by WWU, over thirty-five of those employees are faculty or post-doctoral employees holding advanced degrees.

11. The Proclamation also claims that many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers. That description does not apply to WWU twice over: WWU is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

12. The Proclamation also addresses claimed national security threat s arising from reliance on H-1B-reliant outsourcing companies that have been investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities. WWU has not and does not intend to rely on outsourcing companies in order to fill employment vacancies. To the best of my knowledge, WWU has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

13. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, WWU must complete a Labor Condition Application (LCA) for

Nonimmigrant Workers (Form ETA-9035 9035E). The LCA contains multiple requirements, including that the employer pay at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time, and provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed, among other things. 20 C.F.R. §§ 655.731 655.732.

14. WWU operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

**The Role of H-1B or ers at estern ashington University**

15. WWU relies on the H-1B visa program to fill employment vacancies. Today, WWU employs thirty-six faculty and staff who are holders of H-1B visas. WWU plans to continue to utilize the H-1B visa process, if needed, to fill vacant positions for staff and faculty.

16. In 2025, WWU submitted approximately 12 H-1B visa petitions and extensions. H-1B visa holders are mostly employed as tenured-track faculty, non-tenured track faculty, and staff.

17. Many vacant WWU faculty or post-doctoral positions particularly those in science, technology, engineering and mathematics (STEM) have highly technical and specialized requirements. For example, these positions require applicants, to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants in the world may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that WWU can consider. The result will be the frustration of WWU's ability to employ the individuals necessary to support the research activities and educational offerings it provides to over 14,000 students in the State of Washington.

18. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, WWU must compete with private universities, some of which have more expansive financial resources than does WWU, which is a public institution. WWU's inability to pay the 100,000 fee imposed by the Proclamation will further limit its ability to hire candidates for these positions.

19. H-1B holders are critical to WWU's programs. Without them, students are not getting a world class education and will lose out competitively to students that have that expertise available. Exposure to leading faculty researchers through robust undergraduate research experiences is a core aspect of a WWU education, preparing Washington students to pursue high demand careers and to continue to doctoral research of their own, which further strengthens the quality of research occurring nationally. WWU is ranked third in the U.S., second in the West, and first in the Pacific Northwest among master's-granting universities for the number of graduates who go on to earn doctoral degrees.

**Su stantial and Irrepara le Harm**

20. WWU is a public university of the state of Washington. The Policy has placed an unnecessary financial burden on WWU, limiting the university's ability to fill essential positions in high demand degree programs.

21. Western Washington University is a state funded, public institution of higher education. State appropriations are approved on a biennial basis, with annual ad ustments tuition rates are also set a year in advance and are limited by both state law and affordability pressures.

a. Funds available for faculty hiring each Fiscal Year (FY) are fixed per year one year in advance, given the standard national recruitment cycle for

faculty. For example, in FY 2024, WWU had funding allocated in its budget for 29 faculty hires, with searches authorized in FY 2023. For WWU to pay the  100,000 fee would unduly restrict the number of employees that it could onboard in any given year to continue to meet academic needs, programming, and research goals. Nor can WWU simply increase the amount of funds for hiring without depleting other necessary funding.

b. Depending on experience and specialty, new permanent faculty at WWU are typically paid a salary of approximately  75,000 plus benefits. The fee would double the costs to WWU necessary to hire new candidates requiring a H-1B visa, reducing the overall number of new hires that it could afford.

22. Assuming WWU submits a similar number of H-1B petitions this year as it did last year, the new fee would result in the need for WWU to pay approximately  200,000 in additional fees. This would double the annual costs associated with immigration cases for our institution.

23. This is a significant amount that WWU will be unable to cover without redirecting funds from other employee salary lines, reducing the number of positions available to all candidates. Reserves are not available for use as they have been significantly reduced by impacts of the pandemic on operations and enrollments, and goods and services budgets have already been reduced to historical lows.

24. The Policy will have other impacts as well, such as lowering our required qualifications standards, adversely changing availability of courses, cutting of academic programs, impacts on research, and being unable to serve student needs.

25. The Policy will have a significant and irreparable impact on WWU beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments

have posted vacancy pools and several have assistant/associate professor openings to hire new candidates by fall of 2026. WWU requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

I declare under penalty of per ury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29 day of January 2026.

FAYE-LYNN GALLANT
Associate Vice President
Western Washington University

# Exhibit WA-5

## DECLARATION OF CAREN LINCOLN

I, Caren Lincoln, declare as follows:

1. I am a resident of the State of Washington. I am over the age of eighteen, have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by Eastern Washington University (EWU) as the Senior Director of Human Resources. My team manages the processing of employment visas and H-1B visas. My job duties include providing advice and counsel to supervisors and managers relating to university policy, laws and processes relevant to assigned functions; managing the university compensation programs; facilitating personnel actions; facilitating immigration process; managing the Human Resource Services system; and supervising staff. I report to the Vice President of People and Culture.

3. I have been employed by EWU since January 27, 1983, and I have served as the Senior Director of Human Resources since September 23, 2019. Before my role as Senior Director of Human Resources, I served as the Human Resources Supervisor/Manager from 2003 to 2019 and in various other Human Resources staff roles from 1983 to 2003.

4. I have compiled the information in the statements set forth below through personal knowledge, through university personnel who have assisted me in gathering this information from our university, and on the basis of documents that have been provided to and/or reviewed by me.

**Eastern Washington University and Its Hiring**

5. EWU is a state regional comprehensive university in Washington and has approximately 10,000 students and about 1221 full and part-time employees who study, work, and/or conduct research on its campuses at the undergraduate, graduate, postgraduate, and doctoral levels. EWU's academic programs with the largest number of faculty who hold H-1B visas are in the College of Science, Technology, Engineering, and Math (STEM) and business. In addition, there are a number of H-1B visa holders working at EWU in such functions as coaching, teaching, information technology, and student support services.

6. Each year, EWU hires approximately 120 new faculty and staff. EWU must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 10,000 students.

**Impact of the H-1B Policy on University Hiring**

7. I understand that earlier this year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the Policy).

8. As described below, I believe that the Policy will have significant impacts on EWU and its mission to serve the greater good.

9. On September 19, 2025, President Trump issued a Proclamation, Restriction on Entry of Certain Nonimmigrant Workers (Proclamation), that restricts the entry of certain applicants seeking to enter the United States with H-1B visas "except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." I understand that this Proclamation provided the basis for the promulgation and implementation of the Policy.

10. The Proclamation purports to address "systemic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately

Case 1:25-cv-13829-LTS Document 45-4 Filed 02/06/26 Page 4 of 7

describe EWU's hiring practices. EWU does not and has not used the H-1B visa program to hire "lower-paid, lower-skilled" employees. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training and advanced degrees; of the approximately 15 H-1B visa holders currently employed by EWU, the majority of those employees are faculty, and the others are employees holding advanced degrees.

11. The Proclamation also claims that "many American tech companies have laid off their qualified and highly skilled American workers and simultaneously hired thousands of H-1B workers." That description does not apply to EWU twice over: EWU is not a tech company, and it does not and has not used the H-1B visa program to lay off domestic workers or replace domestic workers with international employees.

12. The Proclamation also addresses claimed "national security threat[s]" arising from reliance on "H-1B-reliant outsourcing companies" that have been "investigated . . . for engaging in visa fraud, conspiracy to launder money, conspiracy under the Racketeer Influenced and Corrupt Organizations Act, and other illicit activities." EWU has not and does not intend to rely on "outsourcing companies" in order to fill employment vacancies. To the best of my knowledge, EWU has never relied on an outsourcing company for hiring that was accused of fraud by any state or federal agency.

13. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, EWU must complete a Labor Condition Application (LCA) for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

14. EWU operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

**The Role of H-1B Workers at Eastern Washington University**

15. EWU relies on the H-1B visa program to fill employment vacancies. Today, EWU employs approximately 15 faculty and staff who are holders of H-1B visas. EWU plans to continue to rely on the H-1B visa process to fill vacant positions for staff and faculty.

16. In 2024, EWU submitted three H-1B visa petitions (including one new petition and two conversions) and in 2025, EWU submitted six H-1B visa petitions (including one renewal, three new petitions, and two conversions). H-1B visa holders are mostly employed in faculty positions in, Mathematics, Biology, Mechanical Engineering and Design. H-1B visa holders are also employed in Business, Information Technology, Management, Public Health, Athletics, Cybersecurity and Student Support areas.

17. Many vacant EWU faculty positions—particularly those in STEM—have highly technical and specialized requirements. For example, these positions require applicants, inter alia, to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials. Depending on the vacancy, only a handful of applicants may satisfy these requirements. The fee imposed by the Policy will further limit the pool of applicants that EWU can consider. The result will be the frustration of EWU's ability to employ the individuals necessary to support the research activities and educational offerings it provides to over 10,000 students in the State of Washington.

18. Given the highly specialized nature of many faculty and staff positions and the limited number of eligible candidates, many universities often vie to hire a handful of eligible applicants. In such situations, EWU must compete with private universities, some of which have more expansive financial resources than does EWU, which is a public institution. EWU's

inability to pay the $100,000 fee imposed by the Proclamation will further limit its ability to hire candidates for these positions.

19. H-1B holders are critical to EWU's programs. Without them, students are not getting a world class education and will lose out competitively to students that have that expertise available. Additionally, the inability to hire qualified faculty could lead to fewer course offerings which could increase the time to graduate for students; specialty courses may no longer be offered; class sizes could increase as fewer faculty may be hired harming the student to faculty ratio; and higher costs could be passed along to students.

**Substantial and Irreparable Harm**

20. EWU is a public university of the state of Washington. The Policy has placed an unnecessary financial burden on EWU, limiting the university's ability to sponsor international candidates.

21. Our recruitment efforts are being affected as viable candidates are being reviewed and considered but we may not be able to proceed due to their need for sponsorship. Candidates have also withdrawn from applicant pools due to the potential inability for sponsorship. Additionally, we currently employ six faculty and staff members where future H-1B sponsorship is anticipated. The potential inability to sponsor them will create a gap in our workforce and require additional recruitment efforts to fill those positions, creating a disruption in our ability to fulfill our mission as the region's polytechnic university.

22. Faculty at EWU are paid based on the Collective Bargaining Agreement with the United Faculty of Eastern. The average salary of our faculty based on the current academic year is approximately $93,000. As the fee would exceed the average salary necessary to hire new candidates requiring a H-1B visa, it would reduce the overall number of new hires EWU could afford.

23. Assuming EWU submits a similar number of H-1B petitions this year as it did

last year, the new fee would result in the need for EWU to pay approximately $300,000 in additional fees.

24. This is a significant amount that EWU will be unable to cover without redirecting funds from other sources. These costs are not planned in an already lean budget and would result in EWU not being able to hire the most qualified candidates for our positions. Additionally, there is an anticipated budgetary shortfall in Washington State which will affect the funding provided to higher education institutions potentially resulting in budgetary reductions. As a result, there would not be funds available for the new fee.

25. The Proclamation will have a significant and irreparable impact on EWU beginning in January 2026. With certain exceptions, hiring for faculty positions is cyclical. Many departments, including Computer Science and Electrical Engineering, Chemistry, Management, Psychology and Public Health have posted vacancies and are expecting to hire new candidates by August 1, 2026. EWU requires relief from the fee imposed by the Policy to ensure that it can hire for these essential positions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of January 2026.

CAREN LINCOLN
Senior Director of Human Resources
Eastern Washington University

# Exhibit WI-1

**DECLARATION OF FRANCES VAVRUS**

I, Frances Vavrus, declare as follows:

1. I am a resident of the State of Wisconsin. I am over the age of eighteen.

2. I am Vice Provost and Dean at the University of Wisconsin-Madison ("UW-Madison") in Madison, Wisconsin. I have held that position since July 31, 2023. Prior to this position, I served as Professor and Chair in the Department of Organizational Leadership, Policy, and Development at the University of Minnesota-Twin Cities, and, in the latter role, worked on the recruitment of international employees.

3. I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records provided to me by UW-Madison personnel, and could testify thereto.

4. UW-Madison maintains business records in the ordinary course of business which include, *inter alia,* records concerning hiring at UW-Madison.

5. I submit this Declaration in support of the States' Motion for Summary Judgment.

6. I am familiar with the presidential proclamation of September 19, 2025, Restriction on Entry of Certain Nonimmigrant Workers (the "Proclamation"). I understand that the Proclamation would restrict from entry into the United States any H-1B visa holder whose initial H-1B petition, filed after the date of the Proclamation, was not accompanied by a payment of $100,000. In effect, the Proclamation aims to impose a $100,000 fee on future H-1B petitions as specified in the updated USCIS guidance on October 20, 2025. I understand that last year the Department of Homeland Security issued a policy requiring employer payment of a $100,000 supplemental fee in conjunction with any new petition for an H-1B visa (the "Policy").

7. UW-Madison, the flagship institution of the University of Wisconsin System, is a public land-grant university, enrolling over 51,000 students. UW-Madison contributes to critical research and innovation in numerous fields, including all areas of medicine and the health sciences, biology, business and marketing, engineering, public health, and other fields. Such work has led to advancements like the following:

a. Developing technologies for sustainable energy through the integration of mechanical and chemical engineering, advancing renewable energy innovation, and building connections between academia and industry.

b. Researching economic theory and computer science with a focus on AI and data-driven systems in insurance and business fields.

c. Conducting research to develop and apply machine learning and AI methods for consumer insights and valuation.

8. Each year, on average, UW-Madison hires approximately 4,902 new employees (including faculty, limited, academic staff, university staff, post-degree, and graduate appointments). UW-Madison must continually hire new faculty and staff to support its academic offerings, research capabilities, and student programs to meet the academic and related needs of its over 51,000 students.

9. UW-Madison participates in the H-1B visa program by submitting petitions for such visas to employ individuals with highly specialized knowledge, training, and skill that cannot otherwise be obtained in the U.S. workforce.

10. As of January 13, 2026, UW-Madison has 369 employees in H-1B status, with 137 of them holding teaching titles (*i.e.*, professor, clinical professor, lecturer). In the 2025 calendar year, 35 UW-Madison-sponsored H-1B petitions with notification to a U.S. consulate or inspection

facility were initiated; for the calendar years 2021-2025, UW-Madison began, on average, 43 H-1B petitions with notification to a U.S. consulate or inspection facility.

11. As it has in the past, UW-Madison intends to submit H-1B petitions in the next year and in future years. But for the Proclamation, UW-Madison reasonably expects that it would submit H-1B petitions at roughly the same rate in the coming years as it has in recent years.

12. The Proclamation purports to address "systematic abuse of the [H-1B] program" that, according to the Proclamation, allows industries to "replace, rather than supplement, American workers with lower-paid, lower-skilled labor." This description does not accurately describe UW-Madison's hiring practices. To the contrary, many of our employees currently in possession of H-1B visas have highly specialized training, advanced degrees, and expertise. For example:

a. Employees in H-1B status are vital to medical research initiatives and patient care in the UW-Madison School of Medicine and Public Health (SMPH). These employees hold faculty, scientist, and researcher appointments that bring specialized expertise that enhances SMPH's ability to innovate and develop new therapies and treatments. Some employees in H-1B status at SMPH are faculty physicians, who are crucial to delivering patient care and teaching the next generation of physicians. They offer diverse perspectives and expertise that enrich our healthcare services, particularly in subspecialties where there is a shortage of qualified American practitioners. Some of them are doing award-winning longitudinal research on neurocognitive aging that integrates the study of hearing, vision, motor skills, and other functions in people from age 50 onward.

b. In the UW-Madison School of Pharmacy, employees in H-1B status are doing groundbreaking interdisciplinary research that benefits rural and urban residents. One example is the design and implementation of equitable, digitally enabled health interventions using insights from behavioral science, implementation science, and design science with the goal of ensuring that digital health innovations are effective and accessible for all.

13. In addition, the H-1B visa program already contains conditions designed to protect domestic workers which predate the Proclamation. For example, for every employee hired through the H-1B visa program, UW-Madison must complete a Labor Condition Application ("LCA") for Nonimmigrant Workers (Form ETA-9035 & 9035E). The LCA contains multiple requirements, including that the employer pay "at least the prevailing wage or the employer's actual wage, whichever is higher, and pay for nonproductive time," and "provide working conditions for nonimmigrants which will not adversely affect the working conditions of workers similarly employed," among other things. *See* 20 C.F.R. §§ 655.731 & 655.732.

14. UW-Madison operates consistently with the requirements set forth in the LCA and all applicable H-1B laws and regulations.

15. Many vacant UW-Madison faculty or post-doctoral positions—particularly those in science, technology, engineering and mathematics ("STEM")—have highly technical and specialized requirements. For example, these positions require applicants, *inter alia,* to possess advanced research capabilities, have teaching experience, have a track record of publications, and/or have the appropriate academic credentials.

16. If UW-Madison cannot provide H-1B sponsorship for employees in positions for which qualified American workers are not available, UW-Madison's research and patient care will

be severely hampered. For example, if SMPH cannot employ faculty physicians in H-1B status due to the cost-prohibition brought on by the Policy, the quality of patient care could be impacted. The absence of these international physicians could strain our ability to maintain service levels in certain departments. For instance, our division of hospital medicine relies heavily on international hospitalists to address physician shortages. The inability to access this population of talent could lead to longer waiting times for patients and limit our capacity to provide timely interventions, ultimately affecting overall patient care. While forgoing employment of individuals through the H-1B visa program would be devastating to UW-Madison's ability to further its research, teaching, and patient care missions, the same is true for continuing to submit H-1B petitions under the terms of the Policy. Based on UW-Madison's average number of 43 H-1B petitions with notification to a U.S. consulate or inspection facility beginning each year, the Policy would require UW-Madison to pay approximately $4,300,000 per year in additional fees.

17. The Policy thus places UW-Madison in a very difficult position of choosing between alternatives that are each harmful to the university's ability to conduct the work that is key to its mission. UW-Madison cannot simultaneously pay the fees for the petitions it reasonably anticipates it would submit but for the Policy and maintain its current research initiatives and other priorities. For example, UW-Madison's new research initiative known as RISE— Research Innovation and Scholarly Excellence—would be significantly compromised because a key part of the initiative is the hiring of the best researchers in the world in the areas of AI, sustainability, virology, and the health span. The inability to hire the very top scholars and scientists regardless of their country of origin will harm our efforts at producing research for the public good and preparing the next generation of scientists. It is also not feasible or sustainable for UW-Madison to use other revenue sources to fund petition fees at the anticipated level of $4,300,000. As a non-

profit institution, UW-Madison reinvests nearly all of its revenue into mission-critical activities, leaving little margin to absorb unexpected funding gaps. In other words, UW-Madison does not generate the level of surplus necessary to cover these fees without impacting core academic priorities such as educational programs and financial aid support for students.

18. Paying these fees, even if it were possible, would require reductions in key investments supporting UW-Madison's faculty, students, staff, research, and teaching infrastructure, as well as other critical activities needed to maintain UW-Madison's academic excellence. So even if UW-Madison could "cover" these new fees, it could do so only by negatively affecting other critical goals central to the institution's mission.

19. In addition to disrupting the programs from which UW-Madison would divert funds to cover the Policy's fees, the task of revamping UW-Madison's budget to account for these unanticipated fees would require significant effort due to the recent launch of a new budget model. With implementation set for FY 27, the necessity of finding more than $4 million to cover the anticipated H-1B fees would set back this important budget transformation process.

20. There would also be additional, longer-term cumulative and cascading effects, even if the Policy only remains in effect for one year. One of these effects is that these highly- skilled doctors, scientists, and scholars will go to other countries, and we will lose the opportunity to benefit from their human capital in making medical breakthroughs, research innovations, and academic advancements. Moreover, it can take more than one year to get a research laboratory ready for a new faculty member, and we must be able to plan several years in advance for new hires to get the space and equipment necessary for their work. Even a one-year fee imposition would significantly set back the research enterprise at UW-Madison.

21. Disruptions to UW-Madison's research will also have negative effects in the Madison area, the state of Wisconsin, and the broader region. Some employees in H-1B status conduct research that directly contributes to the Wisconsin Idea, namely, that research conducted on our campus ought to benefit the lives of the state's residents. Those whose research increases dairy production, improves medical care, advances entrepreneurship in the state's corporate sector, and enriches K-12 education help to stimulate the Wisconsin economy and improve the health and wellbeing of the population. The opportunity cost from ceasing H-1B sponsorship for potential employees is great, and our state and nation will be paying the price for years to come should UW-Madison have to make the difficult choice of not submitting H-1B petitions owing to the prohibitive cost for our public institution.

22. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of ~~January,~~ February 2026, in Madison, Wisconsin

/s/ Frances Vavrus

Frances Vavrus
Vice Provost and Dean
University of Wisconsin-Madison
Office of the Provost, Bascom Hall
500 Lincoln Drive
Madison, WI 53706

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*, *et al.*,<br><br>Defendants. | [JUDGE NAME]<br><br>No. 1:25-cv-13829-LTS |

**DECLARATION OF JEFFREY ALDERETTE**

I, Jeffrey Alderette, declare and state as follows:

1. I am an attorney with the United States Department of Justice.

2. I make this declaration in support of Defendants' opposition to Plaintiffs' motion for summary judgment and cross-motion for summary judgment in the above-captioned case.

3. Attached as **Exhibit 1** is a true and correct printout of a screenshot of the webpage located at https://travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-nonimmigrant-workers.html as of February 25, 2026.

4. Attached as **Exhibit 2** is a true and correct copy of the Plaintiffs' Complaint in *Chamber of Commerce of the United States of America et al. v. U.S. Department of Homeland Security*, *et al.*, 25-cv-3675 (D.D.C.).

5. Attached as **Exhibit 3** is a true and correct copy of the Association of American Universities membership list, downloaded from its website: https://www.aau.edu/who-we-are/our-members/aau-member-universities-year-entry.

6. Attached as **Exhibit 4** is a true and correct copy of the Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2) in *Global Nurse Force*, *et al. v. Donald J. Trump*, *et al.*, 4:25-cv-08454-HSG (N.D. Cal. 2025).

7. Attached as **Exhibit 5** is a true and correct copy of the Plaintiffs' Complaint in *Global Nurse Force*, *et al. v. Donald J. Trump*, *et al.*, 4:25-cv-08454-HSG (N.D. Cal. 2025).

8. Attached as **Exhibit 6** is a true and correct copy of the declaration of Cara M. Selby, Acting Associate Director of USCIS Service Center Operations, dated March 4, 2026.

9. Attached as **Exhibit 7** is a true and correct copy of the declaration of Jerome Jackson, Branch Manager of the Budget Reporting Branch in the Central Accounting and Reporting Division at the Department of the Treasury's Bureau of the Fiscal Services, dated December 1, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of March, 2026.

JEFFREY ALDERETTE Digitally signed by JEFFREY ALDERETTE Date: 2026.03.09 16:14:04 -04'00'

/s/ Jeffrey Alderette
Jeffrey Alderette
Trial Attorney
U.S. Department of Justice
Civil Division

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Ex. 1 | A screenshot of the webpage located at https://travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-nonimmigrant-workers.html as of February 25, 2026. |
| Ex. 2 | Plaintiffs' Complaint in *Chamber of Commerce of the United States of America et al. v. U.S. Department of Homeland Security*, *et al.*, 25-cv-3675 (D.D.C.). |
| Ex. 3 | The Association of American Universities membership list, downloaded from its website: https://www.aau.edu/who-we-are/our-members/aau-member-universities-year-entry. |
| Ex. 4 | Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2) in *Global Nurse Force*, *et al. v. Donald J. Trump*, *et al.*, 4:25-cv-08454-HSG (N.D. Cal. 2025). |
| Ex. 5 | Plaintiffs' Complaint in *Global Nurse Force*, *et al. v. Donald J. Trump*, *et al.*, 4:25-cv-08454-HSG (N.D. Cal. 2025). |
| Ex. 6 | Declaration of Cara M. Selby, Acting Associate Director of USCIS Service Center Operations, dated March 4, 2026. |
| Ex. 7 | Declaration of Jerome Jackson, Branch Manager of the Budget Reporting Branch in the Central Accounting and Reporting Division at the Department of the Treasury's Bureau of the Fiscal Services, dated December 1, 2025. |

Case 1:25-cv-13829-LTS Document 93-3 Filed 03/09/26 Page 1 of 2

# Exhibit 1

travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-nonimmigrant-workers.html

Lexis+® | Legal Res... Westlaw Edge Case Information M... Public Access to Co... Employee Personal...

Special Issuance Agency | U.S. Passports | International Travel | U.S. Visas | Intercountry Adoption | International Parental Child Abduction | Replace or Certify Documents

Travel.State.Gov Newsroom | U.S. Passports News | International Travel News | U.S. Visas News | Intercountry Adoption News and Notices

Travel.State.Gov > U.S. Visas News > Restriction on Entry of Certain Nonimmigrant Workers

Share this page:

# Restriction on Entry of Certain Nonimmigrant Workers

Last Updated: September 21, 2025

Presidential Proclamation (PP) *Restriction on Entry of Certain Nonimmigrant Workers*↗, issued on September 19, 2025, restricts the entry of aliens into the United States as H-1B nonimmigrants if they are seeking to perform services in a specialty occupation. This restricts the issuance of H-1B visas, except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services (USCIS) are accompanied or supplemented by a payment of $100,000. **The Proclamation's restrictions on visa issuance and entry apply only to aliens seeking visa issuance or entry into the United States based on H-1B petitions filed with USCIS after the Proclamation's effective date of September 21, 2025, at 12:01 a.m. Eastern Daylight Time (EDT).**

No visas have been revoked pursuant to the Proclamation. All exceptions to this Proclamation will be determined by the Department of Homeland Security as set forth in the Proclamation.

The full text of the proclamation is available here: https://www.whitehouse.gov/presidential-actions/2025/09/restriction-on-entry-of-certain-nonimmigrant-workers/↗

**White House Fact Sheet:** https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-suspends-the-entry-of-certain-alien-nonimmigrant-workers/↗

**H-1B FAQs on state.gov:** https://www.state.gov/h-1b-faq/

Suspension of Visa Issuance to Foreign Nationals to Protect the Security of the United States

Countries Subject to Visa Bonds

Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance

Diversity Visa Issuance Updated Guidance

Adjudicating Immigrant Visa (IV) Applicants in Their Country of Residence

Adjudicating Nonimmigrant Visa (NIV) Applicants in Their Country of Residence

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br>1615 H Street, NW<br>Washington, D.C. 20062-2000,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br>2707 Martin Luther King Jr. Avenue, SE<br>Washington, D.C. 20528;<br><br>UNITED STATES DEPARTMENT OF STATE<br>2201 C Street, NW<br>Washington, D.C. 20520;<br><br>KRISTI L. NOEM, in her official capacity as Secretary of Homeland Security<br>2707 Martin Luther King Jr. Avenue, SE<br>Washington, D.C. 20528;<br><br>MARCO A. RUBIO, in his official capacity as Secretary of State<br>2201 C Street, NW<br>Washington, D.C. 20520,<br><br>Defendants. | Case No. 25-cv-3675 |

**COMPLAINT**

Plaintiff the Chamber of Commerce of the United States of America brings this action for declaratory and injunctive relief and alleges as follows:

## INTRODUCTION

1. The United States is unique in its ability to attract the brightest talent from across the globe. For more than 70 years, what is now known as the H-1B visa program has enabled the United States to harness this magnetic draw. Tens of thousands of highly skilled people in specialized fields boost the American economy each year after obtaining H-1B status. These workers allow businesses of all sizes, in industries across the economy, to innovate and grow. The resulting innovations lead to more American jobs, higher wages, and new products and services that improve the quality of life for all Americans.

2. The H-1B program is a creature of statute, which Congress has meticulously maintained and modified over decades. The goal, from the start, has been to maximize the benefits of the program for the American people while also ensuring that American workers do not face a competitive disadvantage in the national workforce. That is, Congress has focused on making this program available to employers seeking workers with specialized skills not available in the United States while preventing H-1B abuse and the displacement of American workers. To that end, it has struck an intricate, thoughtful balance by specifying how fees for the program should be calculated, how many visas may be issued annually, and what requirements the executive branch should enforce to ensure that H-1B workers do not displace American workers or undercut wages.

3. The presidential proclamation at issue in this action, *Restriction on Entry of Certain Nonimmigrant Workers* (Sept. 19, 2025) (the Proclamation), upends that carefully crafted congressional balance. The centerpiece of the Proclamation is the imposition of a $100,000 fee on all new petitions filed by United States employers intending to hire foreign workers through the H-1B program. By comparison, prior to the Proclamation, most H-1B petitions cost less than $3,600.

4. If implemented, that fee would inflict significant harm on American businesses, which would be forced to either dramatically increase their labor costs or hire fewer highly skilled employees for whom domestic replacements are not readily available. While Congress made the

program generally available for domestic employers, this new fee would make it no longer economically viable for many, primarily smaller businesses. Indeed, a fee of $100,000 would significantly reduce participation in the program, resulting in fewer employers being able to access the highly skilled workers they need to continue to innovate and create American jobs.

5. These harms to American businesses will also be a boon to America's economic rivals, who will surely welcome the talent no longer able to accept work in the United States. That is a competitive edge that foreign employers might never cede back.

6. The Proclamation is not only misguided policy; it is plainly unlawful. The President has significant authority over the entry of noncitizens into the United States, but that authority is bounded by statute and cannot directly contradict laws passed by Congress.

7. The Proclamation does precisely that: It blatantly contravenes the fees Congress has set for the H-1B program and countermands Congress's judgment that the program should provide a pathway for up to 85,000 people annually to contribute their talents to the United States for the betterment of American society. As fully set forth herein, other problems abound.

8. Because the Proclamation exceeds the President's lawful authority, it must be enjoined as to Plaintiff and its members, and any implementing agency action must be held unlawful and set aside.

## PARTIES

9. Plaintiff the Chamber of Commerce of the United States of America (the U.S. Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the U.S. Chamber is to represent the interests of its members before Congress, the executive branch, and the courts. To that end, the U.S. Chamber regularly litigates on

behalf of its members in federal court. The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

10. Defendant the United States Department of Homeland Security is the federal department with substantial responsibility for immigration policy and enforcement. The Proclamation charges the Department of Homeland Security with certain aspects of its implementation. The Department of Homeland Security is integral to execution of the Proclamation's imposition of a $100,000 fee on new H-1B visas. The Department of Homeland Security is headquartered in Washington, D.C.

11. Defendant the United States Department of State is the federal department charged with conducting foreign relations, including by issuing visas to noncitizens. The Proclamation charges the Department of State with certain aspects of its implementation. The Department of State is integral to execution of the Proclamation's imposition of a $100,000 fee on new H-1B visas. The Department of State is headquartered in Washington, D.C.

12. Defendant Kristi L. Noem is the Secretary of Homeland Security. She is sued in her official capacity.

13. Defendant Marco A. Rubio is the Secretary of State. He is sued in his official capacity.

**JURISDICTION AND VENUE**

14. Plaintiffs bring this suit under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq., the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., and this Court's inherent equitable power.

15. It is within this Court's inherent equitable power to enjoin actions by federal officers in excess of their lawful authority, including when acting pursuant to a presidential directive. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("We think it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit

seeking to enjoin the officers who attempt to enforce the President's directive.'") (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part)); *id.* ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands.") (quotation marks omitted); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

16. This Court has jurisdiction under 28 U.S.C. § 1331, as this case arises under the laws of the United States.

17. Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(e)(1)(A)-(C) because this action seeks relief against federal agencies and officials acting in their official capacities, at least one defendant is located in this district, a substantial part of the events giving rise to the claim occurred in this district, and plaintiff resides in this district and no real property is involved.

18. The U.S. Chamber has standing to bring this action under the doctrine of associational standing. *See, e.g., Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 333 (1977). Many of the U.S. Chamber's members of all sizes, and across a wide spectrum of economic sectors, use the H-1B program. They count H-1B visa holders among their valued employees, and plan to continue sponsoring future hires for visas through the H-1B process, including in the next annual H-1B visa lottery, which will occur in March 2026 and therefore is encompassed within the Proclamation's effective period. U.S. Chamber members use the H-1B program to access employees with specialized, often technical skills that are in high demand—and therefore in short supply—domestically.

19. The imposition of a new $100,000 fee to continue using that program is thus a concrete harm suffered by the numerous U.S. Chamber members who participate in the program. Some members are unable to pay that fee and therefore must either reduce or entirely forgo their planned entries into the March 2026 lottery—thereby giving up the benefits of the program in terms of access to specialized talent and likely leaving difficult-to-fill positions empty. That creates ripple effects across the business, including forgone opportunities and loss of competitiveness.

Other members who find a way to pay a $100,000 per-employee fee will be harmed too, incurring the "classic pocketbook injury" (*Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023)) of paying money to the government. And paying the fee will require members to divert resources and decrease investments in other areas.

20. Either way, the U.S. Chamber's members who intend to sponsor H-1B employees this year are the object of the Proclamation's $100,000 fee requirement—as they are the parties now required to pay the fee—and therefore would have standing to sue in their own right. *See, e.g.*, *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. __, 145 S. Ct. 2121, 2134 (2025) ("[I]f a plaintiff is 'an object of the action (or forgone action) at issue,' then 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-562 (1992))).

21. This action is also germane to the U.S. Chamber's purpose of representing the interests of American business in court. *Hunt*, 432 U.S. at 333; *see also, e.g.*, *Healthy Gulf v. U.S. Dep't of Interior*, _ F.4th __, 2025 WL 2486119, at *5 (D.C. Cir. Aug. 29, 2025) ("Germaneness requires 'pertinence between litigation subject and organizational purpose.'") (indirectly quoting *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)); *Hodel*, 840 F.2d at 58 (germaneness requirement is "undemanding").

22. The U.S. Chamber frequently represents members in both advocating business-friendly policies and challenging executive actions that will negatively affect business, including agency action that imposes unreasonable costs on doing business or that impedes a company's ability to hire well-qualified employees, innovate, and create jobs. The U.S. Chamber, through its Litigation Center, "fights for business at every level of the U.S. judicial system, on virtually every issue affecting business." *Chamber Litigation Center*, U.S. Chamber of Commerce (2025), https://perma.cc/WH3T-JXRP. And the supply of highly qualified labor is one of the fundamental

inputs to any business; ensuring that supply is therefore well within the U.S. Chamber's advocacy mission. *See generally* U.S. Chamber of Commerce, *Topics: Immigration* (describing the U.S. Chamber's efforts in advocating for immigration policies that allow businesses to flourish), https://perma.cc/S4TA-3ZJD; U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative* (describing the Chamber's major initiative to address the "worker shortage crisis" by "helping employers across the country develop and discover talent," including through the "related topic[]" of "immigration"), https://perma.cc/EG35-52F9.

23. Thus, for example, the U.S. Chamber has brought several successful lawsuits (along with other business associations) on behalf of its members, challenging executive action that threatened to undermine the H-1B program. *See generally Chamber of Com. of the U.S. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-7331 (N.D. Cal. 2020); *Nat'l Assoc. of Mfrs. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-4887 (N.D. Cal. 2020). And the U.S. Chamber regularly participates in the notice-and-comment process when DHS or other agencies conduct rulemaking relating to business-relevant immigration policies in general, and to the H-1B program in particular. *See, e.g.*, U.S. Chamber of Commerce, Comment on *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers* (Dec. 22, 2023), https://perma.cc/FK9V-9RT2; U.S. Chamber of Commerce, Comment on *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media* (Sept. 26, 2025), https://perma.cc/B2RV-EUA2.

24. Finally, the participation of the U.S. Chamber's individual members is unnecessary, as this action seeks only declaratory, injunctive, and vacatur relief. *See, e.g., United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members" as opposed to "an action for damages to an association's members.") (quoting *Hunt* 432 U.S.

at 343); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025) ("[T]he purely injunctive and declaratory relief sought by the Center does not require the participation of individual members either to litigate or to remediate the claim.") (citation omitted).

## FACTUAL ALLEGATIONS

### A. Legal background.

#### *1. The H-1B Program.*

25. The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 et seq. Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

26. First enacted in 1952, what is today known as the H-1B visa program makes available a nonimmigrant visa for a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). A "specialty occupation" is one that requires "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)." *Id.* § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii).

27. The process of applying for an H-1B visa is governed by 8 U.S.C. § 1184 and related regulations.

28. The INA provides that the "importing employer" must submit a petition for a nonimmigrant visa "in such form and contain[ing] such information as the [Secretary of Homeland Security] shall prescribe." 8 U.S.C. § 1184(c)(1).

29. An employer must also complete the labor condition application process. The employer must certify to the Department of Labor that (among other things) the company will pay its H-1B employee, at a minimum, the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i); *see generally* 20 C.F.R. part 655 (DOL regulations governing labor condition application process).

30. The "prevailing wage" is calculated by assessing the "skill level" of the proposed H-1B worker and corresponding wages for workers in the occupation and location in which the employer is seeking to employ the H-1B worker, based on statistics compiled by the Bureau of Labor Statistics. *See Strengthening Wage Protections for the Temporary and Permanent Employment of Certain Aliens in the United States*, 85 Fed. Reg. 63,872, 63,875-63,876 (Oct. 8, 2020); *see* also 8 U.S.C. § 1182(p)(4).

31. Since 1990, Congress has maintained a cap on the total number of available H-1B visas that may be issued each year. Presently (with some exemptions),[1] the statutory cap allows 65,000 noncitizens to obtain H-1B nonimmigrant status per year, with an additional 20,000 visas per year available to individuals with an advanced degree from a U.S. higher education institution. *See* 8 U.S.C. § 1184(g).

32. Because demand for H-1B visas far outstrips the number of visas available—for fiscal year 2026, more than 336,153 people registered against a cap of 85,000—the United States Citizenship and Immigration Services (USCIS) traditionally has implemented a lottery system to

---

[1] Universities and their affiliated nonprofit entities (such as university health systems) and nonprofit and government research organizations are exempt from the numerical cap, and may submit H-1B petitions outside of the lottery procedure discussed below. *See* 8 U.S.C. § 1184(g)(5)(A), (B).

determine which petitions would be processed. If the number of H-1B petitions filed exceeded the numerical quota for that year in the first five business days of the designated petition submission window, USCIS would select randomly among all petitions filed on those first five days. *See* 8 C.F.R. § 214.2(h)(8)(ii)(B) (prior to Apr. 1, 2019).

