**No. 26-1699**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

Plaintiffs - Appellees,

v.

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Acting Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

Defendants - Appellants.

**On Appeal from the United States District Court for the District of Massachusetts**

# BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS – APPELLANTS AND REVERSAL

Matt Crapo
Christopher J. Hajec
Edwin E. Pieters
Federation for American Immigration Reform
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
(202) 328-7004
mcrapo@fairus.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

DATED: September 2, 2026 Respectfully submitted,

s/ Matt A. Crapo

# TABLE OF CONTENTS

Page


DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF AMICUS CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. The President's Proclamation and the agencies' implementing guidance and memoranda are unreviewable .......... 3

II. Even if the Proclamation were subject to judicial scrutiny, it would clearly meet the statutory standard .......... 10

CONCLUSION .......... 14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) .......... 4

*Dalton v. Specter,*
511 U.S. 462 (1994) .......... 8, 9

*Detroit Int'l Bridge Co. v. Gov't of Can.,*
189 F. Supp. 3d 85 (D.D.C. 2016) .......... 9

*Edye v. Robertson (aka Head Money Cases)*,
112 U.S. 580 (1884) .......... 8

*Franklin v. Massachusetts*,
505 U.S. 788, 800-01 (1992) .......... 5

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) .......... 3, 6

*Hernandez v. Mesa*,
589 U.S 93 (2020) .......... 3

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 4, 7

*San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*,
967 F.2d 683 (1st Cir. 1992) .......... 7, 8

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 3, 5

*Trump v. United States*,
603 U.S. 593 (2024) .......... 3, 5

*Tulare Cty. v. Bush,*
185 F. Supp. 2d 18 (D.D.C. 2001) .......... 9

*United States v. Pink*,
315 U.S. 203 (1942)....6

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950)....4

*Webster v. Doe*,
486 U.S. 592 (1988)....4

**STATUTES**

8 U.S.C. § 1182(f).... 4-5, 10, 13

Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*,
90 Fed. Reg. 46027 (Sept. 24, 2025) .... 4, 6, 8, 10-13

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* Federation for American Immigration Reform ("FAIR") is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to advocate for immigration policy that is in America's best interest. FAIR has been involved in more than 100 legal cases since 1980, either as a party or *amicus curiae*, with the aim of advancing this mission.

The decision in this case, which concerns the imposition by the President of a $100,00 fee on H-1B visas, will impact the ability of the federal government to protect American workers. *Amicus* FAIR thus has a direct and vital interest in the outcome of this case.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's decision because it disrupts the separation of powers and intrudes on the political branches' exclusive authority over immigration policy. First, the district court lacked authority to review a direct presidential directive under the APA, failed to afford the President the deference

[1] Both parties have consented to the filing on this *amicus* brief. No counsel for any party authored this brief in whole or in part and no person or entity, other than *amicus curiae*, its members, or its counsel, has contributed money that was intended to fund preparing or submitting the brief.

mandated by Supreme Court precedent, and improperly interpreted a restriction on foreign entry as a tax.

In addition, even if the President's action was subject to judicial scrutiny, the Proclamation easily satisfies the statutory standard. The United States faces an immigration crisis caused, in part, by the H-1B nonimmigrant visa program. Most alien H-1B guestworkers are employed in computer occupations, and the number of H-1B workers imported each year exceeds the number of computer jobs created in the entire country. The saturation of the job market with foreign workers creates unacceptably high unemployment for American graduates and the displacement of experienced Americans. Therefore, this Court should reverse the district court's judgment.

## ARGUMENT

The district court's order vacating the implementation of Presidential Proclamation 10973 disrupts the constitutional separation of powers, paralyzes a core executive foreign policy function, and compromises the political branches' sovereign prerogative to manage the border. By halting a vital border initiative designed to protect American workers, the district court misapprehended the boundaries of administrative review and executive authority. It must be reversed.

## I. The President's Proclamation and the agencies' implementing guidance and memoranda are unreviewable.

The Immigration and Nationality Act ("INA") allocates authority over immigration in multiple provisions that address distinct subjects. For example, Congress has enacted detailed statutes governing the fees executive agencies may charge in administering immigration benefits and establishing standards for the admission of aliens. Separately, the President has broad inherent authority to exclude aliens, including by suspending or conditioning entry when he finds that their admission would be detrimental to the interests of the United States.

