**No. 26-1699**

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

v.

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts (Sorokin, J.) in No. 1:25-cv-13829-LTS

## ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

*(Counsel listed on inside cover)*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
GERARD J. CEDRONE
*Deputy State Solicitor*
MICHELLE R. PASCUCCI
NITA K. KLUNDER
*State Trial Counsels*
JULIA S. CANNEY
*Assistant Attorney General*
COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
JULIE VEROFF
*Deputy Solicitor General*
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy Attorneys General*
DENISE LEVEY
LORRAINE LOPEZ
JEANELLY OROZCO ALCALÁ
JAMES E. RICHARDSON
*Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov

*Attorneys for the State of California*

November 4, 2026

*(Additional counsel listed in signature block)*

# TABLE OF CONTENTS

**Page**

Introduction ... 1

Statement of the issues ... 4

Statement of the case ... 4

A. Legal background ... 4

B. Procedural history ... 10

Summary of argument ... 14

Argument ... 17

I. The district court correctly granted summary judgment to plaintiffs on the ground that defendants unlawfully implemented a tax ... 17

A. The H-1B policy imposes a $100,000 tax without the necessary clear congressional authorization ... 17

1. The H-1B policy implements a tax ... 18

2. Defendants identify no congressional authorization for the challenged tax, let alone the necessary "clear" authorization ... 22

3. Defendants provide no persuasive basis for declining to apply the clear statement rule for assessing whether Congress delegated the taxing power ... 32

B. Defendants' justiciability arguments fail ... 35

1. Defendants' H-1B policy is subject to APA review ... 35

2. Defendants' H-1B policy is subject to ultra vires review ... 40

3. The doctrine of consular nonreviewability is inapplicable ... 43

## TABLE OF CONTENTS
## (continued)

**Page**


II. The district court correctly granted summary judgment to plaintiffs on the ground that defendants violated the APA's procedural requirements ........ 46

III. This Court can affirm on the alternative ground that the H-1B policy usurps Congress's plenary power over admissions ........ 52

IV. The district court properly vacated the policy ........ 53

Conclusion ........ 56

## TABLE OF AUTHORITIES

**Page**

**CASES**

*AA v. Dep't of State*
2026 WL 1498079 (E.D. Va. May 28, 2026) .............................................45

*Agatha v. Trump*
151 F.4th 9 (1st Cir. 2025).......................................................15, 37, 38, 39

*Amanullah v. Nelson*
811 F.2d 1 (1st Cir. 1987).........................................................................44

*Biden v. Nebraska*
600 U.S. 477 (2023)...................................................................................29

*Biden v. Texas*
597 U.S. 785 (2022)...................................................................................36

*Bradford v. Dep't of Labor*
101 F.4th 707 (10th Cir. 2024) ..................................................................50

*Brock v. Wash. Metro. Area Transit Auth.*
796 F.2d 481 (D.C. Cir. 1986)...................................................................20

*Brox v. Hole*
83 F.4th 87 (1st Cir. 2023).........................................................................55

*California v. Mullin*
183 F.4th 42 (1st Cir. 2026).............................12, 13, 18, 23, 26, 32, 35, 36

*Catholic Legal Imm. Network, Inc. v. Rubio*
840 F. Supp. 3d 209 (S.D.N.Y. 2026) .......................................................44

*Cent. Me. Power Co. v. F.E.R.C.*
252 F.3d 34 (1st Cir. 2001)........................................................................54

*Chamber of Com. v. DHS*
815 F. Supp. 3d 73 (D.D.C. 2025)............................................................28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Chamber of Com. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996)....................................................................38

*Chamber of Com. v. Whiting*
563 U.S. 582 (2011)...................................................................................4

*Chi. & N.W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*
71 F.3d 265 (8th Cir. 1995) ........................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971)....................................................................................40

*City & Cnty. of S.F. v. EPA*
604 U.S. 334 (2025)....................................................................................31

*Conservation Law Found. v. Evans*
360 F.3d 21 (1st Cir. 2004).........................................................................49

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*
603 U.S. 799 (2024)....................................................................................53

*Dalton v. Specter*
511 U.S. 462 (1994)....................................................................................42

*Dep't of State v. Muñoz*
602 U.S. 899 (2024)....................................................................................44

*DHS v. Regents of Univ. of Cal.*
591 U.S. 1 (2020)........................................................................................38

*Doe #1 v. Trump*
957 F.3d 1050 (9th Cir. 2020) ....................................................................53

*E. Bay Sanctuary Covenant v. Trump*
932 F.3d 742 (9th Cir. 2018) ......................................................................50

*Edye v. Robertson*
112 U.S. 580 (1884)....................................................................2, 14, 19, 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Esso Standard Oil Co v. Lopez-Freytes*
522 F.3d 136 (1st Cir. 2008)....................55

*FCC v. Consumers' Rsch.*
606 U.S. 656 (2025)....................22, 23

*Fed. Energy Admin. v. Algonquin SNG*
426 U.S. 548 (1976)....................32

*Franklin v. Massachusetts*
505 U.S. 788 (1992)....................38, 39, 43

*Freytag v. Comm'r of Internal Revenue*
501 U.S. 868 (1991)....................44

*Garland v. Cargill*
602 U.S. 406 (2024)....................38

*Global Health Council v. Trump*
153 F.4th 1 (D.C. Cir. 2025)....................43

*Harrington v. Chao*
280 F.3d 50 (1st Cir. 2002)....................54

*Illinois v. Trump*
155 F.4th 929 (7th Cir. 2025)....................42

*In re Blinds to go Share Purchase Litig.*
443 F.3d 1, 8 (1st Cir. 2006)....................55

*Kleindienst v. Mandel*
408 U.S. 753 (1972)....................52

*Learning Res., Inc. v. Trump*
607 U.S. 229 (2026)............1-3, 13, 15-18, 21, 22, 24-26, 28-30, 32-35, 42

*Leedom v. Kyne*
358 U.S. 184 (1958)....................41

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Make The Road N.Y. v. Wolf*
962 F.3d 612 (D.C. Cir. 2020)....................................................................49

*Make The Road New York v. Noem*
2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)...........................................53

*Menezes v. Rubio*
156 F.4th 1 (1st Cir. 2025)..........................................................................44

*Merrion v. Jicarilla Apache Tribe*
455 U.S. 130 (1982)......................................................................................35

*Nebraska v. Su*
121 F.4th 1 (9th Cir. 2024) ....................................................................16, 38

*New York v. Trump*
133 F.4th 51 (1st Cir. 2025).........................................................................38

*NFIB v. OSHA*
595 U.S. 109 (2022)......................................................................................30

*NFIB v. Sebelius*
567 U.S. 519 (2012)..................................................................................20, 21

*NRC v. Texas*
605 U.S. 665 (2025)......................................................................................41

*Trump v. Orr*, 146 S. Ct. 44, 46 (2025) ....................................................16, 38

*Pak v. Biden*
91 F.4th 896 (7th Cir. 2024) ...................................................................45, 46

*Peguero-Moronta v. Santiago*
464 F.3d 29 (1st Cir. 2006)...........................................................................46

*Perez v. Mortgage Bankers Ass'n*
575 U.S. 92 (2015).........................................................................................50

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Pietersen v. Dep't of State*
138 F.4th 552 (D.C. Cir. 2025)....................44, 45

*San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*
967 F.2d 683 (1st Cir. 1992)....................19, 20

*Sherley v. Sebelius*
689 F.3d 776 (D.C. Cir. 2012)....................50

*Skinner v. Mid-Am. Pipeline Co.*
490 U.S. 212 (1989)....................1, 2, 12, 13, 15, 17, 18, 22, 23, 33

*State of S.C. ex rel. Tindal v. Block*
717 F.2d 874 (4th Cir. 1983)....................20

*Sustainability Inst. v. Trump*
165 F.4th 817 (4th Cir. 2026)....................43

*Transamerica Mortg. Advisors, Inc. v. Lewis*
444 U.S. 11 (1979)....................26

*Trump v. California*
609 U.S. 1032 (2026)....................37, 47

*Trump v. Cook*
146 S. Ct. 2234 (2026)....................40, 41, 43

*Trump v. Hawaii*
585 U.S. 667 (2018)....................23, 26, 31, 49, 53

*Trump v. Illinois*
146 S. Ct. 432 (2025)....................42

*Trump v. New York*
592 U.S. 125 (2020)....................37

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
578 U.S. 590 (2016)....................35, 36

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States ex rel. Knauff v. Shaughnessy*
338 U.S. 537 (1950)....................35

*United States v. Kahriger*
345 U.S. 22 (1953)....................21

*United States v. Reyes*
24 F.4th 1 (1st Cir. 2022)....................52

*Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc.*
820 F.3d 36 (1st Cir. 2016)....................31

*V.O.S. Selections, Inc. v. Trump*
149 F.4th 1312 (Fed. Cir. 2025)....................47

*West Virginia v. EPA*
597 U.S. 697 (2022)....................29

*Wickard v. Filburn*
317 U.S. 111 (1942)....................34

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)....................39, 41, 43

**STATUTES**

2 U.S.C. § 622(8)(B)(i)....................26

5 U.S.C.
§ 553(b)(4)(B)....................51
§ 701(a)(2)....................39
§ 704....................35
§ 706(2)....................12, 53

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

8 U.S.C.
§ 1101(a)(15)(H)(i)(b) .......... 5
§ 1182(f) .......... 2, 8, 15, 23, 29, 40
§ 1182(n)(1) .......... 5
§ 1184(i) .......... 53
§ 1184(i)(1) .......... 5
§ 1184(c)(9) .......... 6
§ 1184(c)(9)(A) .......... 6, 26, 52
§ 1184(c)(9)(A)-(C) .......... 6
§ 1184(c)(12)-(13) .......... 7
§ 1184(c)(12)(A)-(C) .......... 6
§ 1184(g)(1)(A) .......... 5
§ 1184(g)(4) .......... 5
§ 1184(g)(5) .......... 5
§ 1184(g)(5)(A)-(B) .......... 6
§ 1185(a)(1) .......... 2, 8, 15, 23
§ 1351 .......... 7
§ 1356(v) .......... 7
§ 1356(m) .......... 7, 13, 28, 52
§ 1356(s)(1) .......... 7
§ 1356(s)(2)-(4) .......... 7
§ 1356(u)(3) .......... 6, 7
§ 1356(u)(4) .......... 7

12 U.S.C. § 1828a .......... 25

15 U.S.C. § 78i(h)(1) .......... 25

16 U.S.C. § 460bbb-9(a) .......... 26

21 U.S.C. § 387f(d)(1) .......... 25

44 U.S.C. § 2108(a) .......... 25

Act of June 21, 1941, Chapter 210, 55 Stat. 252 .......... 27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Act of May 22, 1918, 40 Stat. 559 .......... 27

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 .......... 5

Pub. L. 82-414, 66 Stat. 163 (1952) .......... 4, 23, 25, 27, 28

22 Stat. 214 (1882) .......... 27

34 Stat. 898 (1907) .......... 27

129 Stat. 2242 (2016) .......... 6

162 Stat. 1213 (1903) .......... 27

**CONSTITUTIONAL PROVISIONS**

U.S. Const., art. I
§ 8, cl. 1 .......... 1, 42
§ 8, cl. 15 .......... 42

**REGULATIONS**

8 C.F.R.
§ 106.4 .......... 6
§ 214.2(h)(1)(i) .......... 5
§ 214.2(h)(4)(ii) .......... 5
§ 214.2(h)(8)(iii) .......... 6
§ 214.2(h)(19)(iii) .......... 6

