No. 26-1699

IN THE

# United States Court of Appeals for the First Circuit

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

*v.*

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT of HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants-Appellants,*

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-13829-LTS, Hon. Leo T. Sorokin

**BRIEF OF THE CATO INSTITUTE AND PROFESSOR ILYA SOMIN AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES**

Deno Himonas
WILSON SONSINI
GOODRICH & ROSATI, P.C.
95 S State Street Suite 1000
Salt Lake City, UT 84111

Michael W. McConnell
WILSON SONSINI
GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304-1050

*Additional Counsel Listed on Inside Cover*

Ilya Somin
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIV.
3301 Fairfax Dr.
Arlington, VA 22201

Phillip H.C. Wilkinson
WILSON SONSINI
GOODRICH & ROSATI, P.C.
One Market Plaza, Suite 3300
San Francisco, CA 94105
(415) 947-2000
pwilkinson@wsgr.com

*COUNSEL FOR AMICI CURIAE*

## CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

NOVEMBER 12, 2026

Respectfully submitted,

*/s/Phillip H.C. Wilkinson*
Phillip H.C. Wilkinson

# TABLE OF CONTENTS

**Page**


STATEMENT OF INTEREST ........ 1

INTRODUCTION ........ 2

SUMMARY OF ARGUMENT ........ 7

ARGUMENT ........ 9

I. THE $100,000 EXACTION IS A TAX, AND THE INA DOES NOT CLEARLY DELEGATE THE TAXING POWER ........ 9

A. The Constitution vests the taxing power in Congress alone; the President has no inherent power to tax. ........ 10

B. The $100,000 exaction is a tax ........ 12

1. It raises revenue for the general Treasury ........ 12

2. It is not a cost-recovery fee. ........ 13

3. A regulatory purpose does not change the analysis ........ 14

4. “Regulatory payment” is not a recognized third category. ........ 14

C. The power to “restrict” entry is not the power to “tax” entry. ........ 15

D. Congress’s detailed INA fee scheme confirms the absence of a delegated taxing power. ........ 18

E. The century-plus absence of any revenue use of Sections 212(f) and 215(a) militates against the existence of the power. ........ 20

1. Greater-includes-the-lesser. ........ 20

2. Inherent executive power over entry. ........ 21

II. THE GOVERNMENT'S INTERPRETATION OF SECTION 212(F) RUNS AFOUL OF THE MAJOR QUESTIONS DOCTRINE. ........ 22

A. The imposition of $100,000 fees on H-1B visas raises a major question. ........ 23

B. Taxes on entry are not exempt from the major questions doctrines on the grounds that they are "foreign affairs" issues. ........ 25

III. IF THE RELEVANT STATUTE GRANTS THE GOVERNMENT THE POWER CLAIMED HERE, IT WOULD BE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE. ........ 29

A. The sweeping delegation claimed by the Government violates the nondelegation doctrine. ........ 29

B. Delegations of power over entry are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues. ........ 32

C. The constitutional avoidance canon requires interpreting Section 212(f) to avoid a sweeping delegation of taxing authority that raises constitutional problems. ........ 33

CONCLUSION ........ 34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) (per curiam) .......... 23, 24, 28

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) .......... 30

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 27, 28

*California v. Mullin*,
183 F.4th 42 (1st Cir. 2026) .......... 4, 19, 20, 22

*California v. Mullin*,
833 F.Supp.3d 50 (D. Mass. 2026) .......... 3, 12, 14, 16

*Chi. & N.W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*,
71 F.3d 265 (8th Cir. 1995) .......... 12

*Edye v. Robertson*,
112 U.S. 580 (1884) .......... 7, 13

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 6, 29, 30, 31

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) .......... 22

*Fiallo v. Bell*,
430 U.S. 787 (1977) .......... 27

*FTC v. Bunte Bros., Inc.*,
312 U.S. 349 (1941) .......... 20

*Galvan v. Press*,
347 U.S. 522 (1954) .......... 11, 27

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) .................................................... 17, 30

*Glob. Nurse Force v. Trump*,
2026 WL 2972985 (N.D. Cal. Sep. 30, 2026).................................... 4

*J.W. Hampton, Jr. & Co. v. United States*,
276 U.S. 394 (1928) ............................................................... 29

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ............................................................... 33

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ............................................................... 27

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) ............................................ 2, 5-10, 12, 15, 17, 19-22, 24, 26, 30, 32-33

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ................................................ 10

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) ............................................................... 21

*Merritt v. Welsh*,
104 U.S. 694 (1882) ............................................................... 26

*Mistretta v. United States*,
488 U.S. 361 (1989) (Scalia, J., dissenting) .................................. 31

*Nat'l Ass'n of Mfrs. v. DHS*,
491 F.Supp.3d 549 (N.D. Cal. 2020) ....................................... 11, 21

*Nat'l Cable Television Ass'n, Inc. v. United States*,
415 U.S. 336 (1974) ............................................................... 13

*NFIB v. OSHA*,
595 U.S. 109 (2022) (per curiam) ........................................... 24, 25

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .......... 7, 12, 14, 33

*Nicol v. Ames*,
173 U.S. 509 (1899) .......... 2, 10

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 4

*Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Lab.*,
312 U.S. 126 (1941) .......... 30

*Ping v. United States (The Chinese Exclusion Case)*,
130 U.S. 581 (1889) .......... 11, 26

