No. 26-1699

IN THE

# United States Court of Appeals for the First Circuit

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

*v.*

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARCO RUBIO, in the official capacity as Secretary of State; UNITED STATES DEPARTMENT OF STATE; KEITH E. SONDERLING, in the official capacity as Secretary of Labor; UNITED STATES DEPARTMENT OF LABOR; TODD BLANCHE, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES,

*Defendants-Appellants*,

On Appeal from the United States District Court
for the District of Massachusetts
No. 1:25-cv-13829-LTS, Hon. Leo T. Sorokin

## BRIEF OF PROFESSOR MICHAEL CLEMENS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Geoffrey C. Shaw
Nicole Ries Fox
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071

Anisha S. Dasgupta
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... ii
STATEMENT OF INTEREST .......... 1
INTRODUCTION .......... 2
ARGUMENT .......... 6
I. The Proclamation Imposes A Tax. .......... 6
A. The Payment Qualifies as a Tax Under Defendants' Own Definition. .......... 6
B. Defendants Contradict the Well-Established Definition of a Tax. .......... 12
II. Defendants' Claims Of Economic Harm Find No Support In The Economic Evidence The Proclamation Cites. .......... 17
A. The Proclamation Misstates or Misuses Each Source It Invokes. .......... 18
B. The Broader Economic Literature Contradicts Defendants' Claims of Harm. .......... 29
CONCLUSION .......... 31
ADDENDUM A
CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*California v. Mullin*,
183 F.4th 42 (1st Cir. 2026) .......... 7

*Edye v. Robertson*,
112 U.S. 580 (1884) .......... 16

*Nat'l Cable Television Ass'n v. United States*,
415 U.S. 336 (1974) .......... 16

**Statutes**

22 U.S.C. § 214 .......... 13

26 U.S.C. § 9503 .......... 13

**Rules and Regulations**

DHS, USCIS, *Fee Elasticity Analysis for the U.S. Citizenship and Immigration Services Fee for Certain H-1B Petitions Notice of Proposed Rulemaking* (Aug. 25, 2026), Docket No. USCIS-2026-0298-0003, https://perma.cc/5HGY-EPUU .......... 7, 10, 11

Fee for Certain H-1B Petitions, 91 Fed. Reg. 54,817 (proposed Aug. 25, 2026) .......... 3, 4, 5, 6, 8, 9, 10, 12, 16, 17

IRS, Revenue Ruling 77-29 (1977), https://tinyurl.com/2ew83tjy .......... 15

Proclamation No. 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46,027 (Sept. 24, 2025) .......... 2, 11, 19, 20, 21, 22, 24, 26, 27, 31

**Other Authorities**

Jaison R. Abel & Richard Deitz, *The Labor Market for Recent College Graduates: Outcomes by Major*, Federal Reserve Bank of New York, https://perma.cc/UQZ4-U8ZL (accessed June 25, 2026) .......... 24

Jaison R. Abel et al., *Are Businesses Scaling Back Hiring Due to AI?*, Liberty Street Economics, Federal Reserve Bank of New York (Sept. 4, 2025), https://perma.cc/PY28-FWBT .......... 25

American Immigration Council, *Foreign-born STEM Workers in the United States: Fact Sheet* (June 13, 2022), https://perma.cc/2YND-BSSS .......... 23

David Beckett, Head of Public Sector Classifications, *Taxes and fees for sales of service: how they differ and why it is important*, U.K. Office for National Statistics (May 31, 2019), https://perma.cc/VP3M-QP7U .......... 15

Rebecca Bellan et al., *The running list: major tech layoffs in 2026 where employers cited AI*, TechCrunch (June 22, 2026), https://perma.cc/Y5PT-WKGW .......... 27

Nicholas Bloom, John Van Reenen & Heidi Williams, *A Toolkit of Policies to Promote Innovation*, 33 J. Econ. Perspectives 163 (2019), https://perma.cc/X8RA-SHK3 .......... 30

John Bound, Gaurav Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the US* (Nat'l Bureau of Econ. Rsch., Working Paper No. 23153, 2017), https://perma.cc/UCC4-BEYK .......... 19

John Bound, Gaurav Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the United States*, *in* HIGH-SKILLED MIGRATION TO THE UNITED STATES AND ITS ECONOMIC CONSEQUENCES 109 (Gordon H. Hanson et al. eds. 2018), https://perma.cc/MGK7-L29E .......... 19

Congressional Budget Office, *The Growth of Federal User Charges: A CBO Study* (Aug. 1993), https://tinyurl.com/mr4cm8d9 .......... 14

Daniel Costa & Ron Hira, *H-1B Visas and Prevailing Wage Levels*, Econ. Pol'y Inst. (May 4, 2020), https://tinyurl.com/y42tf39p .......... 21

Natalia Emanuel, Emma Harrington & Amanda Pallais, *The Power of Proximity to Coworkers* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31880, 2023), https://perma.cc/EFP4-9Y86 .......... 25

Jennifer Hunt & Marjolaine Gauthier-Loiselle, *How Much Does Immigration Boost Innovation?*, 2 Am. Econ. J.: Macroeconomics 31 (2010), https://perma.cc/Q2HN-BJQ6 .......... 30

David N. Hyman, *Public Finance* (Cengage 10th ed. 2010) .......... 13

Int'l Monetary Fund, *Government Finance Statistics Manual 2014* ¶ 5.73 (2014), https://perma.cc/T5D2-LBYG .......... 14, 15

Kit Johnson, *Beauty and the Beast: Disney's Use of the Q and H-1B Visas*, 12 N.Y.U. J. L. & Liberty 124 (2018), https://perma.cc/5N5D-M7BQ .......... 28

William R. Kerr & William F. Lincoln, *The Supply Side of Innovation: H-1B Visa Reforms and US Ethnic Invention*, 28 J. Lab. Econ. 473 (2010), https://perma.cc/K9TF-H57G .......... 30