33. In 2019, USCIS implemented a "registration" system that requires a U.S. employer to register electronically for each person for whom they intend to file an H-1B petition. 8 C.F.R. § 214.2(h)(8)(iii)(A)(1). If USCIS receives more registrations than the number of available visas, the agency runs a lottery among the registrations to determine who can file an H-1B petition. After USCIS notifies an employer that its registration has been selected, the employer has 90 days to file its H-1B petition.

34. The lottery occurs every March. The next lottery to follow the implementation of the Proclamation will occur in March 2026.

35. The fees associated with H-1B petitions are set by USCIS through notice-and-comment rulemaking and are governed by statutory provisions. Relevant statutory provisions include 8 U.S.C. § 1356(m), which says that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." Presently, fees that USCIS has assessed under its Section 1356(m) authority include a registration fee to enter the H-1B lottery (8 C.F.R. § 106.2(c)(11)), a filing fee for the form (I-129) used to submit an H-1B petition (*id.* § 106.2(a)(3)), and an asylum program fee (*id.* § 106.2(c)(13)). Depending on the size of the employer, these fees can add up to as much as $1,595.

36. In addition to the fees set by USCIS through notice-and-comment rulemaking pursuant to 8 U.S.C. § 1356(m), Congress has also set multiple specific fees for H-1B petitions by

statute, including a $1,500 fee for most employers to file the petition (8 U.S.C. § 1184(c)(9)(A)-(C)) and an additional $500 fee to fund fraud prevention measures (*id.* § 1184(c)(12)(A)-(C)).

37. Additionally, in 2010, Congress imposed by statute an additional fee of $2,000 on certain H-1B petitions. Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010). The fee was increased to $4,000 in 2015. Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 40101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411).[2] Employers covered by this fee are those that employ more than 50 workers in the United States, and more than half of whose U.S. workforce is composed of H-1B or L-1 employees (a visa category used for intracompany transferees). *Id.*

38. Congress also has provided for "premium processing" fees for immigration services—currently $2,805 for H-1B petitions—under which sponsoring employers can have petitions processed within a shorter timeframe. 8 U.S. § 1356(u)(3); *See USCIS Fee Schedule* (Aug. 29, 2025) at 32, https://perma.cc/U7D4-5VS9.

39. Prior to the Proclamation, the total fees associated with filing an H-1B petition, including both USCIS-set fees and statutory fees, generally amounted to approximately $3,600 (excluding the optional premium processing fee and the additional $4,000 fee for H-1B-reliant employers). *See USCIS Fee Schedule*, *supra*, at 6, 39-40.

40. After USCIS approves an H-1B petition, if an applicant is outside the United States, he or she must apply for an H-1B visa at a U.S. embassy or consulate abroad before traveling to the United States. If granted, an H-1B visa is good for three years and is eligible for one extension of the same duration. *See* U.S.C. § 1184(g)(4); 8 C.F.R. § 214.2(h)(13)(iii)(A).

---

2 This $4,000 additional fee was initially set to sunset in 2025, but Congress later extended the sunset date until September 30, 2027. *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 30203(b), 132 Stat. 64, 126.

41. Congress has carefully calibrated the H-1B visa system to the needs of the domestic economy. For example, as noted, the law contains labor protections designed to ensure that H-1B visas do not become a vehicle for displacing well-qualified Americans.

42. Before hiring a noncitizen through the H-1B program, a company must make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. § 1182(n)(1)(A)-(D). An employer must attest, among other things, that the position pays prevailing wages, that the position will not adversely affect other workers, and that the employer has provided to existing employees certain forms of notice regarding the petition, including by physical posting. These certification requirements are backed up by monetary fines and bans on further visa applications. 8 U.S.C. § 1182(n)(2)(C).

43. Employers with a history of willful certification violations or a large percentage of workers already on H-1B visas must additionally certify that the company has tried and failed to fill the position with a domestic worker, and that it has not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A); *see also* 20 C.F.R. § 655.736.

44. For example, an employer with 51 or more U.S. employees must make these additional certifications—that U.S. workers were not available to fill the position and that it has not and will not displace U.S. workers in a 6-month period—if 15 percent or more of its employees are in H-1B status. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A)(iii).

45. Since 1990, the law also has imposed an annual cap on the total number of new H-1B visas that can be issued each year, to prevent the American workforce from being overwhelmed with highly competitive noncitizen workers. *See* 8 U.S.C. § 1184(g).

46. At the same time, Congress has been attuned to "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found and the need for other workers to meet specific labor shortages." H.R.

Rep. 101-723, pt. 1, at 41 (Sept. 19, 1990). It enacted the modern H-1B statute based on the conviction "that immigration can and should be incorporated into an overall strategy that promotes the creation of the type of workforce needed in an increasingly competitive global economy without adversely impacting on the wages and working conditions of American workers." *Id.*

47. In other words, the relevant statutory provisions struck an intentional balance between the hiring needs of businesses and protections for American workers. Indeed, the government itself has recognized that "the broad intent of the Act is clear. . . . [It] seeks to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers." *Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706- 11,707 (Mar. 20, 1991).

48. Congress's repeated statutory amendments adjusting the H-1B program—without changing its essential nature—reaffirm this fundamental principle.

49. In making one such statutory adjustment—instituting a temporary increase in the cap on H-1B visas—the Senate Report accompanying the American Competitiveness in the Twenty-First Century Act expressly noted that H-1B visas are essential to growing the number of American jobs:

> Critics of H-1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H-1B ceiling is what will deprive Americans of jobs. This is because artificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs Many of the concerns about H-1B visas revolve around the fear that individuals entering on H-1B visas will ''take'' a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.]

S. Rep. 106-260, at 11-12 (Apr. 11, 2000).

50. In 2004, Congress specifically addressed appropriate limitations on the H-1B visa category via the H-1B Visa Reform Act of 2004. 118 Stat. 2809, 3353-61 §§ 421-430. This Act, among other things, revised prevailing wage requirements, adjusted the number of visas available by adding a set-aside for individuals completing U.S. graduate degrees, and otherwise calibrated the program to meet the needs of the domestic economy.

51. Most recently, as noted, Congress in 2010 and again in 2015 responded to the potential for H-1B visa abuse by imposing a temporary surcharge fee of $4,000 on certain employers with a high proportion of H-1B visa holders as employees. Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010); Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015).

52. These recent and ongoing congressionally enacted adjustments to the program reflect Congress's active and engaged decisionmaking about how the program is designed and ought to operate, as well as Congress's reaffirmation of the program's fundamental goals and purpose.

*2. The President's authority under the INA.*

53. Congress, in the INA, provided the President certain authority. Under Section 212(f) of the INA:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

54. And Section 215(a) of the INA provides that it is unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policymaking authority stemming from this provision "substantially overlap[s]" with the President's authority under Section 212(f). *Trump v. Hawaii*, 85 U.S. 667, 693 n.1 (2018).

**B. Factual Background.**

*1. Importance of H-1B workers.*

55. H-1B visas are critical to the success and growth of American businesses.

56. It is estimated that as many as 730,000 H-1B visa holders currently work in specialized fields across the American economy. These workers contribute enormously to American productivity, prosperity, and innovation.

57. Meanwhile, the United States suffers from a well-documented labor shortage. As recent research by the U.S. Chamber has shown, "[n]early every state is facing an unprecedented challenge finding workers to fill open jobs." *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (Dec. 13, 2024), https://perma.cc/ZMJ6-BNF5. In the most-affected states, for example, the number of job openings is more than double the number of unemployed workers. *Id.*; *see also, e.g.,* Arturo Castellanos Canales, *America's Labor Shortage: How Low Immigration Levels Accentuated the Problem and How Immigration Can Fix It*, National Immigration Forum (February 28, 2022), https://perma.cc/B9UA-KA3M.

58. The skilled labor shortage is even more acute in certain industries. For example, the United States faces a serious shortage of doctors: One report estimated that the United States will face a shortage of between 54,100 and 139,000 physicians by 2033. *See* Association of American Medical Colleges, *The Complexities of Physician Supply and Demand: Projections From 2018 to 2033* (June 2020), https://perma.cc/36P9-PS2R). The H-1B program helps fill that gap. *See, e.g.,* Peter A. Kahn & Tova M. Gardin*, Distribution of Physicians With H-1B Visas By State and Sponsoring Employer,* JAMA: The Journal of the American Medical Association (June 6, 2017) (noting that there are roughly 10,000 H-1B approvals annually for physicians), https://perma.cc/3FN5-FLE9.

59. Individuals entering the United States via H-1B visas also are integral to the landscape of higher education. In 2020, more than 28,000 H-1B-related labor condition applications

were filed for higher education, confirming the central importance of these programs. Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), https://perma.cc/SMW4-UUJT; *see* ¶¶ 29-30, *supra* (describing labor condition application process).

60. American firms, particularly in manufacturing and certain STEM (science, technology, engineering, and mathematics) fields, also face a shortage of domestic workers qualified and available to fill the roles needed for the companies to perform. For example, in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them." New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017), https://perma.cc/4BZR-ED9S.[3]

61. And "having the workers to fill such jobs" through nonimmigrant visa programs like H-1B "allows American employers to continue basing individual operations or offices in the United States, a move that creates jobs at all levels—from the engineers and computer programmers based in American offices to the secretaries, HR staff, and mailroom employees that support them." Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* 1-2 (2015), https://perma.cc/C6T2-6TKZ.

62. One comprehensive study evaluating the productivity impacts from H-1B visas in 219 American cities showed that an increased number of H-1B visa holders in a city resulted in

[3] *See also, e.g.*, Deloitte & The Manufacturing Institute, *The jobs are here, but where are the people?: Key findings from the 2018 Deloitte and The Manufacturing Institute skills gap and future of work study* 2 (2018) ("[R]esearch reveals an unprecedented majority (89 percent) of executives agree there is a talent shortage in the US manufacturing sector."), https://perma.cc/W2ND-RRLB; *id.* at 3 fig. 2 ("[The p]ersistent skills shortage could risk US$2.5 trillion [in] economic output over the next decade.").

productivity gains. Specifically, "foreign STEM growth explained between one-third and one-half of the average [Total Factor Productivity] growth during the period" between 1990 to 2010. Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Citie*s, Journal of Labor Economics (July 2015), https://perma.cc/N4GV-YJJ6.

63. Those productivity gains translate into jobs created. A recent study demonstrated that, at the individual firm level, each H-1B lottery win resulted not just in increased noncitizen employment, but a corresponding increase in native-born employment at the lottery-winning firm as well. Parag Mahajan et al., *The Impact of Immigration on Firms and Workers: Insights from the H-1B Lottery* 25 (May 2025) ("H-1B hires seem to crowd-in other workers, such as non-college workers of all nativities, as lottery-winning firms *expand* their usage of workers outside of the immigrant college group."), https://perma.cc/F9AE-BEJC.

64. H-1B visa petitions are associated with higher rates of new product innovation. Gaurav Khanna & Munseob Lee, *High-Skill Immigration, Innovation, and Creative Destruction*, Nat'l Bureau of Economic Research (2018), perma.cc/QE87-KDAC. Across the country, H-1B workers "directly increase the production of knowledge through patents, innovation, and entrepreneurship." Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020), https://perma.cc/SMW4-UUJT.

65. That innovation is a boon to the American economy, and ultimately American workers. One 2019 study found that between 2000 and 2015, the foreign-born share of STEM professionals in the United States—many of them attributable to the H-1B program—created an estimated benefit of $103 billion for American workers, largely due to the development of new technologies that increase the productivity and wages of U.S.-born workers. Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), https://perma.cc/U39W-P2SZ.

66. As a result, the H-1B program has empowered tremendous growth and value creation in American firms. Indeed, a 2025 analysis of H-1B data from 2008 to 2020 showed that "H-1B workers contribute to firm value creation" through forces including "innovation" and "enhancing operational efficiency." Jiang, et al., *Skilled Foreign Labor, Urban Agglomeration, and Value Creation*, working paper at 22 (February, 19, 2025), https://perma.cc/9VWK-592B. Accordingly, after 12 years, "the nominal value of a dollar invested in [firms with high H-1B applications]" had grown by 1000%, three times the value created by firms with no H-1B applications. *Id.*

67. The H-1B program is vital to the success of American manufacturing—the largest workforce sector in the United States. A 2021 analysis focusing on the manufacturing industry concluded that the H-1B program, by promoting a "qualified educated labor force," is critical for the manufacturing sector to "be competitive on the global stage." Eron Gjoci, *Empirical evidence against U.S. H1-B visa restrictions, the case of employment in the manufacturing industry*, working paper at 21 (Nov. 16, 2021), https://perma.cc/7356-6W44.

68. Relatedly, research shows that "participation of foreign-born workers in the American labor market has a positive effect on American trade with foreign nations." Nadia Almasalkhi, *High-Skilled Immigration Workers Benefit American Industry, But U.S. Policies Threaten Them*, Berkely Interdisciplinary Migration Initiative 1 (September 11, 2023) https://perma.cc/RUY2-GER6. That is attributable to, among other factors, the "language skills, cultural competency, and transnational personal networks of foreign-born high skilled workers," which are a "boon for businesses operating in fast-moving and competitive industries like technology," as well as the ability of high-skilled foreign-born workers to "facilitate the international flow of knowledge." *Id.*

69. Research shows that at least three factors explain the link between robust high-skilled immigration and economic growth—*first*, individuals likely to be hired under an H-1B visa have an overabundance of entrepreneurship and innovative talent; *second*, high-skilled temporary workers tend to focus in "quantitative skills and STEM fields," which are specialties that fuel

growth; and *third*, high-skilled temporary workers are often instrumental in the creation of new technologies. Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy*, U.C. Davis Global Migration Center Policy Brief 2 (July 2020), https://perma.cc/3B6B-25YU.

70. For precisely these reasons, many of the U.S. Chamber's members rely on the H-1B program and have benefited enormously from the program in ways that have allowed those companies to create better well-paying jobs for American workers.

*2. The Proclamation.*

71. The President issued the Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, on September 19, 2025.

72. The preamble of the Proclamation cites an alleged "large-scale replacement of American workers through systemic abuse of the [H-1B] program." It alleges that certain employers "have abused the H-1B statute and its regulations to artificially suppress wages resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields."

73. The Proclamation points to a doubling of "foreign STEM workers," the "key facilitator" of which, it claims, has been "abuse of the H-1B visa." In particular, the Proclamation accuses "Information Technology (IT) firms" of "manipulat[ing] the H-1B system, significantly harming American workers in computer-related fields."

74. Citing rising unemployment rates of IT workers overall, the Proclamation asserts that H-1B visas "are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States." Instead, the Proclamation charges H-1B employers with "undercut[ting] the integrity of the program" to the "detriment[] [of] American workers' wages and labor opportunities," "prevent[ing] American employers in other industries from utilizing the

H-1B program in the manner in which it was intended," and creating "a national security threat" by encouraging fraud and discouraging Americans from pursuing STEM careers.

75. The preamble concludes that it is "therefore necessary to impose higher costs on companies seeking to use the H-1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers."

76. Section 1(a) of the Proclamation, citing Sections 212(f) and 215(a) of the INA, states that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under [the H-1B program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000," subject to certain exceptions.

77. Section 1(b) states that "[t]he Secretary of Homeland Security shall restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty occupation workers," and further directs the Secretary to "issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026."

78. Section 1(c) states that the $100,000 fee requirement "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States."

79. Section 2(b) of the Proclamation requires the Secretary of State to "verify receipt" of the $100,000 fee and "approve only those visa petitions for which the filing employer has made the payment."

80. Section 2(c) states that "[t]he Department of Homeland Security and the Department of State shall coordinate to take all necessary and appropriate action to implement this

proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation."

81. The effective date of the Proclamation was September 21, 2025, and it expires 12 months thereafter. Within 30 days of the upcoming March 2026 H-1B lottery, however, Section 3(b) of the Proclamation directs the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security to jointly submit to the President a recommendation on whether to extend the $100,000 fee.

*3. The Proclamation's devastating effect on businesses using the H-1B program.*

82. Moments after the announcement of the Proclamation, panic rippled through the United States economy. With the Proclamation set to take effect days later, H-1B visa-holders traveling abroad scrambled to make emergency trips back to the United States for fear of losing their legal status. Companies employing H-1B workers sought to understand the far-ranging implications for their present and future workforces.

83. Though the White House eventually clarified that the Proclamation's imposition of a $100,000 fee applies only to future petitions for *new* H-1B visas, and thus does not affect current visa-holders or petitions for H-1B renewal, the thunderbolt of the Proclamation had already had its effect: The American business community was on notice that soon one of the best tools at its disposal for recruiting high-skilled workers when American workers are not readily available would be prohibitively expensive.

84. For many members of the U.S. Chamber, the Proclamation will have far-reaching effects.

85. American businesses use programs like the H-1B program because the domestic supply of highly skilled workers is not large enough to keep apace with the demands of innovation. Certainly, the United States is home to many high-skilled workers. But it is also home to much of

the world's innovation and knowledge generation. And as a result, the domestic supply of high-skilled workers is frequently insufficient to meet employers' needs. *See, e.g.*, ¶ 60 & n.3, *supra*.

86. U.S.-based employers turn to the H-1B visa to make up the difference.

87. With prohibitive limitations on such workers, employers in STEM-focused industries will be hit especially hard. Many of the largest tech companies in the United States currently have thousands of H-1B employees and hire new employees through the program each year. Meanwhile, highly innovative start-ups and small businesses are particularly reliant on the program and will be especially hard-pressed to afford a $100,000 fee.

88. In an interview after the Proclamation's announcement, one Silicon Valley-based tech startup founder offered this somber assessment:

> It diminishes our innovative capacity in the United States. It tells other brilliant people around the world that we are not open for innovation.
>
> I can say that as long as this is in place, we're not going to be able to afford to do it anymore. It's a catastrophe. This additional fee is a non-starter for start-ups and small- and medium-sized businesses.

*Bay Area Tech Leaders Warn New $100,000 H-1B Visa Fee Could Impact Innovation,* KPIX (Sept. 21, 2025) https://perma.cc/2SMX-RF3S.

89. A prominent venture capitalist investing in start-ups offered a similar assessment: "There is not a single company that I have invested in the last 10 years that could afford to pay this." Madeline Ngo et al., *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, New York Times (Sept. 20, 2025), https://perma.cc/6F9G-NUS4.

90. That sentiment is widespread. Indeed, many members of the U.S. Chamber are bracing for the need to scale back or entirely walk away from the H-1B program, to the detriment of their investors, customers, and their own existing employees.

91. That is to say nothing of the many universities, health systems, and other non-profit research-driven institutions that also rely on H-1B visas and certainly cannot afford a new $100,000 fee per H-1B employee.

92. Employers that do continue to use the program will do so at a steep cost that sharply increases the price of labor and correspondingly reduces the company's ability to invest resources elsewhere, including in new innovations.

93. Ultimately, Americans would pay the heaviest price. Shuttered or scaled-back domestic innovation means far fewer U.S.-based jobs, less demand for American workers, and, as a result, lower wages. It also means fewer ground-breaking innovations available to improve the lives of U.S. consumers.

## DISCUSSION

### A. The Proclamation exceeds the President's authority.

94. The Proclamation intends to radically alter the H-1B program. Though purporting to impose a mere "payment," the new $100,000 fee for employers will dramatically reduce the number of H-1B petitions being filed: It drastically increases prospective labor costs, and basic economics dictates that companies will therefore hire fewer H-1B workers. Indeed, that is the stated intent of the Proclamation, which is aimed at reducing the pool of H-1B applicants to "the best of the best," as measured by the imperfect analogue of their employers' ability and willingness to pay the government a six-figure sum.

95. That result—and the means taken to implement it—is flatly contrary to Congress's directives, as stated throughout the INA. Congress has created, long maintained, and periodically modified the H-1B program based on its judgment that bringing highly skilled noncitizen workers to the United States benefits the Nation by driving innovation and creating jobs. That has proven undoubtedly true. *See* ¶¶ 55-70, *supra*.

96. Congress has meticulously defined how the H-1B program is to be implemented. For instance, it has detailed the principles USCIS should use to set fees associated with H-1B petitions, and just recently amended the law to impose a fee on the *heaviest* users of the H-1B program that is *twenty-five times* smaller than the blanket fee the President now aims to impose.

97. Congress also has defined by statute how many people should be able to enter the United States under the program via cap-subject visas: in total, 85,000 annually—a carefully calibrated statutory cap calculated to maximize the program's benefits for the American people while ensuring that highly skilled U.S.-based workers remain competitive in the workforce. *See* 8 U.S.C. § 1184(g). Congress arrived at this figure through titration over multiple pieces of legislation, against the background knowledge that demand for visas vastly exceeds that amount. Most recently, Congress temporarily increased the cap to 195,000 annually for fiscal years 2001-2003 via the American Competitiveness in the Twenty-First Century Act. Pub. L. 106-313, § 102(a), 114 Stat. 1251 (2000); *see* 8 U.S.C. § 1184(g)(1)(A).[4] And Congress did so knowing that demand for H-1B visas exceeds supply. *See* S. Rep. 106-260, at 2 ("Despite the increase in the H-1B ceiling in 1998, a tight labor market, increasing globalization and a burgeoning economy have combined to increase demand for skilled workers even beyond what was forecast at that time. As a result, the 1998 bill has proven to be insufficient to meet the current demand for skilled professionals."). *Cf., e.g.*, *United States v. Wilson*, 290 F.3d 347, 354 (D.C. Cir. 2002) (considering "the contextual background against which Congress was legislating" as an interpretive aide).

98. Relatedly, Congress established elaborate standards to protect American workers, such as the statutory cap and the labor condition application process, designed to ensure that H-1B

[4] This law also established that universities and their nonprofit affiliates are exempt from the cap. Pub. L. 106-313, § 103, 114 Stat. at 1252.

visas do not become a means to undercut wages or put Americans at a competitive disadvantage. *See* ¶¶ 29-31, 41-45, *supra*.

99. The Proclamation upends that careful balancing. It fundamentally alters the H-1B program by tacking on a plainly disproportional fee that expressly contradicts the more modest fees Congress has sought to impose, which are aimed explicitly at recovery of costs. And it replaces Congress's determination of the optimal annual number of new noncitizen workers (85,000, plus additional cap-exempt workers) with an onerous fee that will cause a significant reduction in participation in the program and may leave many H-1B spots unclaimed.

100. Although the President has authority under the INA, that authority does not, and cannot, empower him to override existing statutory provisions and programs. Nor does it authorize the President to create new visa conditions in general—nor new fees in particular—under the guise of a restriction on "entry" under Section 212(f).

1. *The Proclamation expressly overrides provisions of the INA that govern the H-1B program.*

101. The President's authority under Section 212 of the INA to restrict noncitizens from entering the United States, while broad, is not unlimited. Specifically, the Supreme Court has "assume[d] that § 1182(f) does not allow the President to expressly override particular provisions of the INA." *Trump v. Hawaii,* 585 U.S. 667, 689 (2018). And other courts have extended that assumption into an express holding: A Section 212(f) proclamation cannot "effectively rewrit[e] provisions of the INA" or "eviscerate[] the statutory scheme." *Doe #1 v. Trump*, 957 F.3d 1050, 1064, 1067 (9th Cir. 2020).

102. In other words, Section 212(f) "cannot plausibly be read to authorize the President … to supplant" the express provisions of the INA. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *20 (D.D.C. 2025). The President lacks "authority to alter the rules" created by Congress or render other INA provisions "dead letters." *Id.* at 32, 35. Indeed,

even Congress cannot provide the President authority to override prior statutory enactments. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 447 (1998) (Line Item Veto Act was unconstitutional because it "g[ave] the President the unilateral power to change the text of duly enacted statutes."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838) ("[V]esting in the President a dispensing power"—that is, "clothing the President with a power to control the legislation of congress"—"has no countenance for its support in any part of the constitution.").

103. At bottom, the President may not use his control over entry into the United States to supplant or nullify Congress's statutorily enacted immigration policy. Doing so is an *ultra vires* act, and one over which courts have inherent authority to order injunctive relief. *See, e.g., Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 189-190 (D.C. Cir. 2006); *Fleming v. Moberly Milk Prods. Co.*, 160 F.2d 259, 264 (D.C. Cir. 1947); *Youngstown*, 343 U.S. at 585.

104. The H-1B program is the product of careful congressional balancing, reflecting several core policy determinations by Congress. Most obviously, Congress itself has set what it felt were the appropriate fees for the H-1B program and has delegated authority to the executive branch to impose additional fees only under certain conditions, including a cost-recovery principle and a requirement of notice-and-comment rulemaking. Plainly, the Proclamation's new $100,000 per-petition fee meets neither condition.

105. Second, and perhaps more fundamentally, Congress has concluded that the program should exist, and in the robust form it prescribed. Congress statutorily created the H-1B program *in order* to allow employers to bring a certain number of highly skilled, specialized noncitizen workers to the country. That is good for American business, and it is good for American workers, who benefit from the well-paying jobs that result from economic growth and productivity. And the program's maximum benefit is realized when enough specialized workers can enter the United States to deliver those economic benefits but sufficient protections exist to ensure that Americans are not disadvantaged by the hiring of those workers.

106. The Proclamation overrides that balance. It replaces Congress's design—expressed in duly enacted statutory text—with an altogether different approach that undercuts the very existence of the program.

107. These clashes between the statutory design of the H-1B program and the Proclamation are reflected in the Proclamation's direct contradiction of the fees authorized by Congress, as well as its conflict with other aspects of the program.

**a. Explicit fee provisions.**

108. To begin, the Proclamation directly contradicts express provisions of the INA—most obviously, the specific fees that Congress deemed to be appropriate and therefore set for the H-1B program.

109. Congress has set a clear baseline rule governing fees for immigration programs: The executive may charge fees for visas and related services sufficient to fund its activities related to those services, but no more than that. *See* 8 U.S.C. § 1356(m) (also known as INA § 286(m)).

110. Prior to 1988, the immigration functions of the Department of Justice, carried out by the former Immigration and Naturalization Service, were funded from appropriations. *See generally U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 58,962, 58,966 (Sept. 24, 2010). That year, Congress enacted Section 1356(m) "to provide an alternative to appropriations." *Id.*; *see* Pub L. No. 101-459 § 209(a), 102 Stat. 2186 (1988).

111. The statute therefore empowers the agency to impose "adjudication fees" by "regulation[.]" 8 U.S.C. § 1356(m). And as Congress shortly thereafter clarified in a 1990 amendment, those "fees for providing adjudication and naturalization services ***may be set at a level that will ensure recovery of the full costs of providing all such services***, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* (emphasis added); *see* Pub. L. No. 101-515 § 210(d), 104 Stat. 2101 (1990) (adding this provision).

112. In other words, the fee for filing an H-1B petition or other request for an immigration benefit "may" be set at an amount that allows USCIS to recover its costs for processing H-1B petitions and similar services related to programs that cannot generate user fees in their own right. By clear implication, the fee may *not* be set at a level that bears no relationship whatsoever to those costs and indeed would dwarf them. *See, e.g.*, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen mention one thing, like a grant of authority[,] it necessarily, or at least reasonably, implies the preclusion of alternatives.") (quotation marks omitted; alterations incorporated); *cf. Bowles v. Russell*, 551 U.S. 205, 208-209 (2007) (statute and federal rule providing that a district court "may" reopen the time for filing a notice of appeal "for a period of 14 days" created a jurisdictional bar on reopenings lasting longer than 14 days).

113. The legislative history is in accord. As the conference report on the bill that first established Section 1356 provided, "[t]he conferees expect that funds generated by this Account shall not be used for any purpose other than enhancing naturalization and adjudication programs." H.R. Rep. No. 100-979, at 38 (1988); *see also Depts. of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act for 1991, Hearings Before the Subcommittee of the Committee on Appropriations*, 101st Cong., at 74 (1990) ("The resources to be made available will be used to adjudicate applications and petitions for benefits under the Immigration and Nationality Act and to provide necessary support to adjudications and naturalization programs."). And the conference report accompanying the 1990 amendment makes plain that the bolded language above (*see* ¶ 111, *supra*) clarified that the fees are to be set at a level that allows USCIS to recoup all of its costs (as opposed to being strictly tied to the benefit provided to each individual petitioner)—*not* that the "may" in the clause makes the connection between fee levels and USCIS's actual costs somehow optional. *See* H.R. Rep. No. 101-909 (1990) (the provision "allows the Department to

establish adjudications and naturalization fees at a level that will ensure recovery of the full costs of the program.").

114. The government has agreed. Even while resisting the notion that USCIS's fee receipts for a given year must precisely match its costs for that year, the government recently affirmatively argued that Section 1356(m) "afforded USCIS flexibility to set fees at a level that bears 'some relationship' to its costs such that USCIS can carry out its statutory mandate to recover its full costs. That this flexibility encompasses the possibility that USCIS's fees collected might, from time to time, exceed its costs spent, makes sense where USCIS must set fees prospectively to *guarantee* future recovery of its yet-to-be-determined full costs." Reply Mem. of Law in Supp. of Mot. to Dismiss at 10, *Tang v. United States*, No. 23-cv-9885 (S.D.N.Y. Oct 3, 2024), Dkt. 65. In other words, the government took the position that, although Section 1356(m) permits current fee receipts to exceed current costs "from time to time" in order to make the program administrable, the statute requires fees to at least "bear[] a "'relationship' to [USCIS's] costs" in carrying out its statutory functions.

115. Elsewhere, the government has interpreted its authority even less flexibly: DHS recognized in a recent fee rulemaking that "INA section 286(m), 8 U.S.C. § 1356(m) *requires USCIS fees to be based on total costs* for USCIS to carry out adjudication and naturalization services." *USCIS Fee Schedule and Changes to Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194, 6,288 (Jan. 31, 2024); *see also id.* at 6,287 (stating that a particular fee collected under separate statutory authority "will . . . effectively supersede section 286(m)" by "go[ing] beyond normal cost recovery").

116. In sum, Section 1356(m) provides that fees for benefit applications like H-1B petitions may be set only at the level necessary for USCIS to adjudicate those applications and perform its other functions.

117. Pursuant to that congressional command, until now, H-1B fees have been set by USCIS through notice and comment rulemaking, with close attention paid to justifying the fee based on administrative expenses. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (recognizing that an "increase from $10 to $215" in the lottery registration fee "may appear to be exorbitant" but arguing that it is necessary to "cover the expenses of the H-1B registration program").

118. The Proclamation offers no such justification. It baldly conditions H-1B petitions on a $100,000 payment.

119. Where the most recent H-1B petition fee of $780 was tied to administrative costs (*see USCIS Fee Schedule*, *supra*, at 39), the new $100,000 figure cannot bear any such relationship to costs. Rather, it is a punitively high exaction meant to deter use of the H-1B program.

120. Moreover, Congress explicitly determined that notice-and-comment rulemaking—with the attendant protection for the public via arbitrary-and-capricious review—is requisite to set the appropriate fee. 8 U.S.C. § 1356(m). The President cannot disregard these requirements and change the mechanism by which fees are set, drastically reducing protections for the regulated public.

121. In addition to the baseline requirement under Section 1356(m) that visa fee levels must be tied to the cost of administering visa and related programs, Congress itself has explicitly set additional fees for the H-1B program. The imposition of these fees demonstrates that Congress knows how to depart from the cost-recovery principle of Section 1356(m) when it wishes to do so.

122. First, Congress has specified that the fee for the H-1B "petition" (either an initial petition, a renewal, or a request for an H-1B visa-holder to change employers) "shall be $1,500 for each such petition." 8 U.S.C. §§ 1184(c)(9)(A)-(C); *see also id.* § 1184(c)(9)(B) (fee is halved for smaller employers).

123. Second, Congress has required payment of a $500 "fraud prevention and detection fee" from all employers filing an initial H-1B petition or seeking authorization for an H-1B visa-holder to change employers. 8 U.S.C. §§ 1184(c)(12)(A), (C); *see* Pub. L. No. 104-447 § 426, 188 Stat. 2809, 3357 (2004) (enacting this requirement).

124. Third, Congress has imposed an additional $4,000 fee on certain employers. *See* Pub. L. No. 114-113 § 402(g), 129 Stat. 2242, 3006 (2015) (codified at 49 U.S.C. § 10101 note, Airline Transportation Safety and System Stabilization Act, Sec. 411). This additional fee applies to employers with more than 50 employees, over half of whom are foreign, nonimmigrant workers. *Id.*; *see also* Pub. L. No. 111-230, § 402(b), 124 Stat. 2485, 2487 (2010) (earlier imposing a smaller $2,000 fee on these same employers).

125. And fourth, Congress provided for "premium processing" fees for immigration benefits—currently $2,805 for H-1B applicants—under which sponsoring employers can have petitions processed within a shorter timeframe. 8 U.S.C. § 1356(u)(3). The statute specifically limits the circumstances in which premium processing can be suspended. *Id.* § 1356(u)(5). Congress thus determined that, if employers are willing to pay extra, they should receive an expedited decision, contrary to the Proclamation's determination that employers cannot submit a petition *at all* unless they pay a vastly greater fee.

126. In sum, Congress itself has set—and repeatedly adjusted—the appropriate fees for H-1B petitions, and the fees set by Congress reflect its policy judgment concerning the design of the H-1B program. Congress structured the fees for visa programs generally to be tied to administrative costs (and to be determined by notice and comment rulemaking), with additional flat fees ($1,500 and $500) imposed on H-1B petitioners in particular to fund specific initiatives, and another flat fee ($4,000) on those employers who are most reliant on nonimmigrant workers.

127. The $100,000 fee, imposed with no procedure whatsoever, dramatically upends Congress's deliberate decisions about how much a visa (and in particular, an H-1B visa) should

cost and flouts the cost-recovery principle of Section 1356(m). It also distorts which businesses can afford to participate in the program. Whereas Congress set fees that are attainable by companies large and small, the imposition of a $100,000 fee is likely prohibitive to many businesses, particularly small businesses across the country that hire H-1B workers.

128. Put differently, the INA permits the executive branch to charge immigration fees in two circumstances: (a) where the fee is adopted via notice and comment rulemaking and set at a level necessary to recoup USCIS's costs (8 U.S.C. § 1356(m)), or (b) where Congress itself has expressly authorized the fee through statute. The Proclamation's exorbitant $100,000 application fee falls into neither category.

129. Because the Proclamation "expressly override[s] particular provisions of the INA" (*Hawaii*, 585 U.S. at 689), it is not a lawful exercise of Section 212(f) power.

**b. Other INA provisions.**

130. The Proclamation also sits uneasily with other specific congressional determinations regarding the H-1B program.

131. For one, the imposition of a $100,000 fee—which is intended to, and surely will, reduce the number of petitions received—will result in significantly fewer H-1B visas. This dramatic change cannot be squared with Congress's expectation that the high demand for H-1B visas would warrant imposing a statutory cap on the number of new H-1B visas.

132. Congress decided that employers should be able to sponsor up to 85,000 people—65,000 plus up to 20,000 more who must have advanced degrees from American universities—on H-1B visas. 8 U.S.C. § 1184(g). Although Congress's goal in imposing a cap was, in part, to assure that *no more* than this number of noncitizens could obtain visas under this pathway, its imposition of a cap also reflects Congress's considered policy view of roughly the right number of people to be able to obtain visas through the H-1B program each year.

133. That is, Congress legislated the 85,000-person annual cap against the background knowledge that demand for visas under the program vastly exceeded that amount. It was well aware that by imposing an 85,000-person annual cap, it also was deciding that approximately 85,000 people would obtain non-cap-exempt H-1B visas annually.

134. Congress arrived at this number by weighing the clear benefits and possible drawbacks of the program. It wanted to ensure that employers were able to bring enough workers into the United States for the Nation to reap the benefits of innovation and economic growth stimulated by the H-1B program, while ensuring that the workforce was not overwhelmed by new, highly skilled foreign workers. For Congress, 85,000 new visas each year reflected the proper balance.

135. For reasons explained above, the Proclamation upsets that balance by surely causing the number of new H-1B visas to plummet and making the program accessible only to a subset of employers. Most companies that rely on H-1B visas will reduce the number of petitions they submit. Employers who submit few petitions to begin with, or entities like small businesses and nonprofits that cannot possibly afford a $100,000 fee, will be unable to participate at all.

136. Moreover, insofar as the Proclamation suggests that the purpose of imposing a $100,000 fee is to protect American workers, the use of such a blunt tool to achieve those ends contravenes the intricate labor protections that Congress established and instructed the executive to use instead to achieve that goal.

137. Congress has established a carefully reticulated regime to ensure that American workers are not harmed by the H-1B program. The centerpiece of this scheme is the Labor Condition Application, which requires any company seeking to hire an H-1B worker to make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. §§ 1182(n)(1)(A)-(D).

138. Among other requirements, employers must certify that the position pays prevailing wages (or higher), that the position will not adversely impact other workers, and that the employer

has provided certain forms of notice to existing employees in the same occupational classification regarding the position. These provisions are designed to ensure that (a) H-1B workers are not hired at a rate that undercuts the wages American workers are willing to accept; (b) the creation of an H-1B position does not directly result in the elimination of a job held by an American worker; and (c) American jobseekers have the ability to compete for and obtain positions that might ultimately be filled by H-1B workers.

139. The executive is not toothless in enforcing these requirements. Employers who violate them are subject to monetary fines and bans on filing future H-1B petitions. 8 U.S.C. § 1182(n)(2)(C). And certain employers—including those who have violated the certification requirement in the past or have a high percentage of H-1B workers already—must specifically certify that they tried and failed to fill the position with an American worker and that the employer has not and will not displace any American worker within 180 days before or after the date of the application. *See* 8 U.S.C. §§ 1182(n)(1)(E), (n)(1)(G), (n)(3)(A).

140. The predominant concern expressed in the Proclamation is that certain employers are abusing the H-1B system to undercut American workers. That is, no doubt, a serious issue, which is why Congress carefully considered that problem and equipped the executive with various measures both to prevent such abuse from occurring—such as the labor condition application process—and to penalize employers who do abuse the system.

141. In other words, when Congress created the H-1B program—and in its continued maintenance of and modifications to that program—it was aware of the potential for abuse and authorized the executive to take certain measures to prevent and remediate abuse. What Congress did not authorize is disincentivizing the use of the program by imposing a fee many times the amount of fees set by Congress.

**c. Practical availability of the H-1B program.**

142. At bottom, the Proclamation and its practical impact are difficult to square with Congress's basic determination that domestic employers *should* be able to access a program for admitting highly skilled nonimmigrant workers from specialized fields.