The President's authority over immigration flows from constitutional provisions empowering him to regulate in the areas of foreign commerce, foreign relations, and national security. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 607 (2024) (holding that immigration falls within the president's "important foreign relations responsibilities" conferred on him by the Constitution); *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (noting that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"); *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (recognizing that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward

aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government."); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) (recognizing that the right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation"); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs.").

Properly exercising his power under 8 U.S.C. § 1182(f), President Trump issued Proclamation 10973 (published at 90 Fed. Reg. 46027), finding that the H-1B visa program was adversely affecting American workers, and imposed a $100,000 fee on new H-1B admissions to restrict H-1B visas to highly skilled workers.

The President's authority to impose conditions on entry pursuant to the INA is not subject to review under the Administrative Procedure Act (APA). The APA applies only to agencies. *E.g. Lincoln v. Vigil*, 508 U.S. 182, 190–92 (1993); *Webster v. Doe*, 486 U.S. 592, 599 (1988) (holding that the APA applies only to a "final agency action"). The President, though, is not an agency, and thus the APA

does not apply to him or his actions. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

Because the President is not an "agency" under the APA, the H-1B fee imposed by Proclamation 10973 is not an "agency action" subject to the Act's procedural or substantive constraints. The fee is a self-executing condition of entry mandated by the President pursuant to his express authority under 8 U.S.C. § 1182(f). In this context, the agencies' role is not the creation of policy, but the mechanical execution of a Presidential directive that is "conclusive and preclusive" in the realm of border entry. *See Trump v. United States*, 603 U.S. 593, 607 (2024). Consequently, the underlying "policy," D. Ct. Opinion, ECF Doc. 106 ("Op.") at 7, is an exercise of the President's non-reviewable discretion to protect the national interest.

The statute under which the President acted, which implements his inherent authority under the Constitution to exclude aliens, "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Specifically, under 8 U.S.C. § 1182(f), the President, when he "finds that the entry of any alien or of any class of aliens … would be detrimental to the interests of the United States" may "by proclamation … impose on the entry of any alien *any restriction* he may deem to be appropriate." (emphasis added). *See also Hawaii*, 585 U.S. at 685 (recognizing

that the statute's "sole prerequisite" is that the entry of the aliens "would be detrimental to the interests of the United States").

The President exercised this discretion when determining, among other things, that the H-1B program has been "deliberately exploited to replace, rather than supplement American workers." Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sept. 24, 2025). The results of the program have "undermined both our economic and national security" by "artificially suppress[ing] wages, resulting in a disadvantageous labor market for American citizens" and "ma[king] it even more challenging for college graduates to find IT jobs." *Id*.

Courts cannot review this exercise of Presidential authority. Decisions about whether to exclude aliens or place preconditions on their entry are, fundamentally, foreign policy decisions. *Harisiades*, 342 U.S. at 588-589 (observing that immigration and naturalization policies are "interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."). "[T]he conduct of foreign relations is committed by the Constitution to the political departments," and the "propriety of the exercise of that power is not open to judicial inquiry." *United States v. Pink*, 315 U.S. 203, 222-23 (1942). Courts also lack jurisdiction, whether under the APA or otherwise, where Congress drafted a statute "so that a court

would have no meaningful standard against which to judge" the exercise of discretion. *Lincoln*, 508 U.S. at 191. Where, as here, a statute deprives the court of a meaningful standard, "the statute can be taken to have committed the decision-making to the [President's] judgment absolutely." *Id*.

The district court recognized that "adding a payment requirement for H-1B petitions … is part of the process for legally entering the United States and effectively imposes a restriction on entry." Op. at 28; *see also id.* at 29 (describing such an entry restriction as "a type of measure that Congress committed to the President's discretion"). But then the district court erred in concluding otherwise and holding that "the Proclamation's payment requirement amounts to a tax, which exceeds the scope of the President's discretionary authority under the INA." Op. at 29. Thus, the district court's view of this case was tainted by its erroneous conclusion that the payment requirement is a tax instead of an entry condition.