20 C.F.R. § 655.731(c)(9)(iii)(C) .......... 6

*Bump-Stock-Type Devices*, 83 Fed. Reg. 13442 (Mar. 29, 2018) .......... 38

Notice of Proposed Rulemaking, *Fee for Certain H-1B Petitions*,
91 Fed. Reg. 54817 .......... 13, 18

Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sep. 24, 2025) .......... 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Proclamation 11069, *Restriction on Entry of Certain Nonimmigrant Workers*, 91 Fed. Reg. 60497 (Sept. 18, 2026)......13, 14, 21

**OTHER AUTHORITIES**

2 J. Story, Commentaries on the Constitution of the United States (1833)......20

Gibson et al., Cong. Rsch. Serv. LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (Feb. 21, 2024)......28

H.R. Rep. No. 82-1365 (1952)......27

H.R. Rep. No. 101-723 (1990)......5

S. Rep. No. 106-260 (2000)......6

*Senator Collins Urges Sec. Mullin to Consider H-1B, H-2B Visa Exceptions*, United States Senate Committee on Appropriations (June 2, 2026)......48

USCIS, *H-1B Specialty Occupations* (last updated Sept. 21, 2026)......36

## INTRODUCTION

In recognition of the "taxing power's unique importance, and having just fought a revolution motivated in large part by 'taxation without representation,' the Framers gave Congress 'alone . . . access to the pockets of the people.'" *Learning Res., Inc. v. Trump*, 607 U.S. 229, 241 (2026). Article I, Section 8, Clause 1 of the Constitution accordingly provides that "[t]he Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises." By contrast, the Framers did not vest any part of the taxing power in the Executive Branch. To protect Congress's exclusive taxing power—"the most important of the authorities . . . conferred upon the Union," *Learning Res.*, 607 U.S. at 240 (quoting The Federalist No. 33 (A. Hamilton))—courts do not lightly infer that Congress has "delegate[d] to the Executive" authority to levy taxes, *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). Rather, "Congress must indicate clearly its intention" to do so. *Id.*

Applying that longstanding principle here, the district court correctly held that defendants' $100,000 exaction on petitions for H-1B visas is an unlawful tax. The $100,000 payment—which effectively prohibits plaintiffs from using the H-1B visa program to address worker shortages in their schools, hospitals, and research institutions—"raise[s] revenue," "the defining feature of a tax." *Learning Res.*, 607 U.S. at 241 (internal quotation marks omitted). And defendants concede that the $100,000 payment does not "'defray the expenses of regulat[ion]'"—the key

feature of certain cost-recovery fees that the Supreme Court has sometimes declined to treat as taxes. *See Edye v. Robertson*, 112 U.S. 580, 590 (1884). Defendants are thus obligated to locate a clear statement from Congress delegating the taxing authority—a burden they cannot satisfy with either of the two Immigration and Nationality Act (INA) provisions to which they point. Sections 212(f) and 215(a) authorize "restrictions" on the "entry of aliens," as well as related "rules, regulations, and orders." 8 U.S.C. §§ 1182(f), 1185(a)(1). Nowhere do those statutes refer to taxes or other monetary exactions. Although Congress has throughout the U.S. Code delegated power to the Executive to "restrict[]" and "regulat[e]" conduct, defendants identify no statute in which those terms have conferred the power to tax. And at no point in history has the President ever invoked Section 212(f) or 215(a) to impose a tax, which "is strong evidence that [such power] does not exist." *Learning Res.*, 607 U.S. at 250.

In asking this Court to reverse the district court's judgment, defendants make little effort to show that Sections 212(f) and 215(a) "clearly" empower the Executive to levy taxes. *Skinner*, 490 U.S. at 224. Instead, they argue that the $100,000 payment is not a tax subject to clear delegation requirements because its "'real purpose and effect . . . ' is to regulate immigration." Opening Br. 25. But Congress's exclusive power to tax is not confined to taxes that further no regulatory aims. On the contrary, the Supreme Court recently reiterated that taxes

"may accomplish regulatory ends." *Learning Res.*, 607 U.S. at 249. Nor can defendants avoid the clear statement rule by claiming that the tax is an exercise of the foreign commerce power or inherent executive authority concerning immigration. If the Executive Branch seeks to impose any tax, Congress must clearly delegate such authority. *Id.* at 251.

Defendants' "threshold reasons" (Opening Br. 2) for reversal also lack merit. They assert that plaintiffs lack any cause of action to redress the substantial harms caused by this unprecedented exaction, which include teacher shortages, *e.g.*, JA161-162, inadequate "medical care to vulnerable populations," JA366, and cuts to "specialized instruction and research," JA183. But the policies imposing the challenged tax are no different from other executive actions reviewed by courts under the Administrative Procedure Act (APA) or through ultra vires review. Defendants' arguments would make it all too easy for the Executive to usurp powers entrusted to Congress and to insulate those actions from judicial review. Defendants' arguments would also grant the President virtually unchecked authority to exact taxes of any amount whenever he wishes, from whomever he wishes, to spend however he wishes, so long as he asserts some nominal connection to the entry of foreign nationals. Those arguments cannot be reconciled with the relevant text, statutory history, congressional and presidential practice, or

constitutional principles. To preserve our Constitution's separation of powers, the Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the district court properly granted summary judgment to plaintiffs because (a) Sections 212(f) and 215(a) of the INA do not clearly delegate taxing power to the Executive, and (b) plaintiffs have a cause of action to challenge defendants' unlawful tax under the APA or on ultra vires grounds.

2. Whether the district court properly granted summary judgment to plaintiffs because defendants violated the APA's procedural requirements.

3. Whether the Court can affirm on the alternative ground that defendants otherwise exceeded the scope of congressionally delegated powers.

4. Whether the district court properly vacated the unlawful tax on a nationwide basis.

## STATEMENT OF THE CASE

### A. Legal background

1. Congress enacted the INA in 1952 to "establish[] a comprehensive federal statutory scheme for regulation of immigration and naturalization[.]" *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011). As part of the INA, Congress created the "H visa" classification for temporary specialty workers. Pub. L. 82-414, § 101(a)(15)(H)(i), 66 Stat. 163, 168 (1952).

The H-1B visa took its current form with the passage of the Immigration Act of 1990. *See* Pub. L. No. 101-649, 104 Stat. 4978. Through the H-1B program, an employer may petition the federal government to hire a nonimmigrant worker in a "specialty occupation" for up to six years. 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(g)(4); 8 C.F.R. § 214.2(h)(1)(i). A "specialty occupation" is defined as one that requires "(A) theoretical and practical application of a body of highly specialized knowledge and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1); *see also* 8 C.F.R. § 214.2(h)(4)(ii). Congress intended the H-1B program to address "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found and the need for other workers to meet specific labor shortages." H.R. Rep. No. 101-723 (1990), 1990 WL 200418, at *6721.

Congress has imposed several limitations on H-1B visas to protect the domestic labor force. Employers must attest that any H-1B worker they seek to hire will be paid at the same level as other individuals with similar experience and qualifications. *See* 8 U.S.C. § 1182(n)(1). Congress also caps H-1B visas for most private employers at 65,000 per year, with another 20,000 available for advanced-degree holders. *Id.* § 1184(g)(1)(A), (g)(5). Employers who are subject to the cap

must be selected in an annual lottery to petition for an H-1B visa. 8 C.F.R. § 214.2(h)(8)(iii).

Institutions of higher education and affiliated nonprofits, as well as government and nonprofit research organizations, are not subject to the numerical cap. 8 U.S.C. § 1184(g)(5)(A)-(B). Congress exempted those employers because "people working in universities are necessarily immediately contributing to educating Americans," and "[t]he more highly qualified educators in specialty occupation fields we have in this country, the more Americans we will have ready to take positions in these fields upon completion of their education." S. Rep. No. 106-260, at 21-22 (2000). Cap-exempt employers may petition at any time. Ad.3.

2. Congress has set out specific fees that petitioning H-1B employers (not H-1B workers, *see* 20 C.F.R. § 655.731(c)(9)(iii)(C)) must pay. These fees include a $500 fraud-prevention fee, 8 U.S.C. § 1184(c)(12)(A)-(C); a $1,500 filing fee, *id.* § 1184(c)(9)(A)-(C); a $4,000 biometric fee if more than 50% of an employer's employees have H-1B or L-1 visas, 129 Stat. 2242, 3006 (2016); and a $2,965 "premium" processing fee for expedited services, 8 U.S.C. § 1356(u)(3); 8 C.F.R. § 106.4. *See also* JA43-45, JA48-49. Congress has waived certain fees for cap-exempt employers. 8 U.S.C. § 1184(c)(9)(A); 8 C.F.R. § 214.2(h)(19)(iii).

Congress has also set limitations on how H-1B-related fees can be used. Filing fees collected pursuant to Section 1184(c)(9) are to be placed in a "separate

account" of the Treasury known as the H-1B Nonimmigrant Petitioner Account. 8 U.S.C. § 1356(s)(1). Those fees may be used only for job training, scholarship and grant programs, adjudicating H-1B petitions, and "decreasing the processing time" for H-1B labor condition applications. *Id.* § 1356(s)(2)-(4). Separately, premium processing fees collected under Section 1356(u)(3) "may only be used" for specified purposes, including "mak[ing] infrastructure improvements in adjudication processes," and "respond[ing] to adjudication demands." *Id.* § 1356(u)(4); *see also id.* § 1356(v) (allocating fees collected under Section 1184(c)(12)-(13) to various agency heads to be used to combat fraud).

In addition to setting fees itself, Congress has explicitly delegated to the Secretary of State the authority to "prescribe[ ]" "fees for the furnishing and verification of applications for visas . . . and for the issuance of visas," but only "in amounts corresponding . . . to the total of all . . . similar fees, taxes, or charges assessed or levied against nationals of the United States by . . . foreign countries." 8 U.S.C. § 1351. Congress also delegated authority to the Department of Homeland Security (DHS) to set "fees for providing adjudication and naturalization services" at an amount that "ensure[s] recovery of the full costs of providing all such services" and "any additional costs associated with the administration of the fees collected." *Id.* § 1356(m).

3. On September 19, 2025, President Trump issued a proclamation seeking to impose a new $100,000 tax on all H-1B visa petitions. Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46027 (Sep. 24, 2025); *see* JA106-110. The President claimed authority under Sections 212(f) and 215(a) of the INA (8 U.S.C. §§ 1182(f), 1185(a)). JA108. Those provisions authorize the President to "suspend the entry" of noncitizens or "impose on the entry of [noncitizens] any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f), and to prescribe "reasonable rules, regulations, and orders" on entry, *id.* § 1185(a)(1). No President has previously invoked those provisions to impose a tax.

Section 1 of the proclamation—"Restriction on Entry"—states that "the entry into the United States of aliens" as H-1B workers "is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." JA108-109. That section also grants DHS broad discretion to waive the $100,000 payment. JA109. It provides that the payment obligation "shall expire, absent extension, 12 months after the effective date of this proclamation"—i.e., September 21, 2026. *Id.*

Section 2—"Compliance"—requires that, "prior to filing an H-1B petition on behalf of an alien outside the United States, [employers] obtain and retain documentation showing that the [$100,000] payment . . . has been made." JA109.