*Russello v. United States*,
464 U.S. 16 (1983) .......... 19

*San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*,
967 F.2d 683 (1st Cir. 1992) (Breyer, C.J.) .......... 12

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979) .......... 8, 19

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 17, 18

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) .......... 11, 21

*United States v. Kahriger*,
345 U.S. 22 (1953) .......... 12, 14

*United States v. Williams*,
553 U.S. 285 (2008) .......... 17

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 5, 23

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) .......... 2, 26

*W. Lynn Creamery, Inc. v. Healy*,
512 U.S. 186 (1994) .......... 12

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 25, 28

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 8

## STATUTES

5 U.S.C. §706(2)(C) .......... 4

8 U.S.C. §1182(f) .......... 15, 20

8 U.S.C. §1184(c) .......... 18

8 U.S.C. §1185(a) .......... 15, 20

8 U.S.C. §1356 .......... 19

12 U.S.C. §1828a(a) .......... 16

21 U.S.C. §387f(d)(1) .......... 16

42 U.S.C. §264(a) .......... 28

44 U.S.C. §2108(a) .......... 16

Pub. L. No. 114-113, §402(g), 129 Stat. 2242, 3006 (2015) .......... 18

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I §7, cl. 1 .......... 10

U.S. Const. Art. I §8, cl. 1 .......... 10

## MISCELLANEOUS

Black's Law Dictionary (12th ed. 2024) .......... 16

Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority*, 2021–2022 Cato Sup. Ct. Rev. 69, 75–76 (2022) ........................................ 24

Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium*, REASON (Aug. 3, 2021), https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium/ .............................. 24

Ilya Somin, *How the Supreme Court Spared America*, The Atlantic (Feb. 25, 2026), https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/ ........................................................ 6

Ilya Somin, *Immigration and the Economic Freedom of Natives*, 37 PUB. AFFAIRS Q. 226 (2023) ........................................ 29

Off. of the Dir. of Nat'l Intel., *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022), https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf ........................................ 28

Proclamation No. 10,973, *Restriction on Entry of Certain Nonimmigrant Workers* §1(a), 90 Fed. Reg. 46,027, 46,028 (Sep. 24, 2025). ........................................ 3, 13

Ran Abramitzky et al., *Long-Run Effects of H-1B Immigration on the U.S. Economy* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 35560, 2026), https://www.nber.org/system/files/working_papers/w35560/w35560.pdf. ........................................ 5, 23

*Restrict*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/restrict (last visited Nov. 10, 2026)......... 16

*The Federalist* No. 48 (J. Madison) ........................................ 2, 10

## STATEMENT OF INTEREST[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 dedicated to individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies, established in 1989, promotes the principles of limited constitutional government that are the foundation of liberty. This case concerns Cato because of its significance to the constitutional separation of powers and its potential effect on immigration and the U.S. economy.

Ilya Somin is Visiting Professor of Law at the University of Virginia School of Law, Professor of Law at the Antonin Scalia Law School at George Mason University, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute, and the author of numerous works on constitutional law and migration, including *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government Is Smarter* (2d ed. 2016), and *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent*

[1] No party's counsel authored this brief in whole or in part, and no person or entity other than amici curiae and their counsel contributed money intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. Institutional affiliations are provided for identification purposes only.

*Domain* (rev. ed. 2016). His writings helped inspire *V.O.S. Selections, Inc. v. Trump*, where he served as co-counsel for the plaintiffs throughout that litigation.

**INTRODUCTION**

"[T]he Framers gave Congress alone access to the pockets of the people." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 241 (2026) (opinion of the Court) (cleaned up) (quoting The Federalist No. 48, at 310 (J. Madison)). The tax power was, as Alexander Hamilton explained, "the most important of the authorities proposed to be conferred upon the Union," *id.* at 240 (quoting The Federalist No. 33, at 202–203 (C. Rossiter ed. 1961)), and the Framers "did not vest any part of the taxing power in the Executive Branch," *id.* at 241 (citing *Nicol v. Ames*, 173 U.S. 509, 515 (1899)). Just months ago, the Supreme Court in *Learning Resources* applied those fundamental principles to hold that the President may not use a general grant of authority to "regulate … importation" to impose tariffs, because "regulate" is not the power to tax and Congress did not clearly delegate its taxing power. *Id.* at 249. This case asks whether the same President—by imposing a tax of his own devising on the entry of noncitizens and calling it a "restriction" on entry—may accomplish by a

different label what *Learning Resources* forbade. Proclamation No. 10,973, *Restriction on Entry of Certain Nonimmigrant Workers* §1(a), 90 Fed. Reg. 46,027, 46,028 (Sep. 24, 2025).

He may not. Nevertheless, on September 19, 2025, the President issued a proclamation requiring a $100,000 payment to accompany each H-1B visa petition. *Id.* Twenty States sued, and the United States District Court for the District of Massachusetts granted them summary judgment on their Administrative Procedure Act ("APA") claims, holding the $100,000 exaction an unauthorized tax and vacating the implementing agency actions under the APA. *California v. Mullin*, 833 F.Supp.3d 50, 72, 84 (D. Mass. 2026). More specifically, applying *Learning Resources*, the district court held that Sections 212(f) and 215(a) of the Immigration and Nationality Act ("INA") "allow the President to impose 'restrictions,' 'rules,' 'regulations,' 'orders,' 'limitations,' and 'exceptions'" on entry, but that "[l]ike the powers delineated in the IEEPA, none of these terms, by their ordinary meaning, include the power to tax." *Id.* at 72.