Richard A. Musgrave, *The Theory of Public Finance* (1959) .......... 12

OECD, *Revenue Statistics 2025*, Annex A, The OECD Classification of Taxes and Interpretative Guide (2025), https://perma.cc/C668-AKGQ .......... 14

Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S225 (2015) https://perma.cc/F8EE-MVA2 .......... 29

Marta Prato, *The Global Race for Talent: Brain drain, knowledge transfer, and growth*, 140 Q. J. Econ. 165 (2025), https://perma.cc/U3ZT-728R ..................................................30

Julia Preston, *Lawsuits Claim Disney Colluded to Replace U.S. Workers With Immigrants*, N.Y. Times (Jan. 25, 2016) ..................................................28

Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, N.Y. Times (June 3, 2015), https://tinyurl.com/m4w7h58w..................................................28

Julia Preston, *Toys 'R' Us Brings Temporary Foreign Workers to U.S. to Move Jobs Overseas*, N.Y. Times (Sept. 29, 2015) ..................................................28

RePEc (Research Papers in Economics) database, *Top Economists (Last 10 Years of Publications), as of May 2026 (with details)*, https://perma.cc/8VZV-TK29 ..................................1

Edwin R.A. Seligman, *Essays in Taxation* (8th ed. 1913) ......................12

*Tech layoffs hit two-year high; how AI is driving biggest workforce reset*, MSN (June 16, 2026), https://perma.cc/A8UB-HB9X..................................................27

United Nations et al., *System of National Accounts 2008* (2009), https://perma.cc/W8A9-842M..................................................14

USCIS, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2024 Annual Report to Congress* (Apr. 29, 2025), https://perma.cc/W3H4-7255.......................................8

USCIS, *H-1B Employer Data Hub*, https://perma.cc/FMF9-YESP (accessed Nov. 6, 2026)..................................................29

Kelsey Ziser et al., *Tech company layoffs: The post-pandemic correction meets AI realignment*, Information Week (Dec. 22, 2025), https://tinyurl.com/56fd2efa ..............................................26

## STATEMENT OF INTEREST[1]

Amicus curiae Professor Michael Clemens is an economist of global standing who studies the field of immigration, its impact on the American economy, and the history of immigration policy. He is a tenured Professor at the School of Government & Policy at Johns Hopkins University and ranks among the top one percent of most-cited economists for work published in the last ten years.[2] Federal courts and policymakers in the White House, National Security Council, the Department of Homeland Security, and foreign governments have relied on his work. Professor Clemens submits this brief on his own behalf, as an individual and expert in his academic field, in the interest of ensuring that immigration regulation in the United States proceeds from the best available empirical understanding of its impacts and how policy shapes those impacts.

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any person other than amicus or his counsel contributed money intended to fund preparing or submitting this brief. University affiliation is provided for identification purposes only. All parties have consented to the filing of this brief.

[2] RePEc (Research Papers in Economics) database, *Top Economists (Last 10 Years of Publications), as of May 2026 (with details)*, https://perma.cc/8VZV-TK29 (accessed June 22, 2026).

## INTRODUCTION

Defendants seek to reinstate a vacated presidential Proclamation requiring a $100,000 payment for each person entering the United States on an H-1B visa. *See* Proclamation No. 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46,027 (Sept. 24, 2025) (the "Proclamation"). This request is based on assertions that the $100,000 exaction is an "immigration regulation" and not a tax, and assertions in the Proclamation that the H-1B program causes urgent harms to American workers and the national economy. From an empirical economic perspective, both premises are incorrect.

Amicus has comprehensively analyzed the factual claims made by Defendants and by the Proclamation. Defendants' cited authorities for their claim that the payment is not a tax are at odds with their own projections, and contradict the definitions of fees and taxes in the economic research field of public finance. Amicus has also comprehensively reviewed the economic evidence referenced in the Proclamation, which constitutes the sole evidence of harm mentioned by Defendants, and has found that the Proclamation misrepresents or incorrectly characterizes each of its sources.

The government's contention that the payment reflects a regulatory fee and not a tax fails. First, the government contradicts its own projections of the impact of the payment. Defendants assert that this $100,000 payment, collected by the Department of Homeland Security (DHS), is not a tax because "the Proclamation is designed to regulate immigration, not to raise revenue." Opening Brief for Appellants at 16 (filed Sept. 8, 2026) ("OB"). Defendants state, "The purpose is to incentivize the hiring of American workers," OB 24, and say that "the statute must be capable of restricting entry to improve the domestic job market, as the Proclamation here is designed to do," OB 35. But Defendants themselves project that an essentially identical payment of $103,265 for each cap-subject H-1B petition, proposed by Defendants in August, will raise revenue but will not change the number of H-1B workers in the U.S. labor market: DHS projects that the H-1B cap will continue to fill at 85,000 workers per year under a $103,265 payment, exactly as it does without one. Fee for Certain H-1B Petitions, 91 Fed. Reg. 54,817, 54,834 (proposed Aug. 25, 2026) (DHS Docket No. USCIS-2026-0298) ("NPRM"). DHS's projection that the $103,265 payment will raise $8.8 billion per year, "used to reimburse

other executive branch departments, agencies, or DHS components," *id.* at 54,832, rests on its projection that employer demand for H-1B workers is "inelastic," *id.* at 54,835. That is, the payment will not affect the number of H-1B workers sought for the U.S. labor market. There is no plausible economic mechanism by which a payment that leaves the supply of foreign workers unchanged can "incentivize the hiring of American workers," and Defendants suggest none. OB 24. Defendants fail to explain how a $100,000 payment charged by DHS to H-1B sponsors both limits the supply of H-1B workers and raises the projected revenue. Defendants' own projections demonstrate that the $100,000 payment in the Proclamation is a tax by their criteria.