143. Indeed, calling what the Proclamation institutes a "payment" is something of a misnomer. Contrary to the Proclamation's preamble, instituting a new $100,000 price tag on H-1B petitions does not merely impose "higher costs on companies seeking to use the H-1B program while still permitting companies to hire the best of the best temporary foreign workers." Rather, the fee renders the H-1B program practically unavailable for many companies, particularly small businesses, depriving them of a talent pipeline that is critical to innovation and productivity.

144. Although the Proclamation suggests that employers still may hire "the best of the best," it fails to appreciate the economic reality that many employers, particularly small businesses, simply cannot pay the $100,000 fee, regardless of how talented a prospective employee may be. For example, innovative startups typically compensate even their highest performing employees largely with equity compensation rather than cash precisely because cash is scarce, making a $100,000 per-hire outlay impracticable. The filter imposed by the new fee is therefore less about the quality and promise of the prospective employee, and more about the financial circumstances of the employer.

145. Moreover, even to the extent the Proclamation could be successful in admitting only "the best of the best," it distorts Congress's design for the H-1B program. There are already separate provisions in the INA enabling companies to sponsor visas for prospective employees with "exceptional ability," "extraordinary ability," or other comparable qualities, and those noncitizens are eligible for *immigrant* visas. 8 U.S.C. §§ 1153(b)(1)(A), (b)(2)(A). The H-1B program is different. By congressional design, employers need not show that their prospective workers are

the best of the best, but merely highly skilled. The statutory tradeoff is that workers on H-1B status are only eligible for a temporary stay in this country.

146. Thus, even assuming that employers willing and able to pay a $100,000 fee correlated precisely with the "best of the best" talent, the imposition of such a "best of the best" requirement on the H-1B program would trample Congress's duly enacted policy choices.

147. Although the President has broad authority to ensure that those entering the United States under the H-1B program align with the national interest, the President cannot nullify the program altogether by making it infeasible for a subset of employers to use, nor fundamentally amend the program Congress crafted. So long as the Proclamation is in effect, that is the result.

2. *The Proclamation exceeds the President's authority by misapplying or failing to fulfill statutory requirements.*

148. The Proclamation also exceeds the scope of the President's statutory authority in several other respects.

**a. The $100,000 payment is not an entry restriction.**

149. First, the Proclamation relies on a statute that permits the President to "suspend" or "restrict[]" "entry" (8 U.S.C. § 1182(f)), but the Proclamation relates to entry only tangentially. *Cf. Hawaii*, 585 U.S. at 694-695 & n.4 (discussing "the basic distinction" between "the concepts of entry and admission," on the one hand, and "issuance of a visa," on the other). A true entry suspension, such as the proclamation at issue in *Hawaii*, flatly bars the entry of all nationals from certain countries or restricts the entry of other countries' citizens to certain statuses or certain classes. *See id.* at 679-680. Here, by contrast, the Proclamation seeks to change the terms of an existing visa program under the INA while continuing to admit the very same noncitizens, so long as they comply with the new terms.

150. That is a "restriction" on "entry" (8 U.S.C. § 1182(f)) only in the most superficial sense. Taken to its extreme, the same logic would permit the President to promulgate an entirely

new shadow-INA—that is, an entirely new extra-statutory system setting the terms and conditions of immigration to the United States—giving the President blanket authority to create completely different classifications, rules, and procedures, and deny "entry" to any noncitizen who did not comply with them. Section 212(f)'s delegation of entry-suspension power to the President should not be read so broadly, for a whole host of reasons: It would find the proverbial elephant in a textual mousehole, given the lack of any text naturally read as empowering the President to create new immigration programs (*see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); it runs afoul of the major questions doctrine for similar reasons (*see W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme") (quotation marks omitted)); and it raises serious constitutional questions about Congress's ability to empower the President to disregard or override "duly enacted statutes" (*Clinton*, 524 U.S. at 447; *see, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.") (citation omitted)).

151. Instead, the text is best read as permitting the President to either "suspend the entry" of a "class of aliens" or to "impose on the entry of aliens" a "*restriction[]*" (8 U.S.C. § 1182(f) (emphasis added)) in the natural, negative sense of that word. *See, e.g.*, Restrict, *Webster's New International Dictionary* 2125 (2d ed. 1947) ("To restrain within bounds; to limit; to confine."); Restrict, *Oxford English Dictionary* (Rev. 2010) ("To limit (a person or thing); to confine to or within certain limits. . . . To prohibit or prevent from."). It does not empower the executive to *condition* a noncitizen's entry on the noncitizen's compliance with affirmative, non-statutory mandates. By doing so, the Proclamation exceeds the power conferred by Section 212(f).

152. Elsewhere in the statute, by contrast, Congress expressly used the language of "conditions," not restrictions, when that is what it meant to authorize. *See, e.g.*, 8 U.S.C. § 1184(a)(1)

("The admission to the United States of any alien as a nonimmigrant shall be for such time and *under such conditions* as the Attorney General may by regulations prescribe, including when he deems necessary *the giving of a bond*.") (emphases added); Pub. L. 82-414, § 214, 66 Stat. 163, 189 (enacting this language, like Section 212(f), in the original 1952 INA). *That* language, unlike "restrictions" in Section 212(f), naturally *does* encompass requiring affirmative action from a noncitizen in order to enter. *See* Condition, *Webster's New International Dictionary* 557 (2d ed. 1947) ("Something established or agreed upon as a requisite to the doing or taking effect of something else."). "That Congress used different language in these two provisions strongly suggests that it meant for them to work differently." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2064 (2025). If "Congress had wanted" to authorize the President to impose conditions, rather than restrictions, "it knew exactly how to do so—it could have simply borrowed from the statute next door." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

153. Additionally, whatever authority Section 212(f) may confer, it certainly does not authorize the President to institute new *payments* as conditions of entry. After all, because raising revenue is a core power reserved for Congress (*see, e.g.*, U.S. Const. art. I § 7, cl. 1; *id.* § 8, cl. 1), "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to" impose "'fees' or 'taxes'" (*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) (quoting *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 n.10 (1976))); *see also Youngstown*, 343 U.S. at 631 ("The President has no power to raise revenues. That power is in the Congress by Article I, Section 8 of the Constitution.").

154. Section 212(f) contains no such "clear[]" "indicat[ion]." *Skinner*, 490 U.S. at 224. Yet, as discussed, elsewhere in the INA, Congress *has* been clear in enumerating certain specific H-1B fees, and it has provided a limited, well-defined "delegat[ion]" (*id.*) of fee-setting power under Section 1356(m) for USCIS to recover its costs. Courts have not hesitated to block executive action that strains the text of Section 212(f) in similar ways. *See, e.g.*, *Refugee & Immigrant Ctr.*,

2025 WL 1825431, at *4 (rejecting the use of Section 212(f) to create a non-statutory repatriation system), *stay denied in part and granted in part by* No. 25-5243 (D.C. Cir. Aug. 1, 2025); *President and Fellows of Harvard College v. U.S. Dep't of Homeland Sec.*, 2025 WL 1737493, at *1, *9-10 (D. Mass. June 23, 2025) (rejecting use of Section 212(f) to bar noncitizens from entering the country to study at a particular institution).

155. Moreover, certain of the Proclamation's provisions go beyond any possible conception of an entry restriction. Section 1(b) of the Proclamation orders the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment." Though in some sense related, the concept of "entry" is separate from the H-1B petitioning and "visa issuance" process. *Hawaii*, 585 U.S. at 694-695 & n.3. Section 212(f) does not provide authority to categorically deem certain *petitions* acceptable or unacceptable. *Cf. Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32, 33 ("[T]he authority to 'impose on the *entry* of aliens any restrictions he may deem to be appropriate' does not mean that the President has the authority to alter the rules that apply to those who have already entered," and "statutory grants of authority to the executive branch do not carry with them a sweeping, implied authority analogous to Congress's power under the Necessary and Proper Clause.") (citation omitted) (quoting 8 U.S.C. § 1182(f)).

156. Likewise, Section 2(b) of the Proclamation orders the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment." Again, the President has broad authority concerning *entry* into the United States but does not have authority to singlehandedly direct the issuance or non-issuance of visas created by statute. *Hawaii*, 585 U.S. at 694-695 & n.3; *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32. Indeed, as courts in this district have held, the State Department has a nondiscretionary duty to process visa applications presented to it, even if the visa applicant is currently barred from *entry* by a Section 212(f) proclamation. *See Filazapovich v. Department of State*, 60 F. Supp. 3d 203, 235 (D.D.C. 2021)

(rejecting the argument that a Proclamation banning an immigrant from entry renders her ineligible for a visa,") *rev'd on other grounds sub nom. Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024).

157. Sections 1(b) and 2(b), in directing federal agencies to take actions that lie outside the President's purview under Section 212(f), are therefore plainly beyond the power conferred by the statute.

**b. The Proclamation lacks the statutorily required finding necessary to proclaim a restriction on entry.**

158. As a prerequisite to instituting any restriction on entry, the INA requires that the President "find[] that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But, while the Proclamation purports to follow this "find[ing]" requirement, the findings within the Proclamation are seriously deficient.

159. For one thing, much of the data underlying the preamble's conclusions is misleading. For instance, the preamble cites a supposed "36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers." But that figure pits the prevailing wage of *entry-level* H-1B workers—that is, workers with specialized skills primarily due to their academic training, yet with few years of professional experience—against the median wage for *all* workers in the pertinent industry and region. It is entirely unsurprising that entry-level workers—who by definition lack experience and skills gained on the job—would command a lower wage than the median of all employees in the relevant industry, quite apart from their immigration status.

160. Likewise, the Proclamation references an unnamed "2017 study" showing that "wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001." The Proclamation notably does not cite the actual study. It is clear why: notwithstanding that specific finding, the study broadly concludes that "immigration increased the

overall welfare of US natives." *See* Bound et al., *Understanding the Economic Impact of the H-1B Program on the U.S.*, National Bureau of Economic Research Working Paper 23153, https://perma.cc/N9KF-XH3Y.

161. Additionally, the Proclamation makes no finding about the putative "class of aliens" (8 U.S.C. § 1182(f)) that is ultimately the subject of the restriction implemented. *See Hawaii*, 585 U.S. at 687-688 (acknowledging that "properly identify[ing] a 'class of aliens'" is a "textual limit[]" imposed by Section 212(f)).

162. The class of noncitizens identified in the Proclamation whose entry would be detrimental to the United States is noncitizens "whose petitions are [not] accompanied or supplemented by a payment of $100,000." For one thing, this curious grouping strains the statutory term "class" beyond recognition. *See, e.g.*, Class, *Black's Law Dictionary* (12th ed. 2024) ("A group of people . . . that have common characteristics or attributes."); *cf. Hawaii*, 585 U.S. at 688 (holding that "the word 'class' comfortably encompasses a group of people linked by nationality").

163. Indeed, historically speaking, this grouping includes *all* H-1B applicants. Going forward their petitions will either include a $100,000 fee or exclude it, but the presence or absence of that fee will have nothing to do with the noncitizens themselves. It will not, for example, bear any relationship to their respective qualifications for employment in the United States, the economic value they might generate by working in the United States, the implications on national security or foreign policy of their entry into the United States, the industry in which they work, and so on.

164. In fact, the presence or absence of the $100,000 payment will have nothing to do with the noncitizen at all, since it will be the employer filing the petition who either agrees or refuses to include a $100,000 payment.

165. In any event, the Proclamation makes no findings about any noncitizens, let alone the specific class of noncitizens whose petitions are not accompanied or supplemented by a

payment of $100,000. The preamble is directed entirely at *employers* who purportedly abuse the H-1B system, particularly in the IT field, and the concomitant impact on workers in that industry from that alleged abuse. It says nothing at all about the *noncitizens* actually targeted by the restriction nor why noncitizens whose H-1B petitions include a $100,000 payment are any less detrimental to workers than noncitizens whose petitions do not.

166. There is, by the same token, no connection between the findings made in the Proclamation, the class of noncitizens identified for exclusion, and the specific restriction adopted. For instance, the Proclamation draws no connections between the broad trends it identifies—a rising proportion of foreign-born workers in the IT industry and rising unemployment for Americans graduating with degrees in that field—and the existence of a class of noncitizens whose H-1B visas lack a $100,000 fee.

167. The Proclamation does not include any findings that noncitizens within the class are less likely to be hired by companies in the IT industry or by employers who abuse the H-1B system. There is also no connection drawn between the imposition of a $100,000 fee and the curtailing of H-1B abuse. Nor is there any mention of why the existing statutory tools for preventing and penalizing abuse are inadequate to accomplish that goal.

168. In all, the Proclamation exceeds the President's statutory authority. It directly conflicts with the INA multiple times over, it extends to areas beyond the scope of the President's authority to restrict entry, and it fails to make the threshold findings required by law.

169. As an act exceeding the President's lawful authority, the Proclamation must be declared unlawful and its enforcement must be enjoined as to the U.S. Chamber and its members. *See Reich*, 74 F.3d at 1328 ("[R]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.") (quotation marks omitted).

**B. Agency action implementing the Proclamation must be declared unlawful and set aside under the APA.**

170. For many of the reasons described above, implementation of the Proclamation by any agency of the United States will also violate the Administrative Procedure Act (APA).

171. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

172. Agency action taken to implement a presidential proclamation or executive order is subject to review under the APA. *See Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (agency action based on an executive order is not "insulate[d]" from "judicial review under the APA, even if the validity of the [executive order] [is] thereby drawn into question").

173. Many aspects of the Proclamation are not self-executing but, rather, require implementation by executive branch agencies. For example, Section 1(b) of the Proclamation expressly directs the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment," but Section 1(c) authorizes the Secretary to waive that requirement, for a single noncitizen or a class, on grounds of "the national interest." Likewise, Section 2(b) directs the Secretary of State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment."

174. In accordance with these commands, immediately after the Proclamation, USCIS issued a memorandum, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, which states that, effective September 21, 2025, "[t]he entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation" under the H-1B program "is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000." The memorandum further provides that it "applies to H-1B employment-based

petitions filed after" the effective date. The document also directs "[a]ll officers of United States Citizenship and Immigration Services" to "ensure that their decisions are consistent with this guidance." *Id*. U.S. Customs and Border Protection has issued a memorandum to similar effect. And the Department of State "has posted guidance to all consulate offices, consistent with" the other agencies' memoranda.[5]

175. As fully described above, agency actions taken to implement the Proclamation are substantively invalid and must be set aside under the APA, for numerous reasons.

176. *First,* the $100,000 payment called for in the Proclamation was not set by notice-and-comment rulemaking, but by presidential fiat—violating both Section 1356(m)'s express requirement of such rulemaking and the fundamental rule that existing notice-and-comment regulations (such as DHS's existing fee schedule, *see* 8 C.F.R. §§ 106.1(a), 106.2) may be amended or rescinded only through additional notice-and-comment rulemaking. *See, e.g.*, *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) ("It is, of course, black-letter administrative law that ordinarily an agency that promulgates a rule [using notice and comment] must use the same procedure to revoke that rule."). Indeed, the government previously has taken the position that "[a]fter the fee schedule is effective, fees cannot be adjusted until the next fee schedule notice-and-comment rulemaking." *USCIS Fee Schedule*, 88 Fed. Reg. at 447. Notice-and-comment rulemaking both "helps to prevent mistakes" and "also helps ensure that regulated parties receive fair treatment, a value basic to American administrative law." *Ivy Sports Med., LLC v. Burwell*, 767

[5] The informality of these documents does not detract from their finality. *See, e.g.*, *Nat'l Ev'tl Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006-1007 (D.C. Cir. 2014) (document was final agency action where it "provides firm guidance to enforcement officials about how to handle permitting decisions"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (same, where purported guidance document "reads like a ukase. It commands, it requires, it orders, it dictates.").

F.3d 81, 87-88 (D.C. Cir. 2014). The failure to follow that process here was both unlawful and arbitrary and capricious.

177. *Second,* agency action implementing the Proclamation will not be done pursuant to a valid exercise of the President's authority to exclude noncitizens from the United States under Section 212(f). Specifically, Section 212(f) is limited to restrictions on entry and does not authorize the President, the Secretary of Homeland Security, or the Secretary of State to direct approvals or disapprovals of H-1B petitions or H-1B visas. Despite instructions in the Proclamation to restrict decisions on petitions and the issuance of visas to applicants who have paid the $100,000 fee, the President has no statutory authority under Section 212(f) to direct USCIS's action on any H-1B petition or the State Department's issuance of visas. These subjects are not committed to the President's discretion by law. Rather, the President's authority under Section 212 is limited to *entry* into the United States by a noncitizen or class of noncitizens. *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *32-33. And in any event, the President's restriction-of-entry authority depends on the President making findings that he has not made.

178. *Third*, such actions directly conflict with other elements of the INA, supplanting carefully considered congressional judgments regarding the H-1B program. Specifically, imposing a $100,000 fee on H-1B petitions will conflict with other provisions in the law relating to the appropriate fees for the H-1B program; Congress's decision to make the program available to a wide cross-section of employers; and the law's carefully reticulated scheme of labor protections.

179. *Finally*, such actions are, and will be, arbitrary and capricious. The imposition of a $100,000 fee on H-1B petitions has nothing to do with the stated goals of that action, as expressed in the Proclamation, and the Proclamation rests on arguments and data referred to in the preamble that are conclusory, directly contradicted by the underlying sources quoted, and fail to consider all aspects of the problem, among other fundamental procedural defects.

180. Because agency action implementing the Proclamation will be done in violation of the APA, the court must set aside any such action and declare it unlawful.

## CLAIMS FOR RELIEF

### COUNT I
### THE PROCLAMATION AND ANY IMPLEMENTING ACTION UNDER IT ARE IN EXCESS OF EXECUTIVE BRANCH AUTHORITY UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES

181. The U.S. Chamber incorporates and realleges the foregoing paragraphs as though fully set forth herein.

182. Federal courts possess inherent authority to enjoin executive action that is in excess of lawful authority.

183. For the reasons set forth in the foregoing paragraphs, the Proclamation is in excess of the President's authority under Sections 212(f) and 215(a) of the INA, and any executive action implementing it is therefore in excess of executive branch authority under the Constitution and laws of the United States.

184. Specifically, among other things, the imposition of a $100,000 fee for H-1B petitions directly contravenes Congress's statutory enactments related to the H-1B visa programs. These enactments include the much lower fees that Congress deemed appropriate—largely related to the direct costs USCIS incurs in reviewing H-1B petitions and providing similar services. The enactments also include the statutory cap on the number of visas that may be issued under the H-1B program each year and the labor protections incorporated into the law.

185. Moreover, the imposition of a $100,000 fee for H-1B petitions will fundamentally alter the program, diminishing a program that Congress has said *should* exist, and *should* provide a pathway for employers to bring highly skilled noncitizens to work in the United States.

186. The Proclamation also exceeds the President's authority under Section 212(f) by directing agency action that is beyond the scope of the President's authority to restrict entry into

the United States; is not rationally related to a "class" of noncitizens targeted for restriction on entry; and does not contain "find[ings]" pertaining to that class of noncitizens required by law.

187. Accordingly, the Proclamation and any implementing actions under it (including any not subject to review under the Administrative Procedure Act) are *ultra vires* executive action, for which there is no adequate remedy other than an injunction pursuant to this Court's inherent equitable power. The implementation of the Proclamation must be enjoined.

**COUNT II**
**THE PROCLAMATION'S IMPLEMENTATION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 706(2)**

188. The U.S. Chamber incorporates and realleges the foregoing paragraphs as though full set forth herein.

189. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

190. Final agency action implementing the Proclamation is subject to review under the APA. *See Chamber of Commerce*, 74 F.3d at 1327.

191. The Proclamation is not entirely self-executing but requires independent implementation by agencies and authorizes agencies to make independent judgments. Indeed, it expressly directs agency action.

192. As fully described in the foregoing paragraphs, agency action implementing the Proclamation is, and will be, contrary to law and arbitrary and capricious.

193. Specifically, among other things, agency action implementing the Proclamation would impose an unlawful $100,000 fee for H-1B petitions, in direct contravention of Congress's statutory enactments related to the H-1B visa program, including the fees set by law, the statutory

cap on H-1B visas, and the labor protections existing in the law, all of which reflect careful congressional balancing aimed to implement a robust and active H-1B program while protecting American workers.

194. Agency action taken to implement the Proclamation also would be unlawful because it would be taken pursuant to directions from the President made in excess of his lawful authority under Section 212(f).

195. Action implementing the Proclamation also would be procedurally arbitrary and capricious, as the imposition of a fee on H-1B petitions by the executive branch must be done via notice-and-comment rulemaking.

196. Additionally, such action would be unlawful and arbitrary and capricious because there are no "find[ings]" related to the targeted class of noncitizens, as required under Section 212(f), and the Proclamation rests on arguments and data citations that are conclusory, manifestly inaccurate, and fail to consider important aspects of the problem.

197. Because agency action implementing the Proclamation violates the APA, it must be vacated and set aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and that the Court:

1. Declare that the Proclamation and any implementing agency action exceed the executive branch's lawful authority;

2. Enjoin defendants from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation as to Plaintiff and each of its members;

3. Vacate and set aside, under the APA, any agency actions taken to implement the Proclamation;

4. Award Plaintiff reasonable attorney's fees and costs;

5. Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: October 16, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)*
Grace Wallack (Bar No. 1719385)
Emmett Witkovsky-Eldred (Bar No. 90012725)*
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Daryl L. Joseffer (Bar No. 457185)
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337
djoseffer@uschamber.com

* *pro hac vice to be filed*

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

# Exhibit 3

November 20, 2024

# AAU Member Universities By Year of Entry

### Public

Arizona State University (2023)

Georgia Institute of Technology (2010)

Indiana University (1909)

Michigan State University (1964)

The Ohio State University (1916)

The Pennsylvania State University (1958)

Purdue University (1958)

Rutgers University – New Brunswick (1989)

Stony Brook University – The State University of New York (2001)

Texas A&M University (2001)

The University of Arizona (1985)

University at Buffalo – The State University of New York (1989)

University of California, Berkeley (1900)

University of California, Davis (1996)

University of California, Irvine (1996)

University of California, Los Angeles (1974)

University of California, Riverside (2023)

University of California, San Diego (1982)

University of California, Santa Barbara (1995)

University of California, Santa Cruz (2019)

University of Colorado, Boulder (1966)

University of Florida (1985)

University of Illinois Urbana-Champaign (1908)

The University of Iowa (1909)

The University of Kansas (1909)

University of Maryland at College Park (1969)

University of Michigan (1900)

University of Minnesota, Twin Cities (1908)

University of Missouri, Columbia (1908)

The University of North Carolina at Chapel Hill (1922)

University of Oregon (1969)

University of Pittsburgh (1974)

University of South Florida (2023)

The University of Texas at Austin (1929)

The University of Utah (2019)

University of Virginia (1904)

University of Washington (1950)

The University of Wisconsin – Madison (1900)

**Private**

Boston University (2012)

Brandeis University (1985)

Brown University (1933)

California Institute of Technology (1934)

Carnegie Mellon University (1982)

Case Western Reserve University (1969)

Columbia University (1900)

Cornell University (1900)

Dartmouth (2019)

Duke University (1938)

Emory University (1995)

The George Washington University (2023)

Harvard University (1900)

The Johns Hopkins University (1900)

Massachusetts Institute of Technology (1934)

New York University (1950)

Northwestern University (1917)

Princeton University (1900)

Rice University (1985)

Stanford University (1900)

Tufts University (2021)

Tulane University (1958)

The University of Chicago (1900)

University of Miami (2023)

University of Notre Dame (2023)

University of Pennsylvania (1900)

University of Rochester (1941)

University of Southern California (1969)

Vanderbilt University (1950)

Washington University in St. Louis (1923)

Yale University (1900)

**Canadian**

McGill University (1926)

University of Toronto (1926)

# Tools

Cookie settings

## Sign Up for Leading Research Universities Report

AAU members transform lives through education, research, and innovation. Get weekly updates from America's leading research universities.

example@example.com

**Confirmation** *

☐ I understand I am subscribing to this newsletter.

**Subscribe**

Affordability & Student Aid (/affordability-and-student-aid)

Student Loans (/issues/student-loans)

Student Aid (https://www.aau.edu/key-issues/student-aid)

Key Issues (/key-issues)

Advocacy Priorities (/key-issues/advocacy-priorities)

Accreditation & Accountability (/key-issues/accreditation-accountability)

Campus Climate and Safety (/key-issues/campus-climate-and-safety)

Federal Budget (/key-issues/federal-budget)

Higher Education Legislation (/key-issues/higher-education-legislation)

Higher Education Regulation (/key-issues/higher-education-regulation)

Humanities (/key-issues/humanities)

Immigration (/key-issues/immigration)

Innovation & Competitiveness (/key-issues/innovation-competitiveness)

Intellectual Property (/key-issues/intellectual-property)

Research Administration & Regulation (/key-issues/research-administration-regulation)

Science & Security (/key-issues/science-and-security)

Taxation & Finance (/key-issues/taxation-finance)

Newsroom (/newsroom)

Articles & Op Eds

Research (/research)

Featured Research

(/newsroom/articles-op-eds)

Barbara's Blog (/newsroom/blog/barbaras-blog)

Immigrant Spotlight (/newsroom/immigrant-spotlight)

Leading Research Universities Report (https://www.aau.edu/newsroom/leading-research-universities-report/leading-research-universities-report)

Press Releases (/newsroom/press-releases)

(/research/featured-research)

University Research (/research/university-research)

Why University Research Matters (/research/why-university-research-matters)

The Government-University Partnership (/research/government-university-partnership)

Education & Community Impact (/education-community-impact)

Community Impact (/education-community-impact/community-impact)

International (/education-community-impact/international-collaborations)

Graduate Education (/education-community-impact/graduate-education)

Undergraduate Education (/education-community-impact/undergraduate-education)

Who We Are (/who-we-are-americas-leading-research-universities)

Our Members (/who-we-are/our-members)

Membership Policy (/who-we-are/membership-policy)

Leadership (/who-we-are/leadership)

Jobs (/who-we-are/jobs)

By the Numbers (/aau-numbers)

Key Documents (/who-we-are/key-documents)

Values (/who-we-are/aau-values)

1200 New York Ave NW, Suite 500
Washington, DC 20005
Terms of Use and Privacy Policy (/website-terms-use-and-privacy-policy)

**Phone** 202.408.7500
© The Association of American Universities (AAU)

Social

# Exhibit 4

Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending

*Attorneys for Named Plaintiffs BAE Industries, Nephrology Associates of the Carolinas, PA, Lower Brule Day School, and the Proposed Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

GLOBAL NURSE FORCE, et al.,

Plaintiffs,

vs.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.

Defendants.

Case No: 4:25-cv-08454-HSG

**CLASS ACTION**

**PLAINTIFFS BAE INDUSTRIES, NEPHROLOGY ASSOCIATES OF THE CAROLINAS, PA, AND LOWER BRULE DAY SCHOOL'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Judge: Hon. Haywood S. Gilliam, Jr.
Ctrm: 2, 4th Floor
Date: February 12, 2026
Time: 2:00 P.M.

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........ 1
STATEMENT OF THE ISSUES TO BE DECIDED. ........ 2
MEMORANDUM OF POINTS AND AUTHORITIES ........ 2
I. INTRODUCTION ........ 2
II. BACKGROUND ........ 4
A. The Proclamation and its implementation ........ 4
B. Named Plaintiffs ........ 6
1. Nephrology Associates ........ 6
2. BAE Industries ........ 7
3. Lower Brule Day School ........ 8
III. PROPOSED CLASS, CLASS REPRESENTATIVES, AND CLASS COUNSEL ........ 9
IV. ARGUMENT ........ 9
A. The Court can and should certify the Class now. ........ 10
B. This action satisfies all requirements of Rule 23(a). ........ 11
1. The proposed Class is numerous. ........ 11
2. The proposed Class shares common questions of law and fact ........ 12
3. Plaintiffs' claims are typical of the Class. ........ 15
4. The proposed Class Representatives and Class Counsel are adequate. ........ 16
C. This action satisfies Rule 23(b)(2). ........ 17
CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**CASES**

*Ahlman v. Barnes*, 445 F. Supp. 3d 671 (C.D. Cal. 2020) .......... 10

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) .......... 10

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .......... 13

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .......... 9

*Casa Libre/Freedom House v. Mayorkas*, No. 2:22-CV-01510-ODW, 2023 WL 3649589 (C.D. Cal. May 25, 2023) .......... 13

*Chamber of Commerce v. DHS*, 1:25-cv-03675-BAH (D.D.C.) .......... 5

*Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884 (N.D. Cal. 2015) .......... 11

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) .......... 11, 12, 15, 16, 17

*Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020) .......... 15

*Hanon v. Dataproducts Corp*., 976 F.2d 497 (9th Cir. 1992). .......... 15

*Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015) .......... 11

*Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010) .......... 10

*Inland Empire–Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018). .......... 13

*Johnson v. California*, 543 U.S. 499 (2005) .......... 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 10

*MadKudu Inc. v. USCIS*, No. 20-CV-02653, 2020 WL 7389419 (N.D. Cal. Nov. 17, 2020) .......... 11, 13, 16, 18

*Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036 (9th Cir. 2012) .......... 10

*Nightingale v. USCIS*, 333 F.R.D. 449 (N.D. Cal. 2019) .......... 11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) .......... 13

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) .......... 12, 14, 15, 18

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) .......... 9, 10

*Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) .......... 10

*Scholl v. Mnuchin*, 489 F. Supp. 3d 1008 (N.D. Cal. 2020) ....................10, 13, 14, 17, 18

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)....................17

*Sueoka v. United States*, 101 F. App'x 649 (9th Cir. 2004) .................... 11

*Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025) .................... 9, 10, 12, 13, 16

*Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781 (N.D. Cal. 2021).................... 12

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)....................9

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................... 13, 18

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ....................18

**STATUTES & REGULATIONS**

8 C.F.R. § 214.1 .................... 5

8 U.S.C. § 1182.................... 13

8 U.S.C. § 1185.................... 13

8 U.S.C. § 1258....................5

Fed. R. Civ. P. 23 .................... 1, 10

Fed. R. Civ. P. 23(a).................... 9, 11

Fed. R. Civ. P. 23(a)(3) ....................15

Fed. R. Civ. P. 23(a)(4) ....................16

Fed. R. Civ. P. 23(b)(2). .................... 9, 10, 17, 18, 19

Fed. R. Civ. P. 23(c)(1)(a).................... 10

Fed. R. Civ. P. 23(c)(2)(B)....................19

Fed. R. Civ. P. 23(g) .................... 17

**OTHER**

Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025) ....................4, 13

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT on February 12, 2026, at 2:00 P.M., or as soon thereafter as this matter may be heard,[1] before The Honorable Haywood S. Gilliam, Jr., United States District Court for the Northern District of California, Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, California, BAE Industries, Nephrology Associates of the Carolinas PA, and Lower Brule Day School ("Named Plaintiffs") will, and hereby do, respectfully move this Court for an entry of an Order, pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), (b)(2), and (g), in the above-captioned action: (1) certifying the Class (defined below); (2) appointing the Named Plaintiffs as Class Representatives; and (3) appointing counsel for the Named Plaintiffs as Class Counsel. The putative Class comprises of:

> All U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee under the September 19, 2025 Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," or the Proclamation's implementing guidance, or would file such a petition but for the fee, with the United States Citizenship and Immigration Services received on or between September 21, 2025 and September 21, 2026, to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i).

Named Plaintiffs respectfully request that this Motion be briefed and heard in conjunction with the contemporaneously filed Motion for Preliminary Injunction ("PI Motion" or "PI Mot.") in this action. This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities, the Declaration of Harini Srinivasan in support thereof (the "Srinivasan Declaration" or "Srinivasan Decl.") and exhibit attached thereto, as well as the Declaration of Cynthia Liao ("Liao Decl."), the Declaration of Melynn Zylka ("Zylka Decl."), the Declaration of Dattie Michaelle Waters ("Waters Decl."), the Declaration of Lance Witte ("Witte Decl."), the Declaration of Sarah K. Peterson ("Peterson Decl."), and exhibits attached thereto, the pleadings and records on file in this action, and such further arguments and matters as the Court may consider.

[1] Plaintiffs intend to file an administrative motion to expedite the hearing date to January 22 or 29 or any date between those two dates, at the Court's convenience.

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided in this Motion are:

1. Whether the putative Class should be provisionally certified under Rule 23(b)(2) for purposes of preliminary injunctive relief;
2. Whether Named Plaintiffs should be appointed as Class Representatives; and
3. Whether Named Plaintiffs' counsel should be appointed as Class Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

President Trump's Friday, September 19, 2025 Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers" (the "Proclamation") abruptly upended the H-1B visa program by requiring a staggering $100,000 fee for H-1B petitions, effective just two days after its announcement, on Monday, September 21, 2025. This unprecedented $100,000 fee ("$100,000 Requirement") for employers to petition for an H-1B nonimmigrant worker added an extra-statutory eligibility requirement that functions as a massive paywall—a de facto tax on U.S. employers seeking to hire or retain high-skilled foreign professionals. The Department of Homeland Security ("DHS"), its component agencies U.S. Citizenship and Immigration Services ("USCIS") and U.S. Customs and Border Protection ("CBP"), and the Department of State ("State Department" or "State") (collectively with the heads of those agencies and components, the "Agency Defendants"), have since implemented, extended, and changed the terms of the Proclamation through binding policies (collectively, the "Agency Policies") that condition the acceptance, processing, and approval of any new H-1B petition on the upfront payment of $100,000. The result of Defendants' actions is an immediate and nationwide barrier that has and will shut out countless employers, large and small alike, from accessing the talent Congress made available to them under the Immigration and Nationality Act ("INA").

Plaintiffs BAE Industries ("BAE"), Nephrology Associates of the Carolinas, PA ("Nephrology Associates"), and Lower Brule Day School ("LBDS") illustrate the Proclamation's harmful impact. BAE, a small automotive parts manufacturing company in Michigan, has hired several employees who require H-1B visas because BAE has difficulty recruiting and retaining staff in the highly competitive

Detroit-area automotive labor market. Zylka Decl. ¶¶ 1, 5. One of these employees had been with the company for several years but was forced to leave the United States to avoid being unlawfully present when the extension of his H-1B visa was delayed. BAE needs this employee and must now file a new H-1B petition for him, but this time must pay a fee it cannot afford. *Id*. ¶¶ 5-15. Nephrology Associates, a medical practice in rural North Carolina serving chronically ill patients, had finally recruited a much-needed nephrologist through the H-1B program—only to find that it must pay $100,000 or forfeit this physician because of the new Proclamation. Waters Decl. ¶¶ 12-20. LBDS, a tribal school serving the Lower Brule Sioux Reservation, cannot afford the $100,000 fee, which would jeopardize its ability to hire critically needed teachers and sustain educational continuity for its students. Nearly a quarter of LBDS's teachers are H-1B visa holders. Witte Decl. ¶ 11. These Named Plaintiffs typify the experiences of thousands of employers across the country in healthcare, technology, education, manufacturing, and other sectors, who are abandoning vital hires and longstanding employees due to a sudden fee imposed without notice, without statutory authority, and without regard to the havoc it would wreak.

By this motion ("Motion"), Plaintiffs move for class certification under Federal Rule of Civil Procedure 23(b)(2). The proposed class ("Class") consists of all U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee, or would file such a petition but for the fee, received on or between September 21, 2025 and September 21, 2026. This case is particularly well-suited for class treatment because the legality of Defendants' Proclamation and implementing policies present a single, dispositive question common to every class member: *Is the $100,000 H-1B fee lawful or not?* Plaintiffs allege that this $100,000 Requirement is unlawful. The Proclamation far exceeds the President's authority under immigration law, usurping Congress's role by effectively rewriting the H-1B visa conditions and levying a massive fee (or tax) on businesses without congressional approval. Likewise, the Agency Defendants violated the Administrative Procedure Act ("APA") by enforcing this fee immediately through agency directives and procedures that contravene the INA and the agencies' own regulations, all implemented arbitrarily and without the required notice-and-comment process.

This is exactly the kind of case—a broad-based challenge to government policies under the APA—in which courts in this Circuit routinely certify (b)(2) classes, especially where preliminary injunctive relief is also being pursued. To redress these legal violations, Named Plaintiffs, along with other plaintiffs named in the PI Motion, seek declaratory and injunctive relief: a court order invalidating the $100,000 Requirement and barring Defendants from enforcing it, so that class members' H-1B petitions can proceed under the status quo ante (i.e. the regular statutory framework established by Congress, without an extra-statutory $100,000 charge).

For these reasons, Plaintiffs respectfully request that the Court certify the proposed Class, appoint BAE, Nephrology Associates, and LBDS as Class Representatives, and appoint their counsel as Class Counsel, so that the merits of this dispute can be adjudicated on a classwide, uniform basis.

## II. BACKGROUND

### A. The Proclamation and its implementation

On Friday, September 19, 2025, the President issued a Proclamation entitled "Restriction on Entry of Certain Nonimmigrant Workers," which conditions the adjudication of H-1B petitions on an employer's payment of $100,000 per petition. Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025). The Proclamation became effective almost immediately, as of 12:01 a.m. EDT on Monday, September 21, 2025. Proclamation § 1(a). The Proclamation provides for a national interest exemption ("NIE"), allowing the Secretary of Homeland Security, "in the Secretary's discretion," to exempt "any individual alien, all aliens working for a company, or all aliens working in an industry," if the Secretary determines that hiring such H-1B workers "is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* § 1(c). The Proclamation is to be effective for one year, i.e., until September 2026, although the Proclamation calls for agencies to recommend whether to extend it. *Id.* §§ 1(a), 3(b).

Agency Defendants began implementing the Proclamation on an expedited basis. USCIS and CBP issued policy memoranda on September 20, 2025, less than 24 hours after the Proclamation. Both instructed their staff that the Proclamation applied to all "H-1B employment-based petitions filed after

12:01 AM ET on September 21, 2025."[2] The State Department distributed instructions to all consular sections in a cable ("ALDAC") directing them to treat the payment as a mandatory prerequisite for visa adjudications and issuance for any applications filed after the effective date, reflecting State's uniform implementation of the Requirement.[3] USCIS and State then issued FAQs on September 21, 2025, which stated that "any" "new" H-1B petitions would be subject to the Requirement.[4]

In October, USCIS issued updated guidance modifying the Agency Policies. *H-1B Specialty Occupations*, USCIS (Oct. 20, 2025) ("October Guidance" or "Oct. Guidance") (ECF 46-9). According to this guidance, the $100,000 Requirement applies to any new H-1B petition filed on or after September 21, 2025 on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. *Id.* at 2. For beneficiaries inside the United States, under the guidance, the $100,000 fee will not apply to employers of individuals who are changing status from certain valid nonimmigrant visas to H-1B or who are requesting an amendment or extension—*if* USCIS grants the change of status, amendment, or extension. *Id.* Such approvals are discretionary decisions by USCIS.[5]

The October Guidance also expounds on the NIE set forth in the Proclamation. USCIS states that exceptions to the $100,000 Requirement "are granted by the Secretary of Homeland Security in the *extraordinarily rare circumstance*" where the Secretary determines that (1) the particular alien worker's presence "is in the national interest," (2) "*no* American worker is available to fill the role,"

[2] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, (H-1B)*, USCIS (Sept. 20, 2025) (ECF 46-5); Matthew S. Davies, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers (H-1B)*, CBP (Sept. 20, 2025) (ECF 46-6).