In *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*, 967 F.2d 683 (1st Cir. 1992), this Court wrote at length in distinguishing a tax from a fee:

> Courts have had to distinguish "taxes" from regulatory "fees" in a variety of statutory contexts. Yet, in doing so, they have analyzed the legal issues in similar ways. They have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and is spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subjects to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. *See*,

> *e.g.*, *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983). Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*San Juan Cellular*, 967 F.2d at 685 (some citations omitted); *see also id.* at 685-86 (discussing *Edye v. Robertson (aka Head Money Cases)*, 112 U.S. 580, 590 (1884)). Here, the Proclamation fits within the classic regulatory fee framework inasmuch as the President sought to "impose higher costs on companies" "in order to address abuse of [the H-1B] program while still permitting companies to hire the best of the best temporary foreign workers." 90 Fed. Reg. at 46028.

Absent the district court's erroneous "tax" determination, it becomes clear that the Proclamation and the implementing policies are non-reviewable presidential actions. Because Presidents must always act through subordinates, whether an action is that of the President or the head of an agency, for purposes of APA reviewability, hinges not on whether agency personnel help perform a given action, but on whether the authority to take that action is presidential or delegated by Congress to an agency. *See Dalton v. Specter,* 511 U.S. 462, 477 (1994) ("Where a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). Here, the agency guidance and memoranda merely implement the Proclamation. As the U.S. District Court for the District of Columbia has explained:

> [A]n unreviewable presidential action must involve the exercise of discretionary authority vested in the President; an agency acting on behalf of the President is not sufficient by itself. Since the Constitution vests the powers of the Executive Branch in one unitary chief executive officer, *i.e.*, the President, an agency always acts on behalf of the President. Nonetheless, there is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).

*Detroit Int'l Bridge Co. v. Gov't of Can.,* 189 F. Supp. 3d 85, 101-04 (D.D.C. 2016). *See also, e.g., Tulare Cty. v. Bush,* 185 F. Supp. 2d 18, 28 (D.D.C. 2001) ("A court has subject-matter jurisdiction to review an agency action under the APA only when a final agency action exists. Because the President is not a federal agency within the meaning of the APA, presidential actions are not subject to review pursuant to the APA.") (citing *Dalton,* 511 U.S. at 470) (other internal citations omitted).

In issuing the guidance and memoranda, the agencies acted at the direction of the President and implemented his Proclamation in restricting the entry of H-1B nonimmigrants. Accordingly, the agencies exercised independent Article II authority, and the district court lacked jurisdiction to review their actions under the APA. *Dalton,* 511 U.S. at 477.

## II. Even if the Proclamation were subject to judicial scrutiny, it would clearly meet the statutory standard.

While Proclamation 10973 lacks citations to sources, every grim claim it makes is easily verifiable. Thus, even under the false premise that a proclamation made under 8 U.S.C. § 1182(f) is judicially reviewable, the facts conclusively support the findings made in support of Proclamation 10973.

The President found that "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." 90 Fed. Reg. at 46028. The available data clearly supports such a finding. The majority of H-1B beneficiaries are in computer occupations. *Characteristics of H-1B Specialty Occupation Workers*, USCIS, Apr. 25, 2025, p. 9.[2] In fiscal year 2025, about 77,000 H-1B visas were approved for computer workers. *Id*. at 10. This figure has no basis in economic need.

The saturation of the computer job market by H-1B and other similar programs has had a devastating impact on recent graduates. Recent computer science graduates have an unemployment rate of 7.0% and recent computer engineering graduates are unemployed at a rate of 7.8%. Federal Reserve Bank of

---

[2] Available at: https://www.uscis.gov/sites/default/files/document/reports/ola_signed_h1b_characteristics_congressional_report_FY24.pdf (last visited Aug. 31, 2026).

New York, *The Labor Market for Recent College Graduates*, Feb. 4, 2026 (based on data from 2024).[3] These unemployment rates are more than double that of accounting (2.6%) or civil engineering (2.3%) majors. *Id*. When the H-1B program is importing more than enough foreign workers to fill every new computer job in the country, the massive unemployment for Americans in that field is a natural consequence, and that job environment is likely to discourage Americans from pursuing study in that field. *E.g.*, Erica Blom *et al.*, *Investment over the Business Cycle: Insights from College Major Choice*, IZA Discussion Paper No. 9167, July 2015 (explaining that, when unemployment rises, students tend to shift into fields that historically have better employment prospects.). Right now, 25% of unemployed Americans have four-year college degrees, the highest percentage since tracking began. Matthew Boesler, *Americans With Four-Year Degrees Now Comprise a Record 25% of Unemployed Workers*, Bloomberg, Nov. 21, 2025.