The section directs defendants to "coordinate to take all necessary and appropriate action to implement this proclamation." *Id.*

Section 3—"Scope and Implementation of Restriction on Entry"—provides that the $100,000 payment requirement applies to noncitizens who enter or attempt to enter the country after the proclamation's effective date. JA109. It further directs defendants to submit "a recommendation" to the President within 30 days of "the completion of the [2026] H-1B lottery" on whether to extend or renew the $100,000 payment obligation past its expiration. JA109-110.

4. Following the September 19, 2025, announcement of the proclamation, defendants took a series of actions to implement the $100,000 payment requirement (collectively "H-1B policy"). That same day, DHS sent an email notification to its visa offices explaining that the proclamation would "take[] effect at 12:01 a.m. EDT on September 21, 2025" and included "operational guidance" for staff to "immediately implement." JA116.

From September 20 to 21, 2025, defendants issued guidance to agency staff specifying that the $100,000 payment obligation would apply to petitions that had not yet been filed, and providing further instructions regarding the scheduling and adjudication of H-1B petitions. JA113; JA117-121; JA129. Defendants also issued public-facing Frequently Asked Questions documents explaining that the proclamation "[a]uthorize[d]" them "to coordinate to take all necessary and

appropriate action to implement" the proclamation and setting out the scope of the payment obligation. JA130-131; *see also* JA122-123.

The next month, U.S. Citizenship and Immigration Services (USCIS) clarified in another memorandum to staff that the payment is required "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa"; new petitions that request "consular notification, port of entry notification, or pre-flight inspection for an alien in the United States"; and certain new petitions for change of status, amendment, or extension. JA133-134. USCIS also published an updated fee schedule listing the $100,000 payment as an additional payment requirement for H-1B petitioners, JA139, and created a website through which petitioning employers had to submit the payment, JA140-141.

On the USCIS website, defendants further set out how DHS would exercise its authority to grant "[e]xceptions" to the payment obligation. JA133. DHS explained that it would grant exceptions only where a "particular alien worker's presence . . . is in the national interest," and emphasized that exceptions were reserved for "extraordinarily rare circumstance[s]," where "no American worker is available to fill that role." JA134.

**B. Procedural history**

1. Twenty States that rely on the H-1B program to address worker shortages in their schools, hospitals, and research institutions sued, alleging that defendants'

actions violate the APA and are ultra vires. JA33-36, JA86-94. Specifically, plaintiffs alleged that defendants' actions impose an unauthorized tax; usurp Congress's plenary power over immigration; fail to comply with required notice-and-comment procedures; and are arbitrary and capricious. *See* JA86-94; D. Ct. Dkt. 87 at 10-22. The district court granted plaintiffs' summary judgment motion, denied defendants' motion to dismiss, denied defendants' motion for summary judgment in relevant part, declared defendants' actions unlawful, and vacated the policy. Ad.42.

The district court rejected each of defendants' arguments on reviewability. The court held that the doctrine of consular nonreviewability, which prohibits review of a consular officer's denial of a visa, does not apply to a "forward-looking challenge" to an executive policy. Ad.10-11. It also rejected defendants' assertion that their actions merely implemented a valid presidential directive and so were unreviewable under the APA, Ad.26-29, and held that defendants' actions qualified as "final agency action" since they "altered the legal status quo for applicants to the H-1B program," Ad.29-30. And the district court held that defendants' actions were subject to ultra vires review because they lack authorization under the INA and encroach upon Congress's exclusive power to tax. Ad.14.

Turning to the merits, the district court held that the $100,000 payment constitutes a tax, not a "regulatory payment" or penalty, Ad.17-20, and that it is not

clearly authorized by Section 212(f) or 215(a), Ad.21-26. The district court further held that defendants had failed to satisfy the requirements of notice-and-comment rulemaking and reasoned agency deliberation, and that those errors were not harmless. Ad.31, 33-36.

The district court vacated defendants' actions under 5 U.S.C. § 706(2). Ad.36-37. In doing so, the court rejected defendants' arguments that equitable considerations warranted a narrowing of this statutory remedy. For one, the court concluded that defendants' assertion that relief should be limited to plaintiffs failed to account for the fact that APA vacatur is fundamentally different from the "party-specific" nature of "traditional equitable remedies." Ad.37. The district court also rejected defendants' "perfunctory" claim—which defendants do not press on appeal—that "'collateral estoppel and *res judicata* concerns'" required narrower relief. Ad.38-41. In light of its ruling on vacatur, the court concluded that a permanent injunction was "not necessary," but observed that an injunction would be warranted if vacatur were unavailable. Ad.41 & n.14. The district court later denied defendants' motion for a stay pending appeal. JA24-25.

2. In a reasoned order, this Court also denied defendants' request for a stay pending appeal. *See California v. Mullin*, 183 F.4th 42 (1st Cir. 2026). Focusing on plaintiffs' APA claim that defendants' H-1B policy is in excess of statutory authority, the Court held that *Skinner*'s "clear statement" requirement applies, *id.*

at 49, and that defendants had failed to satisfy it, *id.* at 49-50. The Court explained that the Supreme Court in *Learning Resources* had concluded that the word "regulation"—which "it identified as synonymous with the word 'restriction,'" the term used in Section 212(f)—does not include the power to impose a tax. *Id.* at 50 (citing 607 U.S. at 249-251). This Court further reasoned that when Congress had "impose[d] fees or delegate[d] fee-imposing authority under the INA," it did so "explicitly," and "specified how the funds should be collected and used." *Id*. And it observed that neither Section 212(f) nor 215(a) "has ever been used to impose a fee or payment of this kind." *Id.*

3. One month after this Court's stay order, DHS issued a Notice of Proposed Rulemaking with respect to the H-1B program. *See* Notice of Proposed Rulemaking, *Fee for Certain H-1B Petitions*, 91 Fed. Reg. 54817. The proposed rule relies on 8 U.S.C. § 1356(m) to impose a $103,265 fee on all H-1B cap-subject petitions, regardless of whether the worker is currently lawfully present in the United States or seeking entry. *See* 91 Fed. Reg. 54819-54820. Under the proposed rule, the $103,265 fee is "an additional fee separate from the $100,000 payment" at issue in this case. *Id.* at 54819, n.3.

Then, on September 18, 2026, shortly before the initial proclamation was set to expire, *see* JA109, the President issued a proclamation renewing the $100,000 payment obligation for another year. *See* Proclamation 11069, *Restriction on*

*Entry of Certain Nonimmigrant Workers*, 91 Fed. Reg. 60497 (Sept. 18, 2026). The 2026 proclamation reports that petitions for noncitizens seeking to enter the United States on an H-1B visa declined 97% following implementation of the $100,000 payment obligation, and that employers had paid the $100,000 exaction in connection with only 700 petitions. *Id.* at 60497-60498. The 2026 proclamation is substantively identical to the 2025 proclamation in all material respects. It is set to expire on September 21, 2027. *Id.* at 60497. Unlike the proclamations, the agency policies challenged in this case do not specify an expiration date. *E.g.*, JA113, JA118, JA129-130.

## SUMMARY OF ARGUMENT

I.A. The district court correctly held that the $100,000 H-1B policy implements an unlawful tax. In contrast to a fee designed to recover the administrative costs of running a government program, a tax raises revenue for the general public welfare. The exaction here is a tax: it does not recover administrative costs, nor is it earmarked for a particular purpose. It instead raises revenue—some $70 million to date—which is placed into the Treasury's General Fund. Defendants contend that the $100,000 exaction is comparable to the nineteenth-century entry fee of fifty cents that Congress imposed directly and that the Supreme Court upheld as a foreign commerce regulation. *See Edye*, 112 U.S.

at 589, 596. But that entry fee was a cost-recovery fee placed into a special fund earmarked for that purpose. The $100,000 exaction is not remotely analogous.

Because the $100,000 exaction is a tax, defendants must establish that Congress "clearly" delegated taxing authority to the Executive. *Skinner*, 490 U.S. at 224. Defendants point to two provisions of the INA that authorize the President to impose "restrictions" and "regulations" on entry. *See* 8 U.S.C. §§ 1182(f), 1185(a)(1). While that authority may be broad, neither the power to "restrict" nor the power to "regulate" includes the power to tax. *Learning Res.*, 607 U.S. at 249. The U.S. Code is replete with those terms, yet defendants can identify no other statute using them to authorize a tax. It is thus unsurprising that no President has previously invoked Section 212(f) or 215(a) to impose a tax. And if there were any doubt, the major questions doctrine cuts against defendants' reading of those provisions, which would allow the President to tax entry for any sum, for any duration, for any reason. The district court properly rejected that assertion of extraordinary power.

B. The district court also correctly declined to accept defendants' "threshold" arguments against judicial review. The court properly concluded that defendants' actions implementing the $100,000 tax constitute final agency action because they specify who must pay the tax, how it must be paid, and when an exception is warranted. And agency action is reviewable under the APA even if it

implements a presidential directive. *See Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025), *rev'd on other grounds*, *Trump v. Orr*, 146 S. Ct. 44 (2025). Contrary to defendants' argument, nothing in the APA or "existing precedent" bars APA review for actions implementing Presidential directives; defendants' proposed rule would "shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). As to ultra vires review, the Supreme Court has repeatedly held that plaintiffs can sue where the Executive acts without inherent constitutional authority and without statutory authorization. *See, e.g.*, *Learning Res.*, 607 U.S. at 236. And under well-established precedent, a forward-looking challenge to the lawfulness of a policy does not implicate the doctrine of consular nonreviewability, which bars only a challenge to an executive official's exercise of discretionary authority to admit or exclude an individual noncitizen.

II. The Court need go no further, but plaintiffs' other claims provide alternative bases to affirm. As the district court concluded, defendants failed to comply with notice-and-comment procedures and implemented the tax in an arbitrary and capricious manner. And although the district court declined to address the argument, defendants' H-1B policy is in excess of statutory authority because it usurps Congress's plenary power over admissions by eviscerating Congress's design of the H-1B program. In the H-1B statutes, Congress specified

the fees that may be assessed in connection with H-1B petitions and emphasized its intent to make H-1B visas available to public-interest and public-sector employers. Defendants' actions contravene those statutory directives.

III. Finally, the district court properly vacated defendants' actions to implement the $100,000 tax under Section 706 of the APA. Vacatur is a well-established APA remedy. While defendants suggest that equitable considerations may limit the scope of that statutory remedy, they offer no persuasive equitable basis to limit the scope of that remedy under the circumstances of this case.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO PLAINTIFFS ON THE GROUND THAT DEFENDANTS UNLAWFULLY IMPLEMENTED A TAX

#### A. The H-1B Policy Imposes a $100,000 Tax Without the Necessary Clear Congressional Authorization

"Congress alone" has the "unique[ly] importan[t]" authority to impose taxes. *Learning Res.*, 607 U.S. at 241, 248 (internal quotation marks omitted). Accordingly, Congress must "indicate clearly" that it intends to delegate that power to the Executive. *Skinner*, 490 U.S. at 224; *see Learning Res.*, 607 U.S. at 243 (plurality) (delegation of "core congressional power of the purse" must be "'clear[]'"). The $100,000 payment obligation here is a tax, and neither of the INA provisions that defendants invoke provides the necessary "clear congressional authorization." *Learning Res.*, 607 U.S. at 255 (plurality).