The Northern District of California similarly vacated the H-1B policies on other APA grounds. *Glob. Nurse Force v. Trump*, 2026 WL 2972985, at *15–19 (N.D. Cal. Sep. 30, 2026).

This Court then denied the Government's motion to stay judgment pending appeal, holding that the Government had not made the "strong showing" of likely success required by *Nken v. Holder*, 556 U.S. 418, 426 (2009), on the States' claim that the policies implementing the Proclamation exceeded statutory authority, *see* 5 U.S.C. §706(2)(C). *California v. Mullin*, 183 F.4th 42, 48-50 (1st Cir. 2026).

This case is controlled by *Learning Resources*. There, as here: (a) the President invoked a grant of regulatory power (there: "regulate … importation," here: "restrict … entry") to raise substantial revenue from those engaged in that activity; (b) the operative statute nowhere mentions taxes or fees; (c) Congress elsewhere explicitly prescribed monetary exactions in the same statute, showing that it was attendant to the difference between regulation and monetary exactions; and (d) no prior President in the statute's long history had ever used the invoked provision to raise revenue.

The Government's sweeping theory of executive power to tax has no congressional sanction. On the Government's reading, Sections 212(f) and 215(a) would let the President impose a tax of any amount, on any class of entrant, for any duration, whenever he wants. The power the Government claims to tax those who lawfully seek to enter, work, and pay taxes in the United States is no less "unlimited," and no more "clearly" authorized, than the tariff power the Court refused to find in IEEPA's word "regulate." *Learning Resources,* 607 U.S. at 249. Such an expansive interpretation of the statute would violate the major questions doctrine, which requires Congress to "speak clearly" when it delegates to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The economic impacts of the H-1B program further underscore that Congress would have reserved taxation over this realm for itself. The H-1B program has significantly raised the incomes of U.S. natives and pre-existing immigrants. *See* Ran Abramitzky et al., *Long-Run Effects of H-1B Immigration on the U.S. Economy* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 35560, 2026), https://www.nber.org/system/files/working_papers/w35560/w35560.pdf.

A $100,000 per-petition charge on that program is a policy choice of vast economic significance: the kind that "a reasonable interpreter would not expect Congress to pawn … off to another branch" through a word like "restrict." *See Learning Resources*, 607 U.S. at 246 (plurality opinion) (cleaned up). The deeper significance of *Learning Resources* is its insistence that "major legal rules be clearly established by legislation, not subject to the whims of one person." Ilya Somin, *How the Supreme Court Spared America*, The Atlantic (Feb. 25, 2026), https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/.

If, somehow, the statute did grant the President the unrestrained power he claims, it would violate the nondelegation doctrine, as it would be an unconstitutional transfer of legislative power to the executive. Delegations of the tax power must meet various criteria. Congress cannot make "boundless" delegations of tax authority, and "[t]he 'guidance' needed is greater … when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673, 680 (2025). Such delegations must have both a "floor" and a "ceiling." *Id.* at 681. The

Government's assertion of wholesale authority to impose taxes on visas runs afoul of all these requirements.

## SUMMARY OF ARGUMENT

The Constitution commits the tax power to Congress alone. Article I lists "the Power To lay and collect Taxes, Duties, Imposts and Excises" first among Congress's powers, and "[i]t is no accident that this power appears first." *Learning Resources*, 607 U.S. at 240.

The exaction here is a tax. Its "defining feature" is that it raises revenue. *Id.* at 241 (opinion of the Court). It is neither a mere fee contributing to the costs of operating the program, *see Edye v. Robertson*, 112 U.S. 580, 595–96 (1884), nor a penalty, because petitioning for an H-1B visa is entirely lawful, *see NFIB v. Sebelius*, 567 U.S. 519, 567-68 (2012). By contrast, the government concedes the funds from the $100,000 tax are not used "for a specific purpose" but are placed into "the General Fund of the U.S. Treasury." JA659-60.

The power to "restrict" entry is not the power to "tax" entry. To limit or qualify entry says nothing about charging for it, and the Government can identify no statute in which the words "restrict" or "restriction" confer tax authority.

The INA contains express, detailed provisions for fees and payments, setting each amount and specifying how the funds are collected and spent. This confirms the absence of a generalized, unlimited discretionary presidential taxing power. When Congress wanted monetary exactions under the INA, "it knew how to do so and did so expressly," *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 21 (1979). Congress does not "hide elephants in mouseholes," and this case involves a very large elephant. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In more than a century, no President has used Section 212(f) or Section 215(a) to raise revenue, a point the Government does not dispute. That absence is "strong evidence" the power does not exist. *Learning Resources*, 607 U.S. at 250 (opinion of the Court).

In addition, the government's interpretation of the relevant statutes violates the major questions doctrine. If, nonetheless, this court rules that Section 212(f) does somehow grant the Government the power it claims, it would violate the constitutional nondelegation doctrine. This court can avoid grave constitutional problems by following the

constitutional avoidance canon and interpreting the relevant statutes to deny any grant of taxation authority.