In addition to the payment not being a "fee" from a legal perspective (*see* Plaintiff-Appellees' Answering Brief at 18-35 (filed November 4, 2026) ("RB"), the payment is not a "fee" from an economic perspective either. Under standard fiscal and regulatory economic definitions, a tax payment funds general public purposes, while a fee is earmarked to offset the cost of a specific service to the payer. The Proclamation's $100,000 exaction goes to general revenue; Defendants do not identify any specific cost it supposedly offsets. Defendants have

likewise found that the revenue from an essentially identical payment of $103,265 by the same H-1B sponsors is not needed to offset the cost of services DHS or other agencies provide to H-1B sponsors but instead broadly finances "the costs of administering the lawful immigration system" including activities unconnected to H-1B sponsorship such as patrolling the border "between ports of entry" (91 Fed. Reg. at 54,819). Defendants' effort to portray this payment as a regulatory fee thus defies basic economic understanding and usage, as well as Defendants' own analysis.

The government's claims of harm if the Proclamation is not reinstated also fail. The government supports those claims of harm exclusively by referring to the Proclamation itself, without citing any other source, evidence, or research. The Proclamation, in turn, references only one genuine economic study of the nationwide impacts associated with the H-1B program, and misrepresents that study. The study demonstrates that the H-1B program provides a multibillion-dollar annual *benefit* to 99 percent of American workers and massive stimulus to the national economy, which is not mentioned by Defendants or by the Proclamation. Defendants simply have no factual

basis for their claim that reinstatement of the Proclamation is necessary to avoid harms to the American public. The sole economic study they reference finds that *restricting* the H-1B program would harm almost all workers.

In sum, the judgment should be affirmed.

## ARGUMENT

### I. The Proclamation Imposes A Tax.

Defendants argue that the $100,000 payment they demand from H-1B entrants is "not a tax at all," OB 23, because "the Proclamation is designed to regulate immigration, not to raise revenue," OB 16.

#### A. The Payment Qualifies as a Tax Under Defendants' Own Definition.

Defendants have directly contradicted their claim that the payment is not a tax in their own projections of the effects of another, essentially identical payment that DHS proposes to charge H-1B sponsoring firms. Before the Appellants' Brief was filed, DHS issued a Notice of Proposed Rulemaking to require a $103,265 payment with each petition for a cap-subject H-1B visa for initial employment. NPRM, 91 Fed. Reg. at 54,817. This new H-1B payment of very close to $100,000 was proposed by Defendant DHS a month before expiration of

the one-year term of the $100,000 payment to DHS mandated by the Proclamation, and a month after this Court denied a stay of the judgment vacating the Proclamation. *California v. Mullin*, 183 F.4th 42 (1st Cir. 2026).

The NPRM is a proposal, not a final rule, and amicus does not treat it as binding the United States. But it is the only quantitative analysis of a six-figure H-1B charge that any Defendant has produced. Its projections are DHS's own, supported by a technical appendix estimating how employers will respond to H-1B payments.[3] The Appellants' Brief, by contrast, offers no analysis or evidence of any kind on how the $100,000 payment affects the supply of H-1B workers or the revenue of the United States.

The amount and incidence of the $103,265 payment proposed by Defendant DHS are essentially identical to those of the payment in the Proclamation. Both are flat charges set at or very close to $100,000 per worker, paid by the sponsoring employer to DHS as a condition for that

---

[3] DHS, USCIS, *Fee Elasticity Analysis for the U.S. Citizenship and Immigration Services Fee for Certain H-1B Petitions Notice of Proposed Rulemaking* (Aug. 25, 2026), Docket No. USCIS-2026-0298-0003, https://perma.cc/5HGY-EPUU ("Elasticity Analysis").

worker's employment. The two differ only at the margins of coverage, with the NPRM payment affecting more H-1B workers. The NPRM payment applies to all 85,000 cap-subject H-1B workers per year. The Proclamation's payment applies to H-1B workers outside the United States, which were 46 percent of H-1B petitions approved for initial employment in the most recent data—that is, approximately 65,000.[4]

Defendant DHS projects that the NPRM's $103,265 payment will not reduce the supply of H-1B workers. DHS acknowledges that some employers "may file fewer petitions," 91 Fed. Reg. at 54,821, and projects that cap-subject petition receipts will fall from a five-year average of 96,750 to 85,000, *id.* at 54,835. But 85,000 is the statutory cap, and petitions in excess of the cap cannot be approved in any event. *Id.* at 54,834. DHS therefore projects that the number of cap-subject H-1B workers approved each year will remain at 85,000—the full quota—with or without the payment. According to the NPRM, "[i]f this rule were finalized as proposed, DHS anticipates a projected volume of 85,000 would be subject to the proposed additional fee." *Id.* This is

---

[4] USCIS, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2024 Annual Report to Congress* § 2.11 (Apr. 29, 2025), https://perma.cc/W3H4-7255.

because employer demand for H-1B petitions is "inelastic," *id.* at 54,835, and the simulation DHS relies on shows "that the demand for H-1B visas will not go below 85,000 for a fees [sic] above $100,000," *id.*

This estimate by Defendant DHS directly contradicts Defendants' statements about the nature of the Proclamation's $100,000 payment. Defendants state that "[t]he purpose is to incentivize the hiring of American workers," OB 24, by "restricting entry to improve the domestic job market, as the Proclamation here is designed to do", OB 35—"not to raise revenue," OB 16, 25. In sum, DHS projects that an almost identical payment, charged by the same agency to the same firms for the same visa, will not reduce the supply of foreign labor, because the same number of H-1B workers will be approved and employed. There is no plausible economic mechanism by which a policy with no effect on the supply of foreign workers could "incentivize the hiring of American workers," and neither the Proclamation nor Defendants' brief offers one.