[3] State Dep't Administrative Record ("State AR") (Liao Decl. Ex. 7 at 3-4). The government filed the administrative records in another case brought by other plaintiffs challenging the same $100,000 Requirement, *Chamber of Commerce v. DHS*, 1:25-cv-03675-BAH (D.D.C.). *See* Liao Decl. ¶¶ 7-9.

[4] *H-1B FAQ*, USCIS (Sept. 21, 2025) (ECF 46-7); *H-1B FAQ*, State Dept. (Sept. 21, 2025) (ECF 46-8).

[5] *See* 8 U.S.C. § 1258(a) ("The Secretary of Homeland Security *may*, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification . . . .") (emphasis added); 8 C.F.R. § 214.1(c)(7) ("Where an applicant or petitioner demonstrates eligibility for a requested extension or amendment of stay, USCIS may grant the extension or amendment in its discretion. The denial of an extension or amendment of stay request may not be appealed."); USCIS Policy Manual Vol. 2, Part A, Ch. 4.A (ECF 46-10 at 1) ("The decision to grant or deny an extension of stay or change of status request involves an exercise of discretion by USCIS."); USCIS Policy Manual Vol. 1, Part E, Ch. 8.C.2 (ECF 46-11 at 7–8) ("non-exhaustive" list of numerous discretionary factors to consider).

(3) the worker "does not pose a threat to the security or welfare of the United States," and (4) requiring the employer to pay the fee "would significantly undermine the interests of the United States." Oct. Guidance, ECF 46-9 at 2–3 (emphases added). Employers seeking an exemption must email a request and "all supporting evidence." *Id*. The October Guidance does not acknowledge or provide criteria for seeking an exemption on a company-wide or industry-wide basis. It also does not identify any timelines or evidentiary standards for, or a right to, an exemption. *See* Oct. Guidance, ECF 46-9 at 3. Plaintiffs are not aware of any instances of the government granting such an exemption. *See also* Peterson Decl. ¶ 13.

In sum, under the Proclamation, as implemented, an employer who does not pay the $100,000 fee cannot file a petition with USCIS, and the intended beneficiary cannot receive a visa from the State Department and will not be permitted by CBP to enter. Petitions filed by *any* U.S. employer regardless of size, industry, geographic location, or economic profile are all uniformly subject to the $100,000 Requirement. The only two ways to file a petition without being subject to the $100,000 Requirement are (1) if the employer requests a change of status, amendment, or extension for an individual in the United States and it is granted, in USCIS's discretion; or (2) the employer requests an NIE and it is granted, in the DHS Secretary's discretion.

Named Plaintiffs are three of many thousands of employers adversely affected by the Proclamation and the Agency Policies' unlawful $100,000 Requirement. Nephrology Associates is a medical practice that relies on foreign nationals requiring H-1B sponsorship to fill highly specialized physician positions essential to its patient care operations. Waters Decl. ¶ 11. BAE Industries is a small automotive supplier that has hired several H-1B beneficiaries because of challenges it has faced in hiring and retaining talent. Zylka Decl. ¶ 5. LBDS is a tribal school that relies on H-1B teachers to deliver core instruction and maintain consistent staffing for its K-12 classrooms. Witte Decl. ¶ 11. All three employers are currently subject to the $100,000 Requirement.

**B. Named Plaintiffs**

**1. Nephrology Associates**

Nephrology Associates is a medical practice that specializes in kidney care. The practice has

had to rely on the H-1B program to fulfill its physician staffing needs. Waters Decl. ¶ 11. After losing a nephrologist who relocated, Nephrology Associates engaged a recruiter and, over approximately nine months, received only a small number of applications. Only one candidate—a nephrologist from India on a J-1 visa—was both qualified and willing to work in Nephrology Associates' rural, medically underserved community. *Id.* ¶ 12. Nephrology Associates offered this physician the position and, through immigration counsel, obtained a J-1 waiver so that an H-1B petition could be filed for her to work at the practice. *Id.* ¶¶ 12-17; *see also* Peterson Decl. ¶ 7 (describing J-1 waiver process).

Nephrology Associates filed an H-1B petition for the Indian physician on September 24, 2025 and paid for premium processing, which would ordinarily result in adjudication within 15 business days—thus, around mid-October 2025. Waters Decl. ¶ 16. However, the petition remained unadjudicated. In early November, USCIS issued a Request for Evidence asking Nephrology Associates to show that it had either paid $100,000 or obtained an NIE. *Id.* ¶¶ 18-19. As a small practice in a rural, low-income community, Nephrology Associates cannot afford to pay the additional $100,000, and it is still awaiting adjudication of its exemption request and the underlying H-1B petition. *Id.* ¶¶ 19-20. At this time, the physician remains abroad and Nephrology Associates is struggling to maintain its flow of business and accommodate its waiting list of new patients. *Id.* ¶¶ 10, 14, 20.

**2. BAE Industries**

BAE Industries is a small automotive supplier headquartered in Auburn Hills, Michigan. Zylka Decl. ¶¶ 1, 5. Recruiting is difficult given the competitive Detroit-area labor market, and BAE has relied on the H-1B program to hire and retain specialized talent. *Id.* ¶ 5. In July 2018, BAE hired an international student from India who was then in the United States and had completed his master's degree at Wayne State University. BAE filed an H-1B petition on his behalf, which was approved, and he transitioned into H-1B status on October 1, 2019. *Id.* ¶ 6. He now works in BAE's Quality Department as a Senior Quality Engineer at a plant that manufactures stampings used in highly engineered seat mechanisms. *Id.* ¶ 7.

BAE began the process to sponsor this employee for lawful permanent residence (colloquially,

a "green card") and USCIS approved his immigrant petition. However, because there is a long queue for Indian nationals for this type of immigrant visa, the employee is still waiting to be eligible for a green card. *Id.* ¶¶ 8-9. In the meantime, BAE intended to seek an extension of the employee's H-1B visa. BAE submitted a Labor Condition Application on September 25, 2025, but the October 1 government shutdown delayed certification until November 4, 2025, after the employee's H-1B status expired. *Id.* ¶ 10. To avoid falling out of status, the employee left the United States on October 15, 2025, and returned to India, where he planned to seek a visa once BAE filed and USCIS approved the petition. *Id.* ¶ 11. To petition for him now, BAE would have to pay a $100,000 fee that it cannot afford. *Id.* ¶¶ 12-13. As a result, the employee remains in India instead of working in BAE's plant and transitioning into the Quality Manager role, and BAE is having to manage its quality-control needs without the employee it has trained and relied on for years. *Id.* ¶¶ 13-15.

**3. Lower Brule Day School**

LBDS is a K–12 school managed by the Lower Brule Sioux Tribe on its reservation in rural South Dakota. Witte Decl. ¶¶ 1, 5, 8. LBDS faces ongoing challenges in recruiting and retaining qualified teachers due to its geographic location. *Id.* ¶ 10. To meet its staffing needs and ensure instructional continuity, LBDS relies on noncitizen educators requiring H-1B sponsorship. *Id.* ¶ 11.

LBDS currently employs ten H-1B teachers, four of whom are the school's only teachers providing special education services. The school plans to recruit at least one additional teacher for the 2026–2027 school year, and based on past experience, expects the most qualified applicants to require H-1B sponsorship. *Id.* ¶ 12. The imposition of the $100,000 fee has placed the school in an impossible position: the fee is approximately double a starting teacher's salary, and LBDS cannot afford to pay it. *Id.* ¶ 12. In response, the Lower Brule Sioux Tribal Council passed a resolution urging a fee waiver for LBDS and other Bureau of Indian Education funded schools that rely on the H-1B program. *Id.* ¶ 13. Without relief from the fee, LBDS fears it will be unable to sustain its workforce and meet the needs of its students. *Id.* ¶¶ 10, 12.[6]

[6] Two other lawsuits have been filed challenging aspects of the $100,000 Requirement. *Chamber of Commerce of the United States v. DHS*, No. 1:25-cv-03675 (D.D.C.), was filed on October 16, 2025

### III. PROPOSED CLASS, CLASS REPRESENTATIVES, AND CLASS COUNSEL

For the purpose of requesting a preliminary injunction, Named Plaintiffs seek provisional certification of the Class under Rule 23(b)(2), defined as and consisting of:

> All U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee under the Proclamation or the Proclamation's implementing guidance, or would file such a petition but for the fee, with the United States Citizenship and Immigration Services received on or between September 21, 2025 and September 21, 2026,[7] to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i).

Named Plaintiffs BAE, Nephrology Associates, and LBDS seek appointment as Class Representatives. In addition, Named Plaintiffs seek appointment of their counsel as Class Counsel.

### IV. ARGUMENT

The U.S. Supreme Court has long recognized that class actions are an appropriate vehicle for requesting injunctive relief in light of the "principles of equity jurisprudence." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 849–50 (2025) (endorsing the use of class actions under Rule 23). Here, Named Plaintiffs and the proposed Class of thousands of employers are subject to the Defendants' extralegal policies, including the $100,000 Requirement, thus satisfying the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. Further, Named Plaintiffs seek injunctive relief regarding Defendants' policies and practices that are generally applicable to the Class as a whole—thus warranting certification of the Class under Rule

---

in the U.S. District Court for the District of Columbia, and the plaintiffs are the U.S. Chamber of Commerce and the Association of American Universities. Currently pending are the parties' cross-motions for summary judgment—both scheduled for hearing on December 19, 2025, as well as defendants' motion to dismiss the amended complaint. In addition, *California v. Noem*, No. 1:25-cv-13829-LTS (D. Mass.) was filed on December 12, 2025 in the U.S. District Court for the District of Massachusetts by a coalition of state Attorneys General and is currently in its early stages with only a complaint filed. No relief has been granted in either case.

[7] The Class definition references the September 21, 2026 effective period because that is the current duration of the Proclamation and associated agency policies. Given the rapidly evolving policy environment, Plaintiffs recognize that circumstances may change—such as through renewal of the Proclamation's terms—and reserve the right to seek to amend or alter the Class definition accordingly. *See Thakur v. Trump*, 787 F. Supp. 3d 955, 998 (N.D. Cal. 2025) ("[P]rovisional certifications 'may be altered or amended before the decision on the merits.'") (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015)).

23(b)(2).[8]

**A. The Court can and should certify the Class now.**

The Court should certify the Class in conjunction with the pending motion for preliminary injunction. Indeed, "[c]ourts in the Ninth Circuit 'routinely grant provisional class certification for purposes of entering injunctive relief.'" *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 682 (C.D. Cal. 2020) (citation omitted); *accord Roman v. Wolf*, 977 F.3d 935, 944 (9th Cir. 2020) (finding that the "district court did not err by provisionally certifying a class" in the context of a preliminary injunction); *Meyer v. Portfolio Recovery Assoc., LLC*, 707 F.3d 1036, 1041–43 (9th Cir. 2012) (finding the district court "did not abuse its discretion by granting provisional class certification" in an order also addressing a request for a preliminary injunction); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) ("We have approved provisional class certification for purposes of preliminary injunction proceedings."). Such provisional certification is supported by Rule 23(c)(1)(a), which states that "a court must determine whether to certify a class '[a]t an early practicable time after a person sues ... as a class representative.'" *Thakur*, 787 F. Supp. 3d at 997 (citing Fed. R. Civ. P. 23(c)(1)(A)). In deciding whether to provisionally certify a class, a court's "'analysis is tempered[.]'" *Thakur*, 787 F. Supp. 3d at 997 (citing *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015)) (alterations in original) (internal quotations omitted).

Courts in this Circuit have provisionally certified classes requesting a preliminary injunction based on alleged violations of the APA. *See, e.g.*, *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1047 (N.D. Cal. 2020) (provisionally certifying class of certain incarcerated individuals for the purpose of preliminary injunction where the government defendants allegedly violated the APA for improper administration of certain payments pursuant to the Coronavirus Aid, Relief, and Economic Security Act); *Thakur*, 787 F. Supp. 3d at 1005 (provisionally certifying classes of certain academic researchers

[8] In addition, Named Plaintiffs have the requisite standing to pursue class certification. As discussed in further detail in the contemporaneously filed PI Motion, on account of their subjection to the Defendants' unlawful policy, they each have demonstrated "(1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor." *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

for the purpose of a preliminary injunction where the government defendants allegedly violated the APA for terminating grants *en masse* following a series of executive orders). Accordingly, similar relief should be granted here, where Named Plaintiffs seek to certify a class for the purpose of a preliminary injunction that will enjoin enforcement of the $100,000 Requirement.

**B. This action satisfies all requirements of Rule 23(a).**

Pursuant to Rule 23(a), parties seeking class certification must establish: "(1) that the class is so large that joinder of all members is impracticable (numerosity); (2) that there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (adequacy of representation)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(a)). The proposed Class satisfies all four requirements.

**1. The proposed Class is numerous.**

While there is no fixed number that satisfies the numerosity requirement, generally, a class greater than forty is sufficient. *See MadKudu Inc. v. USCIS*, No. 20-CV-02653, 2020 WL 7389419, at *6 (N.D. Cal. Nov. 17, 2020) (citing *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 152–53 (N.D. Cal. 2015), and *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 890 (N.D. Cal. 2015)). Where plaintiffs seek injunctive relief, as they do here, "the numerosity requirement is relaxed and plaintiffs may rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members . . . is sufficient to make joinder impracticable." *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004); *accord Nightingale v. USCIS*, 333 F.R.D. 449, 456-57 (N.D. Cal. 2019) (plaintiffs sufficiently showed numerosity where they "reasonably estimate[d]" that the proposed classes were comprised of at least hundreds of members "who filed, or will file" certain FOIA requests).

Here, numerosity is satisfied because the class is comprised of thousands of U.S. employers. On average, between Fiscal Year ("FY") 2022 and FY 2024, around 14,000 employers filed approximately 58,000 H-1B petitions each year that – if filed today – would or could be subject to the

$100,000 Requirement under the Proclamation.[9] *See* USCIS, *Characteristics of H-1B Specialty Occupation Workers FY 2024 Annual Report to Congress, October 1, 2023 – September 30, 2024* 59 Table 14 (April 29, 2025) (Liao Decl. Ex. 11); USCIS, *Characteristics of H-1B Specialty Occupation Workers FY 2023 Annual Report to Congress, October 1, 2022 – September 30, 2023* Table 14 (Mar. 6, 2024) (Liao Decl. Ex. 12); USCIS, *Characteristics of H-1B Specialty Occupation Workers FY 2022 Annual Report to Congress, October 1, 2021 – September 30, 2022*, Table 14 (Mar. 13, 2023) (Liao Decl. Ex. 13).[10] And this sum of tens of thousands of employers does not include those that were deterred from filing because of the fee, further confirming that joinder is impracticable. *See Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781, 793 (N.D. Cal. 2021); *see also Thakur*, 787 F. Supp. 3d at 1000 (finding numerosity satisfied where a federal policy allegedly "impact[ed] hundreds or thousands").

**2. The proposed Class shares common questions of law and fact.**

"To show commonality, Plaintiffs must demonstrate that there are questions of fact and law that are common to the class." *Ellis*, 657 F.3d at 981 (citing Fed. R. Civ. P. 23(a)(2)). Only "a single common question" is required. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). Demonstrating commonality requires a common contention that "is capable of classwide resolution—which means

---

[9] USCIS does not make publicly available the number of employers who filed an H-1B petition under circumstances that would render them subject to the $100,000 Requirement. Named Plaintiffs reasonably estimated this number by comparing the number of H-1B petitions approved by USCIS in FYs 2022 to 2024 that requested consular (or port of entry) notification as disclosed in USCIS's annual reports to Congress, *see* Liao Decl. Exs. 11, 12, 13, against the employer data downloadable from USCIS's online H-1B Employer Data Hub indicating which employers filed "New Employment" H-1B petitions, *see* https://www.uscis.gov/tools/reports-and-studies/h-1b-employer-data-hub?utm. Requesting consular notification generally indicates that the H-1B beneficiary is located outside the United States (and therefore will apply for a visa at a consulate or seek admission at a port of entry) —circumstances that, under the October Guidance, trigger the imposition of the $100,000 fee—making such petitions a reasonable proxy for estimating the number of employers subject to the Requirement. Given the large size of the data contained in USCIS's H-1B Employer Data Hub, Named Plaintiffs are unable to file the downloadable files as exhibits, but can transmit them to the Court upon the Court's request.

[10] The number of employers who may be subject to the $100,000 fee could extend to as high as over 59,000 employers—the average number of employers that filed any type of H-1B petition between FYs 2022 to 2024, including amendments, extensions, and changes of status—since the granting of amendments, extensions, and changes of status (which would make a petition not subject to the $100,000 fee) is discretionary.

that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). By contrast, questions are not common when they rest on "evidence that varies from member to member" of the class. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). For example, courts have found commonality to be satisfied when the plaintiffs are 'challeng[ing] a system-wide practice or policy that affects all of the putative class members.'" *Thakur*, 787 F. Supp. 3d at 1000 (alteration in original) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005)); *see Scholl*, 489 F. Supp. 3d at 1044 (commonality met where plaintiffs and the class asserted "the same legal claim," that defendants' recent policy of withholding certain payments to incarcerated persons violated the APA); *Casa Libre/Freedom House v. Mayorkas*, No. 2:22-CV-01510-ODW, 2023 WL 3649589, at *9, 15 (C.D. Cal. May 25, 2023) (commonality met where plaintiffs challenged the legality of USCIS's newly-announced tolling provisions for adjudicating Special Immigrant Juvenile petitions under, inter alia, the APA, and where class members included "those who have experienced or will experience the effects" of those provisions); *Inland Empire–Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048, 2018 WL 1061408, at *8 (C.D. Cal. Feb. 26, 2018) (commonality found where Plaintiffs "identified a number of legal questions common to the proposed class," including whether Defendants' DACA termination practices violated the APA).

Here, the implementation of the $100,000 Requirement is "a system-wide practice or policy that affects all of the putative class members." *Armstrong*, 275 F.3d at 868; *see also MadKudu*, 2020 WL 7389419, at *7 (finding commonality satisfied where plaintiffs alleged that defendants had a practice or policy of erroneously denying H-1B petitions for market research analysts). In September 2025, the Defendants instituted the $100,000 Requirement purportedly pursuant to 8 U.S.C. § 1182(f) and § 1185(a), with only limited exceptions that lie within the discretion of DHS. Proclamation § 1(a), (c). However, Named Plaintiffs allege that neither 8 U.S.C. § 1182(f) nor § 1185(a) authorizes the President to impose a $100,000 fee, nor have Congress or the Constitution authorized the imposition of such a fee. First Amended Compl. ("FAC") ¶¶ 82-86 (ECF 74). Accordingly, Named Plaintiffs

allege the $100,000 Requirement is an *ultra vires* act because it conflicts with the existing Congressional statutory scheme and fee statutes governing the H-1B program, exceeds the text of the INA, and impermissibly imposes what amounts to a tax on Class members for raising revenue. *Id.* ¶¶ 211-226. Given the Agency Defendants' role in implementing the Proclamation, Named Plaintiffs also allege that the $100,000 Requirement is subject to review under the APA as final agency action. Aside from being contrary to the law and arbitrary and capricious, the $100,000 Requirement also "imposes new obligations" on Class members and was thus a "legislative rule" that required notice and comment rulemaking before its implementation. *Id.* ¶¶ 227-252.

As such, Named Plaintiffs' claims give rise to several overarching questions that are common to the class, including:

(1) Whether the President exceeded his authority by unilaterally changing a statutory scheme created by Congress;

(2) Whether the President exceeded his authority by unilaterally imposing a fee, tax, or other mechanism to generate revenue for the United States;

(3) Whether the $100,000 Requirement violates the APA because it is not in accordance with the law and is in excess of statutory authority;

(4) Whether the $100,000 Requirement violates the APA because it is arbitrary and capricious;

(5) Whether the $100,000 Requirement violates the APA due to Defendants' failure to conduct notice and comment rulemaking and otherwise rulemaking without observance of the procedure required by law.

Accordingly, notwithstanding any employer-specific differences (such as size, sector, or whether the employers is cap-subject or cap-exempt), the question of whether Defendants can condition H-1B petition adjudications, visa issuance, or entry on a $100,000 fee "can thus be answered as to the entire class 'in one stroke.'" *Parsons*, 754 F.3d at 679–80 (citation omitted) (commonality found where plaintiffs alleged that certain statewide policies and practices exposed putative class of inmates to substantial risk of harm); *see Scholl*, 489 F. Supp. 3d at 1044 (commonality found where plaintiffs and the class asserted the same legal claim that defendants' practice violated the APA). The

same administrative record and governing statutes control for all class members. *See infra* Section IV.C.

Though USCIS's October Guidance states that the Proclamation does not apply to certain amendments, extensions, and changes of status and provides an NIE, such situations where employers are not subject to the $100,000 fee are, by definition, not encompassed by the Class. Thus, these two potential scenarios do not change the fundamental common question to the Class of employers who are subject to the $100,000 Requirement: whether the fee is lawful.

**3. Plaintiffs' claims are typical of the Class.**

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis*, 657 F.3d at 984 (citing Fed. R. Civ. P. 23(a)(3)). To be typical under this "permissive" standard, class representatives' claims "need not be substantially identical," but rather "reasonably coextensive" with those of absent class members. *Parsons*, 754 F.3d at 685 (citation and internal quotations omitted). "'[W]hether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct' inform the analysis." *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 809 (9th Cir. 2020) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Here, there is no question that the Named Plaintiffs suffered "the same or similar injury" based on "the same course of conduct" on the part of the government." *Hanon*, 976 F.2d at 508. Though Named Plaintiffs and putative Class members may operate different entities with different organizational needs and circumstances, they are all employers who have filed or will file an H-1B petition that is subject to the $100,000 fee within the one-year period of the Proclamation, or would file such a petition but for the fee, and are thus subject to the "same course of conduct": the unlawful Proclamation and subsequent agency guidance.

As discussed in further detail *infra* Section IV.C, this subjection to an unlawful executive action is the "same or similar injury" suffered by each of the Named Plaintiffs and putative Class members. *See Parsons*, 754 F.3d at 685 (typicality found where plaintiffs alleged that they "were

exposed, like all other members of the putative class, to a substantial risk of serious harm by the challenged . . . policies and practices"); *Thakur*, 787 F. Supp. 3d at 1001 (typicality met where plaintiffs' and the class's research grants were all subject to the same government practice); *MadKudu*, 2020 WL 7389419, at *8 ("The named Plaintiffs' claims are typical of those of the class because their H-1B petitions were allegedly denied because of Defendants' unlawful policy and practice ........ "). Furthermore, because the Class is limited to employers who are subject to the Proclamation or its implementing guidance—that is, employers who are affected by executive action before its expiration date in September 2026—the Class members all face similarly imminent injury requiring emergency preliminary relief. *See* PI Mot. Argument § IV.

**4. The proposed Class Representatives and Class Counsel are adequate.**

To meet the requirement under Rule 23(a)(4) that the class representatives "fairly and adequately protect the interests of the class," the district court must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985. The Named Plaintiffs are all employers whose interests are identical to those of the putative Class, all of whom are subject to the $100,000 Requirement, which Named Plaintiffs challenge.

***First***, there are no conflicts of interest because the Named Plaintiffs' "interests are aligned with those of absent class members." *Thakur*, 787 F. Supp. 3d at 1002. As discussed above, Plaintiffs' and absent Class members' claims rise and fall on the same questions of law and fact. The Named Plaintiffs either have filed an H-1B petition, plan to file one in the future, or would file one but for the application of the allegedly unlawful $100,000 Requirement. Zylka Decl. ¶¶ 12–13 (BAE would file an amended H-1B petition for an employee were it not for the $100,000 Requirement); Waters Decl. ¶ 16 (Nephrology Associates filed an H-1B petition for a physician, which remains pending); Witte Decl. ¶ 12 (LBDS is seeking a teacher candidate for the fall 2026 school year for which the most qualified available candidates likely would require an H-1B visa). Accordingly, Named Plaintiffs "seek the same injunctive relief as class members: an order enjoining defendants from enforcing an unlawful

policy." *Scholl*, 489 F. Supp. 3d at 1045 (finding the adequacy requirement satisfied where named plaintiffs and class members all sought to enjoin defendants from enforcing their policy of excluding plaintiffs and class members from receiving certain economic impact payments, where named plaintiffs alleged that the policy was contrary to the law and thus violated the APA). Further, Named Plaintiffs are unaware of any conflicts of interest with other Class members and will represent the interests of the Class members as they would their own. Zylka Decl. ¶¶ 16-18 (BAE); Waters Decl. ¶¶ 22-24 (Nephrology Associates); Witte Decl. ¶¶ 14-16 (LBDS).

***Second***, Named Plaintiffs have demonstrated their commitment to "prosecut[ing] the action vigorously" to achieve classwide relief. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Reflecting an intention to pursue the interests of the class vigorously, the Named Plaintiffs have been actively involved, maintained regular contact with proposed Class Counsel, and assisted in the factual development of the class claims. As a result, the Named Plaintiffs have demonstrated that they have sufficient knowledge of the case and their duties as class representatives.

***Third***, the Named Plaintiffs retained a coalition of three not-for-profit organizations and five private law firms each of which, standing on its own, possesses substantial experience in complex civil actions; collectively they are more than qualified to serve as class counsel. *See* Srinivasan Decl. *passim.* Named Plaintiffs have retained counsel who are among the most experienced in the country in representing plaintiffs in administrative law, immigration law, and class actions. Plaintiffs request that their counsel be appointed to represent the proposed Class. Fed. R. Civ. P. 23(g).

**C. This action satisfies Rule 23(b)(2).**

Plaintiffs have satisfied the requirements of Rule 23(b)(2), as they seek uniform classwide injunctive relief from Defendants conditioning H-1B petition adjudications, visa issuance, and/or entry on payment of the $100,000 fee, and request that the Court direct Defendants to accept and adjudicate such petitions without imposing or collecting that fee.

Class certification under Rule 23(b)(2) is appropriate for "the class as a whole" when "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2); *see also Ellis*, 657 F.3d at 986 ("Class certification under Rule 23(b)(2) is appropriate

only where the primary relief sought is declaratory or injunctive.") (citation omitted).[11] The requirements for certification under Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688 (citation omitted); *see also Scholl*, 489 F. Supp. 3d at 1046 (Rule 23(b)(2) satisfied where defendants "implemented a generally applicable policy of denying CARES Act payments"). A court need not "find[] that all members of the class have suffered identical injuries." *Parsons*, 754 F.3d at 688 ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Scholl*, 489 F. Supp. 3d at 1046 (citing *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).

Defendants implemented a policy that is "generally applicable" to the "class as a whole." *Parsons*, 754 F.3d at 688. Specifically, the Proclamation, as implemented by the agencies, requires a $100,000 fee from "any" new H-1B petition filed after 12:01 AM ET on September 21, 2025, which serves as a condition for adjudication of "any" new H-1B petition, as well as for visa issuance and entry into the United States of any beneficiary of a new petition. FAC ¶¶ 11, 107. The "class as a whole" seeks to enjoin Defendants from enforcing the Proclamation, including the $100,000 Requirement, and subsequent agency rules, guidance, or procedures made pursuant to or in implementation of the Proclamation. Granting certification under Rule 23(b)(2) here would accord with the practice in this Court of enjoining allegedly unlawful government policies that are applicable classwide. *See Parsons*, 754 F.3d at 688-89 (finding that district court did not abuse discretion in finding Rule 23(b)(2) satisfied where all class members were "allegedly exposed to a substantial risk of serious harm" from certain government policies of "uniform" application, and the class members' alleged injury could "be alleviated . . . by uniform changes" to those policies); *Scholl*, 489 F.Supp.3d at 1046 (finding Rule 23(b)(2) met where defendants' tax credit policy was "generally applicable to the class as a whole" and where the "plaintiffs request[ed] an injunction relating to [that] generally applicable policy"); *MadKudu*, 2020 WL 7389419, at *9 (finding Rule 23(b)(2) met where defendants'

---

[11] There is no need to show predominance or superiority to certify a Rule 23(b)(2) class. *Dukes*, 564 U.S. at 360, 362-63; *accord Parsons*, 754 F.3d at 688.

"pattern and practice of denying [certain] H-1B petitions" applied to the class as a whole and where "declaratory relief and final injunctive relief enjoining Defendants from continuing this alleged pattern and practice [was] applicable to the class as a whole").

The Named Plaintiffs and members of the Class have all suffered the injury of being subjected to Defendants' unlawful policies, which would be alleviated by uniform relief: an injunction. *See* Zylka Decl. ¶¶ 5, 10-13 (explaining that BAE relies on H-1B employees to remain competitive and that they will be subject to the $100,000 Requirement to retain one of their employees); Waters Decl. ¶¶ 11, 17-19 (explaining that Nephrology Associates has only been able to meet physician staffing needs through the H-1B program and that their H-1B petition for a prospective physician is subject to the $100,000 Requirement, unless Nephrology Associates' request for a NIE is granted); Witte Decl. ¶¶ 10-13 (explaining that LBDS relies on H-1B teachers to fill critical instructional roles and cannot afford the $100,000 Requirement, which may ultimately stall LBDS's ability to hire necessary staff for the 2026-2027 school year).

Even though the Agency Policies now contemplate certain situations in which the $100,000 Requirement does not apply, *see* Oct. Guidance, ECF 46-9 at 2-3, they do not negate the propriety of injunctive relief for the Class because—by definition—the Class includes only employers "who have filed or will file an H-1B petition that is subject to the $100,000 fee under the Proclamation or the Proclamation's implementing guidance, or would file such a petition but for the fee" and does not, therefore, encompass employers that are not subject to the $100,000 fee for any reason.[12] Therefore, enjoining Defendants from continuing the $100,000 Requirement is applicable classwide and will uniformly apply to and benefit the Class.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted and the Court should enter an order (1) certifying the Class; (2) appointing the Named Plaintiffs as Class Representatives; and (3) appointing the signatories below as Class Counsel.

[12] Because Named Plaintiffs seek classwide injunctive relief under Rule 23(b)(2), Rule 23(c)(2)(B) notice is discretionary but not required as Plaintiffs do not have a right to opt out of the class.

Dated: December 18, 2025

Respectfully submitted,


*/s/ Harini Srinivasan*
Harini Srinivasan*
Aniko Schwarcz*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, 8th Floor
Washington, D.C. 20005
(202) 408-4600
hsrinivsan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Alexandra Gray*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

*/s/ Karen C. Tumlin*
Karen C. Tumlin (CA Bar No. 234691)
Esther H. Sung (CA Bar No. 255962)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (GA Bar No. 898375)*
Brandon Galli-Graves (TX Bar No. 24132050)*
Emily Satifka (NJ Bar No. 330452020)*
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
Emily.satifka@justiceactioncenter.org

*/s/ Charles H. Kuck**
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

*/s/ Cynthia Liao*
Cynthia Liao (CA Bar No. 301818)
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*/s/ Kalpana Peddibhotla*
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

*/s/ Jesse M. Bless*
JESSE M. BLESS*
MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*/s/ Greg Siskind*
Greg Siskind***
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

*Attorneys for Named Plaintiffs BAE Industries, Nephrology Associates of the Carolinas PA, Lower Brule Day School, and the Proposed Class*

/s/ *Zachary R. New*
Zachary R. New***
Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
/s/ Zachary R. New
zachary@immigrationissues.com

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending
*** Motion to appear *pro hac vice* forthcoming

Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Elena Goldstein (D.C. Bar No. 90034087)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Jennie L. Kneedler (D.C. Bar No. 500261)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
egoldstein@democracyforward.org
sbressler@democracyforward.org
jkneedler@democracyforward.org

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| GLOBAL NURSE FORCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 4:25-cv-08454-HSG<br><br>**EXHIBIT LIST - PLAINTIFFS NEPHROLOGY ASSOCIATES OF THE CAROLINAS, PA, BAE INDUSTRIES, AND LOWER BRULE DAY SCHOOL'S MOTION FOR CLASS CERTIFICATION** |

# EXHIBIT LIST TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Declarations and exhibits filed with this motion**

| **Document** |
|---|
| Declaration of Harini Srinivasan |
| Exhibit A to Srinivasan Decl. – Cohen Milstein Sellers & Toll PLLC Firm Resume |

**Declarations and exhibits filed with Plaintiffs' concurrently-filed Motion for Preliminary Injunction, ECF 75**

| **ECF No.** | **Document** |
|---|---|
| 75-2 | Declaration of Dattie Michaelle Waters (Nephrology Associates of the Carolinas) |
| 75-3 | Declaration of Melynn Zylka (BAE Industries) |
| 75-4 | Declaration of Lance Witte (Lower Brule Day School) |
| 75-5 | Exhibit A to Witte Decl. – Lower Brule Sioux Tribal Council Resolution No. 2026-006 |
| 75-9 | Declaration of Sarah K. Peterson (International Medical Graduate Taskforce) |
| 75-10 | Declaration of Cynthia Liao |
| 75-17 | Exhibit 7 to Liao Decl. – Administrative Record filed by the Department of State in *Chamber of Commerce v. DHS*, No. 1:25-cv-03675-BAH (Dec. 5, 2025) (ECF 45-1) |
| 75-21 | Exhibit 11 to Liao Decl. – USCIS, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2024 Annual Report to Congress, October 1, 2023 – September 30, 2024* (Apr. 29, 2025) |
| 75-22 | Exhibit 12 to Liao Decl. – USCIS, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2023 Annual Report to Congress, October 1, 2022 – September 30, 2023* (Mar. 6, 2024) |
| 75-23 | Exhibit 13 to Liao Decl. – USCIS, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2022 Annual Report to Congress, October 1, 2021 – September 30, 2022* (Mar. 13, 2023) |

**Exhibits previously filed on the docket, at ECF 46**

| **ECF No.** | **Document** |
|---|---|
| 46-5 | Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025) |

| | |
|---|---|
| 46-6 | Matthew S. Davies, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, CBP (Sept. 20, 2025) |
| 46-7 | *H-1B FAQ*, USCIS (Sept. 21, 2025) |
| 46-8 | *H-1B FAQ*, State Dept. (Sept. 21, 2025) |
| 46-9 | *H-1B Specialty Occupations*, USCIS (Oct. 20, 2025) |
| 46-10 | USCIS Policy Manual Vol. 2, Part A, Ch. 4.A |
| 46-11 | USCIS Policy Manual Vol. 1, Part E, Ch. 8.C.2 |

Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Attorneys for Named Plaintiffs BAE Industries, Nephrology Associates of the Carolinas PA, Lower Brule Day School, and the Proposed Class*

* *Admitted pro hac vice*
* Motion to appear *pro hac vice* pending

[Additional Counsel listed in Motion for Class Certification]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

GLOBAL NURSE FORCE, *et al.*,

Plaintiffs,

vs.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

Case No: 4:25-cv-08454-HSG

**CLASS ACTION**

**DECLARATION OF HARINI SRINIVASAN IN SUPPORT OF PLAINTIFFS BAE, NEPHROLOGY ASSOCIATES, AND LBDS'S MOTION FOR CLASS CERTIFICATION**

Judge: Hon. Haywood S. Gilliam, Jr.
Ctrm: 2, 4th Floor
Date: February 12, 2026
Time: 2:00 P.M.

# DECLARATION OF HARINI SRINIVASAN

I, Harini Srinivasan, declare:

1. I am an attorney in good standing, duly licensed and admitted to the Bars of the District of Columbia and New York. I am admitted to practice in the Northern District of California *pro hac vice*. I submit this declaration in support of Plaintiffs BAE Industries, Nephrology Associates of the Carolinas PA, and Lower Brule Day School's Motion for Class Certification. The statements set forth in this Declaration are based on my personal knowledge, about which I could and would testify competently in open court if called upon to do so.

2. I am a partner at the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"). I represent Plaintiffs in the above-captioned matter, along with co-counsel the Justice Action Center ("JAC"), Democracy Forward Foundation ("DFF"), Kuck Baxter, LLC, Joseph & Hall, P.C., South Asian American Justice Collaborative ("SAAJCO"), Bless Litigation, LLC, and Siskind Susser, P.C. This declaration sets forth the qualifications and experiences of my law firm and co-counsel to serve as Class Counsel.

3. Cohen Milstein is one of the largest and most diversified plaintiff-side litigation firms in the country, with extensive class action experience. The firm has served as class counsel in numerous nationwide class action cases, including *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (nationwide sex discrimination class certified and reversed on appeal); *Jock et al. v. Sterling Jewelers*, No. 11 160 00655 08 (Am. Arb. Ass'n Nov. 15, 2022) (certified class arbitration alleging a nationwide Title VII gender discrimination class and conditionally certified collective action Equal Pay Act claims); and *Keepseagle v. Vilsack*, No. 1:99-CV-3119 (D.D.C. 2011) (lending discrimination class action settled for $760 million).

4. Cohen Milstein also has experience litigating complex cases on behalf of plaintiffs that are germane to the above-captioned action. *See Bourque et al. v. U.S. Dep't of State et al.*, 3:24-cv-06994 (N.D. Cal. filed Oct. 4, 2024) (the court denied the government's motion to dismiss where plaintiffs had pled a class Administrative Procedure Act ("APA") claim); *Nat'l Ass'n for the*

*Advancement of Colored People v. Donald J. Trump, in his official capacity as President of the United States*, Nos. 1:17-cv-01907, 02325 (D.D.C. filed Sep. 18, 2017) (the court granted plaintiffs' motion for summary judgment where plaintiffs had pled an APA claim relating to the rescission of the Deferred Action for Childhood Arrivals (DACA) program; the U.S. Supreme Court affirmed the decision in a 5-4 ruling in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020); *Am. Ass'n of Univ. Professors—Harvard Chapter v. Dep't of Just.*, No. 1:25-cv-10910 (D. Mass. argued July 21, 2025) (the court granted summary judgment where plaintiffs had pled APA claims); *Nat'l Ass'n for the Advancement of Colored People v. United States*, No. 8:25-cv-00965 (D. Md. filed Mar. 24, 2025) (the court administratively denied the government's motion to dismiss where plaintiffs pled an APA claim).