Likewise, Proclamation 10973 quotes a study (without citation) that found H-1B workers are paid 36% less than Americans. 90 Fed. Reg. at 46027. Indeed, a study supports that assertion. Daniel Costa & Ron Hira, *H-1B visas and prevailing wage levels, Economic Policy Institute*, May 4, 2020. This is consistent with a plethora of other studies finding H-1B workers are paid substantially less than

[3] Available at: https://www.newyorkfed.org/research/college-labor-market#--:explore:outcomes-by-major (last visited Aug. 31, 2026); *see also* 90 Fed. Reg. at 46027.

Americans. *E.g.*, Crisil, *Bulging staff cost, shrinking margins*, May 2019 (finding local workers cost 25–30% more than H-1B workers); Thomas Bourveau *et al., H-1B Visas and Wages in Accounting: Evidence from Big 4 Payroll and the Ethics of H-1B Visas*, Journal of Business Ethics (2024). Proclamation 10973 states that "[o]ne software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees." 90 Fed. Reg. at 46027-28. Microsoft received 5,198 H-1B visas in fiscal year 2025. Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Washington Post, Sept. 24, 2025. Microsoft had laid off over 15,000 employees during that time period. Jim Edwards, *Microsoft lays off 9,000 in AI drive, bringing total job cuts to 15,000 this year*, Fortune, July 2, 2025. The proclamation also states that "[o]ne other IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July." 90 Fed. Reg. 46028. Indeed, Intel announced it was laying off 2,400 Americans in Oregon. Allison Frost, *Mass Intel layoffs will hit Oregon economy hard*, Oregon Public Radio, July 24, 2025. Likewise, Intel received 1,698 H-1B visas in FY 2025. Economic Times, *Amazon leads H-1B visa approvals in early 2025*, Sept. 27, 2025.

The proclamation describes the direct displacement of Americans by H-1B workers, and how the Americans have had to train their foreign replacements. 90

Fed. Reg. at 46028. Replacements of Americans by H-1B workers on a massive scale have been extensively documented. *E.g.*, Reuters, *Lawmakers seek answers from major US firms over H-1B visa use amid layoffs*, Sept. 25, 2025 (Members of Congress questioned why Apple, Amazon, and JP Morgan were laying of thousands of Americans while hiring thousands of H-1B workers.); Julia Preston, *Laid-Off Americans, Required to Zip Lips on Way Out, Grow Bolder*, NY Times, June 11, 2016 (describing Americans replaced by H-1B workers at Abbott Labs and Eversource Energy).

The restriction on H-1B workers imposed by Proclamation 10973, moreover, is eminently reasonable. Rather than imposing a total ban on H-1B visas, as permitted under 8 U.S.C. § 1182(f), the Proclamation attempts to limit such visas only to workers who truly are highly skilled and thus will "supplement" the U.S. workforce. 90 Fed. Reg. at 46027. The obvious way to separate the wheat from the chaff flowing into the labor market is to impose a fee. By industry compensation standards, the $100,000 fee is entirely reasonable to restrict H-1B visas to highly skilled workers that supplement—rather than displace—American workers.

Because the district court disregarded the President's unreviewable authority under 8 U.S.C. § 1182(f), the Court should reverse and vacate the district court's holding.

## CONCLUSION

For the foregoing reasons, the judgement below should be reversed.

Dated: September 2, 2026

Respectfully submitted,

/s/ Matt Crapo
Matt A. Crapo
Christopher J. Hajec
Edwin E. Pieters
Federation for American Immigration Reform
25 Massachusetts Ave., N.W., Ste. 330
Washington, D.C. 20001
(202) 328-7004
mcrapo@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the *amicus* brief in support of the motion contains 3,064 words. It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

/s/ Matt Crapo

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2026, a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Matt Crapo