**1. The H-1B policy implements a tax**

"[T]he defining feature of a tax" is that it "'raise[s] revenue.'" *Learning Res.*, 607 U.S. at 241. In this way, taxes differ from fees collected to cover the "administrative costs" of a government program and that are exclusively and "directly" traceable to the benefits conferred upon "regulated parties." *Skinner*, 490 U.S. at 223. As this Court recognized in its order denying a stay, "*Skinner*'s admonition that Congress speak 'clearly' applies" outside that latter category—i.e., it applies "whenever the executive claims 'discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens . . . on those parties.'" 183 F.4th at 49.

Applying this standard, there is no serious question that the $100,000 payment obligation is a tax—as the district court and this Court correctly concluded. *See* Ad.18-20; *California*, 183 F.4th at 48-50. Defendants concede that the $100,000 payment does not "cover costs," D. Ct. Dkt. 93 at 22, and that the funds are not used "for a specific purpose," but are placed into "the General Fund of the U.S. Treasury," JA659-660. DHS's recent notice of rulemaking—proposing an "additional" and "separate" fee to ostensibly recover "the costs of administering the lawful immigration system," 91 Fed. Reg. 54819—further bolsters this conclusion. Whatever the actual justifications for that separate fee, DHS's proposed rulemaking confirms that defendants did not view *this* $100,000

payment obligation as an administrative fee. It is a tax that is unrelated to any cost-recovery purpose.

Defendants' contrary arguments lack merit. Citing *Edye*, 112 U.S. at 594-596, they primarily argue that the $100,000 "payment requirement[], without more," is not a tax but a "*regulation*[] of the activity" it is "tied to." Opening Br. 17-18, 23-24. But they ignore *Edye*'s reasoning. There, the Supreme Court treated a statutory fee of fifty cents imposed on certain arriving noncitizens as an exercise of Congress's Commerce Clause authority, and not its taxing power. 112 U.S. at 596. Contrary to defendants' suggestion (Opening Br. 17-18), the Court did not hold that entry payments can never be taxes. Rather, the Court reasoned that the specific fee at issue was not a tax because it was merely "a charge for services rendered"—"temporary care of the [arriving] passengers"—and the fee was "appropriated in advance to the uses of the statute" and directed into a special fund created for that purpose, not for "the general support of the government." 112 U.S. at 596.

The $100,000 exaction at issue here bears none of those features. In the nearly 150 years since *Edye* was decided, courts have understood that case to "stand for the proposition that a government levy is a tax if it raises revenue to spend for the general public welfare." *Chi. & N.W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*, 71 F.3d 265, 267 (8th Cir. 1995) (collecting cases); *see San*

*Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685-686 (1st Cir. 1992) (Breyer, J.) (similar). That is what the $100,000 exaction does.[1]

Defendants also wrongly contend (Opening Br. 24) that the $100,000 payment is not a tax under the "functional approach" utilized in *NFIB v. Sebelius*, 567 U.S. 519, 565 (2012). Defendants argue that, "[u]nlike [in] *NFIB*, neither the purpose nor effect" of the $100,000 policy "is to raise revenue"; rather, they say, the policy's purpose "is to incentivize the hiring of American workers." Opening Br. 24. But the payment that the Supreme Court deemed a tax in *NFIB* also had a regulatory purpose—it was "plainly designed to expand health care coverage." 567 U.S. at 567. And the Supreme Court explained that "taxes that seek to influence conduct," such as cigarette taxes, "are nothing new." *Id.* (collecting examples where Court recognized "obviously regulatory measures as taxes"). Indeed, "'the taxing power is often, very often, applied for other purposes[ ] than revenue.'" *Id.* (quoting 2 J. Story, Commentaries on the Constitution of the United States § 962, p. 434 (1833)). Recently, in *Learning Resources*, the President

---

[1] The $100,000 tax at issue here is also unlike the fees examined in defendants' other cases. *See* Opening Br. 24-25. As in *Edye*, those fees were earmarked for a specific purpose. *See Brock v. Wash. Metro. Area Transit Auth.*, 796 F.2d 481, 488-489 (D.C. Cir. 1986) (transit authority's required contributions to special workers' compensation fund earmarked to advance specific statutory purpose, not used for general government support); *State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 878 (4th Cir. 1983) (deduction from sale of commercially marketed milk to be paid to specific sub-agency, to be used to offset cost of milk price support program); *see also* Ad.23-24 & n.8.

justified the challenged tariffs with explicit regulatory goals—reducing the influx of drugs into the United States and mitigating trade deficits. 607 U.S. at 238-239. Despite those regulatory aims, the Supreme Court had no trouble concluding that the tariffs constitute taxes. *Id.* at 240-241; *id.* at 249 ("[t]axes, to be sure, may accomplish regulatory ends").

Defendants' argument (Opening Br. 24) that the H-1B policy collects too little revenue to qualify as a tax also lacks merit. *NFIB* confirmed that the amount of revenue raised is immaterial; an exaction need only "produce[ ] at least *some* revenue for the Government" to be a tax. 567 U.S. at 564 (emphasis added); *see also United States v. Kahriger*, 345 U.S. 22, 28 (1953) ("[A] federal excise tax does not cease to be [an exercise of taxing power] merely because it discourages or deters the activities taxed" or "because the revenue obtained is negligible."). That requirement is easily met here. By February 2026, the $100,000 exaction had produced $8.5 million in revenue for the federal government's general use. JA654. By September 2026, it had produced $70 million. *See* 91 Fed. Reg. 60497.

Defendants separately point to plaintiffs' allegation that the payment is "excessive in relation to H-1B application fees" to argue the H-1B policy collects *too much* revenue to be a tax. Opening Br. 24 (contrasting tax in *NFIB*, which "'c[ould] never be more' than 'the price of insurance'"). But the 145% tariff rate

on Chinese goods in *Learning Resources* imposed a tax, despite exceeding the cost of the goods. 607 U.S. at 238.

Finally, defendants deem it significant that the $100,000 payment is "collected by DHS," not the "IRS through the normal means of taxation." Opening Br. 24, 25. But DHS also collected the tariffs at issue in *Learning Resources*, and the Supreme Court had no difficulty classifying those tariffs as taxes. *See* 607 U.S. at 240-241. Taken "in isolation" or together (Opening Br. 25), defendants' arguments would allow the Executive to label a tax a regulation, collect it through an agency other than the IRS, and avoid the constitutional limitation granting Congress the sole authority to decide whether to allow a tax. The district court properly rejected that result.

**2. Defendants identify no congressional authorization for the challenged tax, let alone the necessary "clear" authorization**

Congress did not "'clearly'" delegate authority to the Executive Branch to collect the $100,000 tax. *Learning Res.*, 607 U.S. at 243 (plurality); *see also id.* at 250, 253 (majority). Defendants argue (Opening Br. 26) that even if the $100,000 payment is a tax, the Supreme Court did not mean what it said in *Skinner*, 490 U.S. at 224, when it confirmed the longstanding rule that Congress must "clearly" delegate taxing authority. As support, defendants point to the Court's rejection of a "special nondelegation rule for revenue-raising legislation." *FCC v. Consumers'*

*Rsch.*, 606 U.S. 656, 674 (2025); *see also Skinner*, 490 U.S. at 223. But as this Court recognized, "the question here is not whether Congress *may* delegate the authority in question"; it is "whether Congress *has* done so." *California*, 183 F.4th at 49 (emphasis added). *That* question is subject to *Skinner*'s requirement that Congress delegate "clearly." *Id.* ("apart from their mistaken reliance on *FCC*, the defendants do not explain why such a clear statement is not required here"). And the answer to that question here is no, as the relevant INA provisions do not clearly delegate taxing authority to the Executive.

a. Defendants rely on two "'substantially overlap[ping]'" provisions of the INA as authority to impose the $100,000 tax. *Trump v. Hawaii*, 585 U.S. 667, 683 n.1 (2018). The first provision, Section 212(f), authorizes the President to "suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). The second provision, Section 215(a), makes it "unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). By their "plain language," these provisions allow the President to "impose entry restrictions" and "suspend the entry" of noncitizens. *Hawaii*, 585 U.S. at 683-684. But neither delegates Congress's taxing power—let alone "clearly" so. *Skinner*, 490 U.S. at 224.

The Supreme Court's analysis in *Learning Resources*, 607 U.S. at 240, is instructive. There, the Court looked to the plain language of the International Emergency Economic Powers Act (IEEPA), which the President had invoked to impose tariffs, and held that IEEPA's authorization to "'regulate . . . importation'" did not constitute a specific delegation of the "distinct and extraordinary power" to tax. *Id.* at 248-249. The Court reinforced its conclusion by looking to "[c]ongressional practice," observing that "the Government [failed to] identify any [other] statute" that authorizes "the power to tax" using the language invoked by the President, even though many statutes use "regulate" or similar terms when delegating authority. *Id.* at 249. The Court explained that Congress does not delegate taxing authority in subtle or ambiguous terms; rather, it does so "in explicit terms." *Id.* at 243 (plurality); *see also id.* at 248-249 (majority). Turning to "presidential practice," the Court emphasized that "no President [had] ever found . . . power" to impose taxes under IEEPA. *Id.* at 250. And a plurality of the Court further observed that, under the major questions doctrine, the sweeping consequences of the federal government's position counseled against inferring an "extraordinary delegation[]" to tax under what was, at best, "'ambiguous statutory text.'" *Id.* at 242 (plurality).

Each of these considerations applies with full force here. Starting with the text, Sections 212(f) and 215(a) do not refer to the power to tax. Defendants argue

that the terms "restrictions" (from Section 212(f)) and "regulations" (from Section 215(a)) encompass taxing authority. Opening Br. 19-20. But those terms have the same ordinary meaning as in *Learning Resources*. *Compare* Opening Br. 19 (defining "restriction" as "'[a] limitation imposed upon a person or thing; a condition or regulation of this nature'"), *with* 607 U.S. at 249 (defining "regulate" as "to 'fix, establish, or control; to adjust by rule, method or established mode; to direct by rule or restriction; to subject to governing principles or laws'"). And the Supreme Court held in *Learning Resources* that the term "regulate"—which it deemed synonymous with "restriction"—does *not* include the power to tax. 607 U.S. at 249; *see id.* at 232 ("the term 'regulate,' as ordinarily used, means to ' . . . direct by rule or restriction'"). Rejecting the Executive's indistinguishable argument about the scope of the statutory term "regulate," the Supreme Court explained "that the power to regulate something" does not "include[] the power to tax it as a means of regulation." *Id.* at 249.