The judgment of the district court should be affirmed.

## ARGUMENT

### I. THE $100,000 EXACTION IS A TAX, AND THE INA DOES NOT CLEARLY DELEGATE THE TAXING POWER.

In *Learning Resources*, the Court confronted an executive order imposing tariffs under a general grant of regulatory authority making no mention of tariffs, duties, taxes, or revenue raising. The principal opinion described that claim in terms that fit this case exactly: “The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope. In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it.” 607 U.S. at 255 (plurality opinion). And using principles of statutory interpretation, the Court held in an opinion for six Justices that the authority to “regulate … importation” supplied no such authorization, because “regulate” does not include the power to tax. *Id.* at 249. The Government’s theory here is the same theory in a new setting: that the authority to “restrict …

entry" lets the President impose a tax of unlimited amount, duration, and scope on the noncitizens who seek to enter.

### A. The Constitution vests the taxing power in Congress alone; the President has no inherent power to tax.

Article I, Section 8, Clause 1 provides that "[t]he Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises." That the taxing power "appears first" among Congress's enumerated powers "is no accident." *Learning Resources*, 607 U.S. at 240 (opinion of the Court). The Framers, having just fought a revolution against "taxation without representation," gave Congress "alone … access to the pockets of the people," and required that "[a]ll Bills for raising Revenue … originate in the House of Representatives," the chamber closest to the people. *Id.* at 241 (quoting U.S. Const. art. I, §7, cl. 1 and *The Federalist* No. 48, at 310 (J. Madison)). The taxing power is "'necessary to the existence and prosperity of a nation'—'the one great power upon which the whole national fabric is based,'" *id.* at 240 (quoting *Nicol*, 173 U.S. at 515), and precisely because it is a "power to destroy," *id.* (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819)), the Framers "did not vest any part of the taxing power in the Executive Branch," *id.* at 241.

Nowhere is that principle stronger than in immigration. "[T]he formulation of [immigration] policies is entrusted exclusively to Congress," *Galvan v. Press*, 347 U.S. 522, 531 (1954), and the immigration power itself is a legislative one: the authority to "exclude aliens from [the] territory" belongs to "the government of the United States, through the action of the legislative department," *Ping v. United States (The Chinese Exclusion Case)*, 130 U.S. 581, 603 (1889).

Even the authorities the Government invokes do not support a power to tax. *United States ex rel. Knauff v. Shaughnessy* recognized an inherent "executive power to control the foreign affairs of the nation" including "the admissibility of aliens" for which "Congress prescribes a procedure," 338 U.S. 537, 542 (1950). But whatever power the Executive may have to exclude aliens says nothing about a power to tax that Congress never conferred. *Id.* Indeed, if the President already possessed an inherent, unbounded power over entry, the INA's elaborate scheme of delegations (Section 212(f) itself included) would be superfluous. *See Nat'l Ass'n of Mfrs. v. DHS*, 491 F.Supp.3d 549, 563 (N.D. Cal. 2020).

### B. The $100,000 exaction is a tax.

Whether an exaction is a tax turns on its operation, not its label. *See Sebelius*, 567 U.S. at 564-65. By every functional measure, the $100,000 exaction is a tax.

#### 1. It raises revenue for the general Treasury.

The "defining feature" of a tax is that it "raise[s] revenue" for the government. *Learning Resources*, 607 U.S. at 241 (opinion of the Court) (quoting *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994), and *United States v. Kahriger*, 345 U.S. 22, 28 & n.4 (1953)). The Government concedes the $100,000 payments here are deposited into the General Fund of the Treasury, JA659-60, and defray no cost of adjudicating H-1B petitions. *See Mullin*, 833 F.Supp.3d at 78–79 (noting that the Government conceded that the $100,000 was not an adjudication fee that covered specified costs). A levy that "raises revenue to spend for the general public welfare" is a tax. *Chi. & N.W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*, 71 F.3d 265, 267 (8th Cir. 1995); *accord San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, C.J.) (the classic tax "raises money, contributed to a general fund, and spent for the benefit of the entire community"). That is what this exaction does.

**2. It is not a cost-recovery fee.**

The Government's lead historical authority, *Edye v. Robertson*, proves the point against it. There, a fifty-cent charge per arriving noncitizen passenger was sustained as an exercise of the commerce power rather than the taxing power precisely because the money did "not go to the general support of the government"; it was appropriated "to the uses of the statute" as a fund for "the temporary care of the passengers" whom the shipowners brought. *Edye*, 112 U.S. at 595–96. The $100,000 exaction here, by contrast, is untethered to any cost of service. A charge that funds the government at large, rather than a service rendered to the payer, is a tax. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41 (1974) (distinguishing a "tax," which may "disregard benefits bestowed by the Government on a taxpayer," from a "fee," which "bestows a benefit on the applicant, not shared by other members of society"). The Proclamation confirms the point. It defends the payment as a measure to "impose higher costs on companies seeking to use the H-1B program" in order to "address the abuse of that program," Proclamation No. 10,973, 90 Fed. Reg. at 46,028, and nowhere ties the $100,000 to the cost of adjudicating H-1B petitions.