For the same reason, Defendant DHS's own projections show that the $100,000 payment serves the purpose of generating revenue. DHS states of the $103,265 payment that "the purpose of this proposed rule

is to generate additional revenue," and that the agency only "believes" that the payment "would have indirect benefits" by making "U.S. employers … less likely to hire an H-1B worker over a qualified and highly-skilled American worker." 91 Fed. Reg. at 54,832.

Defendants may respond that the Proclamation, unlike the NPRM's proposed payment, applies only to workers abroad, so that even if the cap fills, it fills with different workers. Defendant DHS's own analysis of the Proclamation's first eight months suggests this: initial petitions for beneficiaries abroad fell by 91 percent. Elasticity Analysis, *supra* note 3, Tables A.6–A.7. But that is a change in the composition of H-1B petitions, not a change in the ultimate number of H-1B workers.

Nowhere does the Proclamation say, and nowhere do Defendants claim, that the Proclamation's purpose is to alter the composition of the HB-1 worker pool. Defendants' claims of regulatory purpose are all claims about the number of foreign workers employed in the United States. According to Defendants, the Proclamation "protects American workers and ensures that only truly necessary foreign workers receive H-1B visas," OB 21; its purpose "is to incentivize the hiring of American workers," OB 24; it is meant to keep aliens from "tak[ing] vital

American jobs," OB 1; and it is "designed" to "improve the domestic job market," OB 35. Each of those claims requires that fewer H-1B workers be employed. None of them can be true of a payment that, according to DHS's own projection, leaves the number of employed H-1B workers constant at the statutory cap of 85,000.

And nowhere do Defendants or the Proclamation claim that the Proclamation's purpose is to protect American workers only from H-1B workers who are not already in the country. The stated concerns relate only to H-1B workers generally. 90 Fed. Reg. at 46,027–28. The only entries that DHS's data suggest the Proclamation reduced were those sponsored by cap-exempt employers like universities and nonprofit research organizations. Elasticity Analysis, *supra* note 3, Table A.7. But the Proclamation refers only to "firms," "companies," "employers," and "sectors," and never mentions universities, nonprofits, or other cap-exempt employers, 90 Fed. Reg. at 46,027–28. Private firms are the exclusive focus of the stated justifications for the Proclamation and DHS's NPRM.

To be sure, fewer petitions for workers abroad means fewer ordinary petition filing fees of $460 to $1,380 each. Elasticity Analysis,

*supra* note 3, Table A.1. But a decline in ordinary and relatively small filing fees is not evidence that a $100,000 payment for each remaining petition fails to raise revenue. DHS projects that the equivalent payment of $103,265 will raise $8.8 billion per year. 91 Fed. Reg. at 54,832.

### B. Defendants Contradict the Well-Established Definition of a Tax.

Defendants' claim that the $100,000 payment is not a tax is wrong from an economic and a legal perspective. The field of economics that studies taxation is known as public finance. That field distinguishes taxes from regulation based on where the revenue goes. This distinction has been constant since the foundation of the field of public finance: "A tax is a compulsory contribution from the person to the government … without reference to special benefits conferred," not to cover the cost of a "service undertaken by the government." Edwin R.A. Seligman, *Essays in Taxation* 432 (8th ed. 1913). The field's leading modern treatise draws the same line: a tax is a compulsory payment whose amount "cannot be determined according to each person's actual consumption of public services." Richard A. Musgrave, *The Theory of Public Finance* 72 (1959). Today's literature on fiscal economics and

fiscal regulation is unwavering in this distinction: "Taxes, the principal means of financing government expenditures, are compulsory payments that *do not necessarily bear any direct relationship to the benefits from government goods and services received*." David N. Hyman, *Public Finance* 21 (Cengage 10th ed. 2010) (emphasis added). In short, compulsory payments that offset an agency's cost of providing a benefit to the payer are fees, and compulsory payments not directly linked to such a cost are taxes.

This is why economists understand that a passport *fee* is not a tax: it bears a direct and quantitatively commensurate relationship to the cost of providing a private benefit (22 U.S.C. § 214). It is also why the federal gasoline *tax* is a tax: its revenue does not have a direct quantitative relationship to a private good or service provided to the payer, but finances government operations related to transportation that benefit many citizens at once (26 U.S.C. § 9503).

The federal government's own definition of a tax confirms that consensus view. As the Congressional Budget Office has explained, "fees and taxes" are distinguishable "based on whether charges are levied for purely private benefits" (as in the case of a fee) "or whether they confer

public benefits that are independent of, rather than incidental to, private benefits" (as in the case of a tax).[5]

The same definition governs the international statistical standards under which the United States and every other major economy report their public finances. The Organisation for Economic Co-operation and Development classifies as taxes all "compulsory unrequited payments to general government," unrequited in that the "benefits provided by government to taxpayers are not normally in proportion to their payments."[6] Under the United Nations System of National Accounts and the International Monetary Fund's Government Finance Statistics Manual, a compulsory payment for a government permit is recorded as a tax rather than as the sale of a service when the payment is "clearly out of all proportion to the costs of providing the services."[7] Applying that standard, the United Kingdom's Office for

[5] Congressional Budget Office, *The Growth of Federal User Charges: A CBO Study* 15 (Aug. 1993), https://tinyurl.com/mr4cm8d9.

[6] OECD, *Revenue Statistics 2025*, Annex A, The OECD Classification of Taxes and Interpretative Guide ¶ 1 (2025), https://perma.cc/C668-AKGQ.

[7] United Nations et al., *System of National Accounts 2008* ¶ 8.54 (2009), https://perma.cc/W8A9-842M (quoted); *see also* Int'l Monetary Fund,

National Statistics reclassified that country's visa charges as taxes in 2019.[8]

"Regulatory payments," in contrast, represent a charge for services. When payments are imposed as a "regulatory measure," the revenue has the "specific purpose" of offsetting the cost of "a privilege or service rendered."[9] Defendants state that the $100,000 H-1B payment is "designed to mitigate the external costs of bringing such aliens into the country," OB 18, and to "mitigat[e]" the "negative externalities of such entry," OB 28. That is, Defendants accept that the purpose of the payment is not to compensate the government for the cost of providing any particular service.