5. I believe our firm has the requisite skill and resources to properly prosecute this case. An excerpt of our firm resume is attached to this declaration as Exhibit A, which includes the background, relevant qualifications, and experience of Cohen Milstein counsel in this case.

6. I am a member of Cohen Milstein's Civil Rights & Employment practice group. I have served as class counsel in several cases. *See Gabaldon v. Mayorkas*, EEOC Case No. 450-2017-00086X (2024) (represented nationwide class of over 1,000 employees in a civil rights action against Customs and Border Protection); *Jock v. Sterling Jewelers Inc.* (see above); *Zollicoffer v. Gold Standard Baking, Inc.*, No. 13-CV-1524 (N.D. Ill. Apr. 23, 2023) (represented class of Black job applicants in Section 1981 hiring discrimination action against staffing agency and client companies); *Eagle v. Vee Pak, Inc.*, No. 12-C-9672 (N.D. Ill. Apr. 19, 2024) (same); *Harris v. Med. Transp. Mgmt., Inc.*, No. 1:17-cv-01371 (D.D.C. filed July 13, 2017) (represented drivers in Rule 23 class action for unpaid wages under state law). I am a graduate of American University Washington College of Law.

7. My Cohen Milstein colleague Aniko Schwarcz is the Director of Case Development in the Civil Rights & Employment practice group. As of January 1, 2026, Ms. Schwarcz will be Of Counsel in the group. Ms. Schwarcz has over a decade of experience working with clients and witnesses and evaluating legal claims of prospective class members. At Cohen Milstein, she directs

and oversees the intake and evaluation of the firm's civil rights-related inquiries and case referrals, including investigating and developing new cases involving antidiscrimination provisions of Title VII, the Equal Pay Act, the Affordable Care Act, and the Fair Housing Act, as well as wage theft issues under the Fair Labor Standards Act. She is a member of the National Employment Lawyers Association and a graduate of the University of Maryland Francis King Carey School of Law.

8. My Cohen Milstein colleague Alexandra Gray is an Associate in the Securities Litigation & Investor Protection practice group, where she represents investors in securities class actions and shareholder derivative lawsuits. She served as co-class counsel in *In re EQT Corp. Sec. Litig.*, No. 2:19-cv-00754 (W.D. Pa. Nov. 24, 2025) and serves as counsel for the lead plaintiff and lead counsel for the proposed class *In re Orthofix Med., Inc. Sec. Litig.*, No. 2:24-cv-00690 (E.D. Tex. filed Aug. 21, 2024). Before joining Cohen Milstein in 2024, Ms. Gray was an associate at a litigation firm where she represented clients in diverse commercial matters. She earned her J.D. from New York University School of Law.

9. JAC is a nonprofit organization that uses co-equal litigation and storytelling strategies to address unmet needs and build new frameworks to tangibly improve immigrants' lives. Collectively, JAC attorneys have over sixty years of experience in immigrants' rights and civil rights litigation, including litigating causes of action under the APA.

10. JAC attorneys' work has included litigation over the DACA program, the first Trump administration's Muslim Ban, and the first Trump administration's Remain in Mexico Protocols, as well as a successful intervention to defend the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans from a legal challenge brought by Texas and a coalition of twenty other states. JAC attorneys are also experienced in complex civil litigation and specifically in federal class actions, having successfully sought and obtained class certification in prior cases over the past two decades. *See, e.g.*, *Gomez v. Trump*, 490 F.Supp.3d 276 (D.D.C. 2020), *rev'd and remanded sub nom. Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024); *Doe 1 v. Trump*, 418 F.Supp.3d 573 (D. Or. 2019), *rev'd and vacated sub nom. Doe #1 v. Trump*, 984 F.3d 848 (9th Cir. 2020), *vacated on denial of reh'g en banc*

*sub nom. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021), and *vacated as moot sub nom. Doe #1 v. Trump*, No. 3:19-CV-1743-SI, 2021 WL 12392716 (D. Or. Oct. 25, 2021); *Batalla Vidal v. Wolf*, 501 F.Supp.3d 117 (E.D.N.Y. 2020); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013); *Unknown Parties v. Johnson*, 163 F.Supp.3d 630 (D. Ariz. 2016); *Orantes-Hernandez v. Gonzales*, 504 F.Supp.2d 825 (C.D. Cal. 2007), *aff'd sub nom. Orantes-Hernandez v. Holder*, 321 F.App'x 625 (9th Cir. 2009).

11. Karen C. Tumlin is the Founder and Director of JAC and a nationally recognized impact litigator focusing on immigrants' rights. She has successfully litigated numerous cases of national significance, including litigating a challenge to the Trump Administration's effort to end the DACA program, filing the first major legal challenge to the Muslim Ban, and bringing the constitutional challenge to Arizona's notorious anti-immigrant law, SB 1070. She formerly served as the Director of Legal Strategy and Legal Director for the National Immigration Law Center, where she built up and led a legal department of over 15 staff members. Ms. Tumlin earned her J.D. and M.P.P. from U.C. Berkeley's School of Law and Goldman School of Public Policy, respectively, and clerked for the Honorable Dorothy Nelson on the United States Ninth Circuit Court of Appeals. She has served as class counsel for classes in multiple class actions, including *Doe v. Noem*, 1:25-cv-10495-IT (D. Mass. filed Feb. 28, 2025); *Batalla Vidal v. Wolf*, 501 F.Supp.3d 117; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006; and *Orantes-Hernandez v. Gonzales*, 504 F.Supp.2d 825.

12. Esther H. Sung is the Legal Director of JAC and has litigated a number of groundbreaking cases, including lawsuits challenging the Trump Administration's Muslim and Refugee Bans and Arizona's anti-immigrant SB 1070 law. Before becoming an immigrants' rights impact litigator, Esther practiced at a litigation firm in Los Angeles for six years, where her clients included the Getty Museum, Southern California Edison, and Transocean. She graduated *magna cum laude* from the University of Texas School of Law and clerked for the Honorable Lee H. Rosenthal on the United States District Court for the Southern District of Texas and the Honorable Allyson K. Duncan on the United States Fourth Circuit Court of Appeals. Ms. Sung has served as class counsel

in multiple class actions, including *Doe v. Noem*, 1:25-cv-10495-IT; *Doe 1 v. Trump*, 418 F.Supp.3d 573; and *Gomez v. Trump*, 490 F.Supp.3d 276.

13. Laura Flores-Perilla is a Staff Attorney at JAC. She received her J.D. from UC Irvine, School of Law and has developed her expertise in immigration law, civil rights law, and administrative law through her work in UC Irvine's Immigrant Rights Clinic and COVID-19 Civil Rights Clinic, internships at the National Center for Youth Law and Public Advocates, and a Skadden Fellowship with JAC. She is now serving as class counsel in *Doe v. Noem*, 1:25-cv-10495-IT, and has litigated and advocated to defend, among others, the rights of unaccompanied children, humanitarian parole beneficiaries, and DACA recipients.

14. Hillary Li serves as Counsel for JAC. She has litigated many complex civil rights suits, including class action and multi-plaintiff cases. She currently serves as class counsel in *Doe v. Noem*, 1:25-cv-10495-IT. Ms. Li earned her law degree from the University of North Carolina School of Law in 2017, after which she litigated complex securities cases for approximately one year and litigated for three years with Asian Americans Advancing Justice-Atlanta. At Advancing Justice-Atlanta, she litigated impact cases related to immigrant justice and voting rights, including challenging the mass detention of Asian immigrants; the detention of medically vulnerable immigrants during the COVID-19 pandemic; and state voter suppression bills. She also served as Policy Counsel with Detention Watch Network for three years, where she led congressional advocacy related to immigration detention and enforcement issues. Ms. Li has experience with litigation involving administrative law, immigration law, and constitutional claims.

15. Brandon Galli-Graves is a Staff Attorney at JAC. He received his JD from Brigham Young University J. Reuben Clark Law School and has experience in immigration, civil rights, constitutional, and administrative law. Prior to joining JAC, Mr. Galli-Graves was an Immigrant Justice Corps fellow on RAICES's federal litigation team, where his work centered on holding the government accountable for harm inflicted on immigrants and pursuing systemic change in the federal courts. Mr. Galli-Graves has been counsel in tort lawsuits against Immigration and Customs

Enforcement (ICE) and private prison companies, lawsuits defending humanitarian immigration parole pathways, and lawsuits challenging immigration enforcement in sensitive locations such as churches and schools. He currently serves as class counsel in *Doe v. Noem*, 1:25-cv-10495-IT.

16. Emily Satifka serves as Counsel for JAC. Prior to joining JAC, she litigated civil rights matters in federal court at both Youth Law Center and Juvenile Law Center addressing systemic failures in youth detention systems. At Youth Law Center, she also worked to address issues impacting immigrant youth in need of legal representation. Ms. Satifka earned her law degree from University of California, Irvine School of Law in 2019. In addition to her litigation experience, she also worked at Philadelphia Lawyers for Social Equity and the New Jersey Office of the Public Defenders, focusing on post-conviction representation and removing barriers created by contact with the criminal legal system, including working closely with immigrant and mixed-status families. Ms. Satifka has experience with litigation involving constitutional claims and policy-oriented litigation.

17. DFF is a nonprofit national legal organization that advances democracy and social progress through litigation, policy and public education, and regulatory engagement. DFF represents clients, including nonprofits, local governments, tribes, small businesses, unions, and individuals, in challenging harmful and unlawful governmental action and in supporting governmental action. DFF has successfully litigated dozens of constitutional and administrative law challenges to government programs and agency actions.

18. DFF has the resources to adequately represent the plaintiff class. With a staff totaling 160 people, DFF employs approximately 80 full-time lawyers and numerous support staff. DFF is committed to providing the resources necessary to represent the members of the Plaintiff class fairly and adequately. We have already devoted substantial effort to identifying and investigating the claims in this case and working with the Plaintiffs and our co-counsel, including developing the complaint, declarations, motion for a preliminary injunction, and motion for class certification.

19. Cynthia Liao is Senior Counsel at DFF. She has extensive experience litigating constitutional and administrative law challenges to government programs and agency actions,

including as a Trial Attorney at the U.S. Department of Justice, Civil Division, Federal Programs Branch, where she litigated high-stakes challenges to federal regulations and enforcement actions in district courts across the country, including numerous cases involving structural constitutional challenges to federal agencies' authority. Before that, she worked at the U.S. Department of Labor for 7 years, most recently as a senior counsel to the Solicitor of Labor. Her portfolio included constitutional and administrative law issues affecting DOL programs, DOL's Supreme Court and amicus docket, and workers' compensation, among others. Cynthia clerked for Judge David O. Carter of the U.S. District Court for the Central District of California and Judge Michael D. Hawkins of the U.S. Court of Appeals for the Ninth Circuit.

20. Johanna M. Hickman is Senior Counsel at DFF. She has substantial experience litigating constitutional and administrative law challenges to government programs and agency actions and in complex civil litigation. Prior to joining DFF, Ms. Hickman was a senior enforcement attorney at the Consumer Financial Protection Bureau, where she investigated and litigated violations of the Consumer Financial Protection Act and other federal consumer financial protection laws. Prior to that, she worked in private practice at Cohen Milstein and Willkie Farr & Gallagher, LLP. Ms. Hickman clerked for Judge James I. Cohn of the U.S. District Court for the Southern District of Florida.

21. Jennie Kneedler is Senior Counsel at DFF. She is a former Immigration Judge in the U.S. Department of Justice's Executive Office of Immigration Review and has extensive experience in federal district court litigation and immigration law, including as a managing attorney in the Detained Adult Program at the Capital Area Immigrants' Rights Coalition (now Amica Center for Immigrant Rights), director of policy and pro bono for the American Bar Association's Commission on Immigration, a Trial Attorney and Senior Trial Counsel with the Federal Programs Branch in the Civil Division at DOJ. Ms. Kneedler also previously worked in private practice at Steptoe & Johnson LLP, and clerked for Judge Keith P. Ellison, United States District Judge for the Southern District of Texas.

22. Steven Bressler is a Senior Legal Advisor at DFF. He has extensive experience litigating high-profile constitutional and administrative law challenges to government programs and agency actions. In his prior role in the Legal Division at the Consumer Financial Protection Bureau (Assistant Attorney General, 2017-2021; Acting Deputy General Counsel, 2021-2022; Deputy General Counsel, 2022-2025), he helped lead and then led all of the agency's appellate, defensive, and amicus litigation, including the CFPB's successful defense of its organic funding statute in various federal district and appellate courts and, with the Office of the Solicitor General, before the Supreme Court in *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024). Mr. Bressler also previously served in various roles at the U.S. Department of Justice, primarily as Trial Attorney then Senior Trial Counsel in the Civil Division, Federal Programs Branch, which represents federal agencies in cases raising constitutional, statutory, and regulatory issues, and he clerked in the U.S. District Court for the Eastern District of Pennsylvania.

23. Elena Goldstein is a Legal Director at DFF. She previously served as Deputy Solicitor of Labor in the U.S. Department of Labor and as Deputy Chief of the Civil Rights Bureau in the New York State Office of the Attorney General, and senior staff attorney at the New York Legal Assistance Group, among other positions. Ms. Goldstein has extensive experience litigating significant administrative law cases. *See, e.g.*, *New York v. U.S. Dep't of Com.*, 351 F.Supp.3d 502 (S.D.N.Y.), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 588 U.S. 752 (2019); *New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210 (2d Cir. 2020); *New York v. Trump*, 490 F.Supp.3d 225 (D.D.C. 2020), *order clarified*, No. 20-CV-2340, 2020 WL 6572675 (D.D.C. Oct. 22, 2020), and *opinion clarified*, No. 20-CV-2340, 2021 WL 7908123 (D.D.C. Apr. 3, 2021), and *opinion clarified sub nom. New York v. Biden*, No. CV 20-2340, 2021 WL 7908124 (D.D.C. Aug. 23, 2021). She also has complex civil litigation and class action experience; during her time at the New York Legal Assistance Group, she represented low-wage and immigrant workers in federal class action litigation.

24. Kalpana Peddibhotla is the Executive Director of SAAJCO, a national nonprofit dedicated to advancing the civil and human rights of the South Asian diaspora in the United States. Ms. Peddibhotla has practiced law for over 25 years, with nearly two decades focused on U.S. immigration law. Prior to joining SAAJCO, she oversaw the filing of thousands of H-1B petitions as a partner at her former law firm and has taught continuing legal education courses on H-1B practice for the American Immigration Lawyers Association and the South Asian Bar Association.

25. Charles H. Kuck is the Founder Partner of Kuck Baxter, LLC. He has served as class counsel for classes that include H-1B visa holders and Diversity Lottery Applicants, and in challenges to regulations under the APA. Mr. Kuck is a former national president of the American Immigration Lawyers Association, is Board Certified in Immigration Law by the National Board of Trial Advocacy, and has litigated in federal court on behalf of plaintiffs in more than 300 cases over the last 36 years.

26. Zachary R. New is a Partner at Joseph & Hall, P.C., where his practice focuses on employment-based immigration and federal litigation. He has worked on large scale immigration litigation ranging from class and mass actions to individual lawsuits for companies and individuals against immigration agencies. Mr. New has represented clients before DOL, USCIS, the Executive Office for Immigration Review ("EOIR"), the Board of Immigration Appeals, and in various federal courts. He also writes frequently about changes in immigration law. His scholarship has been published in the *Yale Law Journal* Forum and the *Southern California Interdisciplinary Law Journal*.

27. Jesse Matthew Bless is the Founding Partner of Bless Litigation, LLC. Mr. Bless has more than twenty years of immigration litigation experience and has previously served as class counsel in immigration-related cases, including those related to H-1B visas and a Presidential Proclamation issued pursuant to section 212(f) of the Immigration and Nationality Act. *See MadKudu Inc. v. U.S. Citizenship & Immigr. Servs.*, No. 20-cv-02653 (N.D. Cal. dismissed Oct. 22, 2021) (appointed class counsel for a class of U.S. employers seeking to employ market research analysts under the H-1B program); *Gomez v. Trump*, 490 F.Supp.3d 276 (appointed class counsel for a class of immigrants subject to a presidential suspension on entry); *Volkova v. U.S. Citizenship & Immigr. Servs.*, No. 23-

cv-7565, 2025 WL 1096918 (E.D.N.Y. Apr. 14, 2025) (appointed class counsel for a class of Ukrainian parolees seeking the return of fees improperly charged for employment authorization documents).

28. Greg Siskind is the Founding Partner of Siskind Susser, P.C. He has previously served as class counsel in immigration-related cases and is also the author of five books on immigration law including the American Immigration Lawyers Association's 4,200-page Practice and Procedure Manual. He also served 12 years on the Board of Governors of the American Immigration Lawyers Association and is the current chairman of the International Bar Association's Immigration and Nationality Law Committee.

29. I am aware of no conflicts of interest that would prevent me, my firm, or my co-counsel from zealously and aggressively pursuing the claims of the putative class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of December 2025, in the District of Columbia.

Harini Srinivasan (D.C. Bar No. 1032002)

# Exhibit A

COHENMILSTEIN

COHENMILSTEIN

# About the Firm

## We are trailblazers in plaintiff-side and class action litigation, often handling groundbreaking cases, resulting in landmark decisions.

We fight corporate abuse by pursuing litigation on behalf of individuals, investors, whistleblowers, small businesses, and other institutions in lawsuits that have raised significant and often novel legal issues.

With more than 100 attorneys in 10 practice areas in eight offices across the country, including Boston, Chicago, Minneapolis, New York, Palm Beach Gardens, Philadelphia, Raleigh, and Washington D.C., we are recognized as one of the largest and most diversified plaintiffs' firms in the country.

We regularly litigate complex matters across a wide range of practice areas:

- Antitrust
- Civil Rights & Employment
- Complex Tort Litigation
- Consumer Protection
- ERISA & Employee Benefits
- Ethics and Fiduciary Counseling
- Human Rights
- Public Client
- Securities Litigation & Investor Protection
- Whistleblower

In 2025, *The National Law Journal* named Cohen Milstein **Plaintiff Law Firm of the Year** and our Employment practice **Practice of the Year – Discrimination.** Also, *Law360* named both our Antitrust and Employment practices **Practice of the Year** for work accomplished in 2024.

*Chambers USA* and *Legal 500* consistently rank Cohen Milstein as a **Top Tier** and **Leading Firm** in Antitrust, Securities Litigation, Product Liability, Mass Torts, ERISA, and Employment Law. Likewise, the firm is consistently named in *Law360's* Glass Ceiling Report as one of the **Best Law Firms for Female Attorneys,** including 2025.

Our attorneys are also heralded as among the best in their practices by industry surveys and organizations, such as American Antitrust Institute, *The American Lawyer, Benchmark Litigation, Chambers USA, Global Competition Review, Law360, Lawdragon, Legal 500,* and *The National Law Journal*.

COHENMILSTEIN

# Civil Rights & Employment

## Our team includes civil rights and employment law visionaries and innovators who have litigated landmark civil rights and employment disputes before the highest courts in the nation and continue to actively shape civil rights and employment law.

We represent individuals from all walks of life and across all industries, including agriculture, entertainment, finance, healthcare services, manufacturing, retail, technology, transportation, and other “white collar,” “blue collar,” and “pink collar” industries.

- **Employees:** We represent employees at all levels of employment – across all industries – who have been subjected to discrimination and unlawful bias in the workplace or who have been denied pay for all of the work they performed.
- **Individuals:** We also represent groups of individuals who have been denied access to places of public accommodation, housing, and/or equal access to credit because of unlawful bias and discriminatory practices.

We are often asked to litigate cutting-edge issues related to the Fair Labor Standards Act, Title VII, Equal Pay Act, Pregnancy Discrimination Act, Americans with Disabilities Act, Family and Medical Leave Act, as well as novel joint employer liability issues and class certification and class arbitration procedural issues.

We pursue civil rights and employment class actions in federal courts across the nation, including the U.S. Supreme Court. We bring an unshakeable commitment to serving our clients vigorously and passionately *for as long as the representation may require.*

### Scope of Our Services

**Discrimination:**
– Age
– Disabilities and reasonable accommodations
– Gender, pregnancy, and family responsibilities
– Race and national origin
– Sexual orientation

**Wage and Hour:**
– Donning and doffing
– Overtime
– Pre-shift and post-shift time
– Worker misclassifications
– Seasonal workers and H-2B visas

### Making An Impact

We have litigated some of the largest, most significant civil rights and employment matters in recent

U.S. history, including:

COHENMILSTEIN

- **Department of Homeland Security v. Regents of the University of California (U.S.):** One of three cases consolidated before the Supreme Court, which ultimately blocked the Trump Administration's plan to rescind the Deferred Action for Childhood Arrivals (DACA) program, preserving immigration protections for approximately 650,000 current DACA recipients aka "Dreamers." The Court's 5-4 ruling upheld the partial summary judgment in our NAACP case before the D.D.C.

- **Jock v. Sterling Jewelers (A.A.A.; S.D.N.Y.):** A nationwide Title VII gender discrimination and Equal Pay Act class arbitration involving a certified class of more than 69,000 female employees of Sterling Jewelers, one of the nation's largest jewelry chains, resulting in the final approval of a $175 million settlement. The case involved novel legal issues and rulings related to class certification, class arbitration, and the threshold role of an arbitrator.

- **Keepseagle v. Vilsack (D.D.C.):** A more than decade-long nationwide class action on behalf of Native American farmers and ranchers against the U.S. Department of Agriculture for its systematic race-based discrimination and denial of access to low-interest rate government loans, resulting in a historic settlement of $760 million.

- **Dukes v. Walmart (N.D. Cal.):** A high-profile gender-based discrimination class action involving more than 1.6 million women that went up to the Supreme Court in 2011 and further defined class action law. The litigation was profiled in the May 2019 issue of TIME, "Nearly Two Decades Ago, Women Across the Country Sued Walmart for Discrimination. They're Not Done Fighting."

We have helped conceive of ground-breaking innovations to foster diversity, equity, and inclusion:

- **The Inclusion Rider:** A novel contractual hiring addendum made famous by Frances McDormand in her 2018 Best Actress acceptance speech. The addendum stipulates that an employer tackle implicit bias of minorities in its hiring process by interviewing or auditioning minorities for open employment opportunities so that the workplace (and the products or services rendered), authentically reflect the world in which we actually live, while protecting creative sovereignty.

- **Gender-Affirming Surgery Coverage by Aetna:** A pivotal access-to-healthcare pre-litigation settlement negotiation on behalf of four transgender women, requiring Aetna to update its clinical policy bulletin to cover such medically necessary surgery for transfeminine members, such as breast augmentation. We worked in coordination with the Transgender Legal Defense & Education Fund.

COHENMILSTEIN

# Accolades

**Practice Achievement:** Our Civil Rights & Employment practice is recognized as one of the most preeminent in the country.

- *The National Law Journal*, **Elite Trial Lawyers of the Year – Practice of the Year – Discrimination – Winner** (2022, 2025)
- *The National Law Journal*, **Elite Trial Lawyers of the Year – Practice of the Year – Employment Rights – Winner** (2023)
- *Law360*, **Practice Group of the Year – Employment Law** (2021, 2024)
- *Law360*, **Practice Group of the Year – Class Action** (2017, 2020, 2021)
- *Chambers USA*, **Litigation: Mainly Plaintiffs – Washington, D.C.** (2024)
- *The National Law Journal*, **Elite Trial Lawyers of the Year – Practice of the Year – Civil Rights – Finalist** (2021, 2022, 2024)
- *The National Law Journal*, **Elite Trial Lawyers of the Year – Practice of the Year – Civil Rights – Winner** (2023)
- *The National Law Journal*, **Elite Trial Lawyers of the Year – Practice of the Year – Employment Rights – Finalist** (2018, 2021, 2022)

**Individual Achievement:** Our Civil Rights & Employment litigators are recognized as among the best in the industry.

- *Law360*, **MVP – Employment** (2021, 2025)
- *The National Law Journal*, **Lifetime Achievement Award** (2023)
- *Forbes*, **America's Top 200 Lawyers** (2024)
- Lawdragon, **Hall of Fame** (2023)
- *Chambers USA*, **Labor and Employment: Mainly Plaintiffs – Washington, D.C.** (2023 – 2025)
- *The National Law Journal*, **Elite Women of the Plaintiffs Bar** (2022)
- *Chambers USA*, **Litigation: Mainly Plaintiffs – Washington, D.C.** (2024, 2025)
- *The National Law Journal*, **Rising Stars** (2025)
- Benchmark Litigation, **Litigation Star** (2025)
- Equal Rights Center, **Partner in Progress Award** (2025)
- Benchmark Litigation, **Labor and Employment Star** (2025)
- *Law360*, **Rising Stars – Employment** (2025)
- Best Lawyers in America, **Lawyer of the Year, Employment Law – Individuals, Washington, D.C.** (2022, 2024, 2026)
- Best Lawyers, **Ones to Watch in America** (2026)

| | |
|---|---|
| Public Justice Center, **Outstanding Partner** (2019) | *The American Lawyer,* **A Giant in the Plaintiffs Bar** (2017) |
| Washington Lawyers' Committee for Civil Rights and Urban Affairs, **Roderic V.O. Boggs Award** (2019) | Washington Lawyers' Committee for Civil Rights and Urban Affairs, **Outstanding Employment Achievement Award** (2016) |
| NAACP, **Foot Soldier in the Sand Award** (2018) | *Lawdragon,* **500 Leading Lawyers in America** (Since 2016) |
| *Legal 500,* **Leading Lawyers** (Since 2018) | Best Lawyers in America (Since 2016) |
| Lawdragon, **500 Leading Plaintiff Employment & Civil Rights Lawyers** (Since 2019) | Super Lawyers (Since 2007) |

COHENMILSTEIN

# Representative Matters – Civil Rights & Employment Law

**We bring an unshakeable commitment to serving our clients for as long as the representation may require.**

### Keepseagle v. Vilsack

Keepseagle, et al. v. Vilsack (D.D.C.): Cohen Milstein represented a certified class of Native American farmers and ranchers, who alleged that the USDA systematically denied the same opportunities to obtain farm loans and loan servicing that had been routinely afforded white farmers. On April 28, 2011, the Court granted final approval of a historic $760 million settlement with the USDA, which agreed to pay $680 million in damages to thousands of Native American farmers and ranchers and forgive up to $80 million worth of outstanding farm loan debt. On March 26, 2018 the U.S. Supreme Court declined to hear an appeal by two objectors for review of the Court of Appeals for the District of Columbia Circuit May 16, 2017 ruling, which affirmed the U.S. District Court's April 20, 2016 decision approving the plan for distribution of $380 million in unclaimed cy pres funds from the historic settlement.

### NAACP DACA Litigation

Department of Homeland Security, et al. v. Regents of the University of California, et al. (S. Ct. No. 18-587): On June 18, 2020, the Supreme Court blocked the Trump Administration's plan to rescind the Deferred Action for Childhood Arrivals (DACA) program, preserving immigration protections for approximately 650,000 current DACA recipients and opening the door for at least 130,000 new applicants to seek the protections afforded by DACA. Cohen Milstein represented the National Association for the Advancement of Colored People, the United Food & Commercial Workers International Union and the American Federation of Teachers in one of three cases consolidated before the Supreme Court.

### Jock et al. v. Sterling Jewelers Inc.

Jock, et al. v. Sterling Jewelers Inc. (A.A.A.; S.D.N.Y.): Cohen Milstein represented a certified class of more than 69,000 female employees of Sterling Jewelers, one of the nation's largest jewelry chains, in a nationwide Title VII gender discrimination and Equal Pay Act class arbitration. Claimants alleged that they were subjected to a pattern of gender-based pay and promotions discrimination. On November 15, 2022, the Arbitrator granted final approval of a $175 million settlement.

**National Association of the Deaf v. Harvard & MIT**

National Association of the Deaf v. Harvard & MIT (D. Mass.): In February 2020 and July 2020, Cohen Milstein and co-counsel successfully settled two groundbreaking class actions on behalf of deaf and hearing-impaired individuals. The landmark settlements are historic because they require two of the most lauded academic research institutions in the world to include closed captioning on all content, including videos and podcasts, available to the public online, establishing a precedent for academia and business worldwide.

**Beck, et al. v. Boeing**

Bird, et al. v. Barr (D.D.C.): Cohen Milstein represented a group of about 29,000 female employees who had claims of sex discrimination against The Boeing Company, Inc. The certified claims address discrimination in compensation for salaried employees, access to overtime work for hourly IAM employees, and promotions for both. In granting class certification, the court noted that "the data yields statistically significant results of adverse impact on female employees in every facility and at every level within the Puget sound area." Boeing agreed to settle the class action for $72.5 million.

**U.S. Customs & Border Protection Agency Pregnancy Discrimination Litigation**

Gabaldon, et al. V. Mayorkas, U.S. Department of Homeland Security (EEOC): Cohen Milstein represented U.S. Customs and Border agents in a certified class action against the U.S. Department of Homeland Security, U.S. Customs and Border Protection Agency, in which plaintiffs claim that the agency and its implementation of the temporary light duty policies discriminate against pregnant agents in violation of the Pregnancy Discrimination Act. On August 13, 2024, a class of over 1,000 agents reached a historic $45 million settlement, which includes an agreement by the agency to enact sweeping reforms to policies that will eliminate long-standing discriminatory practices.

**Disney Gender Discrimination Litigation**

Rasmussen, et al. v. The Walt Disney Company, et al. (Cal. Sup., L.A. Cty.): Cohen Milstein represented a certified class of current and former female employees of The Walt Disney Company and all Disney subsidiaries in gender pay equity dispute. Plaintiffs alleged that Disney paid women workers in California tens of thousands of dollars less than their male counterparts in violation of California's Equal Pay Act. On September 15, 2025, the court granted final approval of a $43.25 million settlement. The terms of the settlement also included a number of best practices, including benchmarking jobs to external market data and organizing jobs within Disney's job architecture.

**Federal Aviation Administration Flight Service Litigation**

Federal Aviation Administration (FAA) Flight Service Litigation (D.D.C.): Cohen Milstein represented plaintiffs in lawsuit against the Department of Transportation (DOT) and FAA for discrimination against 670 former Flight Service Specialists who live in nearly all 50 states after they were terminated by the

FAA through the RIF. On April 28, 2021, the DOT and FAA agreed to a record-breaking $43.8 million settlement to end this 16-year-old age discrimination lawsuit.

### In Re Tyson Foods, Inc. FLSA Litigation

In re Tyson Foods FLSA MDL (M.D. Ga.): Cohen Milstein was lead counsel in a collective action involving FLSA claims at over 40 Tyson chicken processing plants, which ultimately resolved the claims of approximately 17,000 chicken processing workers who had been denied compensation for donning and doffing required safety and sanitary equipment. On September 15, 2011, the Court granted final approval to a $32 million settlement.

### McDonald's Wage & Hour Litigation

McDonald's Wage & Hour Litigation (N.D. Cal., Cal. Sup. Alameda Cty., Cal. Sup. L.A. Cty., E.D.N.Y.): Cohen Milstein represented McDonald's workers in California and New York wage and hour class actions in both federal and state courts. Total settlements exceeded $28 million. Plaintiffs claimed that the fast-food giant unlawfully denied payment for work and other benefits by failing to provide meal and rest breaks, failing to pay overtime, and failing to reimburse workers for the time and expense for cleaning uniforms. These suits addressed novel joint-employer issues. One suit involved a two week-long bench trial brought under the California Private Attorneys General Act (PAGA), a relatively uncharted area of law. As a result, we established legal precedents under PAGA and wage and hour law.

### Bird, et al. v. Garland

Bird, et al. v. Garland (D.D.C.): Cohen Milstein represented a class of women who claim they suffered systemic gender discrimination and subsequent termination from the FBI's Basic Training program for new agents. The women brought their claims of disparate treatment and disparate impact under the Title VII. On February 5, 2025, the court granted final approval of a $22.6 million settlement, including important injunctive relief against the FBI.

### Alvarez v. Chipotle Mexican Grill, Inc.

Alvarez et al. v. Chipotle Mexican Grill Inc. et al. (D.N.J.): Cohen Milstein represented a class of managerial apprentices at Chipotle Mexican Grill restaurants in New Jersey who were denied the overtime pay to which they were entitled under federal and state law, including the newly enacted 2016 Overtime Rule, which was slated to take effect in December 2016 and would have doubled the salary threshold for executive, administrative and professional workers to be exempt from overtime pay requirements. On September 20, 2021, the Court approved a $15 million settlement against Chipotle to resolve the class claims and end the lawsuit.

### Temporary Staffing Agency Litigation

Temporary Employment Staffing Agency Litigation (N.D. Ill.): Cohen Milstein was involved in a series of race-based discrimination class actions in Chicago, representing African American laborers who allege that their temporary staffing agencies, and their factory clients, engaged in a repeated and collusive practice of excluding African Americans from temporary laborer positions. On April 19, 2024, the last of the cases concluded. Approved settlements total more than $14 million.

### Trotter v. Perdue Farms, Inc.

Trotter v. Perdue Farms, Inc. (D. Del.): Cohen Milstein was Co-Lead Counsel in this FLSA and state wage and hour class action brought on behalf of 15,000 hourly workers at Perdue's chicken processing facilities, across eight states. Plaintiffs claimed that Perdue did not pay workers for time spent "donning and doffing" required protective clothing and equipment to comply with worker safety and USDA regulations. In 2002, Perdue agreed to pay workers a $10 million settlement for lost wages. In addition, Perdue was required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits. In a separate settlement with the DOL, Perdue agreed to change its pay practices.

### In re Pilgrim's Pride Fair Labor Standards Act Litigation

In re Pilgrim's Pride Fair Labor Standards Act Litigation (W.D. Ark.): Cohen Milstein represented 8,000 workers in 11 states in a wage and hour lawsuit, in which the workers sought redress for unpaid overtime. The $10 million settlement allowed class members to recover about 85% of the back pay owed them.

### Willis Group Holdings Gender Discrimination Litigation

Hnot et al. v. Willis Group et al. (S.D.N.Y.): Cohen Milstein represented a certified class of 180 current and former female officers in the Northeast Region of Willis Group Holdings Ltd., a global insurance and reinsurance brokerage firm, in this high-profile pay and promotion gender discrimination class action. On November 19, 2007, the court granted final approval to an $8.5 million settlement, roughly $50,000 for each class member, an amount covering 100% of the lost wages plaintiffs claimed. The settlement was reached weeks before a jury trial was scheduled to start.

### Amedisys FLSA Litigation

Cook et al v. Amedisys, Inc. (D. Conn.): Cohen Milstein represented approximately 2,000 home health care workers in a certified FLSA collective action and state wage and hour class action against Amedisys, Inc., a national home health care provider. Home healthcare workers alleged that Amedisys used a hybrid per-visit compensation model that violated FLSA and state wage and hour law requirements for overtime-exempt employees. On January 21, 2016, the court granted final approval to an $8 million settlement, approximately $2,400 per class member.

### Reynolds et al v. Fidelity Investments Institutional Operations Company

Reynolds et al v. Fidelity Investments Institutional Operations Company (M.D.N.C.): Cohen Milstein successfully negotiated a settlement of a nationwide FLSA class action involving thousands of employees at Fidelity Investments Institutional Operations Company, Inc. call centers who were not paid overtime for mandatory pre-shift work. The court granted final approval to the settlement in January 2020.

### Lopez, et al. v. Ham Farms, LLC, et al.

Lopez, et al. v. Ham Farms, LLC, et al. (E.D.N.C.): Cohen Milstein represented hundreds of migrant seasonal and H-2A farm labor workers in a wage and hour dispute under the FLSA, the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), and the North Carolina Wage & Hour Act. On May 14, 2021, the Court granted final approval of a class action settlement with a total value of $1 million. At the final approval hearing on May 14, Judge James C. Dever III commended plaintiffs' counsel for the "excellent [settlement] papers."

### Gentiva Health Services

Gentiva Health Services (N.D. Ga.): Cohen Milstein represented hundreds of health care workers in a nationwide class action against Gentiva, one the country's largest home health care service providers. Plaintiffs sought unpaid overtime wages under FLSA. In June 2017, the court granted final approval of a confidential settlement.

### Stanley, et al. v. BarBri, Inc.

Stanley v. BarBri, Inc. (N.D. Tex.): Cohen Milstein represented a class of blind law students, who claimed that critical components of BarBri, Inc. attorney bar exam prep course offerings, including its mobile application, website and course materials, were not accessible to blind or sight impaired law students in violation of the ADA and Chpt. 121 of the Texas Human Resources. In January 2018, BarBri agreed to change its practices as a part of a settlement.

### Gender-Affirming Breast Surgery Coverage by Aetna

On January 26, 2021, Cohen Milstein and Transgender Legal Defense & Education Fund (TLDEF) successfully negotiated a pre-litigation resolution on behalf of several transgender healthcare beneficiaries of Aetna, a CVS Health company. As a part of the resolution, Aetna announced that it would expand its healthcare coverage of gender-affirming surgery to include breast augmentation for transfeminine members in most of its commercial plans.

COHENMILSTEIN

### Cynthia Allen, et al. v. AT&T Mobility Services LLC

Cynthia Allen, et al. v. AT&T Mobility Services LLC, Case (N.D. Ga.): Cohen Milstein represented plaintiffs in a putative Title VII employment discrimination class action against AT&T Mobility LLC (AT&T) for violating the Pregnancy Discrimination Act (PDA), an amendment to Title VII of the Civil Rights Act of 1964. The lawsuit also included individual Title VII, Americans with Disabilities Act, and Family and Medical Leave Act claims on behalf of the named plaintiff.

COHENMILSTEIN

# Representative Matters – Class Actions

As lead/co-lead class counsel, we have led numerous class actions before Northern California courts. Many of these cases have addressed novel issues and concluded in historic recoveries.

## Current Cases – N.D. Cal.

- ***DZ Reserve et al. v. Meta Platforms* (N.D. Cal.):** Cohen Milstein, as Class Counsel, represents a certified class of advertisers who claim that Facebook's Potential Reach metric is false and misleading due to systemic inflation of the Potential Reach. On January 13, 2025, The U.S. Supreme Court declined Meta's petition to review the Ninth Circuit's 2023 opinion affirming the lower court's 2022 class certification. As of December 5, 2025, the jury trial originally scheduled for October 14, 2025 has been vacated pending an appeal for arbitration by Meta filed weeks before trial was to begin.