As in *Learning Resources*, defendants also "cannot identify any [other] statute in which the power to regulate" or the power to restrict "includes the power to tax." 607 U.S. at 249. That is so even though "[t]he U.S. Code is replete with statutes granting the Executive the authority to 'regulate'" or restrict "someone or something." *Id.*; *see, e.g.*, 12 U.S.C. § 1828a; 15 U.S.C. § 78i(h)(1); 21 U.S.C. § 387f(d)(1); 44 U.S.C. § 2108(a); *contra* Opening Br. 28. As the Supreme Court

observed in *Learning Resources*, "[w]hen Congress addresses both the power to regulate and the power to tax, it does so separately and expressly." 607 U.S. at 249-250 (citing *e.g.*, 2 U.S.C. § 622(8)(B)(i) ("government-sponsored enterprise" does not have the "power to tax or to regulate interstate commerce"); 16 U.S.C. § 460bbb-9(a)). Sections 212(f) and 215(a) contain "no analogous" language, "strongly suggest[ing]" that Congress did not intend for the provisions to confer revenue-raising authority. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 21 (1979); *Learning Res.*, 607 U.S. at 251 ("Congress's pattern of usage is most relevant to answering th[e] question" of whether Congress delegated its taxing authority.). Moreover, as this Court observed, when Congress "imposes fees or delegates fee-imposing authority under the INA, it does so explicitly," by specifying "how the funds should be collected and used." *California*, 183 F.4th at 50 (citing, *e.g.*, 8 U.S.C. §§ 1184(c)(9)(A) ("shall impose a fee"), 1184(c)(11)(A) (same), 1184(c)(12)(A) (similar)); *supra* pp. 6-7. There is simply nothing in the text to suggest that Congress, in Sections 212(f) and 215(a), "hid a delegation of its birth-right power to tax within the quotidian power to 'regulate'" or restrict. *Learning Res.*, 607 U.S. at 249.

Statutory history further reinforces that these provisions do not confer taxing authority. As the Supreme Court recognized in *Hawaii*, Sections 212(f) and 215(a) reflect a consolidation of various wartime and emergency statutes. 585 U.S. at 692

(citing Act of May 22, 1918, § 1(a), 40 Stat. 559; Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252). Those statutory predecessors were first enacted during World War I and amended during World War II to give the President "war" or "national emergency" power to impose "restrictions and prohibitions . . . upon the departure of persons from and their entry into the United States." Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252; *see* H.R. Rep. No. 82-1365 (1952), 1952 U.S.C.C.A.N. 1653, 1666. Those statutes did not confer taxing authority, and no President ever invoked those statutes to impose a tax. When Congress repealed those predecessor statutes and incorporated their text nearly verbatim in the INA, it provided no indication that it intended to broaden the President's authority to include the power to tax.

By contrast, a distinct strand of pre-1952 immigration statutes *did* concern monetary exactions. For decades before the INA, Congress imposed "head taxes" on the entry of noncitizens. *E.g.*, 22 Stat. 214 (1882) ("fifty cents"); 162 Stat. 1213 (1903) ("two dollars"); 34 Stat. 898 (1907) ("four dollars"). When Congress passed the INA, it repealed those "head tax" statutes, enacted a new "schedule of fees" related to entry and visas, and granted the Executive a narrow authority to set visa fees up to a specified amount. Pub. L. 82-414, § 403(13), 66 Stat. at 168 (repealing 1917 head-tax); *id.* § 281, 66 Stat. at 230-231, 279. Today, that authorization is limited to amounts connected to "the full costs of providing" H-1B

petition processing services and "any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). Reflecting the separate lineage of the entry-restriction and fee-setting provisions, Congress placed the fee-setting provisions in a distinct part of the INA, a structural distinction that remains today. *Compare id.* § 281, 66 Stat. 231 (under "Schedule of Fees"), *with id.* § 212(f), 66 Stat. 188 (under "General Classes of Aliens Ineligible to Receive Visas and Excluded from Admission") *and id.* § 215(a), 66 Stat. 190 (under "Travel Control of Aliens and Citizens in Time of War or National Emergency").

Presidential practice likewise cuts against defendants' claim of newfound taxing authority. Presidents have invoked Section 212(f) approximately 100 times since 1981, and not once have they done so to impose a monetary exaction. *See* Gibson et al., Cong. Rsch. Serv. LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* at 6 (Feb. 21, 2024), https://www.congress.gov/crs-product/LSB10458; *Chamber of Com. v. DHS*, 815 F. Supp. 3d 73, 98 (D.D.C. 2025) ("defendants' counsel confirmed[ ] § 1182(f) has not been previously invoked to restrict entry into the United States using monetary mechanisms"), *appeal filed*, No. 25-5473 (D.C. Cir. argued Mar. 9, 2026). "[T]he fact that no President has ever found such power in" these provisions "is strong evidence that it does not exist." *Learning Res.*, 607 U.S. at 250.

Finally, although the text, context, and history of Sections 212(f) and 215(a) are sufficient to show that Congress did not delegate tax authority to the Executive, if the Court has any doubts, the major questions doctrine reinforces that conclusion. Indeed, that doctrine "appl[ies] with particular force where, as here, the purported delegation involves the core congressional power of the purse." *Learning Res.*, 607 U.S. at 242-243 (plurality); *contra* Opening Br. 31-32.

Defendants' reading of Sections 215(f) and 215(a) would grant the Executive "virtually unlimited power," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023), to tax entry as much as the President wants, for as long as he wants, for whatever reason he wants, so long as he deems the entry to be "detrimental" to the country's interests. 8 U.S.C. § 1182(f). The President could deploy this newfound taxing authority to reshape the economy to his political liking—e.g., by selectively imposing H-1B taxes only on renewable-energy companies or only on fossil-fuel companies, or on domestic employers who do not support his agenda. Giving the Executive such power to "exercise control over 'a significant portion of the American economy,'" *Biden*, 600 U.S. at 503, would represent "a 'transformative expansion in [its] regulatory authority,'" *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), with potentially "staggering" "economic and political significance," *Biden*, 600 U.S. at 501-502. Moreover, as detailed above, *supra* pp. 27-28, there is no "historical precedent" for "the breadth of authority that [the Executive Branch]

now claims." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) (internal quotation marks omitted).

The "'lack of historical precedent'" for such taxes, "'coupled with the breadth of authority' that the President now claims, 'is a telling indication' that [the $100,000 H-1B tax] extend[s] beyond the President's 'legitimate reach.'" *Learning Res.*, 607 U.S. at 245-246 (plurality). The Supreme Court recently emphasized that it is reluctant to "'read into ambiguous statutory text' extraordinary delegations of Congress's power," *id.* at 241, particularly where the purported delegation involves the core congressional power to tax. When Congress has delegated taxing authority, "it has done so in explicit terms, and subject to strict limits." *Id.* at 243. Sections 212(f) and 215(a) fall far short of the clarity necessary for the Executive to claim such extravagant taxing power.

b. Defendants make only a limited effort to distinguish *Learning Resources*. They assert that, unlike IEEPA, Section 212(f) "contains no list of ways the President may 'suspend' or 'restrict' entry that would narrow the power conferred." Opening Br. 27. But the "'neighboring words'" in IEEPA, *Learning Res.*, 607 U.S. at 250, were just one of many interpretive tools the Court considered to confirm its conclusion that the plain meaning of "regulate" does not include taxation, *see id.* (observing that IEEPA's eight other verbs "also suggest that Congress did not intend for 'regulate' to include the revenue-raising power").

Defendants also emphasize Section 212(f)'s inclusion of the term "any" to modify "restrictions," arguing that "[e]ven if there is an implied limit on 'regulate' or 'restriction' to exclude taxing, the modifier 'any' sweeps it away." Opening Br. 28. But the Supreme Court has rejected that argument as "misconstru[ing] the term's effect": "The adjective 'any' is indeed a broad term, but it cannot expand the reach of the noun it modifies." *City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 348 (2025). "A reference to 'any mammal' would capture all mammals, but it would not encompass a bird or fish." *Id.* Similarly, Section 212(f) authorizes any lawful *restrictions* on entry, but not taxation, which "do[es] not fall within that category." *Id.*; *see also Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc.*, 820 F.3d 36, 45 (1st Cir. 2016) ("the word 'any' . . . can 'never change in the least[ ] the clear meaning of the phrase' it modifies").

Defendants invoke the Supreme Court's decision in *Hawaii* to claim "sweeping" immigration-related authority to support the tax. *See* Opening Br. 26 (citing *Hawaii*, 585 U.S. at 684). But the Supreme Court explained in that decision that the President's authority under Sections 212(f) and 215(a) is "sweeping" only within a certain "sphere": "decid[ing] whether to suspend entry, whose entry to suspend, and for how long." *Hawaii*, 585 U.S. at 686, 693. For the reasons discussed, that "sphere" does not include the power to tax.

Defendants' reliance on *Federal Energy Administration v. Algonquin SNG*, 426 U.S. 548 (1976) is also misplaced. Opening Br. 28-29. In *Algonquin*, the Court held that a statute authorizing the President to "take such action . . . as he deems necessary to adjust the imports" of certain goods authorized the President to impose import license fees. 426 U.S. at 550-552, 570-571. Defendants maintain that Section 212(f)'s phrase "any restrictions" is akin to the "'sweeping, discretion-conferring language'" in *Algonquin*. Opening Br. 29 (quoting *Learning Res.*, 607 U.S. at 254); *see also id.* at 20. But as this Court observed, *see California*, 183 F.4th at 50, the Supreme Court in *Learning Resources* explained that it was "natural" to construe the statutory text at issue in *Algonquin*—"adjust[ing] . . . imports"—to include duties because a subsection of the same statutory provision made "explicit reference to duties," 607 U.S. at 254. Sections 212 and 215, by contrast, contain no "explicit reference" to taxes whatsoever. The Supreme Court recently "decline[d] to extend *Algonquin*'s expressly 'limited' holding any further," *Learning Res.*, 607 U.S. at 254, and this Court should likewise decline defendants' request to extend it to the circumstances here.

**3. Defendants provide no persuasive basis for declining to apply the clear statement rule for assessing whether Congress delegated the taxing power**

Defendants advance two arguments why the Court need not decide whether Sections 212(f) and 215(a) clearly delegate taxing authority. Neither is persuasive.

First, defendants suggest that *Skinner*'s requirement of a "clear[ ]" delegation is inapplicable if a tax is imposed pursuant to a delegation of constitutional authority other than the Taxing Clause. *See* Opening Br. 17, 22-23, 25-26. In their view, Sections 215(f) and 215(a) represent delegations of Congress's foreign commerce and immigration powers, not its taxing authority. And because Congress may impose taxes in exercising its foreign commerce and immigration authorities, defendants argue that Congress also delegated that taxing authority to the Executive. But defendants confuse the question of a delegation's *source* with the question of a delegation's *scope*. When Congress delegates a given power to the Executive, it does not necessarily delegate the full extent of that power to the Executive. So, the fact that Congress may tax under the foreign commerce and immigration clauses does not establish that Congress delegated that taxing authority to the Executive.

Indeed, the Supreme Court rejected a similar argument in *Learning Resources*. There, the federal government argued that because Congress has the power to impose tariffs pursuant to the Commerce Clause, and because the tariff statute in question was a delegation of Congress's foreign commerce power, the statute necessarily authorized the President to impose tariffs. *See* 607 U.S. at 251. The Supreme Court rejected that argument, reasoning that "[t]he question is not, as the Government would have it, whether tariffs can ever be a means of regulating

commerce. It is instead whether *Congress*," in the statute at issue, "gave the President the power to impose tariffs at his sole discretion." *Id.* So too here: even assuming a tax can be a means of regulating foreign commerce or noncitizen admissions, that does not answer whether Congress gave the Executive the power to impose taxes via Sections 212(f) and 215(a). Were it otherwise, *Skinner*'s requirement of a clear statement could be easily evaded. Given the broad scope of Congress' power under the Commerce Clause, *see, e.g.*, *Wickard v. Filburn*, 317 U.S. 111 (1942), a tax could almost always be justified under the commerce power. Defendants' argument would thus allow any future President to discover new sources of taxing authority in ambiguous delegations, thereby allowing the Executive to siphon revenue from the People in ways that Congress could have never intended.