#### 3. A regulatory purpose does not change the analysis.

"[T]axes that seek to influence conduct are nothing new." *Sebelius*, 567 U.S. at 567. "[A] federal excise tax does not cease to be valid merely because it discourages or deters the activities taxed." *Kahriger*, 345 U.S. at 28. That the exaction is meant to discourage the hiring of foreign workers therefore does not make it something other than a tax; it makes it a tax with a regulatory aim. And a tax need only "produce[] at least some revenue for the Government," *Sebelius*, 567 U.S. at 564, a threshold the exaction here plainly clears.

#### 4. "Regulatory payment" is not a recognized third category.

Faced with these settled categories, the Government has fallen back on the label "a regulatory payment" that is "not the same as a tax." *Mullin*, 833 F.Supp.3d at 71. The district court correctly rejected that *ipse dixit* because the Government "offer[ed] no definition," "cite[d] no cases or statutes employing the term," and advanced "no reasoned argument" distinguishing its coinage from a tax or a penalty. *Id.* A charge that raises general revenue, defrays no cost of service, and punishes no unlawful act is a tax, whatever the Government calls it.

### C. The power to "restrict" entry is not the power to "tax" entry.

Sections 212(f) and 215(a) authorize restrictions on entry; they say nothing of taxes. Section 212(f) permits the President to "suspend the entry" of aliens or "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. §1182(f). Section 215(a) authorizes "reasonable rules, regulations, and orders" and "limitations and exceptions" on entry. *Id.* §1185(a)(1). And the word "any" does not change this. "Any restrictions he may deem to be appropriate," 8 U.S.C. §1182(f), merely enlarges the President's options of entry restrictions; it does not convert a restriction into a levy because "the power to regulate commerce" is "entirely distinct from the right to levy taxes," *Learning Resources*, 607 U.S. at 250 (citation omitted).

This silence with respect to tax power is decisive under *Learning Resources*. The Court held that "the facial breadth of 'regulate' … is not usually thought to include[] … taxation," and that although there are many "statutes granting the Executive the authority to 'regulate,' … the Government cannot identify any statute in which the power to regulate includes the power to tax." *Id.* at 249 (opinion of the Court). What was true of "regulate" is true of "restrict." A restriction is "a limitation or

qualification," Black's Law Dictionary (12th ed. 2024), or "to confine within bounds," *Restrict*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/restrict (last visited Nov. 10, 2026). To limit or qualify who may enter, and on what terms, says nothing about charging a fee for the privilege. As the district court put it, "[l]ike the powers delineated in the IEEPA, none of these terms, by their ordinary meaning, include the power to tax." *Mullin*, 833 F.Supp.3d at 72.

The Government cannot identify any statute in which the power to "restrict" or impose a "restriction" confers a power to tax, even though statutes using "restriction" language that no one reads to authorize taxation are common. *See, e.g.*, 12 U.S.C. §1828a(a) (authorizing the Comptroller to "impose restrictions or requirements on relationships or transactions" between a bank and its subsidiaries, a prudential control that compels no payment and raises no revenue); 21 U.S.C. §387f(d)(1) (empowering the FDA to "require restrictions on the sale and distribution of a tobacco product," including its "advertising and promotion," a marketing limit that yields no revenue); 44 U.S.C. §2108(a) (applying

"restrictive statutory provisions" governing the "examination and use of records" to the Archivist, a constraint on access that levies nothing).

Context further confirms this textual interpretation. In *Learning Resources*, the Court read "regulate" in light of its associated terms, none of which involved taxation. 607 U.S. at 250 (opinion of the Court) (citing *United States v. Williams*, 553 U.S. 285, 294 (2008)). Sections 212(f) and 215(a) likewise surround the President's authority with words of limitation and exclusion ("suspend," "restrictions," "limitations," "exceptions"), not words of exaction. And the taxing power cannot be smuggled in through a grant of regulatory authority, for "the power to regulate commerce" is "entirely distinct from the right to levy taxes." *Id.* (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824)). That a tax may serve regulatory ends does not mean a grant of regulatory power includes the power to tax. *Id.* at 249; *see supra* Part I.B.

*Trump v. Hawaii* is not to the contrary. The Court there described the President's Section 212(f) discretion as "sweeping," 585 U.S. 667, 693 (2018), but only within its proper "sphere," *id.* at 686, which the Court defined as "whether to suspend entry, whose entry to suspend, and for

how long," *id.* at 693. Nothing in that sphere concerns how much money to raise, from whom, and for the general Treasury.

### D. Congress's detailed INA fee scheme confirms the absence of a delegated taxing power.

When Congress authorizes monetary exactions under the INA, it does so expressly and fixes the amounts. The H-1B program carries an enumerated fraud-prevention-and-detection fee, 8 U.S.C. §1184(c)(12)(A)–(C); a filing fee, *id.* §1184(c)(9)(A)–(C); an additional fee on employers with an H-1B-heavy workforce, Pub. L. No. 114-113, §402(g), 129 Stat. 2242, 3006 (2015); and a premium-processing fee, 8 U.S.C. §1356(u)(3). Where Congress delegated authority to set charges, moreover, it limited them to recovery of costs, directing that fees be set to "ensure recovery of the full costs" of the services provided. *Id.* §1356(m).