This economic usage in the field of public finance follows the long-established legal distinction between taxes and regulatory payments. *See* RB 18-22. Defendants' principal authority only confirms this. In

---

*Government Finance Statistics Manual 2014* ¶ 5.73 (2014), https://perma.cc/T5D2-LBYG. Both standards also record such a payment as a tax where the permit is granted automatically with "little or no work" by the government. *Id.*

[8] David Beckett, Head of Public Sector Classifications, *Taxes and fees for sales of service: how they differ and why it is important*, U.K. Office for National Statistics (May 31, 2019), https://perma.cc/VP3M-QP7U.

[9] IRS, Revenue Ruling 77-29 (1977), https://tinyurl.com/2ew83tjy.

*Edye v. Robertson*, 112 U.S. 580 (1884), the Supreme Court held that a fifty-cent charge on every immigrant arriving by vessel was an exercise of the commerce power rather than the taxing power. In reaching that conclusion the Court relied on a specific fact about the "real purpose and effect of the statute," *id.* at 595: the money collected "[did] not go to the general support of the government," but went into a dedicated fund for the care of arriving immigrants. *Id.* at 596. That direct tie between the payment and a benefit for the payers, the Court held, is what distinguished the payment from a tax. The Supreme Court reiterated this definition in *National Cable Television Ass'n v. United States*, 415 U.S. 336 (1974): "A 'fee' connotes a 'benefit,'" one that "bestows a benefit on the applicant, not shared by other members of society," whereas a tax may "disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay." *Id.* at 340–41. DHS describes its proposed $103,265 payment in exactly the latter terms. It states that it proposes to charge H-1B employers this amount because they "have more ability to pay," 91 Fed. Reg. at 54,820, "with an emphasis on the ability-to-pay principle," *id.* at 54,821.

Similarly, the compulsory $100,000 payment under the Proclamation goes into the general Treasury and Defendants nowhere claim that the payment is for $100,000 of services to the firms that paid. *See* Dist. Ct. Dkt. 93-12 ¶ 7; Dist. Ct. Dkt. 93 at 22. Indeed, Defendants have specifically documented that the government activities financed by the nearly identical payment of $103,265 that would be remitted to DHS by H-1B sponsoring firms have little basis in the cost of any service or benefit provided to H-1B sponsors. The funded activities instead comprise a range of functions across several agencies, such as processing asylum claims (91 Fed. Reg. at 54,829) and patrolling the border (*id.* at 54,819). These traits of the payment define it as a tax.

## II. Defendants' Claims Of Economic Harm Find No Support In The Economic Evidence The Proclamation Cites.

To support their claims of economic harm, Defendants rely entirely on the Proclamation itself. Their brief cites no study, report, declaration, or other evidence of harm. *See* OB viii. And it concedes that the Proclamation is "the only evidence of purpose here," OB 25. Defendants assert that the district court's judgment "opened the floodgates to aliens entering the country to take vital American jobs,"

OB 1, that "the harms caused by the flood of H-1B workers to American workers is stark," OB 3, that the H-1B program has been used "to import lower-paid, lower-skilled workers—thereby artificially depressing wages and employment opportunities for Americans," OB 1, and (quoting the Proclamation) that the program "has undermined both our economic and national security," OB 7.

Amicus has conducted a comprehensive review of the factual assertions in the Proclamation. The review shows that far from supporting Defendants' claims of harm, the economic evidence cited by the Proclamation contradicts Defendants' claims at almost every turn.[10]

### A. The Proclamation Misstates or Misuses Each Source It Invokes.

Amicus has conducted a close review of the purported bases for the Proclamation's assertions of economic harm. The sources do not support the assertions. Instead, the Proclamation misconstrues and grossly overstates the underlying source material. In some instances, the sources flat out contradict the Proclamation's assertions of harm.

---

[10] Because the Proclamation cites no sources for its factual assertions, amicus forensically identified the apparent source for each specific economic claim. A table comparing the text of the Proclamation against the sources (Addendum A) is included as an addendum to this brief.

*The "2017 study" on "wages for American computer scientists."*

The only study about the economic effects of H-1B workers that the Proclamation specifically references is a "2017 study" showing a decline in "wages for American computer scientists" supposedly caused by "the importation of foreign workers into the computer science field." 90 Fed. Reg. at 46,028. That study was conducted by John Bound, Gaurav Khanna, and Nicolas Morales in 2017.[11] And even the most cursory review of it shows that it does not support the Proclamation's claim of economic harm. The study's central finding is that H-1B immigration from 1994 to 2001 produced *multibillion-dollar annual benefits* for approximately 99 percent of U.S. workers, including workers both with and without college degrees, as well as gains to businesses, productivity, and national growth.[12]

---

[11] John Bound, Gaurav Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the US* (Nat'l Bureau of Econ. Rsch., Working Paper No. 23153, 2017), https://perma.cc/UCC4-BEYK ("Bound 2017"). Final version published as John Bound, Gaurav Khanna & Nicolas Morales, *Understanding the Economic Impact of the H-1B Program on the United States*, *in* HIGH-SKILLED MIGRATION TO THE UNITED STATES AND ITS ECONOMIC CONSEQUENCES 109 (Gordon H. Hanson et al. eds. 2018), https://perma.cc/MGK7-L29E ("Bound 2018").