---

- ***In re Meta Pixel Healthcare Litigation* (N.D. Cal.):** Cohen Milstein is Interim Co-Lead Class Counsel in this putative class action, in which consumers claim that Meta's proprietary Meta Pixel tool intercepts and transmits protected patient health information to Facebook for advertising purposes in violation of state and federal consumer protection laws, including invasion of privacy, CDAFA, and ECPA.

---

- ***Belyea, et al. v. GreenSky, Inc., et al.* (N.D. Cal.):** Cohen Milstein, as Co-Lead Counsel, is reparenting consumers in this certified false advertising and unfair business practices class action, alleging that GreenSky, a financial technology company, operates in California as an unlicensed and unregistered credit services organization, finance lender, and broker in violation of California Financing Law the Credit Services Act of 1984, and other federal and state laws.

---

- ***Gonsalves v. Block, Inc., et al.* (N.D. Cal.):** Cohen Milstein, as Co-Lead Counsel, represents investors in a putative securities class action against Block, Inc., a financial technology company best known for its Square and Cash App platforms. Investors allege that Block and Block's CEO, Jack Dorsey, and CFO/COO, Amrita Ahuja, misled investors about the strength of Block's compliance protocols and the reliability of its reported user metrics for the Cash App platform. As investors came to realize that Cash App's reported growth was illusory, Block's stock price plummeted more than 80%, erasing billions of dollars in market value.

- ***In re Da Vinci Surgical Robot Antitrust Litigation*** **(N.D. Cal.):** Cohen Milstein serves as Interim Co-Lead Counsel in this consolidated antitrust class action against Intuitive Surgical, Inc. Plaintiffs allege that Intuitive engages in an anticompetitive scheme under which it ties the purchase or lease of its must-have, market-dominating da Vinci surgical robot to the additional purchases of (i) robot maintenance and repair services and (ii) unnecessarily large numbers of the surgical instruments, known as EndoWrists, used to perform surgery with the robot—a violation of Sections 1 and 2 of the Sherman Act.

- ***Scott, et al. v. AT&T Inc.*** **(N.D. Cal.):** Cohen Milstein represents participants and beneficiaries in the AT&T Pension Benefit Plan, one of the nation's largest retirement plans, who allege that AT&T failed comply with ERISA's actuarial equivalence requirements when providing married participants joint and survivor annuities. On July 9, 2025, the court largely denied AT&T's motion for summary judgment. Plaintiffs' motion for class certification is pending.

- ***Berkeley v. Intel Corporation et al.*** **(N.D. Cal.):** Cohen Milstein represents a certified class of pension plan participants and beneficiaries, who allege that the Intel Minimum Pension Plan utilized outdated mortality tables to determine the value of joint and survivor annuities, resulting in married retirees receiving less than the actuarial equivalent of the benefit that ERISA protects.

## Recent Settlements – N.D. Cal. & State Courts

- **Sutter Health Antitrust Litigation (San Fran. Cnty., Cal.):** On August 27, 2021, the court granted final approval of a $575 million eve-of-trial settlement, which included significant injunctive relief, in this closely watched antitrust class action against Sutter Health, one of the largest healthcare providers in California. Plaintiffs alleged that Sutter restrained hospital competition through anticompetitive contracting practices with insurance companies. We represented a certified class of self-insured employers and union trust funds. In 2018, California's attorney general joined the suit.

- **Animation Workers Litigation (N.D. Cal.):** We served as Co-Lead Counsel representing a class of animation and visual effects workers who alleged that Pixar, Lucasfilm, DreamWorks, Disney and other studios conspired to suppress their pay primarily through no-poach agreements. We secured $168.5 million in total settlements, yielding average awards of more than $14,000 per class member in this novel "no-poach" pay suppression class action.

- ***In Re Anthem, Inc. Data Breach Litigation*** **(N.D. Cal.):** On August 16, 2018, the court granted final approval to a $115 million settlement – the largest data breach settlement in U.S. history – ending claims that Anthem Inc., one of the nation's largest for-profit managed health care companies, put 79 million consumers' personal information, including social security numbers and health date, at risk in a 2015 data breach. Cohen Milstein was Co-Lead Counsel in this watershed nationwide class action.

- **Lidoderm Antitrust Litigation (N.D. Cal.):** Plaintiffs alleged that Endo and Teikoku, manufacturers of the Lidoderm patch, paid Watson Pharmaceuticals to delay its generic launch. The case settled on the eve of trial. On September 20, 2018, plaintiffs obtained final approval of a $104.75 million settlement – more than 40% of plaintiffs' best-case damages estimate and the largest end-payor settlement in a federal generic suppression case in over a decade.

- **Dignity Health Church Plan Litigation (N.D. Cal.):** Cohen Milstein represented a certified class of defined benefit participants, which alleges that Dignity Health is improperly claiming that its pension plans are exempt from ERISA's protections because they are "church plans," and as a result has underfunded its plans by over $1.2 billion. In 2016, the Supreme Court agreed to hear arguments on consolidated church plan cases, and in June 2017, it reversed previous rulings and ordered plaintiffs, in this case, to file an amended complaint. On July 15, 2022, the court granted final approval to the $100 million settlement.

- ***In re Resistors Antitrust Litigation* (N.D. Cal.):** Cohen Milstein served as Interim Co-Lead Counsel for the direct purchasers of resisters, who accused the world's largest manufacturers of resistors of fixing prices. In November 2019, the court granted final approval of a $50.25 million settlement – a remarkable recovery, reflecting 33% – 57% of estimated single damages according to plaintiffs' preliminary analysis. Estimated payments to class members would be an average payment of $46,850.64; a median payment of $768.39.

- ***LLE One, LLC, et al. v. Facebook* (N.D. Cal.):** Cohen Milstein served as Co-Lead Counsel representing a class of advertising purchasers who claimed that Facebook breached its implied duty to perform with reasonable care and violated California's Unfair Competition Law by intentionally miscalculating and inflating metrics related to its video advertisement services. If not for these miscalculations, plaintiffs claim, they would not have purchased more video advertisements and at a higher price than they otherwise would have paid. In June 2020, the court granted final approval of a $40 million settlement against Facebook.

- ***Bayer ADR Securities Litigation* (N.D. Cal.):** Cohen Milstein is Lead Counsel in this certified securities class action, in which plaintiffs allege that in connection with its $63 billion acquisition of Monsanto, Bayer misrepresented the rigor of its due diligence and the nature of the legal risk presented by Monsanto's flagship product, the herbicide Roundup. Bayer investors incurred significant losses after bellwether jury trials in toxic tort cases repeatedly found in favor of the plaintiffs against Monsanto, including finding that Roundup was a "substantial factor" in causing the plaintiffs' non-Hodgkin's lymphoma, and leading to jury awards totaling hundreds of millions of dollars. On October 30, 2025, the court granted final approval to a $38 million settlement.

- ***Brooks, et al. v. Thomson Reuters* (N.D. Cal.):** Cohen Milstein represented a certified class of consumers who claimed that Thomson Reuters's CLEAR platform not only surreptitiously collected vast quantities of Californians' personal data but then sold this information to third parties, including commercial and government entities. On February 21, 2025, the court granted final approval of a $27.5 million settlement plus injunctive relief.

- ***In re Google LLC Street View Electronic Communications Litigation* (N.D. Cal.):** Cohen Milstein was co-lead counsel in a nationwide class action alleging that Google violated the Wiretap Act when its Street View vehicles secretly collected payload data from unencrypted Wi-Fi networks. Plaintiffs defeated a motion to dismiss raising novel Wiretap Act issues, and the ruling was affirmed on interlocutory appeal to the Ninth Circuit. The court approved a $13 million settlement in March 2020.

- **BlackRock 401(k) Litigation (N.D. Cal.):** Cohen Milstein successfully settled this certified class action, in which plaintiffs alleged that the BlackRock 401(k) plan administrators engaged in corporate self-dealing—restricting plan options to BlackRock's own proprietary funds, and in many cases failing to provide the lowest cost versions of those funds. On November 3, 2021, the court granted final approval of a $9.65 million settlement.

Harini Srinivasan

Partner

**WASHINGTON, DC**
**T** 202.408.4600
**hsrinivasan@cohenmilstein.com**



**PRACTICE AREAS**

Civil Rights&. Employment

**ADMISSIONS**

District of Columbia | New York

**EDUCATION**

American University Washington College of Law, J.D., cum laude, 2014 | University of Chicago, BA, With Honors, 2010

## Overview

Harini Srinivasan is a partner in Cohen Milstein's Civil Rights&. Employment Litigation practice and co-chair of the firm's Hiring&. Diversity Committee. She represents marginalized groups and supports workers in employment and civil rights class actions, often involving cutting-edge legal issues across a spectrum of discrimination and wage and hour statutes.

Prior to joining Cohen Milstein, Harini was an associate *at* a highly respected plaintiff-focused employment litigation firm, where she represented clients in employment discrimination cases involving claims under Title VII, the Age Discrimination Act, the Americans with Disabilities Act, the Fair Labor Standards Act, and state and federal wage theft statutes.

Prior to entering private practice, H□rini was a Georgetown Law Center Women's Law and Public Policy Fellow and worked at the National Partnership for Women&. Families.

While in law school, Harini was on the editorial staff of the *American University Journal of Gender, Social Policy.*

COHENMILSTEIN

## Current Cases

### Aetna Gender-Affirming Facial Surgery Litigation

Gordon, et al. v. Aetna Life Insurance (D. Conn.): Cohen Milstein is partnering with Transgender Legal Defense and Education Fund (TLDEF), now known as Advocates for Trans Equality (A4TE), and Wardenski P.C. in a putative civil rights class action against Aetna Life Insurance Company on behalf of three transgender women, who were denied coverage for medically necessary gender-affirming facial reconstruction procedures.

### Salvation Army ARC Unpaid Wages Litigation

Salvation Army ARC Unpaid Wages Litigation: Cohen Milstein represents participants in Salvation Army's adult rehabilitation centers (ARC), who perform labor in support of the organization as a condition of their enrollment, in three lawsuits alleging that The Salvation Army violated federal and state laws when it failed to pay minimum wage to ARC workers.

### Harris v. Medical Transportation Management, Inc.

Harris, et al. v. Medical Transportation Management, Inc. (D.D.C.): Cohen Milstein represents non-emergency medical transportation (NEMT) drivers in a certified class action alleging that their employer, Medical Transportation Management, Inc. (MTM), knowingly and willfully failed to pay proper wages to its NEMT drivers across Washington, D.C. under federal and District of Columbia law. This lawsuit seeks to hold MTM liable as a joint employer of the drivers.

## Past Cases

### U.S. Customs & Border Protection Agency Pregnancy Discrimination Litigation

Gabaldon, et al. V. Mayorkas, U.S. Department of Homeland Security (EEOC): Cohen Milstein represented U.S. Customs and Border agents in a certified class action against the U.S. Department of Homeland Security, U.S. Customs and Border Protection Agency, in which plaintiffs claim that the agency and its implementation of the temporary light duty policies discriminate against pregnant agents in violation of the Pregnancy Discrimination Act. On August 13, 2024, a class of over 1,000 agents reached a historic $45 million settlement, which includes an agreement by the agency to enact sweeping reforms to policies that will eliminate long-standing discriminatory practices.

### Jock et al. v. Sterling Jewelers Inc.

Jock, et al. v. Sterling Jewelers Inc. (A.A.A.; S.D.N.Y.): Cohen Milstein represented a certified class of more than 69,000 female employees of Sterling Jewelers, one of the nation's largest jewelry chains, in a nationwide Title VII gender discrimination and Equal Pay Act class arbitration. Claimants alleged that they were subjected to a pattern of gender-based pay and promotions discrimination. On November 15, 2022, the Arbitrator granted final approval of a $175 million settlement.

COHENMILSTEIN

### Temporary Staffing Agency Litigation

Temporary Employment Staffing Agency Litigation (N.D. Ill.): Cohen Milstein was involved in a series of race-based discrimination class actions in Chicago, representing African American laborers who allege that their temporary staffing agencies, and their factory clients, engaged in a repeated and collusive practice of excluding African Americans from temporary laborer positions. On April 19, 2024, the last of the cases concluded. Approved settlements total more than $14 million.

### Alvarez v. Chipotle Mexican Grill, Inc.

Alvarez et al. v. Chipotle Mexican Grill Inc. et al. (D.N.J.): Cohen Milstein represented a class of managerial apprentices at Chipotle Mexican Grill restaurants in New Jersey who were denied the overtime pay to which they were entitled under federal and state law, including the newly enacted 2016 Overtime Rule, which was slated to take effect in December 2016 and would have doubled the salary threshold for executive, administrative and professional workers to be exempt from overtime pay requirements. On September 20, 2021, the Court approved a $15 million settlement against Chipotle to resolve the class claims and end the lawsuit.

### Cynthia Allen, et al. v. AT&T Mobility Services LLC

Cynthia Allen, et al. v. AT&T Mobility Services LLC, Case (N.D. Ga.): Cohen Milstein represented plaintiffs in a putative Title VII employment discrimination class action against AT&T Mobility LLC (AT&T) for violating the Pregnancy Discrimination Act (PDA), an amendment to Title VII of the Civil Rights Act of 1964. The lawsuit also included individual Title VII, Americans with Disabilities Act, and Family and Medical Leave Act claims on behalf of the named plaintiff.

COHEN¥11LSTEIN


# Aniko R. Schwarcz

Director of Civil Rights and Employment Case Development

**WASHINGTON, DC**
**T** 202.408.4600
**aschwarcz@cohenmilstein.com**




**PRACTICE AREAS**

Civil Rights&. Employment

**ADMISSIONS**

District of Columbia | Maryland

**EDUCATION**

University of Maryland School of Law, J.D., 2011 | University of Maryland, M.S.W., 2011 | Vanderbilt University, BA, cum laude, 2004

## Overview

Aniko R. Schwarcz is an attorney in Cohen Milstein's Civil Rights&. Employment practice where she serves ,as director of case development. She investigates and develops new cases involving the antidiscrimination provisions of Title VII, the Equal Pay Act, the Affordable Care Act, and the Fair Housing Act, as well ,as wage theft issues under the F☐ir Labor Standards Act and state law.

With over a decade of experience in employment law, interviewing and working with clients and witnesses and assessing the legal claims of prospective class members, **Aniko** directs and oversees the intake and evaluation of the firm's civil rights-related inquiries and case referrals. She also onboards, educates, and supports clients throughout the class action litigation process, from investigation through resolution.

Aniko's multi-disciplinary training and experience contribute to her unique insight and broad capacity for understanding both the social-emotional and economic effects of workplace discrimination.

She has been involved in matters on behalf of:

> **Female Retail Employees** - Investigation of pregnancy and gender-based discrimination in violation of the Equal Pay Act and Title VII.
>
> **LGBTQ+ Employees** - Investigation into denial of coverage for gender affirming healthcare.

COHENMILSTEIN

- **Detained Immigrants –** Investigation into wage theft at Federal administrative detention facility.
- **Individuals Seeking Treatment for Substance Use Disorder –** Investigation into wage theft at adult rehabilitation centers.

She also represents others, including non-profit organizations, in conducting internal workplace investigations.

Aniko played a key role in *Jock, et al. v. Sterling Jewelers Inc.* (A.A.A.; S.D.N.Y.), a nationwide Title VII gender discrimination and Equal Pay Act case, in which the parties agreed to settle in 2022. She interviewed and collected affidavits from hundreds of the company's retail workers, which were produced in support of the team's successful motion for class certification. Aniko also interviewed and filed hundreds of EEOC charges on behalf of former class members in *Dukes v. Wal-Mart Stores, Inc.*

## Current Cases

### Aetna Gender-Affirming Facial Surgery Litigation

Gordon, et al. v. Aetna Life Insurance (D. Conn.): Cohen Milstein is partnering with Transgender Legal Defense and Education Fund (TLDEF), now known as Advocates for Trans Equality (A4TE), and Wardenski P.C. in a putative civil rights class action against Aetna Life Insurance Company on behalf of three transgender women, who were denied coverage for medically necessary gender-affirming facial reconstruction procedures.

## Past Cases

### Jock et al. v. Sterling Jewelers Inc.

Jock, et al. v. Sterling Jewelers Inc. (A.A.A.; S.D.N.Y.): Cohen Milstein represented a certified class of more than 69,000 female employees of Sterling Jewelers, one of the nation's largest jewelry chains, in a nationwide Title VII gender discrimination and Equal Pay Act class arbitration. Claimants alleged that they were subjected to a pattern of gender-based pay and promotions discrimination. On November 15, 2022, the Arbitrator granted final approval of a $175 million settlement.

### Gender-Affirming Breast Surgery Coverage by Aetna

On January 26, 2021, Cohen Milstein and Transgender Legal Defense & Education Fund (TLDEF) successfully negotiated a pre-litigation resolution on behalf of several transgender healthcare beneficiaries of Aetna, a CVS Health company. As a part of the resolution, Aetna announced that it would expand its healthcare coverage of gender-affirming surgery to include breast augmentation for transfeminine members in most of its commercial plans.

COHENMILSTEIN

# Alexandra Gray

Associate

**NEW YORK**
**T** 212.838.7797
**agray@cohenmilstein.com**



**PRACTICE AREAS**

Securities Litigation&. Investor Protection

**ADMISSIONS**

New York

**EDUCATION**

New York University School of Law, J.D., cum laude, 2022 I Yenching Academy of Peking University, M.A., 2018 I Stanford University, BA, 2016

## Overview

Alexandra Gray is an associate in Cohen Milstein's Securities Litigation&. Investor Protection practice, where she represents investors in shareholder derivative lawsuits and securities class actions.

Prior to joining Cohen Milstein, Alexandra was a litigation associate at aprominent international law firm and engaged in diverse commercial matt,ers, including before the Delaware Chancery Court.

While in law school, Alexandra authored the note, *International Human Rights Law and the Equal Rights Amendment Litigation: Promise and Pitfalls under* Roper v. Simmons, NYU Journal of International Law and Politics, Vol. 53, No. 3,202t She also participated in civil rights clinics and was on the executive board of NYU Law Moot Court.

Prior to law school, Alexandra studied and received a master's degree in China and was named in 2016 *China* Hands 25 Under 25: Leader in US-China Relations, recognizing young individuals for their exceptional promise in furthering US-China relations and in China studies.

## Current Cases

**In re Orthofix Medical, Inc. Securities Litigation**

In re Orthofix Medical, Inc. Securities Litigation (E.D. Tex.): Cohen Milstein, as sole Lead Counsel, represents investors in a securities fraud class action against Orthofix Medical Inc. and SeaSpine

Holdings Corporation and certain senior executives for entering a merger without conducting thorough due diligence. The newly appointed CEO, CFO, and CLO of Orthofix, formerly with SeaSpine, had allegedly fostered a hostile and misogynistic workplace at SeaSpine and were defendants in a California state court gender discrimination class action, which settled in 2021 — information that was publicly available. When the market learned that Orthofix terminated the executives, the stock plummeted by more than 30%.

## Past Cases

### In re EQT Corporation Securities Litigation

In re EQT Corporation Securities Litigation (W.D. Pa.): Cohen Milstein is Co-Lead Counsel in this securities class action, in which Plaintiffs allege that EQT misrepresented the "substantial synergies" that were expected to arise from a planned merger with rival natural gas producer Rice Energy due to "the contiguous and complementary nature of Rice's asset base with EQT's." On November 4, 2025, the court granted final approval of a $167.5 million all cash settlement.

### In re XL Fleet (Pivotal) Stockholder Litigation

In re XL Fleet (Pivotal) Stockholder Litigation (Del. Ch.): Cohen Milstein is co-lead counsel in a stockholder action against XL Fleet and certain current and former officers and directors. The action alleges that XL Fleet and Pivotal entered into a de-SPAC transaction harmful to stockholders. On April 30, 2024, the court granted final approval of a $19.5 million cash settlement.

# Exhibit 5

Karen C. Tumlin (CA Bar No. 234691)
Esther H. Sung (CA Bar No. 255962)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (GA Bar No. 898375)*
Brandon Galli-Graves (TX Bar No. 24132050)*
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

*Counsel for Plaintiffs*

* *Motion for pro hac vice to be filed*

[Additional co-counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

GLOBAL NURSE FORCE; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 4811; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO COMMITTEE OF INTERNS AND RESIDENTS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; GLOBAL VILLAGE ACADEMY COLLABORATIVE; SOCIETY OF THE DIVINE WORD – CHICAGO PROVINCE; FATHERS OF ST. CHARLES; CHURCH ON THE HILL, *D/B/A ALGOOD FIRST BAPTIST*; JOHN SMITH; PHOENIX DOE,

*Plaintiffs*,

**Case No. 3:25-cv-8454**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Administrative Procedure Act Case**

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director, U.S. Citizenship and Immigration Services; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State,

*Defendants*.

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 5

III. DIVISIONAL ASSIGNMENT .......... 6

IV. PARTIES .......... 6

V. LEGAL BACKGROUND .......... 12

A. Congress Created the H-1B Visa to Ensure the U.S. Could Attract Necessary Workers in Specialty Occupations .......... 13

B. In Designing the H-1B Program, Congress Included Protections for U.S. Workers .......... 14

C. Congress Created a Detailed Statutory Scheme to Govern the H-1B Process That Balances Private and Public Sector Needs .......... 16

1. H-1B Registration and Lottery for Cap-Subject H-1B Visas .......... 16

2. Cap-Exempt H-1B Visas .......... 17

3. H-1B Petition Process .......... 17

4. Visa Issuance and Entry .......... 18

D. Congress Established a Detailed Fee System for H-1Bs That Sets Parameters on Fees and Dictates Their Use .......... 19

E. The President's Ability to Restrict Entry Under the INA Does Not Authorize Him to Override Congress's Comprehensive H-1B Statute .......... 21

VI. FACTUAL ALLEGATIONS .......... 22

A. The President's Proclamation .......... 22

1. The Proclamation is Based on Multiple Errors of Fact and Ignores the Benefits of the H-1B Program to the American Economy .......... 24

2. The Proclamation's Exorbitant $100,000 Fee Is Unprecedented and Unjustified, and the Exception Process is Ripe for Abuse .......... 25

3. After the Ill-Planned Proclamation Caused Immediate Harm, the Government Began to Backtrack .......... 26

B. The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions ........ 28

C. The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest ........ 30

1. Health care ........ 30

2. K-12 school systems ........ 35

3. Religious organizations ........ 39

4. Research and academic institutions ........ 48

VII. CAUSES OF ACTION ........ 52

VIII. PRAYER FOR RELIEF ........ 60

# I. INTRODUCTION

1. The H-1B visa program was established by Congress to provide a pathway for American employers to hire skilled non-U.S.-workers in specialty occupations. There are around half a million H-1B workers in the United States[1] across a range of specialty fields, including researchers and workers in the science, technology, engineering, and mathematics (STEM) fields; doctors, other healthcare providers, and medical researchers; university professors and K-12 educators; and religious leaders. The standards for granting an H-1B petition focus on the worker's specialized knowledge and academic credentials. While many H-1B workers are employed in the computer technology industry, more than a third of all H-1B workers are in other fields.[2]

2. The H-1B visa program is a critical pathway to hiring educators and healthcare workers—two categories in high demand in the U.S.—who comprise 10% of all H-1B workers.[3] The United States faces a projected shortfall of nearly 86,000 physicians in the next decade, particularly in medically underserved areas of the United States and places with health professional shortages, where nearly two-thirds of all foreign-trained physicians in the United States—including almost 23,000 H-1B workers, between 2001 and 2024—practice.[4] Nurses, too, are in short supply, particularly after the COVID-19 pandemic drove many nurses out of the profession and insufficient staffing raises nurses' stress level. K-12 school districts also rely on the H-1B visa program to fill critical vacancies, especially in rural areas facing acute staffing

[1] Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Wash. Post (Sept. 24, 2025), https://perma.cc/4YEH-DGLY.
[2] *Id.*
[3] *Id.*
[4] *AMA urges DHS to exempt physicians from new $100,000 H-1B visa fee*, Am. Med. Ass'n (Sept. 25, 2025), https://perma.cc/T69U-67BY.

shortages,[5] and the H-1B visa program allows colleges and universities to hire talented scholars and researchers from around the world, enabling American students to learn from and research under the supervision of these experts in specialized fields.[6]

3. The H-1B program also allows religious organizations to retain priests and pastors who have the language skills, cultural competency, and religious training needed to minister to underserved populations, including poor refugee and migrant communities and economically distressed Appalachian communities.

4. The H-1B program drives innovation and economic growth in the United States. It allows employers to fill labor shortages in specialized fields and fuels workers to invest additional dollars in the U.S. economy. It supports immigrants in creating new businesses that expand the U.S. labor market.

5. H-1B visas are issued for an initial three-year term, and workers who hold these visas can have either immigrant or nonimmigrant intent—meaning Congress intended there to be a path to permanent residency for some H-1B workers, who may ultimately become lawful permanent residents (i.e. "green card" holders)—and may freely travel in and out of the United States.

6. The Immigration and Nationality Act ("INA") sets forth a comprehensive and detailed scheme for the H-1B program and process, specifying qualitative and numeric limits on the number of H-1B visas to be granted, the standards for approving an H-1B petition from an

[5] *Administration Announces Changes to H-1B Visa Program*, The School Superintendents Association (Sept. 24, 2025), https://perma.cc/ZT2K-BB2T.
[6] Ellie Davis, *What Trump's $100,000 Fee for Skilled-Worker Visas Could Mean for Higher Ed*, Chron. Higher Educ. (Sept. 22, 2025), https://perma.cc/J6J5-UDAM.

employer, the standards for detecting and addressing unlawful use of the program by employers, and the fees to be charged and allocation and use of those funds by the government.

7. Without warning on Friday, September 19, 2025, President Trump issued a Proclamation titled "Restriction on Entry of Certain Nonimmigrant Workers"[7] (the "September 19 Proclamation"). The Proclamation "restricted" entry into the United States of workers on H-1B visas, conditioning it on their employers making a $100,000 "payment" to the federal government, starting less than 36 hours after issuance, at 12:01 am ET on Sunday, September 21, 2025.

8. At the Oval Office ceremony unveiling the Proclamation, Commerce Secretary Howard Lutnick stated that it would be "a hundred-thousand dollars a year for H-1B visas" and that "[e]ither the person is very valuable to the company and America, or they are going to depart and the company is going to hire an American."[8]

9. The broad language of the Proclamation and the unprecedented changes to this long-standing program caused a widespread panic, with employers instructing employees to return to the United States before 12:01 am ET on Sunday, September 21, and/or not to leave the country at all. Workers rushed back to the United States, abandoning family events and vacations, while others frantically requested to de-plane flights they had already boarded before they left the United States.

10. Government agencies scrambled to respond to the chaos. Three agencies issued public statements over the weekend, in the days and hours after the Proclamation: the United States Citizenship and Immigration Services ("USCIS") which adjudicates the employer

---

[7] Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025).

[8] Johana Bhuiyan, *Trump signs proclamation imposing annual $100,000 fee on H-1B visas*, The Guardian (Sept. 19, 2025), https://perma.cc/GQ23-AX3U.

petitions; the United States Department of State ("State" or "State Department") which adjudicates visa applications submitted by H-1B nonimmigrant workers; and United States Customs and Border Protection ("CBP") which inspects and admits foreign nationals seeking to enter the United States.

11. Collectively, the agencies' statements reflected the new policies the agencies quickly adopted to implement the Proclamation: A one-time payment of $100,000 is required "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025 ("$100,000 Requirement"). Payment is a condition for adjudication of any such H-1B petition, consular processing for H-1B visas, and entry into the United States for H-1B workers.

12. While the agencies' policies limit the $100,000 Requirement to new petitions and carve out renewals, the new policies do not differentiate between petitions for workers who are outside of the United States and those for workers who are already inside the United States, seemingly expanding the Proclamation's "entry" ban to include individuals who have already entered the country, not just those "currently outside the United States" as stated in the Proclamation.

13. Defendants' abrupt imposition of the $100,000 Requirement is unlawful. The President has no authority to unilaterally alter the comprehensive statutory scheme created by Congress. Most fundamentally, the President has no authority to unilaterally impose fees, taxes or other mechanisms to generate revenue for the United States, nor to dictate how those funds are spent. The Constitution assigns the "power of the purse" to Congress, as one of its most fundamental premises. Here, the President disregarded those limitations, asserted power he does not have, and displaced a complex, Congressionally specified system for evaluating petitions and granting H-1B visas. The Proclamation transforms the H-1B program into one where employers

must either "pay to play" or seek a "national interest" exemption, which will be doled out at the discretion of the Secretary of Homeland Security, a system that opens the door to selective enforcement and corruption.

14. Executive Branch agencies similarly cannot act contrary to or beyond the authority conferred by statute, nor can they act beyond or contrary to their own regulations. In immediately adopting the $100,000 Requirement without notice and comment, the agencies failed to go through required regulatory processes. The $100,000 Requirement is also arbitrary and capricious. The government failed to consider how extorting exorbitant fees will stifle innovation. The government failed to consider harms to hospitals, churches, schools and universities, and small businesses and non-profits, or how the fee will harm communities across the nation. Indeed, economic data and studies confirm that the new $100,000 Requirement will harm, not help, the U.S. economy and workers and their families in the United States.

15. Plaintiffs are a health care business that helps hospitals across the country fill critical vacancies with qualified nurses from abroad, schools, religious organizations, labor unions, and workers, who are all facing the sudden $100,000 Requirement. Plaintiffs bring this action against President Donald J. Trump, the U.S. Department of Homeland Security ("DHS"), its subagencies USCIS and CBP, the State Department, and the heads of these agencies (collectively, "Defendants"), to challenge the legality and implementation of the Proclamation. Plaintiffs seek declaratory relief and injunctive relief because the Proclamation and the agencies' subsequent actions exceed the President's Constitutional authority and contravene the statutory H-1B process and program.

## II. JURISDICTION AND VENUE

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C). Plaintiff Local 4811 of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW Local 4811"), maintains its principal place of business in Berkeley, California. Plaintiff Phoenix Doe also resides in the Northern District of California. There is no real property at issue in this case.

18. Joinder is proper in this action as the questions of law are identical to all Plaintiffs in this action.

## III. DIVISIONAL ASSIGNMENT

19. Per N.D. Cal. Civ. L.R. 3-2(c), this action shall be assigned to the San Francisco/Oakland Division, because Plaintiff UAW Local 4811 is headquartered in Alameda County and has affected members at UCSF.

## IV. PARTIES

20. **Plaintiff Global Nurse Force** is a limited liability company with its principal place of business in Laguna Beach, California. For the past decade, Global Nurse Force has been connecting talented international nurses with healthcare facilities around the world. Global Nurse Force has placed over 10,000 nurses at more than 175 hospitals throughout the UK, Ireland, Canada, Australia and the Middle East. In the United States, where there has been a growing nursing shortage, Global Nurse Force has assisted U.S. health systems to recruit highly skilled and experienced international nurses on H-1B specialty worker visas. Global Nurse Force operates a direct-hire model where the nurses come in as permanent employees of the hospital and receive the same pay and benefits as the hospital's regular staff. Global Nurse Force takes care of the logistics, including recruitment, credentials verification, licensing, immigration and relocation. Although Global Nurse Force operates in various countries, its business model for its

U.S. operations relies on the H-1B system and the ability of U.S. healthcare facilities to sponsor nurses for H-1B visas.

21. **Plaintiff International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811** (**"UAW Local 4811")** is a labor union headquartered in Berkeley, California that, jointly with the UAW International, is the exclusive collective bargaining representative for 48,000 workers at the University of California ("UC") across three distinct bargaining units and has a membership comprised of graduate student employees and non-student academic employees at UC. The Academic Student Employees unit, represented by UAW International and Local 4811, consists of over 36,000 UC employees working in positions such as graduate student researcher, teaching assistant, reader, and tutor. The Postdoctoral Scholars unit represented by UAW International and UAW Local 4811 consists of over 7,000 UC non-student employees working as postdoctoral scholars, who are early career scientists with doctorate degrees that perform research. The Academic Researchers unit represented by UAW International and UAW Local 4811 consists of over 5,000 UC non-student employees working in positions such as researcher, project scientist, specialist, and coordinator of public programs.

22. **Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International")** is one of the largest and most diverse unions in North America. Headquartered in Detroit, Michigan, the UAW International has members in the United States, Canada, and Puerto Rico, and in virtually every sector of the economy. From its earliest days, the UAW International has been a leader in the struggle to secure economic and social justice for all people. The UAW International has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher

education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country including the University of California, California State University, University of Southern California, California Institute of Technology, UC Law San Francisco, California Institute of the Arts, University of Oregon, University of Washington, Washington State University, Columbia University, New York University, Harvard University, University of Pennsylvania, Princeton University, and Johns Hopkins University, among many others.

23. **Plaintiff Service Employees International Union, AFL-CIO Committee of Interns and Residents ("Committee of Interns and Residents, SEIU" or "CIR")** is a local union of the Service Employees International Union, AFL-CIO ("SEIU"). CIR is headquartered in Long Island City, New York, and represents more than 40,000 interns, residents, and fellows in hospitals throughout the United States including California, Delaware, Florida, Idaho, Illinois, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, Vermont, Washington, and Washington, D.C. CIR and CIR members are dedicated to improving residency training and education, advancing patient care, and expanding access to healthcare.

24. **Plaintiff American Association of University Professors ("AAUP")** is a non-profit membership association and labor union of faculty and academic professionals throughout the country. AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. The AAUP has approximately 50,000 members on college and university campuses across the country. AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic

professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. The AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

25. **Plaintiff Global Village Academy Collaborative ("GVAC")** is a public, non-profit organization established in 2013, authorized under Colorado statute, and headquartered in Thornton, Colorado. For over a decade, GVAC has operated similar to a school district, providing centralized operational and educational support services to its member schools (the Global Village Academies, or "GVA") and its staff across Colorado. Global Village Academies are tuition-free, public charter schools providing English and second language immersion instruction (K-8) in Spanish, Mandarin Chinese, Russian, or French to its students. There are currently 3 Global Village Academy schools across the cities of Aurora, Thornton, and Parker, Colorado, which currently serve around 2,200 students collectively.

26. **Plaintiff Society of the Divine Word—Chicago Province (also known as "Societas Verbi Divina," "SVD," and the "Divine Word Missionaries")** is a religious missionary order of Roman Catholic priests and brothers presently serving in almost eighty countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the Provincial Superior of the province—is a non-profit, tax-exempt organization employing several hundred employees. Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it depends on the availability of H-1B visas for foreign religious workers with specialized skillsets including Polish, Spanish, and Vietnamese language abilities.

27. **Plaintiff Fathers of St. Charles** is a non-profit, tax-exempt religious organization and part of the Congregation of the Missionaries of St. Charles – Scalabrinians, a Roman Catholic international religious community dedicated to serving migrants and refugees of different cultures, religions and ethnicities in thirty-five countries on five continents. The Congregation was founded on November 28, 1887, by Saint John Baptist Scalabrini (1839-1905), the bishop of Piacenza, Italy, who at that time recognized the far-reaching social and religious implications of the massive emigration from Europe toward the Americas occurring at that time. Fathers of St. Charles, whose province (the St. John the Baptist Province) covers the United States, Canada, Mexico, Guatemala, and El Salvador, keeps its provincial office in Oak Park, Illinois, and has been serving migrants for well over a century. It is a non-profit, tax-exempt religious organization that employs approximately thirty-five people in the United States. Fathers of St. Charles' missionary focus for the last twenty-five years has been to be in mission with migrants, with a focus on the very poorest migrants. This mission compels Fathers of St. Charles to provide all pastoral activities, including sacramental and liturgical activities, Bible study, and formation, in the native languages of the people they serve.

28. **Plaintiff Church on the Hill d/b/a Algood First Baptist ("Church on the Hill")** is a non-profit 501(c)(3)-approved religious organization. The church was formed seventy years ago, but officially incorporated in its current structure in 2003. It has approximately five employees located in the Appalachia region. In 2021, the church branched out and established a new church congregation, which began with twenty members and has since grown to over 200 members. The new church is in a different location and serves an underserved, economically disadvantaged region in Appalachia. Both Church on the Hill and the new church have

established ministries for children, youth, families and students, as well as community outreach that meets both practical and spiritual needs.

29. **Plaintiff John Smith ("Pastor John Smith" or "Pastor Smith"))** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. Pastor Smith arrived in the United States in 2022 on an R-1 nonimmigrant visa for foreign nationals in religious vocations and is currently working full-time at a church as a pastor in the Appalachia region. His R-1 nonimmigrant visa will expire next year. He has been instrumental in overseeing the expansion of the church's congregation to a second location, and provides essential pastoral and spiritual services and guidance to the congregation's members and the local community.

30. **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B change-of-status petition has been halted due to the $100,000 Requirement, putting at risk her work on detecting and treating blinding conditions and disrupting the laboratory that relies on her.

31. **Defendant Donald J. Trump** is the President of the United States and is sued in his official capacity.

32. **Defendant U.S. Department of Homeland Security ("DHS")** is a federal Department headquartered in Washington, D.C. It is responsible for administering immigration law, including H-1B adjudications through USCIS**.**

33. **Defendant Kristi Noem** is the Secretary of Homeland Security and is sued in her official capacity.

34. **Defendant U.S. Citizenship and Immigration Services ("USCIS")** is a component agency of DHS, headquartered in Camp Springs, MD. It is responsible for adjudicating H-1B petitions and other immigration petitions.

35. **Defendant Joseph B. Edlow** is the Director of USCIS and is sued in his official capacity.

36. **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS, headquartered in Washington, D.C. It is responsible for inspecting and admitting foreign nationals into the United States.

37. **Defendant Rodney Scott** is the Commissioner of CBP and is sued in his official capacity.

38. **Defendant U.S. Department of State ("State" or "State Department")** is a federal Department headquartered in Washington, DC. It is responsible for administering U.S. visa programs, including consular processing for H-1B visas.

39. **Defendant Marco Rubio** is the Secretary of State and is sued in his official capacity.

## V. LEGAL BACKGROUND

40. The purpose of the H-1B provisions is to "help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." *MadKudu Inc. v. USCIS*, No. 20-CV-02653-SVK, 2020 WL 7389419, at *1 (N.D. Cal. Nov. 17, 2020); 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(1)(i).