Second, defendants invoke the President's "inherent authority to exclude aliens from entering the nation." Opening Br. 21. But the President never invoked any supposed "inherent" authority when issuing the proclamation; he only relied on his delegated authority under Sections 212(f) and 215(a). JA108. In any event, the authority to restrict entry does not include the power to levy taxes on entry; the two "are different in kind, not degree." *Learning Res.*, 607 U.S. at 252; *see id.* at 251 (rejecting a "greater-includes-the-lesser argument" that the power to prohibit or restrict imports encompasses the power to tax them).

Defendants cite no authority to the contrary. *See* Opening Br. 21-22. In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), the Court addressed an Indian tribe's inherent powers, not the separation-of-powers question here. And in *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950), the Court merely recognized *Congress's* authority to "place[ ] . . . the decision to admit or exclude" a noncitizen "with the President." Although *Knauff* briefly observed that Congress and the Executive share certain powers over admission and exclusion, *see id.* at 542-543, the Court said nothing suggesting the Executive's powers include the authority to tax. Under our constitutional structure, the President does not inherently possess that authority. *Learning Res.*, 607 U.S. at 241.

**B. Defendants' Justiciability Arguments Fail**

**1. Defendants' H-1B policy is subject to APA review**

Given that Congress did not clearly delegate taxing power to support the H-1B policy, it necessarily follows that plaintiffs have stated an "excess-of-statutory authority APA claim." *California*, 183 F.4th at 48. Resisting this straightforward conclusion, defendants proffer several reasons why their actions are supposedly unreviewable under the APA. Opening Br. 42-47. Each of those proffered reasons is incorrect.

First, defendants argue that their actions implementing the proclamation are not "final agency action." 5 U.S.C. § 704; Opening Br. 42-46. But defendants' actions plainly satisfy the established standard for determining finality. *See U.S.*

*Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Nothing about defendants' actions were "merely tentative or interlocutory." *Id.* And "legal consequences . . . flow" from those actions. *Id.*

As explained above, defendants' implementing actions specified which H-1B petitions were subject to the payment obligation, instructed agency staff how to adjudicate H-1B petitions in light of the payment obligation, set up the mechanism through which petitioners had to submit the payment, and established how petitioners could seek an exception from the payment. *Supra* pp. 9-10; *see Biden v. Texas*, 597 U.S. 785, 808 & n.7 (2022) (agency action final when it "'bound [agency] staff'" and "obligated" them to act in a prescribed manner). Indeed, as this Court recognized, defendants' claim that their actions have no legal significance cannot be reconciled with their position that the district court's vacatur had immediate concrete consequences. *California*, 183 F.4th at 51. Nor can defendants' assertions be squared with the fact that the district court's vacatur, and this Court's denial of a stay, has caused defendants to cease charging the unlawful tax.[2]

Defendants' theory of finality also cannot be squared with recent Supreme Court decisions reasoning that where a presidential directive instructs agencies to

---

[2] USCIS, *H-1B Specialty Occupations*, https://perma.cc/5Z29-AT7N (last updated Sept. 21, 2026) ("DHS strongly disagrees with the First Circuit's order denying the stay but will comply with the court's order").

implement actions or policies, judicial review is available to challenge subsequent implementing actions by the agency. *See Trump v. California*, 609 U.S. 1032, 1040 (2026) ("If the [implementing agency's] final rule harms the States, they may challenge that rule."); *Trump v. New York*, 592 U.S. 125, 131, 134 (2020) (challenge to agency action ordered by presidential "directive" and "policy" unripe until "Executive Branch's decisionmaking process" had "run its course"). Here, the proclamation itself recognized that defendants' actions were "necessary" to "implement this proclamation and to deny entry to the United States" to those who did not pay. JA109. Defendants' argument, under which neither a presidential directive nor an agency's implementing action is the right action for a court to review, would effectively insulate the actions of the Executive from judicial review altogether.

Second, defendants argue that their actions are unreviewable because they "merely carr[y] out" a presidential directive. Opening Br. 42, 44. That argument also contravenes the APA. This Court has held that agency action is reviewable even if it implements a presidential directive. *Agatha*, 151 F.4th at 11. Although the Supreme Court later disagreed with this Court's conclusions in *Agatha* as to whether plaintiffs there were "likely to prevail in arguing that the [agency] acted arbitrarily and capriciously," it did not endorse the federal government's broader

argument that any agency action flowing from a presidential directive is unreviewable. *Orr*, 146 S. Ct. at 46.

*Agatha* aside, the Supreme Court has itself conducted APA review of agency actions that implement signature presidential policies. *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406 (2024) (agency rule that followed "direct[ive]" presidential memorandum, *see Bump-Stock-Type Devices*, 83 Fed. Reg. 13442, 13446 (Mar. 29, 2018)); *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 2 (2020) (rescission of Deferred Action for Childhood Arrivals program "following a change in Presidential administrations"). As sister courts have recognized, that is for good reason: the "plain language of the APA" covers all agency action. *Su*, 121 F.4th at 15; *see also New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025). Nothing in the statute or "existing precedent" supports an exemption from APA review for actions implementing presidential directives; that view would "shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Su*, 121 F.4th at 15-17; *see Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (expressing doubts as to the federal government's "unsupported" position and concerns of "insulat[ing]" agency action from review).

In arguing to the contrary, defendants rely primarily on *Franklin v. Massachusetts*, 505 U.S. 788 (1992). Opening Br. 42. But *Franklin* held only that

"the President's performance of his statutory duties" is not reviewable for an "abuse of discretion" given the "textual silence" on whether the President is subject to the APA. 505 U.S. at 800-801. In contrast, agencies like defendants are "explicitly included" within "the APA's purview." *Id.* at 800. Indeed, Justice Scalia explained in his concurrence in *Franklin* that review of agency action is the necessary corollary of the Court's decision: "Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive[.]" *Id.* at 828 (Scalia, J., concurring in part).[3]

Third, defendants also contend that APA review is unavailable because the proclamation here arises from statutory provisions that "vest the President with . . . authority and discretion." Opening Br. 46. As the district court reasoned, that principle would not apply here given that the unlawful tax falls outside the scope of the authority the President has invoked. Ad.28-29. Regardless, as this Court recognized in *Agatha*, defendants cannot provide "any decision from the U.S. Supreme Court or any federal court of appeals" exempting Executive action entirely from judicial review because it implements a statutory delegation of discretion to the President. 151 F.4th at 11.

[3] Citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), *Franklin* also stressed that "the President's actions may still be reviewed for constitutionality," 505 U.S. at 801.

Finally, defendants argue that their actions are unreviewable because they are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Opening Br. 46-47. But that statutory exemption is "very narrow" and applies only "in those rare circumstances" where there is "no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Here as discussed above, *supra* pp. 22-32, the relevant sections of the INA have defined legal boundaries, including the limitation that the President's power extends only to actions that constitute entry "restrictions." 8 U.S.C. § 1182(f). The district court properly enforced that legal boundary by holding that defendants' tax falls outside the scope of the INA.

**2. Defendants' H-1B policy is subject to ultra vires review**

Defendants' argument (Opening Br. 14, 40-42) that ultra vires review is unavailable also lacks merit. *See* Ad.12-17. The Supreme Court's recent decision in *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026), settles that "plaintiffs may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious action by a public officer.'" There, despite the absence of any "right of action to enforce the Federal Reserve Act," *id.* at 2275 (Thomas, J., dissenting), the Court allowed a member of the Board of Governors of the Federal Reserve System to challenge her removal from the Board and to "enforce the terms of the Federal Reserve Act" requiring "cause" and certain process before removal. *Id.* at 2245,

2251 n.2 (majority). While defendants cite *Cook* for the proposition that Congress legislates against historical background (Opening Br. 28), they do not mention, let alone distinguish, *Cook* when addressing ultra vires review (*see id.* at 40-42).

*Cook* also resolves defendants' argument (Opening Br. 41) that an ultra vires claim must always satisfy the heightened standard set out in *NRC v. Texas*, 605 U.S. 665 (2025)—specifically, that a challenged action is "'contrary to a specific prohibition in a statute,'" *id.* at 681. The Supreme Court did not apply *NRC*'s standards in allowing Cook to proceed. *See Cook*, 146 S. Ct. at 2251 n.2; *see also id.* at 2275 (Thomas, J., dissenting) (observing that Court did not hold that Cook "satisf[ied]" the *NRC* "standards"). Rather, the Court has applied that standard only in cases where plaintiffs sue outside an otherwise available judicial review scheme. *See NRC*, 605 U.S. at 680-682 (Hobbs Act); *Leedom v. Kyne*, 358 U.S. 184, 187-188 (1958) (Wagner Act).

Even setting aside *Cook*, ultra vires review is available here under the logic of *Youngstown*, 343 U.S. 579. There, owners of steel mills argued that President Truman's seizure of the mills was ultra vires on separation-of-powers grounds because it was "not authorized by an act of Congress or by any constitutional provisions." *Id.* at 583. Here, plaintiffs' argument that the $100,000 tax is not authorized by an act of Congress or any constitutional provision is materially indistinguishable. *Supra* pp. 22-32. That is not to say that "every action by . . .

[an] executive official, in excess of . . . statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). But where the Executive lacks inherent constitutional authority, the absence of *any* statutory authority to take the challenged action amounts to a constitutional violation. *See, e.g.*, *Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025).

Two recent decisions support this understanding. In *Learning Resources*, 607 U.S. 229, the Supreme Court reviewed the legality of tariffs imposed by the President under a statute, and in *Trump v. Illinois*, 146 S. Ct. 432 (2025), the Court addressed the President's statutory authority to federalize the National Guard. In neither case did the Court identify a statute expressly conferring a cause of action to challenge those presidential decisions.[4] And in both, the validity of the President's actions turned on whether a statute had conferred power upon the Executive because Congress alone possessed the relevant constitutional authority: in *Learning Resources*, the power to tax, and in *Illinois*, the power to federalize a state militia. *See* U.S. Const., art. I, § 8, cl. 1, 15.