Congress specified not only that these exactions exist but how they are imposed, collected, and spent. As this Court catalogued in its order denying a stay pending appeal, the INA repeatedly provides that a named officer "shall impose a fee," *see* 8 U.S.C. §1184(c)(9)(A), (11)(A), (12)(A), and then directs how the proceeds are to be divided and used, *see id.* §1356(s) (allocating collections among agency programs and STEM

education); *id.* §1356(m) (cost recovery); *id.* §1356(v) (fraud detection). *Mullin*, 183 F.4th at 50. "[T]hat pattern also indicates that when Congress has done so, it has specified how the funds should be collected and used." *Id.* at 50. By contrast, the exaction the Government seeks to impose has no cost-recovery purpose.

Canons of statutory interpretation further support this conclusion. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration in original) (citation omitted). "[W]hen Congress wished to" authorize monetary exactions under the INA, "it knew how to do so and did so expressly." *See Transamerica Mortg. Advisors*, 444 U.S. at 21 (citation omitted) (discussing canon of *expressio unius est exclusio alterius*). *Learning Resources* drew a similar inference: against a "backdrop of clear and limited delegations" in the specific trade statutes, which used words like "duty," capped rates and durations, and imposed procedural prerequisites, IEEPA's silence showed that Congress had not delegated the tariff power. 607 U.S. at 243–44 (plurality opinion).

### E. The century-plus absence of any revenue use of Sections 212(f) and 215(a) militates against the existence of the power.

Presidents have imposed restrictions under Section 212(f) scores of times since 1981 and never used it to impose a monetary exaction. As this Court has observed, "the defendants do not dispute that neither §1182(f) nor §1185(a) has ever been used to impose a fee or payment of this kind." *Mullin*, 183 F.4th at 50.

Under *Learning Resources*, that uncontested history is highly persuasive. The Court held that "the fact that no President has ever found such power in IEEPA is strong evidence that it does not exist." 607 U.S. at 250 (opinion of the Court) (citing *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 351–52 (1941)). The same logic applies here. The Government's remaining defenses fail under *Learning Resources*.

#### 1. Greater-includes-the-lesser.

The Government's principal argument is that the power to exclude entrants must include the lesser power to charge them for entry. *Learning Resources* rejected the identical argument. The Court explained that tariffs are "different in kind, not degree, from the other authorities." 607 U.S. at 252 (opinion of the Court). As compared with the regulatory terms "compel" and "prohibit," which lie on a spectrum

between two opposite poles, tariffs "operate directly on domestic importers to raise revenue" and, therefore, "fall outside the spectrum entirely." *Id.* at 251-52. Similarly, the power to restrict entry no more includes the power to tax it than the power to prohibit imports includes the power to tariff them.

**2. Inherent executive power over entry.**

The Government's suggestion that the Executive possesses an inherent power to condition entry on payment finds no support in the cases it cites. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982), concerned an Indian tribe's power to tax as "a fundamental attribute of sovereignty," not a question of executive power analyzed through a separation of powers lens. *See id.* (citation omitted). And whatever *Knauff* said about the power to exclude aliens, it did not find any inherent executive power to do so via tax power. 338 U.S. at 542. As one court put it in enjoining an earlier H-1B entry suspension, "there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative." *Nat'l Ass'n of Mfrs.*, 491 F.Supp.3d at 563.

***Algonquin.*** The Government relies on *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976), which upheld license fees on imports under a statute authorizing the President to "adjust the imports" of a good. But *Learning Resources* already rejected this argument. The statute there had an "explicit reference" to duties, making it natural to read it to authorize them. 607 U.S. at 254 (opinion of the Court). Neither Section 212(f) nor Section 215(a) nor any other H-1B provision references a payment requirement. The Court expressly "decline[d] to extend *Algonquin*'s expressly 'limited' holding any further." *Id.* (quoting *Algonquin*, 426 U.S. at 571). This Court correctly applied that holding, rejecting the Government's reliance on *Algonquin* for the same reason. *Mullin*, 183 F.4th at 50.

***

It is clear that under *Learning Resources*, Sections 212(f) and 215(a) do not authorize the $100,000 exaction. This Court should again reach this same conclusion.

## II. THE GOVERNMENT'S INTERPRETATION OF SECTION 212(F) RUNS AFOUL OF THE MAJOR QUESTIONS DOCTRINE.

The major questions doctrine requires Congress to "speak clearly" when it delegates to the executive "decisions of vast 'economic and

political significance.'" *Util. Air Regul. Grp.*, 573 U.S. at 324; *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (the Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance" (citation modified)).

In this case, it is far from clear that Congress has delegated the sweeping authority claimed by the Government at all – much less that it has done so clearly. *See supra* Part I.

### A. The imposition of $100,000 fees on H-1B visas raises a major question.

The issue at stake in the present case is obviously a major question. The Government's position would enable the executive branch to impose unlimited fees on virtually any type of visa or entry into the US. That would enable it to extract tens of billions of dollars from foreign workers, immigrants, and sponsoring organizations every year. It would also have massive effects on the US economy. *See* Abramitzky et al., *supra* (noting major economic impact of H-1B visa holders).

The magnitude of the effects here is comparable to that of other policies the Supreme Court has ruled to be major questions. For example, the Court ruled that a nationwide temporary eviction moratorium raises

a major question. *Ala. Ass'n of Realtors*, 594 U.S. at 764. That moratorium was estimated to cost landlords some $26 billion. *See* Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium*, REASON (Aug. 3, 2021), https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium/. The Court likewise found a major question in a nationwide COVID-19 vaccination mandate for employees of firms with 100 or more workers, even though the cost of getting vaccinated by then was low, thereby reducing the potential economic impact of the mandate. *See NFIB v. OSHA*, 595 U.S. 109 (2022) (per curiam); *cf.* Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority*, 2021–2022 Cato Sup. Ct. Rev. 69, 75–76 (2022) (discussing this aspect of the case).