[12] Specifically, the study shows that H-1B immigration from 1994 to 2001 raised the welfare of all U.S.-born workers by about 0.20–0.27%,

Neither the Proclamation nor Defendants' briefing mentions this headline finding. Instead, the Proclamation cherry-picks one subsidiary finding in the study—that from 1994 to 2001, directly competing U.S. computer-science workers experienced a small decline in wages. 90 Fed. Reg. at 46,028 (citing "[a] 2017 study"). That one quoted data point is in fact an exception to the overall findings in the study, for one small sub-group of the population studied. Furthermore, Defendants do not explain how evidence from between 25 and 32 years ago (1994 to 2001) about one small group of U.S. workers could, even in principle, constitute compelling evidence of pressing economic harms in 2026. Nor is the benefit limited to that period: the subsequent research literature on later years, discussed in Part II.B below, likewise finds large and broadly shared productivity benefits to American workers as a whole.

---

worth $8.2–10.9 billion per year (Bound 2018, *supra*, at Table 4.6); it raised non-computer-science college workers' welfare by 0.04–0.28%, worth $0.6–4.3 billion (*Id.* at Table 4.6); it raised non-college workers' welfare by 0.43–0.52%, worth $10.2–13.0 billion (*Id.* at Table 4.6); and it raised IT-sector profits (capital income for largely U.S. investors) by 0.61–0.70%, worth $0.78–0.89 billion (*Id.* at 159, Table 4.7). The study estimates (*Id.* at Table 4.3) that during the period the authors analyze, 1994 to 2001, between 98.8 and 99.0% of U.S. workers were either college-educated non-computer-science workers, or non-college-educated workers—the groups for which they find large economic benefits caused by the H-1B program.

The overall findings of the 2017 study specifically reject Defendants' claims that H-1B workers "undercut[] American worker wages and opportunities," OB 8, or are "artificially depressing wages and employment opportunities for Americans," OB 1. *See also* 90 Fed. Reg. at 46,027.

*The "study of tech workers" relating to IT outsourcing.*

The Proclamation cites a "study of tech workers" that purportedly "showed a 36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers," and attributes that discount to "H-1B-reliant IT outsourcing." 90 Fed. Reg. at 46,027. This most likely refers to an Economic Policy Institute article by Daniel Costa and Ron Hira, titled *H-1B Visas and Prevailing Wage Levels*.[13] The study compares entry-level H-1B software-developer wages in the Washington, D.C. metropolitan area with the average wage of workers in the same occupation across all experience and seniority levels. It finds that in 2019, in the Washington, D.C. metropolitan area *only*, the average *entry-level* wage for H-1B software developers was 36 percent

[13] Daniel Costa & Ron Hira, *H-1B Visas and Prevailing Wage Levels*, Econ. Pol'y Inst. (May 4, 2020), https://tinyurl.com/y42tf39p.

below the average U.S. wage for *all* workers *at all levels* in the same occupational category.[14]

This comparison does not demonstrate or even suggest that H-1B workers are paid less than U.S. workers performing the same work. Entry-level workers earn much less than workers of average experience and seniority in essentially all professional occupations. The study does not reach any finding about the effects of H-1B workers on U.S. workers' wages or the economy more generally. Nonetheless, the Proclamation misleadingly suggests that the study concerns H-1B wages in general, rather than H-1B wages in a single category of worker seniority, in a single year, in a single metropolitan area.

*"Fact sheet" on increase in STEM labor*

The Proclamation cites an increase in the "number of foreign STEM workers in the United States" between 2000 and 2019 and claims that "the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa." 90 Fed. Reg. at 46,027. Amicus found only one source providing the "44.5 percent" increase that the Proclamation references. That is an American Immigration Council

---

[14] *Id.* at 8.

internet "Fact Sheet" reporting that "[b]etween 2000 and 2019, the overall number of STEM workers in the United States increased by 44.5 percent, from 7.5 million to more than 10.8 million."[15]

Contrary to the Proclamation's characterizations of it, this source contains no evidence that increase in foreign STEM workers was caused by "abuse of the H-1B visa"; it simply reports the rise. And in fact, the report actually advocates for an *increase* in the availability of H-1B visas, reporting that "[r]esearch has shown that areas which attract more high-skilled foreign-born workers see faster rates of growth in labor productivity."[16] The Proclamation's claims about "abuse of the H-1B visa" have no support in any economic evidence of which Amicus is aware, and in fact are undermined by the very sources the Proclamation references.

*Federal Reserve Bank data on unemployment rates.*

The Proclamation claims that "the abuse of the H-1B visa program has made it even more challenging for college graduates trying to find

---

[15] American Immigration Council, *Foreign-born STEM Workers in the United States: Fact Sheet* (June 13, 2022), https://perma.cc/2YND-BSSS.

[16] *Id.*

IT jobs, allowing employers to hire foreign workers at a significant discount to American workers." 90 Fed. Reg. at 46,027. It cites to "a study from the Federal Reserve Bank of New York" showing that "among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively—more than double the unemployment rates of recent biology and art history graduates." *Id.*

These numbers come from a data dashboard published by the Federal Reserve Bank of New York (FRBNY).[17] The Proclamation's use of those numbers is misleading at best. The existence of any given unemployment rate in any occupation and in any year does not reveal the reason for the rate. Nor does the source purport to explain the unemployment numbers it reports. The source is simply a standalone table of numbers on the website of the FRBNY, not a "study" of any kind, much less a study of immigration.

---

[17] Jaison R. Abel & Richard Deitz, *The Labor Market for Recent College Graduates: Outcomes by Major*, Federal Reserve Bank of New York, https://perma.cc/UQZ4-U8ZL (accessed June 25, 2026). 2025 edition archived at: https://tinyurl.com/md8m29jd.