41. The H-1B visa has been the subject of more legislation than any other visa category and has been repeatedly modified and changed over the last 35 years. Congress has

created a complex, but consistent, visa category to give U.S. employers access to the talent they need from every part of the world for jobs in any field that require at least a bachelor's degree as an entrance requirement.

42. While many H-1B employers and workers are in the information technology ("IT") industry, H-1B workers are a diverse group, and do not solely reside in Silicon Valley. There are H-1B employers and workers living across the United States, including Texas, New York, California, Colorado, and Illinois.[9] They work in religious organizations like churches, rural medical clinics, and local high schools. Some are entrepreneurs while others serve the public or work in non-profits. All pay taxes and bring value to their communities.

43. As set forth in more detail below, Congress carefully designed the H-1B program to attract highly skilled workers to the United States while also protecting workers already in the United States. For example, Congress set annual limits on the number of H-1B workers and requires that employers pay a mandated prevailing wage and abide by other worker-protection rules. Congress also established detailed filing fee provisions. Congress crafted this framework to balance the interests of workers inside the United States and employers needing to fill vital roles, support innovation, and provide services in communities that would not be possible without H-1B workers.

**A. Congress Created the H-1B Visa to Ensure the U.S. Could Attract Necessary Workers in Specialty Occupations**

44. The United States offers a range of visa categories that Congress created and spelled out in the INA. H-1B visas are awarded to individuals who are sponsored by employers to work temporarily in qualified specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).

[9] *See, e.g.*, Carolyne Im, et al., *What we know about the U.S. H-1B visa program*, Pew Research Center (Mar. 4, 2025), https://perma.cc/GCE3-3AG7.

Typically, they are initially granted for three years and can be extended to six years. 8 U.S.C. § 1184(g)(4), 8 C.F.R. § 214.2(h)(13)(iii)(A).

45. A "specialty occupation" is an occupation that "requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor." 8 C.F.R. § 214.2(h)(4)(ii). These fields include, but are not limited to, "architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts." *Id.*; *see also* 8 U.S.C. § 1184(i)(1). To qualify as a "specialty occupation," the occupation must require a bachelor's or higher degree in a directly related specific specialty, as a minimum for entry. 8 U.S.C. § 1184(i)(1); 8 C.F.R. § 214.2(h)(4)(ii). A medical doctor, for example, is a specialty occupation because generally one must obtain a medical degree to work as a doctor.

**B. In Designing the H-1B Program, Congress Included Protections for U.S. Workers**

46. Congress has highly regulated the H-1B visa category, particularly since 2000, to ensure that the United States enjoys the benefits of bringing in highly-skilled workers from abroad while ensuring that all workers—both workers coming to the U.S. and workers already in the U.S.—are protected from depressed wages and exploitation.

47. For example, Congress sets numerical limits on the annual number of H-1B workers, except for those employed by higher education or research institutions, who are exempt from the statutory "cap" on the number of visas available per fiscal year. 8 U.S.C. § 1184(g)(1)(A), (5). The statutory cap is 65,000, plus an additional 20,000 available only for individuals who have earned a master's or higher degree from a United States institution of higher learning. *Id.* § 1184(g)(1)(A)(vii), (5)(C).

48. Congress also requires that the employer pay the H-1B worker the higher of: (1) the actual wage the employer already pays to similar workers in that occupation; or (2) the prevailing wage for the occupation in the geographic area of intended employment. 8 U.S.C. § 1182(t)(1)(A)(i); 20 C.F.R. § 655.731(a). This prevailing wage requirement is designed to ensure that employers cannot undercut the U.S. labor market by hiring H-1B workers and paying them lower wages than those typical for their job in the U.S. labor market.

49. The employment of the H-1B worker also cannot adversely affect the working conditions of similarly employed workers, and the Department of Labor ("DOL") must certify that there is no such adverse impact. 8 U.S.C. § 1101(a)(15)(H)(i)(b), 1182(t)(1)(A)(ii). Likewise, an employer may not bring in H-1B workers to work during a strike or lockout. 8 U.S.C. § 1182(t)(1)(C); 20 C.F.R. § 655.733.

50. Employers may not discriminate against U.S. citizens based on citizenship status. *See* 8 U.S.C. § 1324b(a)(1).

51. Another safeguard is the anti-displacement provision that applies to employers considered "H-1B dependent"[10] and those considered "willful violators" of employment protections.[11] Such employers must attest that the employment of a U.S. worker will not result in

---

[10] The statute and corresponding regulations include a very specific definition of H-1B dependence: an employer that has 25 or fewer full-time equivalent employees and employs more than 7 H-1B workers; or an employer that has 26 to 50 full-time equivalent employees and employs more than 12 H-1B workers; or 51 or more full-time equivalent employees and at least 15 percent of its workforce are H-1B workers. *See* 8 U.S.C. § 1182(n)(3)(A); 20 C.F.R. § 655.736(a).

[11] An employer is classified as a willful violator if, during the preceding five years, the Secretary of Labor has found, after notice and opportunity for a hearing, that the employer has committed either: willful failure to meet the conditions of the Labor Condition Application; or a willful misrepresentation of a material fact in the LCA. 8 U.S.C. § 1182(n)(1)(E)(ii); 20 C.F.R. § 655.736(f).

the displacement of a U.S. worker either 90 days before, or 90 days after, the filing of such a petition. An employer placing an H-1B worker at a third-party worksite must attest that it has made a good faith effort to determine that the employee's placement will not displace a U.S. worker. 8 U.S.C. § 1182(n)(1)(E)-(F); 20 C.F.R. § 655.738(c)-(d).

52. When an employer misuses the H-1B program, it can face orders to pay back wages, civil monetary fines, and debarment, among other penalties. 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.810. A debarred employer is prohibited from receiving approval for future H-1B petitions and other employment-based visa petitions. 8 U.S.C. § 1182(n)(2)(C); 20 C.F.R. § 655.810(d). This penalty is intended to protect both American and foreign workers from exploitation and unlawful practices.

### C. Congress Created a Detailed Statutory Scheme to Govern the H-1B Process That Balances Private and Public Sector Needs

#### 1. H-1B Registration and Lottery for Cap-Subject H-1B Visas

53. As discussed above, the INA sets a statutory "cap" on the number of new H-1B petitions each fiscal year. "Cap-subject" employers generally are for-profit companies in the private sector.

54. To petition for H-1B status for a worker, cap-subject employers must first register the prospective employees in an annual lottery that is generally held in March of each year for employment starting at the beginning of the federal fiscal year in October. 8 C.F.R. § 214.2(h)(8)(iii).

55. After the close of the registration period, USCIS performs a computer-generated lottery selection. *Id.* § 214.2(h)(8)(iii)(A)(5)(ii), (6)(ii).

56. USCIS then notifies those petitioners whose registrations were selected that they are eligible to file a H-1B cap-subject petition and sends them filing instructions. *Id.* § 214.2(h)(8)(iii)(C). The selected petitioners may then file a petition. *Id.* § 214.2(h)(8)(iii)(D).

**2. Cap-Exempt H-1B Visas**

57. Certain types of employers are "cap-exempt," meaning they are not subject to the numeric cap specified in the statute. Institutions of higher education, non-profit organizations (*e.g.*, certain hospitals, K-12 schools) affiliated with institutions of higher education, non-profit research organizations, and government research organizations are not subject to the annual numerical limitations. 8 U.S.C. § 1184(g)(5)(A)-(B); 8 C.F.R. § 214.2(h)(8)(iii)(F)(1), (2) and (3).

58. Cap-exempt employers do not need to register or to participate in the annual lottery, but they do need to establish, to the satisfaction of USCIS, their cap-exempt status. They can file petitions directly and are not limited to filing on a particular cycle.

**3. H-1B Petition Process**

59. Whether "cap-subject" or "cap exempt," an employer must petition for an H-1B employee by first submitting a Labor Condition Application ("LCA") to DOL. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730.

60. In the LCA, the employer attests that it will follow the wage and working condition requirements. *See* 20 C.F.R. § 655.730(d). DOL then reviews these forms and must certify them. DOL typically does so in seven working days. 20 C.F.R. § 655.730(b).

61. Once DOL certifies the LCA, the employer files a Form I-129 petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. *See* 6 U.S.C. § 271(b)(5); 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i), (2)(i)(A).

62. An employer can petition on behalf of workers who are physically located inside or outside of the United States. *See ITServe All., Inc. v. United States*, 122 F.4th 1364, 1366 (Fed. Cir. 2024); *see also* 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a), (c). The individual may already be in the United States if, for example, their employer is petitioning to change their status from another immigration status to H-1B visa status. For example, many of the Plaintiff Unions' members are currently in the United States in lawful student or exchange status, including on F-1 visas, F-1 OPT, STEM OPT, or J-1 programs, and—until the Proclamation—expected that a current or prospective employer would be able to file H-1B petitions on their behalf, either to change their status within the United States or through consular processing abroad.

**4. Visa Issuance and Entry**

63. Once USCIS approves an H-1B petition, if the worker is outside the United States, the worker generally must then obtain an H-1B visa from a United States consulate abroad before traveling to the United States. *ITServe*, 122 F.4th at 1367. Even some workers who are inside the United States when their H-1B petition is approved, depending on the specific case circumstances, may have to go abroad to receive consular processing in order to effectuate their H-1B status. The individual may then travel to a port of entry for inspection by CBP and, if authorized, be admitted in H-1B nonimmigrant status and enter the United States. *See* 8 U.S.C. §§ 1101(a)(13)(A), 1184(a)(1), 1225(a)(1); 8 C.F.R. § 212.1(a)(1).

64. Workers who are able to change to H-1B status from within the United States may still need to travel abroad for work, for family emergencies, or to renew a passport. These workers typically must obtain an H-1B visa stamp at a U.S. consulate abroad before reentering. 8 U.S.C. § 1184(a).

65. Once an H-1B worker is in the United States, employers may need to file additional petitions with USCIS if there is a material change in the worker's employment conditions, such as a change in worksite, or if the worker changes employers. 8 C.F.R. § 214.2(h)(2)(i)(D)-(E), 8 C.F.R. § 274a.12(b)(9). As the initial three-year work authorization period expires, employers can petition for an extension of another three years, and additional extensions are possible, beyond the 6 years, under limited circumstances. 8 CFR § 214.2(h)(13)(iii)(D).

**D. Congress Established a Detailed Fee System for H-1Bs That Sets Parameters on Fees and Dictates Their Use**

66. Congress has established a clear framework for fees charged to H-1B petitioning employers. These include the adjudication fees that USCIS sets by regulation, as authorized by 8 U.S.C. § 1356(m), and certain statutory fees charged to certain H-1B employers, authorized in 8 U.S.C. § 1184(c)(9)-(14). Required fees must be paid by H-1B employers, not by the H-1B workers or their families. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C)(10).

67. DHS may charge fees for adjudication of petitions under 8 U.S.C. § 1356(m), but Congress limited those fees. The statute provides that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.*

68. DHS sets the amounts of adjudication fees through notice-and-comment rulemaking. *See*, *e.g.*, *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194 (Jan. 31, 2024). Under the latest 2024 rule, for instance, H-1B employers must pay a fee to register for the lottery, a fee to file Form I-129, and

an "asylum program fee," meant to subsidize USCIS's costs for processing asylum applications. 8 C.F.R. § 106.2(a)(3), (c)(11), (c)(13). At full price, these fees for adjudication total $1,595. *Id.*

69. Because DHS has historically factored in an employer's ability to pay, the adjudication fees are discounted for small employers (25 or fewer full-time employees) and non-profits. *See id.* § 106.2(a)(3), (c)(13).

70. Congress, through the INA, set additional mandatory statutory fees to be paid by employers:

a. An American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA") fee of $1,500. The statute effectively requires consideration of ability to pay; there is a discount for employers with 25 or fewer employees, who pay $750, and cap-exempt employers are exempt. The ACWIA fee is required only for the first two petitions filed on behalf of each individual. *See* 8 U.S.C. § 1184(c)(9)-(14).

b. A fraud prevention and detection fee of $500. The fraud fee is required with initial petitions and petitions to change employers. *Id*; *see* 8 U.S.C. § 1184(c)(12)(A)(i)-(ii).

71. Congress spoke clearly as to where these fees should go and for what purpose. For example, in establishing the ACWIA fee, Congress intended to support the American labor market by upskilling its workforce to "address a growing shortage of skilled worked for certain high technology positions important to American business." 144 Cong. Rec. S10877 (daily ed. Sept. 24, 1998). The INA directs that ACWIA fees be segregated into a special account and used for specified purposes. *See* 8 U.S.C. § 1356(s). The revenue is primarily split among: (1) DOL workforce training programs (50%), (2) National Science Foundation low-income STEM

scholarships (30%), and (3) National Science Foundation K-12 stem initiatives (10%). 8 U.S.C. § 1356(s)(2)-(4).

72. The fraud prevention and detection fee's name indicates its purpose. The revenue is split equally among the three agencies responsible for administering the H-1B program: DOL (who oversees the Labor Condition Application and wage payment to the H-1B worker), DHS (who adjudicates requests for H-1B status), and the State Department (who decides whether to issue visas). 8 U.S.C. § 1356(v)(2)(A)-(C).

73. Additionally, certain employers pay enhanced fees. For example, currently, a "50/50 employer" must pay an additional "Public Law 114-113 Fee" of $4,000. 8 C.F.R. § 106.2(c)(8); USCIS, H and L Filing Fees for Form I-129.[12] A "50/50 employer" is an entity that employs over 50 employees with over half comprising nonimmigrant workers in H-1B or L-1 status.[13] *ITServe*, 122 F.4th at 1367 n.2; 8 C.F.R. § 106.2(c)(8).

74. An employer that pays the full amount of these regulatory and statutory fees would pay a total of $7,595, nowhere near the $100,000 Defendants now demand.

75. The $100,000 Requirement does not account for ability to pay, unlike many of the regulatory and statutory fees, which are discounted for small employers and non-profits.

### E. The President's Ability to Restrict Entry Under the INA Does Not Authorize Him to Override Congress's Comprehensive H-1B Statute

76. The Proclamation invokes two provisions of the INA: sections 212(f) and 215(a), 8 U.S.C. §§ 1182(f) and 1185.

---

[12] *See* USCIS*, H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker*, https://perma.cc/5RRV-26DG.

[13] The L-1 visa "allows multinational corporations to sponsor visas for temporary intra-company transfers to the United States" for individuals working in a managerial, executive, or specialized knowledge capacity. *Nat'l Ass'n of Manufacturers v. DHS*, 491 F. Supp. 3d 549, 556 (N.D. Cal. 2020); 8 U.S.C. § 1101(a)(15)(L).

77. Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

78. This statutory provision is designed to "regulate and influence conduct abroad, rather than at home," and does not authorize the President to effectuate "domestic policy as opposed to foreign policy or national security." *President & Fellows of Harvard Coll. v. DHS*, No. 25-cv-11472, --- F. Supp. 3d-----, 2025 WL 1737493, at *10 (D. Mass. June 23, 2025). The Proclamation makes clear that it is concerned with domestic policy—charging domestic employers unprecedented fees, changing the conduct of employers and workers inside the United States, and raising revenue for domestic purposes. But 8 U.S.C. § 1182(f) does not permit the President to restrict entry for these purposes.

79. In addition, section 215(a), 8 U.S.C. § 1185(a)(1), allows the President to "prescribe" "reasonable rules, regulations, and orders" governing who may "enter ...... the United States." *Id.* (emphasis added).

80. Nothing in either statute authorizes the President to rewrite Congress's comprehensive H-1B statute by denying entry to all H-1B workers unless an employer pays $100,000 or is granted an exemption at the discretion of the Secretary of DHS.

## VI. FACTUAL ALLEGATIONS

### A. The President's Proclamation

81. Late in the day on Friday, September 19, 2025, the White House issued a Presidential Proclamation pursuant to 8 U.S.C. § 1182(f) and § 1185(a) conditioning the

adjudication of H-1B petitions and entry of H-1B beneficiaries into the United States on a $100,000 payment.

82. Among other things, the Proclamation requires a $100,000 payment in connection with any H-1B petition for workers currently outside the U.S. seeking entry under the H-1B program, stating: "[e]ntry into the United States of [H-1B workers] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." Proclamation § 1(a). The Proclamation directs DHS to "restrict decisions on petitions not accompanied by a $100,000 payment," *id.* § 1(b), and directs State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment," *id.* § 2(b). DHS and State must "deny entry to the United States to any H-1B nonimmigrant" whose employer has not made the $100,000 payment. *Id.* § 2(c).

83. The Proclamation made these new requirements effective as of 12:01 am ET Sunday, September 21, 2025. But the Proclamation does not specify to which agency the $100,000 "payment" should be made, how it should be paid, where it will be deposited, or how it will be used.

84. The President's key advisor on this Proclamation appears to be Howard Lutnick, who outlined the scope and rationale of the Proclamation when it was issued. Speaking alongside the President at an Oval Office ceremony unveiling the Proclamation on September 19, Lutnick said: "a hundred-thousand dollars a year for H-1B visas, and all of the big companies are on board. We've spoken to them."

85. Lutnick also stated that current visa-holders would be subject to the fee and would have to leave the country if it was not paid: "Either the person is very valuable to the company and America, or they are going to depart and the company is going to hire an American," Lutnick

said at the briefing. "And that's the point of immigration. Hire Americans and make sure the people coming in are the top, top people. Stop the nonsense."[14]

86. Lutnick also made clear that the fee would be charged annually: "The company needs to decide . . . is the person valuable enough to have a $100,000-a-year payment to the government, or they should head home, and they should go hire an American."[15]

**1. The Proclamation is Based on Multiple Errors of Fact and Ignores the Benefits of the H-1B Program to the American Economy**

87. The Proclamation's preamble solely identifies concerns with the program's use in the information technology fields, but employers seek and obtain H-1B visas for workers in a wide range of specialty occupations, including healthcare workers, researchers, clergy, university professors, K-12 teachers, and more. The Proclamation does not identify widespread fraud and misuse of the program in those fields nor otherwise justify why a market-wide penalty is an appropriate remedy.

88. Even as to the IT industry, the Proclamation ignores pertinent facts reflecting that the H-1B program supports economic growth. Indeed, from 1990 to 2010, H-1B holders caused 30-50 percent of all productivity growth in the U.S. economy.[16] As one economist explained, "workers on H-1B visas cause dynamism and opportunity for natives. They cause more patenting of new inventions, ideas that create new products and even new industries. They cause entrepreneurs to found more (and more successful) high-growth startup firms. The resulting productivity growth causes more higher-paying jobs for native workers, both with and without a

[14] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025), https://perma.cc/N7PP-Y53G.
[15] *Id.*
[16] Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S1(2) S225, S250-52 (2015), https://perma.cc/PK6F-KN6K.

college education, across all sectors. American firms able to hire more H-1B workers grow more, generating far more jobs inside and outside the firm than the foreign workers take."[17]

89. The Proclamation also ignores other benefits of bringing H-1B workers to the United States, where they consume goods and services and pay taxes in the United States. Cutting off employers' ability to employ H-1B workers will likely push some employers to outsource their work to other countries.

90. The Proclamation claims, without evidence or explication, that abuses of the H-1B program are so serious as to be a threat to national security. But the government's own enforcement reflects otherwise: DOL is charged with investigating fraud and abuse of the Labor Condition Application portion of the H-1B program and maintains a database of companies that abused the H-1B program and were banned from it. *See* 8 U.S.C. § 1182(n)(2), 20 C.F.R. 655.800 *et seq.*; *H-1B Willful Violator List of Employers*, U.S. Dep't Lab., https://perma.cc/4RPD-X7JT (effective as of Sept. 1, 2025). There are just eight companies on this list and only two were added in 2025, while tens of thousands of employers have used this program in recent years.

**2. The Proclamation's Exorbitant $100,000 Fee Is Unprecedented and Unjustified, and the Exception Process is Ripe for Abuse**

91. The Proclamation's imposition of a draconian fee is unprecedented. No President has, without Congressional authorization and by fiat, imposed a market-wide penalty for purported misuse of a program—disregarding and overriding an existing, complex statutory scheme—on employers seeking to hire workers under a visa program Congress created

[17] Michael A. Clemens, *New US curb on high-skill immigrant workers ignores evidence of its likely harms*, Peterson Inst.Int'l Econ. (Sept. 22, 2025), https://perma.cc/Y4DL-VSRQ.

specifically for that purpose. Nor may Presidents impose a tax or other general revenue-generating requirement without Congressional authorization.

92. Here, the President appears determined to raise general revenue using the $100,000 Requirement, suggesting that this is a tax, not a fee for use of the program. While announcing the Proclamation, the President alluded to the ultimate use of the revenue generated from these $100,000 payments: "The main thing is we're going to have great people coming in and they're going to be paying. We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt."[18]

93. The Proclamation also provides an exception to the payment requirement in section (c), which states that "[t]he restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States."

94. The Proclamation includes no guidance, direction, or parameters for this purported national interest exception, which was created from whole cloth. As drafted, the standardless exception process is an open invitation for selective and arbitrary treatment. It invites lobbying; it permits favoritism, ideologically based bias, and corruption.

**3. After the Ill-Planned Proclamation Caused Immediate Harm, the Government Began to Backtrack**

95. Shortly after this announcement, current H-1B workers that were outside the country started receiving urgent messages from their employers to return to the United States

[18] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, *supra*, note 14.

before the Proclamation became effective at 12:01 am ET on Sunday, September 21. Many were advised to remain in the United States until further notice.[19] Some workers spent thousands of dollars on return travel to the United States.[20] Others cancelled planned trips, and some workers who had already boarded flights made panicked requests to deplane after receiving news of the Proclamation.[21]

96. As this chaos unfolded on Saturday, September 20, the Administration began to backtrack. An unnamed White House source, speaking on condition of anonymity to the press, contradicted Lutnick's statements from the Oval Office and stated that the new requirement was a "one-time fee" and "currently does not apply to renewals but that policy is under discussion."[22] The source did not say whether existing visa-holders would be prevented from returning to the country, under the Proclamation's language broadly barring entry of individuals for whom the fee had not been paid.

---

[19] Madeleine Ngo, Lauren Hirsch & Pranav Baskar, *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, N.Y. Times (Sept. 22, 2025), https://perma.cc/EJ5T-RK6F.
[20] Emma Rossiter & Ishadrita Lahiri, *I spent $8,000 to get back to US after fears over Trump visa deadline*, BBC (Sept. 20, 2025), https://perma.cc/3NHM-JD39.
[21] Aditya Soni & Echo Wang, *'Fast and furious': H-1B workers abroad race to US as Trump order sparks dismay, confusion*, Reuters (Sept. 21, 2025), https://perma.cc/J82X-GHGH.
[22] *White House clarifies $100K H-1B visa fee won't apply to existing holders as Trump stirs anxiety*, PBS News (Sept. 21, 2025), https://perma.cc/SN9S-435A.

97. At 4:16 pm ET on Saturday, September 20, White House Press Secretary Karoline Leavitt posted another attempt at re-writing the Proclamation on the social media platform X:[23]


Karoline Leavitt
@PressSec

To be clear:

1.) This is NOT an annual fee. It's a one-time fee that applies only to the petition.

2.) Those who already hold H-1B visas and are currently outside of the country right now will NOT be charged $100,000 to re-enter.

H-1B visa holders can leave and re-enter the country to the same extent as they normally would; whatever ability they have to do that is not impacted by yesterday's proclamation.

3.) This applies only to new visas, not renewals, and not current visa holders.

It will first apply in the next upcoming lottery cycle.

**B. The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions.**

98. The Proclamation tasked DHS, including its component agencies USCIS and CBP, and the State Department (collectively with the heads of those agencies and components, the "Agency Defendants") with the implementation of its requirements.

99. The Agency Defendants issued a series of public statements in the hours and days following the Proclamation's late Friday issuance.[24]

---

[23] Karoline Leavitt (@PressSec), X (Sept. 20, 2025, 4:16 PM), https://perma.cc/Y7WY-NHN9?type=image.

[24] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025), https://perma.cc/U54U-4UWD; Matthew S. Davies, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, USCBP (Sept. 20, 2025), https://perma.cc/K9VG-QCYS; *H-1B FAQ*, U.S. Dep't State (Sept. 21, 2025), https://perma.cc/6DYF-9SCE; *H-1B FAQ*, White House (Sept. 21, 2025),

100. Collectively, these documents reflect the new policies the Agency Defendants have adopted to implement the Proclamation.

101. The Agency Defendants require a one-time payment of $100,000 "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025. Payment is a condition for adjudication of "any" new H-1B petition, as well as for consular processing and entry into the United States of any beneficiary of a new petition (the "Agency Policies").

102. The Agency Policies are in some ways narrower than the Proclamation. They specify, for example, that the $100,000 Requirement only applies to new petitions and not to "renewals"[25]—a term that is not used in the existing statutory and regulatory scheme. The Agencies have also chosen not to condition entry into the United States on receipt of the $100,000 payment for existing H-1B visa holders or beneficiaries of petitions submitted before the effective date.[26]

103. However, the new Agency Policies sweep more broadly than the Proclamation in that they appear to apply to *any* new H-1B petition submitted on or after September 21, 2025. They do not clearly differentiate between petitions for workers who are "currently outside the United States" and those for workers who are already inside the United States. This means that the $100,000 Requirement applies even where workers are already lawfully present in the United States under, for example, a student visa or another immigration status, and are seeking to change to H-1B status.

---

https://perma.cc/G37A-W3AK; *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.

[25] *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.

[26] *Id.*

### C. The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest

104. The Proclamation and new Agency Policies harm both Plaintiffs and the broader public.

#### 1. Health care

105. For over a decade, Plaintiff **Global Nurse Force**, a California limited liability company, has connected healthcare systems across the globe with highly skilled and experienced nurses to ensure their staffing needs are met. Global Nurse Force has placed over 10,000 nurses at leading hospitals around the world. In the United States, Global Nurse Force's clients include healthcare systems in Washington, Ohio, Louisiana, California and the District of Columbia who have used Global Nurse Force's "direct hire" model to hire hundreds of nurses on H-1B visas to fill critical staffing shortages.

106. The United States has been suffering from a nursing shortage for decades, and this shortage will only intensify as the Baby Boomer generation ages and their need for health care grows. The COVID-19 pandemic drove many nurses out of the profession; nursing schools suffer from a faculty shortage as well as depressed enrollment; and insufficient staffing itself raises the stress level of nurses, has a negative impact on their job satisfaction, and motivates many nurses to retire or otherwise leave the profession. Inadequate levels of nurse staffing lead to errors and increased mortality rates, a decrease in the quality of patient care, and unit or full hospital closures, especially in rural areas.

107. Global Nurse Force offers a direct hire model to U.S.-based healthcare systems that allows these healthcare systems to hire the experienced and specialized nurses they need by sponsoring them for H-1B specialty worker visas. Global Nurse Force provides "end to end" services that include facilitating the employer's interview and selection process, which usually

involves preliminary online interviews followed by international travel that allows the employer to meet, interview, and select in person the nurses needed; providing support for the H-1B application process; and providing logistical travel support for the hired nurses, including arranging travel, airport pickup, and temporary housing for nurses and their families arriving in the United States. Directly hiring skilled nurses on H-1B visas allows healthcare systems to meet their staffing needs without relying on short-term hiring of so-called "travel nurses," which is a far more expensive staffing solution that, in a year, can cost healthcare systems millions of dollars more in fees paid to staffing providers.

108. Global Nurse Force's business model for its U.S. clients is entirely based on the H-1B visa system and the ability of healthcare facilities to sponsor for H-1B visas the specialized nurses they need. As a result, the harmful impact of the Proclamation and the $100,000 Requirement on Global Nurse Force and its healthcare system clientele has been immediate. A health system in Louisiana, for example, recently went through the interview and selection process with Global Nurse Force and selected over two hundred nurses. When the Proclamation was issued, Global Nurse Force was in the process of assisting the hospital with preparing the H-1B applications for these nurses to be filed over the next two quarters. But that healthcare system, like most of Global Nurse Force's clients, cannot afford to pay an additional $100,000 fee for each nurse, and the healthcare system is now at a loss for how to fill the staffing shortages that are affecting its patients now. Indeed, many of Global Nurse Force's clients hire over a hundred nurses through each interview and selection cycle, which would translate into millions of dollars in extra fees required by the Proclamation. Many of Global Nurse Force's clients are non-profit hospitals operating on thin margins and cannot absorb the $100,000 fee per nurse. If

required to pay this fee, they will be forced to cancel international recruitment, leaving their positions unfilled.

109. If the $100,000 Requirement remains in effect, it would force Global Nurse Force to close its U.S.-based operations, which would translate into a loss of millions of dollars in revenue. Without access to international nurses, their clients will be forced to reduce capacity in ICUs, emergency rooms and surgical units. Wait times will increase and patient outcomes will worsen. This proclamation directly threatens Global Nurse Force's operations and forces hospitals towards staffing models that are significantly more expensive – raising healthcare costs rather than reducing them, so that the ultimate victims are patients, especially in rural and inner-city communities.

110. **Plaintiff CIR**, whose membership consists of medical interns, residents, and fellows, has numerous members who plan to seek H-1B visas and who have applications for H-1B visas pending with their employers and may lose their ability to live and work in the United States as a result of the Proclamation.

111. For example, a Pakistani physician and member of CIR is currently completing a fellowship in palliative care at a hospital that is part of an academic health care system on the East Coast. The physician is married and has a two-year-old son who is a U.S. citizen. As our population ages, the United States is facing an acute shortage of palliative care doctors, who provide end of life care; his expertise is therefore particularly valuable.

112. This CIR member holds a J1 visa. Foreign physicians come to the United States on J1 visas to complete their medical training. Generally, J1 visa holders must return to their country for two years at the end of their training, unless they obtain a waiver of this requirement. Foreign physicians generally apply for a waiver program, which allows them to change their

immigration status from a J1visa to an H-IB visa while remaining in the United States, if they commit to practicing in communities with the greatest need. The United States provides these waiver programs as a way to help address severe physician shortages in underserved areas.

113. This CIR member is currently applying and interviewing with facilities located in federally-designated Health Professional Shortage Areas and Medically Underserved Areas, the first step toward securing the employment offer needed to apply for a waiver. Because of the new $100,000 Requirement, however, employers who would normally petition for an H-1B visa on his behalf are unable to do so. If the physician is unable to secure a position with H-1B visa (as is likely), his years of training and his specialization will be for naught, and the United States will lose a physician trained in a critical field who is ready to serve in precisely the communities that need him most. He will be forced to return to Pakistan, where he is unlikely to find employment adequate to support himself and his family.

114. A Canadian CIR member is in his third year of a residency program in internal medicine in a city on the East Coast. Like many foreign physicians, he is training in the United States on a J1 visa, which requires him to pursue a waiver in order to remain and serve after completing his residency.

115. This member will complete his residency next year, apply for positions in underserved areas and apply for a waiver. Like many current and former CIR members before him, his prospective employer would then file an H-1B petition on his behalf. The new $100,000 Requirement, however, places sponsorship entirely out of reach for the very medical facilities Congress intended to benefit from these programs. If such facilities had the resources to pay this fee, they would not be struggling to recruit physicians through waiver programs in the first place.

116. The Proclamation will harm the career prospects and lives of this CIR member and others similarly situated. Since sponsoring organizations are unlikely to be able to afford to pay $100,000, this member will likely face a two-year separation from his U.S. citizen fiancée and would need to incur costs to get recredentialed as a physician in his home country of Canada. This would set him back 1-2 years professionally.

117. The loss of these medical workers will harm communities around the United States. The American Medical Association ("AMA") has expressed grave concerns about the impact of the $100,000 Requirement on the availability and quality of medical care in the United States. In a September 25, 2025, letter to DHS Secretary Kristi Noem urging DHS to exempt foreign-trained physicians from the fee, the AMA, along with more than 50 national specialty societies and state medical associations, noted that the United States is projecting a shortfall of 86,000 physicians by 2036.[27] This is especially concerning because America's population is aging, and there will not be enough doctors to care for older adults, many of whom suffer increased rates of chronic disease and have other complex medical needs.[28] Noting that of the 23% of physicians in the United States who are foreign trained, 65% practice in Medically Underserved Areas or Health Professional Shortage Areas and of those, 46% practice in rural areas, the letter explains that the fee endangers access to quality care for some of the Americans who most need it.[29]

118. Many of the hospitals that hire foreign trained physicians are non-profits and will not be able to afford this fee. As the President of the AMA explained, "[i]f a hospital needs 50

---

[27] *Letter to Kristi Noem from National Medical Societies and State Medical Associations* (Sept. 25, 2025), https://perma.cc/2VP2-B6Q5.

[28] *Id.*

[29] *Id.*

foreign residents, and it's $100,000 each for each one, that's $5 million, and that's not going to happen ........ There will be shortages." The consequences, he explained, are that "spots at hospitals will not be filled. Wait times will go up, and people will wait even longer at emergency departments." The fee, coupled with cuts in health insurance subsidies and reduced Medicaid payments, will exacerbate the financial stress many hospitals are already experiencing.[30]

119. A 2023 study by the National Bureau of Economic Research found that foreign-born doctors help serve rural and low-income communities without reducing the employment of U.S.-trained physicians.[31] The study notes that while about 20% of the U.S. population lives in rural areas, only about 11% of physicians practice in these locations; and disparities in access to physicians contribute to disparities in population health.[32] After examining the data, the study concluded that foreign-born doctors were not "crowding out" U.S. born physicians, but rather that foreign-born physicians were filling essential gaps in coverage, particularly in rural areas.[33]

**2. K-12 school systems**

120. At a time when communities around the country are facing acute teacher shortages, the $100,000 Requirement means that school districts risk losing valuable teachers in both urban areas suffering from staffing shortages and in rural districts where teachers are difficult to recruit. For example, Texas public schools, which have historically employed more H-1B visa holding teachers than any other state education system, currently employ about 500

---

[30] Roni Caryn Rabin, *Medical Groups Warn Against Visa Fees for Foreign Doctors*, N.Y. Times (Sept. 26, 2025), https://perma.cc/Q243-3LTU.

[31] Breno Braga, Gaurav Khanna & Sarah Turner, *Migration Policy and the Supply of Foreign Physicians: Evidence from the Conrad 30 Waiver Program*, Nat'l Bureau of Econ. Research Working Paper No. 32005 (Dec. 2023), https://perma.cc/V8HK-LANH.

[32] *Id.*

[33] *Id.* at 3.

teachers on H-1B visas.[34] The $100,000 Requirement is approximately double the average teacher salary in Texas.[35] A spokesperson for the Alief Independent School District ("ISD"), outside Houston, said the $100,000 Requirement "would be a significant financial barrier for public school districts and an unsustainable cost for Alief ISD."[36] Similarly, school officials in North Carolina expressed concern about how the new fee would impact their ability to hire teachers in a state that started the new school year with 2,155 teaching vacancies.[37] A spokesperson for a charter school system that operates schools across North Carolina said the $100,000 Requirement "would create a significant barrier for non-profit, tax-exempt, and public institutions such as ours. Simply put, most schools could not sustain such costs."[38] She concluded that "without an exemption, the results could be a severe shortage of qualified teachers at a time when schools nationwide already face staffing challenges."[39] The Superintendent of the Kodiak Island Borough School District in Alaska, which relies on H-1B workers to fill staffing gaps, was more direct, saying "[w]ith a pen stroke, we have possibly ruined the future of education for Alaska students."[40]

121. **Plaintiff Global Village Academy Collaborative ("GVAC")** is headquartered in Thornton, Colorado and operates similar to a school district and provides operational and educational services to its member schools (Global Village Academies, or "GVA"), including,

---

[34] Isaac Yu & Nusaiba Mizan, *Hundreds of Texas teachers are on H-1B visas. Could that change after Trump's new $100k fee?*, Hous. Chron. (Sept. 25, 2025), https://perma.cc/ED5L-9U28.
[35] *Id.*
[36] *Id.*
[37] T. Keung Hui & Brian Gordon, *New $100,000 fee for H-1B Visas Could Hurt Teacher Recruitment for NC Schools*, Herald Sun (Sept. 23, 2025), https://perma.cc/T3MQ-LYY7.
[38] *Id.*
[39] *Id.*
[40] Brian Venua, *The White House Upped the Cost of H-1B Visas. Alaska Schools Could Face Major Consequences*, KXMT (Sept. 24, 2025), https://perma.cc/6LDV-SHD2.

but not limited to, staff recruitment, legal services, human resources, facilities and site support, curriculum and material development, and financial management.

122. GVAC's mission is to provide these essential services to its Global Village Academies to cultivate academic excellence, high levels of linguistic proficiency, and cultural competences in all of its students, starting as early as kindergarten and through the eighth grade, so that these students may achieve a higher level entrance in their language of choice by high school and develop the global perspectives and 21st century skills necessary to live and work with others internationally.

123. The Global Village Academies are tuition-free, public charter schools (K-8) providing English and second language immersion instruction to about 2,200 students across its schools in Aurora, Thornton, and Parker, Colorado. The Global Village Academies are centered on providing second language instruction in Spanish, Mandarin Chinese, Russian, or French using an immersion model. Parents select the language, or "village," their child begins learning, and for at least half of their school day, students learn all their core subjects immersed in their chosen language or village and taught by GVA's world language teachers. For the other half of the day, students receive this instruction in English.

124. Global Village Academies heavily rely on recruiting and retaining native-speaking world language teachers from all over the globe to provide their students with second language instruction through an immersion model that is consistent with an internationally benchmarked curriculum. GVA world language teachers are highly qualified, experienced teachers with native-language skills who also bring their unique cultural perspectives and competencies from their home countries into the classroom.

125. Since 2007, GVAC has regularly relied on and engaged in the H-1B visa process by filing H-1B petitions to recruit, hire, and retain world language teachers for its three GVA schools. Each year, GVAC recruits roughly 2-5 new world language teachers, but sometimes more, across their GVA schools. For the current 2025-2026 academic year underway, GVAC sponsored eleven world language teachers through H-1B petitions. Without the H-1B visa system, GVAC would not be able to continue hiring qualified world language teachers to carry out its educational model and provide the level of instruction it has in the past.