To the extent defendants contend that executive action can be challenged as unconstitutional on separation-of-powers grounds only when the Executive does

[4] *See V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-66, Dkt. 2 at 16-18 (C.I.T. Apr. 14, 2025) (pleading excess of statutory authority without pointing to any express cause of action); *Illinois v. Trump*, 155 F.4th 929, 937 (7th Cir. 2025) (distinguishing *Dalton* and treating challenge to President's exercise of statutory authority as judicially reviewable).

not invoke any statutory authority, such as in *Youngstown*, *see* Opening Br. 40-41, that view is irreconcilable with *Learning Resources* and *Illinois*. Accepting defendants' suggestion would also make it trivially easy for the Executive to evade judicial review of separation-of-powers challenges. In *Youngstown*, for example, all the President would have needed to do to insulate his steel seizure from judicial review would have been to present an argument—however flawed—that a statute authorized the seizure. *Cf. Youngstown*, 343 U.S. at 702-703 (Vinson, C.J., dissenting). The availability of judicial review should not turn on such a minor technicality. *See Global Health Council v. Trump*, 153 F.4th 1, 40-44 (D.C. Cir. 2025) (Pan, J., dissenting); *c.f. Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part) (citing *Youngstown* and rejecting notion that "Presidential action is *unreviewable*").[5]

**3. The doctrine of consular nonreviewability is inapplicable**

The district court correctly rejected defendants' argument that the doctrine of consular nonreviewability categorically prohibits challenges to executive action taken pursuant to Section 212(f) or 215(a). Ad.10-11. The "doctrine of consular

[5] The out-of-circuit decisions in *Global Health* and *Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026) (at Opening Br. 40-41) are irreconcilable with *Cook*, *see supra* pp. 40-41, and in any event, do not foreclose review of plaintiffs' claims. *Global Health* acknowledged that separation-of-powers claims are reviewable where—as here, *supra* pp. 22-32—"the presidential action at issue was not 'even contemplated by Congress,'" 153 F.4th at 16.

nonreviewability" is the "rule" that "federal courts cannot review . . . a consular officer's denial of a visa." *Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *see also Menezes v. Rubio*, 156 F.4th 1, 9 (1st Cir. 2025) (doctrine "'is not jurisdictional,'" but a merits question (quoting *Muñoz*, 602 U.S. at 908 n.4)). This case, however, does not challenge an executive official's exercise of delegated "discretionary authority to admit" or exclude a particular noncitizen. *Muñoz*, 602 U.S. at 907-908. Instead, plaintiffs assert a "forward-looking challenge[] to the lawfulness of" a "polic[y] governing consular decisions." *Pietersen v. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). "[I]t is well settled" that consular nonreviewability does not foreclose that type of challenge. *Id.*; *see also Catholic Legal Imm. Network, Inc. v. Rubio*, 840 F. Supp. 3d 209, 233-234 (S.D.N.Y. 2026) (collecting cases). That is for good reason: judicial review of executive policies *promotes* separation of powers principles by helping "to guard against 'the danger of one branch's aggrandizing its power at the expense of another branch.'" *Id.* at 233 (quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991)).

Defendants do not point to any decision that holds otherwise.[6] Instead, defendants attempt to distinguish the D.C. Circuit's *Pietersen* decision as limited to

[6] The one decision from this Court that they do cite (Opening Br. 37-39), *Amanullah v. Nelson*, 811 F.2d 1 (1st Cir. 1987), is inapposite. The Court there considered whether the INS district director abused his discretion in denying three individuals' requests for parole from immigration detention and, upon scrutiny of the record in each parole decision, held that he had not. *Id.* at 9-11.

agency regulations or policies, and inapplicable to agency actions following a presidential proclamation. *See* Opening Br. 38-39. But nothing in *Pietersen* or the consular nonreviewability doctrine supports that distinction. *Pietersen* focused on the difference between "contesting particular visa determinations by a consular officer" and "challenge[s] to the lawfulness of" an executive "policy." 138 F.4th at 560. It did not ascribe significance to the fact that the policy at issue there originated from the State Department rather than the President. *See also, e.g.*, *AA v. Dep't of State*, 2026 WL 1498079, at *7 (E.D. Va. May 28, 2026) (relying on *Pietersen* to hold consular nonreviewability did not apply to challenge to agency implementation of presidential proclamation), *appeal docketed*, No. 26-2119 (4th Cir.).

Defendants also point to a Seventh Circuit decision, *Pak v. Biden*, 91 F.4th 896 (7th Cir. 2024), to argue that "[t]o the extent *Pietersen* would be applicable, it is wrong." Opening Br. 39. But *Pak* did not hold that forward-looking, policy-level challenges to executive entry policies are barred by consular nonreviewability. *Pak* involved a challenge brought by Iranian nationals whose visa applications were denied by consular officers on terrorism-related inadmissibility grounds without having had the opportunity to establish their eligibility for an exemption. 91 F.4th at 898-900. They alleged that the executive official defendants had a practice of depriving visa applicants of the opportunity to

establish those exemptions and sought a writ of mandamus ordering the defendants to consider the exemptions in good faith. *Id.* at 900. The Seventh Circuit affirmed dismissal under consular nonreviewability, explaining that the plaintiffs had standing "only because consular officers denied visas to four of them," that it was impossible to review the officers' "exemption determination without first assessing" their "inadmissibility determination," and that what the plaintiffs "really want[ed]" was a different exemption determination. *Id.* at 900-901. This case, by contrast, is not predicated on the denial of a visa application, does not require the evaluation of any consular officer's determination as to any visa application, and does not seek to compel any particular exercise of executive discretion in an individual case.

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO PLAINTIFFS ON THE GROUND THAT DEFENDANTS VIOLATED THE APA'S PROCEDURAL REQUIREMENTS

If this Court concludes that the challenged policy is an unlawful tax, it need not consider plaintiffs' other claims. Nevertheless, this Court can "affirm on any basis available in the record," *Peguero-Moronta v. Santiago*, 464 F.3d 29, 34 (1st Cir. 2006), and plaintiffs have established other APA violations.

Defendants concede that they failed to undertake any notice-and-comment rulemaking, Opening Br. 48, and they point to nothing in the administrative record rebutting the district court's findings that they "fail[ed] to acknowledge [a] change

in position, fail[ed] to consider reliance interests, and rel[ied] on factors Congress did not intend," *id.* at 52. Apart from repeating the same meritless arguments about APA unreviewability, *see supra* pp. 35-40, defendants try to excuse these deficiencies by characterizing their rulemaking errors as "harmless," Opening Br. 48, 53, and raising various exemptions from the APA's notice-and-comment requirements, *id.* at 49. None of these arguments is persuasive.

Defendants primarily argue that any notice-and-comment rulemaking and reasoned agency deliberation would have been "meaningless," and thus any corresponding APA failures were necessarily "harmless." Opening Br. 48, 50-51, 52. These assertions rest on the premise that defendants could not have deviated from the proclamation. But the proclamation instructs agencies to implement the presidential policy "consistent with applicable law." JA110. In comparable circumstances, federal defendants have pointed to materially similar language to argue that any "eventual action" by the relevant agency must "'reflect both legal and practical constraints.'" *California*, 609 U.S. at 1036. And here, engaging in notice-and-comment processes and reasoned decisionmaking could well have exposed defendants to the legal infirmities in the President's attempt to tax entry, especially because similar issues were being actively litigated in other courts. *See, e.g.*, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (holding

President's tariffs unlawful less than a month before announcement of this proclamation).

The H-1B policy itself also shows that defendants had substantial discretion in implementing the proclamation. *Contra* Opening Br. 50-53. Defendants made their own determinations regarding how to implement the proclamation—decisions which could have benefitted from the process contemplated by the APA. *Supra* pp. 9-10. For example, the APA process could have informed defendants' decision to limit exemptions to "extraordinarily rare circumstances" where requiring a payment "would significantly undermine the interests of the United States"—language and limitations found nowhere in the proclamation. JA134. Defendants also might have issued guidance recognizing that hiring certain categories of H-1B workers (*e.g.*, medical workers for rural hospitals) is presumptively in the national interest. Indeed, the DHS Secretary has since acknowledged the agency's "authority and flexibility" regarding the granting of exceptions and has signaled a willingness to "look into" granting exceptions for rural hospitals. *Senator Collins Urges Sec. Mullin to Consider H-1B, H2-B Visa Exceptions*, United States Senate Committee on Appropriations (June 2, 2026),

https://www.appropriations.senate.gov/news/majority/senator-collins-urges-sec-mullin-to-consider-h-1b-and-h2-b-visas-exceptions.[7]

Defendants provide little support for their more ambitious argument that agencies are categorically exempt from the APA's notice-and-comment requirements so long as they follow a presidential directive. Their sole in-circuit authority (Opening Br. 50), *Conservation Law Found. v. Evans*, 360 F.3d 21 (1st Cir. 2004), merely held that the "omission of a *formal* public comment period" was harmless where the agency had already engaged in "fourteen public meetings," "afforded additional opportunities for public participation," and "analyze[d] the concerns raised by the plaintiffs," *id.* at 29-30 (emphasis added). Their out-of-circuit decisions are also far afield. Opening Br. 51-53. For example, defendants cite *Make The Road New York v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020), but the D.C. Circuit there held that notice-and-comment was unnecessary when applying a statute that made "explicit that the [agency] is under no duty to consider the views of others," *id.* at 634-635. Here, while defendants assert that *the President* has

[7] Defendants' reliance (Opening Br. 53-54) on *Hawaii*, 585 U.S. 667, to avoid APA review is misplaced. *Hawaii* said only that a "President's justifications" for exercising the powers lawfully delegated to the President under Section 212(f)—such as suspending entry—are owed deference. 585 U.S. at 686. The decision did not immunize an agency's implementing actions from ordinary APA review, especially where, as here, an agency is tasked with considering how to implement presidential policy to the extent "consistent with applicable law." JA110.

discretion under the INA, they point to no statute granting *federal agencies* exemptions from APA procedures. And their other cited authorities stand for the unremarkable proposition that courts may find specific errors harmless after an agency undertakes typical notice-and-comment rulemaking and reasoned decisionmaking. *See Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012); *Bradford v. Dep't of Labor*, 101 F.4th 707, 715, 731 (10th Cir. 2024). They do not hold that defendants may evade these obligations altogether.

Defendants separately argue they need not comply with notice-and-comment requirements by characterizing their actions as "more akin to interpretive or internal procedural rules." Opening Br. 49. But their actions cannot seriously be considered "interpretive" rules, which "'do not have the force and effect of law'" and merely "'advise the public of the agency's construction of the statutes and rules [they] administer[].'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015). Defendants' actions were necessary for the proclamation to be implemented, had the force of law, and supplemented the proclamation in meaningful ways. *Supra* pp. 9-10, 36-37, 48.

Finally, defendants cannot invoke the "foreign affairs" and "good cause" exceptions to notice-and-comment rulemaking. Opening Br. 49-50. Defendants have the burden of proving these exceptions, which requires more than mere incantation of their applicability. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*,

932 F.3d 742, 775-776 (9th Cir. 2018) ("the foreign affairs exception applies in the immigration context only when ordinary application of 'the public rulemaking provisions [will] provoke definitely undesirable international consequences' "); *id.* at 777 (good cause exception is " 'narrowly construed and only reluctantly countenanced,' " and "requires the agency to 'overcome a high bar' and show that 'delay would do real harm' to life, property, or public safety"); *see also* 5 U.S.C. § 553(b)(4)(B) (good cause exception requires agency to provide "[good cause] finding and a brief statement of reasons therefor in the rules issued"). Defendants assert that notice-and-comment procedures would "undermine the entire statutory scheme [regarding immigration-restrictions] and the time-limited Proclamation," but offer no supporting evidence. Opening Br. 49-50. Their contention that the harms are "obvious" likewise relies only on speculation and mischaracterization. Opening Br. 50. For example, defendants claim that "aliens would flow into the country during [a notice and comment] period," "causing chaos abroad as they attempted to do when the Proclamation was announced." *Id.* (citing JA57-58.) But the section of the complaint that defendants cite as their only support alleges the opposite—that the rushed and confusing roll-out of the proclamation led existing H-1B visa holders to return promptly to the United States out of fears of being stranded overseas. JA57-58. And defendants provide no evidence to suggest that the sky has fallen in the months since the district court vacated the

challenged policy. Defendants cannot rely on speculation to avoid the deliberative process the APA requires.