The fact that the INA has never been invoked to impose massive entry fees further justifies invocation of the major questions doctrine. Similarly, the doctrine counted against the government in *Learning Resources*, because IEEPA had never been used to impose tariffs. *Learning Resources*, 607 U.S. at 245-46 (plurality opinion); *cf. NFIB*, 595

U.S. at 119 (lack of historical precedent for using the statute indicates violation of major questions doctrine).

Moreover, the authority claimed here goes much further than the fees imposed by this particular action. In *West Virginia v. EPA*, 597 U.S. 697 (2022), the Supreme Court held that EPA's claim of authority to regulate emissions raised a major question even though the agency did not at that point have a specific regulatory plan it sought to implement. What matters is the magnitude of the authority claimed, not just how that authority is deployed in a particular case. The question is whether the executive has laid claim to a "highly consequential power." *Id.* at 723–24. Here, it undeniably has.

### B. Taxes on entry are not exempt from the major questions doctrines on the grounds that they are "foreign affairs" issues.

The Government cannot evade application of the major questions doctrine by claiming that visa fees are matters of foreign affairs. There is no general foreign affairs exception to the major questions doctrine. Even if there were, taxes imposed on visas are not purely a foreign affairs issue.

The Federal Circuit has held that the major questions doctrine applies to tariffs, which resemble taxes imposed on visas. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1332-34 (Fed. Cir. 2025), *aff'd sub nom. Learning Resuorces, Inc. v. Trump*, 607 U.S. 229 (2026). In *Learning Resources*, three Justices in the majority likewise concluded that the doctrine applies to tariffs and that no "foreign affairs" exception applies to the tariff power. *Learning Resources*, 607 U.S. at 247-48 (plurality opinion). Chief Justice Roberts emphasized that "the President and Congress *do not* 'enjoy concurrent constitutional authority' to impose tariffs during peacetime" and that "[t]he Framers gave that power to 'Congress alone'—notwithstanding the obvious foreign affairs implications of tariffs." *Id.* (quoting *Merritt v. Welsh*, 104 U.S. 694, 700 (1882)).

This conclusion is further bolstered by constitutional structure and Supreme Court precedent. Like tariffs, immigration restrictions are a congressional power, not an executive one. In the case first recognizing federal power over immigration, the Supreme Court held that this authority belongs to "the legislative department." *Ping*, 130 U.S. at 603. Indeed, the Court "has repeatedly emphasized that 'over no conceivable

subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted); *cf. Kleindienst v. Mandel*, 408 U.S. 753, 766-67 (1972) (articulating that the principle that "[p]olicies pertaining to the entry of aliens … [are] entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government" (quoting *Galvan*, 347 U.S. at 531)).

The Supreme Court has repeatedly applied the major questions doctrine to policies with significant foreign affairs implications. In *Biden v. Nebraska*, the Court rejected a claim of authority to forgive student loans based on a national emergency declaration, even though the asserted authority in question was based on the 2003 HEROES Act, legislation aimed largely at foreign policy emergencies. 600 U.S. 477, 494 (2023). In *West Virginia v. EPA*, the Supreme Court applied major questions doctrine to measures intended to combat climate change, even though that issue is a global problem with international implications. 597 U.S. at 723-32.

Similarly, in *Alabama Association of Realtors*, the Court applied the doctrine to invalidate a nationwide eviction moratorium meant to curb

the spread of COVID-19, even though the statute authorized measures against the "spread of communicable diseases from foreign countries into the States or possessions." 594 U.S. at 761 (quoting 42 U.S.C. §264(a)). The possibility that the eviction moratorium could inhibit the spread of COVID-19 "from foreign countries" did not prevent application of the major questions doctrine. Moreover, the widespread death and economic disruption inflicted by the COVID-19 emergency impacted U.S. foreign policy and national security. *See* Off. of the Dir. of Nat'l Intel., *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022), https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf (outlining the foreign policy implications in detail). In addition, taxes on visas are not purely or even primarily matters of foreign affairs. As in this case, such taxes are often paid by Americans seeking to employ foreign workers. Moreover, they necessarily restrict activities (i.e., employment, scientific research) that occur on US soil.

Restrictions on immigration have massive effects on the US economy, and on Americans seeking to hire or otherwise engage in transactions with foreign workers. Indeed, few other policies have greater effects on the economic choices of US citizens. *See* Ilya Somin, *Immigration and the Economic Freedom of Natives*, 37 PUB. AFFAIRS Q. 226 (2023) (surveying the magnitude of these effects).

## III. IF THE RELEVANT STATUTE GRANTS THE GOVERNMENT THE POWER CLAIMED HERE, IT WOULD BE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE.

If this Court concludes that Section 212(f) grants the executive the power to impose the taxes at issue, it must invalidate the statute under the nondelegation doctrine.