Defendants' statements in the Proclamation also grossly misrepresent the research of FRBNY economists more broadly. FRBNY economists have directly investigated the causes of high unemployment for recent computer science graduates and traced it to factors other than immigration. For example, Natalia Emanuel of the FRBNY and her co-authors found in one study that the rise of remote work after the COVID-19 pandemic harmed training and mentorship opportunities for recent computer science graduates, causing 64 percent of the rise in their unemployment rates.[18] Other studies written by the economists who created the data dashboard cited by the Proclamation focus on the role of technological change and the rise of artificial intelligence, and do not mention immigration.[19]

*Tech company layoffs of "highly skilled American workers."*

The Proclamation cites "[r]eports" that "indicate that many American tech companies have laid off their qualified and highly skilled

---

[18] Natalia Emanuel, Emma Harrington & Amanda Pallais, *The Power of Proximity to Coworkers* (Nat'l Bureau of Econ. Rsch., Working Paper No. 31880, 2023), https://perma.cc/EFP4-9Y86.

[19] *See, e.g.*, Jaison R. Abel et al., *Are Businesses Scaling Back Hiring Due to AI?*, Liberty Street Economics, Federal Reserve Bank of New York (Sept. 4, 2025), https://perma.cc/PY28-FWBT.

American workers and simultaneously hired thousands of H-1B workers." *See* 90 Fed. Reg. at 46,027-28. The Proclamation's claim of a causal connection between those layoffs and the hiring of H-1B visa holders has no evidentiary or statistical support.

For one, the fact that H-1B hiring and layoffs can occur in the same firm at the same time does not demonstrate or suggest that H-1B workers *caused* layoffs. Layoffs at tech firms can arise from eliminating managerial layers, reallocating resources toward AI data centers, rebalancing skills toward new technical needs, canceling projects or entire divisions, shifting from product development to cybersecurity, or a wide range of other forces.

Indeed, the Proclamation ignores widely available evidence that undercuts the unsupported conjecture it makes. For instance, analyses of recent layoffs by various tech companies have found that those layoffs arose primarily from technological shocks and restructuring in response to competitive pressure.[20] This undermines the Proclamation's suggestion that the H-1B program played any causal role in the layoffs.

---

[20] Kelsey Ziser et al., *Tech company layoffs: The post-pandemic correction meets AI realignment*, Information Week (Dec. 22, 2025),

*Claims of "indignity" to American IT workers.*

The Proclamation reports that "American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance." 90 Fed. Reg. at 46,028. According to the Proclamation, "[t]his suggests H-1B visas are not being used to fill occupational shortages or obtain highly skilled workers who are unavailable in the United States." *Id.*

This claim does not state what specific facts it refers to, when this occurred, or how often it has occurred. Vague claims of "indignities" experienced an unspecified number of times, an unspecified number of years ago, do not demonstrate or suggest an ongoing economic emergency.

Press reports do contain anecdotes of events, 11 years ago, that fit this vague description. An influential investigation by the *New York Times* documented that at least about 200 and at most about 500 U.S.

---

https://tinyurl.com/56fd2efa; Rebecca Bellan et al., *The running list: major tech layoffs in 2026 where employers cited AI*, TechCrunch (June 22, 2026), https://perma.cc/Y5PT-WKGW; *Tech layoffs hit two-year high; how AI is driving biggest workforce reset*, MSN (June 16, 2026), https://perma.cc/A8UB-HB9X.

workers had been laid off from five firms and apparently replaced with H-1B workers that they were obliged to train.[21] A substantial but unclear portion of the workers laid off were not replaced by anyone.

If these events are indeed the evidence Defendants reference in the Proclamation, they certainly do not demonstrate or suggest an ongoing economic harm. First, they occurred 11 years ago. They garnered national attention and were addressed with a series of class-action lawsuits.[22] That negative press and legal jeopardy have strongly discouraged employers from replicating the practice since. No credible study has documented a substantial prevalence of such practices in recent years. If such a study exists, it is difficult to explain why neither Defendants nor the Proclamation would mention it.

---

[21] Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, N.Y. Times (June 3, 2015), https://tinyurl.com/m4w7h58w; Julia Preston, *Toys 'R' Us Brings Temporary Foreign Workers to U.S. to Move Jobs Overseas*, N.Y. Times (Sept. 29, 2015), https://tinyurl.com/bdcn475e; Julia Preston, *Lawsuits Claim Disney Colluded to Replace U.S. Workers With Immigrants*, N.Y. Times (Jan. 25, 2016), https://tinyurl.com/2aweme5v. The range of 200 to 500 workers does not include layoffs reported in the sources who were not replaced, or who were quickly re-hired.

[22] Kit Johnson, *Beauty and the Beast: Disney's Use of the Q and H-1B Visas*, 12 N.Y.U. J. L. & Liberty 124 (2018), https://perma.cc/5N5D-M7BQ.

Second, the events described above concern an extremely small number of H-1B workers—at most between roughly 200 and 500 total H-1B workers in the past 11.5 years. Even 500 workers would be just 0.04 percent of the 1,327,689 H-1B workers hired into the United States during the 11.5-year period from 2015 through April 2026.[23]

### B. The Broader Economic Literature Contradicts Defendants' Claims of Harm.

Defendants' brief relies almost entirely on the "facts" asserted in the Proclamation, ignoring the voluminous peer-reviewed academic research literature on the economic effects of H-1B workers. That literature directly rejects the conjectures in the Proclamation and the brief's claims of harm.

Leading economists have found that the growth of foreign STEM employment caused by the H-1B program accounted for roughly a third or more of all productivity growth in the United States between 1990 and 2010, benefiting native workers at all skill levels,[24] including by

---

[23] USCIS, *H-1B Employer Data Hub*, https://perma.cc/FMF9-YESP (accessed Nov. 6, 2026).