126. The $100,000 Requirement would significantly hinder GVAC's ability to recruit new and qualified teachers for the upcoming academic year, particularly given the challenging teacher recruitment market and the need for world language teachers with both native-language skills and cultural competencies to achieve their mission. Given that GVAC's schools do not charge tuition and have a limited budget, paying $100,000 for each new H-1B petition GVAC anticipates filing for the 2026-2027 academic year would have a significant financial impact on GVAC and its schools. GVAC could not afford to pay upwards of $500,000 or more in H-1B fees to continue hiring qualified world language teachers through H-1B petitions in line with its mission and model. As a result, GVAC would have to take significant, drastic measures to offset such a cost, like cutting down on current staffing or placing a cap on enrollment, which would have a vast impact on GVAC's funding.

127. The $100,000 Requirement would also harm GVAC's programmatic work. If GVAC cannot afford to hire world language teachers through the H-IB visa process, GVAC would be forced to fundamentally change its unique educational model that sets its schools apart for parents and students, undermining GVAC's schools' ability to provide the quality language immersion instruction and cultural competencies they are known for.

**3. Religious organizations**

128. **Plaintiff Society of the Divine Word** (also known as "Societas Verbi Divina," "SVD," and the "Divine Word Missionaries") is a religious missionary order of Roman Catholic priests and brothers presently serving in almost eighty countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the Provincial Superior of the Province—is a non-profit, tax-exempt organization employing several hundred employees.

129. There are approximately 195 Divine Word Missionaries in the Chicago Province. The Divine Word Missionaries work in the states of Illinois, Iowa, Wisconsin, Ohio, Missouri, Tennessee, New Jersey, and Washington D.C; in several island nations in the Caribbean including Antigua, Jamaica, B.V.I., Montserrat, St. Kitts, and St. Maarten; as well as in various provinces in Canada. Divine Word Missionaries are involved in a variety of ecclesiastical duties—or ministries—including parish administration and communications, Catholic formation, Catholic Biblical Apostolate, spiritual direction, vocation recruitment, fundraising, and other specialized ministries.

130. SVD has three formation centers which educate future SVD members in the pre-novitiate, novitiate, and post-novitiate formation programs: Divine Word College in Epworth, Iowa; Divine Word Theologate in Chicago, Illinois; and Catholic Theological Union in Chicago, Illinois. Divine Word Missionaries oversee and implement each of these programs.

131. As an international religious missionary order, SVD's members can be assigned to other countries by the SVD Generalate in Rome. Each year, Rome assigns newly final professed members to various countries around the world where the Society works, including the United States. Additionally, the Chicago Province often invites foreign Divine Word Missionaries to come to the United States to maintain its missionary outreach. Many of the members who are

assigned to the United States will remain in this country for years, including members who eventually become U.S. citizens or lawful permanent residents.

132. Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it is critical that Divine Word Missionaries have the cultural and language skills to properly perform their duties. In the Chicago Province alone, Society of the Divine Word has particularly large Spanish-, Polish-, and Vietnamese-speaking populations that require Divine Word Missionaries with those language skills to receive spiritual guidance and instruction, ministry, and sacraments. Individuals with the proper skillset and experience for these roles are hard to find and hard to replace. Additionally, given the ongoing changing realities in the American Catholic Church, such as an aging native-born clergy and religious community, and fewer American (born and naturalized) candidates becoming priests, many dioceses and religious orders, including SVD, are becoming increasingly dependent on foreign born priests. This trend is expected to worsen in the near future.

133. Three SVD Divine Word Missionaries currently hold an H-1B visa. Each of these Divine Word Missionaries were carefully selected for their unique skills, spoken languages, and expertise, and they are critical for their respective ministries. This includes pastoring parishes, performing administrative work, mentoring newly professed members working in the parish, providing spiritual counsel and guidance in a variety of languages, and serving as church canon law consultants (which requires further specialized training). These individuals' skills are necessary to serve their ethnically diverse parishes.

134. Although the Chicago Province of SVD has at least eight priests working in nonimmigrant status with an R-1 visa—an immigration status which allows a nonimmigrant worker in a religious occupation to temporarily live and work in the United States, under certain

conditions—there are key limitations on this status that prevent it from being a long-term solution for SVD's ministerial needs. For example, an individual in R-1 status can only maintain that status for up to five years. Although there is a path to a green card from R-1 status, it is a long, involved process and currently has a lengthy backlog for an immigrant visa to become available. Given this backlog, the ability to change nonimmigrant status to H-1B status is the only lawful alternative available to SVD to maintain its priests' legal status in the United States. SVD planned to petition for H-1B status for each of these individuals prior to the expiration of their R-1 status, to ensure they could continue their work uninterrupted. If this is not possible because of the prohibitive fee under the Proclamation, a Divine Word Missionary would need to leave the U.S. and wait abroad for at least one year before he could receive another R-1 visa. This would cause significant disruption and severely impact the parishes where these priests perform vital services.

135. The H-1B visa is the lawful pathway SVD must use to continue its critical religious services ministry in the United States. As a non-profit, paying the $100,000 fee per employee would create a crippling burden on the Chicago Province, and would pose serious barriers to the continuity of its ministry in key areas. If SVD is unable to apply for H-1B visas for its staff, it will be unable to continue providing critical language- and culturally-accessible religious services to its congregants, impacting its congregants' spiritual needs and interfering with SVD's religious exercise. In other words, SVD's inability to employ these professionals will harm not only the organization, but also the communities it serves, especially those which require the unique skillset of the individuals who would otherwise apply for H-1B visas. Furthermore, SVD had already begun plans and reserved the fees already required to apply for H-1B visas for its necessary religious workers, to fill roles for which U.S. citizens are simply not

available. These plans must now be placed on hold since SVD cannot afford to pay the extravagant $100,000 fee for each necessary individual.

136. **Plaintiff Fathers of St. Charles** is a part of the Congregation of the Missionaries of St. Charles – Scalabrinians, an international community of brothers who have felt the call to consecrate themselves to a missionary life in service of migrants. The Congregation serves migrants and refugees all over the world and is divided into several provinces or regions, each responsible for serving certain countries. The province of Fathers of St. Charles is the St. John the Baptist Province, whose jurisdiction covers the United States, Canada, Mexico, Guatemala, and El Salvador. The provincial office is located in Oak Park, Illinois and supports a membership of brothers hailing from thirteen different countries who minister in locations all over the province.

137. Because Fathers of St. Charles are called by their faith to be in mission with migrants and refugees, with a special priority for the poorest migrants, it is critical for the members of Fathers of St. Charles to be able to perform all sacramental and liturgical activities in a linguistically and culturally appropriate manner for the communities they serve. For the St. John the Baptist Province, this requires the language and cultural competency to be able to minister to Latin American, Vietnamese, and Brazilian communities throughout the province's jurisdiction. Most members of Fathers of St. Charles speak at least two to three different languages and rotate to different locations both within the province as well as to other Scalabrinian provinces and regions outside the province as part of their calling and mission to be in community with migrants and refugees.

138. The unique mission of the Congregation of the Missionaries of St. Charles and the Fathers of St. Charles requires the St. John the Baptist Province be able to bring members of the

Congregation into the United States on visas so that they can work with and serve the ethnic communities in the parishes entrusted to Fathers of St. Charles by the bishops. In the past, Fathers of St. Charles has used (and continues to use) R-1 religious worker visas to enable its members to live and work in the United States, and it has also subsequently sponsored its members for permanent residency so that they may remain with the province on a long-term basis. But because R-1 visas are valid only for five-year periods before the recipient must leave the United States for at least a year, and due to processing backlogs that have made it nearly impossible for R-1 visa holders to adjust status to lawful permanent residency before the five-year term of their visa expires, it has recently become necessary for Fathers of St. Charles to sponsor its members already in the United States on R-1 visas for H-1B visas so that they may maintain legal status and continue their work here.

139. Fathers of St. Charles currently has three members here on R-1 visas that will expire imminently, and for whom Fathers of St. Charles had planned to petition for H-1B visas in the next few months. The mission and religious calling of Fathers of St. Charles depends heavily on the H-1B visa system and the ability of Fathers of St. Charles to be able to bring members of the Congregation from abroad to work in the United States on H-1B visas on a regular basis.

140. The Proclamation and the $100,000 Requirement is therefore devastating to Fathers of St. Charles and their religious calling. Fathers of St. Charles cannot afford to pay $100,000 for each new H-1B visa application. The province's many humanitarian duties would be severely impacted if the province had to find hundreds of thousands of dollars within its budget to cover new H-1B visa applications on an ongoing basis in future years. If the Proclamation remains in effect, Fathers of St. Charles will not be able to maintain the legal status of the three members currently here on R-1 visas and would be forced to send them abroad, with

no ability to fill the positions those members would leave vacant. In turn, the communities in those parishes would not be able to convene and worship in their own language and would be deprived of spiritual guidance and service, in contravention of the mission and spiritual calling of Fathers of St. Charles. The $100,000 Requirement substantially burdens Fathers of St. Charles's mission and ability to serve the poorest of migrants, and it currently unclear how Fathers of St. Charles will be able to continue their spiritual work if they cannot access the H-1B visa system going forward.

141. **Plaintiff Church on the Hill** is a religious institution located in the Appalachia region of the United States. The church congregation was formed seventy years ago but was officially incorporated in its current structure in 2003.

142. In 2021, Church on the Hill decided to branch out and establish a new church, also known as a "church plant." The church plant, which began with twenty members from Church on the Hill, formed a new congregation in a nearby city. The new church serves an underserved, economically disadvantaged region in Appalachia and now has approximately 200 members in its congregation.

143. Both Church on the Hill and the church plant have established ministries for children, youth, families, and students, as well as community outreach that meets both practical and spiritual needs. Some of the ministries in the church plant work with local schools to support parents who are financially struggling and teachers who work with these low-income families. Church members regularly visit sick and elderly community members in the hospital and in their homes. Through these efforts, the church has become a trusted presence in the community, standing alongside families in hardship and serving as a stabilizing and hope-filled influence in a region marked by economic challenge.

144. The church would not be what it is today if it had not hired foreign talent through the visa system to assist with establishing this second church. Several years ago, Church on the Hill hired a pastor from the United Kingdom on an R-1 visa, a temporary non-immigrant visa available for religious workers. Prior to working for Church on the Hill, this pastor shared with the Church Board his vision and calling to start a new church. The Board found this vision so compelling that they offered a job to the pastor and then became the sponsor for his new petition for nonimmigrant worker status and green card petition, which allowed him to adjust to legal permanent residency from his R-1 visa. This pastor was and is integral to the church's mission and work.

145. To help make this vision of a second church a reality, Church on the Hill sponsored for an R-1 visa a second pastor from the United Kingdom, Plaintiff John Smith ("Pastor John Smith"), who was a colleague of the first pastor the church had sponsored for an R-1 visa. The two pastors' work has allowed Church on the Hill to expand to its second location. Pastor John Smith's relationship to the first pastor, their long history, their common vision, their complementary qualifications, skills, and giftings create a unique synergy so that together they can co-pastor the church plant and its local community.

146. Pastor John Smith is a native of England and is currently present in the U.S. on an R-1 visa. It was important to hire Pastor John Smith with an R-1 visa because of his unique qualifications and partnership with the first pastor. In addition, he brings extensive experience and training in cross-cultural mission work, having served and trained in diverse contexts overseas. This background has shaped his ability to minister effectively across generational, cultural, and socioeconomic boundaries within the Appalachian Highlands. Combined with his theological preparation, pastoral leadership, and long history of shared vision with the first

pastor, his contribution could not be replicated by hiring unrelated local talent. Pastor Smith's leadership is critical for the growth and development of the church plant.

147. Pastor John Smith's R-1 visa is set to expire on November 1, 2026, at which time he will have reached the maximum five-year stay on his R-1 visa in the United States. The church has sponsored Pastor John Smith for a green card, and that application has been approved, but there is a long processing backlog that is delaying his ability to adjust status to lawful permanent residency. Prior to the Proclamation, Church on the Hill planned to apply for an H-1B visa for Pastor John Smith so that he could remain in the U.S. and continue his ministry with the church while he waits to be able to adjust status. The church had retained immigration counsel to apply for an H-1B visa for him just prior to the Presidential Proclamation at issue.

148. After the $100,000 Requirement was instituted, the church was forced to notify Pastor Smith that it cannot afford to pay this fee. Without an H-1B visa, Pastor John Smith will be unable to continue working for Church on the Hill after November 2026.

149. The required fee will directly harm Church on the Hill, their mission, and their members. The church is worried that the fee will prevent them from retaining the pastoral leadership that is central to their mission and the stability of their congregation. The fee has created real concern about the future of the church and the community that depends on it.

150. If the H-1B fee continues in force, the church and its members will face a staffing shortage. Pastor John Smith has played a pivotal role growing the church, including shepherding the church plant in a nearby city. Pastor Smith leads many of the church's ministries and participates in preaching, teaching and mentoring new leaders. He also plays a key role in developing religious education programs for the church, leading worship and performing outreach to underserved families in the community. As part of Pastor John Smith's ministry, he

has developed important and meaningful relationships with members of Church on the Hill's congregation and community that would be immediately weakened, if not severed completely, if he and his family no longer had legal status in the United States and were forced to leave the country. Many of the church's ministries and programs will be paused or cut back if Church on the Hill is unable to change Pastor John Smith's status to H-1B. Church on the Hill's existing church staff would not be able to fill the hole in our workforce that Pastor John Smith would leave if it cannot convert his status to continue his employment.

151. If Pastor John Smith is unable to lawfully remain and work in the United States, the essential services he provides to the congregations and the community will be critically impacted, leaving a vulnerable population and community without the support it needs. Because the other pastor who co-leads the church is dealing with significant health issues, Pastor John Smith's absence would place considerable strain on him and on the church as a whole. Instead of continuing to expand and develop new ministries and outreach, the church would be forced into a position of simply trying to maintain what already exists. This would prevent further growth, limit innovation, and hinder the broader impact the church has been having.

152. **Plaintiff John Smith** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. Pastor John Smith came to the United States in 2022 on an R-1 nonimmigrant visa for foreign nationals in religious vocations, and is currently working as a full-time pastor at a church in his area. In addition to his rewarding and important work with the church, Pastor Smith's family have also established deep roots in their local community, where his children attend school, and have developed meaningful connections with their church and broader community. Pastor Smith's elderly mother and step-father also live close by, which allows Pastor Smith and his family to be close to them and

continue these familial relationships. Pastor Smith and his wife are in the process of purchasing a home for their family.

153. Pastor Smith's R-1 visa allows him to reside in the United States for up to five years until November 1, 2026, but his church offered him a permanent position if he could continue maintaining legal immigrant status in the country, and sponsored him for a green card with an I-360 petition. This I-360 petition was approved last year; however, due to an extreme backlog in visa processing, Pastor Smith cannot file to adjust his status to lawful permanent residency before his R-1 visa will expire. Thus, Pastor Smith's church retained immigration counsel to file an H-1B petition on Pastor Smith's behalf so he can continue working at the congregation while he waits for the opportunity to adjust his status.

154. Before the church could file Pastor Smith's H-1B petition, however, the Proclamation went into effect. It is not possible for the church to pay such a high fee. The news has left Pastor Smith heartbroken and filled with uncertainty. He too cannot afford to pay this fee, and without the H-1B visa process, he will lose his job at the church and will not be able to remain in the United States beyond his five-year maximum stay on his R-1 visa. This would undermine his ability to continue providing the essential pastoral and community to his church. The new $100,000 fee would not only upend Pastor Smith's plans to remain in the United States and much of the spiritual work he has devoted himself to for the past several years, but also his family's lives and the relationships and plans they had for their future.

**4. Research and academic institutions**

155. **Plaintiff UAW International** represents 120,000 members in higher education, and **Plaintiff UAW Local 4811** represents nearly 50,000 members employed at the University of California. These members include post-doctoral researchers, graduate students, and teaching

assistants who drive innovation and advances in multiple fields. Plaintiffs UAW International and Local 4811 have numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

156. For example, one UAW International and Local 4811 member is a 31-year-old Indian post-doctoral researcher at a major U.S. research institution whose work focuses on biomedical modeling and developing tools to simplify and accelerate drug discovery. His current projects support advances in treatment for tuberculosis and breast cancer and he is the only person in his lab working on these projects. He is presently employed on a STEM OPT extension, but his projects will not be completed by the time it expires, and his laboratory recommended that the research institute file an H-1B petition on his behalf. The imposition of a $100,000 fee imposed by the Proclamation would be extremely burdensome on the research institution and thus jeopardize both his research and the institution's investment. Since he found out about the Proclamation, he has felt depressed and hopeless about his own future and the future of his work and is finding it difficult to concentrate on his research.

157. A European UAW International member is currently in a postdoctoral position at a major research institution on the East Coast. He is a neuropharmacologist who studies the impacts of opioids generally and fentanyl specifically on pain management, in an effort to identify ways to reduce the risk of addiction. He chose to do his postdoctoral work in the United States specifically because he is aware of the acuity of the opioid epidemic here and hopes to find ways to reduce it. He is currently in the U.S. through a J-1 visa and his current institution planned to sponsor him for an H-1B visa so he could continue this critical work. He is also preparing to submit a major grant application for funding to continue and expand his work at that

institution, on which he would be the primary investigator. If he is unable to obtain an H-1B visa, his institution will lose access to any potential grant funding, and he will not be able to continue this critical research. When he became aware of the Proclamation, he was also personally devastated and has suffered from anxiety and insomnia because his entire career and the future of his research are now up in the air.

158. **Plaintiff AAUP** has 50,000 members who are faculty and other academic professionals. Plaintiff AAUP has numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

159. For example, one AAUP member had an offer from the major research university where that member is currently completing a postdoc. The university intended to seek an H-1B visa for this member, and they expected the H-1B process to be completed this fall. However, the university has placed the processing of this member's H-1B visa on hold indefinitely due to the $100,000 fee.

160. The potential loss of these postdoctoral researchers, scientists, and academics will not just harm the individuals and the institutions that employ them. It will result in significant and potentially catastrophic setbacks to research that benefits the American public and ensures the United States remains a leading source of innovation and expertise. For example, the fee will likely result in sharp cutbacks in the employment of highly talented foreign workers and severe setbacks for university research, graduate programs, and clinical care, compounding an anticipated shortfall of 5.3 million skilled workers over the next decade.[41] Faculty search

[41] Michael T. Nietzel, *Universities May Face Huge Costs From Trump's $100,000 H-1B Visa Fee*, Forbes (Sept. 26, 2025), https://perma.cc/FB3Y-LNJ4.

committees are already being told they have to exclude top candidates if those candidates would need H-1B visas. Andrea Liu, a physicist at the University of Pennsylvania, said the fee would damage the future of her research group and described the impact as "an utter disaster—yet another body blow to science."[42]

161. **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B petition has been halted due to the $100,000 fee imposed by the Proclamation. Her research focuses on identifying the genetic and epigenetic causes of vision loss due to aging, diseases such as diabetes, and rare inherited genetic abnormalities of unknown etiology, with the goal of finding new ways to diagnose and treat blinding conditions. Her laboratory relies on her as its first postdoctoral scholar to build and advance its research program, and her ongoing work requires a minimum of two more years. Due to the value of her skills and research expertise in both computational biology as well as wet-lab bench research, her university employer approved her for H-1B sponsorship, and she expected the process to be completed by this December, allowing her to visit her home country for the first time in six years. Instead, as a result of the Proclamation, her university has indefinitely paused moving forward with the processing of her application. She is suffering debilitating stress and anxiety due to the uncertainty of her position, which exacerbates the PTSD from which she suffers. Without relief, Plaintiff Phoenix will be forced to leave her postdoctoral position the United States within four months, causing serious professional and personal harm. Her departure will set back the crucial research she is conducting, disrupting the lab's ongoing work and ability to secure future research funding,

[42] Natasha Gilbert, *Trump's $100K Visa Fee for Foreign Talent: How Will It Affect Researchers?*, Nature (Sept. 24, 2025), https://perma.cc/2BUK-T49N.

preventing her department from getting any future funding through her, and potentially delaying the availability of treatment for the conditions that are the focus of her research.

## VII. CAUSES OF ACTION

### COUNT 1
### Against Defendant Trump
### Actions *ultra vires*, in excess of statutory authority

162. Plaintiffs incorporate the factual allegations above as if set forth herein.

163. The Proclamation cites Sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1182(f) and 1185(a), as providing statutory authority for imposing a requirement that employers submitting a petition for an H-1B visa make a "payment" of $100,000 to the United States.

164. Neither INA § 212(f) nor § 215(a) authorizes the President to impose the $100,000 Requirement.

165. Nor has Congress or the Constitution otherwise authorized the President to impose this fee, tax, or other revenue-generating requirement on H-1B petitioners. To the contrary, under the Constitution, the power of taxation belongs to Congress. U.S. Const. art. I, § 8, cl. 1.

166. The cited statutes, INA §§ 212(f) and 215(a), cannot be reasonably interpreted to be a delegation of Congress's tax power.

167. If these provisions were interpreted to provide this authority, they would violate the nondelegation doctrine because they contain no intelligible principles to guide decision-making on the amount of money that can be raised or the use of the money collected.

168. That interpretation would also violate the major questions doctrine because these provisions contain no clear Congressional authorization for this action of great political and

economic significance. And, there is no basis for delegated authority for the President to raise and spend money as he sees fit.

169. INA § 212(f) and § 215(a) also do not authorize the President to override other provisions of the INA. *Trump v. Hawaii*, 585 U.S. 667, 689 (2018).

170. In separate provisions, the INA sets standards for and limits on the entry into the United States of H-1B visa recipients and authorizes DHS—not the President—to impose limited fees in connection with H-1B visa petitions:

a. The INA sets specific requirements for approval under the H-1B visa program. See 8 U.S.C. § 1101(a)(15)(H)(i)(b). It also sets specific caps on the number of people who may be admitted under this program, see 8 U.S.C. § 1184(g), reflecting a careful balancing of policy interests between employers' need to hire foreign workers for certain kinds of roles and the interests of American workers in the labor market.

b. The INA also limits the fees that DHS may impose under 8 U.S.C. § 1356(m) for adjudication and naturalization services. Such fees "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). In accordance with the APA, DHS sets the amounts of these fees through notice-and-comment rulemaking. *See*, *e.g.*, 89 Fed. Reg. 6194.

c. Beginning with the passage of the American Competitiveness and Workforce Improvement Act of 1998, Congress (via the INA) imposed additional fees on employers specifically in connection with H-1B visa petitions. *See* 8 U.S.C. § 1184(c)(9)-(14). The INA also directs that these fees be segregated into a special account and used for specified purposes. 8 U.S.C. § 1356(s). Congress set these limits for the purpose of balancing impacts to the labor market for American workers while permitting foreign workers in this category to be hired for certain kinds of roles.

171. The INA also includes detailed provisions to address misuse of the H-1B visa program. *See* 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.800 *et seq*.

172. In directing DHS to require a $100,000 "payment" to an unspecified account and for unspecified uses, in connection with H-1B visa petitions, the Proclamation conflicts with and supplants the structure Congress has established for approval and entry into the United States of H-1B visa recipients, including the fee structure for adjudication services in general and for the H-1B visa program in particular.

173. Nor does the President have authority under 8 U.S.C. § 1182(f) to restrict workers from entering the United States because their employers failed to make this payment.

174. The Proclamation's requirement to pay $100,000 as a condition of entry or re-entry to the United States, combined with the expansive and effectively standardless discretion of the Secretary of Homeland Security to disregard the Proclamation's dictates and Congressional intent, adds novel eligibility requirements, conflicts with, and supplants the structure Congress has established for the adjudication of H-1B petitions, issuance of H-1B visas, and entry into the United States for those with H-1B visas.

**COUNT 2**
**Against Agency Defendants**
**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A), (C)**
***Not in Accordance with Law, In Excess of Statutory Authority***

175. Plaintiffs incorporate the factual allegations above as if set forth herein.

176. Agency Defendants require a $100,000 fee as a mandatory requirement upon submission of any new H-1B petition received after 12:01 a.m., September 21, 2025.

177. The new $100,000 Requirement, an extortionate fee, constitutes final agency action under 5 U.S.C. § 704.

178. Agency Defendants each lack statutory authority to impose the $100,000 Requirement.

179. The $100,000 Requirement is contrary to and/or in excess of the authority provided in provisions of the INA, including (1) the standards for approval and entry into the United States of H-1B visa applicants, as set forth in 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 U.S.C. § 1184(g); (2) the fees to be charged to employers submitting petitions for H-1B visa applicants, including the amount of those fees and the purposes for which they may be used, as set forth in 8 U.S.C. § 1184(c)(9)-(14) and 8 U.S.C. § 1356(s); and (3) the fees to be charged generally for adjudication and naturalization services, as set forth in 8 U.S.C. § 1356(m).

180. Nor do the Agency Defendants have the statutory authority to stop adjudicating petitions and visas or to bar individuals from entering the country unless their employers have paid $100,000.

181. The $100,000 Requirement is contrary to law and in excess of statutory authority and must be set aside under 5 U.S.C. § 706(2).

182. In the alternative to the APA, Plaintiffs bring this claim pursuant to the Court's inherent equitable authority to declare unlawful and enjoin unlawful agency action.

**COUNT 3**
**Against Agency Defendants**
**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
***Arbitrary and Capricious***

183. Plaintiffs incorporate the factual allegations above as if set forth herein.

184. Under the APA, a court shall set aside an action if it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "When an agency changes course . . . , it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

185. Agency Defendants failed to consider the carefully crafted fees and factors Congress intended for DHS to consider when adjusting fees for adjudication of H-1B petitions. 8 U.S.C. § 1356(m), for example, calls for DHS to consider the costs of providing adjudication and naturalization services. But the $100,000 payment is untethered from the cost of adjudicating H-1B petitions or any other petitions.

186. Agency Defendants failed to consider the adverse impacts of the $100,000 requirement on small businesses, non-profits, and governmental jurisdictions, as required by the Regulatory Flexibility Act. 5 U.S.C. §§ 603-604. Agencies are required to consider small entities' ability to pay and to consider creating exemptions, discounts, or other alternatives for small entities, and DHS typically has required small and non-profit employers to pay less in fees. But

here, the Agency Defendants did not consider ability to pay the $100,000 Requirement or explain its unreasoned departure from that framework.

187. Agency Defendants failed to consider the substantial burden that the $100,000 Requirement places on religious organizations who cannot afford to pay that exorbitant amount and, as a result, will lose their pastors and priests.

188. Agency Defendants failed to consider the negative impacts of the $100,000 Requirement on schools, hospitals, and communities, especially in underserved areas where school districts and hospitals struggle to hire teachers and doctors and rely on the H-1B program to ensure effective health care and educational services for their communities.

189. Agency Defendants failed to consider the reliance interests of regulated parties like Plaintiffs and their members. The agencies have never increased H-1B fees by six figures in one go and have never done it without warning. Agency Defendants should have considered the chaos that this enormous and sudden fee would predictably create for regulated parties, who were caught by surprise and had no opportunity to prepare for it.

190. Agency Defendants failed to consider alternative ways to address the purported problems with the H-1B program, such as more closely scrutinizing any employers who may be abusing the program, under the existing statutory enforcement mechanisms, rather than imposing a blanket $100,000 fee on all employers.

191. Agency Defendants did not consider how the $100,000 Requirement could encourage employers to improperly lower wages for their workers—U.S. workers or H-1B workers—in order to maintain needed staff but recoup additional costs paid to the government.

192. While employers must provide a $100,000 payment "to accompany any new H-1B visa petitions submitted after 12:01 a.m....... on September 21, 2025," *H-1B FAQ*, USCIS

(Sept. 21, 2025), https://perma.cc/9UKN-ZYDG, Agency Defendants have failed to consider that, as of September 21, 2025, there was no mechanism by which petitioners could submit such a fee.

193. Agency Defendants have also failed to coherently explain other key information. For instance, the agencies have not explained what will happen to employers who file petitions before a payment system is set up, where the money will go, or how the money will be used. Nor have Agency Defendants explained the impact of the $100,000 Requirement on individuals residing in the United States under another visa program who seek to convert to an H-1B visa while inside the United States.

194. DHS has also failed to explain what criteria or factors it will consider in determining whether an individual, an employer, or an industry will be exempt from the $100,000 requirement. This failure invites arbitrary, selective enforcement of the new requirement.

**COUNT 4**
**Against Agency Defendants**
**Violations of the Administrative Procedure Act,**
**Regulatory Flexibility Act – 5 U.S.C. §§ 603-604, 706(2)(D)**
***Failure to Conduct Notice and Comment Rulemaking;***
***Rulemaking Without Observance of Procedure Required by Law***

195. Plaintiffs incorporate the factual allegations above as if set forth herein.

196. *Notice and comment.* The APA requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. See 5 U.S.C. §§ 553(b)-(c). The agency must "consider and respond to significant comments received." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). When the final rule is promulgated, the agency must provide "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

197. The new requirement of a $100,000 payment is a legislative rule within the meaning of the APA. It "imposes new obligations" on H-1B petitioners, as the $100,000 payment must "accompany" their petition and the petitions will not be adjudicated and their workers will not be granted visas or be allowed to enter the United States without it. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). Legislative rules like the new $100,000 payment requirement must go through notice and comment rulemaking. See 5 U.S.C. § 553(b)-(c). USCIS has always provided notice and comment when adjusting fees for H-1B petitions except where Congress provided for the fees by statute. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194 (Jan. 31, 2024), *as corrected,* 89 Fed. Reg. 20101 (Mar. 21, 2024).

198. Agency Defendants failed to provide notice and an opportunity for comment as required by the APA and have thus violated 5 U.S.C. §§ 553(b), (c) and 706(2)(D).

199. *Effective date.* Agency Defendants also violated the APA by making the new $100,000 Requirement effective immediately without good cause. The APA requires that a substantive rule be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). If an agency claims good cause for making the rule effective in less than 30 days, it must publish its good cause explanation with the rule. *Id.* § 553(d)(3). Here, however, the new requirement became effective immediately. Agency Defendants failed to publish any good cause finding.

200. *Regulatory Flexibility Act.* Agency Defendants have violated the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 *et seq.* Whenever an agency is required to conduct notice and comment rulemaking, an agency must "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small

entities." 5 U.S.C. § 603(a). The initial analysis must discuss significant alternatives such as establishing different compliance requirements or timetables "that take into account the resources available to small entities" or "exemption from coverage of the rule, or any part thereof, for such small entities." *Id.* § 603(c). A final rule must include a final regulatory flexibility analysis that discusses, among other things, significant issues raised by the public or the Chief Counsel for Advocacy of the Small Business Administration and the steps the agency has taken to "minimize the significant economic impact on small entities." *Id.* § 604(a). Agency Defendants never published an initial analysis for public comment and did not publish a final analysis either, even though the $100,000 requirement will have an enormous impact on small entities.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare unlawful and set aside sections 1, 2, and 3(a) of the Proclamation;

B. Declare unlawful and set aside enforcement and implementation of sections 1, 2, and 3(a) of the Proclamation, including the requirement to make a $100,000 payment as a prerequisite to adjudicate an H-1B petition or as a condition for visa issuance or entry into the United States for H-1B beneficiaries;

C. Declare unlawful and set aside any agency guidance, procedures, or determinations made pursuant to, or in implementation of, sections 1, 2, and 3(a) of the Proclamation, including the Agency Policies;

D. Enjoin Defendants from requiring the $100,000 payment and from conditioning H-1B petition adjudications, visa issuance, or entry on such payment;

E. Order Defendants to process H-1B petitions under existing law, without the $100,000 payment condition;

F. Grant such other and further relief as the Court deems just and proper.

Date: October 3, 2025

Respectfully submitted,


_/s/ Karen C. Tumlin_
Karen C. Tumlin (CA Bar No. 234691)
Esther H. Sung (CA Bar No. 255962)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (GA Bar No. 898375)*
Brandon Galli-Graves (TX Bar No. 24132050)*
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

_/s/ Charles H. Kuck_*
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

/s/ _Zachary R. New_
Zachary R. New*
Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

_/s/ Cynthia Liao_
Cynthia Liao (CA Bar No. 301818)*
Johanna N. Hickman (D.C. Bar No. 981770)*
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
egoldstein@democracyforward.org

_/s/ Kalpana Peddibhotla_
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

_/s/ Jesse M. Bless_
JESSE M. BLESS*
MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

_/s/ Greg Siskind_
Greg Siskind*
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com
_Counsel for Plaintiffs_


* Motion to appear _pro hac vice_ forthcoming

# Exhibit 6

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBAL NURSE FORCE, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, et al.,<br><br>Defendants. | Case No. 4:25-cv-8454-HSG<br><br>**DECLARATION** |

I, Cara M. Selby, pursuant to 28 U.S.C. § 1746, declare the following:

1. I am employed by the U.S. Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), as the Acting Associate Director of the USCIS Service Center Operations directorate. My current duties include managing multiple Service Centers that are responsible for the adjudication of various immigration benefit requests, including H-1B petitions.

2. I have reviewed data pertaining to the number of H-1B petitions (not subject to the cap) filed with USCIS that included, or were supplemented by, evidence of payment of the $100,000 Proclamation Fee, as well as data pertaining to other fees received by USCIS with all H-1B petitions (not subject to the cap).

3. As of February 15, 2026, USCIS has received evidence of 85 settled payments of the $100,000 Proclamation Fee resulting in $8.5 million in fees.

4. Between September 21, 2024, through February 15, 2025, USCIS received approximately 123,924 H-1B petitions (not subject to the H-1B cap) and collected approximately $524.9 million in various filing, statutory and premium processing fees.

5. Between September 21, 2025, through February 15, 2026, USCIS received approximately 105,611 H-1B petitions (not subject to the H-1B cap) and collected approximately $443.4 million in various filing, statutory and premium processing fees, including approximately $8.5 million in fees required by the Proclamation.

6. H-1B petitions (not subject to the H-1B cap) requesting consulate notification for aliens who are outside of the United States or, if present in the United States, will seek admission as an H-1B nonimmigrant from outside the United States, declined by approximately 87 percent based on a comparison of H-1B petitions (not subject to the H-1B cap) requesting consulate notification filed between September 21, 2024, through February 15, 2025, and September 21, 2025, through February 15, 2026.

7. The decline in the number of H-1B petitions (not subject to the cap) requesting consulate notification between September 21, 2024, through February 15, 2025, as compared to September 21, 2025, through February 15, 2026, represented a decline of approximately $28 million in fees collected by USCIS, far greater than the $8.5 million in Proclamation fees collected between September 21, 2025, through February 15, 2026.

8. I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

9. Executed at the USCIS Northeast Regional Office, South Burlington, Vermont on this 4th day of March 2026.

CARA M SELBY Digitally signed by CARA M SELBY Date: 2026.03.04 09:27:52 -05'00'

Cara M. Selby
Acting Associate Director
USCIS Service Center Operations

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al*.<br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al*.,<br>Defendants. | No. 1:25-cv-3675-BAH |

**<u>DECLARATION OF JEROME JACKSON</u>**

I, Jerome Jackson, declare as follows:

1. I currently serve as the Branch Manager of the Budget Reporting Branch (BRB) in the Central Accounting and Reporting Division at the Department of the Treasury's Bureau of the Fiscal Service (BFS). I have been employed in this role since May 13, 2015.
2. BFS is responsible for, among other things, collecting federal taxes, charges, and fees; disbursing U.S. Treasury payments; and providing financial management services and solutions to federal agencies. BRB is an office in BFS that is responsible for, among other things, providing guidance to Federal agencies regarding the accounting and reporting of their transactions and account balances, and establishing and maintaining an official record of

Federal account symbols and titles for all government programs,

appropriations, funds, and receipt accounts. Treasury Account Symbols (TAS) are the cornerstones for reporting the government's financial transactions. Each TAS allows the Department of the Treasury and the Office of Management and Budget (OMB) to track funds collected or spent by Federal agencies, accurately perform accounting and reporting for those funds, and ensure that those funds are spent in accordance with law.

3. To establish a new account to appropriately account for the expenditure or collection of funds, a Federal program agency works OMB and BRB. BRB assigns a TAS after considering the Federal government's relationship to the accounts, such as the source of receipts and the availability of the funds. Each TAS is composed of numbers identifying the responsible agency, the period of availability (for accounts related to appropriations), and the type of account.

4. BRB will establish a General Fund Receipt Account (GFRA) for an agency for the purpose of receiving and accounting for collections not defined by law for a specific purpose.

5. Consistent with the Miscellaneous Receipts Act, 31 U.S.C. § 3302, all amounts held in a Federal agency's GFRA sweep into the General Fund of the U.S. Treasury at the end of the fiscal year.

6. On October 7, 2025, BRB received a request from the Department of Homeland Security (DHS) to establish an account for amounts collected pursuant to the September 19, 2025 Presidential Proclamation entitled "Restriction on Entry of Certain Nonimmigrant Workers" (Proclamation).

7. In response to DHS's request, BRB established a GFRA for amounts collected pursuant to the Proclamation, because such collections are not defined by law for a specific purpose. As with all GFRAs, the amounts in

this GFRA will sweep to the General Fund of the U.S. Treasury at the end of the fiscal year.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of December, 2025.

Jerome L. Jackson Jr.
Digitally signed by Jerome L. Jackson Jr.
Date: 2025.12.01 14:04:23 -05'00'

Jerome Jackson, Branch Manager
Bureau of the Fiscal Service
Department of the Treasury

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**CLERK'S CERTIFICATE AND APPEALS COVER SHEET**

**ABBREVIATED ELECTRONIC RECORD**

Case Caption: State of California et al v. Noem et al

District Court Number: 1:25-cv-13829-LTS

Fee: Paid? Yes ____ No ____ Government filer X In *Forma Pauperis* Yes ____ No X

Motions Pending Yes ____ No X
*If yes, document #* ________

Sealed documents Yes ____ No X
*If yes, document #* ________

*Ex parte* documents Yes ____ No X
*If yes, document #* ________

Transcripts Yes ____ No X
*If yes, document #* ________

Notice of Appeal filed by: Plaintiff/Petitioner ____ Defendant/Respondent X Other: ____

Appeal from:

ECF No. 106 M&O on Plaintiff's Motion for Summary Judgment; 107 Judgment

Other information:

I, Robert M. Farrell, Clerk of the United States District Court for the District of Massachusetts, do hereby certify that the annexed electronic documents:

with the electronic docket sheet, constitute the abbreviated record on appeal in the above entitled case for the Notice of Appeal # 108 filed on 06/11/2026.

In testimony whereof, I hereunto set my hand and affix the seal of this Court on 06/11/2026.

**ROBERT M. FARRELL**
Clerk of Court

Erika Gutierrez
Deputy Clerk

COURT OF APPEALS DOCKET NUMBER ASSIGNED: ________________

**PLEASE RETURN TO THE USDC CLERK'S OFFICE**