## III. THIS COURT CAN AFFIRM ON THE ALTERNATIVE GROUND THAT THE H-1B POLICY USURPS CONGRESS'S PLENARY POWER OVER ADMISSIONS

The Court may also affirm on plaintiffs' alternative claim that the H-1B policy contravenes Congress's "plenary power to make rules for th[e] admission of aliens." *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972).[8] For decades, Congress has exercised its constitutional authority with respect to the admission of specialty workers. Congress has set and modified H-1B fees by statute, *see supra* pp. 6-7; determined that certain government and nonprofit employers should be exempt from some of those fees, *see* 8 U.S.C. § 1184(c)(9)(A); and conferred authority to the Executive to assess "adjudication fees," but only up to an amount "that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," *id.* § 1356(m).

The H-1B policy upends Congress's chosen scheme for the H-1B program by imposing the Executive's preferred taxation policy. By demanding $100,000 per

---

[8] Because the district court did not reach the statutory argument that the H-1B policy usurps Congress's power over immigration, *see* Ad.26, the Court may also remand for the district court to address it in the first instance. *See United States v. Reyes*, 24 F.4th 1, 19 (1st Cir. 2022) ("'the general rule is that a 'federal appellate court does not consider an issue not passed on below'").

H-1B petition, regardless of the employer's identity, the policy nullifies Congress's efforts to ensure the H-1B program is not cost-prohibitive for government and nonprofit employers, and transforms the program from one for employees in "specialty occupation[s]," 8 U.S.C. § 1184(i), to one for employees of entities willing and able to pay an exorbitant tax. The policy also renders meaningless Congress's requirement that the Executive limit any fees to those necessary for cost-recovery. The President's authority to restrict entry does not allow the Executive to override Congress's H-1B program. *See Hawaii*, 585 U.S. at 689 (assuming Section 212(f) "does not allow the President to expressly override particular provisions of the INA"); *Doe #1 v. Trump*, 957 F.3d 1050, 1064 (9th Cir. 2020) (Section 212(f) cannot "eviscerate[] the statutory scheme"); *see also* D. Ct. Dkt. 87 at 2-5, 11-13; D. Ct. Dkt. 99 at 8-11.

## IV. THE DISTRICT COURT PROPERLY VACATED THE POLICY

Having found an APA violation, the district court properly vacated defendants' actions under its statutory authority to "set aside" unlawful agency action. 5 U.S.C. § 706(2). *Contra* Opening Br. 54. "The Federal Government and the federal courts"—including this Court—"have long understood § 706(2) to authorize vacatur." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826-827 (2024) (Kavanaugh, J., concurring); *see, e.g.*, *Make The Road N.Y. v. Noem*, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) ("The Supreme

Court regularly, repeatedly, and recently has applied [Section 706] to provide universal relief under the APA."); *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("vacat[ur] is a proper remedy when an agency fails to explain its reasoning adequately").

Defendants' appeal to "equitable principles" to restrict the scope of APA vacatur is unavailing. *Contra* Opening Br. 55. Even if Section 706 allows consideration of equitable principles to limit the scope of vacatur, defendants did not develop any persuasive argument as to why equity counsels in favor of narrower relief in the circumstances here, where defendants' challenged actions have been found to lack any constitutional or statutory authority. Defendants cite cases (Opening Br. 55) where courts have applied equitable considerations when determining whether to vacate an "inadequately explained" order in the first instance, or to remand to the agency where "the errors at issue can probably be mended." *Cent. Me. Power Co. v. F.E.R.C.*, 252 F.3d 34, 48 (1st Cir. 2001). But here, the district court concluded that defendants had acted unlawfully, thus making remand without vacatur futile and improper. Defendants' only other claim as to why equity required a limited vacatur was based on supposedly "'obvious collateral estoppel and *res judicata* concerns'" that the district court comprehensively rejected (Ad.37-41) and defendants no longer advance on appeal. Defendants accordingly cannot establish that the district court abused its discretion

in evaluating the scope of relief. *See In re Blinds to go Share Purchase Litig.*, 443 F.3d 1, 8 (1st Cir. 2006) ("we review the trial court's choice among available equitable remedies for abuse of discretion").

Finally, the district court also held that "'a permanent injunction would be warranted, if . . . vacatur is not available under the APA.'" Ad.41 n.14. Defendants do not contest that determination and have waived any argument otherwise. *See Brox v. Hole*, 83 F.4th 87, 97 n.2 (1st Cir. 2023). In any event, the district court was correct. *See Esso Standard Oil Co v. Lopez-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008) (setting forth four-factor test for permanent injunction). Plaintiffs sought an injunction that would run to them, their agencies, and their political subdivisions. JA95. On the equities and public interest, the record shows that the $100,000 tax has seriously harmed plaintiffs' public health systems and school districts—leaving them with no way to mitigate critical staffing shortages without making cuts to other essential public services. *E.g.*, JA161-162, JA 183, JA188, JA201-202, JA366, JA378-381. Defendants' only response is to speculate that enjoining their unprecedented tax will "open[ ] the floodgates to aliens entering the country to take vital American jobs" (Opening Br. 1)—but that speculative assertion is undercut by the fact that Congress has already addressed concerns about any negative impact of the H-1B program on the domestic labor force.

*Supra* pp. 5-6. In any event, whatever threat defendants perceive from H-1B visas, a tax is not among the measures defendants may enact to address their concerns.

## CONCLUSION

The judgment of the district court should be affirmed.

November 4, 2026

**ANDREA JOY CAMPBELL**
*Attorney General*
Commonwealth of Massachusetts

*/s/ Gerard J. Cedrone*
GERARD J. CEDRONE
*Deputy State Solicitor*
MICHELLE R. PASCUCCI
NITA K. KLUNDER
*State Trial Counsels*
JULIA S. CANNEY
*Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2282
Gerard.Cedrone@mass.gov

*Attorneys for Plaintiff*
*Commonwealth of Massachusetts*

Respectfully Submitted,

**ROB BONTA**
*Attorney General*
State of California

By: */s/ Julie Veroff*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
JULIE VEROFF
*Deputy Solicitor General*
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy Attorneys General*
DENISE LEVEY
LORRAINE LOPEZ
JEANELLY OROZCO ALCALÁ
JAMES E. RICHARDSON
*Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**KRISTIN K. MAYES**
*Attorney General of Arizona*

/s/ *Jaylia Yan*
JOSHUA G. NOMKIN
JAYLIA YAN
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
jaylia.yan@azag.gov

*Attorneys for Plaintiff*
*State of Arizona*

**PHILIP J. WEISER**
*Attorney General of Colorado*

/s/ *David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
NORA PASSAMANECK
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for Plaintiff*
*State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

/s/ *Michael K. Skold*
MICHAEL K. SKOLD
*Solicitor General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov

*Attorneys for Plaintiff*
*State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of Delaware*

/s/ *Vanessa L. Kassab*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for Plaintiff*
*State of Delaware*

**ANNE E. LOPEZ**
*Attorney General of Hawai'i*

/s/ *Kaliko'onālani D. Fernandes*
KALIKO'ONĀLANI D. FERNANDES
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for Plaintiff*
*State of Hawai'i*

**KWAME RAOUL**
*Attorney General of Illinois*

/s/ *Sarah A. Hunger*
SARAH A. HUNGER
*Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5202
sarah.hunger@ilag.gov

*Attorneys for Plaintiff*
*State of Illinois*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

/s/ *Virginia A. Williamson*
VIRGINIA A. WILLIAMSON
*Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Attorneys for Plaintiff*
*State of Maryland*

**DANA NESSEL**
*Attorney General of Michigan*

/s/ *Neil Giovanatti*
NEIL GIOVANATTI
*Assistant Attorney General*
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov

*Attorneys for Plaintiff*
*State of Michigan*

**KEITH ELLISON**
*Attorney General of Minnesota*

*/s/ Joseph R. Richie*
JOSEPH R. RICHIE
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Attorneys for Plaintiff*
*State of Minnesota*

**AARON D. FORD**
*Attorney General of Nevada*

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND
*Chief of Special Litigation*
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
kireland@ag.nv.gov

*Attorneys for Plaintiff*
*State of Nevada*

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*

*/s/ Melina Meneguin Layerenza*
MELINA MENEGUIN LAYERENZA
*Assistant Attorney General*
MAX G. LESSER
*Deputy Attorney General*
124 Halsey Street
Newark, NJ 07102
(609) 414-4366
melina.meneguin@law.njoag.gov

*Attorneys for Plaintiff*
*State of New Jersey*

**LETITIA JAMES**
*Attorney General of New York*

*/s/ Judith N. Vale*
JUDITH N. VALE
*Deputy Solicitor General*
BARBARA D. UNDERWOOD
*Solicitor General*
ZOE LEVINE
*Special Counsel for Immigrant Justice*
VICTORIA OCHOA
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(212) 416-8329
zoe.levine@ag.ny.gov

*Attorneys for Plaintiff*
*State of New York*

**JEFF JACKSON**
*Attorney General of North Carolina*

/s/ *Daniel P. Mosteller*
DANIEL P. MOSTELLER
*Associate Deputy Attorney General*
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Attorneys for Plaintiff*
*State of North Carolina*

**DAN RAYFIELD**
*Attorney General of Oregon*

/s/ *Robert A. Koch*
ROBERT A. KOCH
*Senior Assistant Attorney General*
100 S.W. Market Street
Portland, OR 97201
(971) 673-1880
robert.a.koch@doj.oregon.gov

*Attorneys for Plaintiff*
*State of Oregon*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

/s/ *Kyla Duffy*
KYLA DUFFY
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
kduffy@riag.ri.gov

*Attorneys for Plaintiff*
*State of Rhode Island*

**CHARITY R. CLARK**
*Attorney General of Vermont*

/s/ *Jonathan T. Rose*
JONATHAN T. ROSE
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for Plaintiff*
*State of Vermont*

**NICHOLAS W. BROWN**
*Attorney General of Washington*

/s/ *Sara L. Wilmot*
SARA L. WILMOT
*Assistant Attorney General*
KATE S. WORTHINGTON
*Assistant Attorney General*
7141 Cleanwater Drive S.W.
P.O. Box 40111
Olympia, WA 98504
(360) 709-6470
sara.wilmot@atg.wa.gov

*Attorneys for Plaintiff*
*State of Washington*

**JOSHUA L. KAUL**
*Attorney General of Wisconsin*

/s/ *Faye B. Hipsman*
FAYE B. HIPSMAN
*Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707
(608) 264-9487
faye.hipsman@wisdoj.gov

*Attorneys for Plaintiff*
*State of Wisconsin*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1. This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 12,887 words and thus does not exceed the 13,000-word limit.

2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because the brief has been prepared in proportionally spaced typeface using Microsoft Word word-processing system in Times New Roman that is at least 14 points.

Dated: November 4, 2026

*/s/ Julie Veroff*
Julie Veroff
Deputy Solicitor General