### A. The sweeping delegation claimed by the Government violates the nondelegation doctrine.

The Supreme Court has long held that the nondelegation doctrine requires Congress to supply an "intelligible principle" to constrain executive discretion. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "[I]n examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Consumers' Rsch.*, 606 U.S. at 673 (second

alteration in original) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). Congress must also "provide[] sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* (second alteration in original) (quoting *Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Lab.*, 312 U.S. 126, 144 (1941)).

It is especially important to constrain delegations of authority that encroach on the power to tax: "The power to impose tariffs is 'very clear[ly] … a branch of the taxing power,'" and the Framers "[r]ecogniz[ed] the taxing power's unique importance, and having just fought a revolution motivated in large part by 'taxation without representation.'" *Learning Resources*, 607 U.S. at 240-41 (some alterations in original) (opinion of the Court) (quoting *Gibbons*, 22 U.S. at 201).

Last year, in *FCC v. Consumers' Research*, the Supreme Court held that a delegation of authority to impose taxes or fees must have a "floor" and a "ceiling," and that the "guidance" Congress must give is greater "when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *Consumers' Rsch.*, 606 U.S.

at 673, 681 (citation omitted). The power to impose virtually unlimited taxes on all immigration and work visas is clearly one that affects the entire economy.

The Government's interpretation of Section 212(f) violates these requirements. It supplies no ceiling and enables the imposition of taxes on visas without meaningful limit.

Even a fixed numerical ceiling is not constraining enough if it leaves the executive with what amounts to "boundless power." *Id.* at 680. As the Court explained, a hard $5 trillion limit on the levies the FCC could impose would not suffice, because "[t]he purpose of the nondelegation doctrine is to enforce limits on the 'degree of policy judgment that can be left to those executing or applying the law,'" and "[t]he anywhere-up-to-$5-trillion tax statute would not do that." *Consumers' Rsch.*, 606 U.S. at 680 (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)). Such a permissive approach violates nondelegation constraints because it "effectively leaves [the] agency with boundless power." *Id.* Here, if the executive can use Sections 212(f) and 215(a) to impose unlimited taxes on visas, it would be

enough to impose hundreds of billions of dollars in taxes, and no effective limit constrains its "degree of policy judgment." *Id.* (citation omitted).

### B. Delegations of power over entry are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues.

Just as claimed delegations of tariff authority are not exempt from the major questions doctrine on the grounds that they are "foreign affairs" issues, so they are not exempt from normal constitutional constraints on delegation on that basis. Many of the reasons why tariffs are not exempt from the major questions doctrine also apply to nondelegation. *See supra* Part II.B. Most notably, tariffs are not pure exercises of powers related to foreign affairs; they are taxes imposed on Americans. While they also have an impact on foreign nations, the same thing is true of policies enacted under many other congressional powers. As Justice Gorsuch noted in his concurring opinion in *Learning Resources*, such powers "include not only the power to impose tariffs … but also the power to establish uniform rules of naturalization, … appropriate money for armies, … and define and punish offenses against the law of nations." *Learning Resources*, 607 U.S. at 286 (Gorsuch, J., concurring). If powers touching foreign affairs were largely exempt from

nondelegation constraints, "all these legislative powers and more could be passed wholesale to the executive branch in a few loose statutory terms, no matter what domestic ramifications might follow." *Id.*

Tariffs are also part of the "core congressional power of the purse," over which the President holds no inherent authority of his own. *Learning Resources*, 607 U.S. at 243 (plurality opinion). That distinguishes tariff delegations from delegations of authority in areas where the President does hold inherent power. *See id.* at 286 (Gorsuch, J., concurring) (emphasizing this distinction).

### C. The constitutional avoidance canon requires interpreting Section 212(f) to avoid a sweeping delegation of taxing authority that raises constitutional problems.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). "The question is not whether" an interpretation that avoids constitutional problems "is the most natural interpretation"—"only whether it is a 'fairly possible'" one. *Sebelius*, 567 U.S. at 563 (opinion of Roberts, C.J.) (citation omitted). The severe

nondelegation concerns raised by the government's sweeping interpretation of Section 212(f) are more than sufficient to trigger the constitutional avoidance canon.

The Court can avoid constitutional problems by holding that Section 212(f) does not authorize imposition of taxes on visas. That reading of the statutes is undeniably at least "fairly possible." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

NOVEMBER 12, 2026

Respectfully submitted,

*/s/Phillip H.C. Wilkinson*

Phillip H.C. Wilkinson
WILSON SONSINI
GOODRICH & ROSATI, P.C.
One Market Plaza, Suite 3300
San Francisco, CA 94105
(415) 947-2000
pwilkinson@wsgr.com

Michael W. McConnell
WILSON SONSINI
GOODRICH & ROSATI, P.C.
650 Page Mill Rd.
Palo Alto, CA 94304

Deno Himonas
WILSON SONSINI
GOODRICH & ROSATI, P.C.
95 S. State St., Suite 1000
Salt Lake City, UT 84111

Ilya Somin
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIV.
3301 Fairfax Dr.
Arlington, VA 22201

*COUNSEL FOR AMICI CURIAE*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,480 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced typeface in 14-point Century Schoolbook.

NOVEMBER 12, 2026

Respectfully submitted,

*/s/Phillip H.C. Wilkinson*
Phillip H.C. Wilkinson

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/Phillip H.C. Wilkinson*
Phillip H.C. Wilkinson