[24] Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S225 (2015) https://perma.cc/F8EE-MVA2.

sparking more inventions.[25] One major study finds that doubling the size of the H-1B program would raise long-run productivity growth in the United States by 4 percent, implying a gain to the U.S. economy on the order of $190 billion per year after 10 years.[26] Indeed, some of the world's top experts on economic productivity identify high-skill immigration visas (H-1B chief among those) as the single most effective policy lever to raise U.S. productivity.[27]

These are just a few highlights from consistent findings across decades of research. The literature as a whole overwhelmingly rejects Defendants' claim that the H-1B program "discourage[s] Americans

[25] William R. Kerr & William F. Lincoln, *The Supply Side of Innovation: H-1B Visa Reforms and US Ethnic Invention*, 28 J. Lab. Econ. 473 (2010), https://perma.cc/K9TF-H57G; Jennifer Hunt & Marjolaine Gauthier-Loiselle, *How Much Does Immigration Boost Innovation?*, 2 Am. Econ. J.: Macroeconomics 31 (2010), https://perma.cc/Q2HN-BJQ6.

[26] Marta Prato, *The Global Race for Talent: Brain drain, knowledge transfer, and growth*, 140 Q. J. Econ. 165 (2025), https://perma.cc/U3ZT-728R. Prato finds that doubling the size of the H-1B program would raise annual *growth* of overall productivity by 4%, or roughly 0.06 percentage points. In a $31.8 trillion economy, approximately today's value, the implied additional GDP would cumulate over 10 years to $((1.0006^{10} \times 31.8) - 31.8) \times 10^{12}$ dollars, or $191 billion added per year.

[27] Nicholas Bloom, John Van Reenen & Heidi Williams, *A Toolkit of Policies to Promote Innovation*, 33 J. Econ. Perspectives 163 (2019), https://perma.cc/X8RA-SHK3.

from pursuing careers in science and technology, [thereby] risking American leadership in these fields." OB 8 (quoting 90 Fed. Reg. at 46,028). To the contrary, the research literature demonstrates that H-1B workers are a central reason for American leadership in the science and technology fields. Defendants ignore that finding entirely.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

November 11, 2026

Respectfully submitted,

*/s/ Anisha S. Dasgupta*

Anisha S. Dasgupta
Orrick, Herrington &
Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Geoffrey C. Shaw
Nicole Ries Fox
Orrick, Herrington &
Sutcliffe LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071

*Counsel for Amicus Curiae*

## ADDENDUM A

Below is a comprehensive list of economic evidence referenced by the Proclamation and its sources:

| # | *Proclamation text* | *Source* |
|---|---|---|
| **A** | "A 2017 study showed that wages for American computer scientists would have been 2.6 percent to 5.1 percent higher and employment in computer science for American workers would have been 6.1 percent to 10.8 percent higher in 2001 absent the importation of foreign workers into the computer science field." | "In the absence of immigration [of H-1B workers, 1994 to 2001], wages for US computer scientists would have been 2.6% to 5.1% higher and employment in computer science for US workers would have been 6.1% to 10.8% higher in 2001" (Bound et al. 2017, a draft version of Bound, Khanna, and Morales 2018). |
| **B** | "Using these H-1B-reliant IT outsourcing companies provides significant savings for employers: one study of tech workers showed a 36 percent discount for H-1B 'entry-level' positions as compared to full-time, traditional workers." | "H-1B prevailing wage levels for 'Software Developers, Applications,' in the Washington, D.C., region": At "Wage level 1" (entry level), the "Discount from median (%)" is "36%" (Costa and Hira 2020, Table 2, row 1). |

| | | |
|---|---|---|
| **C** | "Among computer and math occupations, the foreign share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019. And the key facilitator for this influx of foreign STEM labor has been the abuse of the H-1B visa." | "The largest increase was seen among computer and math occupations, where the immigrant share of the workforce grew from 17.7 percent in 2000 to 26.1 percent in 2019" (American Immigration Council 2022). |
| **D** | "According to a study from the Federal Reserve Bank of New York, among college graduates ages 22 to 27, computer science and computer engineering majors are facing some of the highest unemployment rates in the country at 6.1 percent and 7.5 percent, respectively—more than double the unemployment rates of recent biology and art history graduates." | Data dashboard by Abel and Deitz (2025), which shows a 2023 unemployment rate of 6.1 percent for recent college graduates in computer science, and 7.5 percent for computer engineering. The 2023 figures were the most recent available on the dashboard in September 2025. |
| **E** | "Recent data reveals that unemployment rates among workers in computer occupations jumped from an average of 1.98 percent in 2019 to 3.02 percent in 2025." | Özkan and Sullivan (2025) write that "workers in computer occupations, who historically enjoyed very low unemployment, have seen unemployment rates jump from an average of 1.98% in 2019 to 3.02% in 2025". |

| | | |
|---|---|---|
| **F** | "American IT workers have reported they were forced to train the foreign workers who were taking their jobs and to sign nondisclosure agreements about this indignity as a condition of receiving any form of severance." | A few hundred workers at five firms in 2015 were widely reported to have been both laid off and obliged to train H-1B replacements: Toys 'R' Us (8 H-1B workers), Fossil (25 H-1B workers), Northeast Utilities/Eversource (an unknown portion of 350 layoffs), Disney (150 layoffs, after 100 were re-hired), and Southern California Edison (less than 162 workers, given that 70 percent of 540 layoffs were not replaced) (Preston 2015a, 2015b, 2016; Li and Morrison 2015). |

*References in the above table not included in the main text*

Shan Li & Matt Morrison, *Edison's plans to cut jobs, hire foreign workers is assailed*, Los Angeles Times (Feb. 10, 2015), https://perma.cc/D7KR-SZZN.

Serdar Özkan & Nicholas Sullivan, *Recent College Grads Bear Brunt of Labor Market Shifts*, Federal Reserve Bank of St. Louis (Aug. 25, 2025), https://perma.cc/9CQL-KBDR.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), because this brief contains 6,104 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

*/s/ Anisha S. Dasgupta*
Anisha S. Dasgupta
ORRICK, HERRINGTON & SUTCLIFFE LLP
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on November 11, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Anisha S. Dasgupta*
Anisha S. Dasgupta
ORRICK, HERRINGTON & SUTCLIFFE LLP
*Counsel for Amicus Curiae*